1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BOIES SCHILLER FLEXNER LLP**
Travis LeBlanc, SBN 251097
  tleblanc@bsfllp.com
435 Tasso Street, Suite 205
Palo Alto, California 94301
Phone: (650) 445-6400 /Fax: (650) 329-8507

David K. Willingham, SBN 198874
  dwillingham@bsfllp.com
725 S Figueroa Street, 31st Floor
Los Angeles, California 90017
Phone: (213) 629-9040 /Fax: (213) 629-9022

Lee S. Wolosky (*pro hac vice pending*)
  lwolosky@bsfllp.com
Robert J. Dwyer (*pro hac vice pending*)
  rdwyer@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Phone:  (212) 446-2300 /Fax:  (212) 446-2350

Amy L. Neuhardt (*pro hac vice pending*)
  aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Phone:  (202) 237-2727 /Fax:  (202) 237-6131

**LAW OFFICE OF OMAR K. QUDRAT**
Omar K. Qudrat (*pro hac vice pending*)
43 West 43rd Street, Suite 235
New York, NY 10036-7424

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC, ELLIOTT BROIDY, and ROBIN ROSENZWEIG,<br><br>        Plaintiffs,<br><br>        v.<br><br>STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, and DOES 1-10,<br><br>        Defendants. | Case No.  2:18-cv-2421<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Broidy Capital Management LLC, Elliott Broidy, and Robin Rosenzweig, by and through their attorneys Boies Schiller Flexner LLP, bring this action seeking injunctive relief and monetary damages against Defendants the State of Qatar, Stonington Strategies LLC ("Stonington"), Nicolas D. Muzin ("Muzin"), and Does 1-10, for Defendants' unlawful conduct, as set forth below.  Defendants Stonington, Muzin, and Does 1-10 are collectively referred to herein as the "Agent Defendants."

## NATURE OF THE ACTION

1.     This is a case about a hostile intelligence operation undertaken by a foreign nation on the territory of the United States against successful, influential United States citizens who have spoken out against that country's support for terrorism and who have entered into significant business relationships relating to defense and counterterrorism with a rival nation.  The purpose of the operation appears to have been to diminish the influence of Plaintiffs within the United States through a campaign to discredit Plaintiffs in the press and in the eyes of government officials, and to disrupt their business relationship with rival nations.

2.     The State of Qatar, by itself and/or through its agents, unlawfully hacked into the email accounts and computer servers of United States citizens in California, stole private emails and documents from them, and broadly disseminated the stolen emails and documents to domestic and foreign media. Defendants engaged in a sophisticated electronic warfare, espionage, and disinformation campaign against Plaintiffs in an effort to retaliate against them, and to discredit them in the United States and abroad.  In addition to disseminating unlawfully stolen emails and documents, Defendants doctored or wholly forged documents using information found on Plaintiffs' computers

COMPLAINT AND DEMAND FOR JURY TRIAL

1    to portray a false narrative about Plaintiffs, and to disseminate that false

2    narrative to media organizations.

3         3.     The State of Qatar sponsors and supports terrorists, having once

4    been called a "Club Med for Terrorists."  Last year, the State of Qatar

5    launched a multi-million dollar public relations campaign to obfuscate its ties

6    to, and financial and logistical support of, some of the world's worst extremist

7    and terrorist organizations—including Al Qaeda (and its affiliate Al-Shabab),

8    Hamas, the Taliban, and the Muslim Brotherhood—and to change its image in

9    the United States, specifically in the Jewish community in the United States.

10   To lead this campaign in the United States, the State of Qatar hired Defendant

11   Muzin's firm and several other agents, included among the John Does 1-10.

12        4.     Defendants' actions are motivated by activities undertaken by

13   Plaintiff Broidy that threaten the State of Qatar.  As a prominent member of

14   the American Jewish community who has frequently interacted with the

15   President of the United States, Plaintiff Broidy has been especially vocal in

16   expressing criticism of the State of Qatar's support of terrorism, to private

17   persons, to United States government officials whom the State of Qatar wishes

18   to influence (including the President), and to the public at large, through the

19   support of initiatives that highlight Qatar's efforts to deceive Americans (such

20   as by telling the world they are against terrorism and housing a United States

21   military base while at the same time giving support and assistance to

22   terrorists).

23        5.     On June 5, 2017, the United Arab Emirates ("UAE") and Saudi

24   Arabia led an effort to isolate the State of Qatar because of the State of

25   Qatar's support for terrorism as well as the country's close ties to Iran.  The

26   UAE and Saudi Arabia severed diplomatic relations with the State of Qatar,

27   and the UAE closed its airspaces to Qatari aircrafts.  Saudi Arabia further

28

COMPLAINT AND DEMAND FOR JURY TRIAL

B O I E S   S C H I L L E R   F L E X N E R   L L P

1  closed its border with Qatar and banned Qatari-flagged ships from docking at

2  Saudi Arabian ports.

3      6.     Plaintiff Broidy operates businesses that have contracts with the

4  government of the UAE to assist the UAE in developing its defense and

5  counterterrorism capabilities.  These contracts, which were finalized in 2017,

6  are worth over $200 million.  Plaintiff Broidy also has entered into

7  preliminary discussions with Saudi Arabia about providing similar capabilities

8  enhancement in that country.

9      7.     For more than 25 years, Plaintiff Broidy has supported the State

10  of Israel through donations to many organizations.

11      8.     Since September 11, 2001, Plaintiff Broidy has increased his

12  involvement in supporting the safety of his homeland, the United States. As

13  part of his involvement, he became active in fundraising for the Republican

14  Party because he believed its views on how to defend the United States were

15  aligned with his own. He also became involved in numerous civic activities

16  involving counter-terrorism to promote the security of the United States.

17      9.     Beginning with the AIPAC Policy Conference at the end of

18  March 2017, Plaintiff Broidy and others began to be vocal critics of the State

19  of Qatar's for its support for terrorists and its friendly relationship with Iran,

20  which Mr. Broidy sees as a major threat to the security of the United States

21  and its allies, and began to support financially public initiatives – such as

22  conferences – to educate Americans about Qatar's support for terrorist and

23  extremist organizations.

24      10.    Shortly thereafter, the State of Qatar, in an attempt to blunt the

25  effect of the these initiatives and media reports highlighting its duplicitous

26  nature,  hired teams of lobbyists and began to spend millions of dollars in an

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES  SCHILLER  FLEXNER  LLP

1  effort to whitewash its record and hide the true facts about its support for

2  terrorists.

3      11.    These lobbyists include Avenue Strategies, a firm founded by

4  Corey Lewandowski, former campaign manager for the Trump campaign, and

5  former U.S. Attorney General John Ashcroft, whose responsibilities included

6  lobbying members of Congress and the Trump Administration (including the

7  White House) to try to convince our nation's political leadership to see

8  Defendant State of Qatar in a more favorable light.

9      12.    Defendant State of Qatar also tried to enlist the support of the

10  Jewish community in the United States, and hired Defendant Muzin.

11  Defendant Muzin owns and operates Defendant Stonington, which is a

12  registered foreign agent of the State of Qatar.  The State of Qatar pays Muzin

13  $300,000 per month for "strategic communications" and for trying to

14  influence public opinion in, and the foreign policies of, the United States.

15  Muzin has been employed by the State of Qatar to improve the State of

16  Qatar's image in the United States and whitewash its coddling of terrorist

17  leaders by getting support from Jewish leaders. Defendant Muzin first

18  attempted to try to arrange meetings between leaders of American Jewish

19  organizations and the current Emir of Qatar, Sheikh Tamim bin Hamad Al

20  Thani (the "Emir") while the Emir was attending the United Nations General

21  Assembly in New York City.  The opposition of Plaintiff Broidy and others to

22  these efforts helped prompt American Jewish leaders to refuse to meet with

23  the Emir at the United Nations General Assembly in September 2017, thereby

24  frustrating the State of Qatar's plan as well as Muzin's efforts to win over

25  Jewish leaders.  According to a February 13, 2018 article in *Tablet Magazine,*

26  an online publication focused on Jewish news, "Muzin largely failed to

27

28                          -4-

BOIES SCHILLER FLEXNER LLP

1    persuade Jewish leaders to agree to meetings with influential Qataris visiting
2    New York for the opening of the United Nations General Assembly."

3        13.    Soon after the failure of the State of Qatar's and the Agent
4    Defendants' United Nations General Assembly initiative, Muzin began to
5    invite American Jewish leaders on all-expense-paid trips to Qatar to further
6    the State of Qatar's public relations campaign.  Plaintiff Broidy and others
7    again encouraged American Jewish leaders to decline the invitations.  These
8    efforts were mostly successful in helping to prompt many American Jewish
9    leaders to decline to participate in the public relations trips to Qatar.

10       14.    The Emir is expected to travel again to the United States in April
11   2018 for bilateral meetings with the Trump Administration and visits to
12   Capitol Hill.  The failure of the State of Qatar and its agents to improve the
13   State of Qatar's image in the United States—and, specifically, with the
14   American Jewish community—led to meetings and discussions in advance of
15   the Emir's anticipated visit to discuss the impediments to the State of Qatar's
16   public relations efforts.  On information and belief, during those discussions,
17   many of which occurred in the Embassy of Qatar in Washington, D.C.,
18   Defendant Muzin fingered Plaintiff Broidy as such an impediment.

19       15.    Starting last year, the State of Qatar, Muzin, and other foreign
20   agents conspired in a strategic campaign to retaliate against and discredit
21   Plaintiff Broidy. Through this campaign, Defendant State of Qatar seeks to
22   damage Plaintiff Broidy's reputation in order to frustrate his ability to educate
23   the American people about Qatar, to damage his reputation and reduce his
24   influence within the United States, to harm his ability to do further business
25   with the UAE and other Middle Eastern countries that are aligned against
26   Qatar because of its support for terrorism, and to impact negatively his other
27   business prospects around the world.

28

-5-

BOIES SCHILLER FLEXNER LLP

16.     Over a period of months, on information and belief in the second half of 2017 and in the first quarter of 2018, including critically on February 14, 2018, the State of Qatar, by itself and/or through its agents, hacked Plaintiffs' personal and business email accounts and computer servers in California.  On information and belief, during the same time period and using similar techniques, the State of Qatar also, by itself and/or through its agents, hacked the electronic communications of at least one other United States-based, United States citizen who was also involved in activities that threatened Defendant State of Qatar's public relations campaign.

17.     On information and belief, Defendants illegally accessed Plaintiffs' credentials and used those credentials, along with other means, to access Plaintiffs' computer networks, and to thereafter steal and doctor Plaintiffs' emails and documents.

18.     On information and belief, Defendants then began to disseminate these emails and documents—including the forged documents—to media organizations around the world and to provide those media organizations with false stories based on those documents.

19.     Defendants' efforts to target Plaintiff Broidy in this manner have been largely successful—several media organizations have published articles (including front page stories in the March 22 and 26, 2018 editions of The New York Times, a March 26, 2018 story by the Associated Press, a story in the March 1, 2018 edition of the Wall Street Journal, and additional articles in The Huffington Post, McClatchy and Bloomberg News, which stories were reprinted or summarized by numerous other news outlets). As acknowledged in the article in today's New York Times,these articles were based on information news organizations received from anonymous sources which claimed the materials were hacked from Plaintiffs' computers. Some of the

-6-

B O I E S   S C H I L L E R   F L E X N E R   L L P

documents received by these news organizations were clearly falsified, altered or forged.

20.    Al Jazeera, the international broadcaster owned by the State of Qatar, was the only news organization willing to publish a story that relied on clearly falsified or forged documents purporting to contain proof that Plaintiff Broidy engaged in potentially unlawful business activities with a Russian bank that is now sanctioned by the United States.

21.    As a result of Defendants' actions, Plaintiffs, and in particular Plaintiff Broidy, have been harmed.  If Defendants are not enjoined from disseminating the unlawfully obtained and fabricated data, Plaintiffs will continue to suffer further serious injury.  As a result, Plaintiffs request injunctive relief to prevent the further accessing, use, and dissemination of Plaintiffs' data by Defendants, who seek only to benefit themselves and harm Plaintiffs by illegally targeting United States citizens.  Plaintiffs also seek monetary damages with respect to harm that has already occurred, despite the inability of such monetary damages to fully compensate Plaintiffs for the harm they have suffered.

## PARTIES

22.    Plaintiff Broidy Capital Management LLC ("BCM") is an investment firm run by Plaintiff Elliott Broidy.  BCM is a corporation duly organized under the laws of the State of California with its principal place of business in Los Angeles, California.

23.    Plaintiff Elliott Broidy is a citizen of the United States and the State of California who resides in Los Angeles, California.  Plaintiff Broidy is the Chief Executive Officer and Chairman of BCM.

24.    Plaintiff Robin Rosenzweig is a citizen of the United States and the State of California who resides in Los Angeles, California.  Plaintiff

BOIES SCHILLER FLEXNER LLP

1  Rosenzweig is a sole practitioner attorney with a law firm called Colfax Law
2  Office, Inc. and the wife of Plaintiff Broidy.

3      25.    Defendant the State of Qatar is a foreign state.  The head of state
4  and head of government of Qatar is the current Emir of Qatar, Sheikh Tamim
5  bin Hamad Al Thani.  The Emir has made visits to Los Angeles, California
6  and has hosted the Mayor of Los Angeles, Eric Garcetti, in Doha, the capital
7  of Qatar, as part of an effort to strengthen the partnership between the cities of
8  Los Angeles and Doha.  Additionally, the State of Qatar maintains a
9  Consulate in Los Angeles, California.  Entities related to the State of Qatar
10 own a majority interest in Ooredoo Q.S.C. ("Ooredoo"), an international
11 telecommunications company incorporated under the laws of Qatar with its
12 principal place of business in Doha, Qatar.  Ooredoo provides services
13 throughout the Middle East and Southeast Asia and, in partnership with T-
14 Mobile and AT&T, provides roaming services in the United States, and its
15 facilities were employed to attack Plaintiffs' computer servers.

16     26.    Defendant Stonington Strategies LLC is a public relations and
17 lobbying firm incorporated under the laws of Delaware, with its principal
18 place of business in New York City.  Stonington registered on September 3,
19 2017 under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611
20 *et seq.*, as a foreign agent providing "strategic communications" for the State
21 of Qatar.  Stonington originally was retained to provide these services for
22 $50,000 per month.  On November 1, 2017, the State of Qatar increased the
23 amount to $300,000 per month.

24     27.    Defendant Nicolas D. Muzin is the Chief Executive Officer of
25 Stonington and a political lobbyist who signed the FARA documents on
26 behalf of Stonington as a registered foreign agent of the State of Qatar.

27

28

BOIES  SCHILLER  FLEXNER  LLP

-8-

1   Defendant Muzin is a citizen of the United States and a resident of the state of
2   Maryland.

3        28.     On information and belief, Defendants Does 1-10 are agents of
4   the State of Qatar, some of whom may not have not registered under FARA.
5   On information and belief, none of Defendants Does 1-10 is a citizen or
6   resident of the state of California.

7                        **JURISDICTION AND VENUE**

8        29.     This Court has subject matter jurisdiction and personal
9   jurisdiction over the State of Qatar pursuant to 28 U.S.C. § 1330 and the
10  Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1602 *et seq.*,
11  because its conduct falls within the exception to foreign sovereign immunity
12  set forth in 28 U.S.C. § 1605(a)(5).  Plaintiffs intend to serve the State of
13  Qatar pursuant to 28 U.S.C. § 1608(a), among other lawful means that may
14  present themselves.

15       30.     This Court further has subject matter jurisdiction over this action
16  under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state
17  law claims under 28 U.S.C. § 1367.  Additionally, this Court has subject
18  matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332 because
19  Plaintiffs are all citizens of the state of California and, to Plaintiffs'
20  knowledge, none of the Defendants is a citizen of the state of California.
21  Accordingly, the citizenship of the parties is diverse.  The amount in
22  controversy exceeds $75,000, exclusive of interest and costs.

23       31.     This Court has personal jurisdiction over the Agent Defendants
24  under the state of California's long-arm statute, Cal. Civ. Proc. Code § 410.10.

25       32.     Venue is proper in this judicial district under 28 U.S.C. §
26  1391(b)(2) because a substantial part of the events or omissions giving rise to
27  this claim occurred in this judicial district.  Venue is also proper in this

28

-9-

BOIES  SCHILLER  FLEXNER  LLP

judicial district under 28 U.S.C. § 1391(f)(1) for the same reasons and because Defendant the State of Qatar is a foreign state.

## STATEMENT OF FACTS

**I.  DEFENDANTS DELIBERATELY TARGETED PLAINTIFF BROIDY BECAUSE OF HIS AFFILIATIONS, HIS INFLUENCE, AND HIS CRITICISMS OF THE STATE OF QATAR.**

33.    Defendant the State of Qatar has allowed and continues to allow itself to be a sanctuary for terrorist leaders and organizations, including but not limited to Al Qaeda (and its affiliates including Al-Shabab and Al Qaeda in Syria, also known as Al-Nusra Front or Jabhat Al-Nusra), Hamas, the Taliban, and the Muslim Brotherhood.

34.    Numerous individuals residing in Qatar have been sanctioned by the United States Department of Treasury for raising funds for Al Qaeda.

35.    Individuals who serve as fundraisers for Al Qaeda's Syrian franchise (the Nusra Front) operate freely in Qatar.  These individuals appear at state-owned Mosques and on broadcasts aired by the state-funded Al Jazeera.  The State of Qatar has failed to shut down these fundraisers.

36.    The State of Qatar has also been accused of hosting the Somali terrorist group Al-Shabab, an Al Qaeda affiliate.

37.    The State of Qatar also has permitted Hamas leaders to operate freely within the country.  Indeed, the State of Qatar has provided substantial funding to Hamas, despite being subjected to international political and economic sanctions for such support.

38.    The State of Qatar has further allowed the Taliban to operate and maintain an office in Doha.

-10-

39.    The State of Qatar has given safe haven to many leaders of the Muslim Brotherhood after their expulsion from Egypt by the Egyptian government.

40.    On May 25, 2017, a bill (H.R. 2712) was introduced in the United States House of Representatives titled "The Palestinian International Terrorism Support Prevention Act of 2017."  The draft bill, which would have barred assistance from the United States government to any country that aided Hamas, stated in its findings that "Hamas has received significant financial and military support from Qatar."

41.    On June 5, 2017, the UAE, Saudi Arabia and other Middle Eastern states severed diplomatic relations with the State of Qatar because of the State of Qatar's support for terrorism and its close ties to Iran.  Other governments, including Yemen, the Maldives, and Libya, quickly followed.  The UAE, Egypt, and Bahrain each also closed their airspaces to Qatari aircraft.  Saudi Arabia closed its border with the State of Qatar and banned Qatari-flagged ships from docking at its ports.  The UAE and the other sanctioning states issued a set of demands to the State of Qatar through Kuwaiti intermediaries.  Those demands included that the State of Qatar curb ties with Iran and stop funding terrorist organizations.  Those demands were rejected.

42.    These international sanctions on the State of Qatar remain in effect today.

43.    Defendant State of Qatar is a nation rich in natural gas resources, but it is reliant on food and other supplies that arrive by truck via its border with Saudi Arabia.  The sanctions threatened to damage Qatar's economy.

44.    As a result of its Arab neighbors severing diplomatic relations with the country and in fear of the enactment of H.R. 2712, the State of Qatar

-11-

B O I E S   S C H I L L E R   F L E X N E R   L L P

1   decided to retain agents in Washington, D.C. and to pay them significant sums

2   of money to impact public opinion and public policy in the United States.

3   According to the Center for Responsive Politics, the State of Qatar spent

4   nearly five million dollars on lobbyists and media relations in 2017 in an

5   effort to ensure that the United States would support the State of Qatar in its

6   diplomatic standoff with other Arab countries.

7       45.   Among the high-profile agents hired by the State of Qatar was

8   former Attorney General John Ashcroft, who leads that engagement for the

9   Ashcroft Law Group.  The relevant contract with the State of Qatar states that

10  former Attorney General Ashcroft would seek to "enlist the support and

11  expertise of former key government leaders, including former officials who

12  held very senior positions within the Intelligence Community, the Federal

13  Bureau of Investigation, the Department of Treasury and the Department of

14  Homeland Security[.]"

15      46.   Defendant Muzin also sought out other high-profile individuals

16  who could be helpful in furthering the interests of the State of Qatar.  On

17  information and belief, Defendant Muzin recruited former Arkansas Governor

18  Mike Huckabee, a Republican candidate for President, prominent media

19  commentator, and father of current White House Press Secretary Sarah

20  Huckabee Sanders, to participate on a trip to Qatar.  On January 8, 2018,

21  former Governor Huckabee tweeted "I'm in Doha," and then on January 12,

22  2018, tweeted, "Just back from a few days in surprisingly beautiful, modern,

23  and hospitable Doha[.]"

24      47.   On information and belief, Defendant Muzin also met with White

25  House aide Victoria Coates, the Senior Director for International Negotiations

26  on the National Security Council and a former aide to Senator Ted Cruz, to

27  advocate for United States policies that would be supportive of the State of

28

-12-

BOIES  SCHILLER  FLEXNER  LLP

1  Qatar. On information and belief, Defendant Muzin got Coates to have her

2  boss, Jason Greenblatt, the Special Envoy for International Negotiations, send

3  out a Tweet that was supportive of Qatar. On February 9, 2018, Greenblatt

4  tweeted: "Qatar partnering with Israel can bring real relief to the people of

5  Gaza. Ending support for Hamas and focusing on humanitarian aid and

6  reconstruction will end the suffering."

7      48.    One of the objectives of this multi-million dollar lobbying effort

8  was to whitewash and obscure the voluminous record of the State of Qatar's

9  support for terrorism. The State of Qatar also sought to discredit United States

10 citizens who opposed the State of Qatar's agenda and frustrated its public

11 relations offensive.

12     49.    Even before Defendant Muzin was retained, officials of

13 Defendant State of Qatar told him at a meeting in Qatar of their concerns

14 about Plaintiff Broidy. As Defendant Muzin recounted, "They knew about

15 him [Broidy]" and "knew that he [Broidy] had been influential" in shaping the

16 White House's views on Qatar.

17     50.    Qatari officials complained in particular about President Trump's

18 remarks at a June 2017 meeting of the Republican National Committee where

19 President Trump singled out Plaintiff Broidy in the audience and stated:

20 "Elliott Broidy is fantastic." That acknowledgment was followed by a round

21 of applause. Later in his speech, President Trump made the following remarks

22 in the speech: "We're having a dispute with Qatar — we're supposed to say

23 Qatar. It's Qatar, they prefer. I prefer that they don't fund terrorism."

24     51.    According to Defendant Muzin, the officials of Defendant State

25 of Qatar, with whom he met shortly after President Trump's remarks stated:

26

27

28
                                    -13-

"Broidy was like sitting in the front row and that he had somehow prompted Trump to say that."

52.     According to filings with the United States Department of Justice mandated under FARA, at least the following agents were retained in the second half of 2017 or the first quarter of 2018 to help the State of Qatar to improve its image in the United States:

a.  Avenue Strategies Global LLC (July 17, 2017 agreement), a firm with which former Trump Campaign Manager Corey Lewandowski has been affiliated, at the rate of $150,000 per month, increased to $500,000 per month on September 5, 2017;

b.  Stonington Strategies LLC (August 24, 2017 agreement) at the rate of $50,000 per month, increased to $300,000 per month on November 1, 2017;

c.  Ashcroft Law Group (June 7, 2017 agreement), at the rate of $2.5 million for a 90 day retainer

d.  Levick Strategic Communications (June 5, 2017 agreement) at the rate of $54,000 per month;

e.  Information Management Services Inc. (June 19, 2017 agreement) at the rate of $375,000 per month;

f.  Conover & Gould Strategic Communications (June 29, 2017 agreement) at the rate of $100,000 per month;

g.  Gallagher Group (July 11, 2017 agreement) at the rate of $25,000 per month;

h.  McDermott, Will & Emery (July 13, 2017 agreement) at the rate of $40,000 per month;

-14-

1        i.   Nelson Mullins Riley & Scarborough LLP (July 26, 2017

2            agreement) at the rate of $100,000 per month;

3        j.   Portland PR (December 6, 2017 agreement) at the rate of

4            $123,195 per month;

5        k.   Mercury Public Affairs (September 7, 2017 agreement) at the

6            rate of $120,000 per month;

7        l.   Bluefront Strategies (September 12, 2017 agreement)

8            $100,000;

9        m.  Hawksbill Group (August 1, 2017 agreement) $165,000;

10       n.   Vitello Consulting (December 6, 2017 agreement) $10,000 as

11           a subcontractor of Stonington Strategies;

12       o.   Iron Bridge Strategies (February 1, 2018 agreement) at the

13           rate of $25,000 per month;

14       p.   Tigercomm LLC (January 11, 2018 agreement) at the rate of

15           $30,000 per month;

16       q.   Husch Blackwell Strategies (February 1, 2018 agreement) at

17           the rate of $25,000 per month;

18       r.   SGR Government Relations & Lobbying (February 1, 2018

19           agreement) at the rate of $40,000 per month; and

20       s.   Venable LLP (January 31, 2018 agreement) at the rate of

21           $150,000 per month.

22      53.     Defendant Muzin, CEO of Stonington, is a graduate of Yale Law

23 School and a high-level Republican political operative.  Muzin served as chief

24 of staff to then-Congressman Tim Scott and served as senior policy advisor

25 and deputy chief of staff for strategy to Senator Ted Cruz.  According to his

26 biography on the Stonington website, Muzin also worked on the Trump

27

28                     -15-

1 | Presidential campaign as well as on the transition team to recruit candidates

2 | for the new Administration.

3 |      54.     Defendant Muzin's efforts as an agent of the State of Qatar

4 | quickly focused on an effort to put a pro-Jewish spin on the State of Qatar's

5 | facilitation of terrorist activities in the Middle East.  Muzin is quoted in a

6 | September 5, 2017 article in *O'Dwyer's*, an online magazine covering the

7 | public relations industry, as stating:  "Engagement with Qatar can only be in

8 | the best interests of the United States and the Jewish community, as we cannot

9 | allow Qatar to be ostracized by its neighbors and pushed into Iran's sphere of

10 | influence."

11 |      55.     Shortly thereafter, as reported by the Israeli newspaper *Haaretz*,

12 | Defendant Muzin invited American Jewish leaders to meet with the Emir in

13 | New York City during the Emir's visit for the United Nations General

14 | Assembly later that month.

15 |      56.     The Zionist Organization of America ("ZOA") reacted to that

16 | invitation with a press release on September 12, 2017, in which the

17 | organization's president, Morton A. Klein, stated that although he had

18 | "received an invitation to meet with" the Emir of Qatar during the United

19 | Nations General Assembly, he had "decided not to accept this invitation."

20 | Mr. Klein further stated:  "Any Jewish leader meeting with the Qatari Emir or

21 | Crown Prince likely means well, but he will serve as an unwitting prop in

22 | their PR ploy to whitewash the legitimate reasons why its Arab Muslim

23 | neighbors are boycotting them and why Israel and Jews are horrified by them,

24 | meaning it will only strengthen Qatar's embrace of Iran and critical backing of

25 | Hamas."

26 |      57.     Around that time and subsequently, Defendant Muzin, along with

27 | others, also invited American Jewish leaders to Qatar.

28 |

-16-

COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES  SCHILLER  FLEXNER  LLP

BOIES SCHILLER FLEXNER LLP

58.    Plaintiff Broidy and others spoke out in response to Defendant Muzin's efforts on behalf of the State of Qatar.

59.    Plaintiff Broidy is a prominent business and civic leader who has actively served in leadership roles in Jewish organizations and the Republican Party for decades.  His advocacy against terrorism and extremism is well known.  Plaintiff Broidy served on the Homeland Security Advisory Council from 2006 to 2009 and specifically on the Future of Terrorism Task Force of that Council.  The "Findings" report of that Task Force, issued on January 11, 2007, stated:  "Factors that will influence the future of terrorism include:  the leadership of the terrorists, US counterterrorism efforts, status of political reform in Muslim nations and *the elimination of safe havens*[.]"  (emphasis added.)  This report was directed at and, on information and belief, was known to countries operating as safe havens for terrorist organizations, including the State of Qatar.

60.    Plaintiff Broidy also has substantial business ties to the UAE, a regional rival of Qatar.  Through his work with a contractor to the government of the UAE, he has been involved in strengthening the UAE's defense capabilities and its capabilities to combat terrorist organizations, including those organizations being provided safe harbor by the State of Qatar.

61.    In meetings with United States Government officials and civic leaders, including the President of the United States, Plaintiff Broidy has been critical of the State of Qatar for its coziness with Iran and its facilitation of the work of terrorists. Plaintiff Broidy's opposition to Qatar's policies was well known.

62.    Beginning in or around September 2017, Plaintiff Broidy and others began telling American Jewish leaders that they should decline the

-17-

invitations of the State of Qatar and Defendant Muzin to meet with the Emir in New York City and/or to visit Qatar.

63.     Additionally, on September 15, 2017, *Forbes* published a piece by a contributing writer titled "Why is Qatar offering to trade dead Israelis for meetings with live Jews?"  The article reported that an offer was being made to American Jewish leaders to return the corpses of two Israeli soldiers whom Hamas had killed if those leaders would meet with the Emir.  The article stated:

a.  Rabbi Shmuel Boteach (who according to *Newsweek* is one of the ten most influential rabbis in the United States) stated that "all who agreed to whitewash the terror-stained hands of the emir would be condoning murder."

b.  The State of Qatar hired Defendant Muzin, who "may have hinted to some Jewish leaders that his lobbying had the 'blessing' of Israel's elected government."  Israel's Ambassador to the United States, Ron Dermer, denied this, stating:  "It is not true."

c.  The State of Qatar has admitted to giving approximately $1.4 billion to Hamas over the past few years.

d.  Qatar is "like Woodstock for terrorists," and has also "been accused of hosting the Somali terrorist group Al-Shabab, an al Qaeda affiliate."

e.  Defendant Muzin claimed that he contacted prominent American Jewish leaders, but that "[e]ach denied agreeing to any meeting with Qatar and two of these leaders denied ever even speaking to Muzin."  "Like a child's game of telephone, Muzin apparently told each Jewish leader that a different

-18-

BOIES   SCHILLER   FLEXNER   LLP

1             prominent Jew had already agreed to meet the emir.  This

2             didn't turn out to be true."

3      64.      Although many American Jewish leaders declined the invitations

4 given in September 2017, Defendant Muzin continued his attempts to arrange

5 trips to Qatar for American Jewish leaders.  These trips furthered the State of

6 Qatar's strategy to court favor with high-profile American Jewish leaders,

7 whom they believed could shift United States policy in favor of the State of

8 Qatar.  On information and belief, in some instances, Defendant Muzin paid

9 for the trips taken.  Among those participating in the trips were:

10         a.   Rabbi Shmully Hecht, co-founder and Rabbinical Advisor of

11             Shabtai, the Jewish Society at Yale University, who wrote in a

12             January 25, 2018 article in *The Times of Israel*, an online Israeli

13             newspaper:  "A few months ago, Nick Muzin asked me to attend

14             meetings with influential global thought leaders who are also

15             prominent in the Jewish world, and the Emir of Qatar. . . . Many

16             prominent Jewish leaders have flown to Qatar and have spent

17             quality time with the country's leadership."

18         b.   Alan Dershowitz, the Felix Frankfurter Professor of Law,

19             Emeritus, at Harvard Law School, who wrote in a January 12,

20             2018 article in *The Hill*:  "I just returned from a private visit to

21             Qatar, at the invitation of and paid for by the Emir. . . . I observed

22             that Qatar is quickly becoming the Israel of the Gulf States,

23             surrounded by enemies, subject to boycotts and unrealistic

24             demands, and struggling for its survival."

25         c.   Mr. Klein, the President of ZOA, who, despite his initial

26             reluctance to meet with the Emir at the United Nations,

27             ultimately decided to travel to Qatar in order to have the chance

28

-19-

BOIES SCHILLER FLEXNER LLP

1   to confront the Emir, wrote in a January 30, 2018 article in

2   *Haaretz*:  "I decided it was important for me to speak truth to

3   power, especially when the Emir repeatedly invited me to give

4   them my views on what they needed to do."

5       d.  Malcolm Hoenlein, the executive vice chairman of the

6           Conference of Presidents of Major Jewish Organizations.

7   65.   Despite these successes, there was nonetheless significant

8   backlash in the American Jewish community against Defendant Muzin's work

9   on behalf of the State of Qatar.  For example:

10      a.  On January 15, 2018, Rabbi Shmuel Boteach published "An

11          Open Letter to the Emir of Qatar," stating:  "Newspapers are

12          filled with reports that you have hired an Orthodox Jew, Nick

13          Muzin, of Stonington Strategies, and his partners, as agents of

14          Qatar to promote your image among American Jews, and to

15          lobby the US government.  There is non-stop chatter of rabbis,

16          writers and community leaders accepting free trips to Doha,

17          which is big news because your regime funds Hamas — which is

18          responsible for an endless stream of funerals in Israel."

19      b.  A spokesman for the Israeli Embassy in Washington denounced

20          the trips to Qatar.  *See Haaretz* on January 31, 2018 ("We oppose

21          this outreach effort in the Jewish and pro-Israel community.")

22          and the *New York Times* on February 9, 2018 ("We do not

23          approve of these visits by the Jewish organizations to Qatar.").

24  66.   Plaintiff Broidy did not make any public statements against the

25  trips to Qatar, but he and others did speak with other American Jewish leaders

26  to discourage them from going on the trips being organized by Defendant

27  Muzin on behalf of the State of Qatar.

28

-20-

BOIES   SCHILLER   FLEXNER   LLP

67.    Plaintiff Broidy's past and present activities also put him on the State of Qatar's radar.  Defendant Muzin had weekly meetings at the Embassy of Qatar in Washington, D.C., where he discussed information about ongoing political activities.  As Defendant Muzin later admitted:  "Broidy's name comes up in Embassy meetings often."  At those meetings, as Defendant Muzin later admitted:  "I definitely identified him as somebody who, was not, didn't like them too much." Defendant Muzin also stated: "There's no question I had conversations with them [the Qataris] about Elliott."

68.    Defendant the State of Qatar and the Agent Defendants reacted to Plaintiff Broidy's exercise of his right to speak out on an issue of national and international concern by engaging in a series of attacks on the private communications, documents and intellectual property of Plaintiff Broidy, his wife and his company.

## II.    PLAINTIFFS' EMAILS WERE HACKED, STOLEN, AND ALTERED.

69.    On information bad belief, sometime prior to December 27, 2017, Defendant State of Qatar directed its espionage and offensive cyber and intelligence capabilities toward Plaintiffs and their facilities within the territory of the United States.

70.    On December 27, 2017, Plaintiff Rosenzweig received an email on her computer that appeared to be a Gmail security alert.  As requested by the email, she entered her credentials.

71.    On information and belief, that email was a phishing email designed to gain unauthorized access into Plaintiff Rosenzweig's personal Google accounts, which contained, among other things, usernames and passwords to access other email accounts, including Plaintiff Rosenzweig's as well as those of Plaintiffs Broidy and BCM.

-21-

72.     Beginning January 16, 2018 and continuing until at least March 2, 2018, multiple instances of unlawful access to corporate email accounts at BCM occurred.  The accounts targeted included but were not limited to Plaintiff Broidy's own email account.

73.     Although initial forensic analysis of the BCM email server logs suggested that the unauthorized access originated from IP addresses in the United Kingdom and the Netherlands, a more thorough review of server data from February 14, 2018 revealed that the attack had originated from an IP address in Qatar.  On information and belief, the IP addresses in the Netherlands and the United Kingdom originally identified were used to mask the true identity of the source of the intrusion.  Plaintiff Broidy's advanced cyber unit was able to uncover problems with the attacker's obfuscation technique on February 14, 2018, which revealed that the attack originated in Qatar.

**III.  DEFENDANT THE STATE OF QATAR, ACTING THROUGH STATE-OWNED INSTRUMENTALITIES AND THE AGENT DEFENDANTS, DELIBERATELY OBTAINED AND DISSEMINATED STOLEN AND ALTERED EMAILS AND DOCUMENTS (WHILE KNOWING THEY WERE STOLEN), AND ENGAGED IN A HOSTILE CAMPAIGN AGAINST PLAINTIFF BROIDY.**

74.     On March 1, 2018, the contents of emails stolen from Plaintiffs appeared in the *Wall Street Journal* in an article titled, "Trump Ally Was in Talks to Earn Millions in Effort to End 1MDB Probe in U.S."  Additional emails stolen from those accounts were published or reported on in other media outlets:  the *Huffington Post* on March 2, 2018; the *New York Times* on March 3, 2018; and the BBC on March 5, 2018.  On March 22, 2018, the *New York Times* published a front page article noting that an "anonymous group critical of Mr. Broidy's advocacy of American foreign policies in the Middle East" has been distributing "documents, which included emails, business

-22-

B O I E S   S C H I L L E R   F L E X N E R   L L P

proposals and contracts," supposedly belonging to Plaintiffs.  On March 23, 2018, *Bloomberg* published an article alleging that Plaintiff Broidy had helped get Russian companies removed from a United States sanctions list; the news article noted that it had "received two separate documents this week purporting to be versions" of a unverifiable January 2017 proposal by Plaintiff Broidy geared towards influencing United States officials. On March 26, 2018, the *New York Times* published another front page story on Plaintiff Broidy that again acknowledged that it relied on "[h]undreds of pages of Mr. Broidy's emails, proposals and contracts" received from "an anonymous group critical of Mr. Broidy's advocacy of American foreign policies in the Middle East."  On information and belief, the State of Qatar, acting through the Agent Defendants, disseminated the various stolen emails and documents, some of which had been doctored.

75.    On information or belief, the State of Qatar, acting through the Agent Defendants, disseminated additional stolen documents that were not authentic (including documents that had been altered or wholly fabricated) that attempt to portray Plaintiff Broidy as involved with a Russian bank that had been the subject of international sanctions.  Al Jazeera, the State of Qatar's state-owned broadcaster, published those documents on March 8, 2018.  None of the other media organizations to which the documents had been distributed at the time did so.

76.    On March 8, 2018, Defendant Muzin demonstrated his knowledge that Plaintiff Broidy had been successfully targeted by the State of Qatar by stating: "I did not cause the Broidy stuff, just because I have information" and "I don't know all the details, but I know that I am hearing repeatedly that there's a lot more coming."

-23-

77.     On information and belief, following that March 8, 2018 conversation, there were further unlawful disclosures of the contents of Plaintiffs' emails and the altered and forged documents, and the *New York Times*, *The Associated Press*, *Newsweek*, *Bloomberg*, *The Huffington Post*, and other news organizations have indicated to Plaintiffs that they have received documents that purport to belong to Plaintiffs, and plan to write additional stories about them.  The dissemination of stolen and doctored materials concerning Plaintiffs is ongoing.

78.     Although Defendant Muzin has attempted to distance himself from the attacks on those accounts by stating he wasn't "the one who's calling the reporters and giving the stories," Defendant Muzin also mentioned that there are weekly meetings at the Embassy of Defendant State of Qatar in Washington D.C. in which he or his representatives along with high-level Embassy personnel and other registered agents of Defendant the State of Qatar discuss strategies to improve its image, which strategies include targeting and destroying the reputations of those who oppose them. "Broidy's name comes up in Embassy meetings often," Defendant Muzin stated. In subsequent conversations, Defendant Muzin clearly demonstrated his knowledge of and encouragement of the unlawful conduct towards Plaintiff Broidy and his participation in the conspiracy, by stating that "there's a lot more coming," which, on information and belief, was followed by further leaks of Plaintiffs' emails and the altered and forged documents. Defendant Muzin stated to another individual critical of Qatar: "I know they're [Qatari officials] after you and Broidy." (emphasis added.)

79.     Defendant Muzin worked closely with high-level Qatari officials on shaping their outreach in Washington D.C. He not only attended meetings at the Embassy of Qatar but has been involved in planning the Emir's

-24-

BOIES SCHILLER FLEXNER LLP

forthcoming trip to Washington D.C., and was aware of details of that state visit before they were made public. On information and belief, Defendant Muzin hoped to parlay his high-level work with Qatari officials into lucrative business deals in Qatar.

80.     On March 19, 2018, Plaintiffs' counsel formally requested that the State of Qatar take appropriate action to halt the attacks on Plaintiffs' emails, documents, and data and to stop Defendants from disseminating Plaintiffs' emails, documents, and data and/or to assist Plaintiffs in halting dissemination if the hack had been conducted by a rogue actor in the State of Qatar.  However, to date, no response has been received to that letter.

81.     On information and belief, the State of Qatar, with the knowledge and participation of the Agent Defendants, orchestrated the attack on Plaintiffs' email accounts after Defendant Muzin identified Plaintiff Broidy as an individual who was opposing the State of Qatar's efforts to improve its image and relationships in Washington, D.C. and who was aligned with its regional rivals, the UAE and Saudi Arabia.

## FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
### Computer Fraud and Abuse Act
### 18 U.S.C. §§ 1030(a)(2)(C) & (a)(5)

82.     Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

83.     On information and belief, Defendant the State of Qatar, by itself and/or through its agent Ooredoo and the Agent Defendants, accessed Plaintiffs' computers at Broidy Capital Management, specifically by accessing accounts associated with Plaintiff Broidy and other BCM employees.  Said Defendants first compromised Plaintiff Rosenzweig's personal email account by a targeted phishing email in December 2017, and thereafter, beginning on or about January 16, 2018, and without authorization, accessed the corporate

-25-

BOIES SCHILLER FLEXNER LLP

1   accounts of Plaintiff Broidy and other BCM employees.  Defendants did so

2   with knowledge that they were accessing these accounts without Plaintiffs'

3   authorization.  Defendants not only engaged in the deliberate phishing attacks

4   and unauthorized access, but also implemented identifiable obfuscation

5   techniques to engage in ultimately unsuccessful efforts to hide the origin of

6   their cyber-attacks.

7       84.    On information and belief, by engaging in this conduct,

8   Defendants accessed protected computers, defined by 18 U.S.C.

9   § 1030(e)(2)(B) as computers "used in or affecting interstate or foreign

10  commerce or communication."

11      85.    On information and belief, after accessing the relevant accounts,

12  Defendants obtained and stole private emails and documents, and then

13  distributed Plaintiffs' private information to the media.  Defendants also

14  altered information contained in the emails, and in some instances wholly

15  forged new documents, and then distributed those altered or forged documents

16  to the media.  On information and belief, by virtue of the actions of

17  Defendants, Plaintiffs suffered damage, including harm to their data,

18  programs, and computer systems, including but not limited to the stealing of

19  Plaintiffs' data, and the corruption and doctoring of Plaintiffs' emails.

20      86.    On information and belief, by virtue of the actions of Defendants,

21  Plaintiffs also suffered loss, including but not limited to the investigation costs

22  associated with identifying the cyber-attacks and repairing the integrity of

23  Plaintiffs' computer systems after the attacks, including by hiring forensic

24  investigators and data security experts, and attorneys, among other losses, in

25  an amount to be proven at trial, but in any event, in excess of $5,000 and,

26  together with the other alleged damages, in excess of $75,000, exclusive of

27  interest and costs.

28

-26-

COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES  SCHILLER  FLEXNER  LLP

87.     On information and belief, the unlawful action by Defendants also has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, an increased risk of further theft, an increased risk of harassment, and increased risk of being required to engage in costly efforts to defend themselves against erroneous, libelous accusations. Plaintiffs' remedy at law is not itself adequate to compensate for the injuries inflicted by Defendants.  Accordingly, Plaintiffs are also entitled to injunctive relief to prevent the further accessing, use, and dissemination of Plaintiffs' data.

**FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**California Comprehensive Computer Data Access and Fraud Act**
**Cal. Pen. Code § 502**

88.     Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

89.     On information and belief, Defendant the State of Qatar, acting by itself and/or through its agent Ooredoo and the Agent Defendants, violated § 502(c)(2) by knowingly accessing and without permission taking and making use of programs, data, and files from Plaintiffs' computers, computer systems, and/or computer networks.

90.     On information and belief, Defendants have violated § 502(c)(4) by knowingly accessing and without permission altering Plaintiffs' data, which resided in Plaintiffs' computers, computer systems, and/or computer networks.

91.     On information and belief, Defendants have violated § 502(c)(6) by knowingly and without permission providing or assisting in providing, a means of accessing Plaintiffs' computers, computer systems, and/or computer networks.

92.     On information and belief, Defendants have violated § 502(c)(7) by knowingly and without permission accessing, or causing to be accessed, Plaintiffs' computers, computer systems, and/or computer networks.

93.     On information and belief, Defendants have violated § 502(c)(9) by knowingly and without permission using the Internet domain name or profile of another individual in connection with the sending of one or more email messages and thereby damaging Plaintiffs' computers, computer data, computer systems, and/or computer networks.

94.     Plaintiffs own certain data that comprises information that, on information and belief, was obtained by Defendants as alleged above.

95.     On information and belief, Defendants knowingly accessed the computers at Plaintiff BCM as well as Plaintiff Rosenzweig's computer in the manner described above, and knew that at the time they accessed the various accounts, they were without authorization to do so.  For this reason, Defendants engaged in phishing attacks as well as identifiable obfuscation techniques in an attempt to hide the origin of their cyber-attack.

96.     On information and belief, after accessing the relevant accounts, Defendants obtained and stole massive amounts of private emails and documents, and then distributed Plaintiffs' private information to the media. Defendants also doctored the information contained in the emails and documents, and then distributed those doctored or altered emails and documents to the media.

97.     On information and belief, Defendants engaged in these actions as part of a targeted attack on Plaintiff Broidy, who is an outspoken critic of the Qatari government and whose businesses are assisting in developing the defense and anti-terrorism capabilities of the UAE, one of the regional rivals

-28-

BOIES  SCHILLER  FLEXNER  LLP

1  of the State of Qatar, and has engaged in discussions to do the same for Saudi

2  Arabia, another regional rival of the State of Qatar.

3       98.    On information and belief, as a direct and proximate result of

4  Defendants' unlawful conduct, Plaintiffs have been damaged in an amount to

5  be proven at trial, but in any event, in excess of $75,000 exclusive of interest

6  and costs, including but not limited to the investigation costs associated with

7  identifying the cyber-attacks; verifying the integrity of the computer systems,

8  computer networks, computer programs, and/or data; and repairing the

9  integrity of Plaintiffs' computer systems after the attack, including by hiring

10  forensic investigators and data security experts.  Plaintiffs are also entitled to

11  recover their attorneys' fees pursuant to § 502(e).

12       99.    Additionally, Defendants' actions were willful and malicious,

13  such that Plaintiffs are also entitled to punitive damages under § 502(e)(4).

14       100.   On information and belief, Defendants' unlawful access to and

15  theft from Plaintiffs' computers, and Defendants' subsequent dissemination of

16  Plaintiffs' information, has also caused, and will continue to cause, Plaintiffs

17  irreparable injury, including reputational harm, an increased risk of further

18  theft, and an increased risk of harassment.  Plaintiffs' remedy at law is not

19  itself adequate to compensate for the injuries inflicted by Defendants.

20  Accordingly, Plaintiffs are also entitled to injunctive relief to prevent the

21  further accessing, use, and dissemination of Plaintiffs' data.

22  **FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**Receipt and Possession of Stolen Property**
23  **in Violation of Cal. Pen. Code § 496**

24       101.   Plaintiffs incorporate and adopt by reference the allegations

25  contained in each and every preceding paragraph of this Complaint.

26       102.   On information and belief, Defendant the State of Qatar, acting

27  by itself and/or through its agent Ooredoo and/or the Agent Defendants,

28                                    -29-

B O I E S   S C H I L L E R   F L E X N E R   L L P

received property, including documents, emails, and other materials housed on Plaintiffs' computer networks, which had been stolen from Plaintiffs or had been obtained from Plaintiffs in a manner that constitutes theft.  Plaintiffs are engaged in ongoing efforts to receive additional property stolen from Plaintiffs or obtained from Plaintiffs in a manner that constitutes theft.

103.   On information and belief, Defendants knew that the property they received was stolen or obtained in a manner that constituted theft, and Defendants know that the property they are continuing to acquire and disseminate can only be acquired if it is stolen or obtained in a manner that constitutes theft.  In fact, Defendant Muzin acknowledged that he had information about the cyber-attacks and knew that there was "a lot more coming."

104.   On information and belief, as a result of Defendants' actions, Plaintiffs have been damaged in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs, and are entitled to treble damages, the costs of bringing this suit, and attorneys' fees under § 496(c).

105.   On information and belief, Defendants' unlawful actions have also caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, an increased risk of further theft, and an increased risk of harassment.  Plaintiffs' remedy at law is not itself adequate to compensate for the injuries inflicted by Defendants.  Accordingly, Plaintiffs are also entitled to injunctive relief to prevent the further accessing, use, and dissemination of Plaintiffs' data.

/ / /

/ / /

/ / /

-30-

BOIES  SCHILLER  FLEXNER  LLP

## FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### Invasion of Privacy by Public Disclosure of
### Private Facts

106.    Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

107.    Plaintiffs have a reasonable privacy interest in their personal information, including information contained in their private email accounts. Additionally, Plaintiffs had a reasonable expectation that information contained in their email accounts would remain private.

108.    Access to Plaintiffs' personal accounts was achieved by unlawful hacking and stealing of personal data.  Without these unlawful actions, Plaintiffs' personal information would not have been made public.

109.    On information and belief, after hacking, stealing, and altering Plaintiffs' personal information, Defendant the State of Qatar, acting by itself and/or through its agent Ooredoo and the Agent Defendants, publicly disclosed Plaintiffs' personal information by disseminating the materials to the media for publication, and sought to facilitate further disclosures by providing staggered data "dumps" to the media.

110.    On information and belief, the personal information that Defendants have publicly disclosed includes, but is not limited to, confidential communications between Plaintiff Broidy and his clients and/or personal relations and legal documents, some of which have been fabricated or altered.

111.    The public disclosure—and its threatened further disclosures—of Plaintiffs' personal information constitutes a public disclosure of private facts.

112.    At no time have Plaintiffs waived or otherwise taken any action that would constitute an implied waiver of their privilege against the public disclosure of private facts.

-31-

113.   On information and belief, the personal information that Defendants have publicized, and are threatening to further publicize, are not matters of public concern.  Neither Defendants nor the public have a need to acquire, review, or disseminate Plaintiffs' personal information and communications for any legitimate purpose.  Nor, in fact, have Defendants acted with a legitimate purpose.  Rather, they have publicly disclosed Plaintiffs' private information merely to attack a private United States citizen.

114.   The public disclosure of Plaintiffs' personal information is highly offensive to a reasonable person of ordinary sensibilities.  Individuals have a legitimate and reasonable interest in keeping their personal email communications private, and reasonably expect that such information will not be publicly disclosed.

115.   The public disclosure of Plaintiffs' personal information has caused, and will continue to cause, Plaintiffs injury, including reputational harm, an increased risk of further theft, and an increased risk of harassment.

116.   On information and belief, Plaintiffs will continue to suffer this injury as long as their personal information is available to Defendants and, consequently, to numerous organizations.  Plaintiffs' remedy at law is not itself adequate to compensate for the injuries inflicted by Defendants.  Accordingly, Plaintiffs are entitled to injunctive relief to prevent the further accessing, use, and dissemination of Plaintiffs' data.

117.   The public disclosure of Plaintiffs' personal information has also caused them to suffer monetary damages, at an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.  Because Defendants' actions are intolerable in a civilized community, Plaintiffs also seek punitive damages.

/ / /

-32-

BOIES SCHILLER FLEXNER LLP

## FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### Invasion of Privacy by Intrusion
### Upon Seclusion

118.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

119.   Plaintiffs have a legally protected privacy interest in their personal information and email accounts, and had a reasonable expectation that their information would remain private.  Plaintiffs' accounts were password protected, and at no time did Plaintiffs provide those passwords, or the contents of their emails, to the public.

120.   On information and belief, Defendant the State of Qatar, acting by itself and/or through its agent Ooredoo and the Agent Defendants, hacked, stole, doctored, and disseminated to others the personal and private information of Plaintiffs.  Defendants clearly did so without permission and with deliberate intent to access and obtain Plaintiffs' personal and private information.  At no point did Plaintiffs authorize Defendants to hack, steal, doctor, or disseminate their personal and private information.

121.   On information and belief, Defendants' intentional intrusion upon Plaintiffs' seclusion was highly offensive to Plaintiffs and would be unjustifiable and highly offensive to an ordinary, reasonable person.

122.   The public disclosure of Plaintiffs' personal information has caused, and will continue to cause, Plaintiffs injury, including reputational harm, an increased risk of further theft, and an increased risk of harassment.

123.   Plaintiffs will continue to suffer this injury as long as their personal information is available to Defendants and, subsequently, to media organizations and the world at large.  Plaintiffs' remedy at law is not itself adequate to compensate for the injuries inflicted by Defendants.  Accordingly,

-33-

BOIES   SCHILLER   FLEXNER   LLP

Plaintiffs are entitled to injunctive relief to prevent the further accessing, use, and dissemination of Plaintiffs' data.

124.    The public disclosure of Plaintiffs' personal information has also caused them to suffer monetary damages, at an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs. Because Defendants' actions are intolerable in a civilized community, Plaintiffs also seek punitive damages.

## FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

### Conversion

125.    Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

126.    By hacking and stealing Plaintiffs' personal emails and documents, along with Plaintiff Rosenzweig's passwords, Defendant the State of Qatar, acting by itself and/or through its agent Ooredoo and the Agent Defendants, took Plaintiffs' exclusive private and personal property. Additionally, on information and belief, certain of the emails were doctored and then deleted by Defendants from Plaintiffs' computers.

127.    On information and belief, Defendants clearly engaged in these actions without permission from Plaintiffs and with the deliberate intent to access and obtain Plaintiffs' personal and private information.  At no point did Plaintiffs authorize Defendants to hack, steal, doctor, or disseminate their exclusive personal and private information.

128.    Plaintiffs will continue to suffer injury as long as their personal information is available to Defendants and, subsequently, to media organizations and the world at large.  Plaintiffs' remedy at law is not itself adequate to compensate for the injuries inflicted by Defendants.  Accordingly,

-34-

BOIES SCHILLER FLEXNER LLP

1  Plaintiffs are entitled to injunctive relief to prevent the further accessing, use,

2  and dissemination of Plaintiffs' data.

3      129.   The public disclosure of Plaintiffs' personal information has also

4  caused them to suffer monetary damages, at an amount to be proven at trial,

5  but in any event, in excess of $75,000, exclusive of interest and costs.

6      130.   Additionally, Defendants' actions were willful and malicious,

7  such that Plaintiffs are also entitled to punitive damages.

8  ## FOR A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

9  ### Civil Conspiracy

10     131.   Plaintiffs incorporate and adopt by reference the allegations

11  contained in each and every preceding paragraph of this Complaint.

12     132.   On information and belief, Defendants willfully, intentionally,

13  and knowingly agreed and conspired with each other and with others to

14  engage in the wrongful conduct alleged herein, including but not limited to

15          a.  Intentionally accessing Plaintiffs' accounts without

16              authorization and then stealing and/or doctoring Plaintiffs'

17              data and emails, in violation of the Computer Fraud and

18              Abuse Act, 18 U.S.C. § 1030(a)(2)(C) & (a)(5);

19          b.  Knowingly accessing or causing to be accessed, and without

20              permission taking, altering, and making use of Plaintiffs'

21              programs, data, and files from Plaintiffs' computers, computer

22              systems, and/or computer networks, and/or knowingly and

23              without permission providing or assisting in providing a

24              means of accessing Plaintiffs' computers, computer systems,

25              and/or computer networks, in violation of the California

26

27

28
                              -35-

B O I E S   S C H I L L E R   F L E X N E R   L L P

B O I E S   S C H I L L E R   F L E X N E R   L L P

Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502;

c. Intentionally receiving stolen property, in violation of Cal. Pen. Code § 496;

d. Invading Plaintiffs' reasonable privacy interests and then publicly disseminating Plaintiffs' private information in a manner that is highly offensive to a person of reasonable sensibilities; and/or

e. Taking and converting Plaintiffs' exclusive private and personal property without permission and with deliberate intent to access and obtain Plaintiffs' personal and private information.

133.   On information and belief, Defendants performed the acts alleged pursuant to, and in furtherance of, their agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, and/or adopting the wrongful acts of others.

134.   On information and belief, Defendants expressly or tacitly agreed to, at the very least:

a. Devise and execute a scheme to access without permission, take, convert, alter, obtain, and use Plaintiffs' private data and computer networks;

b. Transfer and then disseminate the stolen private data; and/or

c. Access, receive, and/or possess the stolen private information, all with the intent to harm Plaintiff Broidy, a private United States citizen residing in California.

-36-

135.   On information and belief, Defendants, with full knowledge that they were engaged in wrongful actions, deliberately accessed, received, possessed, stored, and helped to disseminate Plaintiffs' stolen data and emails.

136.   On information and belief, Defendants also had meetings wherein targeting Plaintiff Broidy was discussed.

137.   On information and belief, Defendants' agreement was both explicit and tacit.  In particular, those Agent Defendants who were registered agents of the State of Qatar under FARA, as well as unregistered agents of the State of Qatar, were incentivized to do the bidding of the State of Qatar and engage in any acts that would further the overall scheme.

138.   Plaintiffs will continue to suffer injury as long as their personal information is available to Defendants and, subsequently, to media organizations and the world at large.  Plaintiffs' remedy at law is not itself adequate to compensate for the injuries inflicted by Defendants.  Accordingly, Plaintiffs are entitled to injunctive relief to prevent the further accessing, use, and dissemination of Plaintiffs' data.

139.   On information and belief, Plaintiffs have been injured and have suffered monetary damages as a result of Defendants' conspiratorial actions in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

## **REQUEST FOR RELIEF**

140.   Plaintiffs repeat and re-allege the allegations contained in each and every preceding paragraph of this Complaint.

141.   Plaintiffs request that this Court order the following relief:

  a. Grant judgment in favor of Plaintiffs and against Defendants;

  b. Declare that Defendants' conduct constitutes violations of

-37-

1             the statutes and common law cited herein;

2      c.     Grant all appropriate injunctive relief;

3      d.     Award Plaintiffs an appropriate amount in monetary

4             damages as determined at trial, including pre- and post-

5             judgment interest, and any treble damages to which

6             Plaintiffs are entitled under Cal. Pen. Code § 496;

7      e.     Award Plaintiffs punitive damages under Cal. Pen. Code §

8             502 as well as under Plaintiffs' claims for invasion of

9             privacy by public disclosure of private facts, invasion of

10            privacy by intrusion upon seclusion, and conversion;

11     f.     Award Plaintiffs attorneys' fees and the costs of bringing

12            this action; and

13     g.     Grant Plaintiffs such other relief as is just and appropriate.

14

15 Dated: March 26, 2018          Respectfully submitted,

16                           BOIES SCHILLER FLEXNER LLP

17

18                        By:       _/s/_____

19                            DAVID K. WILLINGHAM
                               *Counsel for Plaintiffs*

20

21

22

23

24

25

26

27

28

-38-

BOIES SCHILLER FLEXNER LLP

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: March 26, 2018

Respectfully submitted,

BOIES SCHILLER FLEXNER LLP

By: _____/s/_____
DAVID K. WILLINGHAM
*Counsel for Plaintiffs*

COMPLAINT AND DEMAND FOR JURY TRIAL