**BOIES SCHILLER FLEXNER LLP**
Travis LeBlanc, SBN 251097
  tleblanc@bsfllp.com
435 Tasso Street, Suite 205
Palo Alto, California 94301
Phone: (650) 445-6400 /Fax: (650) 329-8507

David K. Willingham, SBN 198874
  dwillingham@bsfllp.com
725 S Figueroa Street, 31st Floor
Los Angeles, California 90017
Phone: (213) 629-9040 /Fax: (213) 629-9022

Lee S. Wolosky (*pro hac vice*)
  lwolosky@bsfllp.com
Robert J. Dwyer (*pro hac vice pending*)
  rdwyer@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Phone:  (212) 446-2300 /Fax:  (212) 446-2350

Amy L. Neuhardt (*pro hac vice pending*)
  aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Phone:  (202) 237-2727 /Fax:  (202) 237-6131

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC, ELLIOTT BROIDY, and ROBIN ROSENZWEIG,<br><br>              Plaintiffs,<br><br>        v.<br><br>STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, and DOES 1-10,<br><br>Defendants. | Case No.  2:18-CV-02421-JFW-(Ex)<br><br>The Honorable John F. Walter<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR (1) TEMPORARY RESTRAINING ORDER AGAINST DEFENDANTS; (2) ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION; AND (3) ORDER GRANTING EXPEDITED DISCOVERY**<br><br>**[Ex Parte Application;Declarations of Elliott Broidy, Joel Mowbray, Luke Tenery,and Lee Wolosky with Exhibits; [Proposed] Temporary Restraining Order, Order to Show Cause Regarding Preliminary** |

1

**Injunction, and Order Granting Expedited Discovery, and [Proposed] Order Granting Preliminary Injunction filed concurrently herewith]_____**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................ 1

II.   STATEMENT OF FACTS ............................................................. 1

III.  ARGUMENT .................................................................................. 7

    A.    Plaintiffs Satisfy the Legal Standards for a Temporary Restraining Order and a Preliminary Injunction ..................... 7

    B.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims ................................................................................... 8

        1.    Plaintiffs Are Likely to Succeed on the Merits of Their CFAA Claim ...................................................... 8

        2.    Plaintiffs Are Likely to Succeed on the Merits of Their California CCDAFA Claim .......................... 10

        3.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim for Possession of Stolen Property under California Penal Code Section 496 ............................ 11

        4.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim for Invasion of Privacy by Intrusion upon Seclusion ...................................................................... 12

        5.    Plaintiffs Are Likely to Succeed on the Merits of Their Invasion of Privacy by Public Disclosure of Private Facts Claim ................................................................ 14

        6.    Plaintiffs Are Likely to Succeed on the Merits of Their Conversion Claim ...................................................... 15

        7.    Plaintiffs Are Likely to Succeed on the Merits of Their Civil Conspiracy Claim ............................................. 15

    C.    Plaintiffs Will Suffer Immediate and Irreparable Harm Absent Injunctive Relief .......................................................... 17

    D.    The Balance of Equities and Consideration of the Public Interest Tip Sharply in Plaintiffs' Favor ............................... 18

        1.    Defendants Will Not Be Prejudiced by a Temporary Restraining Order and Preliminary Injunction ........... 18

        2.    Plaintiffs Have A Strong Interest in the Protection of Their Private Electronic Communications and Documents .............................................................. 19

        3.    An Injunction Against Defendants is in the Public

i

B O I E S   S C H I L L E R   F L E X N E R   L L P

       Interest................................................................ 19

E.    The Court Should Not Require a Bond.................................. 21

F.    The Court Should Grant Plaintiffs' Request for Limited
    Expedited Discovery ............................................................ 22

IV.   CONCLUSION ............................................................... 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BOIES SCHILLER FLEXNER LLP

MEMO OF P'S AND A'S ISO PLAINTIFFS' EX PARTE APP FOR TEMPORARY RESTRAINING ORDER, ORDER
TO SHOW CAUSE FOR PRELIMINARY INJUNCTION, AND ORDER GRANTING EXPEDITED DISCOVERY

# TABLE OF AUTHORITIES

**Cases**

*AccuImage Diagnostics Corp v. Terarecon, Inc.*,
260 F. Supp. 2d 941 (N.D. Cal. 2003) .................................................. 17

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ............................................................. 7

*Am. Trucking Associations, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ........................................................... 19

*Bartnicki v. Vopper*
532 U.S. 514 (2001) ......................................................................... 22

*Clear Channel Outdoor, Inc. v. City of Los Angeles*,
340 F.3d 810 (9th Cir. 2003) ............................................................... 7

*Coal. for an Airline Passengers' Bill of Rights v. Delta Air Lines, Inc.*,
693 F. Supp. 2d 667 (S.D. Tex. 2010) ................................................ 14

*CRS Recovery, Inc. v. Laxton*,
600 F.3d 1138 (9th Cir. 2010) ........................................................... 16

*Doe v. Gangland Prods., Inc.*,
730 F.3d 946 (9th Cir. 2013) ............................................................. 15

*Don King Productions/Kingvision v. Lovato*,
911 F. Supp. 419 (N.D. Cal. 1995) .................................................... 16

*Entler v. Gregoire*,
872 F.3d 1031 (9th Cir. 2017) ........................................................... 22

*Facebook, Inc. v. ConnectU LLC*,
489 F. Supp. 2d 1088 (N.D. Cal. 2007) .............................................. 11

*Facebook, Inc. v. Jeremi Fisher*,
No. C 09-05842 JF (PVT), 2009 WL 5095269 (N.D. Cal. Dec. 21, 2009) .......... 19

*Harper & Row, Publishers, Inc. v. Nation Ents.*,
471 U.S. 539 (1985) ......................................................................... 23

*Hill v. Colorado*,
530 U.S. 703 (2000) ..................................................................... 21, 23

*Hill v. Nat'l Collegiate Athletic Ass'n*,
865 P.2d 633 (Cal. 1994) .................................................................. 21

*HIQ Labs, Inc. v. LinkedIn Corp.*,
273 F. Supp. 3d 1099 (N.D. Cal. 2017) ......................................... 7, 9, 21

*Hunter Consulting, Inc. v. Beas*,
No. SACV 12-1947 AG (JPRx), 2012 WL 6193381 (C.D. Cal. Dec. 10, 2012) .. 18

*Johnson v. Macy*,
145 F. Supp. 3d 907 (C.D. Cal. 2015) .................................................. 8

*Jorgenson v. Cassiday*,
320 F.3d 906 (9th Cir. 2003) ............................................................. 24

*Ken Roberts Co. v. GoTo.Com*,
No. 99-CV-4775, 2000 WL 33680439 (N.D. Cal. Feb. 8, 2000) ................... 19

*Klein v. City of Clemente*,
584 F.3d 1196 (9th Cir. 2009) ........................................................... 22

*Kremen v. Cohen*,
337 F.3d 1024 (9th Cir. 2003) ........................................................... 12

*Martinez v. Ziomek*,
No. CIV S-08674, 2008 WL 5099590 (E.D. Cal. Nov. 25, 2008) .................. 8

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chung*,
No. CV 01-00659 CBM RCX, 2001 WL 283083 (C.D. Cal. Feb. 2, 2001) ........ 20

*Meyer v. Bd. of Cty. Comm'rs*,
482 F.3d 1232 (10th Cir. 2007) ......................................................... 22

*Michaels v. Internet Ent't Grp., Inc.*,
5 F. Supp. 2d 823 (C.D. Cal. 1998) .................................................... 15

iii

BOIES SCHILLER FLEXNER LLP

*Olmstead v. United States,*
    277 U.S. 438 (1928)........................................................................23

*Peavy v. WFAA-TV, Inc.,*
    221 F.3d 158 (5th Cir. 2000) .......................................................23

*People v. Gentry,*
    234 Cal. App. 3d 131 (Cal. Ct. App. 1991) ................................11

*People v. Gopal,*
    171 Cal. App. 3d 524 (Cal. Ct. App. 1985) ................................12

*People v. Kwok,*
    63 Cal. App. 4th 1236 (Cal. Ct. App. 1998) ...............................13

*Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp. 2d 1079, 1087 (E.D. Cal.
    2012) ...........................................................................................8, 18

*Quigley v. Rosenthal,*
    327 F.3d 1044 (10th Cir. 2003) ..................................................23

*Rubin v. Coors Brewing Co.,*
    514 U.S. 476 (1995)......................................................................23

*SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd.,*
    No. CV 15-08157-BRO (EX), 2015 WL 6680807 (C.D. Cal. Oct. 19, 2015)......24

*Sierra On-Line, Inc. v. Phoenix Software, Inc.,*
    739 F.2d 1415 (9th Cir. 1984) ......................................................7

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,*
    240 F.3d 832 (9th Cir. 2001) .......................................................18

*SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 980–81 (N.D. Cal.
    2008) ............................................................................................10

*Tyan, Inc. v. Garcia,*
    No. CV-15-05443-MWF-JPR, 2016 WL 7655790 (C.D. Cal. May 19, 2016).....16

*United States v. Calabrese,*
    825 F.2d 1342, (9th Cir. 1987) ....................................................17

*United States v. Nosal,*
    676 F.3d 854 (9th Cir. 2012) .........................................................9

*Weingand v. Harland Fin. Solutions, Inc.,*
    No. C-11-3109 EMC, 2012 WL 2327660, (N.D. Cal. June 19, 2012)...........11, 21

*Williams v. Superior Court,*
    81 Cal. App. 3d 330 (Cal. Ct. App. 1978) ..................................12

**Rules**

Cal. Pen. Code § 496..........................................................................8
Cal. Pen. Code § 502................................................................8, 10, 19
Cal. Penal Code § 496......................................................................11
Fed. R. Civ. P. 26...............................................................................21

iv

BOIES SCHILLER FLEXNER LLP

## I.     INTRODUCTION

Plaintiffs are the targets of a deliberate campaign by Defendants to discredit Plaintiffs and destroy their reputations and businesses, in particular those of Plaintiff Elliott Broidy.  Defendants have hacked, stolen, and altered data and information from Plaintiffs' computers and computer accounts, and disseminated that data and information to media organizations.  Defendants' actions have caused and continue to cause Plaintiffs irreparable harm.

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65-1, Plaintiffs move this Court for a temporary restraining order and preliminary injunction prohibiting Defendants, as well as each and every one of their officers, agents, employees, representatives, and all persons acting in concert with them, from (1) accessing or causing access to Plaintiffs' computers, computer servers, emails, or internet accounts; (2) adding, altering, damaging, deleting, or destroying data located on Plaintiffs' computers, computer servers, emails, or internet accounts; or (3) distributing, publishing, uploading, broadcasting, or otherwise disseminating materials obtained from Plaintiffs' computers, computer servers, emails, or internet accounts, including any alterations of such materials, or any documents falsified or created to appear as though they are such materials belonging to Plaintiffs.

Plaintiffs further request limited expedited discovery from Defendants Stonington Strategies LLC ("Stonington") and Nicolas D. Muzin ("Muzin") in order to gather the evidence—including who is distributing Plaintiffs' stolen emails to news outlets and how much more private material will be released—necessary in connection with an upcoming hearing on their request for a preliminary injunction.

## II.     STATEMENT OF FACTS

Plaintiff Broidy is a businessman and philanthropist who lives in Los Angeles. (Declaration of Elliott Broidy, sworn to on March 29, 2018 ("Broidy Decl.") ¶¶ 1, 5.)  He is the Chairman and CEO of Broidy Capital Management

-1-

BOIES SCHILLER FLEXNER LLP

1  ("BCM"), a firm that invests in companies, including defense companies.  (*Id.* ¶¶ 1–
2  2.)

3      Plaintiff Broidy has served in leadership roles in Jewish organizations and the
4  Republican Party, including serving as Deputy National Chairman of the Republican
5  National Committee's Finance Leadership Team and actively supporting the
6  Republican Jewish Coalition.  (*Id.* ¶¶ 6–7.)

7      After the events of September 11, 2001, Plaintiff Broidy became active in
8  anti-terrorism and other national security activities.  (*Id.* ¶¶ 6, 8.)  For example, in
9  2017, he sponsored conferences that discussed, among other items, the State of
10 Qatar's support for terrorist organizations.  (*Id.* ¶¶ 9–11.)  Plaintiff Broidy has been
11 critical of the State of Qatar to United States government officials, including the
12 President, and has advocated that the United States take a strong stance against the
13 State of Qatar and other state sponsors of terrorism.  (*Id.* ¶ 14.)

14     Plaintiff Broidy's criticism of the State of Qatar and other state sponsors of
15 terrorism is well known.  Plaintiff Broidy served on the Homeland Security
16 Advisory Council's Future of Terrorism Task Force, which specifically targeted
17 "the elimination of safe havens" as an important step that would "impact the future
18 of terrorism."  (*Id.* ¶ 6 & Ex. 1.)  The State of Qatar, which hosts, funds, and
19 otherwise supports four large terrorist and extremist groups (Hamas, Al Qaeda, the
20 Taliban, and the Muslim Brotherhood), (*id.* ¶ 9), is particularly sensitive to that
21 criticism.

22     Four significant events that occurred between May 2017 and September 2017
23 triggered Defendants' targeting and attack on Plaintiffs.  *First*, on May 25, 2017,
24 and contemporaneous with conferences Plaintiff Broidy helped to organize to draw
25 attention to the issue, a bill was introduced in the House of Representatives (H.R.
26 2712) that would have barred United States assistance to any country assisting
27 Hamas, and which identified the State of Qatar as such a country.  (Broidy Decl. ¶

28

-2-

11.) *Second*, on June 5, 2017, many of Qatar's Arab neighbors, led by Saudi Arabia and the United Arab Emirates ("UAE"), severed diplomatic relations with and imposed economic sanctions on the State of Qatar because of its support for terrorism. (*Id.* ¶ 12.) *Third*, in June 2017 during a meeting of the Republican National Committee, President Trump criticized the State of Qatar for sponsoring terrorists, which Defendant the State of Qatar believed was done at the suggestion of Plaintiff Broidy, who was complimented by President Trump during that speech. (*Id.* ¶ 12.) *Finally*, beginning in September 2017, Plaintiff Broidy (among others) actively discouraged prominent members of the American Jewish community from accepting offers from representatives of Defendant State of Qatar to meet the current Emir of Qatar, Sheikh Tamim bin Hamad Al Thani, at the Fall 2017 session of the United Nations General Assembly and/or visit Qatar on all-expenses paid visits. (*Id.* ¶ 16.)

Defendant the State of Qatar reacted to those events by launching an effort, acting by itself and through the other Defendants and others as its agents and co-conspirators, to impact public opinion and public policy in the United States in order to whitewash its record of funding and otherwise supporting terrorism. One of the first steps taken in the summer of 2017 by Defendant the State of Qatar was to hire at least ten agents tasked to improve the State of Qatar's image in Washington D.C. (*See* Declaration of Lee Wolosky, sworn to on March 30, 2018 ("Wolosky Decl.") ¶ 18.)

One of the agents retained by the State of Qatar was Defendant Stonington, whose President, Defendant Muzin, focused on building support from the American Jewish community for the State of Qatar. (Declaration of Joel Mowbray, sworn to on March 26, 2018 ("Mowbray Decl.") ¶¶ 8, 11–12.) Defendant Muzin spearheaded the efforts to get American Jewish leaders to meet with the Emir and visit Qatar. (*See id.* ¶¶ 8, 11; Compl. (Doc. 1) ¶¶ 12–13, 55–57, 64.)

BOIES SCHILLER FLEXNER LLP

BOIES  SCHILLER  FLEXNER  LLP

1    Plaintiff Broidy opposed those meetings and trips, and he attempted to

2  persuade other American Jewish leaders not to participate. (Broidy Decl. ¶ 16.)

3  Defendant the State of Qatar perceived Plaintiff Broidy as a significant obstacle to

4  achieving their goals. (*Id.* ¶ 16.) Defendant Muzin identified Plaintiff Broidy as

5  someone who was frequently identified as an opponent of the State of Qatar at

6  meetings at its Embassy in Washington, D.C. (*See* Mowbray Decl. ¶ 22.)

7    Defendants' response to Plaintiff Broidy's exercise of his right to speak out

8  on an issue of national and international concern was to engage in a series of

9  computer hacking attacks on the data and information of Plaintiffs and to

10 disseminate the stolen information and other altered or forged documents to media

11 outlets as part of a campaign to damage Plaintiffs personally and professionally and

12 prevent them from exercising their First Amendment rights to be heard and

13 influence the United States government on an issue of importance to the country and

14 the world. (*See* Declaration of J. Luke Tenery, sworn to on March 30, 2018

15 ("Tenery Decl.") ¶ 9; Broidy Decl. ¶ 21; Mowbray Decl. ¶¶ 4, 23–28, 32.)

16    On March 1, 2018, an article appeared in the *Wall Street Journal* based on

17 data hacked from Plaintiffs' computer accounts. Similar articles have continued to

18 appear in other publications, including the *Huffington Post*, the *New York Times*,

19 *Bloomberg*, The Associated Press, *Newsweek*, and the BBC. (*See* Exs. 3–5, 8–12 to

20 Wolosky Decl.)[1]

21    Defendant Muzin acknowledged his own involvement and the involvement of

22 the State of Qatar (acting by itself and through Defendants) in this effort to punish

23 Plaintiff Broidy for his anti-Qatar advocacy. Muzin inculpated himself by stating:

24

25 [1] Particularly noteworthy is the fact that the only media outlet to publish an article
based on a completely fabricated document was Al Jazeera, a media organization
26 associated with the Qatari government and chaired by a member of the Qatari ruling
family. *See* Will Thorne & Will Jordan, "Trump donor Elliott Broidy named in
27 Ukraine criminal probe," *Al Jazeera*, Mar. 8, 2018. (Broidy Decl. ¶ 20; Wolosky
Decl. ¶ 8 & Ex. 6.)

28

-4-

BOIES SCHILLER FLEXNER LLP

1   "I did not cause the Broidy stuff, just because I had information about it" and "I
2   don't know all the details, but I keep hearing that there's a lot more coming."
3   (Mowbray Decl. ¶ 30.)

4          Since that conversation, the *New York Times*, *Bloomberg*, *The Huffington*
5   *Post*, *Newsweek*, and *Business Insider* indicated to Plaintiffs that they had received
6   from anonymous sources documents that purportedly came from Plaintiffs'
7   computer files, and planned to write additional stories. (Broidy Decl. ¶ 19; Wolosky
8   Decl. ¶ 10.) These "anonymous sources" leaked the documents in stages to different
9   media outlets so that multiple media outlets would continue to publish new stories,
10  ensuring that media interest would continue. (Broidy Decl. ¶¶ 22–23; Wolosky
11  Decl. ¶ 4.)

12         Forensic experts examined Plaintiffs' computers and concluded that the
13  unauthorized attack on those computers originated from Qatar. (Tenery Decl. ¶¶ 11,
14  17)   The forensic experts also concluded that this attack was carried out by a
15  sophisticated team experienced in conducting covert cyber-operations. (*Id.* ¶ 17.)

16         The forensic experts also examined the PDFs that had been sent to news
17  organizations.  They found that the metadata had been stripped off of them to erase
18  the identity of the author of the document. (*Id.* ¶ 13.)  However, in one PDF some
19  metadata was found and indicated that the author of that file was "David." (*Id.*)
20  David is the middle name of the Defendant, Nicolas David Muzin.  Examination of
21  the PDFs also showed the date and time stamps for when the emails had been
22  converted into PDF files.  The information showed that the time stamps on the files
23  was within North American time zones. (*Id.* ¶ 15.)  That means that the individual
24  who turned the emails into a form that could be distributed to the media was likely
25  in the United States. (*Id.*) The attackers not only accessed the system but had to
26  comb through emails and documents in order to curate discreet collections of
27  documents that would be of interest to reporters. (Wolosky Decl. ¶ 4.) The date and
28

-5-

1    time stamps indicate that the individual who converted the stolen emails from native

2    electronic format into the PDFs was, in fact, in North America. (Tenery Decl. ¶ 15.)

3          Defendant Stonington had originally been paid $50,000 per month as a

4    registered foreign agent of Defendant State of Qatar but, according to FARA filings,

5    on December 11, 2017 – only days before the attack on Plaintiffs began – that pay

6    was increased six-fold, to $300,000 per month, for "consulting services to the

7    Embassy of the State of Qatar in Washington." (Ex. 23 to Wolosky Decl.) Forensic

8    experts determined that Plaintiff Rosenzweig's Gmail account was compromised on

9    December 27, 2017, sixteen days after the amended FARA filing reflecting the

10    increased compensation was made. (Tenery Decl. ¶ 8.)

11          On March 19, 2018, Plaintiffs' counsel formally requested that the State of

12    Qatar take appropriate action to halt the attacks on Plaintiffs' emails, documents,

13    and data and to stop Defendants from disseminating Plaintiffs' emails, documents,

14    and data and/or to assist Plaintiffs in halting dissemination if the hack had been

15    conducted by a person or entity not authorized to do so by the State of Qatar.

16    (Wolosky Decl. ¶ 9.)  No response was received to that letter before this action was

17    commenced on March 26, 2018.[2]

18

19    _____

[2] On the evening of March 28, after Plaintiffs' counsel sent letters to the named
Defendants informing them that this application for interim relief would be made,
Plaintiffs' counsel received an email from Dean M. Dilley of the law firm of Squire
Patton Boggs (US) LLP, stating that "in connection with [his] representation of the
State of Qatar," he wishes that Plaintiffs "provide the relevant papers to me" and
that "Qatar intends to be heard on any motions filed in this matter."  (Ex. 18 to
Wolosky Decl.)  Consequently, Plaintiffs' counsel will serve this application on Mr.
Dilley. Defendant Stonington has been served with the Summons and Complaint via
its registered agent in Delaware, where it is registered as an LLC. (Exhibit 14 to
Wolosky Decl.). Repeated attempts to serve Defendant Muzin at a Maryland address
that Defendant Muzin has used for business purposes and, upon information and
belief is his place of residence, have been unsuccessful. (Ex. 15 to Wolosky Decl.).
We will continue to attempt to serve Defendant Muzin. Defendant Muzin is aware
of the suit and has issued comments to the press in which he referenced the

## III.   ARGUMENT

### A.   *Plaintiffs Satisfy the Legal Standards for a Temporary Restraining Order and a Preliminary Injunction*

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As shown below, Plaintiffs here meet each of these requirements.

Plaintiffs also meet the alternative "sliding scale" approach to evaluating preliminary injunctions applied in this Circuit, "according to which 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1105 (N.D. Cal. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). In particular, "the Ninth Circuit 'has adopted and applied a version of the sliding scale approach under which'" a party "need only show there are 'serious questions going to the merits' in order to be entitled to relief'" once that party shows that "the balance of hardships tips sharply in its favor." *Id.* (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). Under this approach, the party seeking the injunction must also show that there is a likelihood of irreparable injury and that the injunction is in the public interest. *Cottrell*, 632 F.3d at 1135.

controversy around Plaintiff Broidy's hacked emails and said that he was "proud of the work my firm has conducted with Qatar[.]" (Ex. 11 to Wolosky Decl.).

B O I E S   S C H I L L E R   F L E X N E R   L L P

1  "The standards for a temporary restraining order and a preliminary injunction
2  are the same." *Johnson v. Macy*, 145 F. Supp. 3d 907, 913 (C.D. Cal. 2015).  The
3  emphasis of the court is frequently "directed to irreparable harm and the balance of
4  hardships because the merits of a controversy are often difficult to ascertain and
5  adjudicate on short notice." *Martinez v. Ziomek*, No. CIV S-08-674, 2008 WL
6  5099590, at *1 (E.D. Cal. Nov. 25, 2008).

7      **B.    *Plaintiffs Are Likely to Succeed on the Merits of Their Claims***

8          Plaintiffs are likely to succeed on the merits of each of the seven causes of
9  action pleaded in their Complaint:  (1) violations of the Federal Computer Fraud and
10  Abuse Act (the "CFAA"), 18 U.S.C. § 1030; (2) violations of the California
11  Comprehensive Computer Data Access and Fraud Act (the "CCDAFA"), Cal. Pen.
12  Code § 502; (3) receipt and possession of stolen property in violation of Cal. Pen.
13  Code § 496; (4) invasion of privacy by intrusion upon seclusion; (5) invasion of
14  privacy by public disclosure of private facts; (6) conversion; and (7) civil
15  conspiracy.  (*See* Compl. (Doc. 1) ¶¶ 82–139.)

16      **1.    Plaintiffs Are Likely to Succeed on the Merits of Their CFAA
        Claim**
17

18          The CFAA was enacted to address the very type of conduct engaged in by
19  Defendants here—namely, the "'hacking' or 'trespass' onto private, often password-
20  protected mainframe computers." *hiQ Labs*, 273 F. Supp. 3d at 1109 (citation
21  omitted); *see also United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012)
22  ("Congress enacted the CFAA in 1984 primarily to address the growing problem of
23  computer hacking, recognizing that, '[i]n intentionally trespassing into someone
24  else's computer files, the offender obtains at the very least information as to how to
25  break into the computer system.'" (citation omitted) (alteration in original)).
26          Plaintiffs plead violations of two separate provisions of the CFAA:
27  (1) Section 1030(a)(2)(C), which prohibits obtaining information from a protected
28

BOIES  SCHILLER  FLEXNER  LLP

BOIES SCHILLER FLEXNER LLP

1  computer through intentional access of that computer without authorization; and
2  (2) Section 1030(a)(5)(C), which prohibits causation of damage and loss as a result
3  of accessing a protected computer without authorization.  Plaintiffs are likely to
4  succeed on both claims.

5      First, there was unauthorized access to Plaintiffs' computers, servers, and
6  electronic communications and documents.  (*See* Tenery Decl. ¶ 9.)  Second,
7  information was taken during those breaches, and both damages and loss resulted
8  from them.  (*See generally* Broidy Decl.)  Emails were stolen from Plaintiff Broidy
9  and BCM's accounts as a result of these attacks, and began to be distributed to the
10  media shortly thereafter.  (Tenery Decl. ¶ 12; Broidy Decl. ¶¶ 18–19.)  As a result of
11  these breaches, Plaintiffs have been forced to retain attorneys, forensic investigators,
12  and data security experts, and undertake other expenses to identify the source of the
13  cyber-attacks and repair the integrity of Plaintiffs' computer systems after the
14  attacks.  (Broidy Decl. ¶ 25.)  Such expenses are ongoing, and qualify as loss under
15  the CFAA.  *See SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 980–81
16  (N.D. Cal. 2008) (finding that the plaintiff was likely to prevail on its CFAA claim
17  where the loss claimed was the cost of responding to the offense).

18      Finally, these attacks can be connected to Defendants.  As discussed above,
19  during the weeks leading up to the hacks on Plaintiffs' computers, Defendant
20  Muzin, during meetings with representatives of Defendant the State of Qatar,
21  identified Plaintiff Broidy as an impediment to the State of Qatar's public relations
22  efforts, thereby providing the motive for seeking to discredit him.  (*See generally*
23  Mowbray Decl.) In addition to having the motive and opportunity to utilize a
24  computer hacking and press attack strategy against Plaintiffs, Defendant State of
25  Qatar has a pattern of using these tactics against critics. *See*   Eduard Kovacs,
26  "Amnesty Warns of Phishing Attacks on Qatar Activists," *Security Week*, February
27  15, 2017.
28

1    Shortly after the attacks, Defendant Muzin expressed knowledge that the State

2    of Qatar was targeting Plaintiff Broidy, including through hacks.  (*See id.* ¶¶ 13, 22–

3    24, 28.)  Defendant Muzin also expressed knowledge of the use of the emails and

4    documents taken from those attacks prior to publication of that information in the

5    media.  (*Id.* ¶¶ 13, 17.)  In addition, misleading I.P. addresses were used to mask the

6    true identity of the Qatari source of the intrusion. (Tenery Decl. ¶ 11).  Finally, the

7    metadata from one file could be connected to an author "David" who was present in

8    North America at the time of the file's creation; David is the middle name of

9    Defendant Muzin.  (*Id.* ¶¶ 14–15.)  Taken as a whole, this evidence strongly

10   suggests that Defendants were responsible for the attacks on Plaintiffs.

   **2.    Plaintiffs Are Likely to Succeed on the Merits of Their**
11 **       California CCDAFA Claim**

12

13   The CCDAFA prohibits numerous types of unauthorized breaches of

14   computers, computer systems, or computer networks, including but not limited to:

15   (1) unauthorized taking, copying, or making use of any data or supporting

16   documentation, Cal. Pen. Code § 502(c)(2); (2) adding, altering, damaging, deleting,

17   or destroying data, *id.* § 502(c)(4); (3) providing an unauthorized means of access to

18   computers, computer systems, or computer networks, *id.* § 502(c)(6); (4) engaging

19   in or causing unauthorized access, *id.* § 502(c)(7); and (5) unauthorized use of the

20   Internet domain name or profile of another individual, corporation, or entity in

21   connection with the sending of one or more electronic email messages or posts that

22   causes damage, *id.* § 502(c)(9).

23   As with the CFAA, "[o]ne of the legislative purposes of [the CCDAFA] was

24   to deter and punish . . . browsers and hackers – outsiders who break into a computer

25   system to obtain or alter the information contained there." *Weingand v. Harland*

26   *Fin. Solutions, Inc.*, No. C-11-3109 EMC, 2012 WL 2327660, at *5 (N.D. Cal. June

27   19, 2012) (first alteration and omission in original) (quoting *People v. Gentry*, 234

28

BOIES  SCHILLER  FLEXNER  LLP

1   Cal. App. 3d 131, 141 n.8 (Cal. Ct. App. 1991)).  Because the CCDAFA "covers at

2   least as broad a range of unauthorized access to information as the CFAA," *id.*,

3   Plaintiffs are likely to succeed on the merits of their CCDAFA claim for the same

4   reasons they are likely to succeed on the merits of their CFAA claims.  *See* Section

5   III.B.1; *see also Facebook, Inc. v. ConnectU LLC*, 489 F. Supp. 2d 1088, 1091

6   (N.D. Cal. 2007) (allegations sufficient to allege a section 502 claim where

7   "ConnectU knowingly accessed Facebook's website to collect, copy, and use data

8   found thereon in a manner not authorized or permitted by Facebook").

9             **3.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim**
              **for Possession of Stolen Property under California Penal**
10            **Code Section 496**

11

12          Under California law, it is unlawful to "receive[ ] any property that has been

13   stolen or that has been obtained in any manner constituting theft or extortion,

14   knowing the property to be so stolen or obtained."  Cal. Penal Code § 496.  Section

15   496 is not just a criminal prohibition – any party injured by a violation of section

16   496 "may bring an action for three times the amount of actual damages, if any,

17   sustained by the plaintiff, costs of suit, and reasonable attorney's fees."  *Id.* § 496(c).

18          Property is defined broadly, as "[a]nything that could be the subject of a theft

19   can also be property under section 496."  *People v. Gopal*, 171 Cal. App. 3d 524,

20   541 (Cal. Ct. App. 1985) (finding the receipt of stolen trade secrets a crime and

21   affirming the conviction below).  Indeed, in the context of a conversion claim, the

22   Ninth Circuit has held that "[p]roperty is a broad concept that includes 'every

23   intangible benefit and prerogative susceptible of possession or disposition.'"

24   *Kremen v. Cohen,* 337 F.3d 1024, 1030 (9th Cir. 2003) (citation omitted) (finding

25   that domain names are property).  In consideration of property's broad definition,

26   California courts have long interpreted section 496 to prohibit the receipt of stolen

27   documents.  *See, e.g., Williams v. Superior Court*, 81 Cal. App. 3d 330, 341 (Cal.

28   Ct. App. 1978) (avoiding issue of whether information, as opposed to paper, can be

-11-

BOIES  SCHILLER  FLEXNER  LLP

B O I E S   S C H I L L E R   F L E X N E R   L L P

1  the subject of theft, but holding that "[t]he original documents comprising the June

2  Walker file and any photocopies thereof which were in the possession of Hartford,

3  its attorneys, or its investigative agent, were property subject to theft").  Here, the

4  property involved is not merely information in the abstract sense, but consists of

5  concrete documents, contracts, and emails belonging to Plaintiffs, which were taken,

6  held by Defendants, and later printed and disseminated to the press.  That these

7  documents were digital does not alter the analysis.  *See People v. Kwok*, 63 Cal.

8  App. 4th 1236, 1251 (Cal. Ct. App. 1998) ("Making an unauthorized copy of a

9  'borrowed' key, which is analogous to making an unauthorized copy of a trade

10  secret or an unauthorized copy of computer data, destroys the intangible benefit and

11  prerogative of being able to control access to one's residence just as thoroughly as

12  outright theft of the key itself." (internal quotation marks omitted)).

13        For many of the same reasons stated above in connection with Plaintiffs'

14  CFAA claim, Defendants have violated this statute.  After Plaintiffs gained

15  unauthorized access to Plaintiffs' computers, servers, and electronic

16  communications and documents, they stole those electronic communications and

17  documents and then disseminated them to various media outlets.  *See* Section

18  III.B.1.  (*See* Tenery Decl. ¶¶ 11–12; Broidy Decl. ¶¶ 18–19.)

19        **4.     Plaintiffs Are Likely to Succeed on the Merits of Their Claim
                 for Invasion of Privacy by Intrusion upon Seclusion**

20

21        The action for invasion of privacy by intrusion upon seclusion "has two

22  elements:  (1) intrusion into a private place, conversation or matter, (2) in a manner

23  highly offensive to a reasonable person."  *Shulman v. Grp. W Prods., Inc.*, 955 P.2d

24  469, 490 (Cal. 1998) (following the Restatement (Second) of Torts).  This form of

25  invasion of privacy "does not depend upon any publicity given to the person whose

26  interest is invaded or to his affairs," but "consists solely of an intentional

27  interference with his interest in solitude or seclusion, either as to his person or as to

28

-12-

1  his private affairs or concerns, of a kind that would be highly offensive to a

2  reasonable man." Restatement (Second) of Torts § 652B cmt. a. The invasion may

3  be "by opening [an individual's] private and personal email," among other

4  invasions. *Id.* § 652B cmt. b.

5       With respect to the first element, Plaintiffs are likely to prove that Defendants

6  "'penetrated some zone of physical or sensory privacy surrounding, or obtained

7  unwanted access to data about, the plaintiff.'" *Grant v. United States*, No. 11-cv-

8  00360, 2011 WL 2367656, at *7 (E.D. Cal. June 9, 2011) (quoting *Shulman*, 955

9  P.2d at 490). The contents of Plaintiffs' electronic communications and documents

10  are sensitive in nature, including passwords, private personal communications and

11  confidential business communications, and documents. (Broidy Decl. ¶¶ 3–4.) To

12  guard the private and sensitive nature of these materials, Plaintiffs protected their

13  electronic data with passwords. (*Id.* ¶ 4.) For the same reasons as discussed in

14  Sections III.B.1, III.B.2, and III.B.3, Plaintiffs are likely to prove that Defendants

15  unlawfully intruded upon these private and sensitive materials.

16       With respect to the second element, it also is likely that Plaintiffs will be able

17  to show that Defendants' conduct was highly offensive to the reasonable person.

18  Courts have recognized that illegal hacking, particularly with respect to private

19  email accounts and documents, is highly offensive to the reasonable person. *See*

20  *Coal. for an Airline Passengers' Bill of Rights v. Delta Air Lines, Inc.*, 693 F. Supp.

21  2d 667, 675 (S.D. Tex. 2010) (concluding that "hacking into a person's private

22  computer and stealing personal correspondence would represent an intentional

23  intrusion . . . [that] would be highly offensive to a reasonable person"). Defendants'

24  apparent motives for their actions – to retaliate against United States citizens for

25  criticism of the actions of a foreign state – further support a finding of highly

26  offensive behavior. *Grant*, 2011 WL 2367656, at *7 (considering the "degree and

27  setting of the intrusion, and the intruder's motives and objectives," in determining

28

BOIES SCHILLER FLEXNER LLP

1  whether conduct was highly offensive to the reasonable person (internal quotation

2  marks omitted)).

**5.**   **Plaintiffs Are Likely to Succeed on the Merits of Their Invasion of Privacy by Public Disclosure of Private Facts Claim**

Plaintiffs are also likely to succeed on the merits of their claim against

Defendants for public disclosure of private facts.  To establish a claim for invasion

of privacy by public disclosure of private facts, a party must show:  "(1) public

disclosure (2) of a private fact (3) which would be offensive and objectionable to the

reasonable person and (4) which is not of legitimate public concern."  *Doe v.*

*Gangland Prods., Inc.,* 730 F.3d 946, 958 (9th Cir. 2013) (citation and internal

quotation marks omitted).

Plaintiffs will meet all of these elements.  As discussed in Section III.B.1

above, the element of public disclosure is met because "it is undisputed" that the

emails were publicly distributed by the hackers to media outlets.  *Id.* at 959.  The

second element is met because Plaintiffs' email communications were undoubtedly

private.  The third element is met because the accusations stemming from the leaked

emails have painted Plaintiffs in a light that any reasonable person would find

offensive and objectionable.  *Id.* (finding that a disclosure that the plaintiff was tied

to illegal activity was "offensive and objectionable to a reasonable person").

Though the disclosures are in the news, they are not a legitimate matter of public

concern insofar as there was a severe "depth of intrusion" in releasing these private

emails and the Plaintiffs are not public figures as they have not "voluntarily acceded

to a position of public notoriety."  *Michaels v. Internet Ent't Grp., Inc.,* 5 F. Supp.

2d 823, 841 (C.D. Cal. 1998).  The subject of this case is the private emails of

private citizens, where the content of the stolen emails is not limited to public issues.

BOIES  SCHILLER  FLEXNER  LLP

### 6. Plaintiffs Are Likely to Succeed on the Merits of Their Conversion Claim

"In California, conversion has three elements: (1) ownership or right to possession of property, (2) wrongful disposition of the property right of another, and (3) damages." *Don King Productions/Kingvision v. Lovato*, 911 F. Supp. 419, 423 (N.D. Cal. 1995). Property subject to this cause of action includes property rights over intangible property. *Id.* ("[C]ourts . . . have significantly relaxed [the] rule" that "conversion *generally* lies only where the property allegedly converted is tangible." (emphasis in original)). Indeed, the Ninth Circuit has recognized in the context of conversion that it "must accommodate facts arising from Internet transactions within traditional legal doctrines." *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1144 (9th Cir. 2010).

Plaintiffs are likely to succeed on the first two of these elements for the same reasons that they are likely to succeed in their claim for possession of stolen property. *See* Section III.B.3. The third element is met because Plaintiffs have been harmed, and continue to be harmed, by Defendants' action. (*See generally* Broidy Decl.)

### 7. Plaintiffs Are Likely to Succeed on the Merits of Their Civil Conspiracy Claim

"The elements of a civil conspiracy are: (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from an act done in furtherance of the common design." *Tyan, Inc. v. Garcia*, No. CV-15-05443, 2016 WL 7655790, at *4 (C.D. Cal. May 19, 2016) (citation and internal quotation marks omitted). Plaintiffs are likely to succeed in demonstrating these elements. Defendant Muzin met with officials and agents of Defendant the State of Qatar and they discussed the threat posed by Plaintiff Broidy to the State of Qatar's interests. (*See, e.g.*, Mowbray Decl. ¶¶ 22, 24.) Defendant Muzin, acting directly and through

-15-

1  Stonington and other agents, participated in the conspiracy by providing information

2  to the State of Qatar about individuals whom he perceived as engaging in anti-Qatar

3  activities. (*See generally* Mowbray Decl.) Even if Defendant Muzin did not know

4  the full scope of Defendant the State of Qatar's illegal plans, "'[t]o be liable, each

5  participant in the conspiracy need not know the exact details of the plan, but each

6  participant must at least share the common objective of the conspiracy.'" *Gilbrook*

7  *v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999), *as amended on denial of*

8  *reh'g* (July 15, 1999) (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*,

9  865 F.2d 1539, 1541 (9th Cir. 1989) (en banc)). Defendant Muzin worked with

10  Qatari officials on plans to discredit the perceived opponents of the State of Qatar,

11  which included Plaintiff Broidy. (*See generally* Mowbray Decl.) Plaintiffs are

12  likely to prevail because "a defendant's knowledge of and participation in a

13  conspiracy may be inferred from circumstantial evidence and from evidence of the

14  defendant's action." *Gilbrook*, 177 F.3d at 856–57.

15      Defendant Muzin's discussion of Plaintiff Broidy's activities with officials of

16  Defendant the State of Qatar are "[a]cts which seem otherwise innocent [but] when

17  viewed in the context of the surrounding circumstances[] may justify an inference of

18  complicity." *United States v. Calabrese*, 825 F.2d 1342, 1348 (9th Cir. 1987)

19  (discussing a criminal conspiracy) (citation and internal quotation marks omitted).

20  Even if Defendant Muzin did not participate in the hacking, civil conspiracy is "a

21  legal doctrine that imposes liability on persons who, although not actually

22  committing a tort themselves, share with the immediate tortfeasors a common plan

23  or design in its perpetration." *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260

24  F. Supp. 2d 941, 947 (N.D. Cal. 2003) (citation and internal quotation marks

25  omitted). In any event, there is evidence that Defendant Muzin did participate in the

26  activities that took place after the hacking. (*See generally* Mowbray Decl.)

27  Ultimately, the culmination of the conspiracy—the hacking and dissemination of

28

BOIES SCHILLER FLEXNER LLP

BOIES SCHILLER FLEXNER LLP

1   Plaintiffs' emails and documents—caused and continues to cause irreparable
2   damage to Plaintiffs. (Broidy Decl. ¶ 24.) As a result, Plaintiffs will succeed on
3   their conspiracy claim.

### C. *Plaintiffs Will Suffer Immediate and Irreparable Harm Absent Injunctive Relief*

6   There is no question that Plaintiffs have suffered and will continue to suffer
7   irreparable harm in the absence of injunctive relief. Plaintiffs' private emails and
8   documents have been disseminated globally to media organizations, who have
9   published the contents of those stolen materials. *See supra* at 2–5. Worse, altered
10  and forged versions of those emails and documents also have been disseminated to
11  the media. *Id.* (*See also* Mowbray Decl. ¶ 33.)

12  The relentless leak of Plaintiffs' private communications is undermining their
13  reputations and "intangible injuries, such as damage to . . . goodwill[] qualify as
14  irreparable harm." *Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp. 2d 1079,
15  1092 (E.D. Cal. 2012) (citation and internal quotation marks omitted); *see Stuhlbarg*
16  *Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (finding
17  evidence of goodwill supports a finding of irreparable harm); *Hunter Consulting,*
18  *Inc. v. Beas*, No. SACV 12-1947, 2012 WL 6193381, at *4 (C.D. Cal. Dec. 10,
19  2012) ("Harm to business goodwill and reputation is unquantifiable and considered
20  irreparable.").

21  Plaintiffs will suffer "a loss of goodwill and reputation" absent a preliminary
22  injunction. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057
23  (9th Cir. 2009). Such a harm is irreparable (not monetary in nature) and therefore a
24  preliminary injunction is required. Additionally, the loss of "personal privacy" has
25  been recognized as an irreparable harm. *See Facebook, Inc. v. Fisher*, No. C 09-
26  05842 JF, 2009 WL 5095269, at *2 (N.D. Cal. Dec. 21, 2009). As an example, the
27  unauthorized publication of an individual's likeness on the internet has been found
28

1   to have "caused and is causing great and irreparable injury to [the] plaintiff, in an
2   amount that cannot be ascertained at this time and, unless restrained, will cause
3   further irreparable injury, leaving plaintiff with no adequate remedy at law." *Ken*
4   *Roberts Co. v. GoTo.Com*, No. 99-CV-4775, 2000 WL 33680439, at *4 (N.D. Cal.
5   Feb. 8, 2000).  The distribution and posting of stolen emails is a similarly severe
6   harm to the Plaintiffs' goodwill, reputation, and personal privacy.

7        The harm to Plaintiffs' reputation is not speculative, but is part of an ongoing
8   injury that is extremely likely to continue. *See Winter*, 555 U.S. at 22 (holding that
9   the irreparable injury must be "*likely* in the absence of an injunction"). (*See* Broidy
10  Decl. ¶¶ 22–24.)  Indeed, the *New York Times* recently reported that "an anonymous
11  group critical of Mr. Broidy's advocacy of American foreign policies in the Middle
12  East" has been sending "documents, which included emails, business proposals and
13  contracts" to reporters.  David D. Kirkpatrick and Mark Mazetti, "How 2 Gulf
14  Monarchies Sought to Influence the White House," *New York Times*, Mar. 22, 2018.
15  Defendant Muzin stated that "there's a lot more coming." (Mowbray Decl. ¶ 30.)
16  Thus, dissemination of Plaintiffs' emails and documents is ongoing.

17      **D.**   ***The Balance of Equities and Consideration of the Public Interest Tip***
        ***Sharply in Plaintiffs' Favor***
18

19           **1.**   **Defendants Will Not Be Prejudiced by a Temporary**
                      **Restraining Order and Preliminary Injunction**
20

21        Defendants' interest in unauthorized access to Plaintiffs' electronic data,
22  invading Plaintiffs' privacy, and disseminating private and falsified information to
23  the media is far outweighed by Plaintiffs' interest in preserving the privacy of their
24  affairs and avoiding the scrutiny and harassment that has been and will be attendant
25  in having their confidential communications and documents publicly aired.  It is
26  well-settled that injunctions focused on preventing a defendant from acting
27  unlawfully do not cause "any significant hardship to [a] defendant, because [such

28

-18-

BOIES SCHILLER FLEXNER LLP

1  injunctions] essentially only require [the defendant] to abide by existing law."

2  *Souza*, 861 F. Supp. 2d at 1092 (noting that "any injunction issued would be focused

3  on preventing defendant from unlawfully using [plaintiff's] trade secrets to solicit

4  [plaintiff's] customers"); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v.*

5  *Chung*, No. CV 01-00659, 2001 WL 283083, at *6 (C.D. Cal. Feb. 2, 2001) ("[T]he

6  balance of hardships tips heavily in favor of granting injunctive relief because an

7  injunction merely prohibits Defendants from misappropriating the trade secrets of

8  Merrill Lynch, and requires them to comply with the reasonable terms of their

9  Agreements.").

10         **2.  Plaintiffs Have A Strong Interest in the Protection of Their Private Electronic Communications and Documents**

11

12      Conversely, Plaintiffs would suffer significant harm in the absence of

13 injunctive relief.  Defendants not only have wrongfully accessed Plaintiffs'

14 computers, emails, computer servers, and internet accounts, and stolen private

15 electronic communications and documents, but they also have disseminated the

16 stolen information as well as alterations and forgeries of the stolen information to

17 the media.  The releases to the media have been staggered over time and media

18 inquiries are ongoing, (*see* Wolosky Decl. ¶ 4; Broidy Decl. ¶ 22), so Plaintiffs have

19 every reason to believe that additional disclosures are forthcoming in the absence of

20 an injunction.

21         **3.  An Injunction Against Defendants is in the Public Interest**

22      Finally, the public interest weighs strongly in favor of granting Plaintiffs'

23 motion.  Both the United States Congress and California Legislature have

24 recognized a strong public interest in guarding against cyber-attacks and various

25 forms of hacking by enacting multiple statutes imposing civil and criminal liability

26 for such conduct.  *See* Computer Fraud and Abuse Act, 18 U.S.C. § 1030; California

27 Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502; *hiQ*

28

-19-

BOIES SCHILLER FLEXNER LLP

1  *Labs*, 273 F. Supp. 3d at 1109; *Weingand*, 2012 WL 2327660, at \*5.  Similarly,

2  California recognizes a strong right to privacy, a right contained both in California's

3  Constitution and its common law.  *See* Cal. Const. Art. I, § 1 ("All people are by

4  nature free and independent and have inalienable rights.  Among those are . . .

5  privacy."); *Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 647 (Cal. 1994)

6  (explaining, although discussing the common law privacy right's limiting principles,

7  that "[t]he privacy tort seeks to vindicate multiple and different interests that range

8  from freedom to act without observation in a . . . private place to the ability to

9  control the commercial exploitation of a name or picture").

10      The public interest in this injunction is further enhanced because Plaintiffs

11  appear to have been targeted as a result of Plaintiff Broidy's exercise of his First

12  Amendment rights to speak out against the State of Qatar and meet with public

13  officials about those concerns.  *See, e.g., Entler v. Gregoire*, 872 F.3d 1031, 1043

14  (9th Cir. 2017) (recognizing the right to petition for redress of grievances as "'one

15  of the most basic of all constitutional rights'" (quoting *Meyer v. Bd. of Cty.*

16  *Comm'rs*, 482 F.3d 1232, 1243 n.5 (10th Cir. 2007)); *Klein v. City of Clemente*, 584

17  F.3d 1196, 1208 (9th Cir. 2009) (recognizing a "'significant public interest' in

18  upholding free speech principles" because of the potential impact to the free

19  expression interests of third parties (citation omitted)).

20      Conversely, Defendants have no legitimate interest in continuing their

21  unlawful conduct.  Furthermore, to the extent that Defendants may suggest that their

22  dissemination of materials to the media is itself protected by the First Amendment,

23  no such right attaches here.  In *Bartnicki v. Vopper*, the Supreme Court held that the

24  First Amendment prevented liability for defendants who lawfully acquired and

25  subsequently broadcasted a recorded conversation about a threat of violence during

26  a public school teacher's labor negotiation.  532 U.S. 514, 518 (2001).  Since

27  *Bartnicki*, courts have held that the First Amendment provides no shield to those

28

-20-

BOIES SCHILLER FLEXNER LLP

who, like Defendants, intentionally search out and subsequently obtain, and then privately disseminate to organizations around the world, information that they understand was illegally acquired.  *See Quigley v. Rosenthal,* 327 F.3d 1044, 1067–68 (10th Cir. 2003) (finding no protection where defendant knew information was illegally acquired); *cf. Peavy v. WFAA-TV, Inc.,* 221 F.3d 158, 193 (5th Cir. 2000) (finding no protection for television station that was involved in illegal acquisition of intercepted telephone conversations).  To the contrary, Defendants' active effort here to purloin confidential private information and make it public seeks to compel the public disclosure of information the Plaintiffs desire (and have a right) to keep private, thus turning the principles underlying the First Amendment on their head.  It is well-settled that the First Amendment "generally protects the right not to speak as well as the right to speak."  *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 492 (1995).

Indeed, "[t]he essential thrust of the First Amendment is to prohibit improper restraints on the *voluntary* public expression of ideas; it shields the man who wants to speak or publish when others wish him to be quiet.  There is necessarily, and within suitably defined areas, a concomitant freedom *not* to speak publicly, one which serves the ultimate end as freedom of speech in its affirmative aspect."  *Harper & Row, Publishers, Inc. v. Nation Ents.,* 471 U.S. 539, 559 (1985) (citation and internal quotation marks omitted) (emphasis in original).

### E.   *The Court Should Not Require a Bond*

A "district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."  *Jorgenson v. Cassiday,* 320 F.3d 906, 919 (9th Cir. 2003).  Here, Plaintiffs seek merely to enjoin Defendants from their further dissemination of Plaintiffs' illegally obtained emails and documents.  Defendants have no legitimate interest in continuing to access, alter, damage, forge, or disseminate Plaintiffs' private electronic accounts, communications, and documents.  Accordingly,

BOIES SCHILLER FLEXNER LLP

1 Defendants cannot suffer any cognizable harm from an order enjoining this conduct,

2 and this Court should not require a bond as a condition of the relief sought.

3 **F.     *The Court Should Grant Plaintiffs' Request for Limited Expedited Discovery***

5 Good cause exists here for the Court to grant Plaintiffs' request to conduct

6 limited discovery right away, despite the fact that the parties have not engaged in a

7 Federal Rule of Civil Procedure 26(f) conference.  *See* Fed. R. Civ. P. 26(d)(1);

8 *SATA GmbH & Co. v. Wenzhou New Century Int'l*, No. CV 15-08157, 2015 WL

9 6680807, at *11 (C.D. Cal. Oct. 19, 2015) (applying good cause standard to allow

10 discovery before Rule 26(f) conference).  Courts may consider the following factors

11 when determining whether good cause exists:

> (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the responding party in complying with the request; and (5) how far in advance of the typical discovery process the request was made.

17 *Id.* (citation and internal quotation marks omitted) These factors weigh heavily in

18 favor of Plaintiffs.

19 *First*, there is a preliminary injunction motion pending, which strongly favors

20 permitting expedited discovery.  *See* Rutter Group, *Federal Civil Procedure Before*

21 *Trial, Calif. & 9th Cir. Editions* § 13:157 (noting in the preliminary injunction

22 context that parties may need to engage in discovery to prepare for the hearing).

23 *Second*, Plaintiffs' requests are narrowly tailored to matters and time periods raised

24 in Plaintiffs' motion and supporting declarations, particularly, a limited set of

25 discovery requests to, and conducting the depositions of, Defendants Stonington and

26 Muzin, as set forth in Plaintiffs' proposed discovery requests (no discovery is being

27 sought of Defendant State of Qatar at this time).  *Third*, given the limited scope, the

28 burden on Defendants Stonington and Muzin, who are parties, would be minimal.

-22-

BOIES  SCHILLER  FLEXNER  LLP

1  *Finally*, the Court should not accord weight to "how far in advance of the typical

2  discovery process the request was made" because, as in *SATA GmbH*, the discovery

3  requested is "narrowly tailored to obtain information relevant and 'essential' for the

4  preliminary injunction." *SATA GmbH*, 2015 WL 66808007, at *11.

5     For these reasons, the relevant factors strongly favor allowing expedited

6  discovery.

7  **IV.   CONCLUSION**

8     For the foregoing reasons, Plaintiffs respectfully ask this Court to grant their

9  motion and enter a temporary restraining order that prohibits Defendants, as well as

10  each and every one of their officers, agents, employees, representatives, and all

11  persons acting in concert with them, from (1) accessing or causing access to

12  Plaintiffs' computers, computer servers, emails, or internet accounts; (2) adding,

13  altering, damaging, deleting, or destroying data located on Plaintiffs' computers,

14  computer servers, emails, or internet accounts; or (3) distributing, publishing,

15  uploading, broadcasting, or otherwise disseminating materials obtained from

16  Plaintiffs computers, computer servers, emails, or internet accounts, including any

17  alterations of such materials, or any documents falsified or created to appear as

18  though they are such materials belonging to Plaintiffs.  The Court further should not

19  require a bond as a condition of this relief.  Finally, Plaintiffs ask this Court to grant

20  their request for an order to show cause as to why preliminary injunctive relief

21  should not issue, as well as an order granting their request for limited expedited

22  discovery.

23

24

25

26

27

28

BOIES  SCHILLER  FLEXNER  LLP

-23-

DATED:  April 2, 2018

Respectfully submitted,

BOIES SCHILLER FLEXNER LLP
LEE S. WOLOSKY

By _____
LEE S. WOLOSKY
Attorneys for Plaintiffs

MEMO OF P'S AND A'S ISO PLAINTIFFS' EX PARTE APP FOR TEMPORARY RESTRAINING ORDER, ORDER
TO SHOW CAUSE FOR PRELIMINARY INJUNCTION, AND ORDER GRANTING EXPEDITED DISCOVERY