**BOIES SCHILLER FLEXNER LLP**
Travis LeBlanc, SBN 251097
  tleblanc@bsfllp.com
435 Tasso Street, Suite 205
Palo Alto, California 94301
Phone: (650) 445-6400 /Fax: (650) 329-8507

David K. Willingham, SBN 198874
  dwillingham@bsfllp.com
725 S Figueroa Street, 31st Floor
Los Angeles, California 90017
Phone: (213) 629-9040 /Fax: (213) 629-9022

Lee S. Wolosky (*pro hac vice pending*)
  lwolosky@bsfllp.com
Robert J. Dwyer (*pro hac vice pending*)
  rdwyer@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Phone:  (212) 446-2300 /Fax:  (212) 446-2350

Amy L. Neuhardt (*pro hac vice pending*)
  aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Phone:  (202) 237-2727 /Fax:  (202) 237-6131

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC, ELLIOTT BROIDY, and ROBIN ROSENZWEIG,<br><br>                Plaintiffs,<br><br>        v.<br><br>STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, and DOES 1-10,<br><br>                Defendants. | Case No. 2:18-CV-02421<br><br>The Honorable John F. Walter<br><br>**DECLARATION OF JOEL MOWBRAY IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR (1) TEMPORARY RESTRAINING ORDER AGAINST DEFENDANTS; (2) ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION; AND (3) ORDER GRANTING EXPEDITED DISCOVERY**<br><br>**[Ex Parte Application; Memorandum of Points and Authorities; Declarations of Elliott Broidy, Lee Wolosky, and Luke Tenery; [Proposed] Temporary Restraining** |

1    **Order, Order to Show Cause Regarding Preliminary Injunction, and Order Granting Expedited Discovery, and [Proposed] Order Granting Preliminary Injunction filed concurrently herewith]**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BOIES SCHILLER FLEXNER LLP

Case No. 2:18-CV-02421

DECLARATION OF JOEL MOWBRAY

BOIES SCHILLER FLEXNER LLP

# DECLARATION OF JOEL MOWBRAY

I, Joel Mowbray, hereby declare as follows:

1.      I am the founder of Fourth Factor Consulting, LLC, a strategic consulting firm that advises Silicon Valley tech companies and pro-Israel and national security-oriented think tanks.

2.      I have known Plaintiff Elliott Broidy for over a decade, and consider him both a friend and a mentor.  When I first met Plaintiff Broidy, it was in my capacity as a fellow at a think tank, the Foundation for Defense of Democracies, where my responsibilities also included fundraising for the organization.  Plaintiff Broidy was one of many donors to that organization.  We remained in touch after that time.  Plaintiff Broidy has been an occasional client of my consulting firm.

3.      I have known Defendant Nicolas D. Muzin since approximately 2012.  We were introduced through a mutual acquaintance.  I came to consider Defendant Muzin a friend, and I thought highly of him.  I even recommended to Senator Ted Cruz that he hire Defendant Muzin – the only such recommendation I made to Senator Cruz.  Thereafter, Defendant Muzin obtained a position as senior policy advisor and deputy chief of staff for strategy to Senator Ted Cruz.

4.      I understand that, beginning on December 27, 2017, Plaintiff Robin Rosenzweig was the target of a phishing email targeted at gaining unauthorized access to her personal Google accounts.  That same day, I was also the target of an attempted hack by means of series of emails purporting to be Google News alerts.

1  The topics of the news alerts related to policy work that I had done in years prior. I

2  had never spoken about this work publically, and had only discussed the work with

3

4  certain offices on Capitol Hill and a handful of acquaintances. The only one of the

5  acquaintances to whom I had spoken about that policy work that also had a

6  relationship with the State of Qatar was Defendant Muzin.

7

**Meetings with Defendant Muzin**

8

9       5.     Between February 27, 2018 and March 8, 2018, Defendant Muzin and I

10  met three times in-person. Prior to our first meeting, Defendant Muzin had been

11

12  reaching out to me in an attempt to meet. I had several understandings about why

13  he wanted to meet.

14

     6.     First, I understood that he wanted to establish a relationship with

15

16  Plaintiff Broidy. Second, I believe that he wanted to repair his relationship with me.

17  Third, a mutual acquaintance had informed me that Defendant Muzin was going to

18  offer me "business" to see how we could repair our friendship.

19

20       7.     There were at least two reasons why Defendant Muzin might have

21  thought he had a bad relationship with Plaintiff Broidy. First, in a conversation I

22

23  had with Defendant Muzin, he told me that he believed Plaintiff Broidy had stymied

24  his efforts to receive a commission on Defendant Muzin's client's contribution to

25  the Republican National Convention, a commission to which he wouldn't typically

26

27  be entitled. Second, Defendant Muzin also felt that Plaintiff Broidy had rebuffed

28  Defendant Muzin's attempts to establish a relationship, despite having many mutual

-2-

Case No.

DECLARATION OF JOEL MOWBRAY

1    acquaintances.

2        8.      Among the reasons why Defendant Muzin would have wanted to repair

3    his relationship with me was because he knew that Plaintiff Broidy and I were both

4

5    unhappy with efforts undertaken by Defendant Muzin in the months prior to the

6    meeting to contact American Jewish leaders on behalf of the State of Qatar, to ask

7

8    that they meet with the Emir of Qatar, Sheikh Tamim bin Hamad Al Thani (the

9    "Emir").   Plaintiff Broidy and I both engaged in efforts to talk American Jewish

10   leaders out of partaking in such meetings.

11

12       9.      Separately, I heard from a mutual acquaintance who, to my knowledge,

13   originally connected Defendant Muzin with the State of Qatar that Defendant Muzin

14   had a budget from the State of Qatar for "lobbyists and journalists."

15

16   **A.    February 27, 2018 Meeting**

17       10.     The first meeting occurred on February 27, 2018 in the lobby at the

18   Four Seasons Hotel located in the Georgetown area of Washington, D.C.  Defendant

19

20   Muzin and I were the only participants in this meeting.

21       11.     During this first meeting, Defendant Muzin confirmed to me his

22
23   personal involvement in arranging meetings between American Jewish leaders and

24   the Emir.  Defendant Muzin acknowledged that in at least one instance he had paid

25   an individual $50,000 for doing work relating to influencing former Arkansas

26
27   Governor and presidential candidate Mike Huckabee and for meeting with the Emir.

28   Defendant Muzin also acknowledged involvement in arranging for Alan

-3-

BOIES SCHILLER FLEXNER LLP

BOIES  SCHILLER  FLEXNER  LLP

1  Dershowitz, Professor of Law Emeritus and Felix Frankfurter Professor of Law,

2  Emeritus at Harvard Law School, to make multiple trips to the State of Qatar, which

3

4  trips were followed by articles by Professor Dershowitz about those trips.

5      12.    As foreshadowed by our mutual acquaintance, Defendant Muzin also

6  asked me for help with his client, the State of Qatar.  In particular, Defendant Muzin

7

8  affirmed that he was not inviting me to be a "part of the whitewashing machine,"

9  stated that we could "do business together," and promised that I could "make money

10  on this."  He supported his overtures by stating that "this is the Trump

11

12  Administration" and "we have three more years."  I understood that Defendant

13  Muzin was attempting change my opinions about the State of Qatar by offering me

14  money.

15

16      13.    During the February 27 meeting, Defendant Muzin and I discussed

17  press attention regarding Plaintiff Broidy.  He told me that there were "more

18  reporters circulating around" to focus on reports regarding the UAE and George

19

20  Nader.  Defendant Muzin specifically told me that the *New York Times* was "digging

21  for a connection with George Nader" and that he had received an email informing

22  him that the *New York Times* was looking at the "UAE Nader angle."  In my view,

23

24  this information could not be tied in to stories in the public domain.  As far as I am

25  aware, a March 1, 2018 the *New York Times* article was the first article to report on

26  a connection between George Nader and Plaintiff Broidy.  After that conversation, I

27

28  asked journalists whether they had heard of these allegations prior to the date of my

-4-

February 27 meeting with Defendant Muzin; they told me they had not.

14.     During our conversation, although Defendant Muzin denied "directly" contacting reporters about Plaintiff Broidy, he acknowledged it had "crossed [his] mind after all the shit" that Defendant Muzin believed Plaintiff Broidy and I had "done to" him.  I understood this to be in reference to our vocal opposition to Defendant Muzin's work on behalf of the State of Qatar.

## B.     March 5, 2018 Meeting

15.     The second meeting I had with Defendant Muzin occurred on March 5, 2018, at the Marriott Marquis Hotel in Washington, D.C.  That meeting happened during the AIPAC Policy Conference occurring at the hotel at that time.  Defendant Muzin and I were the only participants in this meeting.

16.     Approximately one month before this meeting, on January 29, 2018, I had spoken to Ben Wieder, a reporter from *McClatchy DC.,* in an off-the-record interview for a story that Mr. Wieder was working on about Plaintiff Broidy.  The night before my meeting with Defendant Muzin, March 4, 2018, I had spoken to the editor of *McClatchy D.C.,* and separately with Mr. Wieder about an article they had been intending to run using documents that I informed them were "provably false." Ultimately, *McClatchy D.C.* did not publish that particular news story.

17.     At this meeting, I suspected that Defendant Muzin had some involvement in the false information provided to *McClatchy D.C.*  I believed this because Defendant Muzin had advance knowledge at our last meeting about future

Case No.

DECLARATION OF JOEL MOWBRAY

BOIES SCHILLER FLEXNER LLP

reporting on Plaintiff Broidy and George Nader, and because the phishing attack on me in late December 2017 was disguised as a news alert regarding a matter that few people knew I was involved in.

18. Because of my suspicions, during the March 5 meeting with Defendant Muzin, I told him that the concept for the article that I had discussed with *McClatchy D.C.* could be proven false. Defendant Muzin initially denied speaking with Mr. Wieder, but then acknowledged that Mr. Wieder, along with other reporters, had been in contact with him. Defendant Muzin claimed that he had only spoken with Mr. Wieder once, and that it occurred prior to my January 29, 2018 phone conversation with Mr. Wieder. However, Defendant Muzin then relayed back to me the general content of statements I had made to Mr. Wieder during my January 29, 2018 off-the-record conversation.

19. Defendant Muzin's knowledge of my off-the-record conversation more than a month earlier with Mr. Weider was very concerning to me. Prior to founding my consulting firm, I had worked as a journalist for many years. In my professional experience, news reporters will reveal off-the-record statements from sources to individuals only if those individuals are their own organization's reporters, or an editor.

20. Defendant Muzin also warned me that I should be concerned because there was "more stuff coming" from the *New York Times*.

21. Defendant Muzin and I also discussed the various individuals he had

-6-

Case No.

DECLARATION OF JOEL MOWBRAY

contacted in the United States Government to help promote the public relations image of the State of Qatar. In particular, we discussed his relationship to Special Assistant to the White House Victoria Coates. During this meeting, and during later meetings, Defendant Muzin acknowledged his greatest success with respect to work conducted on behalf of the State of Qatar was due to Victoria Coates. Ms. Coates works under Jason Greenblatt, Assistant to the President and Special Representative for International Negotiations, who has sent out several tweets from his personal account favorable to the State of Qatar.

22. Defendant Muzin also discussed meetings he had with his client the State of Qatar and said "Broidy's name comes up in Embassy meetings often." Defendant Muzin later admitted that "I definitely identified him as somebody who, was not, didn't like them too much."

23. Defendant Muzin also warned me that Plaintiff Broidy and I needed "to be very careful" and that the State of Qatar is "going after you. Honestly, I know they're after you and Broidy." I perceived from Defendant's Muzin's tone that this was intended as a threat.

24. Defendant Muzin also acknowledged to me that he had identified Plaintiff Broidy to the State of Qatar as their "hurdle to clear" with respect to their public relations efforts. He further admitted that "[t]here's no question that I had conversations with them about Elliott and you and a few other people." Defendant Muzin acknowledged that everyone he "fingered" was now "in danger," which I

-7-

Case No.
DECLARATION OF JOEL MOWBRAY

BOIES   SCHILLER   FLEXNER   LLP

interpreted to mean that the State of Qatar was going to target those people identified.

25.    Defendant Muzin also told me that he was "positive" that the State of Qatar had hacked Defendant Muzin, although he later changed his statement to saying that the State of Qatar "probably" hacked him.

26.    I told Defendant Muzin that I knew the State of Qatar had hacked both Plaintiff Broidy and me and that those hacks appeared to be based off of the list Defendant Muzin provided to the State of Qatar of people and entities standing in the way of its public relations goals.  Defendant Muzin said only that he needed "to be a little more careful" when he spoke to me.

27.    Defendant Muzin claimed later in the conversation that "I'm not the one directly hacking and calling journalists."  He nonetheless admitted that he had a trove of emails connected to Plaintiff Broidy, the possession of which he justified by asserting that they were on the "dark web" and through referencing "a lot of reporters out there" and "reporters who are reading this stuff."

28.    I later accused Defendant Muzin of identifying to the State of Qatar the "influencers" and "impediments" to them, then assisting the State of Qatar in their hacks of Plaintiff Broidy and me and the disinformation campaign against Plaintiff Broidy.  Defendant Muzin's response was "I was doing my job."  In my impression, Defendant Muzin's tone and body posture at the time was defensive.

**C.    March 8, 2018 Meeting**

Case No.

DECLARATION OF JOEL MOWBRAY

29.     On March 8, 2018, I met for a third time with Defendant Muzin, this time at the Willard InterContinental hotel in Washington, D.C.  Defendant Muzin and I were the only participants in this meeting.

30.     After I asked Defendant Muzin what was happening with all of hacked and disseminated emails, Defendant Muzin stated: "I did not cause the Broidy stuff, just because I have information about it" and "I don't know all the details, but I keep hearing that there's a lot more coming."  To justify his knowledge, Defendant Muzin has referred to an unidentified friend.

31.     When I reminded Defendant Muzin that he had acknowledged being the one who had identified Plaintiff Broidy to the State of Qatar as an impediment to their goals, Defendant Muzin asserted that the State of Qatar had known about Plaintiff Broidy before that time because of supposed news reports about Plaintiff Broidy sitting in the front row at a conference with Yousef Al Otaiba, the UAE ambassador to the United States.  However, to my knowledge, which was based upon Google searches pursuant to his claim about such news stories, there never have been any press accounts of that fact.  For this reason, I discounted Muzin's new explanation for the targeting of Plaintiff Broidy.

32.     Also in this conversation, I again told Defendant Muzin that I knew the State of Qatar had attempted to hack me.  Defendant Muzin acknowledged: "between me and you it's possible they try to hack people."

**News Reports About Plaintiff Broidy Based on Falsified Documents**

Case No.

DECLARATION OF JOEL MOWBRAY

33.    I am aware of news articles that were created based on false documents provided to reporters.  As one example, the *New York Times* reported that Plaintiff Broidy had sent a $12.7 million budget to George Nader on March 25, 2017 outlining a proposed Washington lobbying and public relations campaign against the State of Qatar and the Muslim Brotherhood.  However, I personally drafted the budget discussed in the article, and did not send that version to Plaintiff Broidy until after March 25, 2017, so it would have been impossible for Plaintiff Broidy to have sent it to Mr. Nader on the date reported.  In addition, the budget I created was not focused on George Nader or the UAE.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 26 2018

Joel Mowbray

Case No.
DECLARATION OF JOEL MOWBRAY