**BOIES SCHILLER FLEXNER LLP**
Travis LeBlanc, SBN 251097
  tleblanc@bsfllp.com
435 Tasso Street, Suite 205
Palo Alto, California 94301
Phone: (650) 445-6400 /Fax: (650) 329-8507

David K. Willingham, SBN 198874
  dwillingham@bsfllp.com
725 S Figueroa Street, 31st Floor
Los Angeles, California 90017
Phone: (213) 629-9040 /Fax: (213) 629-9022

Lee S. Wolosky
  lwolosky@bsfllp.com
Robert J. Dwyer
  rdwyer@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Phone: (212) 446-2300 /Fax: (212) 446-2350

Amy L. Neuhardt
  aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Phone: (202) 237-2727 /Fax: (202) 237-6131

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC, ELLIOTT BROIDY, and ROBIN ROSENZWEIG,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, and DOES 1-10,<br><br>Defendants. | Case No. 2:18-CV-02421<br><br>The Honorable John F. Walter<br><br>**DECLARATION OF ELLIOTT BROIDY IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR (1) TEMPORARY RESTRAINING ORDER AGAINST DEFENDANTS; (2) ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION; AND (3) ORDER GRANTING EXPEDITED DISCOVERY**<br><br>**[Ex Parte Application; Memorandum of Points and Authorities; Declarations of Joel Mowbray, Lee Wolosky, and J. Luke Tenery;** |

|   |   |
|---|---|
| 1 | **[Proposed] Temporary Restraining Order, Order to Show Cause Regarding Preliminary Injunction, and Order Granting Expedited Discovery; and [Proposed] Order Granting Preliminary Injunction filed concurrently herewith]** |
| 2 | |
| 3 | |
| 4 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BOIES SCHILLER FLEXNER LLP

Case No. 2:18-cv-02421
DECLARATION OF ELLIOT BROIDY

## DECLARATION OF ELLIOTT BROIDY

I, Elliott Broidy, hereby declare as follows:

1. I am a Plaintiff in this action. I am also the Chairman and Chief Executive Officer of Plaintiff Broidy Capital Management, LLC ("BCM").

2. BCM is an investment firm based in Los Angeles, California, that makes investments in, among other things, privately-held defense contracting companies.

3. In the defense contracting space, discretion is very important and highly valued. The projects of our portfolio companies involve sensitive counterterrorism and intelligence initiatives, among other things, and many of our employees have high-level security clearances. The work is both highly confidential and proprietary. Our clients rely on us to protect information that is highly sensitive, and the success of our businesses depends on our ability to protect proprietary information and methodologies.

4. Confidential information is stored electronically at BCM, as is trade secret, proprietary and business strategy information relating to BCM and its portfolio companies. As CEO and Chairman of BCM, I had electronic access to all of these materials. Any person unlawfully using my log-in credentials (or those of certain of my employees) would also have access to those materials. My log-in credentials also provide access to personal correspondence between myself and my wife (Plaintiff Robin Rosenzweig) and other family members. My wife is an

attorney and her email accounts and computer contain data that is subject to the attorney-client and other legal privileges.

5. BCM has been a financially successful company, and I have strived to use that success to give back to the community through my work as a philanthropist. I have served in leadership or advisory positions on the Council of Guardians for Aviva Family and Children's Services, Wilshire Boulevard Temple, the USC Hillel Foundation, Hebrew Union College, and the Simon Wiesenthal Foundation. President George W. Bush appointment me to the Board of Trustees of the Kennedy Center for Performing Arts in 2006.

6. I have also been participated in public affairs and increased my involvement in that area after the attacks on the United States on September 11, 2001. In 2005, Secretary Michael Chertoff appointment me to the United States Homeland Security Advisory Council and I have served as Commissioner of the Los Angeles City Fire and Police Pension Fund. The Homeland Security Advisory Council issued a "Findings" report on January 11, 2007 in which it stated that the "elimination of safe havens" was an important measure that would "impact the future of terrorism." A copy of that report is attached hereto as Exhibit #1.

7. I have also increased my involvement in Republican Party activities in recent years, because I believe the Republican Party has the better policies for safeguarding the national security of the United States. Among other roles, I have served as Deputy National Chairman of the Republican National Committee's

Finance Leadership Team and in leadership positions in the Republican Jewish Coalition.

8. I have never been shy about expressing my opposition to terrorism, my commitment to the security of the United States, and my support for Israel. My business initiatives have been designed to increase the security of the United States and its friends and partners. I have sought in particular to find ways to enhance our security while reducing the amount of American blood and treasure we must expend to keep our nation safe.

9. As I learned more about how terrorist and extremist organizations rely on state sponsorship, I grew more concerned about the activities of the State of Qatar. I learned that, despite its attempts to foster a softer image, the State of Qatar provides substantial financial and logistical support for terrorist organizations in the Middle East, including Al-Qaeda and its affiliates, Hamas, the Taliban, and the Muslim Brotherhood. I was also offended—and concerned—about anti-Semitic programming on Al Jazeera (which is Qatar's state-owned international broadcaster) and the distribution of anti-Semitic propaganda (such as the "Protocols of the Elders of Zion") at the Doha International Book Fair. The more I learned about Qatar, the more troubled I became.

10. In 2017, I decided that I would channel my concerns about the activities of the State of Qatar into action. I decided that I wanted to help others understand the dangers posed by the State of Qatar.

11. On May 23, 2017, I helped sponsor a conference in Washington D.C. hosted by the Foundation for Defense of Democracies on "Qatar and the Muslim Brotherhood's Affiliates: A New U.S. Administration Considers New Policies." Speakers for that event included a bipartisan group of experts, including former Secretary of Defense Robert Gates and Jake Sullivan, the former National Security Adviser to Vice President Biden. The conference focused on the dangers that the State of Qatar posed to the security of the United States. Congressman Edward R. Royce, the Chairman of the House Foreign Affairs Committee, spoke on a panel and stated that: "I think we are moving on legislation that addresses those states who don't keep their commitment with respect to changing behavior supporting organizations that are sowing terror. This becomes the acid test." Later that month, Congressman Royce joined other members of the House of Representatives in introducing H.R. 2712, a bill that would impose sanctions on entities that sponsor Hamas, and it explicitly included Qatar as such a sponsor, which I strongly supported.

12. On June 5, 2017, many of Qatar's Arab neighbors, led by Saudi Arabia and the United Arab Emirates, broke off economic and diplomatic ties with the State of Qatar. Later that month, I attended a meeting of the Republican National Committee at the Trump Hotel in Washington D.C. President Donald Trump gave a speech in which he acknowledged my attendance and stated: "I prefer that they [Qatar] don't fund terrorism."

-4-  Case No. 2:18-CV-02421
DECLARATION OF ELLIOTT BROIDY

13. On October 23, 2017, I helped to sponsor a bipartisan conference in Washington D.C. hosted by the Hudson Institute on "Countering Violent Extremism: Qatar, Iran and the Muslim Brotherhood." Former Secretary of Defense Leon Panetta, Former Director of the CIA David Petraeus, Senator Tom Cotton, Representative Brad Sherman, former State Department official Dennis Ross, and Council on Foreign Relations Senior Fellow Ray Takeyh, among others, spoke at the conference.

14. I advocated that the U.S. take a strong position against state sponsors of terrorism such as Qatar, and I shared my views with Members of Congress and the Trump Administration, including President Trump.

15. I was aware that in the summer of 2017 Qatar began to spend millions of dollars to hire lobbyists to whitewash their record of sponsoring terrorists.

16. In late 2017, I became aware that one lobbyist, Nick Muzin of Stonington Strategies, was asking Jewish-American leaders to meet with the Emir of Qatar when he was in New York City for the United Nations General Assembly and was also offering to fly Jewish-American leaders to Qatar to meet with the Emir. When I learned about these meeting invitations, I felt angry and expressed deep anger about them. I considered the effort to bring Jewish-American leaders to Qatar to be a despicable P.R. stunt by a government that sponsors organizations that murder innocent Americans and Israelis. I encouraged other Jewish-American leaders to not go on these junkets. I continued to speak out against Qatar's

sponsorship of terrorism and extremism. I knew that Qatar and its agents viewed me as an enemy but I believed I could play and important role in speaking out on an important issue.

17. I first learned that I had been hacked when a London-based Wall Street Journal reporter sent me an email on February 28, 2018 at 3:56:03 AM PST informing me that he had my emails and that the Wall Street Journal was planning to publish a story that "could be published online very early today." A copy of that email is attached hereto as Exhibit #2. The story that was the subject of that email was, in fact, published on March 1, 2018.

18. After learning that I had likely been hacked, I hired forensic experts to conduct an analysis of all computers that my wife and I used, as well as the computers at BCM. Their conclusions were frightening to me: between January, 16, 2018 and February 25, 2018, there had been many instances of unauthorized access to BCM computers. As a result, it was apparent that unauthorized parties had obtained access to my communications.

19. I soon began to hear from media organizations, which had confidential documents, information, and emails that they had received without authorization from the electronic files of BCM, my wife, and me. Often reporters told me or my representatives that I only had a short time to comment before they would publish stories based on this stolen material. Starting on March 1, 2018, reports based on that stolen information have been published in the *New York Times*, *Bloomberg*

*News*, *McClatchy*, *BBC, The Associated Press*, *The Wall Street Journal*, *Business Insider* and a number of other publications.

20. Some of the articles that were published apparently relied on material that consisted of forgeries or altered documents. One example of that was an article portraying me as involved with a Russian bank that was the subject of international sanctions. I never had any involvement with that Russian bank. To my knowledge, only Al Jazeera, which is funded and controlled by the State of Qatar, published that story.

21. This media onslaught has been a sophisticated attempt to injure my professional and personal standing and activities and those of BCM and my wife. Even worse, it is designed to serve as a warning to anyone with the temerity to exercise his or her First Amendment rights to speak out and petition the United States government on matters involving Qatar and its support for terrorism: If you exercise those Constitutional rights, we will come after you, not in a legitimate exchange of views, but by stealing your intellectual property and attempting to use "leaks" to the press to generate stories designed to retaliate against you, undermine your voice, and cause you to back down.

22. The hackers have not posted all the stolen documents and information online. The hackers are slowly dribbling parts of that material out in bits and pieces to maximize the coverage. Each reporter is given a different 'scoop' to cover; the hackers' tactics have been effective at ensuring continuing coverage of stories about

me based on the stolen information and data.

23.   This media onslaught is ongoing, with the *New York Times* reporting in a front-page story on March 25, 2018 that "an anonymous group critical of Mr. Broidy's advocacy of American foreign policies in the Middle East" has been sending out hundreds of documents purported to be from my email accounts. That group is leaking out more documents, and I was contacted as recently as yesterday about new material purporting to be emails and documents that were stolen from me.

24.   Upon information and belief, the "anonymous group" distributing these materials was in fact the hackers and their associates who stole the documents and emails from me, my wife, and BCM.  The hacking and leaking activity complained of has damaged and continues to damage the business of BCM and its portfolio companies. As described above, working with companies in the defense contracting business requires dealing with confidential information and trade secrets, which are now compromised. That stolen information continues to appear in news articles and is the subject of ongoing media inquiries.  These disclosures alone already have led to a loss of business goodwill and unless enjoined will continue to do so. If, as I expect, the releases of hacked data, information, and documents continues, then additional confidential data, information, documents, and trade secrets will be released to the media and in turn to the public, and to BCM's competitors, thereby resulting in a further loss of reputation, goodwill, and

competitive advantage.

25. The hacking and leaking activity complained of has also cost me very substantial amounts of money in incidence response, including amounts paid to information technology experts, security experts, public relations experts, and lawyers, among others.

26. Since the Defendants have no legitimate interest in distributing my stolen and altered emails and documents, I am asking that the court not require a bond as a condition of the relief sought.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 29, 2018

_____
Elliott Broidy