# EXHIBIT 1

# Trump Ally Sues Qatar For Hacking His Email

GOP fundraiser Elliott Broidy says Qatar leaked his emails to reporters in retaliation for his criticism of the Qatari government.

 **By Jessica Schulberg**



ALEX J. BERLINER/BEI/REX/SHUTTERSTOCK

Elliott Broidy and his wife, Robin Rosenzweig, are suing the government of Qatar.

WASHINGTON — A top GOP fundraiser and his wife sued the government of Qatar, the lobbying firm Stonington Strategies, and lobbyist and former Republican political adviser Nicolas Muzin on Monday for allegedly hacking their email accounts and distributing the stolen emails to various media organizations.

The selectively leaked emails appear to show Elliott Broidy, a Los Angeles-based Republican National Committee deputy finance chair, using his proximity to Republican elected officials to influence foreign policy decisions and to boost his defense company's business prospects. The anonymous leaker, which described itself as a group that exposes wrongdoing in Hollywood, has disseminated different tranches of hacked emails to reporters over the past several weeks, resulting in a trickle of negative news stories scrutinizing Broidy's business practices and his communications with U.S. politicians and foreign governments.

The New York Times, Wall Street Journal, Associated Press, Bloomberg, Al Jazeera, HuffPost and others have published stories that appear to be based on the leaked emails.

Broidy, who has denied any wrongdoing, has accused Qatar of orchestrating the hack in retaliation for his outspoken criticism of the government there and his support for its regional rivals.

"We believe the evidence is clear that a nation state is waging a sophisticated disinformation campaign against me in order to silence me, including hacking emails, forging documents, and engaging in espionage and numerous other illegal activities," Broidy said in a statement. "We believe it is also clear that I have been targeted because of my strong political views against Qatar's state sponsored terrorism and double dealing."

Qatar denies it was involved in the hack and indicated in a statement to HuffPost that it is considering a counter-lawsuit against Broidy for making "false statements."

Broidy made headlines in 2009, when he pleaded guilty to giving New York state officials almost $1 million worth of gifts to help his company win a lucrative contract with the state's pension fund. But since then, he has largely operated behind the scenes.

On Feb. 28, HuffPost received the first batch of Broidy's emails from a group that called itself L.A. Confidential. The emails appeared to show Broidy's wife, Robin Rosenzweig, asking for more than $80 million to scuttle a Justice Department investigation into a corruption scandal implicating a Malaysian businessman — and Broidy using his ties to the Trump administration to help.

The next round of emails showed Broidy directly pitching President Donald Trump on a plan to recruit an international army "of Muslim soldiers recruited from Arab and Islamic

3/26/2019                            Trump Allies Sue Qatar For Hacking His Email. Lawsuits.

Case 2:18-cv-02421-JFW-E   Document 81-9   Filed 04/02/18   Page 4 of 127   Page ID #:222

nations" to fight the Taliban and the Islamic State group in Afghanistan.

The most recent round of emails sent to HuffPost came from a group that called itself Hollywood 2018 and used ProtonMail, an encrypted email service. When HuffPost tried to ask Hollywood 2018 if it was the same group that was behind L.A. Confidential, the email bounced back, indicating the account had been deactivated.

The leaker was strategic, providing different news outlets with different documents, ensuring that each outlet would feel it had newsworthy material.

The New York Times reported that Broidy offered access to Trump as part of an effort to get foreign leaders to sign contracts with his defense firm Circinus. The Times also detailed how George Nader, a political adviser to the United Arab Emirates who is now cooperating with special counsel Robert Mueller, cultivated Broidy to gain influence with the Trump administration.

The Associated Press reported that Nader wired Broidy millions of dollars to fund an effort to convince U.S. lawmakers to pass legislation that would label Qatar as a state sponsor of terrorism.

*This is a developing story. Please check back for updates.*

# EXHIBIT 2

Case 2:18-cv-02421-JFW-E Document 31-9 Filed 04/02/18 Page 6 of 127 Page ID #:224

**The New York Times** | https://nyti.ms/2pECyvY

POLITICS

# Fund-Raiser Held Out Access to Trump as a Prize for Prospective Clients

By KENNETH P. VOGEL and DAVID D. KIRKPATRICK    MARCH 25, 2018

WASHINGTON — For Elliott Broidy, Donald J. Trump's presidential campaign represented an unparalleled political and business opportunity.

An investor and defense contractor, Mr. Broidy became a top fund-raiser for Mr. Trump's campaign when most elite Republican donors were keeping their distance, and Mr. Trump in turn overlooked the lingering whiff of scandal from Mr. Broidy's 2009 guilty plea in a pension fund bribery case.

After Mr. Trump's election, Mr. Broidy quickly capitalized, marketing his Trump connections to politicians and governments around the world, including some with unsavory records, according to interviews and documents obtained by The New York Times. Mr. Broidy suggested to clients and prospective customers of his Virginia-based defense contracting company, Circinus, that he could broker meetings with Mr. Trump, his administration and congressional allies.

Mr. Broidy's ability to leverage his political connections to boost his business illuminates how Mr. Trump's unorthodox approach to governing has spawned a new breed of access peddling in the swamp he vowed to drain.

Mr. Broidy offered tickets to V.I.P. inauguration events, including a candlelight dinner attended by Mr. Trump, to a Congolese strongman accused of funding a lavish lifestyle with public resources. He helped arrange a meeting with Republican senators and offered a trip to Mar-a-Lago, the president's private Florida resort, for

Case 2:18-cv-02421-JFW-E Document 31-9 Filed 04/02/18 Page 7 of 127 Page ID #:225

an Angolan politician. And he arranged an invitation to a party at Mr. Trump's Washington hotel for a Romanian parliamentarian facing corruption charges, who posted a **photograph with the president** on Facebook.

This type of access has value on the international stage, where the **perception of support from an American president** — or even a photo with one — can benefit foreign leaders back home.

Mr. Broidy was open about his business interests, but the administration made no effort to curtail his offers of access to clients or prospective clients.

Yet Mr. Broidy was so aggressive, some associates said, that they warned him to tone down his approach for fear that he might run afoul of the president, clients or American lobbying and anti-corruption laws.

As with so many other political conventions, Mr. Trump has upended the traditional system of access to the president, among the most prized chits in Washington. That is partly because of lax vetting that has allowed largely unfettered access to Mr. Trump and his White House by loyalists, friends and hangers-on with their own policy agendas or business interests.

But it is also because few of Washington's established lobbyists have close connections to the president. In their place, a new class of insider has emerged, able to lobby the president directly on behalf of clients or business partners, an uncommon opportunity in prior administrations, when lobbyists focused on winning support from lawmakers or regulators.

In a statement, Mr. Broidy said the success of his company reflected his recruitment of "the best people, including a number of former flag officers," not his political connections. "The idea that our success derives from activities around last year's presidential inauguration is not only misplaced but insulting to the careers and capabilities of our highly trained and decorated veterans," he said.

Mr. Broidy, 60, in some ways personifies this new breed of Trump insider. A lifelong Los Angeles resident who worked as an accountant before making a fortune as an investor, Mr. Broidy grew more interested in politics after the Sept. 11 attacks,

which shaped his hawkish approach to foreign policy and concern for the defense of Israel. In 2005, he was appointed to a federal homeland security advisory panel.

Mr. Broidy pleaded guilty in 2009 to giving nearly $1 million in illegal gifts to New York state officials to help his company land a $250 million contract with the state's public pension fund. He paid $18 million in restitution and avoided jail time.

As he worked to rebuild his bank account and reputation, he expanded his business interests in the defense and security industry, starting a company called Threat Deterrence in 2013 and purchasing Circinus in July 2015.

Mr. Broidy initially supported Senator Ted Cruz of Texas for the Republican presidential nomination in 2016, embracing Mr. Trump only after Mr. Cruz dropped out.

His business took off after Mr. Trump's election. Circinus has won lucrative work from around the world, including contracts worth more than $200 million to do defense work for the United Arab Emirates. And Mr. Broidy openly promoted Circinus's work in meetings with Mr. Trump and other Republican officials, according to documents and interviews.

But Mr. Broidy faces a sudden backlash.

One of his business partners, George Nader, is cooperating with the special counsel, whose investigators have asked about Mr. Nader's contacts with top Trump administration officials as well as his possible role in funneling money from the U.A.E. to Mr. Trump's political efforts, according to people familiar with the inquiry.

Mr. Nader helped Circinus gain access to U.A.E.'s crown prince, while also using Mr. Broidy as a conduit to shape Trump administration policy toward the Persian Gulf on behalf of the U.A.E. and Saudi Arabia, both American allies. Mr. Broidy, in turn, appears to have helped Mr. Nader get his photograph taken with Mr. Trump at a fund-raiser, over the unspecified objections of the Secret Service. Mr. Nader has been convicted on charges related to child pornography and sexual abuse of minors.

Hundreds of pages of Mr. Broidy's emails, proposals and contracts were provided to The Times by an anonymous group critical of Mr. Broidy's advocacy of

Case 2:18-cv-02421-JFW-E Document 31-9 Filed 04/02/18 Page 9 of 127 Page ID #:227

American foreign policies in the Middle East. Mr. Broidy's representatives say they have proof that the documents were stolen by hackers working for Qatar in retaliation for his efforts to rally opposition in Washington to Qatar, a regional nemesis of the Saudis and the Emiratis. The Qataris dismiss this charge.

The documents reveal that Mr. Broidy, a vice chairman of the finance committee for Mr. Trump's inauguration, arranged invitations to parties celebrating the event for foreign leaders with whom Circinus worked to sign contracts that could have been worth hundreds of millions of dollars. Mr. Broidy in some cases presented the invitations in a manner that suggested they were linked to their countries' willingness to do business with Circinus.

For instance, Mr. Broidy invited Denis Sassou-Nguesso, the longtime president of the Republic of Congo, to a handful of inauguration week events, including the candlelight dinner featuring Mr. Trump, Vice President Mike Pence and their wives. "Your name has been submitted and approved," Mr. Broidy wrote to Mr. Sassou-Nguesso in a note on Broidy Capital Management letterhead. Mr. Broidy stressed that the invitation was from Mr. Broidy and "is not coming from the Joint Congressional Committee" on Inaugural Ceremonies, which oversees the swearing-in and a luncheon at the Capitol.

The day after the letter was dated, Mr. Broidy asked his team at Circinus to prepare an invoice for $2 million to Mr. Sassou-Nguesso's office for "military capabilities assessment and review/services," according to emails and documents.

People close to Mr. Broidy said no invoice was sent and Circinus never worked for the Congolese government. Mr. Sassou-Nguesso declined the invitation to the inauguration festivities, they said.

Donors to previous inaugurations were also able to invite foreign heads of state to events as their guests, a spokesman for Mr. Broidy noted.

Two officials from Romania, another prospective Circinus client, met Mr. Trump at a private party to which Mr. Broidy invited them during inauguration week at the Trump International Hotel near the White House. Liviu Dragnea, a parliamentary leader who runs the Social Democratic Party, called for closer ties

between Romania and the United States, prompting Mr. Trump to declare, "We will make it happen! Romania is important for us!" according to Mr. Dragnea's Facebook post, reported by McClatchy.

At the time, Mr. Dragnea faced corruption charges, which he continues to fight. But for months after the inauguration, Circinus continued pitching his government partly on the access it could provide to Mr. Trump, according to a person who works with the Romanian government and was briefed on the solicitation.

Circinus has yet to receive contracts from Romania, people close to Mr. Broidy said. The company entered into an agreement last month with a Romanian government-owned defense company that appears to give it the inside track for contracts valued at more than $200 million, according to Romanian news media and people familiar with the contracting process.

Similarly, in a letter dated Jan. 3, 2017, and emailed to top Angolan government officials, Mr. Broidy indicated that he was also sending both an invitation to the inauguration festivities and a proposal for Circinus to provide security services for Angola. In one version of the proposal, the company sought nearly $64 million over five years. "With numerous preparations ahead, we request that you kindly return the executed document no later than January 9, 2017," Mr. Broidy wrote in the letter to João Lourenço, then the Angolan defense minister, and another Angolan official.

Three days before inauguration, the Angolans submitted a $6 million payment to Circinus, which people close to Mr. Broidy say was $2 million less than the Angolans had agreed to pay. That same day, the Angolans and Mr. Broidy met on Capitol Hill with senators including Tom Cotton of Arkansas and Ron Johnson of Wisconsin, both Republicans, encounters arranged by Mr. Broidy and his team.

About one month later, Mr. Broidy again wrote to Mr. Lourenço, discussing plans for him "to be joining us at Mira Largo" — an apparent reference to Mar-a-Lago, where Mr. Broidy is a member and has been spotted introducing guests to the president — "this coming weekend."

"Many preparations have been made in advance of your visit, including additional meetings at the Capitol and the Department of Treasury," Mr. Broidy

wrote.

He went on to remind Mr. Lourenço that Angola was past due on "the balance of the payment" for Circinus's services. "Please make this payment immediately," he wrote.

Not long after Mr. Lourenço was inaugurated as president of Angola in September, Mr. Broidy wrote again to congratulate him and offer to help set up meetings with Mr. Trump and Mr. Pence. "Before the formalities which would naturally be in order between our governments, I am able to assess and advise in this matter, and would be delighted to help foster such closer relation between Luanda and Washington," Mr. Broidy wrote, referring to the Angolan capital.

Mr. Lourenço did not come to Mar-a-Lago and never responded to the letters, according to people close to Mr. Broidy. Circinus never collected any additional funds from Angola beyond the initial $6 million payment, they said.

Mr. Broidy emphasizes to potential clients how his connections to Mr. Trump could benefit them, according to several people who have worked with him or heard his pitches.

"He was mentioning that he has political connections, and it could be helpful," said Eymen Errais, a counselor to the Tunisian Ministry of Development, Investment and International Cooperation.

Mr. Errais and the department's minister, Fadhel Abdelkefi, met with Mr. Broidy and Circinus executives in Tunisia a few weeks after Mr. Trump's election. Circinus sought a contract to build an open-source intelligence center for the Tunisian government, a person familiar with the meeting said, but Mr. Abdelkefi's ministry instead sought to persuade Mr. Broidy to invest in the Tunisian hospitality industry.

Nonetheless, in an email to Mr. Abdelkefi just after the meeting, Mr. Broidy vowed that the center "would be an extremely useful and effective tool for your government" and again emphasized his connection to Mr. Trump. He characterized the incoming administration as "an unprecedented opportunity, in that the House,

Senate and executive branch of our government are all under Republican control for the first time in 10 years."

Circinus prepared a proposal for a five-year contract totaling $80 million for the Tunisian work. But Mr. Errais said the Tunisians decided not to do business with Circinus. "A connection with Trump — how would that help us for security?" he said.

A person close to Mr. Broidy said he discussed the Republicans' control of Congress and the White House to suggest that the American government might increase spending on counterterrorism.

Mr. Broidy's allies say he has never hidden the overlap between his business interests and his political activity. In a memorandum about an October Oval Office meeting, for example, Mr. Broidy wrote that he had volunteered to Mr. Trump that his company was seeking a contract from the United Arab Emirates and had tried to arrange a private meeting for the president to discuss the matter with their leader, Crown Prince Mohammed bin Zayed.

But as scrutiny has mounted around Mr. Broidy, Republican officials signaled that he would be a distraction at a high-dollar fund-raiser with Mr. Trump this month in Los Angeles. Mr. Broidy helped plan it and was listed as a co-host.

After conversations with Ronna McDaniel, the chairwoman of the Republican National Committee, he volunteered not to attend, according to people briefed on the situation.

The dinner and round-table with the president proceeded without him.

Kenneth P. Vogel reported from Washington, and David D. Kirkpatrick from London.

A version of this article appears in print on March 26, 2018, on Page A1 of the New York edition with the headline: Marketing Ties to Trump, Top Donor Made Millions.

© 2018 The New York Times Company

# EXHIBIT 3

DOW JONES, A NEWS CORP COMPANY

DJIA **24202.60** 2.84% ▲    Nasdaq **7220.54** 3.26% ▲    U.S. 10 Yr **-7/32 Yield** 2.841% ▼    Crude Oil **65.49** -0.59% ▼    Euro **1.2452** 0.79% ▲

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
http://www.djreprints.com.

https://www.wsj.com/articles/trump-ally-was-in-talks-to-earn-millions-in-effort-to-end-1mdb-probe-in-u-s-1519919321

POLITICS

# Trump Ally Was in Talks to Earn Millions in Effort to End 1MDB Probe in U.S.

Emails indicate Republican donor and wife were negotiating fee if the Justice Department closed its investigation



Elliott Broidy, a longtime GOP donor, right, and his wife, Robin Rosenzweig, an attorney, discussed setting up a consulting contract with Jho Low, the Malaysian businessman at the center of the 1MDB scandal, in emails. **PHOTO:** BILLY BENNIGHT/UPPA/ZUMA PRESS

*By Bradley Hope, Tom Wright and Rebecca Ballhaus*

March 1, 2018 10:48 a.m. ET

A top Republican fundraiser close to President Donald Trump was in negotiations to earn tens of millions of dollars if the U.S. Justice Department dropped its investigation into a multibillion-dollar graft scandal involving a Malaysian state investment fund, according to emails reviewed by The Wall Street Journal.

In emails dated during the past year, Elliott Broidy, a venture capitalist and a longtime Republican donor, and his wife, Robin Rosenzweig, an attorney, discuss setting up a consulting contract with Jho Low, the Malaysian businessman at the center of the 1Malaysia Development Bhd. scandal, which brought scrutiny to the country's prime minister, Najib Razak. The messages include draft agreements between Ms. Rosenzweig's California law firm and representatives of Mr. Low about the possible terms of their business engagement. In one draft, there is a proposal that includes a $75 million fee if the Justice Department quickly drops its investigation.

Along with the contract drafts, the emails also appear to show Mr. Broidy prepared talking points for Malaysia's prime minister ahead of a 2017 visit to Washington that included a meeting with Mr. Trump and other officials. In the talking points, the prime minister was

advised to state that Malaysia wanted to emphasize its work with the U.S. in confronting North Korea, while also arguing against the U.S. legal pursuit of the 1MDB matter. It isn't clear what, if anything, came of the talking points.

The details of the purported effort to influence the Justice Department investigation were included in a cache of emails from Mr. Broidy's and his wife's email accounts that were provided to the Journal.

Mr. Broidy was a vice chairman for the Trump campaign's joint fund with the Republican Party during the 2016 campaign, helping it raise more than $108 million. A longtime Republican donor, he gave more than $160,000 last year to the Republican National Committee, where he is currently a national deputy finance chairman. In March, Mr. Trump is set to attend a fundraiser in Los Angeles that Mr. Broidy helped organize.

Chris Clark of Latham & Watkins LLP, on behalf of Mr. Broidy and Ms. Rosenzweig, who runs Colfax Law Office Inc., said in a statement that Ms. Rosenzweig's law firm was engaged by Pras Michel, a member of the 1990s hip-hop group the Fugees and a friend of Mr. Low, "to provide strategic advice as part of a broader team to Mr. Low."

The statement adds: "During the course of this engagement a number of strategies were discussed with Mr. Broidy, Mr. Michel, and other members of the team. But at no time did Mr. Broidy or Ms. Rosenzweig, or anyone acting on their behalf, discuss Mr. Low's case with President Trump, any member of his staff, or anyone at the U.S. Department of Justice."

Mr. Clark said neither Colfax Law nor Mr. Broidy has ever represented Malaysia or any of its officials "in any capacity."

"We are concerned that the Wall Street Journal is in possession of internal drafts of documents that were never used, and that were never intended to be shared with third parties," he said. "We question the legality and propriety of the manner in which the documents were obtained."

The Justice Department declined to comment.



President Donald Trump welcomed Malaysia's Prime Minister Najib Razak in September. Emails appear to show Elliott Broidy prepared talking points for Mr. Najib ahead of the visit. PHOTO: ALEX WONG/GETTY IMAGES

Mr. Low didn't respond to a request for comment on the arrangement. He has denied wrongdoing in the 1MDB matter. The 1MDB fund has denied any money is missing and said it would cooperate with any lawful investigation. Multiple investigations in Malaysia into 1MDB closed without finding wrongdoing.

Prime Minister Najib, who oversaw 1MDB and gave Mr. Low control over investment decisions, has been keen for the Justice Department to drop its probes.

The Justice Department alleges Mr. Low, a 36-year-old Malaysian financier, helped siphon off at least $4.5 billion from 1MDB, between 2009 and 2015. Mr. Low and conspirators from Asia and the Middle East allegedly used the proceeds to buy luxury homes in the U.S., frequent Las Vegas nightclubs and fund Hollywood movies, among other things. At least six countries are investigating the affair, including Singapore and Switzerland.

Since mid-2016, the Justice Department has sought, via civil lawsuits in California, to seize almost $2 billion in assets allegedly bought with the stolen money. On Wednesday, authorities in Indonesia seized Mr. Low's $250 million yacht at a port on the resort island of Bali after a request from the Federal Bureau of Investigation.

A representative for Mr. Low said in a written statement in the wake of the yacht seizure that the case was "completely without foundation'' and that "rather than reflecting on the deeply flawed and politically motivated allegations, the DoJ is continuing with its pattern of global over-reach—all based on entirely unsupported claims of wrongdoing."

U.S. authorities also allege in civil lawsuits that "Malaysian Official 1," which people aware of the matter say is a reference to Mr. Najib, received $681 million from 1MDB into his personal accounts. The Justice Department in its asset-seizure suits identified tens of millions of dollars worth of jewelry purchased with funds originating from the alleged 1MDB fraud, including for Mr. Najib's wife. Mr. Najib has denied taking money for personal gain and he was cleared by Malaysia's attorney general of any wrongdoing.

In September 2017, Mr. Trump invited Mr. Najib to a meeting in the White House to discuss trade ties. Given the 1MDB scandal, and Mr. Najib's alleged personal involvement, the timing of the trip sparked contention among the prime minister's critics. Ahead of that trip, Mr. Broidy sent an email to a colleague at his venture-capital firm on Aug. 7, 2017, with the subject line "Malaysia Talking Points *Final*."

The email appears to outline how Mr. Najib should approach his U.S. visit. The first-listed priority was to make it clear that Malaysia fully backed U.S. efforts to isolate North Korea, the email said. The talking points also list the 1MDB affair: The U.S. investigation "has caused unnecessary tension," the talking points read, "and could cause a negative reaction among Malaysians."

A spokesman for Mr. Najib didn't respond to a request for comment on the purported talking points or his visit to Washington.

---

MORE ON CAPITAL JOURNAL »

- Surge in Buybacks Renews Debate Over Tax-Cut Benefits
- Russian Meddling on Social Media Targeted U.S. Energy Industry, Report Says
- Sign Up: Capital Journal Daybreak newsletter

In his September 2017 visit to the White House, Mr. Najib met with Mr. Trump, Secretary of State Rex Tillerson, national security adviser Lt. Gen. H.R. McMaster, senior White House adviser Jared Kushner and other U.S. officials. In a public appearance together, Mr. Trump identified Malaysia as a strategic national-security ally in Asia. "He does not do business with North Korea any longer," Mr. Trump said of Mr. Najib. "We find that to be very important."

Ahead of Mr. Trump's meeting with Mr. Najib last fall, Gen. McMaster and a member of the White House Counsel's Office advised him that the prime minister was under investigation by the Justice Department and that the issue might come up, a White House official said. Mr. Trump was advised that Mr. Najib might bring up the case and could lobby him to ask the

Justice Department to shut it down, and that he should respond that he wouldn't interfere, the official said.

Mr. Najib subsequently didn't raise the issue in his private meeting with the president, nor did Mr. Trump, the official said.

The White House didn't respond to a question about whether Mr. Trump had ever discussed the Justice Department probe with Mr. Broidy.

Legal experts said certain actions described in the emails had little precedent in Washington. An effort to approach White House officials to close a Justice Department investigation would be unusual because administrations have typically not had any involvement in federal investigations, to avoid giving the appearance of any political motivation. Mr. Trump, by contrast, has often waded into Justice Department matters, criticizing Attorney General Jeff Sessions as recently as Wednesday, when he labeled Mr. Sessions' handling of a surveillance-related probe as "disgraceful."

Mr. Broidy's involvement with Malaysian politics dates to at least March 2017, when his wife, Ms. Rosenzweig, drew up an agreement between her Beverly Hills law firm and Mr. Low, according to the emails.

On March 12, 2017, Ms. Rosenzweig emailed the agreement to Nickie Lum Davis, whose Hawaii-based firm, LNS Capital, acted as a consultant to Colfax on the deal with Mr. Low, the emails show. The unsigned draft stipulated various terms, including a $75 million payment if the firm could help get the Justice Department to drop its civil-asset forfeiture lawsuits within 180 days.

Ms. Rosenzweig later changed the details of the agreement to a flat fee, which she said was to ensure they complied with U.S. law, according to an email later in March to LNS's Ms. Davis.

Ms. Davis didn't respond to a question for comment.

By May, there was still no final agreement, according to the email chain. Mr. Low didn't want to pay Ms. Rosenzweig directly, but through Mr. Michel, the former hip-hop star, the emails show. Mr. Michel was among the many celebrity friends Mr. Low made in the years after the alleged fraud began in late 2009. The emails didn't state a reason for the payment structure.

Mr. Michel didn't respond to a request for comment.

The emails the Journal viewed didn't show whether Ms. Rosenzweig's firm had finalized terms of the agreement with Mr. Low.

In 2009, Mr. Broidy pleaded guilty to a felony charge of rewarding official misconduct and admitted to making nearly $1 million in gifts to benefit four former top officials in the office that oversees New York state's pension fund, which made $250 million in investments in Mr. Broidy's firm, the Journal reported. As part of his guilty plea, he agreed to forfeit $18 million to New York state.

*—Aruna Viswanatha contributed to this article.*

**Write to** Bradley Hope at bradley.hope@wsj.com, Tom Wright at tom.wright@wsj.com and Rebecca Ballhaus at Rebecca.Ballhaus@wsj.com

*Appeared in the March 2, 2018, print edition as 'Trump Ally's Help Sought in 1MDB Probe.'*

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

# EXHIBIT 4

The New York Times | https://nyti.ms/2F86rdF

## POLITICS

# Mueller's Focus on Adviser to Emirates Suggests Broader Investigation

By MARK MAZZETTI, DAVID D. KIRKPATRICK and MAGGIE HABERMAN     MARCH 3, 2018

WASHINGTON — George Nader, a Lebanese-American businessman, has hovered on the fringes of international diplomacy for three decades. He was a back-channel negotiator with Syria during the Clinton administration, reinvented himself as an adviser to the de facto ruler of the United Arab Emirates, and last year was a frequent visitor to President Trump's White House.

Mr. Nader is now a focus of the investigation by Robert S. Mueller III, the special counsel. In recent weeks, Mr. Mueller's investigators have questioned Mr. Nader and have pressed witnesses for information about any possible attempts by the Emiratis to buy political influence by directing money to support Mr. Trump during the presidential campaign, according to people with knowledge of the discussions.

The investigators have also asked about Mr. Nader's role in White House policymaking, those people said, suggesting that the special counsel investigation has broadened beyond Russian election meddling to include Emirati influence on the Trump administration. The focus on Mr. Nader could also prompt an examination of how money from multiple countries has flowed through and influenced Washington during the Trump era.

How much this line of inquiry is connected to Mr. Mueller's original task of investigating contacts between Mr. Trump's campaign and Russia is unclear. The examination of the U.A.E. comes amid a flurry of recent activity by Mr. Mueller.

Last month, investigators negotiated a plea agreement with Rick Gates, Mr. Trump's deputy campaign manager, and indicted 13 Russians on charges related to a scheme to incite political discord in the United States before the 2016 election.

In one example of Mr. Nader's influential connections, which has not been previously reported, last fall he received a detailed report from a top Trump fundraiser, Elliott Broidy, about a private meeting with the president in the Oval Office.

Mr. Broidy owns a private security company with hundreds of millions of dollars in contracts with the United Arab Emirates, and he extolled to Mr. Trump a paramilitary force that his company was developing for the country. He also lobbied the president to meet privately "in an informal setting" with the Emirates' military commander and de facto ruler, Crown Prince Mohammed bin Zayed al-Nahyan; to back the U.A.E.'s hawkish policies in the region; and to fire Secretary of State Rex W. Tillerson.

A copy of Mr. Broidy's memorandum about the meeting was provided to The New York Times by someone critical of the Emirati influence in Washington.

Mr. Trump has closely allied himself with the Emiratis, endorsing their strong support for the new heir to the throne in Saudi Arabia, as well as their confrontational approaches toward Iran and their neighbor Qatar. In the case of Qatar, which is the host to a major United States military base, Mr. Trump's endorsement of an Emirati- and Saudi-led blockade against that country has put him openly at odds with his secretary of state — as well as with years of American policy.

Mr. Nader, 58, made frequent trips to the White House during the early months of the Trump administration, meeting with Stephen K. Bannon and Jared Kushner to discuss American policy toward the Persian Gulf states in advance of Mr. Trump's trip to Saudi Arabia in May 2017, according to people familiar with the meetings. By some accounts, it was Mr. Bannon who pushed for him to gain access to White House policymakers. Others said Mr. Kushner backed him.

Reached by phone last month, Mr. Nader said he had dinner guests and would call back. He did not, and attempts to reach him over several weeks were unsuccessful. Mr. Nader's lawyer did not respond to messages seeking comment.

The White House did not respond to requests for comment. In a statement, a spokesman for Mr. Broidy said his memorandum had been stolen through sophisticated hacking.

"We have reason to believe this hack was sponsored and carried out by registered and unregistered agents of Qatar seeking to punish Mr. Broidy for his strong opposition to state-sponsored terrorism," said the spokesman, adding that Mr. Broidy had also made the accusation in a letter to the Qatari ambassador in Washington.

Yousef al-Otaiba, the Emirati ambassador to the United States, declined to comment. Axios first reported Mr. Mueller's questioning of Mr. Nader.

Mr. Nader has long been a mysterious figure. In the 1990s, he presided over an unusual Washington magazine, Middle East Insight, which sometimes provided a platform for Arab, Israeli and Iranian officials to express their views to a Washington audience.

On the magazine's 15th anniversary, in 1996, a West Virginia congressman praised Mr. Nader on the floor of the House, calling him a "recognized expert on the region" and pointing out that the magazine had been a showcase for prominent figures such as President Hosni Mubarak of Egypt, Prime Minister Yitzhak Rabin of Israel, and Yasir Arafat, the head of the Palestine Liberation Organization.

"He always struck me as a person who really thought he should be in the eye of the storm trying to make things happen," said Frederic Hof, a former top American diplomat who knew Mr. Nader in the 1990s.

Late in that decade, Mr. Nader convinced the Clinton administration that he had valuable contacts in the Syrian government and took on a secretive role trying to broker a peace deal between Israel and Syria. Working with Ronald S. Lauder, the American cosmetics magnate and prominent donor to Jewish causes, Mr. Nader shuttled between Damascus and Jerusalem, using his contacts in both capitals to try to negotiate a truce.

"In the 1990s, George was a very effective under-the-radar operator in the peace process," said Martin S. Indyk, a former American ambassador to Israel and a member of a team put together by President Bill Clinton to negotiate peace deals between Israel and its neighbors.

"Then, he disappeared."

Indeed, a man with a once very public profile in Washington effectively vanished from the capital's policy scene, and his magazine ceased publication in 2002.

During the middle part of the last decade, Mr. Nader appears to have spent most of his time in the Middle East, especially in Iraq after the 2003 invasion. He developed close ties to national security officials in the Bush White House.

Erik Prince, the founder of Blackwater USA, the private security company now known as Academi, at one point hired Mr. Nader to help the company generate business deals in Iraq. In a 2010 deposition that Mr. Prince gave as part of a lawsuit against the company, Mr. Prince described Mr. Nader as a "business development consultant that we retained in Iraq" because the company was looking for contracts with the Iraqi government.

Mr. Prince said that Mr. Nader was unsuccessful in getting contracts, and that senior Blackwater officials did not work directly with him.

"George pretty much worked on his own," he said.

At the beginning of the Obama era, Mr. Nader tried to parlay his ties to the Syrian government into access to senior members of President Barack Obama's foreign policy team, while also seeking to advance business deals with former advisers to President George W. Bush.

By the time of the 2016 election, he had become an adviser to Prince Mohammed of the U.A.E. According to people familiar with the relationship, it was around Mr. Trump's inauguration that Mr. Nader first met Mr. Broidy, the Republican fund-raiser, who is a California-based investor with a strong interest in the Middle East.

Mr. Broidy's security company, Circinus, provides services to both United States agencies and foreign governments. Run by former American military officers, Circinus promises on its website that it "can employ personnel worldwide to provide physical force protection to individuals, groups or facilities within austere, hostile environments," as well as conducting "specialized operations, infrastructure protection and training."

Mr. Broidy, 60, had once stumbled into legal trouble over payments to a political figure. In 2009, he agreed to plead guilty to a misdemeanor charge for providing $1 million in illegal gifts to New York State pension authorities, including trips, payouts and a secret investment in a film called "Chooch" that was produced by an official's brother. In exchange for the gifts, the state pension fund invested $250 million with an Israeli-based investment management firm that Mr. Broidy had founded. He reimbursed the pension fund for $18 million in fees.

After the inauguration, Mr. Nader became friendly with Mr. Broidy and introduced him to Prince Mohammed. Circinus then signed contracts with the United Arab Emirates worth several hundred million dollars, according to people familiar with the arrangement.

By Oct. 6, Mr. Broidy had evidently become close enough to both the prince and Mr. Nader to send a detailed memorandum to an encrypted email address used by Mr. Nader recounting his advocacy on the U.A.E.'s behalf during the meeting with Mr. Trump in the Oval Office amid an afternoon of stops throughout the White House.

An ally of the White House involved in one of the initiatives discussed — a counterterrorism task force — said Mr. Broidy sent the memorandum because he had been asked by the crown prince to seek the president's views on the idea. Mr. Broidy believed that the creation of the task force would aid American security, this person said.

According to the memo, Mr. Broidy repeatedly pressed Mr. Trump to meet privately with Prince Mohammed, preferably in an informal setting outside the White House.

"I offered that M.B.Z. is available to come to the U.S. very soon and preferred a quiet meeting in New York or New Jersey," Mr. Broidy wrote to Mr. Nader, using the crown prince's initials. "President Trump agreed that a meeting with M.B.Z. was a good idea."

Mr. Broidy wrote that he had twice told Lt. Gen. H. R. McMaster, the national security adviser, that the crown prince "preferred an informal setting to meet one on one with President Trump." But General McMaster resisted. "LTG McMaster smiled and replied that heads of state usually meet in the White House," as "protocol dictates."

In his memorandum, Mr. Broidy recounted that he had told Mr. Trump that he recently returned from meeting with the crown prince about Circinus work for the U.A.E. Mr. Broidy had explained "the exciting and transformational plan being constructed by M.B.Z. to develop a counterterrorism task force," which Mr. Broidy told the president was "inspired" by his speech at a conference in Riyadh.

Mr. Broidy was harshly critical of the crown prince's neighbor and nemesis, Qatar. The U.A.E. has accused Qatar, an American ally, of using its satellite network Al Jazeera to promote political Islam, among other allegations.

Mr. Trump also asked about Mr. Tillerson — who had publicly criticized the isolation of Qatar — and Mr. Broidy said that the secretary of state should be fired. "Rex was performing poorly," Mr. Broidy said, according to the memorandum.

In between the discussions of diplomacy, business and statecraft, Mr. Broidy wrote, he and the president "spoke for several minutes about politics and the fund-raising efforts for the midterm elections as well as the state of affairs at the R.N.C.," or the Republican National Committee.

Mark Mazzetti and Maggie Haberman reported from Washington, and David D. Kirkpatrick from London. Michael S. Schmidt and Adam Goldman contributed reporting from Washington.

A version of this article appears in print on March 4, 2018, on Page A1 of the New York edition with the headline: Mueller Witness Signals Widening of Russia Inquiry.

© 2018 The New York Times Company

# EXHIBIT 5



| Home | News | Sport | Weather | Shop | Earth | Travel |

AD

# Emails show UAE-linked effort against Tillerson

By Suzanne Kianpour
BBC News, Washington

5 March 2018





AFP

**The BBC has obtained leaked emails that show a lobbying effort to get US Secretary of State Rex Tillerson sacked for failing to support the United Arab Emirates against regional rival Qatar.**

Major Trump fundraiser and UAE-linked businessman Elliott Broidy met US President Donald Trump in October 2017 and urged him to sack Mr Tillerson, the emails reveal.

In other emails, he calls the top US diplomat "a tower of Jello", "weak" and says he "needs to be slammed".

Mr Broidy says Qatar hacked his emails.

"We have reason to believe this hack was sponsored and carried out by registered and unregistered agents of Qatar seeking to punish Mr Broidy for his strong opposition to state-sponsored terrorism," a spokesman for the businessman said.

He said some of the emails "may have been altered" but did not elaborate.

Saudi Arabia, UAE and a number of Arab countries cut diplomatic ties with Qatar in June 2017 over its alleged support for terrorism, a claim which it denies. The unprecedented move was seen as a major split between powerful Gulf countries, who are also close US allies.

- **Qatari royal 'held against will' in UAE**

- **Nations silent on Tillerson Qatar blockade plea**

Qatari officials denied the claims in a statement to the BBC.

Its communications office said: "Qatar would like to state unequivocally that it has not engaged in or committed any of the alleged accusations made falsely by Mr Broidy, nor has it engaged or paid anyone to do so.

"We believe that Mr Broidy's baseless accusations are simply a diversionary tactic to distract attention from the serious allegations against himself and his client the Government of the United Arab Emirates.

"The Government of Qatar reserves its right to taking any necessary legal action as the victim of false allegations by Mr Broidy or others."

Mr Broidy's defence company Circinus has hundreds of millions of dollars worth of contracts with the UAE, according to the New York Times newspaper.

He had recently returned from the UAE when he met Mr Trump at the White House in October.

## What did the emails say?

According to a memorandum he prepared of the meeting, Mr Broidy urged continued support of US allies the UAE and Saudi Arabia and advised Mr Trump against getting involved in last year's row with Qatar.

Mr Broidy called Qatar "a television station with a country" - alluding to broadcaster Al Jazeera - and said it was doing "nothing positive", according to the emails.

He said he touted a regional counter-terrorism force being set up by the UAE that his company was involved with, and suggested that the US president "sit down" with Mohammed bin Zayed al-Nahyan, the crown prince of Abu Dhabi and a top UAE military commander.

"I offered that MBZ [the crown prince] is available to come to the US very soon and preferred a quiet meeting in New York or New Jersey. President Trump agreed that a meeting with MBZ was a good idea," Mr Broidy wrote in an email.

He also said he advised the president on Mr Tillerson - who was "performing poorly and should be fired at a politically convenient time".

**Mr Tillerson had criticised the blockade of Qatar** and called for it to be eased, in comments that contrasted with Mr Trump's support for the move.

Mr Tillerson spent most of the first year in his position embattled and weakened.

Last autumn, in a rare move for the soft-spoken secretary, **the state department held a press conference in which Mr Tillerson pushed back against reports he had called the president "a moron".**

## Who did Mr Broidy email?

He emailed a detailed account of his meeting with the president to George Nader, a Lebanese-American businessman with decades of experience serving as an interlocutor between the Middle East and Washington.

Sources familiar with the investigation of Special Counsel Robert Mueller, who is looking into alleged Russian meddling in the 2016 US election and possible links between the Trump campaign and the Kremlin, tell the BBC that Mr Nader has become a person of interest and has been questioned in recent weeks.

Investigators questioned Mr Nader and other witnesses on whether there were any efforts by the Emiratis to buy political influence by directing money to Mr Trump's presidential campaign, **according to a New York Times report**.

- **Trump Russia affair: Key questions answered**

- **Who's who in Russia scandal?**

- **The Trump-Russia saga in 200 words**

## What else was in the leaked emails?

Mr Broidy also detailed a separate sit-down with Mr Trump's son-in-law and adviser Jared Kushner, according to the emails.

After Mr Broidy criticised Qatar extensively to Mr Kushner, "Jared's demeanour was very passive and pleasant but he seemed to not want to engage on this issue," he wrote to Mr Nader.

**Kushner Companies - owned by the family of Jared Kushner - is reported to have in April 2017 sought financing from Qatar for its flagship property at 666 5th Avenue, New York.**

However, Mr Kushner has maintained that he has had no role in his family's business since joining the White House last year.

## Has anyone else claimed to have been hacked?

UAE ambassador to Washington Yousef al-Otaiba - who in diplomatic circles is known as the most effective and influential ambassador in Washington - has himself been a recent victim of email hacking.

It's well known in Washington that Mr Otaiba and Mr Kushner have enjoyed a close relationship.

Industry experts looking at both hacks have drawn comparisons between the two, showing reason to suspect links to Qatar.

"This is rinse and repeat on Otaiba," a source familiar with the hack told the BBC.

**The UAE has also been known to use similar tactics, and was accused of hacking Qatari government websites prior to the blockade, according to the FBI.**

## Related Topics

| United Arab Emirates | Robert Mueller | Donald Trump | United States |

| Qatar |

## Share this story About sharing

## More on this story

**Trump-Russia inquiry: Lawyer Alex van der Zwaan pleads guilty**
20 February 2018

**Russia-Trump inquiry: Ex-aide Rick Gates 'to plead guilty'**
19 February 2018

**Special counsel: What is it and what is Robert Mueller doing?**
20 February 2018

**Russia-Trump: Who's who in the drama to end all dramas?**
26 February 2018

**Trump-Russia story explained**
27 February 2018

**The tactics of a Russian troll farm**
16 February 2018

# EXHIBIT 6



**NEWS** / **DONALD TRUMP**

# Trump donor Elliott Broidy named in Ukraine criminal probe

*Republican fundraiser Elliott Broidy under scrutiny over alleged deal with sanctioned Russian bank VTB.*

by **Will Thorne** & **Will Jordan**

**20 Mar 2018**



In 2009, Broidy pleaded guilty for bribing New York state pension officials [Getty Images]

**Editor's Note, Mar. 20, 2018:** *This article is subject to a legal complaint by Investment Capital Ukraine, which asserts that the claimed agreement and memorandum are forgeries and that it had no involvement in any transactions of the kind described.*

The Prosecutor General of Ukraine has launched an investigation into claims surrounding an alleged multi-million dollar lobbying contract that names one of US President Donald Trump's most influential fundraisers, Elliott Broidy.

The 12-page document, which appears to have been signed by Broidy, outlines his role as providing "political advocacy" on behalf of a now sanctioned Russian bank, VTB.

The deal was apparently dated June 12, 2014, just weeks before VTB Bank was blacklisted by the United States and European Union as a key Kremlin asset following Russia's invasion of Crimea. Russian President Vladimir Putin is guest of honour at VTB Bank's investor conference every year.

The document raises serious questions about whether Broidy is in breach of the US Foreign Agents Registration Act (FARA), a law that has gained prominence following the investigation of special counsel Robert Mueller into foreign meddling in the 2016 presidential election. Former Trump campaign chairman Paul Manafort and his aide Rick Gates have both been charged as a result of their work in Ukraine.

The document, obtained by Al Jazeera's Investigative Unit, also suggests that Broidy, a national deputy finance chairman of the Republican National Committee, would provide the same services to Investment Capital Ukraine (ICU), a Ukraine brokerage that has acted as financial advisors to President Petro Poroshenko.

"If this is a bonafide document, it is very troubling," says the Washington-based organisation Citizens for Responsibility and Ethics in Washington (CREW).

"Broidy appears to be an unregistered agent of a foreign principal in violation of federal law," says spokesman Jordan Libowitz.

(b) It is understood that the purpose of the Services is to provide regular political and business analysis, political advocacy, investment advice, and money management to the Company and its affiliates, including but not limited to ICU Holdings, Ltd. (BVI) and VTB Bank and its affiliates. To that end, the Company shall provide

The document obtained by Al Jazeera raises serious questions about whether Broidy is in breach of the US Foreign Agents Registration Act [Al Jazeera]

US law requires American citizens involved in lobbying on behalf of foreign governments or parties to register with the US Department of Justice on their Foreign Registered Agents (FARA) database. Al Jazeera found no evidence that Broidy is registered despite mounting evidence of multiple foreign clients.

Details of the alleged consultancy first emerged in Ukraine in January. The files were handed to Ukraine's Prosecutor General, who has ordered the Kiev Prosecutor's office to investigate further.

Ukraine's Institute of Law and Society submitted the documents to authorities, and the reform group is now calling for a thorough investigation in both Ukraine and the US.

The document outlines the work to be undertaken by Broidy, which includes "regular political and business analysis, political advocacy, investment advice, and money management" to VTB Bank and ICU.



Russian President Vladimir Putin is a regular guest of honour at the annual investor conference of VTB Bank, whose chairman is Yuri Soloviev [File: EPA]

The consultancy work was apparently to be paid in five annual payments of $2.5m from an offshore company, Quillas Equities SA, which is registered in the British Virgin Islands, but with an address in Dubai. According to the Panama Papers, a massive leak of offshore documentation, Quillas Equities SA's shareholder is Yuri Soloviev, first deputy president and chairman of VTB Bank Management Board.

The document names Broidy as a consultant who has "many years of investment banking and money management experience." It goes on to detail his "expertise in international investments and American politics."

The alleged agreement outlines Broidy's background in Republican politics, describing how he served "as Finance Chair of the Republican Party and has access to US politicians and government agencies."

The business and lobbying activities of this prominent Republican are coming under increasing scrutiny beyond Ukraine.

Case 2:18-cv-02421-JFW-E   Document 91   Filed 04/02/18   Page 36 of 127   Page ID #:254

Last week a group calling itself LA Confidential leaked emails that appeared to show Broidy and his wife Robin Rosenzweig, deputy finance chair of the Republican National Committee, asking for more than $75m to quash an investigation in the US into a <u>multibillion-dollar fraud</u> in Malaysia.

Further revelations came from The New York Times, which reported that Broidy has a <u>lucrative defence contract</u> with the United Arab Emirates (<u>UAE</u>) and that he had lobbied President Trump to meet privately with Crown Prince Mohammed bin Zayed al-Nahyan, the leader of the UAE. The emails suggest he has direct access to the US President.

Romanian media have also reported Broidy's role in negotiating arms deals worth potentially millions of dollars.

In 2009, Broidy pleaded guilty in New York to bribing New York state pension officials with almost $1m in return for their $250m investment in an Israel-focused investment fund he helped to manage.

He and the firm paid over $30m in fines; however, the charges against Broidy were downgraded, and he avoided jail.

Now, Broidy claims he is the victim of a "hack" and smear campaign orchestrated by the state of <u>Qatar</u> in response to his criticism of the Gulf state's record against terrorism, a charge that Qatar denies.

Amid long-standing regional rivalries, the UAE, along with Saudi Arabia, Egypt and Bahrain, has imposed a <u>nine-month-long siege</u> on Qatar. Broidy has close financial ties to the UAE and its royal family.

Case 2:18-cv-02421-JFW-E Document 31-3 Filed 04/02/18 Page 37 of 127 Page ID #:255



Broidy is tipped to be a key part of President Trump's re-election campaign team in 2020 [Reuters]

Broidy's wider links with the Middle East are now reportedly of interest in the FBI's far-reaching probe into foreign influence in US politics, which are mostly focused on Paul Manafort. Breaches of the Foreign Agents Registration Act form a key part of this investigation.

## 'Confidential MOU'

A second document appears to expose further connections with the UAE. It outlines a plan for ICU and an Abu Dhabi based company to invest $40m into a fund to be managed by Broidy. The same group also handed what is described as a "Confidential Memorandum of Understanding" to prosecutors in Ukraine.

The Abu Dhabi firm and ICU apparently agreed to provide 80 percent of the investment, including an initial $3.5m payment.

It is unclear as to what the $40m was to be used for. This alleged MOU states that the deal was effective from December 2014, but omits specific details on how the money would be invested. It is also not clear if it was ever completed as the paperwork is

unsigned.

**Confidential**

**3.0 The Fund and ICU Investment.** Subject to the terms of this MOU and the Definitive Documents, and to the satisfaction of all conditions to the Closing, Parties shall make a series of at least 2 equity investments for a total of $40,000,000 (Forty Million Dollars) into a corporate entity to be organized and based in Abu Dhabi ("the "Corporation"). The ICU and ███████ shall provide initial capitalization of $3,500,000 (Three Million Five Hundred Thousand US Dollars) by way of an escrow instrument, the structure of which shall be delineated in the Definitive Documents between Parties. Generally, the initial capital shall be used for operations whereby Broidy shall act as co-manager. The ICU and ███████ will be issues a total of 80% (Eighty percent) equity interest in the Corporation, as set out in <u>Exhibit A</u>.

This alleged MOU states that the deal was effective from December 2014, but omits specific details on how the money would be invested [Al Jazeera]

Broidy owns a security company, which is run by former US military personnel and provides services to governments in the Middle East. Its services include conducting "specialised operations, infrastructure protection and training."

Broidy, a Los Angeles-based financier and seasoned political operator, has raised millions of dollars in donations for the Republican Party. He is tipped to be a key part of Trump's campaign team for 2020.

In a response to these claims, ICU denies that the company, or its affiliates, has had any relationship with Broidy or his company and describes the contracts as being part of an elaborate forgery.

"We believe they are part of a malicious fraud against us," they told Al Jazeera in a statement.

VTB Bank also denied dealing with the Republican Party fundraiser. "Yuri Soloviev is not acquainted with Elliott Broidy and has never had any business dealings with him."

Al Jazeera also approached Broidy for comment during the preparation of this article. However, no response was received.

---

### Statement from Elliott Broidy Regarding Al-Jazeera "News" Report

"Al-Jazeera, the state funded propaganda arm of Qatar, yesterday published a libelous and entirely false story on the basis of provably false documents. This article is yet the most recent piece of evidence of Qatar's tortious activity against me in response to my work in the U.S. to expose Qatar's state sponsorship of terrorism and double dealing with the United States.

The agents of the Qatari government unsuccessfully shopped this exact dump of forged documents over the past month with multiple U.S. news organizations. Because each of those news outlets rejected the story after realizing -- based on substantial and irrefutable evidence -- that the documents were forged, Qatar as a last resort used their state funded propaganda arm, Al Jazeera, a media operation that completely lacks credibility among western publics.

I have never had any consulting or any business agreement of any kind with any of VTB Bank, Yuri Soloviev, Investment Capital Ukraine, or Quillas Equities.

These documents were peddled by a phony Ukrainian "think tank" working in partnership with a Ukrainian news outlet owned by a Ukrainian oligarch who is still business partners with Gazprom and thus Putin—and that oligarch is linked to the shell company that paid hundreds of thousands of dollars last year to one of Qatar's registered foreign agents here in the U.S. We encourage credible journalists and the American public to investigate this link to Qatar's registered foreign agents here in the U.S.

This unprecedented, highly sophisticated Qatari government assault on me for political expression in my homeland involves manufacturing false stories to foment a false narrative to paint me as a "lobbyist" engaged with nations in such ways there is simply no factual basis for whatsoever. Yesterday's libelous and reckless piece in Al Jazeera was just the latest step in a prolonged and targeted campaign.

With this article, Qatar has manufactured yet another piece of evidence that we will use against it under U.S. law."

 **Elliott Broidy**
@Elliott_Broidy

Statement Regarding Al-Jazeera "News": pdf-archive.com/2018/03/08/ell… #ElliottBroidy

4:23 PM - Mar 8, 2018

12      19 people are talking about this

---

Al Jazeera obtained the documents as part of a one-year investigation into corruption involving Eastern European oligarchs, which also revealed a massive off-shore corruption network linked to former Ukrainian President Viktor Yanukovych.

# EXHIBIT 7

 BOIES
SCHILLER
FLEXNER

March 19, 2018


VIA COURIER AND FEDERAL EXPRESS

Sheikh Meshal bin Hamad Al Thani
Ambassador of Qatar to the United States of America
Embassy of the State of Qatar
2555 M Street, NW
Washington, DC 20037

Dear Ambassador Al Thani:


We represent Mr. Elliott Broidy. We write further to Mr. Broidy's letter to you dated March 3, 2017, concerning the hostile attack on his company's computer servers and the theft of his electronic data. The computer hack and related activities have caused Mr. Broidy substantial damages.

We now possess irrefutable forensic evidence tying Qatar to this unlawful attack on, and espionage directed against, a prominent U.S. citizen within the territory of the United States. We have made aware, or are in the process of making aware, relevant U.S. authorities, including U.S. counterintelligence authorities.

The individuals located in Qatar tied to this attack evidently believed they could maintain anonymity by trying to disguise their malicious activity targeting Mr. Broidy's servers. They were wrong. Mr. Broidy's advanced cyber crime forensics unit has established Qatar's ties to this illegal hacking operation.

Your government appears to believe it could maintain plausible deniability by relying on layers of registered and unregistered agents in Washington, DC to target Mr. Broidy and disseminate false and stolen information about him. This too was wrong. We have clear evidence of the role of your agents in Washington in targeting and harming Mr. Broidy. We demand that they and other parties under your government's control cease and desist disseminating stolen property.

Hostile intelligence operations by foreign sovereigns directed against Americans on U.S. soil will not be tolerated. We intend to hold responsible parties accountable for this unlawful activity.

---

BOIES SCHILLER FLEXNER LLP

575 Lexington Avenue, New York, NY 10022 | (t) 212 446 2300 | (f) 212 446 2350 | www.bsfllp.com

**BSF**

2 | P a g e

If, as you have suggested, the attack on Mr. Broidy that originated in Qatar was not authorized by your government, then we expect your government to hold accountable the rogue actors in Qatar who have caused Mr. Broidy substantial damages.  We reserve all rights and, if we do not hear from you by Thursday, March 22, 2018, will pursue all available legal remedies at a time and in a manner of our choosing.

Sincerely,

Lee S. Wolosky

# EXHIBIT 8



Qatar   United Arab Emirates   Middle East   Legislation   Persian Gulf   Politics   Business   North America   Trump-Russia Probe   Donald Trump   AP Top News

## Mueller probe witness secretly backed UAE agenda in Congress

By DESMOND BUTLER, TOM LoBIANCO and BRADLEY KLAPPER
Today



WASHINGTON (AP) — A top fundraiser for President Donald Trump received millions of dollars from a political adviser to the United Arab Emirates last April, just weeks before he began handing out a series of large political donations to U.S. lawmakers considering legislation targeting Qatar, the UAE's chief rival in the Persian Gulf, an Associated Press investigation has found.

George Nader, an adviser to the UAE who is now a witness in the U.S. special counsel investigation into foreign meddling in American politics, wired $2.5 million to the Trump fundraiser, Elliott Broidy, through a company in Canada, according to two people who spoke on the condition of anonymity because of the sensitivity of the matter. They said Nader paid the money to Broidy to bankroll an effort to persuade the U.S. to take a hard line against Qatar, a long-time American ally but now a bitter adversary of the UAE.

A month after he received the money, Broidy sponsored a conference on Qatar's alleged ties to Islamic extremism. During the event, Republican Congressman Ed Royce of California, the chairman of the House Foreign Affairs Committee, announced he was introducing legislation that would brand Qatar as a terrorist-supporting state.

In July 2017, two months after Royce introduced the bill, Broidy gave the California congressman $5,400 in campaign gifts — the maximum allowed by law. The donations were part of just under $600,000 that Broidy has given to GOP members of Congress and Republican political committees since he began the push for the legislation fingering Qatar, according to an AP analysis of campaign finance disclosure records.

Broidy said in a statement to AP that he has been outspoken for years about militant groups, including Hamas.

"I've both raised money for, and contributed my own money to, efforts by think tanks to bring the facts into the open, since Qatar is spreading millions of dollars around Washington to whitewash its image as a terror-sponsoring state," he said. "I've also spoken to like-minded members of Congress, like Royce, about how to make sure Qatar's lobbying money does not blind lawmakers to the facts about its record in supporting terrorist groups."

While Washington is awash with political donations from all manner of interest groups and individuals, there are strict restrictions on foreign donations for political activity. Agents of foreign governments are also required to register before lobbying so that there is a public record of foreign influence.

Cory Fritz, a spokesman for Royce, said that his boss had long criticized the "destabilizing role of extremist elements in Qatar." He pointed to comments to that effect going back to 2014. "Any attempts to influence these longstanding views would have been unsuccessful," he said.

In October, Broidy also raised the issue of Qatar at the White House in meetings with Trump and senior aides.

The details of Broidy's advocacy on U.S. legislation have not been previously reported. The AP found no evidence that Broidy used Nader's funds for the campaign donations or broke any laws. At the time of the advocacy work, his company, Circinus, did not have business with the UAE, but was awarded a more than $200 million contract in January.

The sanctions bill was approved by Royce's committee in late 2017. It remains alive in the House of Representatives, awaiting a review by the House Financial Services Committee.

___MEETINGS PROBED

The backstory of the legislative push is emerging amid continuing concerns about efforts by foreign governments or their proxies to influence American politics. While reports about possible Russian links to Trump's campaign and his presidential administration have been making headlines since 2016, questions are now arising about efforts during the Trump era to influence U.S. policy in the Middle East.

The U.S. has long been friendly with Saudi Arabia and the UAE as well as Qatar, which is home to a massive American air base that the U.S. has used in its fight against the Islamic State. But as political rifts in the Gulf have widened, the Saudis and Emiratis have sought to undercut American ties with Qatar.

Qatar and UAE have also exchanged allegations of politically motivated hacks. Scores of Broidy's emails and documents have leaked to news organizations, drawing attention to his relationship with Nader. Broidy has alleged that the hack was done by Qatari agents and has reported the breach to the FBI.

"It's no surprise that Qatar would see me as an obstacle and come after me in the way it has," he said in a statement.

A spokesman for the Qatari embassy, Jassim Mansour Jabr Al Thani, denied the charges, calling them "diversionary tactics." Representatives of the UAE did not respond to requests for comment.

The timeline of the influx of cash wired by Nader, an adviser to Abu Dhabi Crown Prince Sheikh Mohamed bin Zayed al-Nahyan, the de facto leader of the UAE, may provide grist for U.S. special counsel Robert Mueller's legal team as it probes the activities of Trump and his associates during the 2016 campaign and beyond. However, it is not clear that Mueller has expanded his investigation in that direction.

Mueller's investigators are looking into two meetings close to Trump's inauguration attended by Nader and bin Zayed. The pair joined a meeting at New York's Trump Tower in December 2016 that included presidential son-in-law Jared Kushner and Steve Bannon, who was Trump's chief strategist at the time. A month later, Nader and bin Zayed were a world away on the Seychelles island chain in the Indian Ocean, meeting with Erik Prince, the founder of the security company Blackwater, and the Kremlin-connected head of a large Russian sovereign wealth fund, Kirill Dmitriev.

Nader, a Lebanese-American businessman, agreed to cooperate with Mueller's team after investigators stopped him at Dulles International Airport, according to a person familiar with his case.

That person and others who spoke to the AP on condition of anonymity said they could not be identified because of the sensitivity of the issues surrounding the Mueller investigation.

A lawyer for Nader declined to comment for this story.

___POLICY PUSH

Broidy and Nader first met at Trump's presidential inauguration on Jan. 20, 2017, according to a person with knowledge of the matter.

Both men have checkered legal histories. Nader was convicted in a Czech Republic court in 2003 of multiple counts of sexually abusing minors. Broidy, a businessmen and prolific Republican fundraiser, was sidelined for a few years after he pleaded guilty to bribery in a case stemming from an investment scheme involving New York state's employee pension fund.

Broidy later re-emerged as a player in GOP politics. During the 2016 Republican presidential primary, he raised money for U.S. Sen. Lindsey Graham, Sen. Marco Rubio and Sen. Ted Cruz. After Cruz bowed out of the race, Broidy signed on to help Trump during the 2016 election and beyond, co-hosting fundraisers across the country.

The meeting between Broidy and Nader at the dawn of Trump's presidency soon led the two to work together in an effort to shift U.S. policies on the Middle East.

On April 2, 2017, Nader asked Broidy to invoice his Dubai-based company for $2.5 million, according to someone familiar with the transaction who spoke on condition of anonymity.

On the same day, Broidy attached an invoice for that amount from Xiemen Investments Limited, a Canadian company directed by a friend. The money was forwarded to his own account in Los Angeles from the Canadian account, the person said. It was marked for consulting, marketing and advisory services, but was actually intended to fund Broidy's Washington advocacy regarding Qatar, two people familiar with the transaction said. The financial transaction and the White House meetings were first reported by The New York Times.

It was on May 23, 2017, when Royce, a 13-term Congressman, appeared at a conference on Qatar's ties to the Muslim Brotherhood and announced that he was introducing the sanctions bill that would name Qatar a state sponsor of terrorism.

The Foundation for the Defense of Democracies, a think tank that hosted the conference, said Broidy had approached it about organizing the event. Broidy bankrolled that conference and contributed to the financing of a second conference hosted on a similar theme in October by another think tank, the Hudson Institute.

Both organizations said Broidy said that no money from foreign governments was involved. FDD says it does not accept money from foreign governments and Hudson only accepts money from Democratic countries allied with the U.S.

"As is our funding policy, we asked if his funding was connected to any foreign governments or if he had business contracts in the Gulf. He assured us that he did not," FDD said in a statement.

Broidy donated millions of his own money to efforts to fight Qatar, in addition to the $2.5 million from Nader, according to someone close to him, who spoke on condition of anonymity because he was not authorized to discuss Broidy's private finances.

Broidy's behind-the-scenes efforts unfolded as animosity was growing between the UAE and Qatar. These tensions came to a head when the UAE and Saudi Arabia launched an embargo with travel and trade restrictions against Qatar less than two weeks after Royce introduced the sanctions legislation in the U.S. House of Representatives.

Weeks later, Trump himself waded into the fracas, accusing Qatar of funding extremism in tweets on June 6.

Royce and a staff member met with Broidy at Washington's Capitol Hill Club to discuss the bill, according to someone who was at the meeting. An associate, who Broidy paid for some of the work, also had frequent contact with congressional staff.

___STRONG LANGUAGE

Broidy's effort to cultivate allies in Congress extended beyond Royce.

Broidy has personally given hundreds of thousands of dollars to Republicans over the past decade or more. But he gave nothing during the 2012 and 2014 election cycles and just $13,500 during the 2016 cycle. Things changed after Trump's election as Broidy ramped up his advocacy on Middle East policy. Broidy has given nearly $600,000 to GOP candidates and causes since the beginning of last year when he began his advocacy push— more than in the previous 14 years combined.

Campaign finance records going back two decades show Broidy had not given any money to Royce — until he gave the lawmaker a pair of $2,700 donations on July 31, 2017.

By then, the sanctions bill was on a fast track.

The original draft considered by the Foreign Affairs Committee contained language singling out Qatar as a supporter of Hamas, a Palestinian organization that has been designated as a terrorist group by the U.S. State Department.

"Hamas has received significant financial and military support from Qatar," the draft bill states.

Soon Qatar was lobbying hard to have that language excised. Nikki Haley, U.S. ambassador to the United Nations, declared in a statement to the committee that Qatar does not fund Hamas.

According to two people familiar with the committee deliberations, both Republican and Democratic staff members reached a consensus that because of the tensions in the Gulf, the language would look like the lawmakers were taking sides. They agreed to take it out of the bill.

Qatari officials and lobbyists thought the matter had been settled, according to one lobbyist and a committee staffer. But just before the bill was to be put up for debate ahead of the committee's vote, Royce ordered the language on Qatar not only reinstated, but strengthened, they say. The bill was approved by the committee in November with the stronger language on Qatar intact.

A Royce aide, who spoke on condition of anonymity because he was not authorized to comment, denied that Royce had ever considered removing the Qatar language.

In January, Royce announced that he would not seek re-election, saying that he wanted to focus on his committee in the last year of his chairmanship rather than a political campaign.

In the same month, Broidy's company signed the hefty contract with the UAE government for gathering intelligence, according to someone familiar with the work.

____

Associated Press writers Chad Day and Richard Lardner contributed to this report

# EXHIBIT 9

# The New York Times

# *Trump Fund-Raiser Files Hacking Lawsuit Against Qatar*



Elliott Broidy with his wife, Robin, in 2012.   Alex J. Berliner/ABImages, via Associated Press

**By David D. Kirkpatrick (https://www.nytimes.com/by/david-d-kirkpatrick)**
March 26, 2018

LONDON — Lawyers for Elliott Broidy, a Republican fund-raiser close to President Trump, on Monday filed a lawsuit accusing the government of Qatar of hacking into his emails and conspiring with Washington lobbyists to besmirch his reputation.

The lawsuit is one of the first high-profile attempts to hold a foreign government accountable in American courts for cyberespionage. It comes at a time when hacking is becoming an increasingly common tool among a growing number of states seeking to punish enemies or achieve political goals.

"This suit is the first of its kind," said Lee Wolosky, a lawyer for Mr. Broidy.

Mr. Broidy, a Los Angeles investor, has been an antagonist of Qatar in Washington. He has accused it of supporting Islamist extremism, and he has provided millions of dollars in financial support for think-tank conferences amplifying those criticisms. He has made the same arguments to Mr. Trump and Republican lawmakers.

At the same time, Mr. Broidy also owns a defense contractor, Circinus L.L.C., that in the past year signed a contract worth more than $200 million with the United Arab Emirates and is pursuing another large contract with Saudi Arabia. Both countries are engaged in a bitter dispute with Qatar, the home to a major American military base and vast natural gas deposits.
Several recent news articles, including three on the front page of The New York Times, have called attention to the overlap of Mr. Broidy's political advocacy and his business interests. They describe what appear to be his promises of access to the Trump administration or congressional Republicans as he sought lucrative contracts with various foreign governments.

Most of those articles, including those in The Times, relied in part on copies of emails from Mr. Broidy's account that were provided to journalists by an anonymous group critical of his views about the Middle East.

Representatives of Mr. Broidy immediately suspected Qatar of stealing his emails, in part because the private emails of at least one other high-profile foe of Qatar — Yousef al-Otaiba, the Emirati ambassador to Washington — have also been hacked and disseminated to journalists in a similar fashion. The hack required a level of resources and sophistication that suggested a state was responsible.

"This is a case about a hostile intelligence operation undertaken by a foreign nation on the territory of the United States against successful, influential United States citizens," the lawyers for Mr. Broidy charged in a lawsuit filed in United States District Court for the Central District of California.

In a statement, a spokesman for Qatar said the suit was "without merit or fact." The spokesman, Jassim al-Thani, of the Qatari Embassy in Washington, called Mr. Broidy's lawsuit "a transparent attempt to divert attention from U.S. media reports about his activities."

The lawsuit charges that the attack began last Dec. 27, when Mr. Broidy's wife, Robin Rosenzweig, received an email that appeared to be a security alert from Google. She entered her password as the alert requested. It turned out to be a phishing attack, according to the lawsuit, and the information she provided was used to get access to her account, Mr. Broidy's and that of his company, Broidy Capital Management.

After the emails began appeared in the news media, Mr. Broidy retained a team of cyberforensic experts, including at least one former American intelligence official. According to the lawsuit, their initial analysis indicated that the attacks appeared to originate from computer servers in Britain and the Netherlands, but the researchers later concluded that the addresses of those servers had been used to mask another point of origin.

"A more thorough review of the server data" showed that for a brief time on one day — Feb. 14, 2018 — "problems with the attackers obfuscation techniques" had "revealed that the attack originated in Qatar."

The lawsuit also claims that a Republican lobbyist, Nicolas D. Muzin of Stonington Strategies, conspired with Qatar to exploit the hacked emails to damage Mr. Broidy's reputation. Stonington Strategies is registered as a foreign agent of Qatar, and the lawsuit says that Qatar pays him $300,000 a month. Qatar spent nearly $5 million on Washington lobbyists and media relations during the six months that ended last October, according to the Center for Responsive Politics.

Mr. Muzin has reportedly courted Jewish leaders and others by offering them trips to Doha, the capital of Qatar. "Starting last year, the State of Qatar, Muzin, and other foreign agents conspired in a strategic campaign to retaliate against and discredit Plaintiff Broidy," the lawsuit claims. It specifically accused Qatar of orchestrating the hacking after Mr. Muzin "identified Plaintiff Broidy as an individual who was opposing the State of Qatar's efforts to improve its image and relationships in Washington, D.C. and who was aligned with its regional rivals, the UAE and Saudi Arabia."

In a statement, Mr. Muzin said, "Mr. Broidy's lawsuit is an obvious attempt to draw attention away from his controversial work, and is as flimsy as the promises he reportedly made to his clients."

A version of this article appears in print on March 27, 2018, on Page A6 of the New York edition with the headline: Fund-Raiser For Trump Sues Qatar Over Hacking. Order Reprints (http://www.nytreprints.com/) | Today's Paper (http://www.nytimes.com/pages/todayspaper/index.html) | Subscribe (https://www.nytimes.com/subscriptions/Multiproduct/lp8HYKU.html?campaignId=48JQY)

(https://www.facebook.com/dialog/feed?
app_id=9869919170&link=https%3A%2F%2Fwww.nytimes.com%2F2018%2F03%2F26%2
broidy-qatar-lawsuit.html&smid=fb-share&name=Trump%20Fund-
Raiser%20Files%20Hacking%20Lawsuit%20Against%20Qatar&redirect_uri=https%3A%2F%
(https://twitter.com/intent/tweet?
url=https%3A%2F%2Fwww.nytimes.com%2F2018%2F03%2F26%2Fworld%2Fmiddleeast%
broidy-qatar-lawsuit.html&text=Trump%20Fund-
Raiser%20Files%20Hacking%20Lawsuit%20Against%20Qatar)     (mailto:?
subject=NYTimes.com%3A%20Trump%20Fund-
Raiser%20Files%20Hacking%20Lawsuit%20Against%20Qatar&body=From%20The%20New
Raiser%20Files%20Hacking%20Lawsuit%20Against%20Qatar%0A%0ALeaked%20emails%
broidy-qatar-lawsuit.html)

## Related Coverage

### A Top Trump Fund-Raiser Says Qatar Hacked His Email

MARCH 5, 2018



(https://www.nytimes.com/2018/03/05/world/middleeast/qatar-trump-hack-email.html?
action=click&module=RelatedCoverage&pgtype=Article&region=Footer&contentCollection=Related)

### Fund-Raiser Held Out Access to Trump as a Prize for Prospective Clients

MARCH 25, 2018



(https://www.nytimes.com/2018/03/25/us/politics/elliott-broidy-trump-access-circinus-lobbying.html?
action=click&module=RelatedCoverage&pgtype=Article&region=Footer&contentCollection=Related)

### How 2 Gulf Monarchies Sought to Influence the White House

MARCH 21, 2018



(https://www.nytimes.com/2018/03/21/us/politics/george-nader-elliott-broidy-uae-saudi-arabia-white-
house-influence.html?
action=click&module=RelatedCoverage&pgtype=Article&region=Footer&contentCollection=Related)

# EXHIBIT 10

# Trump fundraiser Elliott Broidy sues Qatar alleging cyber smear campaign



Elliot Broidy, seen here at an event in Beverly Hills in 2015. (Stefanie Keenan/Getty Images for Pepperdine Univ)

By Ellen Nakashima, Tom Hamburger and Karen DeYoung

March 26 at 5:36 PM    Email the author

A prominent Republican fundraiser and longtime supporter of President Trump sued the country of Qatar on Monday, alleging it engaged in a sophisticated information warfare campaign against him to smear his name in the United States and abroad.

The fundraiser, Elliott Broidy, alleged that the Qatari government hacked his email accounts and, through U.S.-based lobbyists, leaked stolen and forged material to U.S. and foreign journalists.

The move is Broidy's counterpunch to a recent stream of negative news stories that have relied in part on the hacked emails to explore various individuals' alleged efforts to exploit their access to Trump to affect foreign policy and peddle influence to further their own business interests.

"We believe the evidence is clear that a nation state is waging a sophisticated disinformation campaign against me to silence me, including hacking emails, forging documents, and engaging in espionage and numerous other illegal activities," said Broidy. "We believe it is also clear that I have been targeted because of my strong political views against Qatar's state sponsored terrorism and double dealing.

[*Read the complaint: Trump fundraiser sues government of Qatar*]

He is framing the case as a "hostile intelligence operation" undertaken by a foreign nation on U.S. territory against U.S. citizens — including himself and his wife, Robin Rosenzweig — who have charged that Qatar is a state sponsor of terrorism.

The lawsuit lays bare how information warfare is not just waged between states but is used by states

Case 2:18-cv-02421-JFW-E Document 31-9 Filed 04/02/18 Page 58 of 127 Page ID #:276

against individuals and has now invaded the murky world of American politics and political lobbying.

Broidy filed suit in federal court in Los Angeles, where his firm, Broidy Capital Management, is based. He is seeking damages to be determined by the court.

Broidy alleges that Qatar supports terrorists and last year launched a multimillion dollar public relations campaign to hide its ties to, and financial support of, groups including al-Qaeda, Hamas, the Taliban and the Muslim Brotherhood — in order to change its image in the United States.

"We believe Qatar has engaged in cyberattacks aimed at a U.S. citizen on American soil seemingly because of their perceived political influence and their outspoken opposition to Qatar's support and sponsorship of terrorists," said Lee Wolosky, Broidy's lawyer. "The Broidys are victims of a sophisticated effort to damage their reputations and relationships."

The couple are also suing Nicholas Muzin and his firm, Stonington Strategies, which they allege were employed by the Qatar government and were part of the smear campaign. Muzin, a medical doctor with a law degree, is a former senior aide to Sen. Ted Cruz (R-Tex.) and Cruz's presidential campaign, and former chief of staff to Sen. Tim Scott (R-S.C.). The lawsuit alleges that Muzin, an Orthodox Jew, was hired by Qatar to improve the

country's standing with the U.S. Jewish community.

The Qatari embassy did not respond to requests seeking comment.

In a statement, Muzin said: "Mr. Broidy's lawsuit is an obvious attempt to draw attention away from his controversial work, and is as flimsy as the promises he reportedly made to his clients. I am proud of the work my firm has conducted with Qatar and look forward to continuing to support peaceful dialogue and progress in the Middle East."

The lawsuit occurs in the midst of a continuing high-priced feud playing out over the past year in Washington between factions in the Middle East. On one side is Qatar, which has amassed a fleet of Washington lawyers and lobbyists to represent its interests. The other side comprises four countries: Saudi Arabia, the United Arab Emirates, Egypt and Bahrain. The quartet accuse Qatar of destabilizing the region and supporting terrorism, and has its own high-priced collection of U.S. lobbyists.

Qatar rejects the accusations.

"I've never seen anything like this," in terms of expense and aggressive tactics employed, said longtime lobbyist Charlie Black.

Saudi Arabia and the U.A.E. have for years objected to what they charged was Qatar's funding harboring of leaders of Hamas and the Muslim

Case 2:18-cv-02421-JFW-E Document 31-9 Filed 04/02/18 Page 60 of 127 Page ID #:278

Brotherhood, and its willingness to have stable
relations with Iran, with which it shares a massive
natural gas field in the Persian Gulf. Most
vociferously, the two gulf states have said that the
Arabic language service of Al Jazeera, the media
conglomerate based in and financed by the Qatari
government, gave voice to internal dissent within
those countries.

In early June last year, the Saudis and Emiratis,
along with Bahrain and Egypt, severed relations
with Qatar and imposed a blockade of the country,
a small peninsula into the gulf whose only land
border is with Saudi Arabia. Days before they
severed ties, they charged that Qatari leader, Emir
Tamin bin Hamad al-Thani, had made public
statements in support of terrorists and Iran.

Qatar quickly denied the statements, which
appeared on its official news site. The Washington
Post later reported that, according to U.S.
intelligence, the Qatari site had been hacked, and
the false statements inserted, by officials of the
UAE government.

*[UAE orchestrated hacking of Qatari government sites, sparking regional upheaval, according to U.S. intelligence officials]*

The Saudi and UAE actions sent the region into a political and diplomatic tailspin that continues to threaten to undermine U.S. military objectives in the Middle East.

Much of what Broidy alleges appears to fall within confines of the lobbying campaigns. He charges that Muzin attempted to persuade American Jewish leaders — a community in which Broidy has long been active — to visit Qatar.

Broidy alleges that his own prominence in the American Jewish community, with Trump and the administration, and with Congress, made him a threat to Qatar, which he actively campaigned against. He alleges Qatar damaged his reputation and undermined his business interests, including what he says is a $200 million security contract with the UAE.

Broidy and Rosenzweig allege that late last year, Qatar hacked their personal and business email accounts. On Dec. 27, they allege, Rosenzweig received an email that appeared to be a Gmail security alert, which she clicked on, and as directed, entered her log-in and password. In fact she'd clicked on a "phishing" email designed to get her to give up her security credentials.

That enabled the hackers to obtain access to her personal Google accounts, which contained user names and passwords to access other email accounts, including Broidy's and the firm's.

The intruders used a common technique to mask their location, hacking through servers located elsewhere, in this case in Britain and the Netherlands, the lawsuit alleges. According to forensic investigator Robert Johnston, chief executive of Adlumin, which was hired by Broidy, they also used a server in Utah. The hackers, he said, slipped up while trying to mask their location, and revealed an IP address that tracked back to an Internet service provider controlled by the Qatari government and that has ties to the state intelligence agency.

Among the emails distributed to U.S. media outlets were indications that Broidy had attempted to use his access to Trump to further his own political and foreign policy interests, as well as his business interests in obtaining overseas contracts.

On Monday, the Associated Press reported that Broidy had received a $2.5 million payment sent through a Canadian company by George Nader, an adviser to the UAE government who is currently cooperating with the U.S. special counsel investigation into Russian interference in the 2016 presidential election.

The AP indicated that money was spent in part on an anti-Qatar conference by a Washington think tank, and in contributions to U.S. political figures critical of Qatar.

A person familiar with Broidy's views, speaking on condition of anonymity, said that Nader had sent the money to Broidy, but denied the funds had any connection to the UAE.

Under U.S. law, foreign sovereign countries generally may not be sued in U.S. courts unless one of a handful of exceptions apply. Broidy is suing under the noncommercial tort exception, which enables a lawsuit for "personal injury or death, or damage to or loss of property, occurring in the United States" that is caused by the "tortious act" of the foreign state.

Checkpoint newsletter
Military, defense and security at home and abroad.

Sign up

There is not much case law in this area that involves cyber intrusions. But in a hacking case brought against the government of Ethiopia by a U.S. citizen, the federal appeals court in the District of Columbia last year ruled for the foreign government. Because the hack originated outside the United States, the plaintiff had no grounds to sue, the court said.

Wolosky noted that the D.C. appeals court ruling does not bind the Central District of California, where the lawsuit was filed.

But Paul Krieger, a former cyber prosecutor in the Southern District of New York, said he thought that the appellate ruling "seems to pose significant challenges" for Broidy's case because, among other things, the complaint alleges that the hack originated in Qatar.

# EXHIBIT 11

DOW JONES, A NEWS CORP COMPANY

DJIA **24202.60** 2.84% ▲    Nasdaq **7220.54** 3.26% ▲    U.S. 10 Yr **-10/32 Yield** 2.855% ▼    Crude Oil **65.49** -0.59% ▼    Euro **1.2448** 0.02% ▲

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

https://www.wsj.com/articles/gop-fundraiser-sues-qatar-over-stolen-emails-1522094870

POLITICS

# GOP Fundraiser Sues Qatar Over Stolen Emails

Elliott Broidy accuses the emirate of leaking messages that detailed contacts with Trump administration and the U.A.E.



According to a lawsuit by Elliott Broidy, a Republican fundraiser, Qatar's representatives identified him as an impediment to their plan to improve the country's standing in Washington. **PHOTO:** DAVID KARP/ASSOCIATED PRESS

*By Aruna Viswanatha and Rebecca Ballhaus*

Updated March 26, 2018 5:14 p.m. ET

Republican fundraiser Elliott Broidy sued Qatar on Monday, accusing the Middle East emirate of trying to discredit him by stealing and leaking emails that detailed his contacts with the Trump administration and Persian Gulf rival, the United Arab Emirates.

The lawsuit, filed in federal court in Los Angeles, adds another layer of intrigue to a complicated narrative that has connected a Middle East dispute to Republican fundraisers, the Trump White House and special counsel Robert Mueller's examination of Russian meddling in the 2016 presidential election.

Last year, the U.A.E. joined with Saudi Arabia to accuse Qatar, the tiny Persian Gulf emirate, of financing extremists, and then cut ties with the country. President Donald Trump, who sided with the Arab countries against Qatar, claimed in June that Saudi Arabia and others' decision to cut ties was evidence of the success of his visit to the region in May, when the president encouraged regional powers to crack down on support for extremist groups.

According to Mr. Broidy's lawsuit, Qatar's representatives identified him as an impediment to their plan to improve the country's standing in Washington, and developed an effort to discredit him. The lawsuit is filed against the state of Qatar and one of the country's Washington-based lobbyists, Nick Muzin, of Stonington Strategies.

"This is a case about a hostile intelligence operation undertaken by a foreign nation" against American citizens "who have spoken out against that country's support for terrorism and who have entered into significant business relationships relating to defense and counterterrorism with a rival nation," the lawsuit said.

A spokesman at Qatar's embassy in Washington, Jassim Al-Thani said: "Mr. Broidy's baseless accusations are just more diversionary tactics by him," referring to a letter from Mr. Broidy's lawyer last week that outlined allegations similar to those in the lawsuit. He added that Qatar "has not engaged in any of the activities" Mr. Broidy has alleged. He had no immediate comment on the lawsuit.

In a statement, Mr. Muzin called the lawsuit "an obvious attempt to draw attention away from [Mr. Broidy's] controversial work." Mr. Muzin added: "I am proud of the work my firm has conducted with Qatar and look forward to continuing to support peaceful dialogue and progress in the Middle East."


Emails and other documents hacked from Mr. Broidy and his wife, Robin Rosenzweig, and provided to news outlets in the past month showed that Mr. Brody spoke to the White House and Mr. Trump about issues of interest to the U.A.E., and relayed information from those meetings to George Nader, an adviser to the U.A.E. and an associate of Mr. Broidy who, according to the emails, was also his conduit to the U.A.E.'s leadership.

Mr. Broidy owns a security company called Circinus, which has a contract with the U.A.E. worth more than $200 million to develop defense and counterterrorism capabilities, according to the lawsuit.

The White House didn't respond to several requests for comment.

Mr. Nader has been questioned by Mr. Mueller's investigators in depth about a meeting in the Seychelles weeks before Mr. Trump's inauguration between a Russian executive and another top Republican donor, Erik Prince, according to people familiar with the matter. A spokesman for Mr. Prince has declined to comment.

According to the lawsuit, the hack started with a fake email that appeared to be from Google security sent to Ms. Rosenzweig in December 2017. Through that so-called spear-phishing attempt, the hackers obtained her login credentials and then access to Mr. Broidy's email account and that of his company, Broidy Capital Management, the suit alleges.

The lawsuit said forensic evidence gathered by Mr. Broidy's "advanced cyber unit" showed that the hackers used proxy servers in the United Kingdom and the Netherlands, but that the attack originated from Qatar. Some of the emails and documents that were provided to several news organizations were fake or included doctored information, the lawsuit said.

A lawyer for Mr. Broidy, Lee Wolosky, of the law firm Boies Schiller Flexner LLP, released a letter sent to the Qatari ambassador in Washington last week that said his team possessed "irrefutable forensic evidence" tying Qatar to the "unlawful attack." The embassy didn't respond by the Thursday deadline he provided, Mr. Wolosky told The Wall Street Journal, triggering the Monday lawsuit.

Mr. Broidy was a vice chairman for the Trump campaign's joint fund with the Republican Party during the 2016 campaign, helping it raise more than $108 million, according to Federal Election Commission filings. A longtime Republican donor, he is currently a national deputy finance chairman for the Republican National Committee. Earlier this month, Mr. Trump attended a fundraiser in Los Angeles that Mr. Broidy helped organize.

During the past year, Mr. Broidy appears to have sought out contracts with several foreign countries by advertising his contacts in the White House. According to emails provided to the Journal, Mr. Broidy was in negotiations to earn tens of millions of dollars if the U.S. Justice Department dropped its investigation into a multibillion-dollar graft scandal involving a Malaysian state investment fund. The messages included draft agreements, including one proposal that included a $75 million fee if the Justice Department quickly dropped the probe.

The dispute with Saudi Arabia and other Arab states prompted Qatar to hire a group of high-profile lobbyists in Washington, including a company founded by Mr. Trump's former campaign manager Corey Lewandowski, to try to improve the country's image in Washington, the lawsuit said. Mr. Lewandowski had left the firm by the time it was hired by Qatar.

In a memo to Mr. Nader last fall, Mr. Broidy said he informed Mr. Trump's son-in-law and senior adviser, Jared Kushner, that Qatar had hired Mr. Lewandowski's former firm at a fee of $500,000 a month. Foreign Agent Registration Act records show the firm, Avenue Strategies, was hired by Qatar at an initial quarterly fee of $450,000.

"Jared was shocked and repeated it back to me," Mr. Broidy wrote. "Jared offered no further comments to my remarks."

Mr. Broidy also said he told Mr. Kushner that the U.S. should stay out of the dispute between Qatar and the Arab countries and "allow the disagreement to run its course."

An Avenue Strategies spokesman didn't immediately respond to a request for comment. Mr. Lewandowski declined to comment.

**Write to** Aruna Viswanatha at Aruna.Viswanatha@wsj.com and Rebecca Ballhaus at Rebecca.Ballhaus@wsj.com

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.



See what a financial advisor can do for you.

Learn More

RAYMOND JAMES
LIFE WELL PLANNED.

WORLD NEWS

MARCH 26, 2018 / 8:46 PM / UPDATED 13 HOURS AGO

# Trump fundraiser sues Qatar over hacked emails

Reuters Staff

（Reuters) - Elliott Broidy, a top Republican fundraiser, sued Qatar on Monday, accusing the Gulf state of pilfering and leaking emails in retribution for his attempts to influence the Trump administration in favor of regional rivals of Qatar.

In the lawsuit, filed in U.S. District Court in Los Angeles, Broidy accused Qatar and its agents of hacking into his and his wife's email accounts and providing the stolen documents, via U.S.-based lobbyists, to media outlets in order to plant damaging articles about him.

The lawsuit, which seeks unspecified damages, says some of the leaked materials were doctored.

"We believe the evidence is clear that a nation state is waging a sophisticated disinformation campaign against me in order to silence me," Broidy said in a statement.

The lawsuit adds a new dimension to a diplomatic crisis in the Gulf set off when the United Arab Emirates, Saudi Arabia, Bahrain and Egypt imposed sanctions on Qatar last June.

# EXHIBIT 12



SPONSORED BY DELOITTE

**Automation in insurance**

Robotics and cognitive automation will transform the insurance industry, but how?

Learn more ›

The boycott was based on allegations that Qatar supports Islamic extremists and regional foe Iran. Qatar denies the charges.

Jassim Al-Thani, a spokesman at Qatar's embassy in Washington, described the lawsuit as an attempt by Broidy to divert attention from media scrutiny on his activities.

"It is Mr. Broidy, not Qatar, who orchestrated nefarious activities designed to influence Congress and American foreign policy," Al-Thani said in a statement.

Broidy, a vocal critic of Qatar, met with Trump in September and tried to set up an informal meeting between the president and Crown Prince Mohammed bin Zayed al-Nahyan of the UAE, according to a person familiar with the matter.

While the meeting did not materialize, the episode highlighted the influential role Broidy, the deputy finance chairman of the Republican National Committee, has developed in the administration.

Broidy, whose company is based in California, finalized more than $200 million worth of defense contracts with the UAE government and is in talks on similar deals with Saudi Arabia, the lawsuit says.

Broidy cited several articles that he believes were prompted by the leaking of his emails and other documents.

Broidy claims Al Jazeera published an article on March 8 based on falsified documents accusing him of entering into a lobbying contract in 2014 with a Russian bank under U.S. sanctions.

Al Jazeera did not immediately respond to an email seeking comment.

Broidy accused Nicolas Muzin, a Washington-based lobbyist whose firm has a $300,000 per month contract with Qatar, of helping to wage a campaign to discredit Broidy's efforts to "educate the American people about Qatar." Muzin was also named as a defendant in the suit.

"Mr Broidy's lawsuit is an obvious attempt to draw attention away from his controversial work, and is as flimsy as the promises he reportedly made to his clients," Muzin said in a statement, saying he was proud of the work he did for Qatar.

Reporting by Nathan Layne and Karen Freifeld in New York; Editing by Leslie Adler

*Our Standards:*   *The Thomson Reuters Trust Principles.*

SPONSORED

 Learn If You'll Pre-Qualify For A Citi Card Before Applying
Citi


 UK population may reach 74 million by 2039. How will housing keep up?
Barclays


 6 Credit Cards You Should Not Ignore If You Have Excellent Credit
NerdWallet


Promoted by **Dianomi**



**BUSINESS NEWS**

MARCH 26, 2018 / 9:00 PM / UPDATED 6 HOURS AGO

# Arizona governor suspends Uber's ability to test self-driving cars

David Schwartz



PHOENIX, Ariz. (Reuters) - The governor of Arizona on Monday suspended Uber's ability to test self-driving cars on public roads in the state following a fatal crash last week that killed a 49-year-old pedestrian.



ADVERTISEMENT: Your content will begin in 14 seconds.

sees its future success reliant on driverless vehicles, and trails competitors such as Alphabet

Inc's Waymo in developing the technology.

Arizona had been a key hub for Uber, with about half of the company's 200 self-driving cars and a staff of hundreds.

In a letter sent to Uber Chief Executive Dara Khosrowshahi and shared with the media, Governor Doug Ducey said he found a video released by police of the crash "disturbing and alarming, and it raises many questions about the ability of Uber to continue testing in Arizona."

Police and safety regulators are investigating the March 18 fatality in which a woman crossing a four-lane road at night was struck and killed by an Uber self-driving SUV. The incident has focused new attention on the lack of clear safety standards for such vehicles.

FILE PHOTO - Doug Ducey smiles after voting in the Paradise Valley section of Phoenix, Arizona August 26, 2014. REUTERS/Samantha Sais

Ducey called the crash "an unquestionable failure."

"In the best interests of the people of my state, I have directed the Arizona Department of Transportation to suspend Uber's ability to test and operate autonomous vehicles on Arizona's public roadways," Ducey said.



FILE PHOTO - Uber's logo is pictured at its office in Tokyo, Japan, November 27, 2017. REUTERS/Kim Kyung-Hoon

The letter strikes a dramatically different tone from late 2016, when Ducey invited Uber to his state with celebration, saying "Arizona welcomes Uber self-driving cars with open arms and wide open roads." At the time, a banner was hung on a building in Phoenix welcoming Uber.

Uber moved its driverless cars to Arizona from San Francisco after California regulators shut down the self-driving fleet for not having the proper permits.

Uber, which had already pulled its self-driving cars off the road after the accident, said in a statement on Monday that it will "keep a dialogue open with the Governor's office to address any concerns they have."

Reporting by David Schwartz; Writing by Heather Somerville; Editing by Sandra Maler and Michael Perry

*Our Standards:*   *The Thomson Reuters Trust Principles.*

Apps     Newsletters     Reuters Plus     Advertising Guidelines     Cookies     Terms of Use     Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2018 Reuters. All Rights Reserved.

# EXHIBIT 13



March 28, 2018

**BY FEDERAL EXPRESS AND COURIER**

Mr. Nicolas D. Muzin
800 Stonington Road
Silver Spring, MD. 20902

   Re: *Broidy Capital Management LLC, et al., v. State of Qatar, et al.,*
     *USDC C.D. Ca.* (Case No. 2:18-cv-02421) (Walter, J.)

Dear Mr. Muzin,

  Attached please find a letter that we attempted to hand deliver to your last known business address at 550 Madison Avenue, New York, NY. We were unable to do so as the building is under renovation. We also were unable to locate a new business address for you.

           Sincerely,

           Lee Wolosky



BOIES
SCHILLER
FLEXNER

March 28, 2018

**BY FEDERAL EXPRESS AND COURIER**

Mr. Nicolas D. Muzin
550 Madison Avenue
New York, NY 10022

Stonington Strategies LLC
550 Madison Avenue
New York, NY 10022

State of Qatar
Embassy of the State of Qatar
2555 M St, NW
Washington, DC 20037

State of Qatar
The Consulate General of the State of Qatar
150 S. Rodeo Dr.
Suite #250
Beverly Hills, CA 90212

Re:   *Broidy Capital Management LLC, et al., v. State of Qatar, et al., USDC C.D. Ca.*
       (Case No. 2:18-cv-02421) (Walton, J.)

Dear Sirs,

This is to advise you that in the near future we intend to file a motion for a preliminary injunction and temporary restraining order, in addition to a motion for expedited discovery, on behalf of our clients Elliott Broidy, Robin Rosenzweig, and Broidy Capital Management LLC.

Please advise us as to whether you intend to be heard on these motions either personally or through counsel. Please provide identity of your counsel, if applicable, so we can forward motion papers to those persons.

Sincerely,

Lee Wolosky

BOIES SCHILLER FLEXNER LLP

# EXHIBIT 14

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**BROIDY CAPITAL MANAGEMENT LLC, et al.,**

CIVIL ACTION NO.: 2:18-CV
-02421-JFW (EX)

**vs**                                                    *Plaintiff*

**STATE OF QATAR, et al.,**

*Defendant*

## AFFIDAVIT OF SERVICE

State of Delaware  }
County of New Castle }  ss.:

The undersigned, being duly sworn, deposes and says;

Deponent is not a party herein, is over 18 years of age and resides in the state of Delaware,

That on **03/29/2018 at 3:15 PM at 8 The Green, Suite A, Dover, DE 19901**

deponent served **Summons in a Civil Action, Complaint and Demand for Jury Trial, Honorable John F. Walter Law and Motion Schedule, Honorable Charles F. Eick Law and Motion Schedule, Electronic Filing and Case Management, Local Rules - Central District of California**

on **Stonington Strategies LLC**, a domestic limited liability company, c/o A Registered Agent, Inc., Registered Agent,

by delivering thereat a true copy of each to **Debbie Woods (Authorized To Accept Service)** personally.

Description of Person Served:
Gender : Female
Skin :  White
Hair : Brown
Age : 36 - 50 Yrs.
Height : 5' 4" - 5' 8"
Weight :131-160 Lbs.
Other :

Sworn to before me this
29 day of March, 2018

_____
NOTARY PUBLIC

KEVIN DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires September 14, 2020

_____
Granville Morris

Serving By Irving, Inc. | 233 Broadway, Suite 2201 | New York, NY 10279
New York City Dept. of Consumer Affairs License No. 0761160

# EXHIBIT 15

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

---

BROIDY CAPITAL MANAGEMENT LLC, ELLIOTT BROIDY
AND ROBIN ROSENZWEIG
**Plaintiff**                                              )
                                                          )
                                                          )      **Case Number: 2:18-cv-024421- JFW**
**vs**                                                     )                    **(eX)**
                                                          )
**STATE OF QATAR, STONINGTON STRATEGIES LLC,**             )
**NICOLAS D. MUZIN, AND DOES 1-10**                        )

---

## AFFIDAVIT OF ATTEMPTED SERVICE

I, Nina Lew, depose and state that I am not a party to this action, am over the age of eighteen and a private process server for the firm of Serving By Irving, 233 Broadway, Suite 2201, New York, New York 10279.

At the request of Serving By Irving I was asked to serve a Summons and Complaint on defendant Nicholas D. Muzin at the given address of 800 Stonington Road, Silver Spring, MD 20902.

That on March 28, 2018 at approximately 1:10 p.m. I attempted to serve Nicholas D. Muzin at the given address. I knocked on the door for several minutes but did not receive a greeting. I spoke the neighbor at 808 Stonington Road who advised that he occasionally sees Nicholas during the day but had not seen him for some time.

That on March 28, 2018 at approximately 8:15 p.m. I attempted to serve Nicholas D. Muzin at the given address. I knocked on the door for several minutes but did not receive a greeting. The hallway light was on and there was a gray Lexus, plate number 6BG0088, was parked in front of the residence.

That on March 28, 2018 at approximately 9:16 p.m. I attempted to serve Nicholas D. Muzin at the given address. I knocked on the door for several minutes but did not receive a greeting. The hallway light was still on and the gray Lexus, plate number 6BG0088, was still parked in front of the residence.

That on March 29, 2018 at approximately 9:30 a.m. I attempted to serve Nicholas D. Muzin at the given address. I knocked on the door for several minutes but did not receive a greeting. The gray Lexus, plate number 6BG0088, was still parked in front of the residence. Everything looked the same as on my previous attempts.

That on March 29, 2018 at approximately 2:30 p.m. I attempted to serve Nicholas D. Muzin at the given address. I knocked on the door for several minutes but did not receive a greeting. The gray Lexus, plate number 6BG0088, was still parked in front of the residence.

That on March 30, 2018 at approximately 8:15 a.m. I attempted to serve Nicholas D. Muzin at the given address. I knocked on the door for several minutes but did not receive a greeting. There was a Fedex sticker on the door. The gray Lexus, plate number 6BG0088, was still parked in front of the residence.

given address. I knocked on the door for several minutes but did not receive a greeting. The Fedex sticker was still on the door. The gray Lexus, plate number 6BG0088, was still parked in front of the residence.

The undersigned declares and affirms that she has personal knowledge of the foregoing facts, that the facts are true and correct and that this affidavit was executed by Nina Lew, process server.

Sworn to and subscribed before me on
.03/30/2018

_E. Torri Schaffer, Notary Public_
_Commission Expires 11/29/2020_

38133

**Nina Lew**
P.O. Box 18647
Washington, DC 20036
(202) 296-0222

E. TORRI SCHAFFER
Notary Public
State of Maryland
Montgomery County
My commission exp. November 29, 2020

# UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

**BROIDY CAPITAL MANAGEMENT LLC, ELLIOTT BRODY
AND ROBIN ROSENZWEIG**
**Plaintiff**                                                      )
                                                                    )
                                                                    )          **Case Number: 2:18-cv-024421- JFW**
**vs**                                                              )                          **(eX)**
                                                                    )
**STATE OF QATAR, STONINGTON STRATEGIES LLC,**    )
**NICOLAS D. MUZIN, AND DOES 1-10**                   )

## AFFIDAVIT OF ATTEMPTED SERVICE

I, Dilani Dias, depose and state that I am not a party to this action, am over the age of eighteen and a private process server for the firm of Serving By Irving, 233 Broadway, Suite 2201, New York, New York 10279.

At the request of Serving By Irving I was asked to serve a Summons and Complaint on defendant Nicholas D. Muzin at the given address of 800 Stonington Road, Silver Spring, MD 20902.

That on March 29, 2018 at approximately 9:07 p.m. I attempted to serve Nicholas D. Muzin at the given address. I knocked on the door for several minutes but did not receive a greeting. The gray Lexus was parked in front of the residence. There were lights on all over inside the residence and lights on in the yard. There was a camera on the front porch. I knocked again for several minutes but was unable to summons anyone to the door.

The undersigned declares and affirms that she has personal knowledge of the foregoing facts, that the facts are true and correct and that this affidavit was executed by Dilani Dias, process server.


Sworn to and subscribed before me on
03/30/2018

*E. Torri Schaffer, Notary Public*
*Commission Expires 11/29/2020*

38167

**Dilani Dias**
P.O. Box 18647
Washington, DC 20036
(202) 296-0222



E. TORRI SCHAFFER
Notary Public
State of Maryland
Montgomery County
My commission exp. November 29, 2020

# EXHIBIT 16

-----Original Message-----
**From:** TrackingUpdates@fedex.com [TrackingUpdates@fedex.com]
**Sent:** Thursday, March 29, 2018 10:39 AM Eastern Standard Time
**To:** Lee Wolosky
**Subject:** FedEx Shipment 771857520720 Delivered



# Your package has been delivered

## Tracking # 771857520720

| Ship date: | | Delivery date: |
|---|---|---|
| **Wed, 3/28/2018** | | **Thu, 3/29/2018 10:37 am** |
| **Lee Wolosky** | | **State of Qatar** |
| BOIES,SCHILLER,FLEXNER LLP |  | Embassy of the State of Qatar |
| New York, NY 10022 | Delivered | 2555 M Street, NW |
| US | | WASHINGTON, DC 20037 |
| | | US |

## Shipment Facts

Our records indicate that the following package has been delivered.

| | |
|---|---|
| **Tracking number:** | 771857520720 |
| **Status:** | Delivered: 03/29/2018 10:37 AM Signed for By: W.CROMARTIE |
| **Reference:** | 60547.0001 |
| **Signed for by:** | W.CROMARTIE |
| **Delivery location:** | WASHINGTON, DC |

| | |
|---|---|
| **Delivered to:** | Guard/Security Station |
| **Service type:** | FedEx Priority Overnight |
| **Packaging type:** | FedEx Envelope |
| **Number of pieces:** | 1 |
| **Weight:** | 0.50 lb. |
| **Special handling/Services:** | Deliver Weekday |
| **Standard transit:** | 3/29/2018 by 10:30 am |

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 9:39 AM CDT on 03/29/2018.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2018 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

# EXHIBIT 17

**From:** TrackingUpdates@fedex.com [mailto:TrackingUpdates@fedex.com]
**Sent:** Thursday, March 29, 2018 12:39 PM
**To:** Lee Wolosky
**Subject:** FedEx Shipment 771857566489 Delivered



# Your package has been delivered

## Tracking # 771857566489



| Ship date: | | Delivery date: |
|---|---|---|
| Wed, 3/28/2018 | | Thu, 3/29/2018 9:35 am |
| **Lee Wolosky** | | **State of Qatar** |
| BOIES,SCHILLER,FLEXNER LLP | Delivered | The Consulate General of the State |
| New York, NY 10022 | | 150 S. Rodeo Dr. |
| US | | Suite #250 |
| | | BEVERLY HILLS, CA 90212 |
| | | US |

## Shipment Facts

Our records indicate that the following package has been delivered.

| Tracking number: | 771857566489 |
|---|---|

1

| Status: | Delivered: 03/29/2018 09:35 AM Signed for By: M.MARWAH |
|---|---|
| Reference: | 60547.0001 |
| Signed for by: | M.MARWAH |
| Delivery location: | BEVERLY HILLS, CA |
| Delivered to: | Receptionist/Front Desk |
| Service type: | FedEx Priority Overnight |
| Packaging type: | FedEx Envelope |
| Number of pieces: | 1 |
| Weight: | 0.50 lb. |
| Special handling/Services: | Deliver Weekday |
| Standard transit: | 3/29/2018 by 10:30 am |

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 11:39 AM CDT on 03/29/2018.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2018 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

# EXHIBIT 18

-----Original Message-----
**From:** Dilley, Dean [dean.dilley@squirepb.com]
**Sent:** Wednesday, March 28, 2018 07:50 PM Eastern Standard Time
**To:** Lee Wolosky
**Subject:** Broidy Capital Management et al. v. State of Qatar et al.

Dear Mr. Wolosky,

In connection with my representation of the State of Qatar, I am responding to your letter of March 28 to the Embassy and Consulate General.

Qatar intends to be heard on any motions filed in this matter. Pending appointment of local counsel, please provide the relevant papers to me.

I would be grateful if you confirmed receipt of this message.

Regards.

D M Dilley

 **Dean M. Dilley**

Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037
T  +1 202 457 5253
O  +1 202 457 6000
F  +1 202 457 6315

**dean.dilley@squirepb.com** squirepattonboggs.com

-----------------------------------------------------------------
47 Offices in 20 Countries

This message is confidential and may be legally privileged or otherwise protected from disclosure. If you are

1

not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system; you must not copy or disclose the contents of this message or any attachment to any other person.

Squire Patton Boggs (US) LLP is part of the international legal practice Squire Patton Boggs, which operates worldwide through a number of separate legal entities. Please visit www.squirepattonboggs.com for more information.

#US
-------------------------------------------------------------------

# EXHIBIT 19

Received by NSD/FARA Registration Unit 09/03/2017 3:55:47 PM

OMB No. 1124-0006; Expires May 31, 2020

**U.S. Department of Justice**

Washington, DC 20530

**Exhibit A to Registration Statement**

**Pursuant to the Foreign Agents Registration Act of 1938, as amended**

INSTRUCTIONS. Furnish this exhibit for EACH foreign principal listed in an initial statement and for EACH additional foreign principal acquired subsequently. The filing of this document requires the payment of a filing fee as set forth in Rule (d)(1), 28 C.F.R. § 5.5(d)(1). Compliance is accomplished by filing an electronic Exhibit A form at https://www.fara.gov.

Privacy Act Statement. The filing of this document is required by the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide this information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, DC. Statements are also available online at the Registration Unit's webpage: https://www.fara.gov. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: https://www.fara.gov.

Public Reporting Burden. Public reporting burden for this collection of information is estimated to average .49 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| 1. Name and Address of Registrant<br>Stonington Strategies LLC<br>550 Madison Avenue<br>New York, NY 10022 | 2. Registration No.<br>6458 |
|---|---|
| 3. Name of Foreign Principal<br>Embassy of the State of Qatar | 4. Principal Address of Foreign Principal<br>2555 M Street NW<br>Washington, DC 20037 |

5. Indicate whether your foreign principal is one of the following:

☒ Government of a foreign country [1]

☐ Foreign political party

☐ Foreign or domestic organization: If either, check one of the following:

☐ Partnership ☐ Committee

☐ Corporation ☐ Voluntary group

☐ Association ☐ Other *(specify)* _____

☐ Individual-State nationality _____

6. If the foreign principal is a foreign government, state:

   a) Branch or agency represented by the registrant

      Ministry of Foreign Affairs

   b) Name and title of official with whom registrant deals

      Mohammed Al-Attiyah, Government Affairs

7. If the foreign principal is a foreign political party, state:

   a) Principal address

   b) Name and title of official with whom registrant deals

   c) Principal aim

1 "Government of a foreign country," as defined in Section 1(e) of the Act, includes any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country, other than the United States, or over any part of such country, and includes any subdivision of any such group and any group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated. Such term shall include any faction or body of insurgents within a country assuming to exercise governmental authority whether such faction or body of insurgents has or has not been recognized by the United States.

FORM NSD-3
Revised 05/17

8. If the foreign principal is not a foreign government or a foreign political party:

    a) State the nature of the business or activity of this foreign principal.

    b) Is this foreign principal:

| | |
|---|---|
| Supervised by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |
| Owned by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |
| Directed by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |
| Controlled by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |
| Financed by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |
| Subsidized in part by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |

9. Explain fully all items answered "Yes" in Item 8(b). *(If additional space is needed, a full insert page must be used.)*

10. If the foreign principal is an organization and is not owned or controlled by a foreign government, foreign political party or other foreign principal, state who owns and controls it.

## EXECUTION

In accordance with 28 U.S.C. § 1746, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this Exhibit A to the registration statement and that he/she is familiar with the contents thereof and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

| Date of Exhibit A | Name and Title | Signature |
|---|---|---|
| September 3, 2017 | Nicolas D. Muzin, CEO | /s/ Nicolas D. Muzin |

OMB No. 1124-0004; Expires May 31, 2020

**U.S. Department of Justice**

Washington, DC 20530

**Exhibit B to Registration Statement**

**Pursuant to the Foreign Agents Registration Act of 1938, as amended**

INSTRUCTIONS. A registrant must furnish as an Exhibit B copies of each written agreement and the terms and conditions of each oral agreement with his foreign principal, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances by reason of which the registrant is acting as an agent of a foreign principal. Compliance is accomplished by filing an electronic Exhibit B form at https://www.fara.gov.

Privacy Act Statement. The filing of this document is required for the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 et seq., for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide the information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, DC. Statements are also available online at the Registration Unit's webpage: https://www.fara.gov. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: https://www.fara.gov.

Public Reporting Burden. Public reporting burden for this collection of information is estimated to average .33 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| 1. Name of Registrant | 2. Registration No. |
|---|---|
| Stonington Strategies LLC | 6458 |

3. Name of Foreign Principal

Embassy of the State of Qatar

Check Appropriate Box:

4. ☒ The agreement between the registrant and the above-named foreign principal is a formal written contract. If this box is checked, attach a copy of the contract to this exhibit.

5. ☐ There is no formal written contract between the registrant and the foreign principal. The agreement with the above-named foreign principal has resulted from an exchange of correspondence. If this box is checked, attach a copy of all pertinent correspondence, including a copy of any initial proposal which has been adopted by reference in such correspondence.

6. ☐ The agreement or understanding between the registrant and the foreign principal is the result of neither a formal written contract nor an exchange of correspondence between the parties. If this box is checked, give a complete description below of the terms and conditions of the oral agreement or understanding, its duration, the fees and expenses, if any, to be received.

7. Describe fully the nature and method of performance of the above indicated agreement or understanding.

The registrant will develop and implement a government relations strategy for the State of Qatar. For the performance of these services, the foreign principal will pay the registrant a monthly fee retainer of $50,000.

8. Describe fully the activities the registrant engages in or proposes to engage in on behalf of the above foreign principal.

The registrant will develop and implement a government relations strategy for the State of Qatar.

9. Will the activities on behalf of the above foreign principal include political activities as defined in Section 1(o) of the Act and in the footnote below? Yes ☒ No ☐

If yes, describe all such political activities indicating, among other things, the relations, interests or policies to be influenced together with the means to be employed to achieve this purpose.

The registrant's activities may include communications with Executive Branch officials, Members of Congress and congressional staff, and other individuals and organizations involved in governmental or public policy matters.

## EXECUTION

In accordance with 28 U.S.C. § 1746, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this Exhibit B to the registration statement and that he/she is familiar with the contents thereof and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

| Date of Exhibit B | Name and Title | Signature |
|---|---|---|
| September 3, 2017 | Nicolas D. Muzin, CEO | /s/ Nicolas D. Muzin |

Footnote: "Political activity," as defined in Section 1(o) of the Act, means any activity which the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party.

Received by NSD/FARA Registration Unit 09/03/2017 3:55:38 PM

Rev. 081617

Ref:

August 24, 2017

Mr. Nicolas Muzin
Stonington Strategies
nick@stoningtonstrategies.com

**CONFIDENTIAL**

Re:     **Agreement for Consulting Services**

Dear Mr. Muzin:

This will confirm the terms of our agreement (the "Agreement") by which you and Stonington Strategies shall provide consulting services to the Embassy of the State of Qatar in Washington.

The services provided by you shall include the development and implementation of a government relations strategy for the State of Qatar, as requested and directed by the Embassy.

You will be compensated at the rate of US\$ 50,000 (Fifty Thousand United States Dollars) per month, for twelve months. The first monthly payment shall be made on execution of this Agreement. Eleven subsequent payments shall be made on the 15th day of each calendar month. No compensation or reimbursement in excess of that amount shall be paid.   Without limiting the generality of the foregoing, the compensation described above shall be inclusive of all expenses that you may incur in the performance of this Agreement.

The term of this Agreement shall commence on August 24, 2017, and expire on August 21, 2018. Upon written notice, the Agreement may be terminated by any party at any time, without cause and without any liability, effective 30 calendar days after notice. Upon termination, you shall be paid at the agreed rate of compensation, *pro rata*, through the effective date of termination.

Except as directed by the Embassy, you are not authorized by this Agreement to act as a representative, spokesperson or agent on behalf of the Embassy or the State of Qatar in any meeting or communication with any person, or in any public or private statement, or in any communications with the media.

You agree that all documents, information or communications (whether verbal or recorded) exchanged between you and the Embassy (including the Embassy's diplomats, employees, contractors, or attorneys), and any information generated or received by you in the course of your performance of this Agreement, are confidential, and will not be disclosed to any person except as instructed by the Embassy or as required by law. You agree that you will not use confidential information for any purpose other than performance of this Agreement, and you will return the information upon request. You shall be responsible for assuring that your employees, agents or subcontractors have executed written confidentiality agreements reflecting the substance of this provision, and you shall guarantee their adherence to these terms.   This provision shall survive termination of this Agreement.

This Agreement is not intended to establish an employer-employee relationship, or principal-agent relationship. You are not authorized to commit the Embassy to any cost, contract, or other obligation.   You shall be solely

Page 2

responsible for compliance with any applicable laws or regulations that govern your performance of this Agreement, including, without limitation, any laws in respect of taxation, registration as a foreign agent or lobbyist, or reporting as may be required by law.

During the term of this Agreement, and for a period of one year after expiration or termination, you shall not accept any employment position, contract, consulting engagement, or compensation from any member state of the Gulf Cooperation Council, nor from any person or entity acting on behalf of any member state, except the State of Qatar.

Nothing in this Agreement shall waive or otherwise alter the privileges and immunities to which the Embassy is entitled under the laws of the United States or any treaty to which the United States is a party.

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled exclusively by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The place of arbitration shall be Washington, D.C.

Please indicate your acceptance by signing below, and forwarding a copy of this letter to the Embassy.

Very truly yours,

For the Embassy of the State of Qatar

AGREED: 

For Stonington Strategies

# EXHIBIT 20

OMB No. 1124-0004; Expires May 31, 2020

**U.S. Department of Justice**

Washington, DC 20530

**Exhibit B to Registration Statement**
**Pursuant to the Foreign Agents Registration Act of**
**1938, as amended**

INSTRUCTIONS. A registrant must furnish as an Exhibit B copies of each written agreement and the terms and conditions of each oral agreement with his foreign principal, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances by reason of which the registrant is acting as an agent of a foreign principal. Compliance is accomplished by filing an electronic Exhibit B form at https://www.fara.gov.

Privacy Act Statement. The filing of this document is required for the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide the information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, DC. Statements are also available online at the Registration Unit's webpage: https://www.fara.gov. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: https://www.fara.gov.

Public Reporting Burden. Public reporting burden for this collection of information is estimated to average .33 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| 1. Name of Registrant | 2. Registration No. |
|---|---|
| Stonington Strategies LLC | 6458 |

3. Name of Foreign Principal

Embassy of the State of Qatar

Check Appropriate Box:

4. ☒ The agreement between the registrant and the above-named foreign principal is a formal written contract. If this box is checked, attach a copy of the contract to this exhibit.

5. ☐ There is no formal written contract between the registrant and the foreign principal. The agreement with the above-named foreign principal has resulted from an exchange of correspondence. If this box is checked, attach a copy of all pertinent correspondence, including a copy of any initial proposal which has been adopted by reference in such correspondence.

6. ☐ The agreement or understanding between the registrant and the foreign principal is the result of neither a formal written contract nor an exchange of correspondence between the parties. If this box is checked, give a complete description below of the terms and conditions of the oral agreement or understanding, its duration, the fees and expenses, if any, to be received.

7. Describe fully the nature and method of performance of the above indicated agreement or understanding.

The registrant will develop and implement a government relations strategy for the State of Qatar. Under the amended agreement for the performance of these services, the foreign principal will pay the registrant a monthly fee retainer of $300,000, including not less than $150,000 for the compensation of the registrant's subcontractors which assist in performing services under the agreement.

8. Describe fully the activities the registrant engages in or proposes to engage in on behalf of the above foreign principal.

The registrant will develop and implement a government relations strategy for the State of Qatar.

9. Will the activities on behalf of the above foreign principal include political activities as defined in Section 1(o) of the Act and in the footnote below?    Yes ☒    No ☐

If yes, describe all such political activities indicating, among other things, the relations, interests or policies to be influenced together with the means to be employed to achieve this purpose.

The registrant's activities may include communications with Executive Branch officials, Members of Congress and congressional staff, and other individuals and organizations involved in governmental or public policy matters.

## EXECUTION

In accordance with 28 U.S.C. § 1746, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this Exhibit B to the registration statement and that he/she is familiar with the contents thereof and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

| Date of Exhibit B | Name and Title | Signature |
|---|---|---|
| December 21, 2017 | Nicolas D. Muzin, CEO | /s/ Nicolas D. Muzin |

Footnote: "Political activity," as defined in Section 1(o) of the Act, means any activity which the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party.

Received by NSD/FARA Registration Unit 12/21/2017 5:41:09 PM

EMBASSY OF THE
# STATE OF QATAR
Washington, DC



سفارة دولة قطر
واشنطن د . ج . سي .

Ref:

December 11, 2017

Mr. Nicolas Muzin
Stonington Strategies
nick@stoningtonstrategies.com

**CONFIDENTIAL**

Re:     **Agreement for Consulting Services – Amendment One**

Dear Mr. Muzin:

This shall amend the terms of our August 22, 2017 agreement (the "Agreement") by which you and Stonington Strategies provide consulting services to the Embassy of the State of Qatar in Washington.

Effective November 1, 2017, the rate of compensation under the Agreement shall be US$ 300,000 (Three Hundred Thousand United States Dollars) per month. Of this amount, not less than US$150,000 (One Hundred and Fifty Thousand United States Dollars) per month shall be reserved for compensation of Stonington Strategies' subcontractors, selected after written approval by the Embassy, which shall assist in performing the services required by the Agreement. Upon expiration or termination of the Agreement, any unexpended portion of the amounts reserved for subcontractors shall be refunded to the Embassy by Stonington.

Except as expressly modified by this Amendment One, all terms of the Agreement shall remain unchanged.

Without limiting the generality of the foregoing, you shall be solely responsible for compliance (by Stonington, its employees, agents and subcontractors) with any applicable laws or regulations that govern performance of this Agreement, including, without limitation, any laws in respect of taxation, registration as a foreign agent or lobbyist, or reporting as may be required by law.

Please indicate your acceptance of this Amendment One by signing below, and forwarding a copy of this letter to the Embassy.

Very truly yours,

_____
For the Embassy of the State of Qatar

AGREED: _____
For Stonington Strategies

2555 M St. N.W., Washington, D.C. 20037 • Tel: (202) 274-1600 • Fax: (202) 237-0061 • Email: info@qatarembassy.net • www.qatarembassy.net

Received by NSD/FARA Registration Unit 12/21/2017 5:41:09 PM

# EXHIBIT 21

**BOIES SCHILLER FLEXNER LLP**
Travis LeBlanc, SBN 251097
  tleblanc@bsfllp.com
435 Tasso Street, Suite 205
Palo Alto, California 94301
Phone: (650) 445-6400 /Fax: (650) 329-8507

David K. Willingham, SBN 198874
  dwillingham@bsfllp.com
725 S Figueroa Street, 31st Floor
Los Angeles, California 90017
Phone: (213) 629-9040 /Fax: (213) 629-9022

Lee S. Wolosky (*pro hac vice*)
  lwolosky@bsfllp.com
Robert J. Dwyer (*pro hac vice*)
  rdwyer@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Phone:  (212) 446-2300 /Fax:  (212) 446-2350

Amy L. Neuhardt (*pro hac vice*)
  aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Phone:  (202) 237-2727 /Fax:  (202) 237-6131

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC, ELLIOTT BROIDY, and ROBIN ROSENZWEIG, | Case No.  2:18-CV-02421-JFW-(Ex) |
| Plaintiffs, | The Honorable John F. Walter |
| v. | **PLAINTIFFS' NOTICE OF DEPOSITION OF NICOLAS D. MUZIN** |
| STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, and DOES 1-10, | _____ |
| Defendants. | |

## PLAINTIFFS' NOTICE OF DEPOSITION OF NICOLAS D. MUZIN

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, Plaintiffs in the above-captioned action, by and through their attorneys, will take the deposition of Defendant Nicolas D. Muzin on Tuesday, April 10, 2018, commencing at 9:00 a.m. at the offices of Boies Schiller Flexner LLP, 1401 New York Avenue, NW, Washington, D.C. 20005, or at other such time and place as the parties may agree upon, before a person authorized to administer oaths, and continuing from day to day until completed. The deposition will be recorded by stenography and video.

DATED: April ___, 2018          BOIES SCHILLER FLEXNER LLP
                                DAVID K. WILLINGHAM


                                By _____
                                    DAVID K. WILLINGHAM
                                    Attorneys for Plaintiffs

# EXHIBIT 22

**BOIES SCHILLER FLEXNER LLP**
Travis LeBlanc, SBN 251097
  tleblanc@bsfllp.com
435 Tasso Street, Suite 205
Palo Alto, California 94301
Phone: (650) 445-6400 /Fax: (650) 329-8507

David K. Willingham, SBN 198874
  dwillingham@bsfllp.com
725 S Figueroa Street, 31st Floor
Los Angeles, California 90017
Phone: (213) 629-9040 /Fax: (213) 629-9022

Lee S. Wolosky (*pro hac vice*)
  lwolosky@bsfllp.com
Robert J. Dwyer (*pro hac vice*)
  rdwyer@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Phone:  (212) 446-2300 /Fax:  (212) 446-2350

Amy L. Neuhardt (*pro hac vice*)
  aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Phone:  (202) 237-2727 /Fax:  (202) 237-6131

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC, ELLIOTT BROIDY, and ROBIN ROSENZWEIG,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, and DOES 1-10,<br><br>Defendants. | Case No.  2:18-CV-02421-JFW-(Ex)<br><br>The Honorable John F. Walter<br><br>**PLAINTIFFS' NOTICE OF DEPOSITION OF STONINGTON STRATEGIES LLC**<br><br>_____ |

**PLAINTIFFS' NOTICE OF DEPOSITION OF**
**STONINGTON STRATEGIES LLC**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Plaintiffs will take the deposition of Defendant Stonington Strategies LLC ("Stonington") on Wednesday, April 11, 2018, commencing at 9:00 a.m., at the offices of Boies Schiller Flexner LLP, 1401 New York Avenue, NW, Washington, D.C. 20005, or at such other time and place as the parties may agree upon, before a person authorized to administer oaths, and continuing from day to day until completed.  The deposition will be recorded by stenography and video.

The matters for examination are set forth in Exhibit A.  Stonington must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf, to testify about information known or reasonably available to Stonington.

DATED:  April ___, 2018       BOIES SCHILLER FLEXNER LLP
                              DAVID K. WILLINGHAM


                              By _____
                                  DAVID K. WILLINGHAM
                                  Attorneys for Plaintiffs

## EXHIBIT A
## DEFINITIONS AND INSTRUCTIONS

All terms not otherwise defined shall have their ordinary and common meanings.  Unless the context indicates otherwise, terms used herein shall have the following meanings:

1.      "Action" means the litigation captioned:  *Broidy Capital Management LLC, et al. v. State of Qatar, et al.*, Case No. 2:18-CV-02421, pending in the United States District Court for the Central District of California, Western Division.

2.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

3.      "Concerning" means relating to, referring to, describing, evidencing or constituting.

4.      "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)(1)(A).  A draft or non-identical copy is a separate Document within the meaning of this term.

5.      "Stonington Strategies LLC" or "Stonington" means the Defendant, Stonington Strategies LLC, and any of its predecessors, or successors in interest, parents, subsidiaries, affiliates, divisions, departments, offices, and, for each of the foregoing, any present or former directors, officers, executives, trustees, employees, agents, subcontractors (including but not limited to Aryeh Shudofsky, Alexander Shively, and Karl Notturno), attorneys, accountants, advisors and representatives, or any other Person(s) known, believed, or suspected to be acting or purporting to act on its behalf, now or at any previous time.

6.       "Including" means "including but not limited to" or "including without limitation."

7.      "Person" is defined as any natural person or any business, legal, or governmental entity or association.

BOIES SCHILLER FLEXNER LLP

8.      "Personnel" means any present or former directors, officers, executives, trustees, employees, agents, attorneys, accountants, advisors, and representatives of an entity, or any other Person(s) known, believed, or suspected to be acting or purporting to act on the entity's behalf, now or at any previous time during the relevant time period.

9.      "Publications" shall mean all organizations or sources that published or could publish the Published Articles and Unpublished Articles.

10.     "Published Articles" shall mean any and all articles that were published discussing or referencing any one or more of Plaintiffs Elliott Broidy, Robin Rosenzweig, and Broidy Capital Management LLC after the State of Qatar retained Stonington, including but not limited to articles in the *Wall Street Journal*, *Huffington Post*, *New York Times*, *McClatchy D.C.*, *Al Jazeera*, *Bloomberg*, *The Associated Press*, and *Newsweek*.

11.     "Unpublished Articles" shall mean the same as "Published Articles," except that "Unpublished Articles" shall only include articles that were in draft form, or were being considered or discussed, and have not yet been published.

12.     "You" or "Your" refer to the Defendant, Stonington Strategies LLC.

13.     The terms "all," "any," and "each" shall each be construed as encompassing any and all.

14.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

15.     The use of the singular form of any word includes the plural and vice versa.

16.     The terms "refer," "reflect," "relate," "relating to," and "in relation to" are used in their broadest sense and include all matter embodying, containing,

comprising, indicating, concerning, referring to, identifying, describing, discussing, involving, evidencing, or otherwise pertaining to the referenced subject.

17.     All verbs or verb phrases shall be construed as including the past, present, and future tense of the verb or verb phrase.

## TOPICS FOR EXAMINATION

**Topic No. 1.**  Any and all communications with or concerning, or documents concerning, Plaintiffs.

**Topic No. 2.**  Any and all communications with or concerning, or documents concerning, the State of Qatar.

**Topic No. 3.**  Any and all communications with or concerning, or documents concerning, meetings with representatives or agents of the State of Qatar.

**Topic No. 4.**  Any and all communications with or concerning, or documents concerning, payments to Stonington with respect to its work or the work of others on behalf of the State of Qatar, including but not limited to the increase of Stonington's monthly fees from $50,000 to $300,000.

**Topic No. 5.**  Communications related to the State of Qatar with current or former federal or state governmental officials, including Victoria Coates and Mike Huckabee.

**Topic No. 6.**  Communications concerning the State of Qatar and/or its agents, or concerning Plaintiffs, with media or press representatives.

**Topic No. 7.**  Communications with Jewish leaders, including Morton A. Klein, Rabbi Shmully Hecht, Alan Dershowitz, Malcolm Hoenlein, and Rabbi Shmuel Boteach concerning the State of Qatar or Plaintiffs.

**Topic No. 8.**  Any and all efforts to hack or otherwise access without authorization the electronic facilities or other computers of Plaintiffs.

**Topic No. 9.**  Any and all communications with or concerning, or documents concerning, Published Articles and/or Unpublished Articles.

**Topic No. 10.**  The work done by or any and all communications with or concerning, or documents concerning,  other registered foreign agents of the State of Qatar, including Avenue Strategies Global LLC, Ashcroft Law Group, Levick Strategic Communications, Information Management Services Inc., Conover & Gould Strategic Communications, Gallagher Group, McDermott, Will & Emery, Nelson Mullins Riley & Scarborough LLP, Portland PR, Mercury Public Affairs, Bluefront Strategies, Hawksbill Group, Vitello Consulting, Iron Bridge Strategies, Tigercomm LLC, Husch Blackwell Strategies, SGR Government Relations & Lobbying, and Venable LLP.

**Topic No. 11.**  Any and all communications with or concerning, or documents concerning, Ooredoo Q.S.C.

**Topic No. 11.**  The State of Qatar's initial retention of You.

**Topic No. 12.**   Any and all bank records reflecting payments to Stonington with respect to its work or the work of others on behalf of the State of Qatar, as well as payments to others connected to Stonington's work on behalf of the State of Qatar.

**Topic No. 13.**  Your policies, procedures, and practices, both pertaining to this Action specifically and to Your ordinary course of business generally, related to the retention, destruction, management, storage and/or maintenance of documents, recordings, communications, and any other similar materials.

**Topic No. 14.**  Any and all non-privileged communications between You and any other Person regarding the facts underlying the Complaint.

1
2

DATED:  April ___, 2018

BOIES SCHILLER FLEXNER LLP
DAVID K. WILLINGHAM

3
4
5
6
7

By _____

DAVID K. WILLINGHAM
Attorney for Plaintiffs

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 23

**BOIES SCHILLER FLEXNER LLP**
Travis LeBlanc, SBN 251097
  tleblanc@bsfllp.com
435 Tasso Street, Suite 205
Palo Alto, California 94301
Phone: (650) 445-6400 /Fax: (650) 329-8507

David K. Willingham, SBN 198874
  dwillingham@bsfllp.com
725 S Figueroa Street, 31st Floor
Los Angeles, California 90017
Phone: (213) 629-9040 /Fax: (213) 629-9022

Lee S. Wolosky (*pro hac vice*)
  lwolosky@bsfllp.com
Robert J. Dwyer (*pro hac vice*)
  rdwyer@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Phone:  (212) 446-2300 /Fax:  (212) 446-2350

Amy L. Neuhardt (*pro hac vice*)
  aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Phone:  (202) 237-2727 /Fax:  (202) 237-6131

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC, ELLIOTT BROIDY, and ROBIN ROSENZWEIG,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, and DOES 1-10,<br><br>Defendants. | Case No.  2:18-CV-02421-JFW-(Ex)<br><br>The Honorable John F. Walter<br><br>**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS NICOLAS D. MUZIN AND STONINGTON STRATEGIES LLC**<br>_____ |

Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiffs hereby

request that Defendants Stonington Strategies LLC ("Stonington") and Nicolas D.

Muzin ("Muzin" and collectively, "You") produce for inspection and copying all documents responsive to the following individual requests (collectively, "the Requests"). All documents responsive to the Requests shall be produced at the offices of Boies Schiller Flexner LLP, 575 Lexington Avenue, 7th Floor, New York, New York 10022 within seven (7) days of service of the Requests.

## **DEFINITIONS**

In addition to the definitions set forth in the Federal Rules of Civil Procedure, the following definitions apply to each of the Requests, and are deemed to be incorporated in each of said Requests:

1. The term "Complaint" means the Complaint filed on March 26, 2018, in the above-captioned action.

2. "Concerning" means relating to, referring to, describing, evidencing or constituting.

3. "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)(1)(A). A draft or non-identical copy is a separate Document within the meaning of this term.

4. "Stonington Strategies LLC" or "Stonington" means the Defendant, Stonington Strategies LLC, and any of its predecessors, or successors in interest, parents, subsidiaries, affiliates, divisions, departments, offices, and, for each of the foregoing, any present or former directors, officers, executives, trustees, employees, agents, subcontractors (including but not limited to Aryeh Shudofsky, Alexander Shively, and Karl Notturno), attorneys, accountants, advisors and representatives, or any other Person(s) known, believed, or suspected to be acting or purporting to act on its behalf, now or at any previous time.

5. "Person" is defined as any natural person or any business, legal, or governmental entity or association.

6.      "Published Articles" shall mean any and all articles that were published discussing or referencing any one or more of Plaintiffs Elliott Broidy, Robin Rosenzweig, and Broidy Capital Management LLC after the State of Qatar retained Stonington, including but not limited to articles in the *Wall Street Journal*, *Huffington Post*, *New York Times*, *McClatchy D.C.*, *Al Jazeera*, *Bloomberg*, *The Associated Press*, and *Newsweek*.

7.      "Unpublished Articles" shall mean the same as "Published Articles," except that "Unpublished Articles" shall only include articles that were in draft form, or were being considered or discussed, and have not yet been published.

8.      The terms "You," "Your" or "Yours" mean Defendants Stonington or Muzin, their agents and/or employees, and persons acting on behalf of the foregoing described entities and persons.

## INSTRUCTIONS

The following instructions apply to each of the Requests and are deemed to be incorporated in each of them:

1.      In producing documents, You are requested to produce the original of each document requested together with all non-identical copies and drafts of that document.  If the original of any document cannot be located, a copy shall be provided in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.  In any circumstance in which an agreement is reached to allow the production of copies of documents rather than originals, You shall retain all of the original documents for inspection or copying throughout the pendency of this case, any appeal(s), and any related proceedings.

2.      Any alteration of a responsive document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications and other versions of a document is a responsive document in its own right and must be produced.

-3-

BOIES SCHILLER FLEXNER LLP

B O I E S   S C H I L L E R   F L E X N E R   L L P

3.     The terms defined above and used in each of the Requests should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules of Civil Procedure.

4.     The term "including" shall be construed as "including, but not limited to."

5.     The use of the singular form of any word includes the plural, and vice-versa.

6.     Where it is necessary to bring within the scope of these Requests information that might otherwise be construed to be outside their scope, the use of a verb in any tense shall be recognized as the use of that verb in all other tenses.

7.     You should construe negative terms to include the positive, and vice-versa.  For example, You should construe the word "preference" to mean preference or lack of preference.

8.     Any reference to a person that is a business entity and is not otherwise defined includes that person's predecessors (including any preexisting person that at any time became part of that entity after merger or acquisition), successors, parents, divisions, subsidiaries, affiliates, franchisors and franchisees; each other person directly or indirectly owned or controlled by any of them; each partnership or joint venture to which any of them is a party; all present and former directors, officers, employees, agents, consultants, controlling shareholders (and any entity owned by any such controlling shareholder), and attorneys of any of them; and any other person acting for or on behalf of any of them.

9.     Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition.

10.     Any document request that demands the production of "documents sufficient to show" requires You to produce only those documents necessary to

1   provide all the information necessary to show, identify, or describe the subject

2   matter requested.

3         11.    Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, each

4   document shall be produced either (a) as it was kept in the usual course of business

5   (in which case it shall be produced in such fashion as to identify the department,

6   branch, or office in whose possession it was located and, where applicable, the

7   natural person in whose possession it was found or the server or central file in which

8   it was found, and the address of each document's custodian(s)), or (b) segregated as

9   responsive to a specific request enumerated in these Requests, with such specific

10  request identified.

11        12.    All hard copy documents shall be produced in a manner that reflects the

12  file folder, envelope, or other container in which the documents are kept or

13  maintained and electronically associates those documents together as a document

14  family.

15        13.    Documents attached to each other should not be separated.

16        14.    If identical copies of a document are in the possession, custody or

17  control of more than one natural person or other document custodian, a copy of that

18  document shall be produced from each such natural person or other document

19  custodian.

20        15.    In instances where two or more exact duplicates of any document exist,

21  the most legible copy shall be produced.

22        16.    The fact that a document is in the possession of Plaintiffs, or can be

23  produced by another Person, does not relieve You of the obligation to produce all of

24  Your copies of the same document, even if Your copies are identical in all respects

25  to a document held by another Person.

26        17.    If You file a timely objection to any portion of a Request, definition, or

27  instruction, provide a response to the remaining portion.

28

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
TO DEFENDANTS NICOLAS D. MUZIN AND STONINGTON STRATEGIES LLC

18.     Other than redactions of privileged information as addressed in Instruction 20 below, documents are to be produced in full and may not be redacted in any manner.  If any requested document cannot be produced in full, produce it to the extent possible, and provide the following information with regard to each such document and each portion of such document withheld:

      (a)    the type of document;

      (b)    the general subject matter of the document and each portion withheld;

      (c)    the date of the document;

      (d)    the author(s) of the document and their title(s);

      (e)    the recipient(s) of the document and their title(s); and

      (f)    the basis for withholding each portion of the document that is withheld from production.

19.     If You withhold production of any document or portion of any document responsive to the Requests based upon any privilege, such documents should be included on a privilege log in a form to be agreed upon by the parties that includes the following information:

      (a)    document type;

      (b)    subject matter;

      (c)    date or date range of the document or documents;

      (d)    author(s) of the document;

      (e)    recipient(s) of the document; and

      (f)    basis for withholding the document.

20.     The time period to which these Requests refer (*i.e.*, the "relevant period") is from May 1, 2017 to the present.  If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to any of the Requests.

-6-

BOIES  SCHILLER  FLEXNER  LLP

BOIES SCHILLER FLEXNER LLP

21.    Production will be conducted pursuant to an agreement of the parties or order of the Court governing the format of the production and the media on which production will be made, or in the absence of such agreement or order will be provided in a form to be specified by Plaintiffs.

22.    These Requests are continuing and require supplemental responses in accordance with the requirements of Federal Rule of Civil Procedure 26(e).

## DOCUMENT REQUESTS

Produce all documents concerning, reflecting, relating, or referring to:

### REQUEST FOR PRODUCTION NO. 1

Any and all communications with or concerning, or documents concerning, the State of Qatar, its diplomatic representatives or governmental officials in the United States or abroad, its agents (registered or unregistered), the Qatari ruling family, or any persons acting on behalf of the State of Qatar, regarding Plaintiffs.

### REQUEST FOR PRODUCTION NO. 2

Any and all communications with or concerning, or documents concerning, the State of Qatar, its agents, the Qatari ruling family, or any persons acting on behalf of the State of Qatar, related to efforts made on behalf of the State of Qatar with respect to its public relations campaign, as described in the Complaint.

### REQUEST FOR PRODUCTION NO. 3

Any and all communications with or concerning, or documents concerning, current or former federal or state governmental officials in the United States, including but not limited to Victoria Coates and former Arkansas Governor Mike Huckabee.

### REQUEST FOR PRODUCTION NO. 4

Any and all communications with or concerning, or documents concerning, the State of Qatar and/or its agents, or concerning Plaintiffs, with media or press representatives.

-7-

**REQUEST FOR PRODUCTION NO. 5**

Any and all communications with or concerning, or documents concerning, Jewish leaders, including but not limited to Morton A. Klein, Rabbi Shmully Hecht, Alan Dershowitz, Malcolm Hoenlein, and Rabbi Shmuel Boteach, concerning the State of Qatar or Plaintiffs.

**REQUEST FOR PRODUCTION NO. 6**

Any and all communications with or concerning, or documents concerning, Ooredoo Q.S.C.

**REQUEST FOR PRODUCTION NO. 7**

Any and all communications with or concerning, or documents concerning, the State of Qatar's payments to You, including the November or December 2017 increase of Stonington's monthly fees from $50,000 to $300,000.

**REQUEST FOR PRODUCTION NO. 8**

Any and all communications with or concerning, or documents concerning, efforts to hack or otherwise access without authorization the electronic facilities or other computers of Plaintiffs.

**REQUEST FOR PRODUCTION NO. 9**

Any and all communications with or concerning, or documents concerning, Published Articles and/or Unpublished Articles, both before, during, and after publication.

**REQUEST FOR PRODUCTION NO. 10**

Any and all communications with or concerning, or documents concerning, meetings between You and the State of Qatar, its agents, the Qatari ruling family, or any persons acting on behalf of the State of Qatar.

**REQUEST FOR PRODUCTION NO. 11**

Any and all communications with or concerning, or documents concerning, the State of Qatar initially retaining You.

-8-

**REQUEST FOR PRODUCTION NO. 12**

Any and all communications with or concerning, or documents concerning, H.R. 2712.

**REQUEST FOR PRODUCTION NO. 13**

Any and all communications with or concerning, or documents concerning, the State of Qatar's agents (registered and unregistered), including with or involving individuals associated with, or employed by, Avenue Strategies Global LLC, Ashcroft Law Group, Levick Strategic Communications, Information Management Services Inc., Conover & Gould Strategic Communications, Gallagher Group, McDermott, Will & Emery, Nelson Mullins Riley & Scarborough LLP, Portland PR, Mercury Public Affairs, Bluefront Strategies, Hawksbill Group, Vitello Consulting, Iron Bridge Strategies, Tigercomm LLC, Husch Blackwell Strategies, SGR Government Relations & Lobbying, and Venable LLP, related to efforts on behalf of the State of Qatar.

**REQUEST FOR PRODUCTION NO. 14**

Any communications with or concerning Corey Lewandowski.

**REQUEST FOR PRODUCTION NO. 15**

Any communications with any reporters or media organizations concerning Plaintiffs.

**REQUEST FOR PRODUCTION NO. 16**

Any and all bank records reflecting payments to Stonington with respect to its work or the work of others on behalf of the State of Qatar, as well as payments to others connected to Stonington's work on behalf of the State of Qatar.

**REQUEST FOR PRODUCTION NO. 17**

Any and all non-privileged communications between You and any other person regarding the facts underlying the Complaint.

-9-

B O I E S   S C H I L L E R   F L E X N E R   L L P

1  DATED:  April ___, 2018          BOIES SCHILLER FLEXNER LLP
2                                   DAVID K. WILLINGHAM

3

4                             By _____
5                                   DAVID K. WILLINGHAM
6                                   Attorneys for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
TO DEFENDANTS NICOLAS D. MUZIN AND STONINGTON STRATEGIES LLC