**BOIES SCHILLER FLEXNER LLP**

Travis LeBlanc, SBN 251097
  tleblanc@bsfllp.com
435 Tasso Street, Suite 205
Palo Alto, California 94301
Phone: (650) 445-6400 /Fax: (650) 329-8507

David K. Willingham, SBN 198874
  dwillingham@bsfllp.com
725 S Figueroa Street, 31st Floor
Los Angeles, California 90017
Phone: (213) 629-9040 /Fax: (213) 629-9022

Lee S. Wolosky (*pro hac vice*)
  lwolosky@bsfllp.com
Robert J. Dwyer (*pro hac vice*)
  rdwyer@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Phone:  (212) 446-2300 /Fax:  (212) 446-2350

Amy L. Neuhardt (*pro hac vice*)
  aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Phone:  (202) 237-2727 /Fax:  (202) 237-6131

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC, ELLIOTT BROIDY, and ROBIN ROSENZWEIG,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, and DOES 1-10,<br><br>Defendants. | Case No.  2:18-CV-02421-JFW-(Ex)<br><br>The Honorable John F. Walter<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR (1) TEMPORARY RESTRAINING ORDER AGAINST DEFENDANTS; (2) ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION; AND (3) ORDER GRANTING EXPEDITED DISCOVERY**<br><br>**[Declarations of Lee Wolosky and Samuel Miller Kleiner filed concurrently herewith]**_____ |

TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1

II. ARGUMENT ................................................................................................. 1

    A. The Foreign Sovereign Immunities Act Does Not Deprive the Court of Subject Matter Jurisdiction Because the Noncommercial Torts Exception Applies ................................................ 1

        1. Plaintiffs Have Alleged Sufficient Acts by Defendant the State of Qatar Within the United States to Satisfy the FSIA's Noncommercial Tort Exception ............................... 2

        2. The Noncommercial Tort Exception Applies Here Because Plaintiffs Seek Monetary Relief In Addition to Injunctive Relief ................................................................... 4

    B. The State of Qatar Is Subject to Personal Jurisdiction in This Court ................................................................................................... 5

    C. Plaintiffs Have Made the Required Showing for a Temporary Restraining Order Pending a Hearing on a Preliminary Injunction ................................................................................................ 5

        1. Plaintiffs Are Likely to Succeed on their Claims ....................... 5

        2. Plaintiffs Will Suffer Irreparable Harm Without Interim Relief ........................................................................................... 6

        3. The Balance of Equities Supports Granting the Temporary Restraining Order .................................................... 8

        4. No Bond Should be Required for the Temporary Restraining Order ........................................................................ 8

    D. The State of Qatar Has No Basis for Opposing Expedited Discovery Against Defendants Stonington Strategies, LLC and Nicolas Muzin ............................................................................... 9

III. CONCLUSION ............................................................................................ 10

i

REPLY MEMO OF P'S AND A'S ISO PLAINTIFFS' EX PARTE APP FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION, AND ORDER GRANTING EXPEDITED DISCOVERY

# TABLE OF AUTHORITIES

**Cases**

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ..................................................................................... 7

*Jorgenson v. Cassiday*,
  320 F.3d 906, 919 (9th Cir. 2003) ............................................................. 9

*Kemet Elec. Corp. v. Barshefsky*,
  21 Ct. Int'l Trade 701, 710 (1997) ............................................................. 8

*Milena Ship Mgmt. Co. v. Newcomb*,
  995 F.2d 620, 623 (5th Cir. 1993) ............................................................. 8

*NML Capital, Ltd. v. Spaceport Systems International, L.P.*,
  788 F. Supp. 2d 1111 (C.D. Cal. 2011) ..................................................... 4

*O'Shea v. Littleton*,
  414 U.S. 488, 495–96 (1974) ..................................................................... 7

*Olsen ex rel. Sheldon v. Government of Mexico*,
  729 F.2d 641, 646 (9th Cir. 1984) ............................................................. 2

*Palermo v. Underground Sols., Inc.*,
  No. 12CV1223-WQH BLM, 2012 WL 2106228 (S.D. Cal. June 11, 2012) ........ 10

**Statutes**

28 U.S.C. § 1346(b)(1) ..................................................................................... 4

28 U.S.C. § 1605(a)(5) ..................................................................................... 4

28 U.S.C. § 1608(a)(3) ..................................................................................... 5

ii

REPLY MEMO OF P'S AND A'S ISO PLAINTIFFS' EX PARTE APP FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION, AND ORDER GRANTING EXPEDITED DISCOVERY

## I. INTRODUCTION

Shortly after receiving the opposition brief filed by the State of Qatar, Counsel for Plaintiffs, in order to promote judicial efficiency and avoid unnecessary motion practice, offered to stay consideration of Plaintiffs' Application for a Temporary Restraining Order, Order to Show Cause for a Preliminary Injunction, and Order Granting Expedited Discovery as against the State of Qatar until such time as the jurisdictional issues raised by the State of Qatar can be resolved through a motion to dismiss. Supplemental Declaration of Lee Wolosky ("Supp. Wolosky Decl.") ¶ 3 and Exhibit 1. In exchange, Plaintiffs asked for assurances that ongoing unlawful access to Plaintiffs electronic data was not ongoing. *Id.* ¶ 4 and Exhibit 1.[1] Plaintiffs made this request in part because nowhere in the State of Qatar's opposition brief does it ever deny engaging in such unlawful conduct. As of the present time, the State of Qatar has not agreed to Plaintiffs' proposal. *Id.* ¶ 5 and Exhibit 3. As a result, Plaintiffs will continue to seek injunctive relief and limited expedited discovery of Defendants Muzin and Stonington for the reasons stated in their opening papers and as set forth below.

## I. ARGUMENT

### A. *The Foreign Sovereign Immunities Act Does Not Deprive the Court of Subject Matter Jurisdiction Because the Noncommercial Torts Exception Applies*

The State of Qatar argues that the non-commercial tort exception to the Foreign Sovereign Immunities Act ("FSIA") does not apply under the circumstances of this case because Plaintiffs allege that some actions taken by the State of Qatar

---

[1] Plaintiffs also asked the State of Qatar to drop its opposition to limited expedited discovery against Defendants Stonington and Muzin, and/or to explain the basis for its objections to such discovery with greater particularity. Supp. Wolosky Decl. ¶ 5 and Exhibit 1.

occurred outside of the United States and because Plaintiffs seek injunctive relief from this Court as well as money damages. Neither argument has merit.

### 1. Plaintiffs Allege Sufficient Acts by the State of Qatar Within the U.S. to Satisfy the Noncommercial Tort Exception

The State of Qatar's primary argument that the noncommercial torts exception to FSIA does not apply is that some allegedly tortious conduct at issue in this case occurred in Qatar. Qatar Opp. at 5-6. This interpretation of the FSIA is contrary to the Ninth Circuit's as laid out in *Olsen ex rel. Sheldon v. Government of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984), *abrogated on other grounds as stated in Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987). In *Olsen*, the Ninth Circuit found that the noncommercial torts exception applied to claims arising from a plane crash in the United States of a flight that originated in Mexico, was caused in part by negligent conduct in Mexico, and was supposed to land in Mexico. *Id.* As here, Mexico argued that "because some allegedly tortious acts or omissions took place outside the United States—such as the maintenance of the aircraft and the inoperative radar at Tijuana airport—Mexico should be immune." *Id.* The Ninth Circuit rejected this argument, reasoning:

> By requiring every aspect of the tortious conduct to occur in the United States, a rule such as in SEDCO would encourage foreign states to allege that some tortious conduct occurred outside the United States. The foreign state would thus be able to establish immunity and diminish the rights of injured persons seeking recovery. Such a result contradicts the purpose of the FSIA, which is to "serve the interests of justice and ... protect the rights of both foreign states and litigants in United States courts. *Id.*

The court then concluded that because one alleged tort – negligent piloting of the aircraft – occurred in the United States, it could exercise jurisdiction over the entirety of the foreign state's conduct. *Id.* Here, although aspects of Qatar's alleged tortious misconduct may have occurred abroad, Plaintiffs also allege that at least one

-2-

entire tort – civil conspiracy – occurred in the United States.  Plaintiffs allege that the State of Qatar hired its registered-foreign-agent co-defendants Nicolas Muzin and Stonington Strategies, LLC in the United States to participate in a wide-ranging conspiracy against Plaintiffs.  Complaint ¶¶ 52b, 68, 74-77 [ECF No. 1 at 15, 22, 23-25].[2]  The formation and execution of this conspiracy included meetings at the State of Qatar's embassy in Washington, D.C.[3] at which meetings Plaintiff Broidy's opposition to the State of Qatar was discussed.  *Id.* ¶ 78; Declaration of Joel Mowbray ("Mowbray Decl.") ¶ 22 [ECF No. 31-4 at 9].  Plaintiffs also allege that, after Plaintiffs' electronic data was illegally obtained by Defendants, stolen, altered, and forged materials were disseminated to United States media outlets by someone whose computer was configured for a time zone corresponding to time zones in the United States.  Declaration of J. Luke Tenery ("Tenery Decl.") ¶ 15 [ECF No. 31-5 at 7].  The conspiracy included unlawful access to and hacking of computers belonging to Plaintiffs located in the Central District of California.  This is sufficient to establish a civil conspiracy claim against Qatar occurring in the United States at this stage under the standard set out in *Olsen*.

---

[2] Indeed, according to public filings, the State of Qatar raised Muzin and Stonington's monthly compensation from $50,000 to $300,000 immediately after the conspiracy was agreed to, and shortly before the hacking began.  Wolosky Decl. ¶ 18 & Exhibit 20 [ECF No. 31-8 at 7; ECF No. 31-9 at 105].

[3] Foreign embassies sit within a host country's territory. *See Galvin v. United States*, 859 F.3d 71, 74 (D.C. Cir. 2017) (rejecting Federal Tort Claims Act ("FTCA") case arising from injuries suffered in U.S. embassy in Haiti in part because under the Vienna Convention on Diplomatic Relations, "foreign embassies sit within the host country's territory"); *cf. Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984), *cert. denied*, 105 S. Ct. 247 (1984) (holding FSIA non-commercial torts exception did not apply to torts taking place in U.S. embassy located in Iran because embassy was not within the United States).

-3-

## 2. The Noncommercial Tort Exception Applies Here Because Plaintiffs Seek Both Monetary and Injunctive Relief

The State of Qatar also argues that "[t]he noncommercial tort exception of the FSIA applies only to claims for *monetary* damages." Qatar Opp. 12:16 (emphasis in original). In support, it first cites to the statutory provision for the noncommercial tort exception, which limits the reach of that exception to "any case … in which money damages are sought." 28 U.S.C. § 1605(a)(5). The State of Qatar reads that phrase as providing that a Plaintiff can seek "only" money damages, reading text into the statute that does not exist. Plaintiffs here seek both "injunctive relief and monetary damages." Complaint at 1. The case therefore is one "in which money damages are sought," satisfying that requirement of 28 U.S.C. § 1605(a)(5).

*NML Capital, Ltd. v. Spaceport Systems International, L.P.*, 788 F. Supp. 2d 1111 (C.D. Cal. 2011) does not read textual limitations into FSIA and does not concern the non-commercial tort exception, but addresses immunity "'from attachment[,] arrest and execution.'" *NML Capital*, 788 F. Supp. 2d at 1119 (quoting 28 U.S.C. § 1609) (alteration in *NML Capital*). The case does not address what types of relief may be sought, and it is irrelevant to this case.

Finally, the State of Qatar relies on a several claims under the Federal Torts Claims Act. These cases are inapposite, as the FTCA does not address the same statutory language at issue here. The FTCA waives sovereign immunity for "civil actions on claims against the United States[] for money damages," while the FSIA non-commercial tort exception applies to "cases . . . in which money damages are sought." 28 U.S.C. § 1346(b)(1); 28 U.S.C. § 1605(a)(5). Although it is true that in some circumstances courts rely on FTCA cases to interpret the characterization of causes of action, *see de Sanchez v. Banco Central De Nicaragua*, 770 F.2d 1385, 1398-99 (5th Cir. 1985), the State of Qatar cites no precedent for applying FTCA cases to interpret the "money damages" requirement of 28 U.S.C. § 1605(a)(5).

-4-

### B. *The State of Qatar Is Subject to Personal Jurisdiction in This Court*

As the State of Qatar acknowledges, Qatar Opp. Br. 8:11-15, at the time of Plaintiffs' application for injunctive relief, Plaintiffs were in the process of serving the State of Qatar in accordance with FSIA. That process is now completed. Pursuant to the requirements for service under the FSIA, 28 U.S.C. § 1608(a)(3), Plaintiffs have "sen[t] a copy of the summons and complaint and a notice of suit," *id.*, in both English and Arabic, to the Foreign Minister of Qatar via the Clerk of Court for the Central District of California. *See* Declaration of Samuel Kleiner ("Kleiner Decl.") ¶¶ 2-4. The office of the Clerk of Court has represented to Plaintiffs' Counsel it has received the package and will a docket entry will reflect when it has dispatched the package to the State of Qatar. *Id.* ¶ 5.[4]

### C. *Plaintiffs Have Made the Required Showing for a Temporary Restraining Order Pending a Hearing on a Preliminary Injunction*

#### 1. **Plaintiffs Are Likely to Succeed on their Claims**

In dismissing the evidence against it, the State of Qatar gives short shrift to the statement of its own registered agent, Defendant Muzin, that acknowledges unlawful activity by the State of Qatar. As previously explained, shortly after the attacks on Plaintiffs began, Defendant Muzin expressed knowledge that the State of Qatar was targeting Plaintiff Broidy, including through hacks. "Mowbray Decl." ¶¶ 13, 22-24, 28 [ECF No. 31-4 at 6-7, 9-10]. Defendant Muzin further expressed knowledge of the use of the emails and documents taken from those attacks prior to that information being published in the press. *Id.* ¶¶ 13, 17 [ECF No. 31-4 at 6-7]. He also admitted to Mr. Mowbry that the State of Qatar was "after you and Broidy," *id.* ¶ 23 [ECF No. 31-4 at 9], and acknowledged that the persons he had identified to

---

[4] The State of Qatar's argument that it is not subject to personal jurisdiction because the non-commercial tort exception to FSIA does not apply fails for the reasons explained in Part A above.

the State of Qatar as hurdles to their goals, including Broidy, were "in danger[.]" *Id.* ¶ 24.  Defendant Muzin's admissions are far from speculative:  his status as a registered agent of the State of Qatar, speaking about actions taken by his principal, makes his admissions highly compelling.  Moreover, the veracity of his statements is enhanced by the fact that, shortly before the start of the first known attack on Plaintiffs, the State of Qatar increased the monthly compensation of Defendants Stonington and Muzin six-fold – from $50,000 a month to $300,000 a month. Wolosky Decl. ¶ 18 & Exhibit 20 [ECF No. 31-8 at 7; ECF No. 31-9 at 105].

The State of Qatar further ignores the analysis of Luke Tenery, an expert in computer forensics.  Tenery Decl. ¶ 3 [ECF No. 31-5 at 3].  Mr. Tenery's analysis of the IP addresses that engaged in the unauthorized access of Plaintiffs' computer systems demonstrated that addresses from Europe were behind the attack but in two brief instances "a Qatar source IP registered to a physical location in Doha, Qatar" was revealed to be the source behind the unauthorized access.  *Id.* ¶ 11 [ECF No. 31-5 at 5].  The State of Qatar's suggestion that this might have been a red herring ignores Tenery's expert conclusion that the "nature of the Qatar IP discovery is consistent with the attacker's system configuration losing its obfuscation ability and exposing the true origin of the attacker by mistake." *Id.*  Combined with the clear motivation that the State of Qatar has to undermine Broidy, *see* Complaint ¶¶ 58-68 [ECF No. 1 at 18-22], and the admissions by Defendant Muzin, this evidence strongly suggests that Plaintiffs will succeed on the merits of their claims against the State of Qatar, and at a minimum demonstrates a "serious question" as to liability on the sliding scale applicable here.

### 2. Plaintiffs Will Suffer Irreparable Harm Without Interim Relief

The State of Qatar does not dispute that the harm identified by Plaintiffs, *see* Broidy Decl. at ¶¶ 21-23 [ECF No. 31-6 at 9-10]; Pl. Memo. at 17-18 [ECF No. 31-

-6-

BOIES SCHILLER FLEXNER LLP

1 at 24-25], is irreparable. Rather, it disputes whether the harm will continue to occur, and cites to *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), for the unremarkable holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 95-96 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). Contrary to the assertions of the State of Qatar, Plaintiffs have provided ample evidence that the campaign against Broidy is ongoing, and defendant's counsel has declined to date to make a simple representation that it is not. Supp. Wolosky Decl. ¶¶ 4-5 and Exhibit 3. The releases of Plaintiffs' stolen, altered and forged communications were not released in a single dump on media outlets, but have been released piecemeal and on a staggered basis. *See* Declaration of Elliott Broidy ("Broidy Decl.") ¶ 22 [ECF No. 31-6 at 9-10]; *see also* Mowbray Decl. ¶ 30 [ECF No. 31-4 at 11] (Defendant Muzin stated that "there's a lot more coming."); Wolosky Decl. ¶ 4 [ECF No. 31-8 at 3]. Media reports regarding the releases have continued. As recently as March 25, 2018, the *New York Times* reported that "an anonymous group critical of Mr. Broidy's advocacy of American foreign policies in the Middle East" has been sending "documents, which included emails, business proposals and contracts" to reporters. David D. Kirkpatrick and Mark Mazetti, "How 2 Gulf Monarchies Sought to Influence the White House," *New York Times*, Mar. 25, 2018. And on March 29, 2018, *Newsweek* released a story based on emails purportedly from Plaintiffs that had been sent to Newsweek "from an anonymous ProtonMail account." Greg Price, "Top Trump Fundraiser Helped Congressman's Wife Land State Department Job," *Newsweek*, March 29, 2018. Moreover, as late as April 3, 2018, media inquiries relating to the hack were continuing. Supp. Wolosky Dec. ¶ 6 and Exhibits 4-5. The State of Qatar presents no evidence to the contrary. The pattern of releases of Plaintiffs' information to the media, coupled with ongoing

-7-

interest by the media in Plaintiff Broidy and his activities strongly suggest that more leaks are imminent. The same evidence, coupled with Plaintiff Broidy's explanation of harms suffered, demonstrates "continuing, present adverse effects" from the disclosures of Plaintiffs' emails and documents.

### 3. The Balance of Equities Supports Granting the Temporary Restraining Order

The State of Qatar does not dispute that it has no legitimate interest in continuing its unlawful activities, and argues only that the relief sought *could* harm the State of Qatar's foreign relations with the U.S. It notably provides no evidence or support for this assertion, however, and it is mere supposition. Moreover, the cases cited by the State of Qatar are inapposite; each addresses potential injunctive relief against *the United States* based on concerns of harm to the United States' own established procedures, officers, and agencies. *See, e.g.*, *Kemet Elec. Corp. v. Barshefsky*, 21 Ct. Int'l Trade 701, 710 (1997) (regarding a preliminary injunction against a Presidential proclamation); *Ibrahim v. Gonzales*, 633 F. Supp. 2d 737, 740 (W.D. Mo. 2007) (regarding a preliminary injunction concerning an FBI investigation); *Milena Ship Mgmt. Co. v. Newcomb*, 995 F.2d 620, 623 (5th Cir. 1993) (regarding a preliminary injunction concerning an order from the U.S. Department of the Treasury). Plaintiff cites no case supporting the proposition that the interest of a foreign state in continuing illegal activity outweighs the rights of United States citizens targeted by that foreign state.

### 4. No Bond Should be Required

The State of Qatar does not challenge Plaintiffs' argument that the State of Qatar will suffer no legally cognizable harm if forced to cease its illegal activity. Rather, it argues that the Court should impose a bond as a condition of Plaintiffs' temporary restraining order because "Plaintiffs have failed to articular any harm they would suffer from posting a bond." Qatar Opp. 14:13-14. This argument gets

-8-

the analysis for imposing a bond backwards: A "district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm *to the defendant* from enjoining his or her conduct." *Jorgenson v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (emphasis added).

### D. The State of Qatar Has No Basis for Opposing Expedited Discovery Against Defendants Stonington Strategies, LLC and Nicolas Muzin

Plaintiffs do not seek expedited discovery from the State of Qatar. The State of Qatar nonetheless purports to oppose Plaintiffs' efforts to seek expedited discovery from Defendants Muzin and Stonington, arguing that the requests were not sufficiently limited. This argument fails.

First, the State of Qatar has no legitimate interest in opposing discovery from other defendants. Although it argues that "the requested information . . . would be a significant intrusion into Defendant State of Qatar's affairs with Defendant Muzin and others," Qatar Opp. 15:23-24, it provides no evidence or explanation of such intrusion, and fails to offer any cognizable legal basis for its objection. In the absence of an applicable privilege, the State of Qatar's amorphous concerns about discovery of Defendants Muzin and Stonington are irrelevant.

Second, Plaintiffs' requests are narrow in scope and in time, covering only Muzin and Stonington's relationship with the State of Qatar since mid-2017[5]; Plaintiffs seek discovery to help end the ongoing breach of Plaintiffs' privacy

---

[5] Although the State of Qatar argues that there is no time limitation on the requests to Defendants Muzin and Stonington, Qatar Br. 15:11-12, Plaintiffs' request for the production of documents from Muzin and Stonington is expressly limited to "[t]he time period . . . from May 1, 2017 to the present." Exhibit 23 to Declaration of Lee Wolosky at 6 [ECF No. 31-9 at 123]. In addition, the Declaration of Lee Wolosky to which all three of Plaintiffs' discovery requests were attached as exhibits stated that the requests "only asked [Stonington and Muzin] to produce files and answer questions about [their] work for Qatar (which appears to have begun in June 2017)." Wolosky Decl. ¶ 19 [ECF No. 31-8 at 7].

through the release of hacked emails;[6] and the burden on Muzin and Stonington will be minimal. Although Plaintiffs' 30(b)(6) notice of deposition of Stonington does not contain a date range, it provides Stonington with the information it would need to designate a person with knowledge of "the matters for examination." Fed. Rule Civ. P. 30(b)(6). Moreover, Plaintiffs would be willing to stipulate that, other than background matters, the "matters for examination" would also be limited by date, from May 1, 2017 to the present.

## II. CONCLUSION

For the foregoing reasons, and the reasons outlined in the Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Ex Parte Application for a Temporary Restraining Order, Order to Show Cause for a Preliminary Injunction, and Order Granting Expedited Discovery, Plaintiffs respectfully ask this Court for the relief requested in Plaintiffs' application.

DATED: April 4, 2018                Respectfully submitted,

                                    BOIES SCHILLER FLEXNER LLP
                                    LEE S. WOLOSKY


                                    By       /s/ Lee S. Wolosky
                                         LEE S. WOLOSKY
                                         Attorneys for Plaintiffs

---

[6] Expedited discovery will allow this Court to have a fuller review of the facts in this matter. "In cases where preliminary injunction motions are pending, courts often permit expedited discovery designed to obtain information required for the preliminary injunction." *Palermo v. Underground Sols., Inc.*, No. 12CV1223-WQH BLM, 2012 WL 2106228, at *2 (S.D. Cal. June 11, 2012).