**BOIES SCHILLER FLEXNER LLP**

David K. Willingham SBN 198874
  dwillingham@bsfllp.com
725 S Figueroa Street
Los Angeles, California 90017
31st Floor
Phone: (213) 629-9040
Fax: (213) 629-9022

Amy L. Neuhardt (*pro hac vice*)
  aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Phone: (202) 237-2727
Fax:  (202) 237-6131

Lee S. Wolosky (*pro hac vice*)
  lwolosky@bsfllp.com
Robert J. Dwyer (*pro hac vice*)
  rdwyer@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Phone:  (212) 446-2300
Fax:  (212) 446-2350

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY,<br><br>            Plaintiffs,<br><br>      v.<br><br>STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, GLOBAL RISK ADVISORS LLC, KEVIN CHALKER, DAVID MARK POWELL, MOHAMMED BIN HAMAD BIN KHALIFA AL THANI, AHMED AL-RUMAIHI, and DOES 1-10,<br><br>            Defendants. | Case No.  18-cv-02421-JFW<br><br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>The Honorable John F. Walter |

BOIES SCHILLER FLEXNER LLP

Plaintiffs Broidy Capital Management LLC ("BCM") and Elliott Broidy ("Broidy"), by and through their attorneys Boies Schiller Flexner LLP, bring this action seeking injunctive relief and monetary damages against Defendants the State of Qatar, Stonington Strategies LLC ("Stonington"), Nicolas D. Muzin ("Muzin"), Global Risk Advisors LLC ("GRA"), Kevin Chalker ("Chalker"), David Mark Powell ("Powell," and together with Chalker and GRA the "GRA Defendants"), Mohammed bin Hamad bin Khalifa al Thani ("Al Thani"), Ahmed al-Rumaihi ("Al-Rumaihi," and together with al Thani and the State of Qatar, the "Qatari Defendants"), and Does 1-10, for Defendants' unlawful conduct, as set forth below.[1]

## NATURE OF THE ACTION

1.     This case presents the issue of whether a nation state can orchestrate and execute a criminal conspiracy directed against a United States citizen on United States soil and then invoke sovereign immunity to avoid liability, accountability and exposure.

2.     Defendant State of Qatar reacted after neighboring Middle Eastern countries sanctioned, embargoed and isolated Qatar commercially and diplomatically in June 2017 for its support of terrorist organizations, and after Qatar's subsequent shunning by President Trump, by launching a wide-ranging and extremely well-resourced effort to influence public opinion in the United States.   Defendants Al Thani and Al-Rumaihi, a Qatari operative present in the United States, were the architect of these efforts, which included (among other things) initiatives to attack and discredit those who had spoken

---

[1] The GRA Defendants, Does 1-10 and Defendants Muzin, Stonington and Al-Rumaihi, are sometimes referred to herein as the "Agent Defendants."

BOIES SCHILLER FLEXNER LLP

1  out against Qatar, and – according to court documents – efforts to bribe

2  individuals close to President Trump.

3       3.     Defendant State of Qatar (which as a principal is bound by the

4  actions and knowledge of its agents) hired numerous United States agents at a

5  cost of millions of dollars, including by entering into specific agreements with

6  those agents for those agents to provide public relations, consultancy, and

7  related services.  Some of those agents disclosed their work for Qatar by

8  making filings pursuant to the Foreign Agents Registration Act (such as

9  Defendants Stonington and Muzin) while others worked secretly for the State

10  of Qatar and did not make filings (such as Joseph ("Joey") Allaham and the

11  GRA Defendants).

12       4.     In late 2017, the whitewashing campaign organized by Al Thani

13  and Al-Rumaihi – on behalf of and with the knowledge of and agreement to

14  by Defendant State of Qatar – was encountering serious problems and targeted

15  Plaintiff Broidy.  Plaintiff Broidy's public and private actions and statements

16  stood in the way of the State of Qatar's aggressive public relations and

17  governmental relations efforts that sought to ingratiate Qatar with the new

18  Trump Administration and to deflect attention from Qatar's record of

19  supporting terrorist organizations.

20       5.     On information and belief, Defendant Chalker is a former CIA

21  cyber-operative who runs GRA, which is headquartered in New York, New

22  York.  On information and belief, Defendant Powell is a former British

23  intelligence operative who runs GRA operations out of Qatar and established

24  GRA's office there through a Gibraltar subsidiary in October 2017 – just

25  weeks prior to the commencement of the attack on Plaintiffs.

26       6.     On information and belief, the Qatari Defendants retained and

27  used the GRA Defendants to coordinate and implement the hack, and the

28

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES SCHILLER FLEXNER LLP

1    GRA Defendants also personally supervised aspects of the information

2    operation against Plaintiffs.

3         7.    On information and belief, the GRA Defendants introduced

4    Defendant State of Qatar to cyber mercenaries in various countries to

5    coordinate technical aspects of the illegal intrusion into Plaintiffs' email

6    server in Los Angeles and Google LLC's server(s) in California, and the

7    dissemination of the contents to U.S. news organizations, including

8    individuals or groups associated with known mercenary cyber threat actors.

9    On information and belief, the individuals and entities identified by the GRA

10   Defendants and used by the Qatari Defendants to attack Plaintiffs are:

11   Omniscope Limited, a U.K. security and intelligence firm; a naturalized

12   Israeli citizen with a history of criminal activity; a retired Moroccan diplomat;

13   and a London-based strategic intelligence firm with offices in the United

14   States.

15        8.    On information and belief, the Agent Defendants all participated

16   in the strategic planning for and execution of the attacks.

17        9.    On information and belief, Defendant Muzin's company

18   (Defendant Stonington) conspired with the other Defendants from within the

19   United States to organize and disseminate Plaintiffs' stolen emails to media

20   organizations.  Significantly, Defendant Muzin exhibited inside knowledge of

21   the attacks on Plaintiffs, and disclosed foreknowledge of future attacks to at

22   least one other potential victim to warn him against taking public positions

23   adverse to the State of Qatar.  On information and belief, Defendant Muzin's

24   company (Defendant Stonington) was among the vehicles used by the State of

25   Qatar to funnel funds to others involved in the attack.

26

27

28

BOIES  SCHILLER  FLEXNER  LLP

10.     Defendant Muzin has admitted his culpability.  Because of Muzin's status as its registered foreign agent, Muzin's admission also binds Defendant the State of Qatar.

11.     On March 5, 2018, Defendant Muzin told Joel Mowbray, a business associate of Plaintiff Broidy and a critic of both the State of Qatar and of Muzin, that there was "more stuff coming" from the *New York Times.* Indeed, there was: the *New York Times* published stories based on Plaintiffs' stolen emails on March 22 and 26, 2018.  In that same meeting, Muzin discussed meetings he had with his client the State of Qatar while serving as its registered agent.  Muzin told Mowbray: "**Broidy's name comes up in Embassy meetings often**" and "I definitely identified him as somebody who, was not, didn't like them too much."  **Muzin further acknowledged that everyone he "fingered" was "in danger."**  He warned Mowbray that Mowbray and Plaintiff Broidy needed "to be very careful," that **the State of Qatar is "going after you,"** and that **"Honestly, I know they're after you and Broidy."**

12.     At that meeting, Muzin tried to persuade Mowbray that the blame for the hacks on Plaintiffs and attempted hacks on Mowbray and subsequent media leaks should fall on Muzin's principal (the State of Qatar) and not Muzin because "I was doing my job." **Muzin was aware that the State of Qatar utilized computer hacking as one of its cyber-weapons and even admitted to Mowbray that he was "positive" that he himself had been hacked by the Qataris.**  Muzin's admissions to Mowbray inculpate both Muzin and his principal and co-conspirator the State of Qatar, since Muzin admitted that he and his principal orchestrated and participated in the scheme to harm Plaintiffs by hacking and disseminating their computer systems and information.

BOIES   SCHILLER   FLEXNER   LLP

13.     Somewhat belatedly, recognizing that he had admitted his culpability and that of the State of Qatar to Mowbray, Muzin stated that he realized that he needed "to be a little more careful" when he spoke to Mowbray.

14.     Defendants' unlawful activity was directed toward the United States and much of that activity occurred within the United States, including the formation of the conspiracy in the United States during meetings in Washington, D.C.  The participants in these meetings were not engaged in activities related to Qatar's discretionary foreign policy, but instead were conspiring to violate United States criminal and civil laws by targeting a United States citizen for retribution because he had exercised his First Amendment right to speak out publicly and privately to United States government officials against the State of Qatar's support for terrorist organizations.

15.     The hack, and the resulting unlawful access to Plaintiffs' private communications, documents, trade secrets and intellectual property, occurred in the United States.  Defendants conspired to design, coordinate and execute an unlawful spearphishing campaign against several U.S. persons affiliated with Plaintiff Broidy that included the following: spoofing or otherwise obfuscating U.S.-assigned phone numbers to deceive several persons in the United States into providing their email login credentials; misappropriating the trademarks of U.S. companies such as Google LLC, a subsidiary of Alphabet, Inc; fraudulently registering online website domains in the United States; stealing email and online account login credentials for several U.S. persons; illegally intruding into Plaintiffs' email server in Los Angeles as well as California servers of U.S.-based Google; stealing emails from those U.S.-based servers; and then printing collections of Plaintiffs' stolen electronic files

Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES SCHILLER FLEXNER LLP

from within North America, sorting them by topic, and delivering them (in some cases by hand) to news organizations in the United States, knowing that the news organizations would publish the stolen emails under the cloak of the First Amendment – all for the purpose of discrediting Plaintiff Broidy in the United States and interfering with his business relationships.  Defendants' efforts to target Plaintiff Broidy in this manner have been largely successful: several media organizations published articles (including front page stories in the March 22 and 26, 2018 editions of the *New York Times*, a March 26, 2018 story by the Associated Press, a story in the March 1, 2018 edition of the *Wall Street Journal*, and additional articles in *The Huffington Post*, *McClatchy*, *Esquire, The Intercept* and *Bloomberg News*, which stories were reprinted or summarized by numerous other news outlets).  As recently as May 21, 2018, the Associated Press published a story based on the hacked materials.  In some instances, these news organizations have acknowledged that those articles were based on information they received from sources who boasted that the materials were hacked from Plaintiffs' computers.

16.    As a result of Defendants' actions, Plaintiffs, and in particular Plaintiff Broidy, have been harmed, and will continue to be harmed.

## **PARTIES**

17.    Plaintiff Broidy Capital Management LLC is an investment firm run by Plaintiff Elliott Broidy.  BCM is a corporation duly organized under the laws of the State of California with its principal place of business in Los Angeles, California.

18.    Plaintiff Elliott Broidy is a citizen of the United States and the State of California who resides in Los Angeles, California.  He is the Chief Executive Officer and Chairman of BCM.

BOIES SCHILLER FLEXNER LLP

19.     Defendant the State of Qatar is a foreign state.  The head of state and head of government of Qatar is the current Emir of Qatar, Sheikh Tamim bin Hamad Al Thani.  The Emir has made visits to Los Angeles, California and has hosted the Mayor of Los Angeles, Eric Garcetti, in Doha, the capital of Qatar, as part of an effort to strengthen the partnership between the cities of Los Angeles and Doha.  Additionally, the State of Qatar maintains a Consulate in Los Angeles, California.

20.     Defendant Stonington Strategies LLC is a public relations and lobbying firm incorporated under the laws of Delaware.  Upon information and belief, Stonington's principal place of business is in New York, New York.  Stonington registered on September 3, 2017 under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, as a foreign agent providing "strategic communications" for the State of Qatar.  Stonington originally was retained to provide these services for $50,000 per month.  On November 1, 2017, shortly before the hacks on Plaintiff's computers began, Defendant the State of Qatar increased the amount by a factor of six – to $300,000 per month.

21.     Defendant Nicolas D. Muzin is the Chief Executive Officer of Stonington and a political lobbyist who signed the FARA documents on behalf of Stonington as a registered foreign agent of the State of Qatar.  He is a graduate of Yale Law School and a high-level Republican political operative.  Muzin served as chief of staff to then-Congressman (now Senator) Tim Scott and served as deputy chief of staff for strategy to Senator Ted Cruz. According to his biography on the Stonington website, Muzin also worked on the Trump Presidential campaign as well as on the transition team to recruit candidates for the new Administration.  Shortly after the inauguration of President Donald J. Trump, Muzin began working as a lobbyist, first

BOIES  SCHILLER  FLEXNER  LLP

registering as a FARA agent for the Democratic Party of Albania in March 2017.  On August 24, 2017, he was retained by the State of Qatar for "consulting services."  More recently, on May 14, 2018, Muzin was photographed at the opening of the United States Embassy in Jerusalem with Senator Cruz and White House aide Victoria Coates, the Senior Director for International Negotiations on the National Security Council and a former aide to Senator Cruz.  Defendant Muzin is a citizen of the United States and a resident of the state of Maryland.  On information and belief, Muzin has frequently traveled to California for business and political purposes during recent years.

22.     Defendant Global Risk Advisors, LLC is a limited liability company formed under the laws of Delaware, with its primary place of business in New York, New York.  It has not registered as a FARA agent of the State of Qatar.

23.     Defendant Kevin Chalker is the founder and Chief Executive Officer of GRA.  Upon information and belief, he is a citizen of the United States and is domiciled in the state of New York.  Chalker has not registered as a FARA agent of the State of Qatar.

24.     Defendant David Mark Powell is a Managing Director of GRA and also is the Principal Agent of GRA in Qatar.  On information and belief, Powell is a citizen of the United Kingdom and is domiciled in the United Kingdom.

25.     On October 26, 2017, only a few weeks before Defendants began their efforts to unlawfully access Plaintiffs' emails, documents, trade secrets and intellectual property, GRA, acting through a wholly-owned subsidiary – Global Risk Advisors (EMEA) Limited, a Gibraltar corporation, headed by Defendant David Mark Powell – began to operate in Qatar.

BOIES  SCHILLER  FLEXNER  LLP

26.     Defendant Mohammed bin Hamad bin Khalifa Al Thani, who received his degrees from Georgetown and Harvard, is a brother of the Emir of Qatar.  According to articles in *Sports Illustrated* on May 23, 2011 and *The Telegraph* on March 18, 2014, Defendant Al Thani has been accused of bribery and human rights abuses in connection with Qatar's successful bid to host the 2022 FIFA World Cup and the subsequent construction of the necessary facilities, which *The Guardian* reported on September 25, 2013 resulted in the "exploitation and abuses" of Nepalese workers "that amount to modern-day slavery."

27.     On information and belief, after its neighboring Middle Eastern countries began their quarantine of Qatar in 2017, Defendant the State of Qatar charged Defendant Al Thani with the task of attempting to influence United States public opinion, and the position of the Trump Administration. For example, as reported in *Politico* on May 8, 2018, the State of Qatar's ongoing efforts to purchase Newsmax, a conservative news outlet with ties to the Trump Administration, were "overseen by Mohammed bin Hamad bin Khalifa Al Thani, a younger brother of Qatari Emir Tamim bin Hamad Al Thani" and "came during a mad scramble by the wealthy Gulf monarchy to win friends and clout in the United States as it struggled to respond to a Trump-endorsed blockade by its Arab neighbors."  On information and belief, Al Thani also specifically directed the effort to address impediments to the success of Qatar's program to influence United States public opinion and the position of the Trump Administration on the embargo, including specifically the efforts to attack and discredit Plaintiff Broidy.

28.     Defendant Ahmed Al-Rumaihi is a citizen of the State of Qatar and a former Qatari diplomat.  In the time period beginning in April 2017 and continuing to the present, Defendant Al-Rumaihi has not held an official

position in the Government of the State of Qatar (according to the State of Qatar), but on information and belief has continued to act as an agent of the State of Qatar.  Al-Rumaihi is a resident of Qatar.

29.     On information and belief, Defendants Does 1-10 are agents of the State of Qatar, some of whom have not registered under FARA.  On information and belief, none of Defendants Does 1-10 is a citizen or resident of the State of California.

## JURISDICTION AND VENUE

## I.    SUBJECT MATTER JURISDICTION

30.     This Court has subject matter jurisdiction over the State of Qatar pursuant to 28 U.S.C. § 1330 and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, because its conduct falls within the exception to foreign sovereign immunity set forth in 28 U.S.C. § 1605(a)(5).  Multiple entire torts as described herein occurred within the United States, and additional tortious misconduct described herein occurred at a minimum predominately within the United States.

31.     This Court also has subject matter jurisdiction over the State of Qatar because its conduct falls within the exception to foreign sovereign immunity set forth in 28 U.S.C. § 1605(a)(2).  The State of Qatar entered into numerous commercial contracts with persons to provide consulting, public relations, offensive cyber and other lawful and unlawful commercial services in order to further the State of Qatar's public relations efforts and economic and commercial interests, which included most significantly the lifting of a comprehensive trade and commercial embargo on Qatar.  In furtherance of those commercial contracts, Defendants then targeted Plaintiff Broidy.  Upon information and belief, the State of Qatar engaged the GRA Defendants and the Agent Defendants to use illegal commercial means to promote its own

BOIES SCHILLER FLEXNER LLP

1   economic and commercial interests, including by conducting economic

2   espionage.  These forms of commercial activity directly affected the United

3   States.

4         32.    This Court further has subject matter jurisdiction over this action

5   under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state

6   law claims under 28 U.S.C. § 1367.  Additionally, this Court has subject

7   matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332 because

8   Plaintiffs are all citizens of the state of California and, to Plaintiffs'

9   knowledge, none of the Defendants is a citizen of the State of California.

10  Accordingly, the citizenship of the parties is diverse.  The amount in

11  controversy exceeds $75,000, exclusive of interest and costs.

12  **II.    PERSONAL JURISDICTION**

13        33.    This Court has personal jurisdiction over the State of Qatar

14  pursuant to 28 U.S.C. § 1330 and the Foreign Sovereign Immunities Act, 28

15  U.S.C. § 1602 *et seq.*, because its conduct falls within the exception to foreign

16  sovereign immunity set forth in 28 U.S.C. § 1605(a)(5) and § 1605(a)(2).

17        34.    Plaintiffs served the State of Qatar pursuant to 28 U.S.C.

18  § 1608(a).

19        35.    This Court has personal jurisdiction over the Agent Defendants

20  and the Qatari Defendants other than the State of Qatar itself under the state of

21  California's long-arm statute, Cal. Civ. Proc. Code § 410.10, because they

22  directly or as a result of their participation in the conspiracy described herein,

23  targeted Plaintiffs in California and directed their tortious conduct towards

24  Plaintiffs in California, with knowledge and intent that Plaintiffs suffer harm

25  in California.

26

27

28

BOIES   SCHILLER   FLEXNER   LLP

36.     On information and belief, Defendant Al-Rumaihi leases property in California, conducts substantial business in California, and has sufficient and substantial contacts with this jurisdiction.

**III.     VENUE**

37.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district, and a substantial part of property that is the subject of this action is situated in this judicial district.  In particular, the private communications, documents, trade secrets and intellectual property that was unlawfully accessed, converted, and stolen was located in this district and the unlawful access to those materials necessarily took place in this district.

38.     Venue also is proper in this judicial district under 28 U.S.C. §1391(f)(1) for the same reasons and because Defendant the State of Qatar is a foreign state.

39.     Alternatively, venue is proper in this judicial district under 28 U.S.C. § 1391(b)(3) because there is no judicial district in a State in which all non-foreign defendants are resident, and at least one Defendant is subject to personal jurisdiction in California.

**STATEMENT OF FACTS**

40.     This is a case about a civil and criminal conspiracy undertaken by a foreign nation on the territory of the United States against a successful, influential United States citizen and his California corporation.  Qatar targeted Plaintiff Broidy because he spoke out forcefully and effectively against Qatar's support for terrorism, entered into significant business relationships relating to defense and counterterrorism with a neighboring nation, and stood

-- 13 --

Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

in the way of relieving commercial pressures resulting from a devastating economic embargo.  The purpose of the conspiracy targeting Broidy was to use illegal means to diminish his influence within the United States through a campaign to discredit him in the press and in the eyes of U.S. government officials, and to disrupt Plaintiffs' business relationships.  The conspiracy included the commissioned hacking of Plaintiffs' computer networks, which were located in the United States during the relevant timeframe, including Plaintiffs' email accounts, and transmission of the illicitly obtained data to the media.

## I.   INTERNATIONAL SANCTIONS WERE IMPOSED ON THE STATE OF QATAR IN JUNE 2017 AS THE RESULT OF ITS HISTORY OF SUPPORTING AND HARBORING TERRORISTS

41.   Defendant the State of Qatar sponsors and supports terrorists, having once been called a "Club Med for Terrorists."  Qatar has allowed and continues to allow itself to serve as a sanctuary for terrorist leaders and organizations, including but not limited to Al Qaeda (and its affiliates including Al-Shabab and Al Qaeda in Syria, also known as Al-Nusra Front or Jabhat Al-Nusra), Hamas, the Taliban, and the Muslim Brotherhood.

42.   Numerous individuals residing in Qatar have been sanctioned by the United States Department of Treasury for raising funds for Al Qaeda.

43.   Individuals who serve as fundraisers for Al Qaeda's Syrian franchise (the Nusra Front) operate freely in Qatar.  These individuals appear at state-owned Mosques and on broadcasts aired by the state-funded Al Jazeera.  The State of Qatar has failed to shut down these fundraisers.

44.   The State of Qatar also has been accused of hosting the Somali terrorist group Al-Shabab, an Al Qaeda affiliate.

45.   The State of Qatar also has permitted Hamas leaders to operate freely within the country.  Indeed, the State of Qatar has provided substantial

BOIES   SCHILLER   FLEXNER   LLP

funding to Hamas, despite being subjected to international political and economic sanctions for such support.

46.     The State of Qatar has further allowed the Taliban to operate and maintain an office in Doha.

47.     The State of Qatar has given safe haven to many leaders of the Muslim Brotherhood after their expulsion from Egypt by the Egyptian government.

48.     On May 25, 2017, a bill (H.R. 2712) was introduced in the United States House of Representatives titled "The Palestinian International Terrorism Support Prevention Act of 2017." The bill, which would have barred assistance from the United States government to any country that aided Hamas, stated in its findings that "Hamas has received significant financial and military support from Qatar."

49.     On June 5, 2017, neighboring Middle Eastern states severed diplomatic relations with the State of Qatar because of the State of Qatar's support for terrorism and its close ties to Iran. Other governments quickly followed. Some countries closed their airspaces to Qatari aircraft, closed their borders with the State of Qatar and/or banned Qatari-flagged ships from docking at their ports. The sanctioning states issued a set of demands to the State of Qatar including that the State of Qatar curb ties with Iran and stop funding terrorist organizations. Those demands were rejected.

50.     President Trump denounced Qatar and sided with the efforts to embargo Qatar, tweeting on June 6, 2017: "During my recent trip to the Middle East I stated that there can no longer be funding of Radical Ideology. Leaders pointed to Qatar - look!"

51.     On June 9, 2017, once again siding with the sanctioning states and criticizing the more conciliatory tone of the then-Secretary of State, President Trump stated:

> The nation of Qatar, unfortunately, has historically been a funder of terrorism at a very high level, and… nations came together and spoke to me about confronting Qatar over its behavior.  So we had a decision to make:  Do we take the easy road, or do we finally take a hard but necessary action?  We have to stop the funding of terrorism.  I decided, along with Secretary of State Rex Tillerson, our great generals and military people, the time had come to call on Qatar to end its funding — they have to end that funding — and its extremist ideology in terms of funding… This is my great priority because it is my first duty as President to keep our people safe.  Defeating ISIS and other terror organizations is something I have emphasized all during my campaign and right up until the present.  To do that, stop funding, stop teaching hate, and stop the killing.  For Qatar, we want you back among the unity of responsible nations.

52.     Defendant State of Qatar is a nation rich in natural gas resources, but it is reliant on food and other supplies that arrive by truck via borders that closed as part of the embargo.  The international sanctions – and the support the President Trump expressed for them – threatened to damage Qatar's economy and plunged Qatar into crisis.  The sanctioning states threatened to expel the State of Qatar from the Gulf Cooperation Council, a regional economic and security cooperation body made up of six nations.  The economic quarantine led to a massive drop-off in foreign investment in Qatar.  According to the International Monetary Fund, "following the rift, foreign financing (non-resident deposits and inter-bank placements) and resident private-sector deposits fell by about US$40 billion."

53.     These international sanctions on the State of Qatar remain in effect today.

Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES SCHILLER FLEXNER LLP

## II.  THE STATE OF QATAR BEGAN A PUBLIC RELATIONS CAMPAIGN TO IMPROVE ITS IMAGE IN THE UNITED STATES, WHICH HAS SUPPORTED THE INTERNATIONAL SANCTIONS AGAINST QATAR

54.     As a result of its Middle Eastern neighbors severing diplomatic relations and imposing a commercial blockade, the Qatari Defendants retained agents in Washington, D.C. and paid them millions of dollars to impact public opinion and public policy in the United States, including by entering into specific agreements with those agents for those agents to provide public relations, consultancy, and related services.  The Qatari Defendants launched a public relations campaign to obfuscate Qatar's ties to, and financial and logistical support of, some of the world's worst extremist and terrorist organizations—including Al Qaeda (and its affiliate Al-Shabab), Hamas, the Taliban, and the Muslim Brotherhood—and to change Qatar's image in the United States, including particularly in the Jewish community in the United States.  As *Tablet Magazine*, an online publication focused on Jewish news, wrote on February 13, 2018, the Qatari influence operation reflected "a Qatari preoccupation with American Jewish communal power, as well as a desire to address whichever challenges Doha believes Jewish influence raises for the country's vast ambitions in Washington and beyond."

55.     This campaign was aimed at: (1) bolstering the image of the State of Qatar in circles perceived as influential with the Trump Administration; and (2) curtailing the influence of individuals that could undermine the standing of the State of Qatar in the United States.

### A. Al Thani and Al-Rumaihi Directed and Supervised The State Of Qatar's Whitewashing Efforts

56.     This campaign on behalf of Defendant the State of Qatar was directed and supervised by its agents Defendant Al Thani and Defendant Al-Rumaihi.

57.     One of the activities engaged in by Defendant Al-Rumaihi was investing in entities that he and Defendant Al Thani thought could help to bolster Qatar's image in the United States.  Al-Rumaihi and Al Thani have access to billions of dollars in capital from the Qatar Investment Authority to use for this purpose.  As one example, in 2017 Al-Rumaihi was a significant investor in the "Big3" basketball league, started by Rapper Ice Cube and Jeff Kwatinetz, a Los Angeles businessman.  Al-Rumaihi then sought to use his association with Kwatinetz to gain contact with Kwatinez's former business associate, Steve Bannon, who was at that time the Chief White House Strategist for President Trump.  In litigation relating to Al-Rumaihi's investment in Big3, Kwatinetz filed an affidavit stating: "there were numerous occasions during the 2017 [Big3] season, where Mr. Al-Rumaihi would bring up Mr. Bannon's name to me and comment about Mr. Bannon's political positions, his views on the blockade [of Qatar by Gulf states], the Trump administration's position toward Qatar, and he persistently inquired about wanting to meet with Mr. Bannon."

58.     In an affidavit filed in that litigation, Kwatinetz further revealed that Defendant Al-Rumaihi admitted that he had previously attempted to financially influence former officials of the Trump Administration:

> Mr. Al-Rumaihi stated to me [Kwatinetz] that he wanted me to convey a message from the Qatari Government to Steve Bannon. Mr. Al-Rumaihi requested I set up a meeting between him, the Qatari government, and Steven Bannon, and to tell Steve Bannon that Qatar would underwrite all of his political efforts in return for his support.  I immediately let Mr. Al-Rumaihi know that I

Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BOIES SCHILLER FLEXNER LLP

was offended by this request, that I was trying to run a basketball league and need our money paid, and I stated that neither I nor Steve Bannon would ever take, or even entertain the concept, of a bribe of any kind.  I was appalled.  Mr. Al-Rumaihi laughed and then stated to me that I shouldn't be naive, that so many Washington politicians take our money, and stated "do you think [former National Security Advisor Michael] Flynn turned down our money?"

59.    On information and belief, Defendant Al-Rumaihi's comments to Kwatinetz reference a December 12, 2016 visit by Al-Rumaihi to Trump Tower to visit with the Trump Transition Team.  Michael Flynn, at that time the incoming National Security Adviser, was at Trump Tower on that same day.  Both Al-Rumaihi and Flynn were photographed in the lobby of the Trump Tower that day.

60.    The attempted purchase of *Newsmax* is another example of how Al-Rumaihi and Al Thani sought to use millions of dollars from the Qatari Investment Authority to bolster Qatar's image in the United States in an effort to address the commercial embargo.  *Politico* reported on May 8, 2018 that the State of Qatar's attempt to purchase *Newsmax* was "overseen by Mohammed bin Hamad bin Khalifa Al Thani, a younger brother of Qatari Emir Tamim bin Hamad Al Thani" and "came during a mad scramble by the wealthy Gulf monarchy to win friends and clout in the United States as it struggled to respond to a Trump-endorsed blockade by its Arab neighbors."

61.    Defendant Al-Rumaihi retained additional agents to craft and execute the State of Qatar's image whitewashing campaign.  For example, Al-Rumaihi was identified as the contact for Qatar in the June 7, 2017 retainer agreement between the Ashcroft Law Firm LLC and the "Government of Qatar."  According to the FARA filing disclosing that contract, former Attorney General Ashcroft was retained by the Qatari Defendants to "enlist the support and expertise of former key government leaders, including former

officials who held very senior positions within the Intelligence Community, the Federal Bureau of Investigation, the Department of Treasury and the Department of Homeland Security[.]" That $2.5 million retainer agreement was signed for the State of Qatar by Dr. Ahmed Al-Hammadi, the Secretary General of the State of Qatar's Ministry of Foreign Affairs and the Acting Head of Investments of the State-owned Qatar Investment Authority.

**B. Defendants Stonington And Muzin Initially Focused On Influencing The United States Jewish Community**

62.    Upon information and belief, as described in the February 13, 2018 *Tablet Magazine* article, Defendant Al-Rumaihi worked with unregistered Qatari agent Joey Allaham to identify Defendants Muzin and Stonington to assist in the State of Qatar's campaign to influence the Jewish community in the United States.

63.    In late August 2017, the Qatari Defendants retained Defendants Stonington and Muzin to influence public opinion regarding the State of Qatar.  Their agreement specifies that Muzin and Stonington were to provide "consulting services" including the "development and implementation of a government relations strategy for the State of Qatar, as requested and directed by the Embassy."  The initial agreement provided that the State of Qatar would pay Muzin and Stonington $50,000 a month for these services.

64.    Defendant Muzin's efforts as an agent of the State of Qatar quickly focused on an effort to put a pro-Jewish spin on the State of Qatar.  A September 5, 2017 article in *O'Dwyer's*, an online magazine covering the public relations industry, quotes Muzin as stating:  "Engagement with Qatar can only be in the best interests of the United States and the Jewish community, as we cannot allow Qatar to be ostracized by its neighbors and pushed into Iran's sphere of influence."

65.     As reported by the Israeli newspaper *Haaretz* on September 28, 2017, Defendant Muzin invited American Jewish leaders to meet with the Emir in New York City during the Emir's visit for the United Nations General Assembly later that month.  The opposition of Plaintiff Broidy and others to these efforts helped prompt American Jewish leaders to refuse to meet with the Emir at that gathering, thereby frustrating the plans of the Qatari Defendants and Defendants Muzin, and Stonington to win over Jewish leaders.

66.     The Zionist Organization of America ("ZOA") reacted to that invitation with a press release on September 12, 2017, in which the organization's president, Morton A. Klein, stated that although he had "received an invitation to meet with" the Emir of Qatar during the United Nations General Assembly, he had "decided not to accept this invitation." Mr. Klein further stated:  "Any Jewish leader meeting with the Qatari Emir or Crown Prince likely means well, but he will serve as an unwitting prop in their PR ploy to whitewash the legitimate reasons why its Arab Muslim neighbors are boycotting them and why Israel and Jews are horrified by them, meaning it will only strengthen Qatar's embrace of Iran and critical backing of Hamas."

67.     According to a February 13, 2018 article in *Tablet Magazine*, "Muzin largely failed to persuade Jewish leaders to agree to meetings with influential Qataris visiting New York for the opening of the United Nations General Assembly."

68.     Soon after the failure of the United Nations General Assembly initiative, Muzin began to invite American Jewish leaders on all-expense-paid trips to Qatar to further the State of Qatar's public relations campaign. Plaintiff Broidy and others again encouraged American Jewish leaders to

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

decline the invitations.  These efforts were mostly successful in helping to prompt many American Jewish leaders to decline to participate in the public relations trips to Qatar.

69.     As part of his work for the State of Qatar, Muzin sought out high-profile individuals who could be helpful in furthering the interests of the State of Qatar.  On information and belief, Defendant Muzin recruited former Arkansas Governor Mike Huckabee, a Republican candidate for President, prominent media commentator, and father of current White House Press Secretary Sarah Huckabee Sanders, to participate on a trip to Qatar.  On January 8, 2018, former Governor Huckabee tweeted "I'm in Doha," and then on January 12, 2018, tweeted, "Just back from a few days in surprisingly beautiful, modern, and hospitable Doha[.]"  On information and belief Defendant Muzin acknowledged paying an individual $50,000 for doing work related to influencing former Governor Huckabee to travel to Qatar and meet with the Emir.

70.     On information and belief, Defendant Muzin also met with White House aide Victoria Coates, the Senior Director for International Negotiations on the National Security Council and a former aide to Senator Ted Cruz, to advocate for United States policies that would be supportive of the State of Qatar.  On information and belief, Defendant Muzin got Coates to have her boss, Jason Greenblatt, the Special Envoy for International Negotiations, send out the following tweet on February 9, 2018, that was supportive of Qatar: "Qatar partnering with Israel can bring real relief to the people of Gaza. Ending support for Hamas and focusing on humanitarian aid and reconstruction will end the suffering."

71.     Defendant Al-Rumaihi also engaged in efforts similar to Defendants Muzin and Stonington with respect to the United States Jewish

BOIES   SCHILLER   FLEXNER   LLP

BOIES SCHILLER FLEXNER LLP

1   Community.  By means of example, at the invitation of unregistered Qatari

2   agent Joey Allaham, Al-Rumaihi attended a gala for the ZOA in New York

3   City in November 2017.  Despite having vocally rejected an invitation by

4   Defendant Muzin to meet with the Emir at the United Nations General

5   Assembly in September 2017, after this dinner, the President of the ZOA

6   (Morton A. Klein) visited Qatar on a trip that Muzin arranged.

7        **C.** **The State Of Qatar Spent Millions of Dollars on Agents To**
8           **Further Its Public And Governmental Relations Efforts in the**
        **United States**

9        72.     According to the Center for Responsive Politics, the State of

10  Qatar spent nearly five million dollars on lobbyists and media relations in

11  2017 in an effort to gain the support of the United States government in

12  Qatar's its diplomatic standoff with other Middle Eastern countries.

13       73.     According to FARA filings of the State of Qatar, it retained and

14  entered into written agreements with at least the following agents in the

15  second half of 2017 or the first quarter of 2018 in an effort to improve its

16  image in the United States.

17            a.  Avenue Strategies Global LLC (July 17, 2017 agreement), a

18                firm with which former Trump Campaign Manager Corey

19                Lewandowski has been affiliated, at the rate of $150,000 per

20                month, increased to $500,000 per month on September 5,

21                2017, with an additional $250,000 added to the October

22                invoice through a retroactive agreement dated February 28,

23                2018;

24

25

26

27

28

        Case No. 18-cv-02421-JFW

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

b. Stonington Strategies LLC (August 24, 2017 agreement) at the rate of $50,000 per month, increased to $300,000 per month on November 1, 2017;[2]

c. Ashcroft Law Group (June 7, 2017 agreement), at the rate of $2.5 million for a 90-day retainer;

d. Levick Strategic Communications (June 5, 2017 agreement) at the rate of $54,000 per month;

e. Information Management Services Inc. (June 19, 2017 agreement) at the rate of $375,000 per month;

f. Conover & Gould Strategic Communications (June 29, 2017 agreement) at the rate of $100,000 per month;

g. Gallagher Group (July 11, 2017 agreement) at the rate of $25,000 per month, amended February 5, 2018 to $45,000 per month;

h. Audience Partners Worldwide (July 28, 2017 agreement) at an undisclosed rate;

i. McDermott, Will & Emery (July 13, 2017 agreement) at the rate of $40,000 per month;

j. Nelson Mullins Riley & Scarborough LLP (July 26, 2017 agreement, renewed on March 19, 2018) at the rate of $100,000 per month for three months;

k. Portland PR (December 6, 2017 agreement) at the rate of $123,195 per month;

---

[2] Stonington notably has not filed its mandatory supplemental FARA filing disclosing the specifics of its FARA activities.  That filing was due in March 2018.  28 C.F.R. § 5.200.

Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

B O I E S   S C H I L L E R   F L E X N E R   L L P

1     l. Mercury Public Affairs (September 7, 2017 agreement) at the

2      rate of $120,000 per month;

3     m. Bluefront Strategies (September 12, 2017 agreement)

4      $100,000;

5     n. Hawksbill Group (August 1, 2017 agreement) $165,000;

6     o. Vitello Consulting (December 6, 2017 agreement) $10,000, as

7      a subcontractor of Stonington Strategies;

8     p. Iron Bridge Strategies (February 1, 2018 agreement) at the

9      rate of $25,000 per month;

10     q. Tigercomm LLC (January 11, 2018 agreement) at the rate of

11      $30,000 per month;

12     r. Venable LLP (January 31, 2018 agreement) at the rate of

13      $150,000 per month;

14     s. Husch Blackwell Strategies (February 1, 2018 agreement) at

15      the rate of $25,000 per month;

16     t. SGR Government Relations & Lobbying (February 1, 2018

17      agreement) at the rate of $40,000 per month;

18     u. Pillsbury Winthrop Shaw Pittman LLP (March 15, 2018

19      agreement) at rates between $500 and $955 per hour;

20     v. Lumen8 Advisors, LLC (March 15, 2018 agreement) at the

21      rate of $1,000 per hour; and

22     w. Ballard Partners (March 29, 2018 Agreement) at the rate of

23      $175,000 per month for one year.

## III. DEFENDANTS BECAME INCREASINGLY FRUSTRATED BY PLAINTIFF BROIDY'S OUTSPOKEN CRITICISM OF THE STATE OF QATAR

26    74. Plaintiff Broidy is a prominent business and civic leader who has

27 actively served in leadership roles in Jewish organizations and the Republican

Party for decades, and during pertinent periods frequently and directly interacted with the President of the United States.  His advocacy against terrorism and extremism is well known.  Plaintiff Broidy served on the Homeland Security Advisory Council from 2006 to 2009 and specifically on the Future of Terrorism Task Force of that Council.  The "Findings" report of that Task Force, issued on January 11, 2007, stated:  "Factors that will influence the future of terrorism include:  the leadership of the terrorists, US counterterrorism efforts, status of political reform in Muslim nations and *the elimination of safe havens*[.]"  (Emphasis added.)  This report was directed at and, on information and belief, was known to countries operating as safe havens for terrorist organizations, including the State of Qatar.

75.     Since September 11, 2001, Plaintiff Broidy has increased his involvement in supporting the safety of his homeland, the United States.  As part of his involvement, he became active in fundraising for the Republican Party because its views on how to defend the United States were aligned with his own.  He also became involved in numerous civic activities involving counter-terrorism to promote the security of the United States.

76.     Beginning in March 2017, Plaintiff Broidy, among others, became a vocal critic of the State of Qatar's support for terrorists and friendly relationship with Iran, which Mr. Broidy sees as a major threat to the security of the United States and its allies, and began to support financially public initiatives – such as conferences – to educate Americans about Qatar's support for terrorist and extremist organizations.

77.     During pertinent periods Plaintiff Broidy regularly conveyed this criticism of Qatar in meetings with United States Government officials and civic leaders, including President Trump.

78.     Defendant the State of Qatar was aware of Plaintiff Broidy's influential criticism.  In initial discussions with Defendants Muzin and Stonington, Qatari officials told Muzin of their concerns about Plaintiff Broidy.  As Defendant Muzin recounted, "They knew about him [Broidy]" and "knew that he [Broidy] had been influential" in shaping the White House's views on Qatar.

79.     Qatari officials complained in particular about President Trump's recorded remarks at a June 2017 meeting of the Republican National Committee: "We're having a dispute with Qatar — we're supposed to say Qatar.  It's Qatar, they prefer.  I prefer that they don't fund terrorism."  At the same meeting, President Trump publicly identified Plaintiff Broidy in the audience and stated: "Elliott Broidy is fantastic."  That acknowledgment was followed by a round of applause.

80.     Defendant Muzin has admitted that officials of Defendant the State of Qatar, with whom he met shortly after President Trump's remarks at that June 2017 meeting, stated: "Broidy was like sitting in the front row and that he had somehow prompted Trump to say that."

81.     After Defendants Muzin and Stonington were retained by the State of Qatar, Mr. Broidy extended his criticism of the State of Qatar to the efforts by Muzin and Stonington to arrange meetings between the Emir and American Jewish leaders.

82.     Beginning in or around September 2017, Plaintiff Broidy began to urge American Jewish leaders to decline the invitations of the State of Qatar and Muzin to meet with the Emir in New York City and/or to visit Qatar.

83.     Plaintiff Broidy was not alone in this effort.  On September 15, 2017, *Forbes* published a piece by a contributing writer titled "Why is Qatar

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES  SCHILLER  FLEXNER  LLP

offering to trade dead Israelis for meetings with live Jews?"  The article reported that an offer was being made to American Jewish leaders to return the corpses of two Israeli soldiers whom Hamas had killed if those leaders would meet with the Emir.  The article stated:

a. Rabbi Shmuel Boteach (who according to *Newsweek* is one of the ten most influential rabbis in the United States) stated that "all who agreed to whitewash the terror-stained hands of the emir would be condoning murder."

b. The State of Qatar hired Defendant Muzin, who "may have hinted to some Jewish leaders that his lobbying had the 'blessing' of Israel's elected government."  But Israel's Ambassador to the United States, Ron Dermer, denied this, stating:  "It is not true."

c. The State of Qatar has admitted to giving approximately $1.4 billion to Hamas over the past few years. (Hamas is designated by the United States as a terrorist organization).

d. Qatar is "like Woodstock for terrorists," and has also "been accused of hosting the Somali terrorist group Al-Shabab, an al Qaeda affiliate."

e. Defendant Muzin claimed that he contacted prominent American Jewish leaders, but "Each denied agreeing to any meeting with Qatar and two of these leaders denied ever even speaking to Muzin."  "Like a child's game of telephone, Muzin apparently told each Jewish leader that a different prominent Jew had already agreed to meet the Emir.  This didn't turn out to be true."

BOIES  SCHILLER  FLEXNER  LLP

84.     Although many American Jewish leaders declined the invitations given in September 2017, Defendant Muzin continued his attempts to arrange trips to Qatar for American Jewish leaders.  These trips furthered the State of Qatar's strategy to court favor with high-profile American Jewish leaders, whom they believed could shift United States policy in favor of the State of Qatar and alleviate pressure caused by the economic embargo on it.  On information and belief, in some instances, Defendants Muzin and Stonington paid for the trips taken.  Among those participating in the trips were:

a. Rabbi Shmully Hecht, co-founder and Rabbinical Advisor of Shabtai, the Jewish Society at Yale University, who wrote in a January 25, 2018 article in *The Times of Israel*, an online Israeli newspaper:  "A few months ago, Nick Muzin asked me to attend meetings with influential global thought leaders who are also prominent in the Jewish world, and the Emir of Qatar. . . .  Many prominent Jewish leaders have flown to Qatar and have spent quality time with the country's leadership."

b. Alan Dershowitz, the Felix Frankfurter Professor of Law, Emeritus, at Harvard Law School, who wrote in a January 12, 2018 article in *The Hill*:  "I just returned from a private visit to Qatar, at the invitation of and paid for by the Emir. . . .  I observed that Qatar is quickly becoming the Israel of the Gulf States, surrounded by enemies, subject to boycotts and unrealistic demands, and struggling for its survival."  Defendant Muzin acknowledged arranging for Dershowitz to make this trip.

c. Morton A. Klein, the President of ZOA, who, despite his initial reluctance to meet with the Emir at the United Nations,

Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

B O I E S   S C H I L L E R   F L E X N E R   L L P

1    ultimately decided to travel to Qatar in order to have the

2    chance to confront the Emir, wrote in a January 30, 2018

3    article in *Haaretz*:  "I decided it was important for me to

4    speak truth to power, especially when the Emir repeatedly

5    invited me to give them my views on what they needed to

6    do."

7       d. Malcolm Hoenlein, the executive vice chairman of the

8    Conference of Presidents of Major Jewish Organizations.

9    (During approximately the same time period in 2017,

10   Defendant Al Thani attended the wedding of Hoenlein's

11   daughter).

12   85.   Despite these successes, there was nonetheless significant

13   backlash in the American Jewish community against Defendant Muzin's work

14   on behalf of the State of Qatar.  For example:

15      a. On January 15, 2018, Rabbi Shmuel Boteach published "An

16   Open Letter to the Emir of Qatar," stating:  "Newspapers are

17   filled with reports that you have hired an Orthodox Jew, Nick

18   Muzin, of Stonington Strategies, and his partners, as agents of

19   Qatar to promote your image among American Jews, and to

20   lobby the US government.  There is non-stop chatter of rabbis,

21   writers and community leaders accepting free trips to Doha,

22   which is big news because your regime funds Hamas —

23   which is responsible for an endless stream of funerals in

24   Israel."

25      b. A spokesman for the Israeli Embassy in Washington

26   denounced the trips to Qatar.  *See Haaretz* on January 31,

27   2018 ("We oppose this outreach effort in the Jewish and pro-

28

1    Israel community.") and the *New York Times* on February 9,

2    2018 ("We do not approve of these visits by the Jewish

3    organizations to Qatar.").

4    86.    Plaintiff Broidy did not make any public statements against the

5    trips to Qatar, but he and others did privately criticize them with other

6    American Jewish leaders.  Plaintiff Broidy also funded at least two high-

7    profile conferences in Washington, D.C. devoted to scrutiny of the State of

8    Qatar.

9    87.    On information and belief, Plaintiff Broidy's efforts opposing the

10   State of Qatar, and in particular the efforts of Muzin and Stonington on

11   Qatar's behalf, only enhanced Muzin's pre-existing animus against Broidy,

12   which arose from Broidy's successful efforts in 2016 to block Muzin from

13   receiving a highly questionable commission on a large political donation that

14   Muzin believed he had been instrumental in arranging.

15   **IV.    DEFENDANTS TARGET BROIDY**

16
17   88.    In connection with his work for the State of Qatar, Defendant

18   Muzin had weekly meetings at the Embassy of Qatar in Washington, D.C.,

     where he discussed his ongoing efforts.  On information and belief, the

19   agendas for these meetings were set by Defendants Al Thani and Al-Rumaihi,

20   and the meetings began in 2017 in anticipation of the Emir's April 2018 visit

21   to the United States for bilateral meetings with the Trump Administration and

22   visits to Capitol Hill.  On information and belief, at those meetings, Defendant

23   Muzin became increasingly upset about Plaintiff Broidy's efforts to

24   undermine his lobbying for the State of Qatar and felt that these were personal

25   attacks on him.  On information and belief, Defendant Muzin brought up

26
27
28
-- 31 --    Case No. 18-cv-02421-JFW

Plaintiff Broidy in these meetings as an obstacle that needed to be dealt with for his lobbying on behalf of Qatar to succeed.

89.     As Defendant Muzin later admitted:  "Broidy's name comes up in Embassy meetings often."  He also admitted, "I definitely identified him as somebody who, was not, didn't like them too much."  Defendant Muzin also stated: "There's no question I had conversations with them [the Qataris] about Elliott."

90.     The efforts undertaken in September and October 2017 by Defendant Muzin, acting as the agent of the State of Qatar, to influence the United States Jewish community were manifestly unsuccessful.  As alleged above, by and large, American Jewish leaders declined to meet with the Emir of Qatar when he was at the United Nations and declined offers of all-expenses-paid trips to visit Qatar.  Notwithstanding Muzin's lack of success, the State of Qatar nevertheless raised his monthly payment to $300,000 a month in November 2017 – shortly before the attacks on Plaintiffs began.  On information and belief, the increase in Muzin's monthly pay was necessary to support activities related to the hacks for which Muzin had responsibility.

91.     Although Plaintiff Broidy was not the only outspoken critic of the State of Qatar and of Muzin's efforts on its behalf, on information and belief, Defendants the State of Qatar, Al Thani, Al-Rumaihi, Stonington, and Muzin, targeted Plaintiff Broidy specifically because he had exercised his right to speak out on an issue of national and international concern and by doing so, had negatively impacted Qatar's interests.

92.     Thereafter, the Qatari Defendants and the Agent Defendants agreed to engage in and did in fact engage in or coordinate a series of hacks and/or other misappropriation of the private communications, documents,

trade secrets and intellectual property of Plaintiffs, and unlawfully distributed those materials to the media.

## V.   DEFENDANTS EXECUTED A SOPHISTICATED CYBERATTACK ON PLAINTIFFS

### A. Defendants Unlawfully Accessed Plaintiffs' Computer Network, Private Communications, Documents, Trade Secrets And Intellectual Property

93.     On information and belief, sometime prior to December 27, 2017, Defendant State of Qatar acting directly or through the Agent Defendants, retained the GRA Defendants to coordinate an offensive cyber and information operation against Plaintiffs, including by infiltrating Plaintiffs' computer networks in Los Angeles, California and obtaining unauthorized access to Google email accounts of United States persons associated with Plaintiffs.  Servers hosting those accounts are located in California.

94.     On information and belief, the GRA Defendants introduced Defendant State of Qatar to known and unknown threat actors to execute the attacks, and supervised this work and were responsible for the overall execution of the project.

95.     Approximately one month before the cyberattacks against Plaintiffs and their associates began, on information and belief, in October 2017 the GRA Defendants also opened a subsidiary of GRA organized under the laws of Gibraltar and physically located in Doha, Qatar.

96.     On information and belief, the GRA Defendants were actively recruiting new employees within the small community of former U.S. government offensive cyber operatives, and the GRA Defendants made it clear within that community that they had been retained to conduct or coordinate offensive cyber operations on behalf of Defendant State of Qatar.

1. The Rosenzweig Attack

97.     Robin Rosenzweig, a U.S. citizen, serves as legal counsel to Plaintiffs and lives in Los Angeles.  On information and belief, Ms. Rosenzweig has an email account through Gmail, an email service provided by Google LLC ("Google"), a company headquartered in Mountain View, California.  Ms. Rosenzweig's Gmail account contains private communications and requires at least a username and password for access.

98.     On December 27, 2017, Ms. Rosenzweig received an email at her Gmail account that appeared to be an account security alert from Google.  On information and belief, the email used Google trademarks without the permission of Google, including the Google logo and the Gmail logo.  The email was sent from a Gmail address, which had been disguised to look like an authentic security alert from Google.  The email purported to alert Ms. Rosenzweig that the security on her account had been compromised and that she needed to verify or change her account credentials.  When she clicked on the link in the email it directed her to a TinyURL website that appeared as if it was an authentic Google account login page.  TinyURL is a redirecting service that provides shortened URLs that redirects a website visitor to the website associated with the longer URL.  It is known to be used by hackers and scammers to avoid detection and circumvent spam and malware filters. The URL address for that page was http://tinyurl.com/yaw4jmpn. When the TinyURL link was clicked it redirected Ms. Rosenzweig to the following website that contained Google's logo and appeared to be an authentic Google account update page: https://mailchallenge-service-userupdate-myprofile-authsupport-key.userupdate.info/m/pn?tR0Il12=cHpXbG8yeXhyR0lOTTIxdW5KamhMM jln&nrn=SHo5dm5KNHREYVdpbkpFNQ==&cr=SkQ9PQ==&lan=en&rD3c

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

In=&rCv=WGxiZFh2YmRYd3Bt&VrCe2Ph=1&VrCe2Em=.  However, that page was a fraudulent login page that is no longer active.  The TinyURL link has been terminated by TinyURL for being used for spam, fraud, malware, or other illegal activity.

99.    On information and belief, that email was a spearphishing email designed to gain unauthorized access to Ms. Rosenzweig's Google accounts which include the full suite of Google's online products, such as Gmail, Google Drive, Google Calendar, Google Contacts, and YouTube.  Those accounts contained, among other things, personal emails, business emails, usernames and passwords to access other non-Google accounts belonging to Ms. Rosenzweig, including an account on the computer network of Plaintiff BCM.  Without authorization and in violation of Google's Terms of Service, the Defendant attackers used Ms. Rosenzweig's credentials to unlawfully access passwords stored by Ms. Rosenzweig on Google's servers.  Gmail Program Policies and Google's Terms of Service, which are expressly governed by the laws of California, prohibit illegal uses as well as sending unauthorized email of any person without their consent.

100.    On information and belief, Ms. Rosenzweig's Gmail account was accessed and modified unlawfully and without her consent on or around January 3, 2018.  The Defendant attackers modified Ms. Rosenzweig's email account settings so that emails containing "Mail.ru," "viewed," or "alert" were marked as read and moved immediately to her trash.  The Defendant attackers did this to ensure that any legitimate security alerts would not be viewed by Ms. Rosenzweig.  Mail.ru is a Russian email service that publishes an app that can be used to send and receive emails on Mail.ru or other email services like Gmail.  Unbeknownst to Ms. Rosenzweig, on January 4, 2018, Ms. Rosenzweig received a true security alert – that went directly to her trash –

BOIES SCHILLER FLEXNER LLP

1  notifying her that a user or users of the Mail.ru app had obtained access to

2  read, send, delete, and manage Ms. Rosenzweig's Gmail account, all without

3  her awareness or consent.

4        2.  The Mowbray Attack

5        101.  Joel Mowbray is a U.S. citizen and resident of New York, New

6  York.  Prior to December 27, 2017, Mr. Mowbray was known by Defendants

7  to be an associate of Plaintiff Broidy as well as a critic of both the Defendant

8  State of Qatar and Defendant Muzin.

9        102.  On information and belief, Mr. Mowbray has a private Gmail

10  account that he uses to send and receive personal and business emails.  Mr.

11  Mowbray's Gmail account contains private communications and requires at

12  least a username and password for access.  Beginning on or around December

13  27, 2017, the same day as Ms. Rosenzweig was attacked, Mr. Mowbray also

14  began to receive a barrage of spearphishing emails disguised as Google News

15  stories that bore Google trademarks used without Google's permission and

16  were sent through Google's Gmail service in violation of Google's Terms of

17  Service and Gmail's Program Policies.  The spearphishing, news-alert emails

18  contained links purportedly to news stories about Mr. Mowbray's family,

19  discrete projects on which Mr. Mowbray previously worked, and Plaintiff

20  Broidy.  These topics were not the subject of general public awareness but

21  they, and their importance to Mr. Mowbray, were known to Defendant Muzin.

22        103.  On information and belief, when Mr. Mowbray clicked on the

23  link in one of the news stories, it directed him to a shortened URL website,

24  like TinyURL or Bitly, that appeared as if it was an authentic Google account

25  login page.  For example, one of the URL addresses was

26  https://tinyurl.com/yckx3cny.  When this TinyURL link was clicked, it

27  redirected Mr. Mowbray to a website that asked for his Google login

28

BOIES  SCHILLER  FLEXNER  LLP

credentials.  Mr. Mowbray provided his credentials to at least one of these malicious websites that contained Google's trademarks without the permission of Google.  TinyURL has now terminated this website because it has been used for spam, fraud, malware, or other illegal activity.

104.   On information and belief, Mr. Mowbray had two-factor authentication enabled for his Google account on or about December 27, 2017.  Two-factor authentication is an extra layer of security that requires not only a password and username for login, but also something that only that user has available to them, such as a mobile phone or other email address.  Mr. Mowbray's second factor was his mobile phone, which he had set to receive verification text messages or a phone call from Google containing a verification code.

105.   Beginning on or about December 27, 2017, Mr. Mowbray received a call from a United States telephone number purportedly associated with Google and containing a recording providing the verification code for his account.  Contemporaneous with that call from Google, Mr. Mowbray also received from the Defendants several spearphishing text messages and calls from U.S. phone numbers that were purportedly from Google.  These phone numbers are associated with U.S. phone carriers such as Hook Mobile.  These text messages and calls directed Mr. Mowbray to log in to his Gmail account so that he could verify his account.  Mr. Mowbray also received spearphishing text messages such as those pictured below, and phone calls from phone numbers with U.S. area codes and registered to U.S. carriers, such as Hook Mobile, which mimicked two-factor authentication messages and made the phishing emails appear authentic.

BOIES   SCHILLER   FLEXNER   LLP



106.   The Defendant attackers sent Mr. Mowbray these messages because they could not access his Google account without his two-factor authentication code.

107.   On information and belief, Defendants also sent emails to Mr. Mowbray to obtain his two-factor authentication code.  These emails, such as the one pictured below, were sent from a misleading Gmail account with the name "Gmail" and email addresses, such as mymail.securealerts@gmail.com and noreply.secureservicealerts@gmail.com, which were designed to appear as if they were from authentic Google security accounts.  These emails used Google trademarks and logos without the permission of Google.



108.   These spearphishing emails were designed to lure Mr. Mowbray to a malicious website seeking his Google login credentials.  For example, one of the links went to a Bitly URL address: http://bit.ly/2lber5Z.  If the Bitly link had been clicked, it would have redirected Mr. Mowbray to the following website that contained Google's logo and appeared to be an authentic Google account page at the same domain (userupdate.info) as one of the spearphishing emails that Ms. Rosenzweig received seeking her Google login information:

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES  SCHILLER  FLEXNER  LLP

https://authsupport-myprofilelogon-servicemail-userowavalue-key.userupdate.info/m/vc/?tR0Il12=bnpFZ28zcXZwelNOTTIxdW5KamhMMjln&nrn=Vk49PQ==&cr=SkQ9PQ==&lan=en&rD3cIn=&rCv=WGxiZFh2YmRYd3A0&VrCe2Ph=&VrCe2Em. As with Ms. Rosenzweig, this link led to a fraudulent login page that is no longer active. The Bitly link was created on December 27, 2017, which is contemporaneous with the email that Mr. Mowbray received. This Bitly link has been terminated by Bitly for suspicious activity.

### 3. The Executive Assistant Attack

109. Plaintiff Broidy's Executive Assistant ("the Executive Assistant") is a U.S. citizen and resident of Los Angeles, CA. She is an employee of Plaintiff BCM. She has a private Gmail account that she uses to send and receive personal emails. Her Gmail account contains private communications and requires at least a username and password for access.

110. On information and belief, on or around January 14, 2018, just weeks after Ms. Rosenzweig and Mr. Mowbray were attacked, the Executive Assistant began to receive spearphishing emails disguised as Google security alerts, which bore Google trademarks used without Google's permission and were sent through Google's Gmail service in violation of Google's Terms of Service and Gmail's Program Policies.

111. On information and belief, one of the spearphishing emails contained a fictitious security alert with a picture of her face and part of her phone number. The email was sent from a misleading Gmail account with the name "Gmail Account" and the email address noreply.user.secure.services@gmail.com, which had been drafted to look like an authentic security alert from Google. The email purported to alert the Executive Assistant that the security on her account had been compromised

B O I E S   S C H I L L E R   F L E X N E R   L L P

and that she needed to verify or change her Google credentials. When she clicked on the link in the email, it directed her to an Owly address, which redirected her to a website that appeared as if it was an authentic Google account login page. Like TinyURL and Bitly, Owly is a redirecting service that provides shortened URLs that redirect a website visitor to the website associated with the longer URL. It is known to be used by hackers and scammers to avoid detection and circumvent spam and malware filters. The URL address for that page was http://ow.ly/FJZ030hLxof. When the Owly link was clicked, it redirected her to the following website that contains Google's logo and appeared to be an authentic Google account login page: http://loms.96.lt/BDHRov58?platform=hootsuite. However, that page was a fraudulent login page that is no longer active.

4.  The BCM Attack

112.   Plaintiff BCM has an exchange server physically located in Los Angeles, California.  The server allows BCM employees to send and receive business and occasional personal emails.  Plaintiff Broidy, his Executive Assistant, and several other employees all have secure email accounts on the BCM server containing private communications that require at least a username and password for access.

113.   On information and belief, efforts to gain access to Plaintiff BCM's network appear to have commenced as early as January 7, 2018.  The first successful access was gained on January 16, 2018, just two days after the successful spearphishing campaign on Plaintiff Broidy's Executive Assistant. The Defendant attackers maintained unauthorized and unlawful access to the BCM email server until at least February 25, 2018.  During this period, there were thousands instances of unlawful and unauthorized access to corporate email accounts at Plaintiff BCM, including but not limited to unlawful and unauthorized connections to Plaintiff Broidy and his Executive Assistant's email accounts at Plaintiff BCM.

114.   From January 7, 2018 to February 25, 2018, several instances of unlawful and unauthorized access occurred through Virtual Private Networks ("VPNs") that masked the IP addresses from which the attacks originated. VPNs route internet communication through additional networks to hide the original source of the connection.  Some of these VPN connections occurred via IP addresses that are allocated to United States companies that lease them to third parties.  For example, one of the suspicious IP addresses associated with the intrusions into the BCM server was leased from Micfo LLC, a company headquartered in Charleston, South Carolina.

BOIES SCHILLER FLEXNER LLP

115.   On February 14, 2018 and February 19, 2018, unlawful and unauthorized connections originated from an IP address in Qatar.  These two unlawful and unauthorized intrusions into BCM's California email server were not masked by VPNs, even though the connections immediately before and immediately after the access were routed through VPNs, possibly because the VPN failed or because the accessing computer automatically connected to Plaintiff BCM's network before the VPN could be activated.  These connections revealed the actual location of a computer or computers accessing Plaintiff BCM's network from an IP address in Qatar.

116.   These attacks resemble known international attacks by sophisticated cyber-hackers.  Previous attacks against other victims by these same threat actors have involved similar fraudulent news alerts, malicious Google login pages, email addresses designed to resemble legitimate Google security addresses, fraudulent two-factor authentication messages, and the use of Mail.ru to control victims' accounts.  In addition, one of the IP addresses used by the Defendants to access Plaintiffs' servers without authorization has been observed in other known, international attacks by these threat actors.

## VI.   DEFENDANTS EXECUTED A DISINFORMATION CAMPAIGN AGAINST PLAINTIFF BROIDY BY DISSEMINATING THE MATERIALS STOLEN FROM PLAINTIFFS

117.   After unlawfully obtaining Plaintiffs' private communications, emails, documents and intellectual property, the Defendants viewed the stolen documents in an email application on their computers and converted them to PDFs for dissemination to third parties.  In multiple instances, this conversion process resulted in information from the Defendants' computers being transferred as metadata to the PDF documents that were subsequently disseminated to third parties.  Many of the PDFs disseminated to third parties contained time stamps different from the Pacific Time Zone associated with

B O I E S   S C H I L L E R   F L E X N E R   L L P

Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1  the original documents – and instead bear time stamps from the Central and

2  Eastern Time Zones.

3       118.   Upon information and belief, some of the unlawfully obtained

4  documents were given to United States media outlets in hard-copy form by

5  hand-delivery within the United States.

6       119.   On February 24, 2018, Defendants registered the email address

7  "LA.Confidential@mail.com" through the company 1&1 Internet, Inc., which

8  operates in the United States through offices in Chesterbrook, Pennsylvania.

9  Mail.com provides free email addresses akin to Google's Gmail service.  On

10  or around March 1, 2018, Defendants used this address to unlawfully

11  distribute Plaintiffs' stolen emails to a United States journalist employed by a

12  United States-based company.

13       120.   On information and belief, Plaintiffs' stolen emails have also

14  appeared on a website hosted by a United States company, GoDaddy LLC

15  ("GoDaddy"), which is headquartered in Scottsdale, Arizona.  GoDaddy is a

16  domain registrar and web hosting service that sells website domains to users

17  so they may create their own webpage and hosts websites.  Defendants further

18  obfuscated their identity using a registration masking service, Domain by

19  Proxy LLC, which allows a user to replace their own personal information

20  with information belonging to Domain by Proxy LLC for purposes of

21  registration.  Domain by Proxy LLC is a company owned by GoDaddy LLC.

22       121.   On March 1, 2018, the contents of emails stolen from Plaintiffs'

23  California-based computer accounts and servers appeared in the *Wall Street*

24  *Journal* in an article titled, "Trump Ally Was in Talks to Earn Millions in

25  Effort to End 1MDB Probe in U.S."  Additional emails stolen from those

26  California computer accounts and servers were published or reported on in

27

28

BOIES SCHILLER FLEXNER LLP

other media outlets including the *Huffington Post* on March 2, 2018 and the *New York Times* on March 3, 2018 and the BBC on March 5, 2018.

122.   On March 8, 2018, Defendant Muzin demonstrated his knowledge that Plaintiff Broidy had been successfully targeted by the State of Qatar by stating: "I did not cause the Broidy stuff, just because I have information" and "I don't know all the details, but I know that I am hearing repeatedly that there's a lot more coming."

123.   On March 22, 2018, the *New York Times* published a front page article noting that an "anonymous group critical of Mr. Broidy's advocacy of American foreign policies in the Middle East" has been distributing "documents, which included emails, business proposals and contracts," supposedly belonging to Plaintiffs.  On March 23, 2018, *Bloomberg* published an article about Plaintiff Broidy, which noted that it had "received two separate documents this week purporting to be versions" of materials belonging to Plaintiff Broidy.

124.   On March 26, 2018, the *New York Times* published another front page story on Plaintiff Broidy that again acknowledged that it relied on "[h]undreds of pages of Mr. Broidy's emails, proposals and contracts" received from "an anonymous group critical of Mr. Broidy's advocacy of American foreign policies in the Middle East."

125.   Media outlets in the United States and abroad continue to publish – and to threaten to publish – materials stolen from Plaintiffs.  Plaintiffs continue to receive numerous press inquiries concerning such materials.

126.   On information and belief, the State of Qatar, acting through the Agent Defendants, was responsible for disseminating the emails and documents stolen from Plaintiffs' California-based email accounts and servers.

BOIES SCHILLER FLEXNER LLP

127.   On March 19, 2018, Plaintiffs,  through counsel, formally requested that the State of Qatar take appropriate action to halt the attacks on Plaintiffs' emails, documents, and data, to stop Defendants from disseminating Plaintiffs' emails, documents, and data, and/or to assist Plaintiffs in halting dissemination if the hack had been conducted by a rogue agent of the State of Qatar.  However, to date, no response has been received to that letter.

128.   On information and belief, the  Qatari Defendants, the GRA Defendants and the Agent Defendants, while in the United States, conspired to unlawfully access Plaintiffs' private communications, documents, trade secrets and intellectual property located in California, and to disseminate that information to the media as retribution for Plaintiff Broidy's public and private criticisms of  Defendants State of Qatar and Muzin, including his direct criticisms of the State of Qatar to the President of the United States.

129.   Upon information and belief, the Qatari Defendants, the GRA Defendants and the Agent Defendants also carried out that conspiracy and unlawfully accessed Plaintiffs' private communications, documents, trade secrets and intellectual property located in California, and further engaged in distribution of that information to media outlets in both the United States and abroad.  Upon information and belief, many of the instances of unlawful distribution of illegally obtained took place within the United States.

130.   The actions of the Qatari Defendants, the GRA Defendants and the Agent Defendants as alleged herein were specifically proscribed by law and were not matters left to the discretion, choice or judgment of a sovereign state.

### B. Defendants Muzin and Stonington Implicated Themselves With Respect To The Dissemination Of Materials Unlawfully Obtained From Plaintiffs' Email Accounts And Servers

131.   Upon information and belief, on January 28, 2018, prior to the first public disclosure in the United States of materials stolen from Plaintiffs, Ben Wieder, a reporter at *McClatchy*, a Washington D.C. publication focused on politics, emailed Defendant Muzin and commented to Defendant Muzin that it was "time to rock."

132.   Weider's article, "GOP Leans on Rainmaker who Courts Controversy on Two Continents," which appeared in *McClatchy* on February 7, 2018, discussed Plaintiff Broidy's political activities in the United States and his business interests in Romania.  The article did not mention either of Muzin's clients at the time (Qatar and Albania).  Indeed, the article did not mention the Middle East at all.  There is no apparent connection between Wieder's January 28th remark to Muzin (that it was "time to rock") and the February 7th article.

133.   On February 27, 2018, Defendant Muzin demonstrated further foreknowledge of press reports about Plaintiff Broidy based on illegally obtained information when he informed Mowbray that there were "reporters circulating around" to focus on issues relating to Plaintiff Broidy, the Middle East and George Nader.  (In that same conversation, Defendant Muzin also referred to "all the shit" that he believed Plaintiff Broidy and Mowbray had "done to" him.)

134.   The first published report of any alleged connection between Nader and Plaintiff Broidy did not occur until March 3, 2018.  Unless Defendant Muzin possessed or knew about documents and information contained in documents unlawfully obtained from Plaintiffs' servers, Muzin would not have been a position to know about the particular issues relating to

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1  Plaintiff Broidy, the Middle East and Nader that were about to become the
2  focus of media attention.

3      135.   On March 5, 2018, Defendant Muzin informed Mowbray that
4  there was "more stuff coming" from the *New York Times.*

5      136.   In the same meeting with Mowbray, Defendant Muzin discussed
6  meetings he had with his client the State of Qatar while serving as a registered
7  agent of Qatar.  Muzin told Mowbray: "Broidy's name comes up in Embassy
8  meetings often" and "I definitely identified him as somebody who, was not,
9  didn't like them too much."  Muzin further acknowledged that everyone he
10 "fingered" was "in danger."  He warned Mowbray that Mowbray and Plaintiff
11 Broidy needed "to be very careful," that the State of Qatar is "going after
12 you," and that "Honestly, I know they're after you and Broidy."

13     137.   In the same meeting, when Mowbray accused Defendant Muzin
14 of targeting Plaintiff Broidy for the State of Qatar and assisting in the hacks
15 on Plaintiffs and attempted hacks on Mowbray, Muzin responded "I was
16 doing my job."  Somewhat belatedly, Muzin stated that he realized that he
17 needed "to be a little more careful" when he spoke to Mowbray.

18     138.   On March 22, 2018, as foretold by Defendant Muzin on March
19 5th, the *New York Times* published a front page article noting that an
20 "anonymous group critical of Mr. Broidy's advocacy of American foreign
21 policies in the Middle East" has been distributing "documents, which included
22 emails, business proposals and contracts," supposedly belonging to Plaintiffs.
23 On March 23, 2018, *Bloomberg* published an article about Plaintiff Broidy
24 and noted that it had "received two separate documents this week purporting
25 to be versions" of documents belonging to Plaintiff Broidy.  On March 26,
26 2018, the *New York Times* published another front page story on Plaintiff
27 Broidy that again acknowledged that it relied on "[h]undreds of pages of Mr.

28
Case No. 18-cv-02421-JFW

BOIES SCHILLER FLEXNER LLP

Broidy's emails, proposals and contracts" received from "an anonymous group critical of Mr. Broidy's advocacy of American foreign policies in the Middle East."

139.   The actions of the Agent Defendants, the GRA Defendants and Defendants Al Thani and Al-Rumaihi described herein are not subject to derivative sovereign immunity because, among other things, the State of Qatar is not entitled to sovereign immunity.  In addition, although the actions of the Agent Defendants, the GRA Defendants and Defendants Al Thani and Al-Rumaihi originated in a conspiracy with the State of Qatar, upon information and belief, the State of Qatar left to the Agent Defendants, the GRA Defendants and Defendants Al Thani and Al-Rumaihi discretion and choice as to the manner in which they would carry out their parts of the unlawful conspiracy.  As such, for these and other reasons, they are not entitled to derivative sovereign immunity for their conduct in furtherance of the conspiracy.

## CAUSES OF ACTION

### FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

#### Computer Fraud and Abuse Act
#### 18 U.S.C. §§ 1030(a)(2)(C) & (a)(5)

140.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

141.   On information and belief, Defendant the State of Qatar, by itself and/or through the Agent Defendants and the GRA Defendants, accessed or caused to be accessed Plaintiffs' servers, and emails and documents physically located on those servers, at BCM's offices in Los Angeles, California, as well as Google servers located in California, specifically by accessing or causing to

BOIES SCHILLER FLEXNER LLP

1 be accessed accounts associated with Plaintiff Broidy and other BCM

2 employees.

3     142.   Said Defendants first compromised Rosenzweig's personal email

4 account by a targeted spearphishing email in December 2017, and thereafter,

5 beginning on or about January 16, 2018, and without authorization, accessed

6 BCM's servers, and emails and documents physically located on those

7 servers, including the accounts Plaintiff Broidy and other BCM employees.

8 Defendants acted with knowledge that they were accessing these accounts

9 without Plaintiffs' authorization.

10     143.   Defendants engaged in deliberate spearphishing attacks on

11 Rosenzweig, Mowbray and Plaintiff Broidy's Executive Assistant (as well as

12 attempted spearphishing attacks on Mowbray) and used information gained

13 from the attacks on Rosenzweig and Plaintiff Broidy's Executive Assistant to

14 obtain unauthorized access to Plaintiffs' servers, and emails and documents

15 physically located on those servers located in Los Angeles, California.

16 Defendants also implemented identifiable obfuscation techniques to engage in

17 ultimately unsuccessful efforts to hide the origin of their spearphishing attacks

18 and unauthorized access to Plaintiffs' servers, and emails and documents

19 physically located on those servers and the servers of Google.

20     144.   On information and belief, by engaging in this conduct,

21 Defendants accessed "protected computers," defined by 18 U.S.C.

22 § 1030(e)(2)(B) as computers "used in or affecting interstate or foreign

23 commerce or communication."

24     145.   Upon information and belief, as a direct result of the actions of

25 Defendants, Plaintiffs suffered damage, including harm to the integrity or

26 availability of their California-based servers, and emails and documents

27 physically located on those servers.

28

BOIES SCHILLER FLEXNER LLP

B O I E S   S C H I L L E R   F L E X N E R   L L P

146.   On information and belief, as a direct result of the actions of Defendants, Plaintiffs also suffered loss, including but not limited to the investigation costs associated with identifying the cyber-attacks and repairing the integrity of Plaintiffs' servers after the attacks, including by hiring forensic investigators and data security experts, and attorneys, among other losses, in an amount to be proven at trial, but in any event, in excess of $5,000 and, together with the other alleged damages, in excess of $75,000, exclusive of interest and costs.

147.   Upon information and belief, Defendants intentionally caused such damage to Plaintiffs.

148.   Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an increased risk of further theft, and an increased risk of harassment.  Such injury cannot be compensated by monetary damages.  Plaintiffs accordingly seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

149.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

## FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS

### California Comprehensive Computer Data Access and Fraud Act Cal. Pen. Code § 502

150.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

151.   On information and belief, Defendant the State of Qatar, acting by itself and/or through the Agent Defendants, violated § 502(c)(2) by

Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES SCHILLER FLEXNER LLP

knowingly accessing and without permission taking and making use of programs, data, and files from Plaintiffs' and Google's computers, computer systems or computer networks, all of which were located in California.

152. On information and belief, Defendants have violated § 502(c)(4) by knowingly accessing and without permission altering Plaintiffs' data, which resided in Plaintiffs' and Google's computers, computer systems or computer networks, all of which were located in California.

153. On information and belief, Defendants have violated § 502(c)(6) by knowingly and without permission providing or assisting in providing, a means of accessing Plaintiffs' and Google's computers, computer systems or computer networks, all of which were located in California.

154. On information and belief, Defendants have violated § 502(c)(7) by knowingly and without permission accessing, or causing to be accessed, Plaintiffs' and Google's computers, computer systems or computer networks, all of which were located in California.

155. On information and belief, Defendants have violated § 502(c)(9) by knowingly and without permission using the Internet domain name or profile of another individual in connection with the sending of one or more email messages and thereby damaging Plaintiffs' and Google's computers, computer systems or computer networks, all of which were located in Los Angeles, California.

156. On information and belief, Defendants knowingly and unlawfully accessed or caused to be accessed computers, computer systems or computer networks at Plaintiff BCM and Google, all of which were located in California. Defendants knew that at the time that they did not have the authorization to take such action. This knowledge is demonstrated by Defendants' use of spearphishing attacks and attempted spearphishing attacks,

1   as well as identifiable obfuscation techniques in an attempt to hide the origin

2   of their cyber-attacks.

3        157.   On information and belief, Defendants engaged in these actions

4   as part of a targeted attack on Plaintiff Broidy, who is an outspoken critic of

5   the Qatari government.

6        158.   On information and belief, as a direct and proximate result of

7   Defendants' unlawful conduct, Plaintiffs have been damaged in an amount to

8   be proven at trial, but in any event, in excess of $75,000 exclusive of interest

9   and costs, including but not limited to the investigation costs associated with

10  identifying the cyber-attacks; verifying the integrity of the computers,

11  computer systems or computer networks, computer programs and/or computer

12  data, and/or data; and repairing the integrity of Plaintiffs' computer systems

13  after the attack, including by hiring forensic investigators and data security

14  experts.  Plaintiffs are also entitled to recover their attorneys' fees pursuant to

15  § 502(e).

16       159.   Additionally, Defendants' actions were willful and malicious,

17  such that Plaintiffs are also entitled to punitive damages under § 502(e)(4).

18       160.   Defendants' conduct has caused, and will continue to cause

19  Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an

20  increased risk of further theft, and an increased risk of harassment.  Such

21  injury cannot be compensated by monetary damages.  Plaintiffs accordingly

22  seek an injunction prohibiting Defendants from engaging in the conduct

23  described in the Cause of Action.

24       161.   Plaintiffs further seek a declaration that Defendants' conduct as

25  described in this First Amended Complaint is a violation of this Cause of

26  Action.

27

28

B O I E S   S C H I L L E R   F L E X N E R   L L P

## FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS

### Receipt and Possession of Stolen Property
### in Violation of Cal. Pen. Code § 496

162.    Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

163.    On information and belief, Defendant the State of Qatar, acting by itself and/or through the Agent Defendants, received property, including private communications, documents, trade secrets and intellectual property housed on Plaintiffs' and Google's servers, and in emails and documents physically located on those servers, all of which were located in California, and were stolen from Plaintiffs in California or otherwise obtained from Plaintiffs in California in a manner that constitutes theft.

164.    Upon information and belief, in at least some instances, Defendants were in the United States when they received or possessed the unlawfully obtained information.

165.    Upon information and belief, at least some instances of the unlawful receipt and possession of Plaintiffs stolen information occurred in the United States.

166.    On information and belief, as a result of Defendants' actions, Plaintiffs have been damaged in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs, and are entitled to treble damages, the costs of bringing this suit, and attorneys' fees under § 496(c).

167.    Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an increased risk of further theft, and an increased risk of harassment.  Such

BOIES  SCHILLER  FLEXNER  LLP

1   injury cannot be compensated by monetary damages.  Plaintiffs accordingly

2   seek an injunction prohibiting Defendants from engaging in the conduct

3   described in the Cause of Action.

4       168.   Plaintiffs further seek a declaration that Defendants' conduct as

5   described in this First Amended Complaint is a violation of this Cause of

6   Action.

7   ### FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

8   **Invasion of Privacy by Intrusion**
**Upon Seclusion**

9

10      169.   Plaintiffs incorporate and adopt by reference the allegations

11  contained in each and every preceding paragraph of this First Amended

12  Complaint.

13      170.   Plaintiffs have a legally protected privacy interest in their

14  personal information, including in information contained on Plaintiffs' and

15  Google's servers, and in emails and documents physically located on those

16  servers, all of which were located in California, and had a reasonable

17  expectation that their information would remain private.  Plaintiffs' accounts

18  were password protected, and at no time did Plaintiffs provide those

19  passwords, or the contents of their emails, to the public.

20      171.   On information and belief, Defendant the State of Qatar, acting

21  by itself and/or through the Agent Defendants, hacked, stole, doctored, and

22  disseminated to others the personal and private information of Plaintiffs.

23  Defendants clearly did so without permission and with deliberate intent to

24  access and obtain Plaintiffs' personal and private information.  At no point did

25  Plaintiffs authorize Defendants to hack, steal, doctor, or disseminate their

26  personal and private information.  Upon information and belief, at least some

27

28

BOIES  SCHILLER  FLEXNER  LLP

1   of the unlawful disseminations of Plaintiffs' personal information occurred

2   completely within the United States

3       172.   On information and belief, Defendants' intentional intrusion

4   upon Plaintiffs' seclusion was highly offensive to Plaintiffs and would be

5   unjustifiable and highly offensive to an ordinary, reasonable person.

6       173.   The public disclosure of Plaintiffs' personal information has

7   caused, and will continue to cause, Plaintiffs injury, including reputational

8   harm, an increased risk of further theft, and an increased risk of harassment.

9       174.   Plaintiffs will continue to suffer this injury as long as their

10  personal information is available to Defendants and, subsequently, to media

11  organizations and the world at large.

12      175.   The public disclosure of Plaintiffs' personal information has also

13  caused them to suffer monetary damages, at an amount to be proven at trial,

14  but in any event, in excess of $75,000, exclusive of interest and costs.

15  Because Defendants' actions are intolerable in a civilized community,

16  Plaintiffs also seek punitive damages.

17      176.   Defendants' conduct has caused, and will continue to cause

18  Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an

19  increased risk of further theft, and an increased risk of harassment.  Such

20  injury cannot be compensated by monetary damages.  Plaintiffs accordingly

21  seek an injunction prohibiting Defendants from engaging in the conduct

22  described in the Cause of Action.

23      177.   Plaintiffs further seek a declaration that Defendants' conduct as

24  described in this First Amended Complaint is a violation of this Cause of

25  Action.

26

27

28

BOIES SCHILLER FLEXNER LLP

## <u>FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>

### Conversion

178.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

179.   Plaintiffs had ownership of and the right to possess their property, including private communications, documents, trade secrets and intellectual property, all of which were located in California.

180.   Defendant the State of Qatar, acting by itself and/or through the Agent Defendants, converted or disposed of Plaintiffs' property including the rights to that property, by unlawfully accessing, or at a minimum receiving that property, including private communications, documents, trade secrets and intellectual property with knowledge that it had been unlawfully taken, and disseminating them to the media in the United States and abroad.

181.   Upon information and belief, some instances of unlawful access and theft of Plaintiffs' property occurred completely within the United States.

182.   Upon information and belief, at least some of the unlawful receipt and dissemination of Plaintiffs' personal information occurred completely within the United States.

183.   Plaintiffs did not provide permission to access, receive or disseminate their exclusive personal and private information.

184.   The public disclosure of Plaintiffs' personal information has also caused them to suffer monetary damages, at an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

185.   Additionally, Defendants' actions were willful and malicious, such that Plaintiffs are also entitled to punitive damages.

186.   Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an increased risk of further theft, and an increased risk of harassment.  Such injury cannot be compensated by monetary damages.  Plaintiffs accordingly seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

187.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

## FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

### Stored Communications Act
### 18 U.S.C. §§ 2701-12

188.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

189.   Plaintiffs are "persons" within the meaning of 18 U.S.C. §§ 2510(6) and 2707(a).

190.   Defendants willfully and intentionally accessed without authorization a facility through which an electronic communication service is provided, namely, BCM's computer systems, including its email servers, as well as Google's servers, thereby obtaining access to wire or electronic communications while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a).

191.   As a result of Defendants' willful and intentional violations, Plaintiffs have suffered damages and, as provided for in 18 U.S.C. § 2707, are entitled to an award of the greater of the actual damages suffered or the

BOIES   SCHILLER   FLEXNER   LLP

statutory damages, punitive damages, attorneys' fees and other costs of this action, and appropriate equitable relief.

192.   Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an increased risk of further theft, and an increased risk of harassment.  Such injury cannot be compensated by monetary damages.  Plaintiffs accordingly seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

193.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

### FOR A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

### Digital Millennium Copyright Act
### 17 U.S.C. § 1201 *et seq.*

194.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

195.   Plaintiffs' computer networks and files contained information subject to protection under the copyright laws of the United States that were illegally accessed by Defendants without authorization.  These materials included, but were not limited to, presentations, proprietary business plans and proposals, and strategic correspondence.

196.   Access to the copyrighted material contained on Plaintiffs' computer networks and email accounts was controlled by technological measures, including firewalls, antivirus software, and measures restricting access to users with valid credentials and passwords.

BOIES SCHILLER FLEXNER LLP

197.   Defendants conducted a targeted attack to circumvent these technological measures by stealing usernames and passwords from authorized users.  Defendants sent spearphishing emails containing links to malicious websites designed to trick users into providing usernames and passwords.  Defendants used the information they obtained from their spearphishing attacks to gain unauthorized access to Plaintiffs' computer networks and email accounts.

198.   Defendants' conduct caused Plaintiffs significant damages, including, but not limited to, damage resulting from harm to Plaintiffs' computers, loss in the value of Plaintiffs' trade secrets and proprietary business information, and harm to the business.

199.   As a result, Plaintiffs are entitled to the greater of their actual damages or statutory damages as provided by 17 U.S.C. § 1203, in an amount to be proven at trial.  Plaintiffs are further entitled to attorneys' fees and costs as provided by 17 U.S.C. § 1203.

200.   Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an increased risk of further theft, and an increased risk of harassment.  Such injury cannot be compensated by monetary damages.  Plaintiffs accordingly seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

201.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

## <u>FOR AN EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>

### California Uniform Trade Secrets Act
### Cal. Civ. Code § 3426 *et seq.*

BOIES SCHILLER FLEXNER LLP

202.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

203.   The California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq.*, prohibits the misappropriation of any "trade secret."

204.   Defendants misappropriated a "trade secret" as defined by the CUTSA to include "information, including a formula, pattern, compilation, program, device, method, technique, or process, that:  (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code. § 3426.1(d).

205.   The BCM server stored trade secrets including but not limited to highly confidential business plans and proposals, research supporting those plans and proposals including costs and service projections, information concerning business strategies and opportunities, and contacts for important business relationships. These trade secrets are of immense value to Plaintiffs.

206.   Plaintiffs take and have taken reasonable measures to keep this information secret.  For example, Plaintiffs have always maintained their information on secured servers that are protected by passwords, firewalls, and antivirus software.

207.   Plaintiffs' trade secrets derive independent actual and potential economic value from not being generally known or available to the public or other persons who can obtain economic value from their disclosure or use.

208.   Plaintiffs' trade secrets have significant value, resulting from significant investment of time and resources.

BOIES SCHILLER FLEXNER LLP

209.   Plaintiffs have made, and continue to make, efforts that are reasonable under the circumstances to maintain the secrecy of their trade secrets.

210.   Defendants improperly disclosed Plaintiffs' trade secrets without Plaintiffs' consent when they widely disseminated those trade secrets to media organizations for publication and at the time of such disclosure, knew or had reason to know that the information disclosed consisted of trade secrets.

211.   As a direct consequence of Defendants' misappropriation, Plaintiffs have suffered damages, which include, but are not limited to, damage resulting from harm to Plaintiffs' computers, servers, and accounts, loss in the value of Plaintiffs' trade secrets and business information, and harm to Plaintiffs' business, in an amount to be proven at trial.

212.   As a direct consequence of Defendants' unlawful misappropriation, Defendants have unjustly benefited from their possession of Plaintiffs' trade secrets.

213.   In misappropriating Plaintiffs' trade secrets, Defendants acted willfully and maliciously.  Plaintiffs are thus entitled to exemplary damages under Section 3426.3(c) of the Civil Code.  Plaintiffs are also entitled to reasonable attorneys' fees and costs under Section 3426.4 of the Civil Code.

214.   Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an increased risk of further theft, and an increased risk of harassment.  Such injury cannot be compensated by monetary damages.  Plaintiffs accordingly seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

215.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

### FOR A NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

**Misappropriation of Trade Secrets In Violation of the Defend Trade Secrets Act**

**18 U.S.C. § 1836 *et seq.***

216.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

217.   The materials that Defendants stole from Plaintiffs' and Google's computer systems include trade secrets within the meaning of 18 U.S.C. § 1839.

218.   The BCM server stored trade secrets including but not limited to highly confidential business plans and proposals, research supporting those plans and proposals including costs and service projections, information concerning business strategies and opportunities, and contacts for important business relationships. These trade secrets are of immense value to Plaintiffs.

219.   Plaintiffs take and have taken reasonable measures to keep this information secret.  For example, Plaintiffs have always maintained their information on secured servers that are protected by passwords, firewalls, and antivirus software.

220.   Plaintiffs' trade secrets were related to products or services used in, or intended for use in, interstate or foreign commerce.

221.   Defendants acquired Plaintiffs' trade secrets knowing or having reason to know that the trade secrets were acquired by improper means. Defendants also disclosed, or aided in the disclosure of, the trade secrets on

BOIES  SCHILLER  FLEXNER  LLP

1 multiple occasions by sharing those trade secrets with media organizations, as

2 discussed herein, while knowing or having reason to know that the trade

3 secrets were acquired by improper means.

4     222.   As a direct consequence of Defendants' misappropriation,

5 Plaintiffs have suffered damages, which include, but are not limited to,

6 damage resulting from harm to Plaintiffs' computers and servers, loss in the

7 value of Plaintiffs' trade secrets and business information, and harm to

8 Plaintiffs' business, in an amount to be proven at trial.

9     223.   Furthermore, as a direct consequence of Defendants' unlawful

10 misappropriation, Defendants have unjustly benefited from their possession of

11 Plaintiffs' trade secrets.

12     224.   In misappropriating Plaintiffs' trade secrets, Defendants acted

13 willfully and maliciously.  Plaintiffs are thus entitled to exemplary damages

14 under 18 U.S.C. § 1836(b)(3).

15     225.   In misappropriating Plaintiffs' trade secrets, Defendants acted

16 willfully and maliciously.  Plaintiffs are thus entitled to exemplary damages

17 and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3).

18     226.   Defendants' conduct has caused, and will continue to cause

19 Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an

20 increased risk of further theft, and an increased risk of harassment.  Such

21 injury cannot be compensated by monetary damages.  Plaintiffs accordingly

22 seek an injunction prohibiting Defendants from engaging in the conduct

23 described in the Cause of Action.

24     227.   Plaintiffs further seek a declaration that Defendants' conduct as

25 described in this First Amended Complaint is a violation of this Cause of

26 Action.

27

28

BOIES SCHILLER FLEXNER LLP

## <u>FOR A TENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>

### Civil Conspiracy

228.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

229.   On information and belief, Defendants willfully, intentionally, and knowingly agreed and conspired with each other and with others to engage in the wrongful conduct alleged herein, including but not limited to

a. Intentionally accessing Plaintiffs' and Google's servers, and emails and documents physically located on those servers accounts without authorization and then stealing and/or doctoring Plaintiffs' data and emails, in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C) & (a)(5);

b. Knowingly accessing or causing to be accessed, and without permission taking, altering, and making use of Plaintiffs' and Google's programs, data, and files from Plaintiffs' computers, computer systems or computer network, and/or knowingly and without permission providing or assisting in providing a means of accessing Plaintiffs' and Google's computers, computer systems or computer network, in violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502;

c. Intentionally receiving stolen property, in violation of Cal. Pen. Code § 496;

Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIS SCHILLER FLEXNER LLP

d.  Invading Plaintiffs' reasonable privacy interests and then publicly disseminating Plaintiffs' private information in a manner that is highly offensive to a person of reasonable sensibilities;

e.  Taking and converting Plaintiffs' exclusive private and personal property without permission and with deliberate intent to access and obtain Plaintiffs' personal and private information;

f.  Willfully and intentionally accessing without authorization a facility through which an electronic communication service is provided, namely, BCM's computer systems, including its email servers, and thereby obtaining access to wire or electronic communications while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a);

g.  Accessing copyrighted material contained on Plaintiffs' computer networks and email controlled by technological measures, in violation of 17 U.S.C. § 1201 *et seq.*; and/or

230.  Misappropriating Plaintiffs' trade secrets in violation of Cal Civ. Code § 3426 *et seq.* and 18 U.S.C. § 1836 *et seq.*  On information and belief, Defendants performed the acts alleged pursuant to, and in furtherance of, their agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, and/or adopting the wrongful acts of others.

231.  On information and belief, Defendants expressly or tacitly agreed to, at the very least:

a.  Devise and execute a scheme to access Plaintiffs' computers, computer systems or computer network without permission, and to take, convert, alter, obtain, and use Plaintiffs' property,

BOIES  SCHILLER  FLEXNER  LLP

including private communications, documents, trade secrets and intellectual property;

b. Transfer and then disseminate the stolen private data; and/or

c. Access, receive, and/or possess the stolen private information, all with the intent to harm Plaintiff Broidy, a private United States citizen residing in California.

232.   On information and belief, Defendants, with full knowledge that they were engaged in wrongful actions, deliberately accessed, received, possessed, stored, and helped to disseminate Plaintiffs' stolen property, including private communications, documents, trade secrets and intellectual property.

233.   On information and belief, Defendants also had meetings wherein targeting Plaintiff Broidy was discussed.

234.   On information and belief, Defendants' agreement was both explicit and tacit.  In particular, those Agent Defendants who were registered agents of the State of Qatar under FARA, as well as unregistered agents of the State of Qatar, were incentivized to do the bidding of the State of Qatar and engage in any acts that would further the overall scheme.

235.   Upon information and belief, the conspiracy was agreed to within the United States, and at least one step in furtherance of the conspiracy occurred within the United States.

236.   On information and belief, Plaintiffs have been injured and have suffered monetary damages as a result of Defendants' conspiratorial actions in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

237.   Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an

Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES SCHILLER FLEXNER LLP

increased risk of further theft, and an increased risk of harassment. Such injury cannot be compensated by monetary damages. Plaintiffs accordingly seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

238.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

## **REQUEST FOR RELIEF**

239.   Plaintiffs repeat and re-allege the allegations contained in each and every preceding paragraph of this Complaint.

240.   Plaintiffs request that this Court order the following relief:

    a.   Grant judgment in favor of Plaintiffs and against Defendants;

    b.   Declare that Defendants' conduct constitutes violations of the statutes and common law cited herein;

    c.   Grant all appropriate injunctive relief;

    d.   Award Plaintiffs an appropriate amount in monetary damages as determined at trial, including pre- and post-judgment interest, and any treble damages to which Plaintiffs are entitled under Cal. Pen. Code § 496;

    e.   Award Plaintiffs punitive damages under 18 U.S.C. § 2707, 18 U.S.C. § 1836(b)(3), Cal. Civ. Code § 3426.3(c), and Cal. Pen. Code § 502, as well as under Plaintiffs' claims for invasion of privacy by intrusion upon seclusion, and conversion;

BOIES SCHILLER FLEXNER LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

f.  Award Plaintiffs attorneys' fees and the costs of bringing this action; and

g.  Grant Plaintiffs such other relief as is just and appropriate.

BOIES SCHILLER FLEXNER LLP

Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: May 24, 2018

Respectfully submitted,

BOIES SCHILLER FLEXNER LLP

By: _____

LEE S. WOLOSKY

*Counsel for Plaintiffs*