**BOIES SCHILLER FLEXNER LLP**
~~Travis LeBlanc, SBN 251097~~
~~tleblanc@bsfllp.com~~
~~435 Tasso Street, Suite 205~~
~~Palo Alto, California 94301~~
~~Phone: (650) 445-6400 /Fax: (650) 329-8507~~

David K. Willingham, SBN 198874
dwillingham@bsfllp.com
725 S Figueroa Street~~,~~
~~31st Floor~~
Los Angeles, California 90017
31st Floor
Phone: (213) 629-9040 ~~/~~
Fax: (213) 629-9022

~~Lee S. Wolosky (pro hac vice pending)~~
~~lwolosky@bsfllp.com~~
~~Robert J. Dwyer (pro hac vice pending)~~
~~rdwyer@bsfllp.com~~
~~575 Lexington Ave., 7th Floor~~
~~New York, NY 10022~~
~~Phone: (212) 446-2300 /Fax: (212) 446-2350~~

Amy L. Neuhardt (pro hac vice ~~pending~~)
aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Phone: (202) 237-2727 ~~/~~

Fax: (202) 237-6131

~~LAW OFFICE OF OMAR K. QUDRAT~~
~~Omar K. Qudrat (pro hac vice pending)~~
~~43 West 43rd Street, Suite 235~~
~~New York, NY 10036-7424~~

*Counsel for Plaintiffs*

Lee S. Wolosky (*pro hac vice*)
lwolosky@bsfllp.com
Robert J. Dwyer (*pro hac vice*)
rdwyer@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Phone: (212) 446-2300
Fax: (212) 446-2350

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

BROIDY CAPITAL MANAGEMENT LLC~~,~~ and ELLIOTT BROIDY, ~~and ROBIN ROSENZWEIG,~~

      Plaintiffs,

      v.

STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, GLOBAL RISK ADVISORS LLC, KEVIN CHALKER, DAVID

Case No. ~~2:~~18-cv-~~2421~~02421-JFW

**FIRST AMENDED** COMPLAINT AND DEMAND FOR JURY TRIAL

The Honorable John F. Walter

Style Definition: Heading 1: Font: 14 pt, Underline, Centered, Indent: Left: 0.5", Space After: 0 pt, No bullets or numbering

Style Definition: Heading 2: Font: Times New Roman Bold, 14 pt, Bold, Indent: Left: All caps, Indent: Left: 0.25", Space Before: 12 pt, Numbered + Level: 1 + Numbering Style: I, II, III, … + Start at: 1 + Alignment: Right + Aligned at: 0.5" + Indent at: 0.75"

Style Definition: Heading 3: Font: Times New Roman, 14 pt, Bold, Indent: Left: 0.5", Space After: 0 pt, Line spacing: Exactly 12 pt, Numbered + Level: 1 + Numbering Style: A, B, C, … + Start at: 1 + Alignment: Left + Aligned at: 1.75" + Indent at: 2", Tab stops: Not at 1.75"

Style Definition: Heading 4: Font: Times New Roman, 14 pt, Not Bold, Underline, Indent: Left: 1", Space After: 0 pt, Line spacing: Exactly 12 pt, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 2.25" + Indent at: 2.5", Tab stops: Not at 1.75"

Style Definition: Heading 5: Indent: Left: 2.5", Tab stops: Not at 2.25"

Style Definition: Heading 6: Indent: Left: 3", Tab stops: Not at 2.75"

Style Definition: Heading 7: Indent: Left: 3.5", Tab stops: Not at 3.25"

Style Definition: Heading 8: Indent: Left: 4", Tab stops: Not at 3.75"

Style Definition: Heading 9: Indent: Left: 4.5", Tab stops: Not at 4.25"

Style Definition: List Paragraph: Font: 14 pt, Indent: Left: 0", First line: 0.5", Space Before: 0 pt, After: 0 pt, Add space between paragraphs of the same style, Line spacing: Exactly 24 pt, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 1" + Indent at: 1.25"

Formatted: Font: Bold

Formatted: Font: 14 pt, Font color: Auto

Formatted: Font color: Auto

Formatted: Normal

Formatted: Normal (Web), Line spacing: Exactly 12 pt

Formatted: Normal, Line spacing: single

Formatted: Space After: 0 pt, Line spacing: single

Formatted: Left: 1.4", Right: 0.5", Top: 1", Bottom: -0.68", Section start: Continuous, Footer distance from edge: 0.2", Different first page header

Formatted: Line spacing: single

Formatted: Line spacing: single

Formatted: Line spacing: single

MARK POWELL, MOHAMMED BIN HAMAD BIN KHALIFA AL THANI, AHMED AL-RUMAIHI, and DOES 1-10,

     Defendants.

Case No.
COMPLAINT AND DEMAND FOR JURY TRIAL

Formatted Table

Formatted: Right

Formatted

Plaintiffs Broody Capital Management LLC, ("BCM") and Elliott Broidy, and Robin Rosenzweig, ("Broidy"), by and through their attorneys Boies Schiller Flexner LLP, bring this action seeking injunctive relief and monetary damages against Defendants the State of Qatar, Stonington Strategies LLC ("Stonington"), Nicolas D. Muzin ("Muzin"), Global Risk Advisors LLC ("GRA"), Kevin Chalker ("Chalker"), David Mark Powell ("Powell," and together with Chalker and GRA the "GRA Defendants"), Mohammed bin Hamad bin Khalifa al Thani ("Al Thani"), Ahmed al-Rumaihi ("Al-Rumaihi," and together with al Thani and the State of Qatar, the "Qatari Defendants"), and Does 1-10, for Defendants' unlawful conduct, as set forth below. Defendants Stonington, Muzin, and Does 1-10 are collectively referred to herein as the "Agent Defendants."[1]

Formatted: Font: Times New Roman

Formatted: Heading 1, Left, Indent: First line: 0.5", Line spacing: single

Formatted: Font: Not Bold

## NATURE OF THE ACTION

1. This is a case about a hostile intelligence operation undertaken by a foreign presents the issue of whether a nation on the territory of the United Statesstate can orchestrate and execute a criminal conspiracy directed against successful, influential a United States citizen on United States citizens soil and then invoke sovereign immunity to avoid liability, accountability, and exposure.

2. Defendant State of Qatar reacted after neighboring Middle Eastern countries sanctioned, embargoed and isolated Qatar commercially and diplomatically in June 2017 for its support of terrorist organizations, and after Qatar's subsequent shunning by President Trump, by launching a wide-ranging and extremely well-resourced effort to influence public opinion in the

---

[1] The GRA Defendants, Does 1-10 and Defendants Muzin, Stonington and Al-Rumaihi, are sometimes referred to herein as the "Agent Defendants."

Formatted Table

B O I E S   S C H I L L E R   F L E X N E R   L L P

United States.   Defendants Al Thani and Al-Rumaihi, a Qatari operative present in the United States, were the architect of these efforts, which included (among other things) initiatives to attack and discredit those who have~~had~~ spoken out against ~~that country's support for terrorism and who have entered into significant business relationships relating to defense and counterterrorism with a rival nation.  The purpose of the operation appears to have been to diminish the influence of~~ Qatar, and – according to court documents – efforts to bribe individuals close to President Trump.

3.     Defendant State of Qatar (which as a principal is bound by the actions and knowledge of its agents) hired numerous United States agents at a cost of millions of dollars, including by entering into specific agreements with those agents for those agents to provide public relations, consultancy, and related services.  Some of those agents disclosed their work for Qatar by making filings pursuant to the Foreign Agents Registration Act (such as Defendants Stonington and Muzin) while others worked secretly for the State of Qatar and did not make filings (such as Joseph ("Joey") Allaham and the GRA Defendants).

4.     In late 2017, the whitewashing campaign organized by Al Thani and Al-Rumaihi – on behalf of and with the knowledge of and agreement to by Defendant State of Qatar – was encountering serious problems and targeted Plaintiff Broidy.  Plaintiff Broidy's public and private actions and statements stood in the way of the State of Qatar's aggressive public relations and governmental relations efforts that sought to ingratiate Qatar with the new Trump Administration and to deflect attention from Qatar's record of supporting terrorist organizations.

5.     On information and belief, Defendant Chalker is a former CIA cyber-operative who runs GRA, which is headquartered in New York, New

B O L E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

1   York.  On information and belief, Defendant Powell is a former British
2   intelligence operative who runs GRA operations out of Qatar and established
3   GRA's office there through a Gibraltar subsidiary in October 2017 – just
4   weeks prior to the commencement of the attack on Plaintiffs.

5   　　　　6.　　On information and belief, the Qatari Defendants retained and
6   used the GRA Defendants to coordinate and implement the hack, and the
7   GRA Defendants also personally supervised aspects of the information
8   operation against Plaintiffs.

9   　　　　7.　　On information and belief, the GRA Defendants introduced
10   Defendant State of Qatar to cyber mercenaries in various countries to
11   coordinate technical aspects of the illegal intrusion into Plaintiffs' email
12   server in Los Angeles and Google LLC's server(s) in California, and the
13   dissemination of the contents to U.S. news organizations, including
14   individuals or groups associated with known mercenary cyber threat actors.
15   On information and belief, the individuals and entities identified by the GRA
16   Defendants and used by the Qatari Defendants to attack Plaintiffs are:
17   Omniscope Limited, a U.K. security and intelligence firm; a naturalized
18   Israeli citizen with a history of criminal activity; a retired Moroccan diplomat;
19   and a London-based strategic intelligence firm with offices in the United
20   States.

21   　　　　8.　　On information and belief, the Agent Defendants all participated
22   in the strategic planning for and execution of the attacks.

23   　　　　9.　　On information and belief, Defendant Muzin's company
24   (Defendant Stonington) conspired with the other Defendants from within the
25   United States through a campaign to discredit Plaintiffs in the press and in the
26   eyes of to organize and disseminate Plaintiffs' stolen emails to media
27   organizations.  Significantly, Defendant Muzin exhibited inside knowledge of
28

Formatted Table

B O I E S   S C H I L L E R   F L E X N E R   L L P

1  the attacks on Plaintiffs, and disclosed foreknowledge of future attacks to at

2  least one other potential victim to warn him against taking public positions

3  adverse to the State of Qatar.  On information and belief, Defendant Muzin's

4  company (Defendant Stonington) was among the vehicles used by the State of

5  Qatar to funnel funds to others involved in the attack.

6      10.    Defendant Muzin has admitted his culpability.  Because of

7  Muzin's status as its registered foreign agent, Muzin's admission also binds

8  Defendant the State of Qatar.

9      11.    On March 5, 2018, Defendant Muzin told Joel Mowbray, a

10  business associate of Plaintiff Broidy and a critic of both the State of Qatar

11  and of Muzin, that there was "more stuff coming" from the *New York Times.*

12  Indeed, there was: the *New York Times* published stories based on Plaintiffs'

13  stolen emails on March 22 and 26, 2018.  In that same meeting, Muzin

14  discussed meetings he had with his client the State of Qatar while serving as

15  its registered agent.  Muzin told Mowbray: "**Broidy's name comes up in**

16  **Embassy meetings often**" and "I definitely identified him as somebody who

17  was not, didn't like them too much."  **Muzin further acknowledged that**

18  **everyone he "fingered" was "in danger."**  He warned Mowbray that

19  Mowbray and Plaintiff Broidy needed "to be very careful," that **the State of**

20  **Qatar is "going after you,"** and that **"Honestly, I know they're after you**

21  **and Broidy."**

22      12.    At that meeting, Muzin tried to persuade Mowbray that the

23  blame for the hacks on Plaintiffs and attempted hacks on Mowbray and

24  subsequent media leaks should fall on Muzin's principal (the State of Qatar)

25  and not Muzin because "I was doing my job." **Muzin was aware that the**

26  **State of Qatar utilized computer hacking as one of its cyber-weapons and**

27  **even admitted to Mowbray that he was "positive" that he himself had**

28



**been hacked by the Qataris.**  Muzin's admissions to Mowbray inculpate both Muzin and his principal and co-conspirator the State of Qatar, since Muzin admitted that he and his principal orchestrated and participated in the scheme to harm Plaintiffs by hacking and disseminating their computer systems and information.

13.    Somewhat belatedly, recognizing that he had admitted his culpability and that of the State of Qatar to Mowbray, Muzin stated that he realized that he needed "to be a little more careful" when he spoke to Mowbray.

1.14.  Defendants' unlawful activity was directed toward the United States and much of that activity occurred within the United States, including the formation of the conspiracy in the United States during meetings in Washington, D.C.  The participants in these meetings were not engaged in activities related to Qatar's discretionary foreign policy, but instead were conspiring to violate United States criminal and civil laws by targeting a United States citizen for retribution because he had exercised his First Amendment right to speak out publicly and privately to United States government officials and to disrupt their business relationship with rival nations against the State of Qatar's support for terrorist organizations.

2.    The State of Qatar, by itself and/or through its agents, unlawfully hacked into the email accounts and computer hack, and the resulting unlawful access to Plaintiffs' private communications, documents, trade secrets and intellectual property, occurred in the United States.  Defendants conspired to design, coordinate and execute an unlawful spearphishing campaign against several U.S. persons affiliated with Plaintiff Broidy that included the following: spoofing or otherwise obfuscating U.S.-assigned phone numbers to deceive several persons in the United States into providing their email login credentials; misappropriating the trademarks of U.S. companies such as Google

-- 6 --   Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



LLC, a subsidiary of Alphabet, Inc; fraudulently registering online website domains in the United States; stealing email and online account login credentials for several U.S. persons; illegally intruding into Plaintiffs' email server in Los Angeles as well as California servers of ~~United States citizens in California, stole private emails and documents from them, and broadly disseminated the stolen emails and documents to domestic and foreign media.  Defendants engaged in a sophisticated~~ U.S.-based Google; stealing emails from those U.S.-based servers; and then printing collections of Plaintiffs' stolen electronic ~~warfare, espionage~~ files from within North America, sorting them by topic, and ~~disinformation campaign against Plaintiffs in an effort to retaliate against them, and to discredit~~ delivering them (in some cases by hand) to news organizations in the United States ~~and abroad.  In addition to disseminating unlawfully stolen emails and documents, Defendants doctored or wholly forged documents using information found on Plaintiffs' computers to portray a false narrative about Plaintiffs, and to disseminate~~, knowing that ~~false narrative to media organizations.~~

3. ~~The State of Qatar sponsors and supports terrorists, having once been called a "Club Med for Terrorists."  Last year,~~ the State of Qatar ~~launched a multi-million dollar public relations campaign to obfuscate its ties to, and financial and logistical support of, some of the world's worst extremist and terrorist~~ news organizations ~~— including Al Qaeda (and its affiliate Al-Shabab), Hamas,~~ would publish the stolen emails under the ~~Taliban, and~~ cloak of the ~~Muslim Brotherhood — and to change its image in~~ First Amendment – all for the ~~United States, specifically in the Jewish community in the United States.  To lead this campaign in the United States, the State of Qatar hired Defendant Muzin's firm and several other agents, included among the John Does 1-10.~~

4. ~~Defendants' actions are motivated by activities undertaken by~~ purpose of discrediting Plaintiff Broidy ~~that threaten the State of Qatar.  As a~~

-- 7 --

Formatted: Right
Formatted: Font: 12 pt
Formatted: Font: 12 pt
Formatted: Font: 12 pt
Formatted: Font: 12 pt
Formatted: Font: 12 pt
Formatted: Font: 12 pt
Formatted: Font: 12 pt
Formatted: Font: 12 pt
Formatted: Font: 12 pt
Formatted: Font: 12 pt
Formatted: Font: 12 pt
Formatted: Font: 12 pt
Formatted Table

Formatted: Right

1  prominent member of the American Jewish community who has frequently

2  interacted with the President of the United States, Plaintiff Broidy has been

3  especially vocal in expressing criticism of the State of Qatar's support of

4  terrorism, to private persons, to United States government officials whom the

5  State of Qatar wishes to influence (including the President), and to the public

6  at large, through the support of initiatives that highlight Qatar's efforts to

7  deceive Americans (such as by telling the world they are against terrorism and

8  housing a United States military base while at the same time giving support

9  and assistance to terrorists).

10          5.      On June 5, 2017, the United Arab Emirates ("UAE") and Saudi

11  Arabia led an effort to isolate the State of Qatar because of the State of

12  Qatar's support for terrorism as well as the country's close ties to Iran.  The

13  UAE and Saudi Arabia severed diplomatic relations with the State of Qatar,

14  and the UAE closed its airspaces to Qatari aircrafts.  Saudi Arabia further

15  closed its border with Qatar and banned Qatari-flagged ships from docking at

16  Saudi Arabian ports.

17          6.      Plaintiff Broidy operates businesses that have contracts with the

18  government of the UAE to assist the UAE in developing its defense and

19  counterterrorism capabilities.  These contracts, which were finalized in 2017,

20  are worth over $200 million.  Plaintiff Broidy also has entered into

21  preliminary discussions with Saudi Arabia about providing similar capabilities

22  enhancement in that country.

23          7.      For more than 25 years, Plaintiff Broidy has supported the State

24  of Israel through donations to many organizations.

25          8.1.    Since September 11, 2001, Plaintiff Broidy has increased his

26  involvement in supporting the safety of his homeland, the United States.  As

27  part of his involvement, he became active in fundraising for the Republican

28

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

Formatted Table

-- 8 --        Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES SCHILLER FLEXNER LLP

**Formatted:** Right

1  Party because he believed its views on how to defend the United States were
2  aligned with his own. He also became involved in numerous civic activities
3  involving counter-terrorism to promote the security of the United States.
4      9.1.   Beginning with the AIPAC Policy Conference at the end of
5  March 2017, Plaintiff Broidy and others began to be vocal critics of the State
6  of Qatar's for its support for terrorists and its friendly relationship with Iran,
7  which Mr. Broidy sees as a major threat to the security of the United States
8  and its allies, and began to support financially public initiatives — such as
9  conferences — to educate Americans about Qatar's support for terrorist and
10 extremist organizations.

**Formatted:** Underline

11     10.   Shortly thereafter, the State of Qatar, in an attempt to blunt the
12 effect of the these initiatives and media reports highlighting its duplicitous
13 nature,  hired teams of lobbyists and began to spend millions of dollars in an
14 effort to whitewash its record and hide the true facts about its support for
15 terrorists.
16     11.   These lobbyists include Avenue Strategies, a firm founded by
17 Corey Lewandowski, former campaign manager for the Trump campaign, and
18 former U.S. Attorney General John Ashcroft, whose responsibilities included
19 lobbying members of Congress and the Trump Administration (including the
20 White House) to try to convince our nation's political leadership to see
21 Defendant State of Qatar in a more favorable light.
22     12.   Defendant State of Qatar also tried to enlist the support of the
23 Jewish community in the United States, and hired Defendant Muzin.
24 Defendant Muzin owns and operates Defendant Stonington, which is a
25 registered foreign agent of the State of Qatar.  The State of Qatar pays Muzin
26 $300,000 per month for "strategic communications" and for trying to
27 influence public opinion in, and the foreign policies of, the United States.

**Formatted Table**

28

BOIES SCHILLER FLEXNER LLP

**Formatted:** Right

1  Muzin has been employed by the State of Qatar to improve the State of
2  Qatar's image in the United States and whitewash its coddling of terrorist leaders
3  by getting support from Jewish leaders. Defendant Muzin first attempted to try
4  to arrange meetings between leaders of American Jewish organizations and
5  the current Emir of Qatar, Sheikh Tamim bin Hamad Al Thani (the "Emir")
6  while the Emir was attending the United Nations General Assembly in New
7  York City.  The opposition of Plaintiff Broidy and others to these efforts
8  helped prompt American Jewish leaders to refuse to meet with the Emir at the
9  United Nations General Assembly in September 2017, thereby frustrating the
10  State of Qatar's plan as well as Muzin's efforts to win over Jewish leaders.
11  According to a February 13, 2018 article in *Tablet Magazine,* an online
12  publication focused on Jewish news, "Muzin largely failed to persuade Jewish
13  leaders to agree to meetings with influential Qataris visiting New York for the
14  opening of the United Nations General Assembly."

15      13.1.  Soon after the failure of the State of Qatar's and the Agent
16  interfering with his business relationships.  Defendants' United Nations
17  General Assembly initiative, Muzin began to invite American Jewish leaders
18  on all-expense-paid trips to Qatar to further the State of Qatar's public
19  relations campaign.  Plaintiff Broidy and others again encouraged American
20  Jewish leaders to decline the invitations.  These efforts were mostly successful
21  in helping to prompt many American Jewish leaders to decline to participate
22  in the public relations trips to Qatar.

23      14.    The Emir is expected to travel again to the United States in April
24  2018 for bilateral meetings with the Trump Administration and visits to
25  Capitol Hill.  The failure of the State of Qatar and its agents to improve the
26  State of Qatar's image in the United States—and, specifically, with the
27  American Jewish community—led to meetings and discussions in advance of

28

**Formatted:** Font: 12 pt

**Formatted:** List Paragraph, Line spacing: single,  No bullets or numbering

**Formatted Table**

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

1  the Emir's anticipated visit to discuss the impediments to the State of Qatar's
2  public relations efforts.  On information and belief, during those discussions,
3  many of which occurred in the Embassy of Qatar in Washington, D.C.,
4  Defendant Muzin fingered Plaintiff Broidy as such an impediment.
5        15.    Starting last year, the State of Qatar, Muzin, and other foreign
6  agents conspired in a strategic campaign to retaliate against and discredit
7  Plaintiff Broidy. Through this campaign, Defendant State of Qatar seeks to
8  damage Plaintiff Broidy's reputation in order to frustrate his ability to educate
9  the American people about Qatar, to damage his reputation and reduce his
10 influence within the United States, to harm his ability to do further business
11 with the UAE and other Middle Eastern countries that are aligned against
12 Qatar because of its support for terrorism, and to impact negatively his other
13 business prospects around the world.
14       16.    Over a period of months, on information and belief in the second
15 half of 2017 and in the first quarter of 2018, including critically on February
16 14, 2018, the State of Qatar, by itself and/or through its agents, hacked
17 Plaintiffs' personal and business email accounts and computer servers in
18 California.  On information and belief, during the same time period and using
19 similar techniques, the State of Qatar also, by itself and/or through its agents,
20 hacked the electronic communications of at least one other United States-
21 based, United States citizen who was also involved in activities that threatened
22 Defendant State of Qatar's public relations campaign.
23       17.    On information and belief, Defendants illegally accessed
24 Plaintiffs' credentials and used those credentials, along with other means, to
25 access Plaintiffs' computer networks, and to thereafter steal and doctor
26 Plaintiffs' emails and documents.
27
28

Formatted Table

BOIES SCHILLER FLEXNER LLP

B O I E S   S C H I L L E R   F L E X N E R   L L P

18. On information and belief, Defendants then began to disseminate these emails and documents — including the forged documents — to media organizations around the world and to provide those media organizations with false stories based on those documents.

19.15. ~~Defendants'~~ efforts to target Plaintiff Broidy in this manner have been largely successful—: several media organizations ~~have~~ published articles (including front page stories in the March 22 and 26, 2018 editions of ~~The~~the *New York Times*, a March 26, 2018 story by the Associated Press, a story in the March 1, 2018 edition of the *Wall Street Journal*, and additional articles in *The Huffington Post*, *McClatchy, Esquire, The Intercept* and *Bloomberg News*, which stories were reprinted or summarized by numerous other news outlets). ~~As acknowledged in the article in today's *New York Times*,these~~ As recently as May 21, 2018, the Associated Press published a story based on the hacked materials. In some instances, these news organizations have acknowledged that those articles were based on information ~~news organizations~~they received from ~~anonymous~~ sources ~~which claimed~~who boasted that the materials were hacked from Plaintiffs' computers. ~~Some of the documents received by these news organizations were clearly falsified, altered or forged.~~

20. Al Jazeera, the international broadcaster owned by the State of Qatar, was the only news organization willing to publish a story that relied on clearly falsified or forged documents purporting to contain proof that Plaintiff Broidy engaged in potentially unlawful business activities with a Russian bank that is now sanctioned by the United States.

21.16. As a result of Defendants' actions, Plaintiffs, and in particular Plaintiff Broidy, have been harmed. ~~If Defendants are not enjoined from disseminating the unlawfully obtained and fabricated data, Plaintiffs~~, and will

continue to ~~suffer further serious injury.  As a result, Plaintiffs request injunctive relief to prevent the further accessing, use, and dissemination of Plaintiffs' data by Defendants, who seek only to benefit themselves and harm Plaintiffs by illegally targeting United States citizens.  Plaintiffs also seek monetary damages with respect to harm that has already occurred, despite the inability of such monetary damages to fully compensate Plaintiffs for the harm they have suffered.~~be harmed.

## PARTIES

~~22.~~ 17. Plaintiff Broidy Capital Management LLC ~~("BCM")~~ is an investment firm run by Plaintiff Elliott Broidy.  BCM is a corporation duly organized under the laws of the State of California with its principal place of business in Los Angeles, California.

~~23.~~ 18. Plaintiff Elliott Broidy is a citizen of the United States and the State of California who resides in Los Angeles, California.  ~~Plaintiff Broidy~~He is the Chief Executive Officer and Chairman of BCM.

~~24.     Plaintiff Robin Rosenzweig is a citizen of the United States and the State of California who resides in Los Angeles, California.  Plaintiff Rosenzweig is a sole practitioner attorney with a law firm called Colfax Law Office, Inc. and the wife of Plaintiff Broidy.~~

~~25.~~ 19. Defendant the State of Qatar is a foreign state.  The head of state and head of government of Qatar is the current Emir of Qatar, Sheikh Tamim bin Hamad Al Thani.  The Emir has made visits to Los Angeles, California and has hosted the Mayor of Los Angeles, Eric Garcetti, in Doha, the capital of Qatar, as part of an effort to strengthen the partnership between the cities of Los Angeles and Doha.  Additionally, the State of Qatar maintains a Consulate in Los Angeles, California.  ~~Entities related to the State of Qatar own a majority interest in Ooredoo Q.S.C. ("Ooredoo"), an international~~

-- 13 --

**Formatted:** Right

1  telecommunications company incorporated under the laws of Qatar with its
2  principal place of business in Doha, Qatar.  Ooredoo provides services
3  throughout the Middle East and Southeast Asia and, in partnership with T-
4  Mobile and AT&T, provides roaming services in the United States, and its
5  facilities were employed to attack Plaintiffs' computer servers.

6      26.20.  Defendant Stonington Strategies LLC is a public relations and
7  lobbying firm incorporated under the laws of Delaware, with its.  Upon
8  information and belief, Stonington's principal place of business is in New
9  York City, New York.  Stonington registered on September 3, 2017 under the
10  Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, as a
11  foreign agent providing "strategic communications" for the State of Qatar.
12  Stonington originally was retained to provide these services for $50,000 per
13  month.  On November 1, 2017, shortly before the hacks on Plaintiff's
14  computers began, Defendant the State of Qatar increased the amount by a
15  factor of six – to $300,000 per month.

16      27.21.  Defendant Nicolas D. Muzin is the Chief Executive Officer of
17  Stonington and a political lobbyist who signed the FARA documents on
18  behalf of Stonington as a registered foreign agent of the State of Qatar.  He is
19  a graduate of Yale Law School and a high-level Republican political
20  operative.  Muzin served as chief of staff to then-Congressman (now Senator)
21  Tim Scott and served as deputy chief of staff for strategy to Senator Ted Cruz.
22  According to his biography on the Stonington website, Muzin also worked on
23  the Trump Presidential campaign as well as on the transition team to recruit
24  candidates for the new Administration.  Shortly after the inauguration of
25  President Donald J. Trump, Muzin began working as a lobbyist, first
26  registering as a FARA agent for the Democratic Party of Albania in March
27  2017.  On August 24, 2017, he was retained by the State of Qatar for
28

**Formatted Table**

B O I E S   S C H I L L E R   F L E X N E R   L L P

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

1  "consulting services."  More recently, on May 14, 2018, Muzin was

2  photographed at the opening of the United States Embassy in Jerusalem with

3  Senator Cruz and White House aide Victoria Coates, the Senior Director for

4  International Negotiations on the National Security Council and a former aide

5  to Senator Cruz.  Defendant Muzin is a citizen of the United States and a

6  resident of the state of Maryland.  On information and belief, Muzin has

7  frequently traveled to California for business and political purposes during

8  recent years.

9       22.    Defendant Global Risk Advisors, LLC is a limited liability

10  company formed under the laws of Delaware, with its primary place of

11  business in New York, New York.  It has not registered as a FARA agent of

12  the State of Qatar.

13       23.    Defendant Kevin Chalker is the founder and Chief Executive

14  Officer of GRA.  Upon information and belief, he is a citizen of the United

15  States and is domiciled in the state of New York.  Chalker has not registered

16  as a FARA agent of the State of Qatar.

17       24.    Defendant David Mark Powell is a Managing Director of GRA

18  and also is the Principal Agent of GRA in Qatar.  On information and belief,

19  Powell is a citizen of the United Kingdom and is domiciled in the United

20  Kingdom.

21       25.    On October 26, 2017, only a few weeks before Defendants began

22  their efforts to unlawfully access Plaintiffs' emails, documents, trade secrets

23  and intellectual property, GRA, acting through a wholly-owned subsidiary –

24  Global Risk Advisors (EMEA) Limited, a Gibraltar corporation, headed by

25  Defendant David Mark Powell – began to operate in Qatar.

26       26.    Defendant Mohammed bin Hamad bin Khalifa Al Thani, who

27  received his degrees from Georgetown and Harvard, is a brother of the Emir

28

Formatted Table

Formatted: Right

of Qatar.  According to articles in *Sports Illustrated* on May 23, 2011 and *The Telegraph* on March 18, 2014, Defendant Al Thani has been accused of bribery and human rights abuses in connection with Qatar's successful bid to host the 2022 FIFA World Cup and the subsequent construction of the necessary facilities, which *The Guardian* reported on September 25, 2013 resulted in the "exploitation and abuses" of Nepalese workers "that amount to modern-day slavery."

27.     On information and belief, after its neighboring Middle Eastern countries began their quarantine of Qatar in 2017, Defendant the State of Qatar charged Defendant Al Thani with the task of attempting to influence United States public opinion, and the position of the Trump Administration. For example, as reported in *Politico* on May 8, 2018, the State of Qatar's ongoing efforts to purchase Newsmax, a conservative news outlet with ties to the Trump Administration, were "overseen by Mohammed bin Hamad bin Khalifa Al Thani, a younger brother of Qatari Emir Tamim bin Hamad Al Thani" and "came during a mad scramble by the wealthy Gulf monarchy to win friends and clout in the United States as it struggled to respond to a Trump-endorsed blockade by its Arab neighbors."  On information and belief, Al Thani also specifically directed the effort to address impediments to the success of Qatar's program to influence United States public opinion and the position of the Trump Administration on the embargo, including specifically the efforts to attack and discredit Plaintiff Broidy.

28.     Defendant Ahmed Al-Rumaihi is a citizen of the State of Qatar and a former Qatari diplomat.  In the time period beginning in April 2017 and continuing to the present, Defendant Al-Rumaihi has not held an official position in the Government of the State of Qatar (according to the State of

Formatted Table

-- 16 --     Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Qatar), but on information and belief has continued to act as an agent of the State of Qatar. Al-Rumaihi is a resident of Qatar.

28.29. On information and belief, Defendants Does 1-10 are agents of the State of Qatar, some of whom may not have not registered under FARA. On information and belief, none of Defendants Does 1-10 is a citizen or resident of the stateState of California.

**JURISDICTION AND VENUE**

**JURISDICTION AND VENUE**

**I.     SUBJECT MATTER JURISDICTION**

30.    This Court has subject matter jurisdiction and personal jurisdiction over the State of Qatar pursuant to 28 U.S.C. § 1330 and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, because its conduct falls within the exception to foreign sovereign immunity set forth in 28 U.S.C. § 1605(a)(5).   (the "FSIA"), 28 U.S.C. § 1602 *et seq.*, because its conduct falls within the exception to foreign sovereign immunity set forth in 28 U.S.C. § 1605(a)(5).   Plaintiffs intend to serve the State of Qatar pursuant to Multiple entire torts as described herein occurred within the United States, and additional tortious misconduct described herein occurred at a minimum predominately within the United States.

29.31. This Court also has subject matter jurisdiction over the State of Qatar because its conduct falls within the exception to foreign sovereign immunity set forth in 28 U.S.C. § 1608(a), among1605(a)(2).  The State of Qatar entered into numerous commercial contracts with persons to provide consulting, public relations, offensive cyber and other lawful and unlawful commercial services in order to further the State of Qatar's public relations efforts and economic and commercial interests, which included most significantly the lifting of a comprehensive trade and commercial embargo on

-- 17 --

Qatar.  In furtherance of those commercial contracts, Defendants then targeted Plaintiff Broidy.  Upon information and belief, the State of Qatar engaged the GRA Defendants and the Agent Defendants to use illegal commercial means that may present themselves to promote its own economic and commercial interests, including by conducting economic espionage.  These forms of commercial activity directly affected the United States.

30. 32. This Court further has subject matter jurisdiction over this action under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.  Additionally, this Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332 because Plaintiffs are all citizens of the state of California and, to Plaintiffs' knowledge, none of the Defendants is a citizen of the state State of California.  Accordingly, the citizenship of the parties is diverse.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

**II.    PERSONAL JURISDICTION**

33.    This Court has personal jurisdiction over the State of Qatar pursuant to 28 U.S.C. § 1330 and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, because its conduct falls within the exception to foreign sovereign immunity set forth in 28 U.S.C. § 1605(a)(5) and § 1605(a)(2).

34.    Plaintiffs served the State of Qatar pursuant to 28 U.S.C. § 1608(a).

31. 35. This Court has personal jurisdiction over the Agent Defendants and the Qatari Defendants other than the State of Qatar itself under the state of California's long-arm statute, Cal. Civ. Proc. Code § 410.10, because they directly or as a result of their participation in the conspiracy described herein, targeted Plaintiffs in California and directed their tortious conduct towards

-- 18 --                    Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



Plaintiffs in California, with knowledge and intent that Plaintiffs suffer harm in California.

36.     On information and belief, Defendant Al-Rumaihi leases property in California, conducts substantial business in California, and has sufficient and substantial contacts with this jurisdiction.

**III.     VENUE**

~~32.~~37. Venue is proper in this judicial district under 28 U.S.C. §~~ ~~1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district~~.~~, and a substantial part of property that is the subject of this action is situated in this judicial district.  In particular, the private communications, documents, trade secrets and intellectual property that was unlawfully accessed, converted, and stolen was located in this district and the unlawful access to those materials necessarily took place in this district. ~~Venue is also proper in this judicial district under 28 U.S.C. § 1391(f)(1) for the same reasons and because Defendant the State of Qatar is a foreign state.~~

38.     Venue also is proper in this judicial district under 28 U.S.C. §1391(f)(1) for the same reasons and because Defendant the State of Qatar is a foreign state.

39.     Alternatively, venue is proper in this judicial district under 28 U.S.C. § 1391(b)(3) because there is no judicial district in a State in which all non-foreign defendants are resident, and at least one Defendant is subject to personal jurisdiction in California.

Formatted: Right

Formatted: Font: Times New Roman, Font color: Auto

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

Formatted Table

## STATEMENT OF FACTS

**I.   DEFENDANTS DELIBERATELY TARGETED PLAINTIFF BROIDY BECAUSE OF HIS AFFILIATIONS, HIS INFLUENCE, AND HIS CRITICISMS OF THE STATE OF QATAR.**

40.   This is a case about a civil and criminal conspiracy undertaken by a foreign nation on the territory of the United States against a successful, influential United States citizen and his California corporation.  Qatar targeted Plaintiff Broidy because he spoke out forcefully and effectively against Qatar's support for terrorism, entered into significant business relationships relating to defense and counterterrorism with a neighboring nation, and stood in the way of relieving commercial pressures resulting from a devastating economic embargo.  The purpose of the conspiracy targeting Broidy was to use illegal means to diminish his influence within the United States through a campaign to discredit him in the press and in the eyes of U.S. government officials, and to disrupt Plaintiffs' business relationships.  The conspiracy included the commissioned hacking of Plaintiffs' computer networks, which were located in the United States during the relevant timeframe, including Plaintiffs' email accounts, and transmission of the illicitly obtained data to the media.

**I.   INTERNATIONAL SANCTIONS WERE IMPOSED ON THE STATE OF QATAR IN JUNE 2017 AS THE RESULT OF ITS HISTORY OF SUPPORTING AND HARBORING TERRORISTS**

33.41.Defendant the State of Qatar sponsors and supports terrorists, having once been called a "Club Med for Terrorists."  Qatar has allowed and continues to allow itself to beserve as a sanctuary for terrorist leaders and organizations, including but not limited to Al Qaeda (and its affiliates including Al-Shabab and Al Qaeda in Syria, also known as Al-Nusra Front or Jabhat Al-Nusra), Hamas, the Taliban, and the Muslim Brotherhood.

Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Formatted: Right

34.42.Numerous individuals residing in Qatar have been sanctioned by the United States Department of Treasury for raising funds for Al Qaeda.

35.43.Individuals who serve as fundraisers for Al Qaeda's Syrian franchise (the Nusra Front) operate freely in Qatar.  These individuals appear at state-owned Mosques and on broadcasts aired by the state-funded Al Jazeera.  The State of Qatar has failed to shut down these fundraisers.

36.44.The State of Qatar has also has been accused of hosting the Somali terrorist group Al-Shabab, an Al Qaeda affiliate.

37.45.The State of Qatar also has permitted Hamas leaders to operate freely within the country.  Indeed, the State of Qatar has provided substantial funding to Hamas, despite being subjected to international political and economic sanctions for such support.

38.46.The State of Qatar has further allowed the Taliban to operate and maintain an office in Doha.

39.47.The State of Qatar has given safe haven to many leaders of the Muslim Brotherhood after their expulsion from Egypt by the Egyptian government.

40.48.On May 25, 2017, a bill (H.R. 2712) was introduced in the United States House of Representatives titled "The Palestinian International Terrorism Support Prevention Act of 2017."  The draft bill, which would have barred assistance from the United States government to any country that aided Hamas, stated in its findings that "Hamas has received significant financial and military support from Qatar."

41.49.On June 5, 2017, the UAE, Saudi Arabia and otherneighboring Middle Eastern states severed diplomatic relations with the State of Qatar because of the State of Qatar's support for terrorism and its close ties to Iran.  Other governments, including Yemen, the Maldives, and Libya, quickly

Formatted Table

Formatted: Right

followed. The UAE, Egypt, and Bahrain each alsoSome countries closed their airspaces to Qatari aircraft. Saudi Arabia, closed its bor-dertheir borders with the State of Qatar and/or banned Qatari-flagged ships from docking at itstheir ports. The UAE and the other sanctioning states issued a set of demands to the State of Qatar through Kuwaiti intermediaries. Those demands includedincluding that the State of Qatar curb ties with Iran and stop funding terrorist organizations. Those demands were rejected.

50. President Trump denounced Qatar and sided with the efforts to embargo Qatar, tweeting on June 6, 2017: "During my recent trip to the Middle East I stated that there can no longer be funding of Radical Ideology. Leaders pointed to Qatar - look!"

51. On June 9, 2017, once again siding with the sanctioning states and criticizing the more conciliatory tone of the then-Secretary of State, President Trump stated:

The nation of Qatar, unfortunately, has historically been a funder of terrorism at a very high level, and… nations came together and spoke to me about confronting Qatar over its behavior. So we had a decision to make: Do we take the easy road, or do we finally take a hard but necessary action? We have to stop the funding of terrorism. I decided, along with Secretary of State Rex Tillerson, our great generals and military people, the time had come to call on Qatar to end its funding — they have to end that funding — and its extremist ideology in terms of funding… This is my great priority because it is my first duty as President to keep our people safe. Defeating ISIS and other terror organizations is something I have emphasized all during my campaign and right up until the present. To do that, stop funding, stop teaching hate, and stop the killing. For Qatar, we want you back among the unity of responsible nations.

42.1. These international sanctions on the State of Qatar remain in effect today.

Formatted: List Paragraph, Line spacing: single, No bullets or numbering

43.52. Defendant State of Qatar is a nation rich in natural gas resources, but it is reliant on food and other supplies that arrive by truck via its border with Saudi Arabia. The sanctions threatened to damage Qatar's

Formatted Table

Formatted: Right

1  economy.borders that closed as part of the embargo.  The international

2  sanctions – and the support the President Trump expressed for them –

3  threatened to damage Qatar's economy and plunged Qatar into crisis.  The

4  sanctioning states threatened to expel the State of Qatar from the Gulf

5  Cooperation Council, a regional economic and security cooperation body

6  made up of six nations.  The economic quarantine led to a massive drop-off in

7  foreign investment in Qatar.  According to the International Monetary Fund,

8  "following the rift, foreign financing (non-resident deposits and inter-bank

9  placements) and resident private-sector deposits fell by about US$40 billion."

10      53.    These international sanctions on the State of Qatar remain in

11  effect today.

12  **II.    THE STATE OF QATAR BEGAN A PUBLIC RELATIONS**

13  **CAMPAIGN TO IMPROVE ITS IMAGE IN THE UNITED STATES, WHICH HAS SUPPORTED THE INTERNATIONAL**

14  **SANCTIONS AGAINST QATAR**

15      54.   As a result of its ArabMiddle Eastern neighbors severing

16  diplomatic relations with the country and in fear ofimposing a commercial

17  blockade, the enactment of H.R. 2712, the State of Qatar decided to

18  retainQatari Defendants retained agents in Washington, D.C. and to paypaid

19  them significant sumsmillions of moneydollars to impact public opinion and

20  public policy in the United States.  According to the Center for Responsive

21  Politics, the State of Qatar spent nearly five million dollars on lobbyists and

22  media, including by entering into specific agreements with those agents for

23  those agents to provide public relations in 2017 in an effort to ensure that,

24  consultancy, and related services.  The Qatari Defendants launched a public

25  relations campaign to obfuscate Qatar's ties to, and financial and logistical

26  support of, some of the world's worst extremist and terrorist organizations—

27  including Al Qaeda (and its affiliate Al-Shabab), Hamas, the Taliban, and the

28

Formatted Table

B O I E S  S C H I L L E R  F L E X N E R  L L P

Muslim Brotherhood—and to change Qatar's image in the United States ~~would support~~, including particularly in the Jewish community in the United States.  As *Tablet Magazine*, an online publication focused on Jewish news, wrote on February 13, 2018, the Qatari influence operation reflected "a Qatari preoccupation with American Jewish communal power, as well as a desire to address whichever challenges Doha believes Jewish influence raises for the country's vast ambitions in Washington and beyond."

~~44.~~   This campaign was aimed at: (1) bolstering the image of the State of Qatar in ~~its diplomatic standoff with other Arab countries.~~

~~55.~~   ~~Among the high-profile agents hired by~~ circles perceived as influential with the Trump Administration; and (2) curtailing the influence of individuals that could undermine the standing of the State of Qatar ~~was former Attorney General John Ashcroft~~ in the United States.

**A. Al Thani and Al-Rumaihi Directed and Supervised The State Of Qatar's Whitewashing Efforts**

56.   This campaign on behalf of Defendant the State of Qatar was directed and supervised by its agents Defendant Al Thani and Defendant Al-Rumaihi.

57.   One of the activities engaged in by Defendant Al-Rumaihi was investing in entities that he and Defendant Al Thani thought could help to bolster Qatar's image in the United States.  Al-Rumaihi and Al Thani have access to billions of dollars in capital from the Qatar Investment Authority to use for this purpose.  As one example, in 2017 Al-Rumaihi was a significant investor in the "Big3" basketball league, started by Rapper Ice Cube and Jeff Kwatinetz, a Los Angeles businessman.  Al-Rumaihi then sought to use his association with Kwatinetz to gain contact with Kwatinez's former business associate, Steve Bannon, who ~~leads that engagement for the Ashcroft Law~~

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

1  Group.  The relevant contract with the State of Qatar was at that time the Chief

2  White House Strategist for President Trump.  In litigation relating to Al-

3  Rumaihi's investment in Big3, Kwatinetz filed an affidavit stating: "there

4  were numerous occasions during the 2017 [Big3] season, where Mr. Al-

5  Rumaihi would bring up Mr. Bannon's name to me and comment about Mr.

6  Bannon's political positions, his views on the blockade [of Qatar by Gulf

7  states that ], the Trump administration's position toward Qatar, and he

8  persistently inquired about wanting to meet with Mr. Bannon."

9       58.   In an affidavit filed in that litigation, Kwatinetz further revealed

10  that Defendant Al-Rumaihi admitted that he had previously attempted to

11  financially influence former Attorney General Ashcroft officials of the Trump

12  Administration:

13       Mr. Al-Rumaihi stated to me [Kwatinetz] that he wanted me to
         convey a message from the Qatari Government to Steve Bannon.
14       Mr. Al-Rumaihi requested I set up a meeting between him, the
         Qatari government, and Steven Bannon, and to tell Steve Bannon
15       that Qatar would seek underwrite all of his political efforts in
         return for his support.  I immediately let Mr. Al-Rumaihi know
16       that I was offended by this request, that I was trying to run a
         basketball league and need our money paid, and I stated that
17       neither I nor Steve Bannon would ever take, or even entertain the
         concept, of a bribe of any kind.  I was appalled.  Mr. Al-Rumaihi
18       laughed and then stated to me that I shouldn't be naive, that so
         many Washington politicians take our money, and stated "do you
19       think [former National Security Advisor Michael] Flynn turned
         down our money?"
20

21       59.   On information and belief, Defendant Al-Rumaihi's comments to

22  Kwatinetz reference a December 12, 2016 visit by Al-Rumaihi to Trump

23  Tower to visit with the Trump Transition Team.  Michael Flynn, at that time

24  the incoming National Security Adviser, was at Trump Tower on that same

25  day.  Both Al-Rumaihi and Flynn were photographed in the lobby of the

26  Trump Tower that day.

27

28

Formatted: Font color: Auto

Formatted Table

Formatted: Right

60.     The attempted purchase of *Newsmax* is another example of how Al-Rumaihi and Al Thani sought to use millions of dollars from the Qatari Investment Authority to bolster Qatar's image in the United States in an effort to address the commercial embargo.  *Politico* reported on May 8, 2018 that the State of Qatar's attempt to purchase *Newsmax* was "overseen by Mohammed bin Hamad bin Khalifa Al Thani, a younger brother of Qatari Emir Tamim bin Hamad Al Thani" and "came during a mad scramble by the wealthy Gulf monarchy to win friends and clout in the United States as it struggled to respond to a Trump-endorsed blockade by its Arab neighbors."

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

45.61. Defendant Al-Rumaihi retained additional agents to craft and execute the State of Qatar's image whitewashing campaign.  For example, Al-Rumaihi was identified as the contact for Qatar in the June 7, 2017 retainer agreement between the Ashcroft Law Firm LLC and the "Government of Qatar."  According to the FARA filing disclosing that contract, former Attorney General Ashcroft was retained by the Qatari Defendants to "enlist the support and expertise of former key government leaders, including former officials who held very senior positions within the Intelligence Community, the Federal Bureau of Investigation, the Department of Treasury and the Department of Homeland Security[.]"  That $2.5 million retainer agreement was signed for the State of Qatar by Dr. Ahmed Al-Hammadi, the Secretary General of the State of Qatar's Ministry of Foreign Affairs and the Acting Head of Investments of the State-owned Qatar Investment Authority.

**B.  Defendant Muzin also sought out otherDefendants Stonington And Muzin Initially Focused On Influencing The United States Jewish Community**

62.     Upon information and belief, as described in the February 13, 2018 *Tablet Magazine* article, Defendant Al-Rumaihi worked with

Formatted Table

-- 26 --                 Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



Formatted: Right

1   unregistered Qatari agent Joey Allaham to identify Defendants Muzin and
2   Stonington to assist in the State of Qatar's campaign to influence the Jewish
3   community in the United States.
4         63.    In late August 2017, the Qatari Defendants retained Defendants
5   Stonington and Muzin to influence public opinion regarding the State of
6   Qatar.  Their agreement specifies that Muzin and Stonington were to provide
7   "consulting services" including the "development and implementation of a
8   government relations strategy for the State of Qatar, as requested and directed
9   by the Embassy."  The initial agreement provided that the State of Qatar
10  would pay Muzin and Stonington $50,000 a month for these services.

Formatted: Font: 12 pt

11        46.    high-profile individuals who could be helpful in furthering the interests of
12  the State of Qatar.  On information and belief, Defendant Muzin recruited former Arkansas
13  Governor Mike Huckabee, a Republican candidate for President, prominent media
14  commentator, and father of current White House Press Secretary Sarah Huckabee Sanders,
15  to participate on a trip to Qatar.  On January 8, 2018, former Governor Huckabee tweeted
16  "I'm in Doha," and then on January 12, 2018, tweeted, "Just back from a few days in
17  surprisingly beautiful, modern, and hospitable Doha[.]"

Formatted: List Paragraph, Line spacing: single, No bullets or numbering

18        47.1.   On information and belief, Defendant Muzin also met with White
19  House aide Victoria Coates, the Senior Director for International Negotiations
20  on the National Security Council and a former aide to Senator Ted Cruz, to
21  advocate for United States policies that would be supportive of the State of
22  Qatar. On information and belief, Defendant Muzin got Coates to have her
23  boss, Jason Greenblatt, the Special Envoy for International Negotiations, send
24  out a Tweet that was supportive of Qatar. On February 9, 2018, Greenblatt
25  tweeted: "Qatar partnering with Israel can bring real relief to the people of
26  Gaza.  Ending support for Hamas and focusing on humanitarian aid and
27  reconstruction will end the suffering."
28

Formatted Table

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

48.    One of the objectives of this multi-million dollar lobbying effort was to whitewash and obscure the voluminous record of the State of Qatar's support for terrorism. The State of Qatar also sought to discredit United States citizens who opposed the State of Qatar's agenda and frustrated its public relations offensive.

Formatted: No bullets or numbering

49.1.    Even before Defendant Muzin was retained, officials of Defendant State of Qatar told him at a meeting in Qatar of their concerns about Plaintiff Broidy. As Defendant Muzin recounted, "They knew about him [Broidy]" and "knew that he [Broidy] had been influential" in shaping the White House's views on Qatar.

50.    Qatari officials complained in particular about President Trump's remarks at a June 2017 meeting of the Republican National Committee where President Trump singled out Plaintiff Broidy in the audience and stated: "Elliott Broidy is fantastic." That acknowledgment was followed by a round of applause. Later in his speech, President Trump made the following remarks in the speech: "We're having a dispute with Qatar — we're supposed to say Qatar. It's Qatar, they prefer. I prefer that they don't fund terrorism."

51.    According to Defendant Muzin, the officials of Defendant State of Qatar, with whom he met shortly after President Trump's remarks stated: "Broidy was like sitting in the front row and that he had somehow prompted Trump to say that."

52.    According to filings with the United States Department of Justice mandated under FARA, at least the following agents were retained in the second half of 2017 or the first quarter of 2018 to help the State of Qatar to improve its image in the United States:

Formatted Table

BOIES   SCHILLER   FLEXNER   LLP

Formatted: Right

a. Avenue Strategies Global LLC (July 17, 2017 agreement), a
firm with which former Trump Campaign Manager Corey
Lewandowski has been affiliated, at the rate of $150,000 per
month, increased to $500,000 per month on September 5,
2017;

b. Stonington Strategies LLC (August 24, 2017 agreement) at
the rate of $50,000 per month, increased to $300,000 per
month on November 1, 2017;

c. Ashcroft Law Group (June 7, 2017 agreement), at the rate of
$2.5 million for a 90 day retainer

d.a. Levick Strategic Communications (June 5, 2017
agreement) at the rate of $54,000 per month;

e.a. Information Management Services Inc. (June 19, 2017
agreement) at the rate of $375,000 per month;

f.a. Conover & Gould Strategic Communications (June 29, 2017
agreement) at the rate of $100,000 per month;

g. Gallagher Group (July 11, 2017 agreement) at the rate of
$25,000 per month;

h.a. McDermott, Will & Emery (July 13, 2017 agreement) at
the rate of $40,000 per month;

i. Nelson Mullins Riley & Scarborough LLP (July 26, 2017
agreement) at the rate of $100,000 per month;

j.a. Portland PR (December 6, 2017 agreement) at the rate of
$123,195 per month;

k.a. Mercury Public Affairs (September 7, 2017 agreement) at
the rate of $120,000 per month;

Formatted Table

-- 29 --

Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



B O I E S   S C H I L L E R   F L E X N E R   L L P



Formatted: Right

l.a. Bluefront Strategies (September 12, 2017 agreement) $100,000;

m.a. Hawksbill Group (August 1, 2017 agreement) $165,000;

n. Vitello Consulting (December 6, 2017 agreement) $10,000 as a subcontractor of Stonington Strategies;

o.a. Iron Bridge Strategies (February 1, 2018 agreement) at the rate of $25,000 per month;

p.a. Tigercomm LLC (January 11, 2018 agreement) at the rate of $30,000 per month;

q.a. Husch Blackwell Strategies (February 1, 2018 agreement) at the rate of $25,000 per month;

r. SGR Government Relations & Lobbying (February 1, 2018 agreement) at the rate of $40,000 per month; and

s. Venable LLP (January 31, 2018 agreement) at the rate of $150,000 per month.

53. Defendant Muzin, CEO of Stonington, is a graduate of Yale Law School and a high-level Republican political operative. Muzin served as chief of staff to then-Congressman Tim Scott and served as senior policy advisor and deputy chief of staff for strategy to Senator Ted Cruz. According to his biography on the Stonington website, Muzin also worked on the Trump Presidential campaign as well as on the transition team to recruit candidates for the new Administration.

Formatted: Font: 12 pt

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

54.64. Defendant Muzin's efforts as an agent of the State of Qatar quickly focused on an effort to put a pro-Jewish spin on the State of Qatar's facilitation of terrorist activities in the Middle East. Muzin is quoted in aQatar. A September 5, 2017 article in *O'Dwyer's*, an online magazine covering the public relations industry, quotes Muzin as stating: "Engagement with Qatar can only be in the best interests of the United States and the Jewish

Formatted Table

-- 30 --

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 18-cv-02421-JFW

BOIES SCHILLER FLEXNER LLP



community, as we cannot allow Qatar to be ostracized by its neighbors and pushed into Iran's sphere of influence."

55.65.Shortly thereafter, asAs reported by the Israeli newspaper *Haaretz* on September 28, 2017, Defendant Muzin invited American Jewish leaders to meet with the Emir in New York City during the Emir's visit for the United Nations General Assembly later that month. The opposition of Plaintiff Broidy and others to these efforts helped prompt American Jewish leaders to refuse to meet with the Emir at that gathering, thereby frustrating the plans of the Qatari Defendants and Defendants Muzin, and Stonington to win over Jewish leaders.

56.66.The Zionist Organization of America ("ZOA") reacted to that invitation with a press release on September 12, 2017, in which the organization's president, Morton A. Klein, stated that although he had "received an invitation to meet with" the Emir of Qatar during the United Nations General Assembly, he had "decided not to accept this invitation." Mr. Klein further stated: "Any Jewish leader meeting with the Qatari Emir or Crown Prince likely means well, but he will serve as an unwitting prop in their PR ploy to whitewash the legitimate reasons why its Arab Muslim neighbors are boycotting them and why Israel and Jews are horrified by them, meaning it will only strengthen Qatar's embrace of Iran and critical backing of Hamas."

57.   Around that time and subsequently, Defendant Muzin, along with others, also invited American Jewish leaders to Qatar.

58.   Plaintiff Broidy and others spoke out in response to Defendant Muzin's efforts on behalf of the State of Qatar.

67.   According to a February 13, 2018 article in *Tablet Magazine*, "Muzin largely failed to persuade Jewish leaders to agree to meetings with

-- 31 --
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**Formatted:** Right

**Formatted:** Font: Not Bold

**Formatted:** Font: Not Bold

**Formatted:** Font color: Auto

**Formatted:** Font: Not Bold

**Formatted Table**

B O I E S   S C H I L L E R   F L E X N E R   L L P

influential Qataris visiting New York for the opening of the United Nations General Assembly."

68.    Soon after the failure of the United Nations General Assembly initiative, Muzin began to invite American Jewish leaders on all-expense-paid trips to Qatar to further the State of Qatar's public relations campaign. Plaintiff Broidy and others again encouraged American Jewish leaders to decline the invitations.  These efforts were mostly successful in helping to prompt many American Jewish leaders to decline to participate in the public relations trips to Qatar.

69.    As part of his work for the State of Qatar, Muzin sought out high-profile individuals who could be helpful in furthering the interests of the State of Qatar.  On information and belief, Defendant Muzin recruited former Arkansas Governor Mike Huckabee, a Republican candidate for President, prominent media commentator, and father of current White House Press Secretary Sarah Huckabee Sanders, to participate on a trip to Qatar.  On January 8, 2018, former Governor Huckabee tweeted "I'm in Doha," and then on January 12, 2018, tweeted, "Just back from a few days in surprisingly beautiful, modern, and hospitable Doha[.]"  On information and belief Defendant Muzin acknowledged paying an individual $50,000 for doing work related to influencing former Governor Huckabee to travel to Qatar and meet with the Emir.

70.    On information and belief, Defendant Muzin also met with White House aide Victoria Coates, the Senior Director for International Negotiations on the National Security Council and a former aide to Senator Ted Cruz, to advocate for United States policies that would be supportive of the State of Qatar.  On information and belief, Defendant Muzin got Coates to have her boss, Jason Greenblatt, the Special Envoy for International Negotiations, send

Formatted: Right

out the following tweet on February 9, 2018, that was supportive of Qatar: "Qatar partnering with Israel can bring real relief to the people of Gaza. Ending support for Hamas and focusing on humanitarian aid and reconstruction will end the suffering."

71.     Defendant Al-Rumaihi also engaged in efforts similar to Defendants Muzin and Stonington with respect to the United States Jewish Community.  By means of example, at the invitation of unregistered Qatari agent Joey Allaham, Al-Rumaihi attended a gala for the ZOA in New York City in November 2017.  Despite having vocally rejected an invitation by Defendant Muzin to meet with the Emir at the United Nations General Assembly in September 2017, after this dinner, the President of the ZOA (Morton A. Klein) visited Qatar on a trip that Muzin arranged.

**C. The State Of Qatar Spent Millions of Dollars on Agents To Further Its Public And Governmental Relations Efforts in the United States**

72.     According to the Center for Responsive Politics, the State of Qatar spent nearly five million dollars on lobbyists and media relations in 2017 in an effort to gain the support of the United States government in Qatar's its diplomatic standoff with other Middle Eastern countries.

73.     According to FARA filings of the State of Qatar, it retained and entered into written agreements with at least the following agents in the second half of 2017 or the first quarter of 2018 in an effort to improve its image in the United States.

   a.  Avenue Strategies Global LLC (July 17, 2017 agreement), a firm with which former Trump Campaign Manager Corey Lewandowski has been affiliated, at the rate of $150,000 per month, increased to $500,000 per month on September 5, 2017, with an additional $250,000 added to the October

Formatted Table

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

invoice through a retroactive agreement dated February 28, 2018;

b.  Stonington Strategies LLC (August 24, 2017 agreement) at the rate of $50,000 per month, increased to $300,000 per month on November 1, 2017;[2]

c.  Ashcroft Law Group (June 7, 2017 agreement), at the rate of $2.5 million for a 90-day retainer;

d.  Levick Strategic Communications (June 5, 2017 agreement) at the rate of $54,000 per month;

e.  Information Management Services Inc. (June 19, 2017 agreement) at the rate of $375,000 per month;

f.  Conover & Gould Strategic Communications (June 29, 2017 agreement) at the rate of $100,000 per month;

g.  Gallagher Group (July 11, 2017 agreement) at the rate of $25,000 per month, amended February 5, 2018 to $45,000 per month;

h.  Audience Partners Worldwide (July 28, 2017 agreement) at an undisclosed rate;

i.  McDermott, Will & Emery (July 13, 2017 agreement) at the rate of $40,000 per month;

j.  Nelson Mullins Riley & Scarborough LLP (July 26, 2017 agreement, renewed on March 19, 2018) at the rate of $100,000 per month for three months;

---

[2] Stonington notably has not filed its mandatory supplemental FARA filing disclosing the specifics of its FARA activities.  That filing was due in March 2018.  28 C.F.R. § 5.200.

Formatted Table



Formatted: Right

k.  Portland PR (December 6, 2017 agreement) at the rate of
    $123,195 per month;

l.  Mercury Public Affairs (September 7, 2017 agreement) at the
    rate of $120,000 per month;

m. Bluefront Strategies (September 12, 2017 agreement)
    $100,000;

n.  Hawksbill Group (August 1, 2017 agreement) $165,000;

o.  Vitello Consulting (December 6, 2017 agreement) $10,000, as
    a subcontractor of Stonington Strategies;

p.  Iron Bridge Strategies (February 1, 2018 agreement) at the
    rate of $25,000 per month;

q.  Tigercomm LLC (January 11, 2018 agreement) at the rate of
    $30,000 per month;

r.  Venable LLP (January 31, 2018 agreement) at the rate of
    $150,000 per month;

s.  Husch Blackwell Strategies (February 1, 2018 agreement) at
    the rate of $25,000 per month;

t.  SGR Government Relations & Lobbying (February 1, 2018
    agreement) at the rate of $40,000 per month;

u.  Pillsbury Winthrop Shaw Pittman LLP (March 15, 2018
    agreement) at rates between $500 and $955 per hour;

v.  Lumen8 Advisors, LLC (March 15, 2018 agreement) at the
    rate of $1,000 per hour; and

w. Ballard Partners (March 29, 2018 Agreement) at the rate of
    $175,000 per month for one year.

Formatted Table

-- 35 --                                        Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

B O I E S   S C H I L L E R   F L E X N E R   L L P

## III.   DEFENDANTS BECAME INCREASINGLY FRUSTRATED BY PLAINTIFF BROIDY'S OUTSPOKEN CRITICISM OF THE STATE OF QATAR

59. 74. Plaintiff Broidy is a prominent business and civic leader who has actively served in leadership roles in Jewish organizations and the Republican Party for decades., and during pertinent periods frequently and directly interacted with the President of the United States. His advocacy against terrorism and extremism is well known. Plaintiff Broidy served on the Homeland Security Advisory Council from 2006 to 2009 and specifically on the Future of Terrorism Task Force of that Council. The "Findings" report of that Task Force, issued on January 11, 2007, stated: "Factors that will influence the future of terrorism include: the leadership of the terrorists, US counterterrorism efforts, status of political reform in Muslim nations and *the elimination of safe havens*[.]" (emphasisEmphasis added.) This report was directed at and, on information and belief, was known to countries operating as safe havens for terrorist organizations, including the State of Qatar.

75.   Since September 11, 2001, Plaintiff Broidy has increased his involvement in supporting the safety of his homeland, the United States. As part of his involvement, he became active in fundraising for the Republican Party because its views on how to defend the United States were aligned with his own. He also became involved in numerous civic activities involving counter-terrorism to promote the security of the United States.

76.   Beginning in March 2017, Plaintiff Broidy, among others, became a vocal critic of the State of Qatar's support for terrorists and friendly relationship with Iran, which Mr. Broidy sees as a major threat to the security of the United States and its allies, and began to support financially public initiatives – such as conferences – to educate Americans about Qatar's support for terrorist and extremist organizations.



Formatted: Right

1    60.    Plaintiff Broidy also has substantial business ties to the UAE, a

2  regional rival of Qatar.  Through his work with a contractor to the government

3  of the UAE, he has been involved in strengthening the UAE's defense

4  capabilities and its capabilities to combat terrorist organizations, including

5  those organizations being provided safe harbor by the State of Qatar.

6    77.    InDuring pertinent periods Plaintiff Broidy regularly conveyed

7  this criticism of Qatar in meetings with United States Government officials

8  and civic leaders, including the President of the United States, Plaintiff Broidy

9  has been critical of Trump.

10    78.    Defendant the State of Qatar for its coziness with Iran and its

Formatted: No bullets or numbering

11  facilitationwas aware of the work of terrorists. Plaintiff Broidy's influential

12  criticism.  In initial discussions with Defendants Muzin and Stonington, Qatari

13  officials told Muzin of their concerns about Plaintiff Broidy.  As Defendant

14  Muzin recounted, "They knew about him [Broidy]" and "knew that he

15  [Broidy] had been influential" in shaping the White House's views on Qatar.

16    61.    Qatari officials complained in particular about President Trump's recorded

17  remarks at a June 2017 meeting of the Republican National Committee: "We're having a

18  dispute with Qatar — we're supposed to say Qatar.  It's Qatar, they prefer.  I prefer that

Formatted: Font: 12 pt

Formatted: Font: 12 pt

19  they don't fund terrorism."  At the same meeting, President Trump publicly identified

20  Plaintiff Broidy in the audience and stated: "Elliott Broidy is fantastic."  That

Formatted: Font: 12 pt

21  acknowledgment was followed by a round of applause. opposition to Qatar's policies

22  was well known.

23    79.

24    80.    Defendant Muzin has admitted that officials of Defendant the

25  State of Qatar, with whom he met shortly after President Trump's remarks

26  at that June 2017 meeting, stated: "Broidy was like sitting in the front row

27  and that he had somehow prompted Trump to say that."

28

Formatted Table

BOIES SCHILLER FLEXNER LLP



81.   After Defendants Muzin and Stonington were retained by the State of Qatar, Mr. Broidy extended his criticism of the State of Qatar to the efforts by Muzin and Stonington to arrange meetings between the Emir and American Jewish leaders.

62.82. Beginning in or around September 2017, Plaintiff Broidy and others began tellingto urge American Jewish leaders that they shouldto decline the invitations of the State of Qatar and Defendant Muzin to meet with the Emir in New York City and/or to visit Qatar.

63.83. Additionally, onPlaintiff Broidy was not alone in this effort. On September 15, 2017, *Forbes* published a piece by a contributing writer titled "Why is Qatar offering to trade dead Israelis for meetings with live Jews?" The article reported that an offer was being made to American Jewish leaders to return the corpses of two Israeli soldiers whom Hamas had killed if those leaders would meet with the Emir.  The article stated:

a. Rabbi Shmuel Boteach (who according to *Newsweek* is one of the ten most influential rabbis in the United States) stated that "all who agreed to whitewash the terror-stained hands of the emir would be condoning murder."

b. The State of Qatar hired Defendant Muzin, who "may have hinted to some Jewish leaders that his lobbying had the 'blessing' of Israel's elected government."  But Israel's Ambassador to the United States, Ron Dermer, denied this, stating:  "It is not true."

c. The State of Qatar has admitted to giving approximately $1.4 billion to Hamas over the past few years. (Hamas is designated by the United States as a terrorist organization).

-- 38 --   Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



d. Qatar is "like Woodstock for terrorists," and has also "been accused of hosting the Somali terrorist group Al-Shabab, an al Qaeda affiliate."

e. Defendant Muzin claimed that he contacted prominent American Jewish leaders, but ~~that "[e]ach~~ "Each denied agreeing to any meeting with Qatar and two of these leaders denied ever even speaking to Muzin." "Like a child's game of telephone, Muzin apparently told each Jewish leader that a different prominent Jew had already agreed to meet the ~~emir~~Emir. This didn't turn out to be true."

~~64.~~84. Although many American Jewish leaders declined the invitations given in September 2017, Defendant Muzin continued his attempts to arrange trips to Qatar for American Jewish leaders. These trips furthered the State of Qatar's strategy to court favor with high-profile American Jewish leaders, whom they believed could shift United States policy in favor of the State of Qatar~~.~~ and alleviate pressure caused by the economic embargo on it. On information and belief, in some instances, ~~Defendant~~Defendants Muzin and Stonington paid for the trips taken. Among those participating in the trips were:

a. Rabbi Shmully Hecht, co-founder and Rabbinical Advisor of Shabtai, the Jewish Society at Yale University, who wrote in a January 25, 2018 article in *The Times of Israel*, an online Israeli newspaper: "A few months ago, Nick Muzin asked me to attend meetings with influential global thought leaders who are also prominent in the Jewish world, and the Emir of Qatar. . . . Many prominent Jewish leaders have flown to Qatar and have spent quality time with the country's leadership."

**Formatted:** Right

b. Alan Dershowitz, the Felix Frankfurter Professor of Law, Emeritus, at Harvard Law School, who wrote in a January 12, 2018 article in *The Hill*:  "I just returned from a private visit to Qatar, at the invitation of and paid for by the Emir. . . .  I observed that Qatar is quickly becoming the Israel of the Gulf States, surrounded by enemies, subject to boycotts and unrealistic demands, and struggling for its survival." Defendant Muzin acknowledged arranging for Dershowitz to make this trip.

c. ~~Mr~~Morton A. Klein, the President of ZOA, who, despite his initial reluctance to meet with the Emir at the United Nations, ultimately decided to travel to Qatar in order to have the chance to confront the Emir, wrote in a January 30, 2018 article in *Haaretz*:  "I decided it was important for me to speak truth to power, especially when the Emir repeatedly invited me to give them my views on what they needed to do."

d. Malcolm Hoenlein, the executive vice chairman of the Conference of Presidents of Major Jewish Organizations. (During approximately the same time period in 2017, Defendant Al Thani attended the wedding of Hoenlein's daughter).

~~65.~~85. Despite these successes, there was nonetheless significant backlash in the American Jewish community against Defendant Muzin's work on behalf of the State of Qatar.  For example:

**Formatted:** List Paragraph, Line spacing: single,  No bullets or numbering

a. On January 15, 2018, Rabbi Shmuel Boteach published "An Open Letter to the Emir of Qatar," stating:  "Newspapers are

**Formatted:** Indent: Left: 1"

**Formatted:** Font color: Auto

**Formatted Table**

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

filled with reports that you have hired an Orthodox Jew, Nick Muzin, of Stonington Strategies, and his partners, as agents of Qatar to promote your image among American Jews, and to lobby the US government.  There is non-stop chatter of rabbis, writers and community leaders accepting free trips to Doha, which is big news because your regime funds Hamas — which is responsible for an endless stream of funerals in Israel."

b.  A spokesman for the Israeli Embassy in Washington denounced the trips to Qatar.  *See Haaretz* on January 31, 2018 ("We oppose this outreach effort in the Jewish and pro-Israel community.") and the *New York Times* on February 9, 2018 ("We do not approve of these visits by the Jewish organizations to Qatar.").

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

66.86. Plaintiff Broidy did not make any public statements against the trips to Qatar, but he and others did speak privately criticize them with other American Jewish leaders.  Plaintiff Broidy also funded at least two high-profile conferences in Washington, D.C. devoted to discourage them from going on the trips being organized by Defendant Muzin on behalfscrutiny of the State of Qatar.

87.   Plaintiff Broidy's past and present activities also put him on the State of Qatar's radar.  On information and belief, Plaintiff Broidy's efforts opposing the State of Qatar, and in particular the efforts of Muzin and Stonington on Qatar's behalf, only enhanced Muzin's pre-existing animus against Broidy, which arose from Broidy's successful efforts in 2016 to block Muzin from receiving a highly questionable commission on a large political donation that Muzin believed he had been instrumental in arranging.

Formatted Table

B O I E S   S C H I L L E R   F L E X N E R   L L P

**Formatted:** Right

## IV.   DEFENDANTS TARGET BROIDY

88.   In connection with his work for the State of Qatar, Defendant Muzin had weekly meetings at the Embassy of Qatar in Washington, D.C., where he discussed his ongoing efforts.  On information and belief, the agendas for these meetings were set by Defendants Al Thani and Al-Rumaihi, and the meetings began in 2017 in anticipation of the Emir's April 2018 visit to the United States for bilateral meetings with the Trump Administration and visits to Capitol Hill.  On information and belief, at those meetings, Defendant Muzin became increasingly upset about ~~ongoing political activities.~~ Plaintiff Broidy's efforts to undermine his lobbying for the State of Qatar and felt that these were personal attacks on him.  On information and belief, Defendant Muzin brought up Plaintiff Broidy in these meetings as an obstacle that needed to be dealt with for his lobbying on behalf of Qatar to succeed.

~~67.~~89. As Defendant Muzin later admitted:  "Broidy's name comes up in Embassy meetings often."  ~~At those meetings, as Defendant Muzin later~~He also admitted~~:~~, "I definitely identified him as somebody who, was not, didn't like them too much."  Defendant Muzin also stated: "There's no question I had conversations with them [the Qataris] about Elliott."

**Formatted:** List Paragraph, Line spacing: single,  No bullets or numbering

90.   The efforts undertaken in September and October 2017 by Defendant Muzin, acting as the agent of the State of Qatar ~~and the Agent Defendants reacted,~~ to ~~Plaintiff Broidy's exercise of~~influence the United States Jewish community were manifestly unsuccessful.  As alleged above, by and large, American Jewish leaders declined to meet with the Emir of Qatar when he was at the United Nations and declined offers of all-expenses-paid trips to visit Qatar.  Notwithstanding Muzin's lack of success, the State of Qatar nevertheless raised his monthly payment to $300,000 a month in November 2017 – shortly before the attacks on Plaintiffs began.  On

**Formatted Table**

Formatted: Right

1   information and belief, the increase in Muzin's monthly pay was necessary to

2   support activities related to the hacks for which Muzin had responsibility.

3       91.    Although Plaintiff Broidy was not the only outspoken critic of

4   the State of Qatar and of Muzin's efforts on its behalf, on information and

5   belief, Defendants the State of Qatar, Al Thani, Al-Rumaihi, Stonington, and

6   Muzin, targeted Plaintiff Broidy specifically because he had exercised his

7   right to speak out on an issue of national and international concern by

8   engaging in and by doing so, had negatively impacted Qatar's interests.

9       68.92. Thereafter, the Qatari Defendants and the Agent Defendants

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

10   agreed to engage in and did in fact engage in or coordinate a series of attacks

11   on the hacks and/or other misappropriation of the private communications,

12   documents, trade secrets and intellectual property of Plaintiff Broidy, his wife

13   and his company Plaintiffs, and unlawfully distributed those materials to the

14   media.

15   I.     PLAINTIFFS' EMAILS WERE HACKED, STOLEN, AND

16         ALTERED.

17   V.    DEFENDANTS EXECUTED A SOPHISTICATED
          CYBERATTACK ON PLAINTIFFS

18      A. Defendants Unlawfully Accessed Plaintiffs' Computer Network,

19         Private Communications, Documents, Trade Secrets And
         Intellectual Property

20

21       93.   On information bad and belief, sometime prior to December 27,

22   2017, Defendant State of Qatar directed its espionage and acting directly or

23   through the Agent Defendants, retained the GRA Defendants to coordinate an

24   offensive cyber and intelligence capabilities toward information operation

25   against Plaintiffs, including by infiltrating Plaintiffs' computer networks in

26   Los Angeles, California and obtaining unauthorized access to Google email

27

Formatted Table

28

B O I E S   S C H I L L E R   F L E X N E R   L L P

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

1  accounts of United States persons associated with Plaintiffs.  Servers hosting
2  those accounts are located in California.
3        94.    On information and belief, the GRA Defendants introduced
4  Defendant State of Qatar to known and unknown threat actors to execute the
5  attacks, and supervised this work and were responsible for the overall
6  execution of the project.
7        95.    Approximately one month before the cyberattacks against
8  Plaintiffs and their ~~facilities~~associates began, on information and belief, in
9  October 2017 the GRA Defendants also opened a subsidiary of GRA
10  organized under the laws of Gibraltar and physically located in Doha, Qatar.

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

11        ~~69.~~96. On information and belief, the GRA Defendants were actively
12  recruiting new employees within the ~~territory of the United States~~small
13  community of former U.S. government offensive cyber operatives, and the
14  GRA Defendants made it clear within that community that they had been
15  retained to conduct or coordinate offensive cyber operations on behalf of
16  Defendant State of Qatar.
17        ~~70.    On December 27, 2017, Plaintiff Rosenzweig received an email~~
18  ~~on her computer that appeared to be a Gmail security alert.  As requested by~~
19  ~~the email, she entered her credentials.~~
20        ~~1.  On information and belief, that email was a phishing~~ The
        Rosenzweig Attack
21
22        97.    Robin Rosenzweig, a U.S. citizen, serves as legal counsel to
23  Plaintiffs and lives in Los Angeles.  On information and belief, Ms.
24  Rosenzweig has an email account through Gmail, an email service provided
25  by Google LLC ("Google"), a company headquartered in Mountain View,
26  California.  Ms. Rosenzweig's Gmail account contains private
27  communications and requires at least a username and password for access.
28

Formatted Table

B O I E S   S C H I L L E R   F L E X N E R   L L P

**Formatted:** Right

98.     On December 27, 2017, Ms. Rosenzweig received an email at her Gmail account that appeared to be an account security alert from Google.  On information and belief, the email used Google trademarks without the permission of Google, including the Google logo and the Gmail logo.  The email was sent from a Gmail address, which had been disguised to look like an authentic security alert from Google.  The email purported to alert Ms. Rosenzweig that the security on her account had been compromised and that she needed to verify or change her account credentials.  When she clicked on the link in the email it directed her to a TinyURL website that appeared as if it was an authentic Google account login page.  TinyURL is a redirecting service that provides shortened URLs that redirects a website visitor to the website associated with the longer URL.  It is known to be used by hackers and scammers to avoid detection and circumvent spam and malware filters.  The URL address for that page was http://tinyurl.com/yaw4jmpn. When the TinyURL link was clicked it redirected Ms. Rosenzweig to the following website that contained Google's logo and appeared to be an authentic Google account update page: https://mailchallenge-service-userupdate-myprofile-authsupport-key.userupdate.info/m/pn?tR0Il12=cHpXbG8yeXhyR0lOTTIxdW5KamhMMjln&nrn=SHo5dm5KNHREYVdpbkpFNQ==&cr=SkQ9PQ==&lan=en&rD3cIn=&rCv=WGxiZFh2YmRYd3Bt&VrCe2Ph=1&VrCe2Em=.  However, that page was a fraudulent login page that is no longer active.  The TinyURL link has been terminated by TinyURL for being used for spam, fraud, malware, or other illegal activity.

99.     On information and belief, that email was a spearphishing email designed to gain unauthorized access ~~into Plaintiff~~to Ms. Rosenzweig's ~~personal~~ Google accounts, ~~which~~ which include the full suite of Google's

**Formatted Table**

B O I E S   S C H I L L E R   F L E X N E R   L L P

online products, such as Gmail, Google Drive, Google Calendar, Google Contacts, and YouTube.  Those accounts contained, among other things, personal emails, business emails, usernames and passwords to access other email accounts, including Plaintiff Rosenzweig's non-Google accounts belonging to Ms. Rosenzweig, including an account on the computer network of Plaintiff BCM.  Without authorization and in violation of Google's Terms of Service, the Defendant attackers used Ms. Rosenzweig's credentials to unlawfully access passwords stored by Ms. Rosenzweig on Google's servers. Gmail Program Policies and Google's Terms of Service, which are expressly governed by the laws of California, prohibit illegal uses as well as those of Plaintiffs sending unauthorized email of any person without their consent.

100.   On information and belief, Ms. Rosenzweig's Gmail account was accessed and modified unlawfully and without her consent on or around January 3, 2018.  The Defendant attackers modified Ms. Rosenzweig's email account settings so that emails containing "Mail.ru," "viewed," or "alert" were marked as read and moved immediately to her trash.  The Defendant attackers did this to ensure that any legitimate security alerts would not be viewed by Ms. Rosenzweig.  Mail.ru is a Russian email service that publishes an app that can be used to send and receive emails on Mail.ru or other email services like Gmail.  Unbeknownst to Ms. Rosenzweig, on January 4, 2018, Ms. Rosenzweig received a true security alert – that went directly to her trash – notifying her that a user or users of the Mail.ru app had obtained access to read, send, delete, and manage Ms. Rosenzweig's Gmail account, all without her awareness or consent.

2.  The Mowbray Attack

71.101.   Joel Mowbray is a U.S. citizen and resident of New York, New York.  Prior to December 27, 2017, Mr. Mowbray was known by

Formatted: Right

1  Defendants to be an associate of Plaintiff Broidy and BCM.as well as a critic
2  of both the Defendant State of Qatar and Defendant Muzin.
3       72.   Beginning January 16, 2018 and continuing until at least March
4  2, 2018, multiple instances of unlawful access to corporate email accounts at
5  BCM occurred.  The accounts targeted included but were not limited to
6  Plaintiff Broidy's own email account.
7       73.   Although initial forensic analysis of the BCM email server logs
8  suggested that the unauthorized access originated from IP addresses in the
9  United Kingdom and the Netherlands, a more thorough review of server data
10 from February 14, 2018 revealed that the attack had originated from an IP
11 address in Qatar.  On information and belief, the IP addresses in the
12 Netherlands and the United Kingdom originally identified were used to mask
13 the true identity of the source of the intrusion.  Plaintiff Broidy's advanced
14 cyber unit was able to uncover problems with the attacker's obfuscation
15 technique on February 14, 2018, which revealed that the attack originated in
16 Qatar.
17 **I.   DEFENDANT THE STATE OF QATAR, ACTING**
18 **THROUGH STATE-OWNED INSTRUMENTALITIES AND**
    **THE AGENT DEFENDANTS, DELIBERATELY**
    **OBTAINED AND DISSEMINATED STOLEN AND**
19 **ALTERED EMAILS AND DOCUMENTS (WHILE**
    **KNOWING THEY WERE STOLEN), AND ENGAGED IN A**
20 **HOSTILE CAMPAIGN AGAINST PLAINTIFF BROIDY.**
21       102.  On information and belief, Mr. Mowbray has a private Gmail
22 account that he uses to send and receive personal and business emails. Mr.
23 Mowbray's Gmail account contains private communications and requires at
24 least a username and password for access.  Beginning on or around December
25 27, 2017, the same day as Ms. Rosenzweig was attacked, Mr. Mowbray also
26 began to receive a barrage of spearphishing emails disguised as Google News
27 stories that bore Google trademarks used without Google's permission and

28

Formatted Table

-- 47 --                                    Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

were sent through Google's Gmail service in violation of Google's Terms of Service and Gmail's Program Policies.  The spearphishing, news-alert emails contained links purportedly to news stories about Mr. Mowbray's family, discrete projects on which Mr. Mowbray previously worked, and Plaintiff Broidy.  These topics were not the subject of general public awareness but they, and their importance to Mr. Mowbray, were known to Defendant Muzin.

103.   On information and belief, when Mr. Mowbray clicked on the link in one of the news stories, it directed him to a shortened URL website, like TinyURL or Bitly, that appeared as if it was an authentic Google account login page.  For example, one of the URL addresses was https://tinyurl.com/yckx3cny.  When this TinyURL link was clicked, it redirected Mr. Mowbray to a website that asked for his Google login credentials.  Mr. Mowbray provided his credentials to at least one of these malicious websites that contained Google's trademarks without the permission of Google.  TinyURL has now terminated this website because it has been used for spam, fraud, malware, or other illegal activity.

104.   On information and belief, Mr. Mowbray had two-factor authentication enabled for his Google account on or about December 27, 2017.  Two-factor authentication is an extra layer of security that requires not only a password and username for login, but also something that only that user has available to them, such as a mobile phone or other email address.  Mr. Mowbray's second factor was his mobile phone, which he had set to receive verification text messages or a phone call from Google containing a verification code.

105.   Beginning on or about December 27, 2017, Mr. Mowbray received a call from a United States telephone number purportedly associated with Google and containing a recording providing the verification code for his

Formatted Table

-- 48 --                                     Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right



account.  Contemporaneous with that call from Google, Mr. Mowbray also received from the Defendants several spearphishing text messages and calls from U.S. phone numbers that were purportedly from Google.  These phone numbers are associated with U.S. phone carriers such as Hook Mobile.  These text messages and calls directed Mr. Mowbray to log in to his Gmail account so that he could verify his account.  Mr. Mowbray also received spearphishing text messages such as those pictured below, and phone calls from phone numbers with U.S. area codes and registered to U.S. carriers, such as Hook Mobile, which mimicked two-factor authentication messages and made the phishing emails appear authentic.

Formatted Table

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

B O I E S   S C H I L L E R   F L E X N E R   L L P

**Formatted:** Right

1
2
3
4
5
6
7
8
9
10        106.   The Defendant attackers sent Mr. Mowbray these messages
11   because they could not access his Google account without his two-factor
12   authentication                                                  code.
13        107.   On                                              information
14   and belief,                                                  Defendants
15   also sent emails                                             to Mr.
16   Mowbray to                                                   obtain his two-
17   factor authentication code.  These emails, such as the one pictured below,
18
19
20
21
22
23
24
25
26
27
28



RIAL

**Formatted Table**

were sent from a misleading Gmail account with the name "Gmail" and email addresses, such as mymail.securealerts@gmail.com and noreply.secureservicealerts@gmail.com, which were designed to appear as if they were from authentic Google security accounts. These emails used Google trademarks and logos without the permission of Google.

108. These spearphishing emails were designed to lure Mr. Mowbray to a malicious website seeking his Google login credentials. For example, one of the links went to a Bitly URL address: http://bit.ly/2lber5Z. If the Bitly link had been clicked, it would have redirected Mr. Mowbray to the following website that contained Google's logo and appeared to be an authentic Google account page at the same domain (userupdate.info) as one of the spearphishing emails that Ms. Rosenzweig received seeking her Google login information: https://authsupport-myprofilelogon-servicemail-userowavalue-key.userupdate.info/m/vc/?tR0Il12=bnpFZ28zcXZwelNOTTIxdW5KamhM Mjln&nrn=Vk49PQ==&cr=SkQ9PQ==&lan=en&rD3cIn=&rCv=WGxiZFh2 YmRYd3A0&VrCe2Ph=&VrCe2Em. As with Ms. Rosenzweig, this link led to a fraudulent login page that is no longer active. The Bitly link was created on December 27, 2017, which is contemporaneous with the email that Mr. Mowbray received. This Bitly link has been terminated by Bitly for suspicious activity.

3. The Executive Assistant Attack

109. Plaintiff Broidy's Executive Assistant ("the Executive Assistant") is a U.S. citizen and resident of Los Angeles, CA. She is an employee of Plaintiff BCM. She has a private Gmail account that she uses to send and receive personal emails. Her Gmail account contains private communications and requires at least a username and password for access.



Formatted: Right

110.   On information and belief, on or around January 14, 2018, just weeks after Ms. Rosenzweig and Mr. Mowbray were attacked, the Executive Assistant began to receive spearphishing emails disguised as Google security alerts, which bore Google trademarks used without Google's permission and were sent through Google's Gmail service in violation of Google's Terms of Service and Gmail's Program Policies.

Formatted Table

B O L E S   S C H I L L E R   F L E X N E R   L L P



Formatted: Right

111.   On information and belief, one of the spearphishing emails contained a fictitious security alert with a picture of her face and part of her phone number.  The email was sent from a misleading Gmail account with the name "Gmail Account" and the email address noreply.user.secure.services@gmail.com, which had been drafted to look like an authentic security alert from Google.  The email purported to alert the Executive Assistant that the security on her account had been compromised and that she needed to verify or change her Google credentials.  When she clicked on the link in the email, it directed her to an Owly address, which redirected her to a website that appeared as if it was an authentic Google account login page.  Like TinyURL and Bitly, Owly is a redirecting service that provides shortened URLs that redirect a website visitor to the

Formatted Table

Formatted: Right

1  website associated with the longer URL.  It is known to be used by hackers
2  and scammers to avoid detection and circumvent spam and malware filters.
3  The URL address for that page was http://ow.ly/FJZ030hLxof.  When the
4  Owly link was clicked, it redirected her to the following website that contains
5  Google's logo and appeared to be an authentic Google account login
6  page: http://loms.96.lt/BDHRov58?platform=hootsuite.  However, that page
7  was a fraudulent login page that is no longer active.

8          4.  The BCM Attack

9      112.   Plaintiff BCM has an exchange server physically located in Los
10 Angeles, California.  The server allows BCM employees to send and receive
11 business and occasional personal emails.  Plaintiff Broidy, his Executive



Formatted Table

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

B O L E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

1  Assistant, and several other employees all have secure email accounts on the
2  BCM server containing private communications that require at least a
3  username and password for access.

4       113.   On information and belief, efforts to gain access to Plaintiff
5  BCM's network appear to have commenced as early as January 7, 2018.  The
6  first successful access was gained on January 16, 2018, just two days after the
7  successful spearphishing campaign on Plaintiff Broidy's Executive Assistant.
8  The Defendant attackers maintained unauthorized and unlawful access to the
9  BCM email server until at least February 25, 2018.  During this period, there
10  were thousands instances of unlawful and unauthorized access to corporate
11  email accounts at Plaintiff BCM, including but not limited to unlawful and
12  unauthorized connections to Plaintiff Broidy and his Executive Assistant's
13  email accounts at Plaintiff BCM.

14       114.   From January 7, 2018 to February 25, 2018, several instances of
15  unlawful and unauthorized access occurred through Virtual Private Networks
16  ("VPNs") that masked the IP addresses from which the attacks originated.
17  VPNs route internet communication through additional networks to hide the
18  original source of the connection.  Some of these VPN connections occurred
19  via IP addresses that are allocated to United States companies that lease them
20  to third parties.  For example, one of the suspicious IP addresses associated
21  with the intrusions into the BCM server was leased from Micfo LLC, a
22  company headquartered in Charleston, South Carolina.

23       115.   On February 14, 2018 and February 19, 2018, unlawful and
24  unauthorized connections originated from an IP address in Qatar.  These two
25  unlawful and unauthorized intrusions into BCM's California email server
26  were not masked by VPNs, even though the connections immediately before
27  and immediately after the access were routed through VPNs, possibly because

28

Formatted Table

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

the VPN failed or because the accessing computer automatically connected to Plaintiff BCM's network before the VPN could be activated.  These connections revealed the actual location of a computer or computers accessing Plaintiff BCM's network from an IP address in Qatar.

116.   These attacks resemble known international attacks by sophisticated cyber-hackers.  Previous attacks against other victims by these same threat actors have involved similar fraudulent news alerts, malicious Google login pages, email addresses designed to resemble legitimate Google security addresses, fraudulent two-factor authentication messages, and the use of Mail.ru to control victims' accounts.  In addition, one of the IP addresses used by the Defendants to access Plaintiffs' servers without authorization has been observed in other known, international attacks by these threat actors.

## VI.   DEFENDANTS EXECUTED A DISINFORMATION CAMPAIGN AGAINST PLAINTIFF BROIDY BY DISSEMINATING THE MATERIALS STOLEN FROM PLAINTIFFS

117.   After unlawfully obtaining Plaintiffs' private communications, emails, documents and intellectual property, the Defendants viewed the stolen documents in an email application on their computers and converted them to PDFs for dissemination to third parties.  In multiple instances, this conversion process resulted in information from the Defendants' computers being transferred as metadata to the PDF documents that were subsequently disseminated to third parties.  Many of the PDFs disseminated to third parties contained time stamps different from the Pacific Time Zone associated with the original documents – and instead bear time stamps from the Central and Eastern Time Zones.

118.   Upon information and belief, some of the unlawfully obtained documents were given to United States media outlets in hard-copy form by hand-delivery within the United States.

Formatted Table

Formatted: Right

119.   On February 24, 2018, Defendants registered the email address "LA.Confidential@mail.com" through the company 1&1 Internet, Inc., which operates in the United States through offices in Chesterbrook, Pennsylvania. Mail.com provides free email addresses akin to Google's Gmail service.  On or around March 1, 2018, Defendants used this address to unlawfully distribute Plaintiffs' stolen emails to a United States journalist employed by a United States-based company.

120.   On information and belief, Plaintiffs' stolen emails have also appeared on a website hosted by a United States company, GoDaddy LLC ("GoDaddy"), which is headquartered in Scottsdale, Arizona.  GoDaddy is a domain registrar and web hosting service that sells website domains to users so they may create their own webpage and hosts websites.  Defendants further obfuscated their identity using a registration masking service, Domain by Proxy LLC, which allows a user to replace their own personal information with information belonging to Domain by Proxy LLC for purposes of registration.  Domain by Proxy LLC is a company owned by GoDaddy LLC.

74.121.   On March 1, 2018, the contents of emails stolen from PlaintiffsPlaintiffs' California-based computer accounts and servers appeared in the *Wall Street Journal* in an article titled, "Trump Ally Was in Talks to Earn Millions in Effort to End 1MDB Probe in U.S."  Additional emails stolen from those California computer accounts and servers were published or reported on in other media outlets: including the *Huffington Post* on March 2, 2018; and the *New York Times* on March 3, 2018; and the BBC on March 5, 2018. On March 22, 2018, the *New York Times* published a front page article noting that an "anonymous group critical of Mr. Broidy's advocacy of American foreign policies in the Middle East" has been distributing "documents, which included emails, business proposals and contracts,"

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

Formatted Table

B O I L E S   S C H I L L E R   F L E X N E R   L L P

supposedly belonging to Plaintiffs.  On March 23, 2018, *Bloomberg* published an article alleging that Plaintiff Broidy had helped get Russian companies removed from a United States sanctions list; the news article noted that it had "received two separate documents this week purporting to be versions" of a unverifiable January 2017 proposal by Plaintiff Broidy geared towards influencing United States officials.  On March 26, 2018, the *New York Times* published another front page story on Plaintiff Broidy that again acknowledged that it relied on "[h]undreds of pages of Mr. Broidy's emails, proposals and contracts" received from "an anonymous group critical of Mr. Broidy's advocacy of American foreign policies in the Middle East."  On information and belief, the State of Qatar, acting through the Agent Defendants, disseminated the various stolen emails and documents, some of which had been doctored.

75.   On information or belief, the State of Qatar, acting through the Agent Defendants, disseminated additional stolen documents that were not authentic (including documents that had been altered or wholly fabricated) that attempt to portray Plaintiff Broidy as involved with a Russian bank that had been the subject of international sanctions.  Al Jazeera, the State of Qatar's state-owned broadcaster, published those documents on March 8, 2018.  None of the other media organizations to which the documents had been distributed at the time did so.

76.122.    On March 8, 2018, Defendant Muzin demonstrated his knowledge that Plaintiff Broidy had been successfully targeted by the State of Qatar by stating: "I did not cause the Broidy stuff, just because I have information" and "I don't know all the details, but I know that I am hearing repeatedly that there's a lot more coming."

Formatted: Right

1    123.   On March 22, 2018, the *New York Times* published a front page

2    article noting that an "anonymous group critical of Mr. Broidy's advocacy of

3    American foreign policies in the Middle East" has been distributing

4    "documents, which included emails, business proposals and contracts,"

5    supposedly belonging to Plaintiffs.  On March 23, 2018, *Bloomberg* published

6    an article about Plaintiff Broidy, which noted that it had "received two

7    separate documents this week purporting to be versions" of materials

8    belonging to Plaintiff Broidy.

9    77.   On March 26, 2018, the *New York Times* published another front page story

10   on Plaintiff Broidy that again acknowledged that it relied on "[h]undreds of pages of Mr.

11   Broidy's emails, proposals and contracts" received from "an anonymous group critical of

12   Mr. Broidy's advocacy of American foreign policies in the Middle East."  On

13   information and belief, following that March 8, 2018 conversation, there were

14   further unlawful disclosures of the contents of Plaintiffs' emails and the

15   altered and forged documents, and the *New York Times*, *The Associated Press*,

16   *Newsweek*, *Bloomberg*, *The Huffington Post*, and other news organizations

17   have indicated to Plaintiffs that they have received documents that purport to

18   belong to Plaintiffs, and plan to write additional stories about them.  The

19   dissemination of stolen and doctored materials concerning Plaintiffs is

20   ongoing.

21   78.   Although Defendant Muzin has attempted to distance himself

22   from the attacks on those accounts by stating he wasn't "the one who's calling

23   the reporters and giving the stories," Defendant Muzin also mentioned that

24   there are weekly meetings at the Embassy of Defendant State of Qatar in

25   Washington D.C. in which he or his representatives along with high-level

26   Embassy personnel and other registered agents of Defendant the State of

27   Qatar discuss strategies to improve its image, which strategies include

28

Formatted: Font: 12 pt, Font color: Auto

Formatted: Font: 12 pt

Formatted Table

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

1  targeting and destroying the reputations of those who oppose them. "Broidy's

2  name comes up in Embassy meetings often," Defendant Muzin stated. In

3  subsequent conversations, Defendant Muzin clearly demonstrated his

4  knowledge of and encouragement of the unlawful conduct towards Plaintiff

5  Broidy and his participation in the conspiracy, by stating that "there's a lot

6  more coming," which, on information and belief, was followed by further

7  leaks of Plaintiffs' emails and the altered and forged documents. Defendant

8  Muzin stated to another individual critical of Qatar: "I know they're [Qatari

9  officials] after you and Broidy." (emphasis added.)

10       79.   Defendant Muzin worked closely with high level Qatari officials

11  on shaping their outreach in Washington D.C. He not only attended meetings

12  at the Embassy of Qatar but has been involved in planning the Emir's

13  forthcoming trip to Washington D.C., and was aware of details of that state

14  visit before they were made public. On information and belief, Defendant

15  Muzin hoped to parlay his high level work with Qatari officials into lucrative

16  business deals in Qatar.

17       124.

18       125.  Media outlets in the United States and abroad continue to publish

19  – and to threaten to publish – materials stolen from Plaintiffs.  Plaintiffs

20  continue to receive numerous press inquiries concerning such materials.

21       126.  On information and belief, the State of Qatar, acting through the

22  Agent Defendants, was responsible for disseminating the emails and

23  documents stolen from Plaintiffs' California-based email accounts and

24  servers.

25       80.127.    On March 19, 2018, Plaintiffs'Plaintiffs,  through counsel,

26  formally requested that the State of Qatar take appropriate action to halt the

27  attacks on Plaintiffs' emails, documents, and data and, to stop Defendants

28

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

Formatted Table

-- 60 --                    Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES SCHILLER FLEXNER LLP

Formatted: Right

from disseminating Plaintiffs' emails, documents, and data, and/or to assist Plaintiffs in halting dissemination if the hack had been conducted by a rogue ~~actor in~~agent of the State of Qatar.  However, to date, no response has been received to that letter.

128.   On information and belief, the ~~State of Qatar, with~~ Qatari Defendants, the ~~knowledge~~GRA Defendants and ~~participation of~~ the Agent Defendants, ~~orchestrated~~while in the ~~attack on~~ United States, conspired to unlawfully access Plaintiffs' ~~email accounts after Defendant Muzin identified Plaintiff Broidy as an individual who was opposing the State of Qatar's efforts to improve its image~~private communications, documents, trade secrets and ~~relationships in~~ intellectual property located in California, and to disseminate that information to the media as retribution for Plaintiff Broidy's public and private criticisms of  Defendants State of Qatar and Muzin, including his direct criticisms of the State of Qatar to the President of the United States.

129.   Upon information and belief, the Qatari Defendants, the GRA Defendants and the Agent Defendants also carried out that conspiracy and unlawfully accessed Plaintiffs' private communications, documents, trade secrets and intellectual property located in California, and further engaged in distribution of that information to media outlets in both the United States and abroad.  Upon information and belief, many of the instances of unlawful distribution of illegally obtained took place within the United States.

130.   The actions of the Qatari Defendants, the GRA Defendants and the Agent Defendants as alleged herein were specifically proscribed by law and were not matters left to the discretion, choice or judgment of a sovereign state.

Formatted Table

Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES SCHILLER FLEXNER LLP

Formatted: Right

**B. Defendants Muzin and Stonington Implicated Themselves With Respect To The Dissemination Of Materials Unlawfully Obtained From Plaintiffs' Email Accounts And Servers**

131.   Upon information and belief, on January 28, 2018, prior to the first public disclosure in the United States of materials stolen from Plaintiffs, Ben Wieder, a reporter at *McClatchy*, a Washington, D.C. and who publication focused on politics, emailed Defendant Muzin and commented to Defendant Muzin that it was "time to rock."

132.   Weider's article, "GOP Leans on Rainmaker who Courts Controversy on Two Continents," which appeared in *McClatchy* on February 7, 2018, discussed Plaintiff Broidy's political activities in the United States and his business interests in Romania.  The article did not mention either of Muzin's clients at the time (Qatar and Albania).  Indeed, the article did not mention the Middle East at all.  There is no apparent connection between Wieder's January 28th remark to Muzin (that it was aligned "time to rock") and the February 7th article.

133.   On February 27, 2018, Defendant Muzin demonstrated further foreknowledge of press reports about Plaintiff Broidy based on illegally obtained information when he informed Mowbray that there were "reporters circulating around" to focus on issues relating to Plaintiff Broidy, the Middle East and George Nader.  (In that same conversation, Defendant Muzin also referred to "all the shit" that he believed Plaintiff Broidy and Mowbray had "done to" him.)

134.   The first published report of any alleged connection between Nader and Plaintiff Broidy did not occur until March 3, 2018.  Unless Defendant Muzin possessed or knew about documents and information contained in documents unlawfully obtained from Plaintiffs' servers, Muzin would not have been a position to know about the particular issues relating to

Formatted Table

-- 62 --                          Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



**Formatted:** Right

1  Plaintiff Broidy, the Middle East and Nader that were about to become the
2  focus of media attention.

3       135.   On March 5, 2018, Defendant Muzin informed Mowbray that
4  there was "more stuff coming" from the *New York Times.*

5       81.136.       In the same meeting with Mowbray, Defendant Muzin

**Formatted:** List Paragraph, Line spacing: single, No bullets or numbering

6  discussed meetings he had with ~~its regional rivals, the UAE and Saudi~~
7  ~~Arabia.~~his client the State of Qatar while serving as a registered agent of
8  Qatar.  Muzin told Mowbray: "Broidy's name comes up in Embassy meetings
9  often" and "I definitely identified him as somebody who, was not, didn't like
10  them too much."  Muzin further acknowledged that everyone he "fingered"
11  was "in danger."  He warned Mowbray that Mowbray and Plaintiff Broidy
12  needed "to be very careful," that the State of Qatar is "going after you," and
13  that "Honestly, I know they're after you and Broidy."

14       137.   In the same meeting, when Mowbray accused Defendant Muzin
15  of targeting Plaintiff Broidy for the State of Qatar and assisting in the hacks
16  on Plaintiffs and attempted hacks on Mowbray, Muzin responded "I was
17  doing my job."  Somewhat belatedly, Muzin stated that he realized that he
18  needed "to be a little more careful" when he spoke to Mowbray.

19       138.   On March 22, 2018, as foretold by Defendant Muzin on March
20  5th, the *New York Times* published a front page article noting that an
21  "anonymous group critical of Mr. Broidy's advocacy of American foreign
22  policies in the Middle East" has been distributing "documents, which included
23  emails, business proposals and contracts," supposedly belonging to Plaintiffs.
24  On March 23, 2018, *Bloomberg* published an article about Plaintiff Broidy
25  and noted that it had "received two separate documents this week purporting
26  to be versions" of documents belonging to Plaintiff Broidy.  On March 26,

**Formatted:** Font color: Auto

27  2018, the *New York Times* published another front page story on Plaintiff

**Formatted Table**

28

Broidy that again acknowledged that it relied on "[h]undreds of pages of Mr. Broidy's emails, proposals and contracts" received from "an anonymous group critical of Mr. Broidy's advocacy of American foreign policies in the Middle East."

139.   The actions of the Agent Defendants, the GRA Defendants and Defendants Al Thani and Al-Rumaihi described herein are not subject to derivative sovereign immunity because, among other things, the State of Qatar is not entitled to sovereign immunity.  In addition, although the actions of the Agent Defendants, the GRA Defendants and Defendants Al Thani and Al-Rumaihi originated in a conspiracy with the State of Qatar, upon information and belief, the State of Qatar left to the Agent Defendants, the GRA Defendants and Defendants Al Thani and Al-Rumaihi discretion and choice as to the manner in which they would carry out their parts of the unlawful conspiracy.  As such, for these and other reasons, they are not entitled to derivative sovereign immunity for their conduct in furtherance of the conspiracy.

## CAUSES OF ACTION

### FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

#### Computer Fraud and Abuse Act
#### 18 U.S.C. §§ 1030(a)(2)(C) & (a)(5)

82. 140.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

141.   On information and belief, Defendant the State of Qatar, by itself and/or through its agent Ooredoo and the Agent Defendants and the GRA Defendants, accessed or caused to be accessed Plaintiffs' computers servers, and emails and documents physically located on those servers, at Broidy

-- 64 --

1  ~~Capital Management~~BCM's offices in Los Angeles, California, as well as

2  Google servers located in California, specifically by accessing or causing to

3  be accessed accounts associated with Plaintiff Broidy and other BCM

4  employees.

5  142.   Said Defendants first compromised ~~Plaintiff~~ Rosenzweig's

6  personal email account by a targeted ~~phishing~~spearphishing email in

7  December 2017, and thereafter, beginning on or about January 16, 2018, and

8  without authorization, accessed BCM's servers, and emails and documents

9  physically located on those servers, including the ~~corporate~~ accounts of

10  Plaintiff Broidy and other BCM employees.  Defendants ~~did so~~acted with

11  knowledge that they were accessing these accounts without Plaintiffs'

12  authorization.

13  ~~83.~~143.   Defendants ~~not only~~ engaged in ~~the~~ deliberate

14  ~~phishing~~spearphishing attacks ~~and~~ on Rosenzweig, Mowbray and Plaintiff

15  Broidy's Executive Assistant (as well as attempted spearphishing attacks on

16  Mowbray) and used information gained from the attacks on Rosenzweig and

17  Plaintiff Broidy's Executive Assistant to obtain unauthorized access,~~but~~ to

18  Plaintiffs' servers, and emails and documents physically located on those

19  servers located in Los Angeles, California.  Defendants also implemented

20  identifiable obfuscation techniques to engage in ultimately unsuccessful

21  efforts to hide the origin of their ~~cyber-attacks~~spearphishing attacks and

22  unauthorized access to Plaintiffs' servers, and emails and documents

23  physically located on those servers and the servers of Google.

24  ~~84.~~144.   On information and belief, by engaging in this conduct,

25  Defendants accessed "protected computers~~.~~" defined by 18 U.S.C.

26  § 1030(e)(2)(B) as computers "used in or affecting interstate or foreign

27  commerce or communication."

28

BOIES SCHILLER FLEXNER LLP



85.145.   OnUpon information and belief, after accessing the relevant accounts, Defendants obtained and stole private emails and documents, and then distributed Plaintiffs' private information to the media. Defendants also altered information contained in the emails, and in some instances wholly forged new documents, and then distributed those altered or forged documents to the media.  On information and belief, by virtueas a direct result of the actions of Defendants, Plaintiffs suffered damage, including harm to the integrity or availability of their data, programs, and computer systems, including but not limited to the stealing of Plaintiffs' data, and the corruption and doctoring of Plaintiffs' emails.California-based servers, and emails and documents physically located on those servers.

86.146.   On information and belief, by virtueas a direct result of the actions of Defendants, Plaintiffs also suffered loss, including but not limited to the investigation costs associated with identifying the cyber-attacks and repairing the integrity of Plaintiffs' computer systemsservers after the attacks, including by hiring forensic investigators and data security experts, and attorneys, among other losses, in an amount to be proven at trial, but in any event, in excess of $5,000 and, together with the other alleged damages, in excess of $75,000, exclusive of interest and costs.

147.  OnUpon information and belief, the unlawful action by Defendants alsointentionally caused such damage to Plaintiffs.

148.  Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an increased risk of further theft, and an increased risk of harassment, and increased risk of being required to engage in costly efforts to defend themselves against erroneous, libelous accusations.  Plaintiffs' remedy at law is not itself adequate to compensate for the injuries inflicted by.  Such injury

-- 66 --

Formatted: Right

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted Table

cannot be compensated by monetary damages.  Plaintiffs accordingly seek an injunction prohibiting Defendants.  Accordingly, Plaintiffs are also entitled to injunctive relief to prevent the from engaging in the conduct described in the Cause of Action.

87.149.    Plaintiffs further accessing, use, and dissemination of Plaintiffs' data.seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

## FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS

## California Comprehensive Computer Data Access and Fraud Act Cal. Pen. Code § 502

88.150.    Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

89.151.    On information and belief, Defendant the State of Qatar, acting by itself and/or through its agent Ooredoo and the Agent Defendants, violated § 502(c)(2) by knowingly accessing and without permission taking and making use of programs, data, and files from Plaintiffs' and Google's computers, computer systems, and/ or computer networks, all of which were located in California.

90.152.    On information and belief, Defendants have violated § 502(c)(4) by knowingly accessing and without permission altering Plaintiffs' data, which resided in Plaintiffs' and Google's computers, computer systems, and/ or computer networks, all of which were located in California.

91.153.    On information and belief, Defendants have violated § 502(c)(6) by knowingly and without permission providing or assisting in

-- 67 --

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 18-cv-02421-JFW



providing, a means of accessing Plaintiffs' and Google's computers, computer

systems, and/ or computer networks, all of which were located in California.

92.154.    On information and belief, Defendants have violated

§ 502(c)(7) by knowingly and without permission accessing, or causing to be

accessed, Plaintiffs' and Google's computers, computer systems, and/ or

computer networks, all of which were located in California.

93.155.    On information and belief, Defendants have violated §

502(c)(9) by knowingly and without permission using the Internet domain

name or profile of another individual in connection with the sending of one or

more email messages and thereby damaging Plaintiffs' and Google's

computers, computer data, computer systems, and/ or computer networks, all

of which were located in Los Angeles, California.

94.    Plaintiffs own certain data that comprises information that, on

information and belief, was obtained by Defendants as alleged above.

95.156.    On information and belief, Defendants knowingly and

unlawfully accessed the or caused to be accessed computers, computer

systems or computer networks at Plaintiff BCM as well as Plaintiff

Rosenzweig's computer in the manner described above, and Google, all of

which were located in California.  Defendants knew that at the time that they

accessed the various accounts, they were without did not have the

authorization to do so.  For this reason, Defendants engaged in phishingtake

such action.  This knowledge is demonstrated by Defendants' use of

spearphishing attacks and attempted spearphishing attacks, as well as

identifiable obfuscation techniques in an attempt to hide the origin of their

cyber-attackattacks.

96.    On information and belief, after accessing the relevant accounts,

Defendants obtained and stole massive amounts of private emails and

-- 68 --

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 18-cv-02421-JFW

B O I E S   S C H I L L E R   F L E X N E R   L L P

1  documents, and then distributed Plaintiffs' private information to the media.
2  Defendants also doctored the information contained in the emails and
3  documents, and then distributed those doctored or altered emails and
4  documents to the media.

5  ~~97.~~157.    On information and belief, Defendants engaged in these
6  actions as part of a targeted attack on Plaintiff Broidy, who is an outspoken
7  critic of the Qatari government ~~and whose businesses are assisting in~~
8  ~~developing the defense and anti-terrorism capabilities of the UAE, one of the~~
9  ~~regional rivals of the State of Qatar, and has engaged in discussions to do the~~
10 ~~same for Saudi Arabia, another regional rival of the State of Qatar~~.

11 ~~98.~~158.    On information and belief, as a direct and proximate result
12 of Defendants' unlawful conduct, Plaintiffs have been damaged in an amount
13 to be proven at trial, but in any event, in excess of $75,000 exclusive of
14 interest and costs, including but not limited to the investigation costs
15 associated with identifying the cyber-attacks; verifying the integrity of the
16 computers, computer systems~~, or~~ computer networks, computer programs
17 and/or computer data, ~~and/or data~~; and repairing the integrity of Plaintiffs'
18 computer systems after the attack, including by hiring forensic investigators
19 and data security experts.  Plaintiffs are also entitled to recover their
20 attorneys' fees pursuant to § 502(e).

21 ~~99.~~159.    Additionally, Defendants' actions were willful and
22 malicious, such that Plaintiffs are also entitled to punitive damages under
23 §~~.~~ 502(e)(4).

24     160.   ~~On information and belief,~~ Defendants' ~~unlawful access to and~~
25 ~~theft from Plaintiffs' computers, and Defendants' subsequent dissemination of~~
26 ~~Plaintiffs' information,~~conduct has ~~also~~ caused, and will continue to cause,
27 Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an

28

BOIES SCHILLER FLEXNER LLP



increased risk of further theft, and an increased risk of harassment. ~~Plaintiffs' remedy at law is not itself adequate to compensate for the injuries inflicted~~Such injury cannot be compensated by ~~Defendants. Accordingly,~~monetary damages. Plaintiffs ~~are also entitled to injunctive relief to prevent~~accordingly seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

~~100.~~161.    Plaintiffs further ~~accessing, use, and dissemination of Plaintiffs' data.~~seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

**FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**Receipt and Possession of Stolen Property in Violation of Cal. Pen. Code § 496**

~~101.~~162.    Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

~~102.~~163.    On information and belief, Defendant the State of Qatar, acting by itself and/or through ~~its agent Ooredoo and/or~~the Agent Defendants, received property, including private communications, documents, ~~emails,~~trade secrets and ~~other materials~~intellectual property housed on Plaintiffs' ~~computer networks,~~and Google's servers, and in emails and documents physically located on those servers, all of which ~~had been~~were located in California, and were stolen from Plaintiffs in California or ~~had been~~otherwise obtained from Plaintiffs in California in a manner that constitutes theft. ~~Plaintiffs are engaged in ongoing efforts to receive additional property stolen from Plaintiffs or obtained from Plaintiffs in a manner that constitutes theft.~~

164.    ~~On~~Upon information and belief, in at least some instances, Defendants ~~knew that~~were in the ~~property~~United States when they received

-- 70 --



Formatted: Right

1  was stolen or obtained in a manner that constituted theft, and Defendants

2  know that~~or possessed~~ the ~~property they are continuing to acquire and~~

3  ~~disseminate can only be acquired if it is stolen or obtained in a manner that~~

4  ~~constitutes theft.  In fact, Defendant Muzin acknowledged that he had~~

5  unlawfully obtained information~~about.~~

6      ~~103.~~165.    Upon information and belief, at least some instances of the

7  ~~cyber-attacks and knew that there was "a lot more coming."~~unlawful receipt

8  and possession of Plaintiffs stolen information occurred in the United States.

9      ~~104.~~166.    On information and belief, as a result of Defendants'

10  actions, Plaintiffs have been damaged in an amount to be proven at trial, but in

11  any event, in excess of $75,000, exclusive of interest and costs, and are

12  entitled to treble damages, the costs of bringing this suit, and attorneys' fees

13  under § 496(c).

14      167.   ~~On information and belief,~~ Defendants' ~~unlawful actions have~~

15  ~~also~~conduct has caused, and will continue to cause Plaintiffs irreparable

16  injury, including reputational harm, loss of goodwill, an increased risk of

17  further theft, and an increased risk of harassment.  ~~Plaintiffs' remedy at law is~~

18  ~~not itself adequate to compensate for the injuries inflicted~~Such injury cannot

19  be compensated by ~~Defendants.  Accordingly,~~monetary damages.  Plaintiffs

20  ~~are also entitled to injunctive relief to prevent~~accordingly seek an injunction

21  prohibiting Defendants from engaging in the conduct described in the Cause

22  of Action.

23      ~~105.~~168.    Plaintiffs further ~~accessing, use, and dissemination of~~

24  ~~Plaintiffs' data.~~seek a declaration that Defendants' conduct as described in

25  this First Amended Complaint is a violation of this Cause of Action.

26      ///

27      ///

28

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

Formatted: Font: Not Bold

Formatted: Font: Not Bold

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

Formatted: Font color: Auto

Formatted: Font: Not Bold, No underline

Formatted Table

B O I E S   S C H I L L E R   F L E X N E R   L L P



///

## FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

**Invasion of Privacy by Public Disclosure of Private Facts**

106.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

107.   Plaintiffs have a reasonable privacy interest in their personal information, including information contained in their private email accounts. Additionally, Plaintiffs had a reasonable expectation that information contained in their email accounts would remain private.

108.   Access to Plaintiffs' personal accounts was achieved by unlawful hacking and stealing of personal data.  Without these unlawful actions, Plaintiffs' personal information would not have been made public.

109.   On information and belief, after hacking, stealing, and altering Plaintiffs' personal information, Defendant the State of Qatar, acting by itself and/or through its agent Ooredoo and the Agent Defendants, publicly disclosed Plaintiffs' personal information by disseminating the materials to the media for publication, and sought to facilitate further disclosures by providing staggered data "dumps" to the media.

110.   On information and belief, the personal information that Defendants have publicly disclosed includes, but is not limited to, confidential communications between Plaintiff Broidy and his clients and/or personal relations and legal documents, some of which have been fabricated or altered.

111.   The public disclosure – and its threatened further disclosures – of Plaintiffs' personal information constitutes a public disclosure of private facts.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 18-cv-02421-JFW

Formatted: Right

112.   At no time have Plaintiffs waived or otherwise taken any action that would constitute an implied waiver of their privilege against the public disclosure of private facts.

113.   On information and belief, the personal information that Defendants have publicized, and are threatening to further publicize, are not matters of public concern.  Neither Defendants nor the public have a need to acquire, review, or disseminate Plaintiffs' personal information and communications for any legitimate purpose.  Nor, in fact, have Defendants acted with a legitimate purpose.  Rather, they have publicly disclosed Plaintiffs' private information merely to attack a private United States citizen.

114.   The public disclosure of Plaintiffs' personal information is highly offensive to a reasonable person of ordinary sensibilities.  Individuals have a legitimate and reasonable interest in keeping their personal email communications private, and reasonably expect that such information will not be publicly disclosed.

115.   The public disclosure of Plaintiffs' personal information has caused, and will continue to cause, Plaintiffs injury, including reputational harm, an increased risk of further theft, and an increased risk of harassment.

116.   On information and belief, Plaintiffs will continue to suffer this injury as long as their personal information is available to Defendants and, consequently, to numerous organizations.  Plaintiffs' remedy at law is not itself adequate to compensate for the injuries inflicted by Defendants.  Accordingly, Plaintiffs are entitled to injunctive relief to prevent the further accessing, use, and dissemination of Plaintiffs' data.

117.1. The public disclosure of Plaintiffs' personal information has also caused them to suffer monetary damages, at an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

Formatted: Font color: Auto

Formatted: List Paragraph, Line spacing: single,  No bullets or numbering

Formatted Table

BOIES SCHILLER FLEXNER LLP

Because Defendants' actions are intolerable in a civilized community, Plaintiffs also seek punitive damages.

///

**FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**Invasion of Privacy by Intrusion
Upon Seclusion**

118. 169.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

119. 170.   Plaintiffs have a legally protected privacy interest in their personal information, including in information contained on Plaintiffs' email accounts Google's servers, and in emails and documents physically located on those servers, all of which were located in California, and had a reasonable expectation that their information would remain private.  Plaintiffs' accounts were password protected, and at no time did Plaintiffs provide those passwords, or the contents of their emails, to the public.

120. 171.   On information and belief, Defendant the State of Qatar, acting by itself and/or through its agent Ooredoo and the Agent Defendants, hacked, stole, doctored, and disseminated to others the personal and private information of Plaintiffs.  Defendants clearly did so without permission and with deliberate intent to access and obtain Plaintiffs' personal and private information.  At no point did Plaintiffs authorize Defendants to hack, steal, doctor, or disseminate their personal and private information.  Upon information and belief, at least some of the unlawful disseminations of Plaintiffs' personal information occurred completely within the United States



121.172.    On information and belief, Defendants' intentional intrusion upon Plaintiffs' seclusion was highly offensive to Plaintiffs and would be unjustifiable and highly offensive to an ordinary, reasonable person.

122.173.    The public disclosure of Plaintiffs' personal information has caused, and will continue to cause, Plaintiffs injury, including reputational harm, an increased risk of further theft, and an increased risk of harassment.

123.174.    Plaintiffs will continue to suffer this injury as long as their personal information is available to Defendants and, subsequently, to media organizations and the world at large.  Plaintiffs' remedy at law is not itself adequate to compensate for the injuries inflicted by Defendants.  Accordingly, Plaintiffs are entitled to injunctive relief to prevent the further accessing, use, and dissemination of Plaintiffs' data.

124.    The public disclosure of Plaintiffs' personal information has also caused them to suffer monetary damages, at an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs. Because Defendants' actions are intolerable in a civilized community, Plaintiffs also seek punitive damages.

175.    The public disclosure of Plaintiffs' personal information has also caused them to suffer monetary damages, at an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs. Because Defendants' actions are intolerable in a civilized community, Plaintiffs also seek punitive damages.

176.    Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an increased risk of further theft, and an increased risk of harassment.  Such injury cannot be compensated by monetary damages.  Plaintiffs accordingly

-- 75 --    Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

177.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

**FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**Conversion**

125.178.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

179.   By hacking Plaintiffs had ownership of and stealing Plaintiffs' personal emails and the right to possess their property, including private communications, documents, along with Plaintiff Rosenzweig's passwords, trade secrets and intellectual property, all of which were located in California.

180.   Defendant the State of Qatar, acting by itself and/or through its agent Ooredoo and the Agent Defendants, took Plaintiffs' exclusive private converted or disposed of Plaintiffs' property including the rights to that property, by unlawfully accessing, or at a minimum receiving that property, including private communications, documents, trade secrets and intellectual property with knowledge that it had been unlawfully taken, and personal property. Additionally, ondisseminating them to the media in the United States and abroad.

126.181.   Upon information and belief, certainsome instances of the emails were doctoredunlawful access and then deleted by Defendants

*B O I E S   S C H I L L E R   F L E X N E R   L L P*



1  ~~from~~theft of Plaintiffs' ~~computers~~property occurred completely within the

2  United States.

3      182.   ~~On~~Upon information and belief, ~~Defendants clearly engaged in~~

4  ~~these actions without~~at least some of the unlawful receipt and dissemination

5  of Plaintiffs' personal information occurred completely within the United

6  States.

7      ~~127.~~183.    Plaintiffs did not provide permission ~~from Plaintiffs and~~

8  ~~with the deliberate intent to access and obtain Plaintiffs' personal and private~~

9  ~~information.  At no point did Plaintiffs authorize Defendants to hack, steal,~~

10 ~~doctor,~~to access, receive or disseminate their exclusive personal and private

11 information.

12 ~~128.   Plaintiffs will continue to suffer injury as long as their personal~~

13 ~~information is available to Defendants and, subsequently, to media~~

14 ~~organizations and the world at large.  Plaintiffs' remedy at law is not itself~~

15 ~~adequate to compensate for the injuries inflicted by Defendants.  Accordingly,~~

16 ~~Plaintiffs are entitled to injunctive relief to prevent the further accessing, use,~~

17 ~~and dissemination of Plaintiffs' data.~~

18 ~~129.~~184.    The public disclosure of Plaintiffs' personal information

19 has also caused them to suffer monetary damages, at an amount to be proven

20 at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

21 ~~130.~~185.    Additionally, Defendants' actions were willful and

22 malicious, such that Plaintiffs are also entitled to punitive damages.

23      186.   Defendants' conduct has caused, and will continue to cause

24 Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an

25 increased risk of further theft, and an increased risk of harassment.  Such

26 injury cannot be compensated by monetary damages.  Plaintiffs accordingly

27

28

BOIES SCHILLER FLEXNER LLP

Formatted: Right
Formatted: Font color: Auto
Formatted: Font color: Auto
Formatted: Font: Not Bold, No underline
Formatted: List Paragraph, Line spacing: single,  No bullets or numbering
Formatted: Font: Not Bold
Formatted: Font color: Auto
Formatted: List Paragraph, Line spacing: single,  No bullets or numbering
Formatted: Font: Not Bold
Formatted: Font color: Auto
Formatted: List Paragraph, Line spacing: single,  No bullets or numbering, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers
Formatted: Font: Not Bold, Font color: Auto
Formatted Table

seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

187.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

## FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

### Stored Communications Act
### 18 U.S.C. §§ 2701-12

188.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

189.   Plaintiffs are "persons" within the meaning of 18 U.S.C. §§ 2510(6) and 2707(a).

190.   Defendants willfully and intentionally accessed without authorization a facility through which an electronic communication service is provided, namely, BCM's computer systems, including its email servers, as well as Google's servers, thereby obtaining access to wire or electronic communications while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a).

191.   As a result of Defendants' willful and intentional violations, Plaintiffs have suffered damages and, as provided for in 18 U.S.C. § 2707, are entitled to an award of the greater of the actual damages suffered or the statutory damages, punitive damages, attorneys' fees and other costs of this action, and appropriate equitable relief.

192.   Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an

-- 78 --

increased risk of further theft, and an increased risk of harassment.  Such injury cannot be compensated by monetary damages.  Plaintiffs accordingly seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

193.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

### FOR A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

### Digital Millennium Copyright Act
### 17 U.S.C. § 1201 *et seq.*

194.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

195.   Plaintiffs' computer networks and files contained information subject to protection under the copyright laws of the United States that were illegally accessed by Defendants without authorization.  These materials included, but were not limited to, presentations, proprietary business plans and proposals, and strategic correspondence.

196.   Access to the copyrighted material contained on Plaintiffs' computer networks and email accounts was controlled by technological measures, including firewalls, antivirus software, and measures restricting access to users with valid credentials and passwords.

197.   Defendants conducted a targeted attack to circumvent these technological measures by stealing usernames and passwords from authorized users.  Defendants sent spearphishing emails containing links to malicious websites designed to trick users into providing usernames and passwords.  Defendants used the information they obtained from their spearphishing

-- 79 --

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**Formatted:** Right

1   attacks to gain unauthorized access to Plaintiffs' computer networks and email
2   accounts.
3        198.   Defendants' conduct caused Plaintiffs significant damages,
4   including, but not limited to, damage resulting from harm to Plaintiffs'
5   computers, loss in the value of Plaintiffs' trade secrets and proprietary
6   business information, and harm to the business.
7        199.   As a result, Plaintiffs are entitled to the greater of their actual
8   damages or statutory damages as provided by 17 U.S.C. § 1203, in an amount
9   to be proven at trial.  Plaintiffs are further entitled to attorneys' fees and costs
10  as provided by 17 U.S.C. § 1203.
11       200.   Defendants' conduct has caused, and will continue to cause
12  Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an
13  increased risk of further theft, and an increased risk of harassment.  Such
14  injury cannot be compensated by monetary damages.  Plaintiffs accordingly
15  seek an injunction prohibiting Defendants from engaging in the conduct
16  described in the Cause of Action.
17       201.   Plaintiffs further seek a declaration that Defendants' conduct as
18  described in this First Amended Complaint is a violation of this Cause of
19  Action.

20                **FOR AN EIGHTH CAUSE OF ACTION AGAINST ALL
21                                    DEFENDANTS**

22                        **California Uniform Trade Secrets Act
                              Cal. Civ. Code § 3426 *et seq.***

23       202.   Plaintiffs incorporate and adopt by reference the allegations
24  contained in each and every preceding paragraph of this First Amended
25  Complaint.
26       203.   The California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ.
27  Code § 3426 *et seq.*, prohibits the misappropriation of any "trade secret."
28

**Formatted Table**

B O I E S   S C H I L L E R   F L E X N E R   L L P

B O I E S   S C H I L L E R   F L E X N E R   L L P

Formatted: Right

204.   Defendants misappropriated a "trade secret" as defined by the CUTSA to include "information, including a formula, pattern, compilation, program, device, method, technique, or process, that:  (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).

205.   The BCM server stored trade secrets including but not limited to highly confidential business plans and proposals, research supporting those plans and proposals including costs and service projections, information concerning business strategies and opportunities, and contacts for important business relationships. These trade secrets are of immense value to Plaintiffs.

206.   Plaintiffs take and have taken reasonable measures to keep this information secret.  For example, Plaintiffs have always maintained their information on secured servers that are protected by passwords, firewalls, and antivirus software.

207.   Plaintiffs' trade secrets derive independent actual and potential economic value from not being generally known or available to the public or other persons who can obtain economic value from their disclosure or use.

208.   Plaintiffs' trade secrets have significant value, resulting from significant investment of time and resources.

209.   Plaintiffs have made, and continue to make, efforts that are reasonable under the circumstances to maintain the secrecy of their trade secrets.

210.   Defendants improperly disclosed Plaintiffs' trade secrets without Plaintiffs' consent when they widely disseminated those trade secrets to media

Formatted Table

B O I E S   S C H I L L E R   F L E X N E R   L L P

organizations for publication and at the time of such disclosure, knew or had reason to know that the information disclosed consisted of trade secrets.

211.   As a direct consequence of Defendants' misappropriation, Plaintiffs have suffered damages, which include, but are not limited to, damage resulting from harm to Plaintiffs' computers, servers, and accounts, loss in the value of Plaintiffs' trade secrets and business information, and harm to Plaintiffs' business, in an amount to be proven at trial.

212.   As a direct consequence of Defendants' unlawful misappropriation, Defendants have unjustly benefited from their possession of Plaintiffs' trade secrets.

213.   In misappropriating Plaintiffs' trade secrets, Defendants acted willfully and maliciously.  Plaintiffs are thus entitled to exemplary damages under Section 3426.3(c) of the Civil Code.  Plaintiffs are also entitled to reasonable attorneys' fees and costs under Section 3426.4 of the Civil Code.

214.   Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an increased risk of further theft, and an increased risk of harassment.  Such injury cannot be compensated by monetary damages.  Plaintiffs accordingly seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

215.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

**FOR A NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**Misappropriation of Trade Secrets In Violation of the Defend Trade Secrets Act**

**18 U.S.C. § 1836 *et seq.***

B O I E S   S C H I L L E R   F L E X N E R   L L P

**Formatted:** Right

216.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

217.   The materials that Defendants stole from Plaintiffs' and Google's computer systems include trade secrets within the meaning of 18 U.S.C. § 1839.

218.   The BCM server stored trade secrets including but not limited to highly confidential business plans and proposals, research supporting those plans and proposals including costs and service projections, information concerning business strategies and opportunities, and contacts for important business relationships. These trade secrets are of immense value to Plaintiffs.

219.   Plaintiffs take and have taken reasonable measures to keep this information secret.  For example, Plaintiffs have always maintained their information on secured servers that are protected by passwords, firewalls, and antivirus software.

220.   Plaintiffs' trade secrets were related to products or services used in, or intended for use in, interstate or foreign commerce.

221.   Defendants acquired Plaintiffs' trade secrets knowing or having reason to know that the trade secrets were acquired by improper means. Defendants also disclosed, or aided in the disclosure of, the trade secrets on multiple occasions by sharing those trade secrets with media organizations, as discussed herein, while knowing or having reason to know that the trade secrets were acquired by improper means.

222.   As a direct consequence of Defendants' misappropriation, Plaintiffs have suffered damages, which include, but are not limited to, damage resulting from harm to Plaintiffs' computers and servers, loss in the

**Formatted Table**

value of Plaintiffs' trade secrets and business information, and harm to Plaintiffs' business, in an amount to be proven at trial.

223.   Furthermore, as a direct consequence of Defendants' unlawful misappropriation, Defendants have unjustly benefited from their possession of Plaintiffs' trade secrets.

224.   In misappropriating Plaintiffs' trade secrets, Defendants acted willfully and maliciously.  Plaintiffs are thus entitled to exemplary damages under 18 U.S.C. § 1836(b)(3).

225.   In misappropriating Plaintiffs' trade secrets, Defendants acted willfully and maliciously.  Plaintiffs are thus entitled to exemplary damages and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3).

226.   Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an increased risk of further theft, and an increased risk of harassment.  Such injury cannot be compensated by monetary damages.  Plaintiffs accordingly seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

227.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

**FOR A TENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**Civil Conspiracy**

131.228.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this First Amended Complaint.

-- 84 --   Case No. 18-cv-02421-JFW
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

B O I E S   S C H I L L E R   F L E X N E R   L L P

B O I E S   S C H I L L E R   F L E X N E R   L L P

1    132.229.    On information and belief, Defendants willfully,

2  intentionally, and knowingly agreed and conspired with each other and with

3  others to engage in the wrongful conduct alleged herein, including but not

4  limited to

5            a.  Intentionally accessing Plaintiffs' and Google's servers, and

6                emails and documents physically located on those servers

7                accounts without authorization and then stealing and/or

8                doctoring Plaintiffs' data and emails, in violation of the

9                Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C)

10               & (a)(5);

11           b.  Knowingly accessing or causing to be accessed, and without

12               permission taking, altering, and making use of Plaintiffs' and

13               Google's programs, data, and files from Plaintiffs' computers,

14               computer systems, and/ or computer networksnetwork, and/or

15               knowingly and without permission providing or assisting in

16               providing a means of accessing Plaintiffs' and Google's

17               computers, computer systems, and/ or computer

18               networksnetwork, in violation of the California

19               Comprehensive Computer Data Access and Fraud Act, Cal.

20               Pen. Code § 502;

21           c.  Intentionally receiving stolen property, in violation of Cal.

22               Pen. Code § 496;

23           d.  Invading Plaintiffs' reasonable privacy interests and then

24               publicly disseminating Plaintiffs' private information in a

25               manner that is highly offensive to a person of reasonable

26               sensibilities; and/or

27

28

-- 85 --                          Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



e.  Taking and converting Plaintiffs' exclusive private and personal property without permission and with deliberate intent to access and obtain Plaintiffs' personal and private information. :

f.  Willfully and intentionally accessing without authorization a facility through which an electronic communication service is provided, namely, BCM's computer systems, including its email servers, and thereby obtaining access to wire or electronic communications while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a);

g.  Accessing copyrighted material contained on Plaintiffs' computer networks and email controlled by technological measures, in violation of 17 U.S.C. § 1201 *et seq.*; and/or

133.230.   Misappropriating Plaintiffs' trade secrets in violation of Cal Civ. Code § 3426 *et seq.* and 18 U.S.C. § 1836 *et seq.*  On information and belief, Defendants performed the acts alleged pursuant to, and in furtherance of, their agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, and/or adopting the wrongful acts of others.

134.231.   On information and belief, Defendants expressly or tacitly agreed to, at the very least:

a.  Devise and execute a scheme to access Plaintiffs' computers, computer systems or computer network without permission, and to take, convert, alter, obtain, and use Plaintiffs' property, including private data and computer networks communications, documents, trade secrets and intellectual property;

-- 86 --

Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



b. Transfer and then disseminate the stolen private data; and/or

c. Access, receive, and/or possess the stolen private information, all with the intent to harm Plaintiff Broidy, a private United States citizen residing in California.

135.232.   On information and belief, Defendants, with full knowledge that they were engaged in wrongful actions, deliberately accessed, received, possessed, stored, and helped to disseminate Plaintiffs' stolen data and emailsproperty, including private communications, documents, trade secrets and intellectual property.

136.233.   On information and belief, Defendants also had meetings wherein targeting Plaintiff Broidy was discussed.

137.234.   On information and belief, Defendants' agreement was both explicit and tacit.  In particular, those Agent Defendants who were registered agents of the State of Qatar under FARA, as well as unregistered agents of the State of Qatar, were incentivized to do the bidding of the State of Qatar and engage in any acts that would further the overall scheme.

138.   Plaintiffs will continue to suffer injury as long as their personal information is available to Defendants and, subsequently, to media organizations and the world at large.  Plaintiffs' remedy at law is not itself adequate to compensate for the injuries inflicted by Defendants.  Accordingly, Plaintiffs are entitled to injunctive relief to prevent the further accessing, use, and dissemination of Plaintiffs' data.

235.   Upon information and belief, the conspiracy was agreed to within the United States, and at least one step in furtherance of the conspiracy occurred within the United States.

139.236.   On information and belief, Plaintiffs have been injured and have suffered monetary damages as a result of Defendants' conspiratorial

-- 87 --

actions in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

**REQUEST FOR RELIEF**

237.   Defendants' conduct has caused, and will continue to cause Plaintiffs irreparable injury, including reputational harm, loss of goodwill, an increased risk of further theft, and an increased risk of harassment.  Such injury cannot be compensated by monetary damages.  Plaintiffs accordingly seek an injunction prohibiting Defendants from engaging in the conduct described in the Cause of Action.

238.   Plaintiffs further seek a declaration that Defendants' conduct as described in this First Amended Complaint is a violation of this Cause of Action.

**REQUEST FOR RELIEF**

140.239.    Plaintiffs repeat and re-allege the allegations contained in each and every preceding paragraph of this Complaint.

141.240.    Plaintiffs request that this Court order the following relief:

   a.   Grant judgment in favor of Plaintiffs and against Defendants;

   b.   Declare that Defendants' conduct constitutes violations of the statutes and common law cited herein;

   c.   Grant all appropriate injunctive relief;

   d.   Award Plaintiffs an appropriate amount in monetary damages as determined at trial, including pre- and post-judgment interest, and any treble damages to which Plaintiffs are entitled under Cal. Pen. Code § 496;



Formatted: Right

e.  Award Plaintiffs punitive damages under 18 U.S.C.
§ 2707, 18 U.S.C. § 1836(b)(3), Cal. PenCiv. Code
§ 3426.3(c), and Cal. Pen. Code § 502, as well as under
Plaintiffs' claims for invasion of privacy by public
disclosure of private facts, invasion of privacy by intrusion
upon seclusion, and conversion;

f.  Award Plaintiffs attorneys' fees and the costs of bringing
this action; and

g.  Grant Plaintiffs such other relief as is just and appropriate.

Dated: March 26, 2018                    Respectfully submitted,

BOIES SCHILLER FLEXNER LLP


By:          /s/
DAVID K. WILLINGHAM
Counsel for Plaintiffs

Formatted Table

-- 89 --                                Case No. 18-cv-02421-JFW

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES SCHILLER FLEXNER LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Formatted: Right

Formatted Table

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: ~~March 26~~May 24, 2018        Respectfully submitted,

BOIES SCHILLER FLEXNER LLP

By:        /s/
~~DAVID K. WILLINGHAM~~
LEE S. WOLOSKY

*Counsel for Plaintiffs*