**BOIES SCHILLER FLEXNER LLP**

David K. Willingham (SB No. 198874)
  dwillingham@bsfllp.com
725 South Figueroa Street, Floor 31
Los Angeles, California 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022


Amy L. Neuhardt (*pro hac vice*)
  aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005-2102
Phone:  (202) 237-2727
Fax:  (202) 237-6131

Lee S. Wolosky (*pro hac vice*)
  lwolosky@bsfllp.com
Robert J. Dwyer (*pro hac vice*)
  rdwyer@bsfllp.com
575 Lexington Ave., Floor 7
New York, NY 10022-6138
Phone:  (212) 446-2300
Fax:  (212) 446-2350

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY,<br><br>             Plaintiffs,<br><br>      v.<br><br>STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, GLOBAL RISK ADVISORS LLC, KEVIN CHALKER, DAVID MARK POWELL, MOHAMMED BIN HAMAD BIN KHALIFA AL THANI, AHMED AL-RUMAIHI, and DOES 1-10,<br><br>             Defendants. | Case No.  18-cv-02421-JFW<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS STONINGTON STRATEGIES LLC AND NICOLAS D. MUZIN'S MOTION TO STAY THIS CASE, OR ALTERNATELY, TO STAY DISCOVERY**<br>[Declaration of Lee S. Wolosky and Proposed Order filed concurrently herewith]<br><br>**The Honorable John F. Walter**<br>Date:   July 9, 2018<br>Time:   1:30 p.m.<br>Ctrm.:  7A |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BOIES SCHILLER FLEXNER LLP

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................... 1

LEGAL STANDARD ........................................................................ 4

ARGUMENT ................................................................................ 6

    I.     MUZIN HAS NOT DEMONSTRATED THAT HE IS
          LIKELY TO BE IMMUNE TO SUIT .......................................... 6

         A.    Muzin Is Not Entitled To Derivative Sovereign
              Immunity ................................................................ 6

         B.    Muzin Is Not A "Diplomatic Agent" Of Qatar ................ 10

    II.    MUZIN IS NOT LIKELY TO SUCCEED ON THE
          MERITS OF HIS ANTICIPATED MOTION TO
          DISMISS FOR LACK OF PERSONAL JURISDICTION ......... 13

    III.    PLAINTIFFS HAVE STATED A CLAIM AGAINST
           MUZIN ...................................................................... 20

    IV.    ADDITIONAL FACTORS WEIGH IN FAVOR OF
           CONTINUING DISCOVERY DURING THE
           PENDENCY OF MUZIN'S MOTION TO DISMISS ............... 22

CONCLUSION ............................................................................. 23

# TABLE OF AUTHORITIES

## Cases

*Arei II Cases*,
 157 Cal. Rptr. 3d 368 (Cal. Ct. App. 2013) ................................................21

*Athridge v. Aetna Cas. & Sur. Co.*,
 163 F. Supp. 2d 38 (D.D.C. 2001) ................................................................11

*Att'y General of the U.S. v. Irish People, Inc.*
 684 F.2d 928 (D.C. Cir 1982) ......................................................................13

*Attorney Gen. of U.S. v. Covington & Burling*,
 411 F. Supp. 371 (D.D.C. 1976) ...................................................................12

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
 874 F.3d 1064 (9th Cir. 2017) ............................................................. passim

*Butters v. Vance Int'l, Inc.*,
 225 F.3d 462 (4th Cir. 2000) ..........................................................................8

*Calder v. Jones*,
 465 U.S. 783 (1984) .............................................................................. passim

*California Trout, Inc. v. United States Bureau of Reclamation*,
 115 F. Supp. 3d 1102 (C.D. Cal. 2015) .........................................................6

*Charvat v. NMP, LLC*,
 No. 2:09-CV-209, 2009 WL 3210379 (S.D. Ohio Sept. 30, 2009) ...............4

*El-Hadad v. United Arab Emirates*,
 496 F.3d 658 (D.C. Cir. 2007) .......................................................................9

*Ghahremani v. Gonzales*,
 498 F.3d 993 (9th Cir. 2007) ..........................................................................5

*Holden v. Canadian Consulate*,
 92 F.3d 918 (9th Cir. 1996) ............................................................................9

*In re KBR, Inc., Burn Pit Litig.*,
 744 F.3d 326 (4th Cir. 2014) ........................................................................10

*Landis v. N. Am. Co.*,
 299 U.S. 248 (1936) ........................................................................................6

*Lockyer v. Mirant Corp.*,
 398 F.3d 1098 (9th Cir. 2005) ........................................................................6

*Lofton v. Bank of Am. Corp.*,
 No. C 07-05892 SI, 2008 WL 2037606 (N.D. Cal. May 12, 2008) ..........4, 5

*Madsen v. Buffum*,
 No. ED 12-01605-MWF (SPx), 2013 WL 12139139 (C.D. Cal. July

17, 2013) ...................................................................................................19

*Nken v. Holder*,
   556 U.S. 418 (2009) ..............................................................................6

*Palestine Info. Office v. Shultz*,
   853 F.2d 932 (D.C. Cir. 1988) .............................................................13

*Republic of Mexico v. Hoffman*,
   324 U.S. 30 (1945) ................................................................................8

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) .........................................................................7, 8

*Sandoval v. Friendlum, Inc.*,
   No. 17CV1917-MMA (BGS), 2018 WL 1150837 (S.D. Cal. Mar. 2,
   2018) .....................................................................................................22

*Tabion v. Mufti*,
   73 F.3d 535 (4th Cir. 1996) .................................................................10

*Top Rank, Inc. v. Haymon*,
   No. CV154961JFWMRWX, 2015 WL 9952887 (C.D. Cal. Sept. 17,
   2015) .....................................................................................................22

*Vulcan Iron Works, Inc. v. Polish Am. Mach. Corp.*,
   479 F. Supp. 1060 (S.D.N.Y. 1979) ...................................................11

*Walden v. Fiore*,
   571 U.S. 277 (2014) ......................................................................14, 15

*Yearsley v. W.A. Ross Const. Co.*,
   309 U.S. 18 (1940) ................................................................................7

**Federal Cases**

18 U.S.C. § 1836 ..........................................................................................21

22 U.S.C. § 4301 ..........................................................................................13

22 U.S.C. § 613 ............................................................................................12

22 U.S.C. § 614 ............................................................................................12

28 U.S.C. § 1603 ............................................................................................7

U.S.C. § 1605 .................................................................................................9

**State Cases**

Dep't of Justice Nat'l Sec. Div.,
   *National Security Division Announces Enhanced Foreign Agents
   Registration Act Website*, May 31, 2007 ...........................................12

BOIES SCHILLER FLEXNER LLP

- iii -

Transnational Litigation § 29:90 ....................................................................11

United State Department of State's Office of Foreign Missions,
   "Diplomatic and Consular Immunity: Guidance for Law
   Enforcement and Judicial Authorities," 12 (2015),
   https://www.state.gov/documents/organization/150546.pdf .......................9

Vienna Convention on Diplomatic Relations,
   Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502 ................................3, 10

**Other Authorities**

Fed. R. Civ. P. 12 .................................................................................. 3, 20, 21

Fed.R.Civ.P. 26 ....................................................................................................2

1

## PRELIMINARY STATEMENT[1]

2

When it comes to lobbyists and their use by foreign sovereigns to try to

3

influence the public policy of the United States, this case demonstrates that

4

sunshine is the best disinfectant.

5

On June 6, 2018, the same day a federal judge in the Southern District

6

of New York enforced a third-party subpoena in this matter seeking, among

7

other things, "communications regarding Plaintiffs with the State of Qatar or

8

with its officials, agents, or any persons acting on its behalf, including but not

9

limited to Nicolas D. Muzin," (Declaration of Lee Wolosky, dated June 11,

10

2018 ("Wolosky Decl."), Exh. C),[2] Defendant Nicolas Muzin precipitously

11

announced via Twitter that he and Defendant Stonington Strategies LLC

12

("Stonington")[3] were severing all ties to Defendant State of Qatar ("Qatar"),

13

(*id*. Exh. H).  In addition, the recipient of that third-party subpoena – Joseph

14

Allaham – immediately disclosed a previously hidden business relationship

15

with Qatar (characterized by Qatar as a sub-agent relationship)[4], announced

16

the termination of that relationship, and announced that he would belatedly

17

file a registration statement under the Foreign Agents Registration Act

18

("FARA") regarding that relationship.  (*Id*. ¶ 22.)  All of this occurred before

19

Mr. Allaham produced a single document.

20

Similarly, although Muzin complains about Plaintiffs' "exploitation"

21

22

[1] Plaintiffs incorporate by reference the Statement of Facts in Plaintiffs' Opposition to Qatar's Motion to Stay.

23

24

[2] The Declaration of Lee Wolosky dated June 11, 2018, refers to the declaration filed today in this action in connection with Plaintiffs' opposition to Defendant State of Qatar's motion to stay discovery.

25

26

[3] Unless otherwise specified, because Muzin is the owner and founder of Stonington, references herein to "Muzin" include Stonington.

27

[4] If Allaham is an agent or even a sub-agent of Qatar, his actions bind Qatar.

28

B O I E S   S C H I L L E R   F L E X N E R   L L P

of the discovery process through purportedly "expedited" discovery[5] (Muzin Br. 2), Plaintiffs' subpoenas to third-party telecommunications and internet service providers ("ISPs") have revealed Muzin's *pre-publication* interactions with a reporter who published news articles based on documents stolen from the Plaintiffs. Subpoenaed phone records for just one of Muzin's likely many telephone numbers show numerous calls between Muzin and Tom LoBianco of the Associated Press. (Wolosky Decl. ¶¶ 12-13.) Defendant Muzin spoke to LoBianco on more than a dozen occasions between March 12, 2018 and May 8, 2018, during which time Mr. LoBianco was engaged in extensive reporting relating to a long feature (published May 21) about Mr. Broidy that was based on access to data stolen from Plaintiffs. His activities having been exposed by that discovery, Muzin finally (and belatedly) disclosed these contacts in a Supplemental FARA disclosure filed on May 22, 2018, nearly two months after it was due. (Wolosky Decl. ¶ 11, n.1.)

As described in greater detail below, this is just one are just example of the fruits some of the limited discovery has propounded to date. Far from a fishing expedition, Plaintiffs' discovery to date, conducted pursuant to this Court's standing order,[6] and a stipulation voluntarily entered into by Muzin,[7] is accomplishing exactly what discovery is supposed to do – revealing the truth behind the allegations of conspiracy and wrongdoing directed towards Plaintiffs as set forth in the First Amended Complaint ("FAC"). Muzin now seeks to prevent further disclosure of his wrongdoings. There is no basis for a

---

[5] Muzin does not – and cannot – identify a single discovery request or subpoena in this case demanding a response on an expedited basis.

[6] *See* ECF-17 ("Counsel shall begin to actively conduct discovery before the Fed.R.Civ.P. 26(f) conference because at the Scheduling Conference the Court will impose tight deadlines to complete discovery.")

[7] *See* ECF-46 ¶¶ 3-4.

stay either of discovery or this action.

Muzin did not brief – and therefore has waived – his request for a stay of the entire litigation.  With respect to his motion for a stay of discovery, Muzin only offers a conclusory showing that he will succeed on the merits. First, Muzin's sovereign immunity arguments fail.  The boundaries of sovereign immunity – including for lobbyists like Muzin – are strictly defined by the Foreign Sovereign Immunities Act ("FSIA") and the Vienna Convention on Diplomatic Relations ("Vienna Convention" or "Convention"). Under these laws and unambiguous precedent interpreting them, United States citizens and corporations such as Muzin and Stonington cannot claim sovereign immunity through foreign principals.

Second, Muzin's personal jurisdiction argument fails.  The FAC does not merely plead that Muzin should have foreseen that his unlawful conduct would harm Plaintiffs in California – it pleads that such California harm was the specific motivation and intent driving Muzin's actions. (FAC ¶ 173).  The FAC further alleges that, using materials stolen from California and as part of the conspiracy with Qatar, Muzin was involved in the dissemination of those stolen materials directly to the California public through national media organizations with massive circulations on line and in print in the State of California. (*Id.* ¶ 15).

Thirdly, Muzin misrepresents the totality of allegations against him in the FAC (and additional evidence against him) in an effort to dodge further discovery pending a motion to dismiss pursuant to Rule 12(b)(6).

Finally, a stay of discovery in this case would prejudice Plaintiffs because of the likelihood that critical evidence from telecommunications companies and internet service providers will be spoliated in the event of further delay.  Allowing discovery to proceed in this action significantly

serves the public interest, including by protecting the ability of private U.S. citizens to express themselves politically on U.S. soil without fear of intimidation and attack from a foreign power, and with respect to Muzin and Qatar's other agents, by furthering the strong public interest in transparency around the activities of foreign  sovereign's use of FARA agents to influence U.S. public policy and thereby impact our democracy.

## LEGAL STANDARD

Plaintiffs incorporate by reference the general discussion of the relevant legal standard for a motion to stay discovery set forth in their Opposition to Qatar's Motion, (Pl's Opp. to SOQ Br. 8), including the standard for permitting limited jurisdictional discovery (*id.* 24-25).

In addition, Plaintiffs note that, as here, where a defendant seeks a complete stay of discovery pending a motion to dismiss on grounds of personal jurisdiction, such motions are rarely granted.  Muzin does not identify a single case granting such a stay.  A good reason for allowing discovery to continue is that the discovery would be available in another court:

> In fact, it could be argued that because these types of motions do not go to the merits of the case, but only to the forum in which it proceeds, there is even less reason to stay discovery pending their outcome.  Any discovery taken while such a motion is pending would, of course, be available for the parties to use if the case is dismissed other than on the merits and then refiled in a Court where subject matter or personal jurisdiction is proper.

*Charvat v. NMP, LLC*, No. 2:09-CV-209, 2009 WL 3210379, at *2 (S.D. Ohio Sept. 30, 2009).

*Lofton v. Bank of Am. Corp.*, No. C 07-05892 SI, 2008 WL 2037606, at *2 (N.D. Cal. May 12, 2008), also provides helpful guidance.  In *Lofton*, a putative class representative moved to compel discovery responses from one of many defendants, which then cross-moved for a stay of discovery while it

challenged personal jurisdiction.  The court denied the motion because the plaintiff had "persuasively argu[ed] that he must have access to information that involves the merits of his suit" to establish the relationship between the numerous defendants, including for jurisdictional purposes.  *Id.* at *2.  The *Lofton* Court observed that, as does Muzin here, defendant "claims it had no involvement in the program, but plaintiff contends otherwise and points to a document that indicates [defendant] may have been involved in and had knowledge of the program."  *Id.*  As a result, the *Lofton* court held that the plaintiff was "entitled to discovery on the merits that may inform his opposition to CCI's jurisdictional motion."  *Id.*

The same holds true here:  Muzin denies involvement in the hacking and dissemination of materials stolen from Broidy, Plaintiffs allege the contrary, and third-party evidence – the statements of Muzin to Mowbray recounted in the FAC (FAC ¶¶ 136-37) and phone records recently obtained through discovery (Wolosky Decl. ¶¶ 11) – indicates to the contrary.  At a minimum, discovery is needed to resolve those issues.

In addition to his motion to stay discovery, Muzin also seeks to stay the entirety of this action. (Muzin Br. 25).[8]  Four factors are relevant in determining a motion for a stay:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

---

[8] In addition to stay of discovery, Muzin also seeks a stay of this action in its entirety.  (Muzin Br. 25).  Other than asserting that Plaintiffs will not suffer any harm if the case is stayed, (*id.* 24), Muzin does not brief that aspect of his motion.  Accordingly, that motion should be denied.  *Ghahremani v. Gonzales*, 498 F.3d 993, 997 (9th Cir. 2007) ("Issues raised in a brief that are not supported by argument are deemed abandoned.").

(4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the Court's] discretion." *Id.* at 433-34.

If "there is even a fair possibility" that granting the stay will "work damage" to the non-moving parties, Muzin "must make out a *clear case* of hardship or inequity in being required to go forward." *Landis v. N. Am. Co.,* 299 U.S. 248, 255 (1936) (emphasis added).  "[B]eing required to defend a suit, without more, does not constitute a "clear case of hardship or inequity" within the meaning of *Landis*."  *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005); *see also California Trout, Inc. v. United States Bureau of Reclamation*, 115 F. Supp. 3d 1102, 1117 (C.D. Cal. 2015) ("However, diverting staff attention from other activities does not sufficiently satisfy the requirement of hardship or inequity.").  As set out fully below, Muzin has failed to demonstrate a likelihood of success on the merits of his anticipated motions, much less a strong showing of such success.  He also does not clearly identify any "hardship or inequity" that would entitle him to a stay of all proceedings in this case.

## ARGUMENT[2]

### I.   MUZIN HAS NOT DEMONSTRATED THAT HE IS LIKELY TO BE IMMUNE TO SUIT

#### A. Muzin Is Not Entitled To Derivative Sovereign Immunity

Muzin is not entitled to derivative sovereign immunity.  As an initial matter, because Qatar itself is not entitled to sovereign immunity in this matter (*see* Pl's Opp. to SOQ Br. 10-15), Muzin cannot derive immunity from his

---

[9] Plaintiffs incorporate by reference both the Statement of Facts and Arguments sections of Plaintiff's Opposition to the State of Qatar's Brief. Plaintiffs address certain arguments specific to Muzin in the remainder of this brief.

relationship to Qatar.

Even if Qatar were immune to suit, however, Muzin would remain subject to the jurisdiction of this Court.  Neither Muzin nor Stonington is a foreign state within the meaning of FSIA, nor an "agency or instrumentality" thereof, which is strictly defined as any entity "which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(b)(2).  Moreover, with respect to Muzin individually, the Supreme Court has made clear that no "individual," even *a foreign government official*, enjoys sovereign immunity under the FSIA. *Samantar v. Yousuf*, 560 U.S. 305, 315 (2010).

Nor can Muzin claim derivative sovereign immunity by virtue of his contractual relationship with the State of Qatar under *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940).  *Yearsley* has nothing to do with foreign sovereign immunity or the Supreme Court's well-developed FSIA jurisprudence.  It addresses immunity for a U.S. contractor who performed work for the "United States Government, and under the direction of the Secretary of War and the supervision of the Chief of Engineers of the United States."  *Id*. at 19.  *Yearsley* held that if the U.S. government contractor's work "was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."  *Id*. at 20-21 (emphasis added).

Muzin is a statutory FARA agent and his assertions of immunity must fall within the parameters of immunity of that statute and the FSIA.  Muzin acknowledges as much when he invokes "'the immunity framework adopted by the FSIA.'" (Muzin Br. 25.)  *Yearsley* is thus inapposite and Muzin may look only to the FSIA for immunity.

*Samantar* is the controlling case on the extension of sovereign immunity beyond "foreign states" as defined in the FSIA.  *Samantar* held that no individual may claim immunity under the FSIA because "[r]eading the FSIA as a whole, there is nothing to suggest that "foreign state" should be read to include an official acting on behalf of that state."  560 U.S. at 319.  Although *Samantar* concerned the applicability of the FSIA to individuals, the Court notably observed that "[t]he Act specifies that a foreign state 'includes a political subdivision or an agency or instrumentality' of that state, §1603(a), and *specifically delimits what counts as an 'agency or instrumentality*.'"  *Id.* at 315 (emphasis added).  As discussed above, neither Muzin nor Stonington satisfies this specifically delimited definition of an agency or instrumentality.  Therefore, they cannot enjoy any form of sovereign immunity.[10]

*Samantar* also held that where, as here, no "Suggestion of Immunity" has been entered by the State Department with respect to a person or entity seeking immunity, the Court should look to "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize."  *Samantar*, 560 U.S. at 312 (quoting *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945)).  Here, State Department policy is clear that "U.S. nationals, legal permanent residents, or who are permanently resident in the United States *enjoy no personal inviolability or jurisdictional immunity in the United States*."  United State Department of State's Office of Foreign Missions, "Diplomatic and Consular Immunity: Guidance for Law Enforcement and Judicial Authorities," 12 (2015),

---

[10] Muzin cites only a single case importing the *Yearsley* analysis to the context of FSIA immunity – *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000).  But that case predates *Samantar,* which makes clear that foreign sovereign immunity must be interpreted strictly within the bounds of the language of the FSIA.  *See Samantar*, 560 U.S. at 315-19.

https://www.state.gov/documents/organization/150546.pdf (emphasis added).
This official statement of the State Department precludes any claim by Muzin,
a Canadian-born permanent resident of the United States, or Stonington, a
Delaware corporation, of derivative sovereign immunity under FSIA.

Derivative sovereign immunity also cannot apply to the type of work
engaged in by Muzin here.  The FSIA explicitly exempts commercial activity
from immunity:  "A foreign state shall not be immune from the jurisdiction of
courts of the United States or of the States in any case . . . in which the action
is based upon a commercial activity carried on in the United States by the
foreign state[.]"  28 U.S.C. § 1605(a)(2); *see also Holden v. Canadian
Consulate*, 92 F.3d 918, 920 (9th Cir. 1996) ("[A] foreign state is not immune
if the plaintiff's cause of action is based upon a commercial activity carried on
by the foreign state.").  There is "a per se rule that Americans and third
country nationals, even if employed by a foreign state . . . count as
commercial employees."  *El-Hadad v. United Arab Emirates*, 496 F.3d 658,
667 (D.C. Cir. 2007).  Although the FSIA does not explicitly define
"commercial activity," in this context the Ninth Circuit has "adopt[ed] the
standard suggested by the legislative history, that is, employment of
diplomatic, civil service or military personnel is governmental and *the
employment of other personnel is commercial*."  *Holden*, 92 F.3d at 921
(emphasis added).

Even if *Samantar* did not control the issue of sovereignty immunity for
Muzin, he cannot claim that his FARA agreement with Qatar was intended to
grant him immunity from suit.  The August 24, 2017 agreement (the
"Agreement") between Qatar and Stonington filed with the Department of
Justice as part of Muzin's FARA reporting requirement stated that Stonington
is "*not authorized by This Agreement to act as a[n]  . . . agent on behalf of the*

- 9 -

B O I E S   S C H I L L E R   F L E X N E R   L L P

*Embassy or the State of Qatar . . .*  This Agreement is *not intended to establish an employer-employee relationship, or principal-agent relationship*."  https://www.fara.gov/docs/6458-Exhibit-AB-20170903-1.pdf (emphasis added).  Although the FAC alleges that Muzin acted as Qatar's agent (FAC ¶ 3), it is clear from the language of the Agreement that Qatar had no intention of extending its own legal immunities, to the extent they might exist, to Muzin for actions undertaken at Qatar's behest.[11]

### B. Muzin Is Not A "Diplomatic Agent" Of Qatar[12]

Muzin also does not fall within the scope of the protections of the Vienna Convention, which provides immunity only to "a diplomatic agent" or the "diplomatic staff" of a sovereign.  Vienna Convention on Diplomatic Relations, Apr. 18, 1961, art. 31, 23 U.S.T. 3227, T.I.A.S. No. 7502 ("A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State" as well as "immunity from its civil and administrative jurisdiction," except in certain circumstances.); *Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir. 1996) ("The Vienna Convention provides diplomats with absolute immunity from criminal prosecution and protection from most civil and administrative actions brought in the 'receiving State,' i.e., the state where they are stationed.").  A "diplomatic agent" is narrowly defined under the Convention as "the head of the mission or a member of the diplomatic staff of

---

[11] At a minimum, discovery intended to discover the scope of the agency is appropriate.  Where "the record does not contain enough evidence to determine whether [the agent] acted in conformity with [its assignment], its appended task orders, and any laws and regulations that the contract incorporates," discovery is appropriate.  *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014).

[12] Muzin's argument that his communications with Qatar are privileged under the Vienna Convention are addressed in Plaintiffs' Opposition to Qatar's Motion to Stay at 18-21.

1   the mission."  Vienna Convention on Diplomatic Relations, art. 1(e); *see also*

2   Transnational Litigation § 29:90 ("The definition of a 'diplomatic agent'

3   under the Vienna Convention is *limited*, in that it relates to 'the head of the

4   mission or a member of the diplomatic staff of the mission.'" (emphasis

5   added)).  The diplomatic staff in turn "are the members of the staff of the

6   mission having diplomatic rank."  Vienna Convention on Diplomatic

7   Relations, art. 1(d).

8       Muzin plainly does not satisfy either of these tests.  Neither Muzin

9   personally nor anyone at Stonington heads the Qatari mission to the United

10  States.  Stonington employees such as Muzin are not members of the staff of

11  the mission with diplomatic rank nor have they had credentials presented to

12  the United States Department of State, which is a prerequisite to immunity

13  under the Vienna Convention.  *Vulcan Iron Works, Inc. v. Polish Am. Mach.*

14  *Corp.*, 479 F. Supp. 1060, 1064 (S.D.N.Y. 1979) ("[I]t is reasonable to

15  assume that the drafters of the Convention intended that recognition of an

16  individual's status as a member of a diplomatic mission, and recognition of

17  the privileges and immunities attendant on such status, should depend on the

18  formal notification required by Article 10.").  Muzin is not a permanent

19  resident of Qatar or another foreign state.  Muzin is permanently a resident in

20  the United States and Stonington is a Delaware corporation that exists only in

21  the United States.  *Athridge v. Aetna Cas. & Sur. Co.*, 163 F. Supp. 2d 38, 56

22  (D.D.C. 2001) (Convention protections only extend to those "not permanently

23  resident in the United States"), *aff'd in part, rev'd in part*, 351 F.3d 1166

24  (D.C. Cir. 2003).

25      Muzin addresses only one of these points, arguing that Stonington's

26  "FARA registration serves as notice to the State Department sufficient for

27  diplomatic immunities to attach to Stonington."  (Muzin Br. 18 (emphasis

28

- 11 -

added).)  FARA registration is made with the Department of Justice, not the Department of State.  More importantly, the very fact of Muzin's FARA registration defeats his claims of immunity.  FARA specifically applies only to persons and entities *who are not diplomatic agents or staff*, stating that it "shall not apply to . . .  [a] duly accredited diplomatic or consular officer of a foreign government who is so recognized by the Department of State, while said officer is engaged exclusively in activities that are recognized by the Department of State as being within the scope of the functions of such officer[.]"  22 U.S.C. § 613(a) (emphasis added).  FARA thus does not confer diplomatic immunity upon a registrant.  To the contrary, registration was required of Muzin precisely because neither Muzin nor anyone at Stonington is a diplomatic officer with corresponding immunity.

Muzin's argument that FARA registration confers immunity upon him also runs counter to the purpose of FARA as "a disclosure statute."  *Attorney Gen. of U.S. v. Covington & Burling,* 411 F. Supp. 371, 373 (D.D.C. 1976).  FARA was enacted to ensure disclosure of lobbying being conducted by U.S. citizens on behalf of foreign states.  *See* Dep't of Justice Nat'l Sec. Div., *National Security Division Announces Enhanced Foreign Agents Registration Act Website,* May 31, 2007 ("The purpose of the Foreign Agents Registration Act is to protect the national defense, internal security, and foreign relations of the U.S. by requiring public disclosure by persons engaged in certain political and quasi-political activities on behalf of foreign principals to ensure the American public and its law makers know the source of information intended to sway public opinion, policy and laws.").  It requires that "information distributed by registered agents be prefaced or accompanied by a true and accurate statement to the effect that such person is registered as an agent of such foreign principal[.]"  22 U.S.C. § 614(e).  Nothing in this "disclosure

statute" suggests that it is intended to confer diplomatic immunity upon its United States agents, or that activities within its scope should be kept concealed from public purview.

The case law cited by Muzin is inapposite. *Palestine Info. Office v. Shultz*, 853 F.2d 932, 938-39 (D.C. Cir. 1988), did not address diplomatic immunity at all. Rather, the court affirmed the constitutionality of the State Department's designation of the Palestinian Information Office ("PIO") as a "foreign mission" of the Palestine Liberation Organization ("PLO") under the Foreign Missions Act, 22 U.S.C. § 4301 *et seq.*, which designation permitted the State Department to order the closure of the PIO. Here, there has been no such "foreign mission" designation by the State Department. Similarly, *Att'y General of the U.S. v. Irish People, Inc.* 684 F.2d 928, 937 (D.C. Cir 1982) addresses only whether the defendant newspaper was required to register as a foreign agent under FARA – not whether the newspaper would then be immune to suit as a result.

## II.   MUZIN IS NOT LIKELY TO SUCCEED ON THE MERITS OF HIS ANTICIPATED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

As will be explained more fully in Plaintiffs' opposition to Muzin's expected motion to dismiss, Muzin has failed to demonstrate that this Court may not exercise personal jurisdiction over him.

Where a case alleges tort claims, the Ninth Circuit employs a "purposeful direction" test. *See Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017). The test, which derives from *Calder v. Jones,* 465 U.S. 783 (1984), requires that the defendant must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state," *Axiom*, 874 F.3d at 1069 (citation omitted). Although Muzin does not

BOIES SCHILLER FLEXNER LLP

brief the law on this point, he appears to argue that Plaintiffs do not meet that test by asserting that the FAC alleges only that "unlawful conduct was aimed at and attempting to influence individuals in New York and Washington." (Muzin Br. 14.)  This argument misrepresents Plaintiffs' allegations. Plaintiffs do allege that Defendants were *motivated* by a desire to change the views of decision makers in Washington, D.C. in order to obtain relief from the international trade embargo imposed on Qatar as a result of its support for terrorist organizations.  (FAC ¶¶ 27, 31, 40.)  But the FAC alleges that the Defendants specifically *targeted*[13] Elliott Broidy in this District because of his outspoken criticism of Qatar and the fact that the President of the United States in June 2017 publicly identified Broidy with the President's own support of the trade embargo.  (*Id.* ¶¶ 4, 27, 50-51, 79-80.)  Defendants – including Muzin – "fingered" Plaintiffs' employees and family members in California and caused harm to them here.  Although the FAC alleges that other defendants targeted Plaintiffs' computer servers and emails accounts in California, the FAC alleges that Muzin (among others) deliberately caused harm to Plaintiffs through dissemination to the national media of materials stolen from those servers and accounts.  (*See, e.g.,* FAC ¶¶ 7, 14-15, 35, 40, 91, 93, 112, 115, 121-22, 126, 128-29, 137, 157, 233.)  This is precisely the type of "individualized targeting" that the Ninth Circuit has held satisfies the express aiming requirement of *Calder* and its progeny.  *Axiom*, 874 F.3d at 1071 ("We have held that 'individualized targeting' satisfies the express aiming requirement." (citation omitted)).

Muzin next argues that the allegations of the FAC against him do not satisfy the requirements of *Walden v. Fiore*, 571 U.S. 277 (2014), which

---

[13] "Fingered" is the term adopted by Muzin to describe what he and others did to Plaintiff Broidy.  (Mowbray Declaration, ECF-31-4.)

BOIES  SCHILLER  FLEXNER  LLP

requires that a foreign defendant's suit-related conduct create a substantial

connection with the forum state (Muzin Br. 13-14).  In making this argument,

Muzin relies on *Axiom*, 874 F.3d 1064, in which the Ninth Circuit found that,

under *Walden*, the Court did not have jurisdiction over foreign defendants that

allegedly violated plaintiffs' copyright in newsletters that went to "no more

than ten" residents of California, *id*. at 1070.  (Muzin Br. 13.)  This argument

ignores *Axiom*'s express comparison of the limited contacts defendants had

with California with the defendants' contacts in *Calder*, 465 U.S. at 784-86,

788-89, which held that out-of-state defendants could be subject to personal

jurisdiction in California where defendants used California sources and media

as a weapon and plaintiffs suffered reputation-based effects, like here.  *See*

*Axiom*, 874 F.3d at 1071.  As explained there:

> *Calder* is instructive to show *how different the facts are in this case.*  In *Calder*, a California actress brought a libel action against two nonresident defendants in California state court, based on an article defendants wrote for the *National Enquirer.* The Supreme Court found the defendants' "forum contacts to be ample."  The defendants contacted "California sources" for information and wrote about the actress's activities in California. *Roughly 600,000 copies of the article were sold in California, where the actress suffered the "brunt" of the reputational injury. In short, "[t]he crux of Calder was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff."*  In this case, Acerchem UK sent one newsletter to a maximum of ten recipients located in California, in a market where Acerchem UK has no sales or clients.  The alleged infringement barely connected Acerchem UK to California residents, much less to California itself.

*Id.* (internal citations omitted) (emphasis added).

This case is more akin to *Calder* than *Axiom*.  While the foreign

defendants in *Calder* wrote articles that were distributed to 600,000 persons in

California, in *Axiom* "[n]o more than ten of the newsletter's recipients were

physically located in California.  Indeed, most of the recipients were located

in Western Europe."  874 F.3d at 1070.  Here, Defendants ensured that

- 15 -

hundreds of thousands, if not millions of California residents received reports of Plaintiffs' stolen materials.  Indeed, just one of the publications that published materials stolen from Plaintiffs, *The Wall Street Journal* (FAC ¶ 121), has 202,465 print subscribers in California,[14] a number that does not include the *Journal's* digital subscribers in California, or readers in California that do not have personal subscriptions.[15]  In addition, discovery has shown that Defendant Muzin had numerous contacts during pertinent periods with publications that published articles about Plaintiff Broidy, including McClatchy, the New York Times, the Associated Press, and Bloomberg News.  (Wolosky Decl. ¶ 11.)  The McClatchy Company is based in Sacramento, California.[16]

In addition, just as the *Calder* defendants "contacted 'California sources' for information and wrote about the actress's activities in California," *Axiom*, 874 F.3d at 1071 (citing *Calder*, 465 U.S. 788-90), Muzin and his co-conspirators obtained information from "sources" in California – namely, computer servers and email accounts located in California (FAC ¶¶ 115, 128) which were hacked by Muzin's coconspirators with his knowledge and approval, (*id.* ¶¶ 134, 136-37).  Muzin then took the information obtained from those sources and, through unlawful dissemination of those materials to the national media, sent it back *en masse* to California residents in an effort to

---

[14] *See* Circulation & Distribution Areas, Wall Street Journal, https://classifieds.wsj.com/circulation-distribution-areas/ (last visited June 11, 2018).

[15]  Jurisdictional discovery of all the news outlets that reported on materials stolen from Plaintiffs likely would reveal that they reached millions of Californians.

[16] Contact McClatchy, McClatchy http://www.mcclatchy.com/contact (last visited June 11, 2018).

neutralize the exercise of free speech undertaken by California resident Elliott Broidy.  (*See id.* ¶¶ 14, 35, 91.)

In fact, the case for personal jurisdiction is stronger here than in *Calder*. Defendants in *Calder* were subject to personal jurisdiction in California where they could only "foresee that the article will be circulated and have an effect in California."  *Calder*, 465 U.S. at 789.  Here, Muzin did not merely "foresee" massive distribution by the media in California of Plaintiffs' stolen information and "reputation-based" harm, *Calder*, 874 F.3d 1071, to Plaintiffs in California – that result was Muzin's specific *intent*.  The FAC alleges Muzin's intent was to harm Plaintiff Broidy; Muzin "acknowledged that everyone he 'fingered' was 'in danger'" (FAC ¶ 136), and when accused of "targeting plaintiff Broidy for the State of Qatar and assisting in the hacks on Plaintiffs . . . Muzin responded, 'I was doing my job'" (*id.* ¶ 137; *see also id.* ¶¶ 88 ("Defendant Muzin brought up Plaintiff Broidy in these meetings as an obstacle that needed to be dealt with for his lobbying on behalf of Qatar to succeed."), 91 ("Stonington, and Muzin, targeted Plaintiff Broidy specifically.").)  Muzin also specifically is alleged to have engaged with the media with respect to the stolen materials, demonstrated foreknowledge of reporting on stolen materials (FAC ¶¶ 131, 134-35, 138),[17] and may well have been involved directly in the handoff of those materials to the press (*see* FAC ¶ 118 ("[S]ome of the unlawfully obtained documents were given to United States media outlets in hard-copy form by hand-delivery within the United States.")).

Muzin cannot plausibly argue that he expected Plaintiff Broidy to feel

---

[17] Discovery has already shown that Defendant Muzin exchanged dozens of calls with certain of these media outlets during the critical time frame. (Wolosky Decl. ¶¶ 11-12.)

the intended harm any place other than where Mr. Broidy lived and worked:

California.  As explained in *Calder*:

> Petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California.  Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. *And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works . . .*  Under the circumstances, petitioners must reasonably anticipate being haled into court there.

*Calder*, 465 U.S. 789-90 (citation and internal quotation marks omitted)

(emphasis added).

None of the out-of-state defendants in *Calder* had significant contacts with California, *Calder*, 465 U.S. at 786, and each had less significant contacts with California than Muzin, who is alleged to have "frequently traveled to California for business and political purposes during recent years" (FAC ¶ 21).  Nonetheless, the Supreme Court found unanimously that "[a]n individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California."  *Calder*, 465 U.S. at 790.  This holding remains the law in the Ninth Circuit.  *See Axiom*, 874 F.3d at 1069, 1070-71.

Muzin also cannot escape jurisdiction by asserting that the sole basis of personal jurisdiction over him is a conspiracy allegation.  The FAC contains multiple allegations that Muzin was personally and directly involved in the weaponization of documents stolen from Plaintiffs and the distribution of those documents to the mass media in an effort to cause Mr. Broidy specific harm in California.  (*See* FAC ¶¶ 129 ("[T]he Agent Defendants also carried out that conspiracy and unlawfully accessed Plaintiffs' private communications . . . and further engaged in distribution of that information to media outlets."); 131-32; *compare* FAC ¶ 13 ("On March 5, 2018, Defendant

Muzin informed Mowbray that there was 'more stuff coming' from the New York Times"), *with* ¶ 138 (describing the March 22nd and 26th New York Times articles "rely[ing] on '[h]undreds of pages of Mr. Broidy's emails, proposals and contracts," "as foretold by Defendant Muzin on March 5th").)

Moreover, prior to the completion of discovery, allegations demarking the line between actions undertaken by Muzin and those undertaken by the Doe Defendants is necessarily, in some instances, blurred.  In such cases, where jurisdictional discovery is intertwined with merits discovery, courts opt to permit discovery to move forward unfettered.  *See, e.g., Madsen v. Buffum*, No. ED 12-01605-MWF (SPx), 2013 WL 12139139, at *4 (C.D. Cal. July 17, 2013) ("The Court sees no reason to steer this litigation towards 'jurisdictional' discovery and an evidentiary hearing when any such discovery would be so intertwined with discovery on the merits of Plaintiffs' claims. Instead, this action will proceed to full fact discovery on both personal jurisdiction and the merits.").  Here, it currently is unclear whether and to what extent Muzin conspired to steal and disseminate Plaintiffs' private communications or only participated in the dissemination of the stolen materials.

Facts already obtained in discovery reveal numerous contacts between Muzin and reporters who later wrote offensive and inaccurate stories about Plaintiffs.  (Wolosky Decl. ¶¶ 11-12.)  These contacts occurred contemporaneously with the cyberattack and in the days prior to reporters publishing damaging stories.  *See supra* at 2-3.  Finally, although Muzin is alleged to have acted directly against Plaintiffs, and not merely in conspiracy against them, the conspiracy allegations here would be sufficient to confer personal jurisdiction.  The Ninth Circuit has never addressed whether the conspiracy theory of personal jurisdiction applies.  In

1   any event, Plaintiffs do not claim ties to California that rest merely on

2   personal jurisdiction over a co-conspirator.  Rather, Plaintiffs allege that

3   Muzin's own actions in the conspiracy were directed at California.  Here, as

4   discussed above, the conspiracy allegations against Muzin allege purposeful

5   direction towards California under *Calder,* and the specific California-specific

6   contacts required by *Walden* are satisfied by Muzin's direct targeting of

7   Plaintiffs in California – whether Muzin stole electronic materials himself, or

8   merely collated them and propagated them to the international news media in

9   order to cause harm to Plaintiffs in California.

10  **III.   PLAINTIFFS HAVE STATED A CLAIM AGAINST MUZIN**

11          Contrary to Muzin's assertion that the FAC "lumps Stonington with

12  fourteen other defendants," (Muzin Br. 19-20), the FAC contains numerous

13  allegations specific to Muzin, including specific allegations concerning

14  Muzin's own admissions of involvement in targeting Plaintiff Broidy, (*see*

15  FAC ¶¶ 131-38).[18]  Those allegations are specific to the alleged campaign to

16  distribute Plaintiffs' stolen confidential communications and other documents

17  to U.S.-based news organizations.  Muzin implicated himself in the

18  distribution efforts by the statements he made to Mowbray and by telling Mr.

19  Mowbray "to be very careful" because the State of Qatar was "after you and

20  Broidy."  (*Id.* ¶ 136.)  The FAC also alleges that Muzin was aware of

21  information in articles based on emails stolen from Plaintiffs before those

22  articles were published.  (*See id.* ¶¶ 131-38.)  These allegations are not just

23  supposition – telephone records demonstrate Muzin's contact with key

24  reporters during critical, pre-publication time periods.  (Wolosky Decl. ¶¶ 11-

25  12.)

---

[18] The standard of review on a motion pursuant to Fed. R. Civ. P. 12(b)(6) is
set forth in Plaintiffs' Opposition to SOQ's Motion to Stay at 22-24.

These specific allegations of Muzin's participation in the dissemination of Plaintiffs' private emails is sufficient to state a claim for several of the causes of action pleaded in the FAC.  For example, to have the inculpatory knowledge that he admitted to Mowbray (FAC ¶¶ 133, 135, 138), Muzin presumably had to be in possession of property stolen from Plaintiffs.  The distribution of Plaintiffs' private communications renders Muzin liable for invasion of privacy by intrusion upon seclusion and conversion.  By disclosing trade secrets contained in Plaintiffs' server, Muzin is subject to liability under the Digital Millennium Copyright Act, the California Uniform Trade Secrets Act, and 18 U.S.C. § 1836.

Finally, the FAC's allegations are sufficient to survive a motion to dismiss Plaintiffs' conspiracy claim against Muzin.  The allegations in the FAC do "more than simply state that" Muzin was "aware" of the State of Qatar's plan to target Plaintiffs.  *Arei II Cases*, 157 Cal. Rptr. 3d 368, 383 (Cal. Ct. App. 2013).  The FAC alleges that Muzin demonstrated his awareness when he repeatedly told Mowbray about the plan and demonstrated his involvement in it by reporting on aspects of the plan before they were accomplished.  (FAC ¶ 134.)  In addition to admitting his knowledge of the plan, after being accused of targeting Plaintiffs, Muzin defended himself by saying "***I was just doing my job***."  (*Id*. ¶ 137 (emphasis added).)  Plaintiffs do not need to allege that Muzin led the conspiracy, merely that he agreed to participate and seek to achieve the conspiracy's objectives.  *Arei II*, 157 Cal. Rptr. 3d at 382.  By admitting that he was doing "his job" Muzin implicated both himself and Stonington in the conspiracy to target Plaintiffs, which is sufficient to state of cause of action under Fed. R. Civ. Pro. 12 (b)(6).

BOIES SCHILLER FLEXNER LLP

IV.   **ADDITIONAL FACTORS WEIGH IN FAVOR OF CONTINUING DISCOVERY DURING THE PENDENCY OF MUZIN'S MOTION TO DISMISS**

The application of the facts in this case to the factors set out by this Court in *Top Rank, Inc. v. Haymon*, No. CV154961JFWMRWX, 2015 WL 9952887 (C.D. Cal. Sept. 17, 2015)[19] are discussed in detail in Plaintiffs' Opposition to Qatar's Motion to Stay.  (Pl.'s Opp. to SOQ Br. at 8-22.) Plaintiffs offer the following additional commentary regarding two of those factors with respect to Muzin.  First, Plaintiffs are highly likely to suffer prejudice if discovery is delayed because of potential spoliation of the specific types of telecommunications, ISP and other electronic evidence that have already established that Muzin was communicating with relevant media companies relevant to the allegations of the FAC at critical times.  (*See* Wolosky Decl. ¶¶ 11-12.)  Some of the information already has been spoliated.  (*See id.* ¶¶ 15-17.)  This type of spoliation is reason enough to deny the stay sought by Muzin.  *See Sandoval v. Friendlum, Inc*., No. 17CV1917-MMA (BGS), 2018 WL 1150837, at *5 (S.D. Cal. Mar. 2, 2018) ("[T]he Court finds that a stay would result in the potential of prejudicing Plaintiff with regards to delayed discovery . . . if the Court grants a stay in this case, [plaintiff] may struggle to obtain call logs from third-party carriers with retention periods lasting as short as six months.").[20]

---

[19] Those factors are:  "(1) the interests of the plaintiff in proceeding expeditiously with the civil action and the potential prejudice to plaintiffs of a delay; (2) the burden on the defendants; (3) the convenience to the court; (4) the interests of persons not parties to the civil litigation; and (5) the public interest."  *Top Rank*, 2015 WL 9952887, at *1.

[20] Plaintiffs also note that on June 8, one day after Allaham announced both the disclosure and severance of his ties with Qatar, Plaintiffs asked for confirmation that he would not transfer any materials in his possession to Qatar pursuant to any confidentiality agreement governing their relationship. (Wolosky Decl. ¶¶ 22-25 & Exh. D.)  Allaham's counsel failed to provide the

In addition, the interest of the public is in rapid resolution of this litigation and in transparency around the activities of FARA agents paid vast sums of money by foreign powers to influence our democracy.   The case concerns critical public issues, including the ability of a private U.S. citizen to express himself politically on U.S. soil without fear of intimidation and attack from a foreign power.  (FAC ¶ 14.)  With respect to lobbyists like Muzin in particular, though, there also is a strong public interest in transparency, consistent with the very purpose of the FARA statutory regime. The activities of foreign countries using U.S. nationals to impact the public policy of the United States is of current public interest and concern.  *See, e.g.,* NBC News, "The Mueller Effect:  FARA Filings Soar In Shadow Of Manafort, Flynn Probes, *https://www.nbcnews.com/news/us-news/mueller-effect-fara-filings-soar-shadow-manafort-flynn-probes-n838571*.  As discussed above in Section II of Plaintiff's Opposition to the State of Qatar's Motion to Stay, such transparency is a primary purpose of FARA requirements.  This litigation has already forced Stonington to belatedly file mandatory supplemental FARA filings.  (*See* Wolosky Decl. ¶ 11, n.1.)  Discovery in this litigation has forced Muzin to end his relationship with Qatar entirely, and has forced third party witness Joseph Allaham to disclose his own relationship with Qatar, end that relationship, and stated his intent to file a belated FARA disclosure statement. (Wolosky Decl. ¶¶ 11, n.1, 22-25, 32 & Exh. H).  The public interest weighs strongly in favor of continuing the discovery efforts arising from this action.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' Opposition to Qatar's Motion to Stay, this Court should deny Muzin's Motion to Stay the Case, or In

requested assurances. (*Id.* ¶ 25.)

the Alternative to Stay Discovery.

Respectfully submitted,

Dated:  June 11, 2018        **BOIES SCHILLER FLEXNER LLP**

By:   */s/ Lee S. Wolosky*

LEE S. WOLOSKY
*Counsel for Plaintiffs*