**BOIES SCHILLER FLEXNER LLP**
David K. Willingham (State Bar No. 198874)
 dwillingham@bsfllp.com
725 South Figueroa Street, Floor 31
Los Angeles, California 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

Amy L. Neuhardt (*pro hac vice*)
 aneuhardt@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005-2102
Phone:  (202) 237-2727
Fax:  (202) 237-6131

Lee S. Wolosky (*pro hac vice*)
 lwolosky@bsfllp.com
Robert J. Dwyer (*pro hac vice*)
 rdwyer@bsfllp.com
575 Lexington Ave., Floor 7
New York, NY 10022-6138
Phone:  (212) 446-2300
Fax:  (212) 446-2350

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY,<br><br>    Plaintiffs,<br><br>    v.<br><br>STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, GLOBAL RISK ADVISORS LLC, KEVIN CHALKER, DAVID MARK POWELL, MOHAMMED BIN HAMAD BIN KHALIFA AL THANI, AHMED AL-RUMAIHI, and DOES 1-10,<br><br>    Defendants. | Case No.  18-cv-02421-JFW<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT STATE OF QATAR'S MOTION TO STAY THIS CASE, OR ALTERNATELY, TO STAY DISCOVERY**<br>[Declaration of Lee S. Wolosky and Proposed Order filed concurrently herewith]<br><br>**The Honorable John F. Walter**<br><br>Hearing Date: July 9, 2018<br>Time:  1:30 p.m.<br>Ctrm.:  7A |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................. 2

I.   QATAR TARGETED BROIDY FOR ATTACK BECAUSE
     BROIDY'S CRITICISM OF QATAR'S SUPPORT OF
     TERRORISM HINDERED QATAR'S EFFORTS TO LIFT THE
     TRADE EMBARGO AGAINST IT .........................................................2

II.  PLAINTIFFS FILED THIS ACTION AND IMMEDIATELY
     BEGAN SEEKING PERISHABLE ELECTRONIC DISCOVERY
     AND DISCOVERY FROM DISCLOSED AND UNDISCLOSED
     AGENTS OF QATAR ..........................................................................4

III. PLAINTIFFS NEED TO BE ABLE TO CONTINUE TO PURSUE
     PERISHABLE DISCOVERY – NONE OF WHICH IS AGAINST
     QATAR .............................................................................................5

LEGAL STANDARD ................................................................................. 8

ARGUMENT ........................................................................................... 8

I.   DISCOVERY SHOULD NOT BE STAYED .........................................8

     A.   Staying Discovery Will Irreparably Harm Plaintiffs ........................8

     B.   Allowing Discovery To Proceed Will Not Unduly Burden
          Qatar Because It Is Not Entitled To Sovereign Immunity In
          This Case ...................................................................................10

          1.   The Non-Commercial Tort Exception Deprives Qatar Of
               Immunity ........................................................................... 11

          2.   The Commercial Activities Exception Deprives Qatar of
               Immunity ........................................................................... 13

     C.   Allowing Discovery To Proceed Is In the Public Interest ...............15

II.  EVEN IF DISCOVERY OF QATAR WERE STAYED, QATAR
     PROVIDES NO VALID REASON TO STAY DISCOVERY FROM
     THE NON-SOVEREIGN DEFENDANTS ...........................................17

     A.   Moving Forward With Discovery From Non-Sovereign
          Individuals for Entities Will Not Burden Qatar ..............................17

     B.   The Vienna Conventions Do Not Extend Privileges or
          Protections to Documents in the Custody of Individuals or
          Entities Who Are Not Members of the Qatari Mission ...................18

Case No. 18-cv-02421-JFW

MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S  MOTION TO
STAY DISCOVERY

C.     Additional Factors Weigh in Favor of Continuing Discovery Against Third-Parties and Parties Other Than Qatar. ........................21

III.     DISCOVERY SHOULD NOT BE STAYED ON THE BASIS OF RULE 12(B)(6) ................................................................................22

IV.     JURISDICTIONAL DISCOVERY IS APPROPRIATE ............................24

CONCLUSION ..............................................................................................25

B O I E S   S C H I L L E R   F L E X N E R   L L P

Case No. 18-cv-02421-JFW

MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S MOTION TO STAY DISCOVERY

# TABLE OF AUTHORITIES

**Page**

**Cases**

*767 Third Avenue Associates v. Permanent Mission of Republic of Zaire to United Nations*,
    988 F.2d 295 (2d Cir. 1993)..........................................................19

*Adler v. Fed. Republic of Nigeria*,
    107 F.3d 720 (9th Cir. 1997)........................................................14

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*,
    475 F.3d 1080 (9th Cir. 2007) ............................................... 18, 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................17

*Attorney Gen. of U.S. v. Covington & Burling*,
    411 F. Supp. 371 (D.D.C. 1976) ................................................20

*City of N.Y. v. Rep. of Philippines*,
    No. 03Civ.6085RCCFSM, 2004 WL 2710026 (S.D.N.Y. Nov. 23, 2004)........................................................................................19

*Conn. Bank of Commerce v. Republic of Congo*,
    309 F.3d 240 (5th Cir. 2002)......................................................25

*Crist v. Republic of Turkey*,
    995 F. Supp. 5 (D.D.C. 1998) ....................................................25

*Doe v. Bin Laden*,
    663 F.3d 64 (2d Cir. 2011)................................................... 11, 12

Doe v. Federal Democratic Republic of Ethiopia,
    851 F.3d 7 (D.C. Cir. 2017) .......................................................12

*Doe v. Holy See*,

BOIES  SCHILLER  FLEXNER  LLP

557 F.3d 1066 (9th Cir. 2009) ..................................................................12

*Ewald v. Royal Norwegian Embassy*,

    No. 11-CV-2116 SRN/SER, 2013 WL 6094600 (D. Minn. Nov. 20,

    2013)..........................................................................................................20

Frolova v. Union of Soviet Socialist Republics,

    761 F.2d 370 (7th Cir. 1985)............................................................ 12, 13

*Greenpeace, Inc. (U.S.A.) v. State of France*,

    946 F. Supp. 773 (C.D. Cal. 1996) ................................................... 11, 24

*Joseph v. Office of Consulate General of Nigeria*,

    830 F.2d 1018 (9th Cir. 1987) ...............................................................11

*Laub v. U.S. Dep't of Interior*,

    342 F.3d 1080 (9th Cir. 2003) ...............................................................24

*Liu v. Republic of China*,

    892 F.2d 1419 (9th Cir. 1989) ...............................................................11

*M.G. v. Metropolitan Interpreters and Translators, Inc.*,

    No. 12cv460-JM (MDD), 2013 WL 690833 (S.D. Cal. Feb. 26,

    2013)...........................................................................................................8

*Malibu Media, LLC v. Braun*,

    No. 14-CV-12409, 2015 WL 1014951 (E.D. Mich. Mar. 9, 2015)..............8

*Olsen by Sheldon v. Gov't of Mexico*,

    729 F.2d 641 (9th Cir. 1984)..................................................................11

*Republic of Argentina v. NML Capital, Ltd.*,

    134 S. Ct. 2250 (2014)..........................................................................10

*Richards v. Wisconsin*,

    520 U.S. 385 (1997)................................................................................9

BOIES SCHILLER FLEXNER LLP

MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S MOTION TO STAY DISCOVERY

*Rutman Wine Co. v. E & J Gallo Winery*,

    829 F.2d 729 (9th Cir. 1987)........................................................................23

*Sandoval v. Friendlum, Inc.,*

    No. 17CV1917-MMA (BGS), 2018 WL 1150837 (S.D. Cal. Mar. 2,

    2018)..............................................................................................................9

*Saudi Arabia v. Nelson*,

    507 U.S. 349 (1993) .......................................................................... 14, 15

*Shearson Lehman Bros Inc. v. Maclaine, Watson and Co Ltd;*

    *International Tin Council (Intervener)*

    *(No 2)* [1988] 1 All ER 116 (Eng.) ...........................................................19

*Siderman de Blake v. Republic of Argentina*,

    965 F.2d 699 (9th Cir. 1992)......................................................................14

*Skellerup Indus. Ltd. v. City of L.A.*,

    163 F.R.D. 598 (C.D. Cal.1995) ..................................................................8

*Sun v. Taiwan*,

    201 F.3d 1105 (9th Cir. 2000) ........................................................... 14, 15

*Taiwan v. U.S. District Court for the Northern District of California*,

    128 F.3d 712 (9th Cir. 1997)......................................................................20

*Top Rank, Inc. v. Haymon*,

    No. CV 15-4961-JFW (MRWx), 2015 WL 9952887 (C.D. Cal. Sept.

    17, 2015) .......................................................................................................8

*United States v. Ivanov*,

    175 F. Supp. 2d 367 (D. Conn. 2001)........................................................13

*Wood v. McEwen*,

    644 F.2d 797 (9th Cir. 1981)......................................................................24

BOIES SCHILLER FLEXNER LLP

**Federal Cases**

22 U.S.C. § 615 ...................................................................................20

28 U.S.C. § 1602 .................................................................................10

28 U.S.C. § 1605 ................................................................ 10, 11, 13, 14

**State Cases**

*Investigation into Abductions of American Children to Saudi Arabia:*

*Hearing Before the H. Comm. on Govt. Reform*, 107th Cong. 1326

(2002) (statement of Professor Eileen Denza)............................................19

Case No. 18-cv-02421-JFW

MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S  MOTION TO STAY DISCOVERY

## **PRELIMINARY STATEMENT**

The State of Qatar ("Qatar"), one of multiple defendants in this action, seeks a blanket stay of all discovery pending a yet-to-be-filed motion to dismiss that cannot resolve the entire case and may not be granted, and even in the absence of the service to date of a single discovery request on Qatar.  If granted, Qatar's requested stay will ensure that data held by third parties is destroyed or overwritten as time passes and permit other spoliation of evidence that will hamper Plaintiffs' receipt of admissible evidence to prove that Defendants hacked Plaintiffs' computers and computer network systems, stole confidential and proprietary documents, and then unlawfully disseminated them to the American media.

Qatar describes discovery thus far as a "fishing expedition," but Plaintiffs have conducted successful, targeted discovery on two discrete fronts:  (1) forensic electronic discovery aimed at proving at trial attribution of the sophisticated cyber-attacks against them; and (2) gathering evidence related to a web of disclosed and undisclosed Qatari agents and sub-agents in the United States who were involved either in carrying out the hacks or in disseminating information stolen during those hacks, many of whom appear to have been operating in contravention of the Foreign Agents Registration Act, 22 USC § 611 *et seq*. ("FARA").

Plaintiffs' efforts on this front are having an effect.  Just last week, after the Southern District of New York granted Plaintiffs' motion to compel the recipient of a third-party subpoena, Mr. Joseph Allaham ("Allaham"), to produce documents, Allaham publicly admitted that he had been operating as an undisclosed agent of Qatar, and attempted to disavow that relationship by

MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S  MOTION TO STAY DISCOVERY

stating publicly:  "Qatar enjoys portraying themselves as the purveyor of peace in the region, but this could not be further from the truth."[1]  (Wolosky Decl. ¶ 26.)  The same day as that order, Defendant Muzin[2] publicly terminated his own relationship with Qatar.  (*Id.* ¶ 34.)  On Friday of last week, Qatar, claiming for the first time that Mr. Allaham was an unlawfully unregistered agent of Qatar, asserted that Qatar had the right to assert diplomatic privileges over his documents.  (*Id.* ¶ 29.)

Qatar's motion to stay has one singular purpose:  impeding Plaintiffs' ability to obtain admissible evidence concerning the hacks and dissemination of materials stolen in the hacks.  Qatar seeks delay in the awareness that such evidence may decay or disappear.  Qatar's motion should be denied.

## STATEMENT OF FACTS

### I.   QATAR TARGETED BROIDY FOR ATTACK BECAUSE BROIDY'S CRITICISM OF QATAR'S SUPPORT OF TERRORISM HINDERED QATAR'S EFFORTS TO LIFT THE TRADE EMBARGO AGAINST IT

Plaintiff Elliott Broidy is a California businessman who owns and operates California-based Plaintiff Broidy Capital Management LLC ("BCM").  As described in the FAC, Broidy is a prominent critic of Qatar's sponsorship of terrorism and is perceived as someone with influence with a range of policymakers, including the President of the United States.  (First Amended Complaint ("FAC") ¶¶ 74-77, ECF No. 47.)   He was identified by

---

[1] Mr. Allaham issued a statement on June 7, 2018 in which he stated that he had engaged in "work with Qatar" and would register under FARA. (Wolosky Decl. ¶ 24.)

[2] Because Muzin is the owner and founder of Stonington Strategies LLC ("Stonington"), references to Muzin herein include Stonington unless otherwise stated.

B O I E S   S C H I L L E R   F L E X N E R   L L P

Qatar's vast lobbying and public relations apparatus in the United States as an obstacle to Qatar's efforts to reverse the Trump Administration's support for a broad commercial embargo imposed on it by its neighboring States.  (*Id.* ¶¶ 40, 78-80, 89.)

Because of the devastating effects of the embargo on Qatar's trade and economy (*id.* ¶¶ 27, 40, 52), Qatar acted against Broidy.  Beginning in early 2018, Broidy became aware that his personal and professional files, correspondence, trade secrets, business plans, and other confidential and private documents had been hacked and stolen from BCM's computers and servers.  (FAC ¶¶ 97-116.)  Forensic investigators retained by Plaintiffs discovered that a sophisticated cyberattack resulted in the theft of thousands of emails and documents from BCM's Los Angeles server from an Internet Protocol ("IP") address located in Doha, Qatar.  (*Id.* ¶ 113; Wolosky Decl. ¶ 9.)  Forensic investigation also determined that although the electronic data was exfiltrated from an IP address in Doha, the hackers assembled the stolen electronic data into PDF-formatted documents that were created in North American time zones.  (FAC ¶ 117.)  The stolen documents then were carefully curated and disseminated to journalists from U.S. media organizations who wrote stories in the U.S. media based on information contained in the stolen emails.  (*Id.* ¶¶ 117-26.)

Broidy soon became aware of Defendants' involvement in these unlawful actions.  Joel Mowbray is a longstanding acquaintance of both Defendant Muzin, a registered foreign agent of Qatar, and Broidy.  In a series of conversations between Mowbray and Muzin, Muzin admitted both his own involvement and, as Qatar's agent, Qatar's involvement, in the illegal scheme.

B O I E S   S C H I L L E R   F L E X N E R   L L P

(*See* Mowbray Decl., ECF No. 31-4.)  Indeed, when Mowbray directly accused Muzin of targeting Broidy on Qatar's orders and assisting in the attacks against Broidy, Muzin responded, "I was doing my job."  (FAC ¶ 137.)  Muzin also admitted that Qatar was targeting both Broidy and Mowbray (who also had criticized Qatar), informing Mowbray that "everyone [Muzin] 'fingered' for Qatar was 'in danger,'" and warning that "Broidy needed 'to be very careful' [because] the State of Qatar is 'going after [Mowbray],'" and "Honestly, I know they're after you and Broidy."  (FAC ¶ 136.)  In addition, according to cell phone records recently obtained by Plaintiffs, Muzin had, in the days and weeks prior to the publication of stories based on the stolen documents, multiple discussions with at least some of the journalists who wrote those stories.  (Wolosky Decl. ¶¶ 12-15.)

## II.   PLAINTIFFS FILED THIS ACTION AND IMMEDIATELY BEGAN SEEKING PERISHABLE ELECTRONIC DISCOVERY AND DISCOVERY FROM DISCLOSED AND UNDISCLOSED AGENTS OF QATAR

On March 26, 2018, Plaintiffs filed their original complaint in this court.  (ECF No. 1.)  Pursuant to this Court's Standing Order in the case (ECF No. 17) and in an effort to prevent spoliation of ephemeral electronic evidence in this case, Plaintiffs immediately thereafter began serving third-party discovery and party discovery on Defendants Muzin and Stonington.  (Wolosky Decl. ¶¶ 1, 33.)

On May 7, the Court entered a stipulated order permitting Plaintiffs to file an amended complaint by May 24.  (ECF No. 46.)  That stipulated order also stayed party discovery and certain third-party discovery through June 4, but specifically permitted all other discovery to continue.  (*Id.*)[3]  Consistent

---

[3] On May 24, 2018, Plaintiffs filed the FAC.  The FAC identified new facts

Case No. 18-cv-02421-JFW

MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S  MOTION TO STAY DISCOVERY

B O I E S   S C H I L L E R   F L E X N E R   L L P

with both the May 7 stipulated order and this Court's Standing Order, Plaintiffs continued to actively pursue third-party discovery to obtain perishable forensic discovery from third-party internet service providers ("ISPs"), email service providers, website registration providers, cloud services providers, virtual private network providers ("VPNs"), and telephone services providers, as well as discovery from unregistered agents of Qatar – including Allaham, the unregistered Qatari agent expressly carved out of the temporary stay of discovery in the May 7 Order. (*Id.*) When the stipulated stay expired on June 4, the discovery against Muzin and Stonington became active again, and responses are due July 2. (Wolosky Decl. ¶ 33.) However, Plaintiffs have not served any discovery on Qatar or its Embassy in Washington D.C. or Consulate in Los Angeles, and do not intend to do so prior to the resolution of Qatar's anticipated motion to dismiss. (*Id.* ¶ 32.)

## III. PLAINTIFFS NEED TO BE ABLE TO CONTINUE TO PURSUE PERISHABLE DISCOVERY – NONE OF WHICH IS AGAINST QATAR

Plaintiffs need to be able to continue their discovery efforts. As set forth throughout the FAC, the hacking campaign against Plaintiffs was highly sophisticated, bearing all the fingerprints of a state-actor or state-sponsored attack. Plaintiffs have conducted targeted discovery associated with multiple attack vectors in order to collect admissible evidence to prove attribution at trial. This process is time-sensitive because many ISP providers, in the ordinary course, implement data overwriting practices, in which the data relevant to Plaintiffs' claims may be deleted within a set period of a few

uncovered through Plaintiffs' continuing investigation, including further specific allegations against existing Defendants, and the addition of several additional defendants.

MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S MOTION TO STAY DISCOVERY

BOIES SCHILLER FLEXNER LLP

months.  (Wolosky Decl. ¶ 18.)  The evidence collection process often entails seeking to obtain perishable evidence by moving down a chain of third parties linking activity on the victims' servers, computers, and email accounts back to the attackers, who took significant and sophisticated precautions to try to hide their identity.

Due to the attackers' use of VPNs to route their malicious IP traffic through multiple computers and hide their own origin IP addresses, for example, Plaintiffs have had to trace IP addresses from the very start at BCM, in many cases through computer servers located in the United States and abroad.  (Wolosky Decl. ¶¶ 2-8.)  Already, Plaintiffs have collected admissible evidence from numerous internet services and accounts used by the cyber attackers to further their unlawful plan.  (*Id.*)  Through subpoenas, Plaintiffs have uncovered the attackers' use of ISPs tied to locations and individuals in the United States to further the attack.  (*Id.* ¶ 6.)  Plaintiffs also have obtained IP addresses showing the ISP and location from which images stored on a cloud storage website were downloaded in connection with the execution of the attack.  (*Id.* ¶ 4.)  Plaintiffs similarly have obtained IP addresses associated with the spear-phishing emails that launched the attacks, and shortened URLs that prevented the victims from learning they are being directed to malicious websites.  (*Id.* ¶ 5.)

The nature of this evidence, however, makes it impossible to be confident it is not being lost with each passing day.  As Plaintiffs continue to seek admissible evidence that will prove attribution, they have requested that each involved third-party preserve all relevant data.  (*Id.* ¶¶ 17-19.)  Plaintiffs cannot in some instances move to the next link until they have collected

- 6 -

B O I E S   S C H I L L E R   F L E X N E R   L L P

evidence from the one preceding it, and Plaintiffs have no way of informing the further links in the chain to suspend their ordinary data over-writing or auto-deletion policies until they obtain evidence from the preceding link. (*Id.*)[4]

Plaintiffs also have also been seeking discovery into the covert attempts to disseminate the fruits of that hacking campaign to U.S. media organizations and elsewhere, focusing their discovery efforts on identifying and collecting evidence from a web of lobbyists, public relations firms, and registered and unregistered domestic agents – all of whom are U.S. persons working for Qatar.  (*Id.* ¶ 33.)  Although much of that discovery was stayed until June 4, it has already had jarring consequences on the Qatari lobbying operation in the United States and has enabled Plaintiffs to gather admissible evidence further tying Muzin to involvement with the dissemination of materials stolen from Plaintiffs.  For example, phone records obtained in discovery reveal numerous pre-publication contacts between Muzin and reporters who published stories based on the stolen emails and documents.  (Wolosky Decl. ¶¶ 12-15.)  Among others, Muzin's phone records show that he spoke to Tom LoBianco of the Associated Press, on more than a dozen occasions between March 12, 2018 and May 8, 2018.  (*Id.* ¶ 12.)  During that period, Mr. LoBianco was engaged in extensive reporting relating to a long feature about Mr. Broidy that was based on access to stolen materials.  (*Id.* ¶ 13.) FARA records also show that Muzin engaged in telephone conversations during periods pertinent to the attack with other reporters who would subsequently write stories about Mr.

---

[4] Plaintiffs' concerns about the spoliation of key electronic evidence have been reinforced by at least one response from an electronic service provider that all relevant data had already been deleted.  (Wolosky Decl. ¶ 17.)

1 Broidy.  (*Id.* ¶¶ 14-15.)

2 ## LEGAL STANDARD

3 The Federal Rules of Civil Procedure do not provide for automatic or

4 blanket stays of discovery merely because a party has filed or, in this case,

5 plans to file, a motion to dismiss.  *See Skellerup Indus. Ltd. v. City of L.A.*,

6 163 F.R.D. 598, 600-01 (C.D. Cal.1995).  Nor are stays "of all discovery . . .

7 required in every case in which a defendant raises a claim of immunity."

8 *M.G. v. Metropolitan Interpreters and Translators, Inc.*, No. 12cv460-JM

9 (MDD), 2013 WL 690833, at *2 (S.D. Cal. Feb. 26, 2013).  Instead, a party

10 "seeking a stay of discovery carries a heavy burden of making a strong

11 showing why discovery should be denied."  *Skellerup*, 163 F.R.D. at 600.

12 When considering a stay of discovery pending a motion to dismiss, the

13 Court should consider factors such as:  (1) the interests of the plaintiff in

14 proceeding expeditiously with the civil action and the potential prejudice to

15 plaintiffs of a delay; (2) the burden on the defendants; (3) the convenience to

16 the court; (4) the interests of persons not parties to the civil litigation; and

17 (5) the public interest.  *Top Rank, Inc. v. Haymon*, No. CV 15-4961-JFW

18 (MRWx), 2015 WL 9952887, at *1 (C.D. Cal. Sept. 17, 2015).

19 ## ARGUMENT

20 ## I.    DISCOVERY SHOULD NOT BE STAYED

21 ### A. Staying Discovery Will Irreparably Harm Plaintiffs

22 A stay of discovery is particularly inappropriate where, as here, there is

23 a genuine danger of key evidence disappearing.  *See*, *e.g.*, *Malibu Media, LLC*

24 *v. Braun*, No. 14-CV-12409, 2015 WL 1014951, at *2 (E.D. Mich. Mar. 9,

25 2015) (denying stay of discovery and finding that "[p]laintiff is entitled to

26

27 - 8 -

28

B O I E S   S C H I L L E R   F L E X N E R   L L P

access the crucial evidence—defendant's hard drives and other electronic storage devices—before time lapses and older deleted files naturally are overwritten by newer files").  An intrinsic concern in any case involving hacking allegations is that the evidence needed to prove the case is stored in volatile digital systems, and often with third parties that frequently overwrite or delete data through normal operations.  *See Sandoval v. Friendlum, Inc.,* No. 17CV1917-MMA (BGS), 2018 WL 1150837, at *5 (S.D. Cal. Mar. 2, 2018) ("[T]he Court finds that a stay would result in the potential of prejudicing Plaintiff with regards to delayed discovery . . . if the Court grants a stay in this case, [plaintiff] may struggle to obtain call logs from third-party carriers with retention periods lasting as short as six months.").  In fact, Plaintiffs already have received a response to a third-party subpoena explaining that the data sought is no longer available.  (*See* Wolosky Decl. ¶ 17.)  As time goes on, more data will be irretrievably lost, rendering a stay of all discovery highly prejudicial to Plaintiffs.

In addition to forensic electronic evidence, Plaintiffs have been steadily uncovering a network of Qatari agents and sub-agents in the U.S. who were involved in the attacks on BCM and Broidy, some of whom appear not to have registered under FARA as required by law.  For example, Mr. Allaham's decision to reveal himself as a sub-agent of Qatar after being ordered to produce documents in this case is but one example of a discovery-driven disclosure of such hidden agents.  (*See id.* ¶ 24.)  Plaintiffs here are concerned that, particularly in light of the publicity surrounding this litigation, such evidence of work for Qatar may be destroyed if discovery is not taken promptly.  *See generally Richards v. Wisconsin*, 520 U.S. 385, 395 (1997)

Case No. 18-cv-02421-JFW

MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S  MOTION TO STAY DISCOVERY

(recognizing that, under certain circumstances, those that are being investigated for crimes may have the opportunity and incentive to destroy evidence).[5]

The potential irreparable prejudice to Plaintiffs from such spoliation of evidence is exacerbated here by the fact that this litigation will continue against non-sovereign defendants even if Qatar itself is ultimately dismissed from the litigation under the FSIA.  Under such circumstances, Qatar's demand for stay of such discovery now would deprive Plaintiffs of the opportunity to prove the merits of their case against the other Defendants.

### B. Allowing Discovery To Proceed Will Not Unduly Burden Qatar Because It Is Not Entitled To Sovereign Immunity In This Case

Qatar contends discovery should be stayed because it has immunity from jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*(the "FSIA").  (SOQ Br. 7-10.)  Under the circumstances of this case, it does not.

The FSIA governs foreign state immunity from jurisdiction in United States courts.  *Republic of Argentina v. NML Capital, Ltd*., 134 S. Ct. 2250, 2256 (2014).  Section 1605 of the FSIA expressly denies immunity to foreign states that engage certain kinds of conduct.  For example, foreign states are not immune from civil liability for torts they commit in the United States.  28 U.S.C. § 1605(a)(5).  They are also not immune from damages based on their commercial activities, whether in the United States or abroad.  *Id.* § 1605(a)(2).  Because Plaintiffs' claims are based on Qatar's tortious conduct

---

[5] Note that the FBI is actively investigating the cyber-attacks on Plaintiffs. *See* "FBI Probes Hack Of Elliott Broidy, The Republican Operative At The Center Of Scandal After Scandal," *The Daily Beast,* June 4, 2018, available at https://www.thedailybeast.com/fbi-probes-hack-of-elliott-broidy-the-republican-operative-at-the-center-of-scandal-after-scandal.

1    and commercial activities, Qatar cannot claim immunity and cannot show that

2    its anticipated motion to dismiss is likely to succeed.  With no immunity, there

3    is no basis for a discovery stay.

4           1.   The Non-Commercial Tort Exception Deprives Qatar Of
                 Immunity

5

6           The FAC establishes that Qatar participated in tortious conduct

7    "occurring in the United States" – conduct that is an exception to immunity

8    under the FSIA.  28 U.S.C. § 1605(a)(5).  In the Ninth Circuit, the non-

9    commercial tort exception removes immunity when "plaintiffs allege at least

10   one entire tort occurring in the United States."  *Olsen by Sheldon v. Gov't of*

11   *Mexico*, 729 F.2d 641, 646 (9th Cir. 1984), *abrogated on other grounds by*

12   *Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018 (9th Cir.

13   1987); *see also Greenpeace, Inc. (U.S.A.) v. State of France*, 946 F. Supp.

14   773, 785 (C.D. Cal. 1996).  The exception applies even though "some

15   allegedly tortious acts . . . took place outside the United States," *Olsen*, 729

16   F.2d at 646, and even though the intent to commit the tort may have been

17   formed outside the United States, *Liu v. Republic of China*, 892 F.2d 1419,

18   1422-23, 1433 (9th Cir. 1989) (tortious activity exception applied where

19   precipitating actions occurred, and intent was formed, abroad when plaintiff

20   brought wrongful death claim based on foreign state planning assassination

21   and training assassins for that purpose abroad).  Other jurisdictions have come

22   to the same conclusions.  *See, e.g.*, *Doe v. Bin Laden*, 663 F.3d 64, 66-67, 71

23   (2d Cir. 2011) (finding "no question" that the tort occurred in the United

24   States where claims alleged that the Taliban, acting as the nation of

25   Afghanistan, entered into a conspiracy to commit aircraft sabotage and

26

27                          - 11 -              Case No. 18-cv-02421-JFW

28   MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S  MOTION TO
                                                                STAY DISCOVERY

BOIES  SCHILLER  FLEXNER  LLP

1  extrajudicial killing; finding discovery necessary to determine whether other

2  elements impacting jurisdiction were satisfied).  Consequently, the FSIA does

3  not protect Qatar either from liability for its participation in the torts alleged in

4  the FAC (*see, e.g.*, FAC ¶¶ 162-68, 178-87, 228-38) or from discovery

5  seeking to establish its liability for those torts.  *See, e.g.*, *Bin Laden*, 663 F.3d

6  at 66-67, 71.[6]

7         Qatar's reliance on *Doe v. Federal Democratic Republic of Ethiopia*,

8  851 F.3d 7 (D.C. Cir. 2017) and *Frolova v. Union of Soviet Socialist*

9  *Republics*, 761 F.2d 370 (7th Cir. 1985) is misplaced and does not support a

10  discovery stay.  The *Ethiopia* court applied a different Circuit Court's

11  conflicting interpretation of the non-commercial tort exception[7] to a complaint

12  that did not allege any U.S.-based activity beyond than the installation of

13  spyware in an email sent from a foreign location.[8]  *Ethiopia*, 851 F.3d at 10.

14  ────────────────

15  [6] Qatar's attempt to cast Plaintiffs' support for an "entire" tort as resting
   merely on Plaintiffs' civil conspiracy claim (*see* SOQ Br. 9) is incorrect.

16  [7] The Ninth Circuit has recognized that its application of the noncommercial

17  tort exception is different from the D.C. Circuit, which decided *Ethiopia*.  *See*
   *Doe v. Holy See*, 557 F.3d 1066, 1085 n.11 (9th Cir. 2009) (noting that "we

18  have no occasion to consider whether the *entire* tort must occur in the United
   States, as the Sixth and D.C. Circuits have held" and pointing to the Ninth

19  Circuit's opinion in *Olsen* as authority contrary to the Sixth and D.C.

20  Circuits).

21  [8] In fact, the *Ethiopia* district court emphasized that the complaint in that case

22  did not allege that any "agent or employee of Ethiopia . . . ever set foot in the
   United States in connection with that tort."  *Doe v. Federal Democratic*

23  *Republic of Ethiopia*, 189 F. Supp. 3d 6, 18 (D.D.C. 2016).  The district court

24  also acknowledged that, if Ethiopia had sent "a flesh and blood agent" to the
   United States to install a recording device, the surveillance would "fall

25  squarely within the 'entire tort' rule."  *Id.* at 11.  Here, Plaintiffs allege that

26  "flesh and blood" agents of Qatar not only "set foot" in the United States but

27                                                      - 12 -                      Case No. 18-cv-02421-JFW

28  ────────────────────────────────────────────
   MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S  MOTION TO
                                                                   STAY DISCOVERY

*Frolova* addressed claims arising from Russia's refusal to allow a Russian citizen to emigrate to the United States, conduct that occurred entirely in Russia.  *Frolova*, 761 F.2d at 371-72.  Moreover, beyond the computer-based statutory claims alleged in the FAC, Plaintiffs also allege other "entire torts" that were committed "in the United States" by "flesh and blood agents" of Qatar.  These include, but are not limited to:  (1) receipt and possession of stolen property (*see* FAC ¶¶ 162-68); (2) conversion (*id.* ¶¶ 178-87); and (3) civil conspiracy (*id.* ¶¶ 228-38).

### 2.  The Commercial Activities Exception Deprives Qatar of Immunity

Qatar also cannot show that its motion to dismiss is likely to succeed because the FAC alleges claims based on Qatar's commercial activities.  Those claims constitute another exception to immunity under the FSIA.  28 U.S.C. § 1605(a)(2).  For example, Plaintiffs allege that the entire reason for

also committed "entire torts" in the United States.  (*See, e.g.*, FAC ¶¶ 93, 105, 114, 117-20, 162-68, 178-87, 228-38.)

Additionally, the "hacks" in *Ethiopia* were also different from those in this case.  The hackers in *Ethiopia* sent an "automated" spyware program into the *Ethiopia* plaintiff's computer via email from outside the United States and did not personally interact with the plaintiff's computer in any way.  *See Ethiopia*, 851 F.3d at 8-9.  The hackers in BCM's and Broidy's case, however, "personally" and "manually" interacted with Plaintiffs' network and computer systems in real time and "manually" initiated the computer applications used to steal Plaintiffs' data files from those computers and servers.  Thus, the "essential locus" of the hacking, and, therefore, the tort was the United States where Plaintiffs' computers were located.  *Cf. United States v. Ivanov*, 175 F. Supp. 2d 367, 274 (D. Conn. 2001) (prosecuting Russian hacker who infiltrated Connecticut business computer network to gain root passwords, holding that violation occurred in U.S. territory because the computers were in Connecticut).

BOIES SCHILLER FLEXNER LLP

BOIES SCHILLER FLEXNER LLP

1    attacking Broidy, who was closely identified with President Trump's support

2    of the commercial embargo of Qatar, was to discredit Broidy as part of an

3    effort to influence and change U.S. policy regarding the embargo, which

4    presented an existential threat to Qatar.  (FAC ¶¶ 2, 4, 15, 27, 31, 40, 52, 77-

5    80.)  The fact that the claims based on Qatar's "commercial activity" are "tort-

6    based" does not preclude the commercial activities exception.  *See, e.g.*, *Adler*

7    *v. Fed. Republic of Nigeria*, 107 F.3d 720, 726 (9th Cir. 1997) (applying the

8    commercial activities exception to tort claims).

9          Contrary to Qatar's assertions, Plaintiffs' claims are "based on" or

10   "connected to" commercial activity by Qatar within the meaning of

11   § 1605(a)(2).  For example, Plaintiffs allege that Qatar retained operatives for

12   the specific purpose of carrying out the hack against Plaintiffs and that Qatar

13   increased the compensation for other United States-based operatives to

14   incentivize them to participate in the effort to destroy BCM and Broidy and to

15   pay for the necessary resources to implement the plan.  (*See, e.g.*, FAC ¶¶ 2-3,

16   5-7, 20-23, 31, 52, 54, 61, 63, 72-73, 88, 90-96.)  Therefore, Qatar's

17   commercial activity forms part of the "elements of [Plaintiffs'] claim that, if

18   proven, would entitle [them] to relief under [their] theory of the case."  *Sun v.*

19   *Taiwan*, 201 F.3d 1105, 1109 (9th Cir. 2000) (quoting *Saudi Arabia v. Nelson*,

20   507 U.S. 349, 357 (1993)).  The FAC also provides the nexus between the

21   Plaintiffs' action and Qatar's commercial activity.  *Siderman de Blake v.*

22   *Republic of Argentina*, 965 F.2d 699, 709 (9th Cir. 1992).  Plaintiffs' claims in

23   this case, therefore, have a "substantive connection" or "causal link" to

24   Qatar's commercial activities.  *Adler*, 107 F.3d at 726.

25         Qatar's myopic focus on the "hiring of U.S. agents" without reference

26

27                                    - 14 -                    Case No. 18-cv-02421-JFW

28   MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S  MOTION TO
                                                              STAY DISCOVERY

1   to what those agents were hired, or paid, to do mischaracterizes the

2   commercial activity.  (SOQ Br. 10.)  Moreover, Qatar fails to recognize that

3   Plaintiffs' claims need not be based entirely on the commercial activity in

4   order for the commercial activity exception to apply.  *Sun*, 201 F.3d at 1109;

5   *Nelson*, 507 U.S. at 358 n.4.

6        Because its conduct falls within the noncommercial tort exception and

7   the commercial activity exception, Qatar does not have immunity and cannot

8   justify staying discovery.

9        **C. Allowing Discovery To Proceed Is In the Public Interest**

10        Qatar is also not entitled to a stay of discovery because the public

11   interest strongly favors allowing discovery.  As discussed at length above, this

12   case implicates crucial public issues, such as the ability of a private citizen to

13   express himself on issues of national importance without fear of attack from a

14   foreign power.  Broidy was targeted specifically because of his political

15   advocacy, and as detailed in the FAC, he has paid an immense price.  If Qatar

16   is permitted to shut discovery down before it even files a motion to dismiss, it

17   will serve to embolden foreign states and cyber mercenaries that wish to target

18   Americans.

19        Broidy is not the only American targeted by a foreign power for

20   exercising his First Amendment rights.  The Electronic Frontier Foundation

21   has noted a dangerous increase in foreign regimes using computer hacking to

22   target dissidents and opponents abroad.  *See* Nate Cardozo, Can Foreign

23   Governments Launch Malware Attacks on Americans Without

24   Consequences?, Electronic Frontier Foundation, Feb. 2, 2017, available at

25   https://tinyurl.com/y8qgk6kj.  While these regimes can more directly stifle

26

27                              - 15 -                   Case No. 18-cv-02421-JFW

28

B O I E S   S C H I L L E R   F L E X N E R   L L P

dissent at home, they are increasingly relying on the very same methods used in this case to punish critics who live outside their borders.  *Id.*  The public has a strong interest in protecting and vindicating the rights of those who reside inside its borders from all forms of unlawful intrusion and theft.

Of equal importance, the public has a significant interest in the national security implications involved with this case, including identifying foreign agents operating on U.S. soil.  Discovery has already led one unregistered foreign agent to come clean, notwithstanding Qatar's last-second attempts to impede him from complying with his discovery obligations.  Just last week, the Southern District of New York granted Plaintiffs' motion to compel discovery against Joey Allaham, who is alleged in the FAC to be an unregistered domestic agent of Qatar.  (*See* FAC ¶¶, 3, 62, 71; Wolosky Decl. ¶ 23.)  Shortly thereafter, Mr. Allaham announced that he was cutting his ties with Qatar and that he would belatedly register under FARA for the period of time he did have such ties.  (Wolosky Decl. ¶ 24.)

Plaintiffs have every expectation that discovery will continue to shine a light on the web of money and influence Qatar aimed at American foreign policy and public opinion.  This discovery, even conducted by private parties, supports the important national objectives that led Congress to enact FARA in the first place:  "to insure that the U.S. Government and the people of the United States are informed of the source of information (propaganda) and the identity of persons attempting to influence U.S. public opinion, policy, and laws."  *General FARA Frequently Asked Questions:  What is the Purpose of FARA?*, U.S. Dep't of Justice (Aug. 21, 2017), https://www.justice.gov/nsd-fara/general-fara-frequently-asked-questions#2.

B O I E S   S C H I L L E R   F L E X N E R   L L P

## II. EVEN IF DISCOVERY OF QATAR WERE STAYED, QATAR PROVIDES NO VALID REASON TO STAY DISCOVERY FROM THE NON-SOVEREIGN DEFENDANTS

### A. Moving Forward With Discovery From Non-Sovereign Individuals for Entities Will Not Burden Qatar

Qatar argues that it requires a stay of discovery against all third-parties because it would be burdensome to participate in the discovery process. (SOQ Br. 10.)  Qatar's reliance on *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) is unavailing for two reasons.  First, *Iqbal* involved a plaintiff who had "not 'nudged [his] claims' of invidious discrimination 'across the line from conceivable to plausible.'"  *Id.* at 680.  By contrast, Plaintiffs allege facts that are not only "plausible" but are known to have occurred.  While there was no known tort that took place in *Iqbal*, here, Defendants do not question that the underlying tort—the hacking of Plaintiffs and the distribution of their emails—did in fact occur.  The Supreme Court found *Iqbal* to be a case where there was nothing more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *id.* at 678, but here there has been evidence attesting to the existence of the tort and the Defendants' responsibility for it.  Plaintiffs have alleged specific steps by specific individuals in the FAC.

Second, the complaint in *Iqbal* failed to identify any exception to the defendants' claims to immunity.  *See Iqbal*, 556 U.S. at 686.  That is not the case here, where Plaintiffs have identified two exceptions to Qatar's immunity and pled facts showing that Qatar's conduct falls within those exceptions. Therefore, Plaintiffs are entitled to proceed with discovery to "verify allegations of specific facts crucial to" acquiring admissible evidence proving that Qatar and the other Defendants are responsible for the cyberattacks.  *Af-*

*Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1095 (9th Cir. 2007) (internal quotation marks omitted).  Plaintiffs' ability to seek jurisdictional discovery to verify the allegations in the FAC is well established and is not imperiled by *Iqbal*.

### B. The Vienna Conventions Do Not Extend Privileges Or Protections to Documents In The Custody Of Individuals Or Entities Who Are Not Members Of The Qatari Mission

Under the guise of avoiding the burden of discovery, Qatar asks the Court to cloak documents not in its possession with privileges that do not exist.  More specifically, it asks the Court to extend protections afforded to diplomatic records under the Vienna Convention on Diplomatic Relations and the Vienna Convention on Consular Relations to documents that it has already intentionally and purposefully disclosed to its agents and subagents in the United States, including Muzin.  (SOQ Br. 12-14.)  Qatar's effort to extend the Vienna Conventions has no legal support and is, in fact, undermined by International Law, its own contractual relations with those third parties and by the U.S. statutes and regulations applicable to FARA-registered agents.

*First*, nothing in the text of either Convention supports the notion that diplomatic privileges extend to documents that have been disclosed to individuals or entities who are not part of the diplomatic mission and have been taken out of the mission's "archives" by such individuals.  Qatar stretches the meaning of the terms "official correspondence" and "inviolable at any time and wherever they may be"[9] far beyond their intended scope.  *See* Eileen Danza, *Diplomatic Law: Commentary on the Vienna Convention on*

---

[9] Vienna Convention on Diplomatic Relations, art. 24, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95; Vienna Convention on Consular Relations, art 33, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.

Case No. 18-cv-02421-JFW

BOIES SCHILLER FLEXNER LLP

*Diplomatic Relations* 189 (4th ed. 2016) (quoting *Summary of Records of the 10th Session*, [1958] 1. Y.B. Int'l L. Comm'n 143, U/N. Doc. A/CN.4/SER.A/1958) ("The phrase 'official correspondence of the mission' meant correspondence from the mission, that sent to the mission from its chancellery or other authorities of the sending state, and the correspondence between the mission and consulates situated in the receiving state."); *Shearson Lehman Bros Inc. v. Maclaine, Watson and Co Ltd; International Tin Council (Intervener) (No 2)* [1988] 1 All ER 116, 124-25 (Eng.) (records provided to third parties are not protected by the Vienna Convention), attached as Exh. J. Similarly, the inviolability of "official correspondence" within the meaning of the Vienna Convention on Diplomatic Relations "is not really dealing with the correspondence between the mission and the outside world; it is really dealing with internal correspondence." *Investigation into Abductions of American Children to Saudi Arabia: Hearing Before the H. Comm. on Govt. Reform*, 107th Cong. 1326 (2002) (statement of Professor Eileen Denza).

*Second*, none of the cases cited by Qatar involve efforts to discover documents from individuals or entities who are not members of the mission. Rather, they all involve discovery directed at the mission or government officials. For example, *767 Third Avenue Associates v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295 (2d Cir. 1993) addressed the "inviolability" of the building used by a diplomatic mission and the limitations on a landlord's authority to "enter" and "evict" the mission when it fails to pay rent. *City of N.Y. v. Rep. of Philippines*, No. 03Civ.6085RCCFSM, 2004 WL 2710026, at *4 (S.D.N.Y. Nov. 23, 2004) involved document requests served directly on the Philippines mission during

B O I E S   S C H I L L E R   F L E X N E R   L L P

1    litigation over tax liabilities for a commercial center being operated in the

2    same building.  *Ewald v. Royal Norwegian Embassy*, No. 11-CV-2116

3    SRN/SER, 2013 WL 6094600, at *6 (D. Minn. Nov. 20, 2013) concerned a

4    motion to compel documents directly from a Norwegian consulate.  And,

5    *Taiwan v. U.S. District Court for the Northern District of California*, 128 F.3d

6    712 (9th Cir. 1997) concerned a motion to compel the deposition of a

7    Taiwanese official who himself enjoyed immunity from jurisdiction.

8         *Third*, Qatar's own agreement with its contractors expressly recognizes

9    that any "documents, information, or communications" "received" by them

10   are subject to being disclosed "as required by law."  (Wolosky Dec. ¶ 25 &

11   Exh. I.)  Therefore, Qatar knows that documents it puts into the custody of

12   third-party agents are not "inviolable" and are subject to discovery.

13        *Fourth*, Qatar's long-standing business dealings with FARA agents also

14   demonstrates that documents it puts into the possession of third parties are not

15   "inviolable."  As more fully set forth in Plaintiffs' Opposition to Muzin's

16   motion to stay discovery, FARA is "a disclosure statute."  *Attorney Gen. of*

17   *U.S. v. Covington & Burling*, 411 F. Supp. 371, 373 (D.D.C. 1976).  (*See also*

18   Pl's Opp. To Muzin Br. Part I.B.)  Section 615 requires FARA agents to keep

19   all "records with respect to all [their] activities" while they are "agent[s] of a

20   foreign principal," and requires them to "open" them for inspection by "any

21   official charged with the enforcement" of FARA.  22 U.S.C. § 615; *see also*

22   *Covington*, 411 F. Supp. at 376 ("[T]he phrase 'books of account and other

23   records' includes records which would tend to reveal confidential

24   communications between a foreign principal and its agent-attorney concerning

25   legal matters.").

26

27                                    - 20 -                  Case No. 18-cv-02421-JFW

B O I E S   S C H I L L E R   F L E X N E R   L L P

BOIES SCHILLER FLEXNER LLP

### C. Additional Factors Weigh in Favor of Continuing Discovery Against Third-Parties and Parties Other Than Qatar.

Additional factors provide compelling reasons to continue discovery from non-sovereign individuals or entitles during the pendency of the motions to dismiss.

*First*, Qatar's assertion that it will suffer prejudice in the absence of a stay of *all* discovery (SOQ Br. 16) conflates discovery against Qatar (which Plaintiffs have not sought to date) with discovery in which Qatar would not be required to have any substantive engagement – such as non-party forensic document discovery[10] and document requests to parties that may well remain in this litigation even if Qatar itself is dismissed.[11]  Qatar's argument that it will be relieved from ever engaging in such discovery if it is dismissed from this case either assumes that *all defendants* will also be dismissed or reveals that Qatar has no intention of challenging such discovery if it is itself dismissed from the action.

*Second,* allowing discovery to continue against third parties and defendants other than Qatar will streamline the litigation going forward.  As discussed above and in Plaintiffs' response to Muzin's motion to stay discovery, Muzin's claims of sovereign immunity are not sustainable.  (*See*

---

[10] Forensic, non-party discovery cannot possibly infringe on any of Qatar's proclaimed diplomatic privileges unless tit results in the production of admissible evidence attributing the hacking to the government of Qatar itself – in which case that fact would be critically important in ruling on any motion to dismiss based on the sufficiency of Plaintiffs' allegations. *See Skellerup*, 163 F.R.D. at 601.

[11] To the extent Qatar argues that it may need to assert privileges over discovery against other parties, it presumably would do so even if it were not a named defendant in this case.

- 21 -

1 Pl's Opp. To Muzin Br. Part II.A.)  Delaying discovery against them in light

2 of those arguments is likely to delay resolution of the litigation as a whole.  In

3 addition, as discussed in Section IV, such discovery is necessary to respond to

4 defendants' jurisdictional challenges.

5   *Third*, permitting discovery to go forward is not prejudicial to third-

6 parties.  Plaintiffs have served a number of Rule 45 subpoenas on third-party

7 ISPs, telephone companies, and related entities.  This discovery has

8 overwhelmingly been non-contentious.

## III.   DISCOVERY SHOULD NOT BE STAYED ON THE BASIS OF RULE 12(B)(6)

11   Qatar's argument that discovery should be stayed because Plaintiffs

12 "have not stated a plausible claim upon which relief can be granted," (SOQ

13 Br. 14), is without merit.[12]

14   *First*, the FAC states a claim for relief under *Iqbal*.  Plaintiffs allege:

15 • Qatar decided to target and damage Plaintiff Broidy because he

16   was criticizing Qatar.  (FAC ¶¶ 88-92.)

17 • Qatar "retained the GRA Defendants to coordinate an offensive

18   cyber and information operation against Plaintiffs" (*id.* ¶ 93), and

19 ─────────────────────

20 [12] The Statements of Fact in Qatar's and Muzin's briefs reference this Court's
denial of Plaintiffs' request for a TRO.  (*See* SOQ. Br. 3; Muzin Br. 2.)

21 However, whether Plaintiffs have alleged sufficient facts to survive a motion
to dismiss and whether discovery should proceed as contemplated by the

22 Federal Rules of Civil Procedure are substantively different issues than those

23 addressed by the Court in connection with Plaintiffs' application for a TRO—
namely whether, at the time, there was then *admissible evidence*

24 demonstrating that Plaintiffs were entitled to the "extraordinary and drastic

25 remedy" of preliminary injunctive relief.  (*See* ECF No. 37.)  In any event, the
FAC alleges myriad facts addressing Defendants' culpability and liability.

26

BOIES  SCHILLER  FLEXNER  LLP

GRA introduced Qatar to "known and unknown threat actors to execute the attacks" (*id*. ¶ 94).

- GRA set up operations in Doha, Qatar.  (*Id.* ¶ 95.)
- Qatar implemented its plan by engaging in a "series of hacks and/or other misappropriation of the private communications, documents trade secrets and intellectual property of Plaintiffs, and unlawfully distributed those materials to the media."  (*Id.* ¶ 92.)
- Numerous hacking events with details of the means, methods, targets, and evidence used in the hacks.  (*Id.* ¶¶ 93-139.)

The facts detailing Qatar's and the other Defendants' participation in the attacks go far beyond a single "IP address registered to a computer in Qatar was somehow related to the alleged hack."  (SOQ Br. 15-16.)  The FAC contains more than sufficient plausible factual matter, which, accepted as true, allows the Court to draw the reasonable inference that Qatar is liable for the misconduct.  *See Iqbal*, 556 U.S. at 678.

*Second*, Qatar does not merely ask the Court to stay discovery based on a Rule 12(b)(6) motion; rather, it asks the Court to stay discovery based on a motion it has not filed.

*Third*, the case law cited by Qatar does not support the imposition of a discovery stay in this case.  For example, in *Rutman Wine Co. v. E & J Gallo Winery*, 829 F.2d 729 (9th Cir. 1987), the plaintiff's complaint was dismissed because it lacked any allegations establishing two essential elements for antitrust claims, *see id.* at 734-36.  The plaintiff then asked the court for leave to conduct discovery prior to filing an amended complaint, a request that the

Case No. 18-cv-02421-JFW

MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S  MOTION TO STAY DISCOVERY

district court and the Ninth Circuit denied.  *Id*.  In *Wood v. McEwen*, 644 F.2d 797 (9th Cir. 1981), the plaintiff's complaint was dismissed after two years of discovery because he failed to comply with court orders.  *Id.* at 799.  Three years later, the same plaintiff filed a new complaint alleging that the judgment in the first was procured by fraud.  *Id*. at 800.  Discovery in the second case was stayed, and the Ninth Circuit found the claims substantively meritless.  *Id*. at 800, 802.

There is no similar fact pattern in the FAC.  Instead, Qatar is trying to run out the clock, knowing that with each passing day more evidence of its cyberattacks is erased.  A Rule 12(b)(6) motion simply does not justify a discovery stay in this case.

## IV.   JURISDICTIONAL DISCOVERY IS APPROPRIATE

Although Plaintiffs have not yet propounded any discovery requests to Qatar, it is clear that even discovery directly against a sovereign is permitted when necessary to determine subject matter jurisdiction.  Such jurisdictional discovery is available when it is "useful to establish federal subject matter jurisdiction."  *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003).  Plaintiffs generally can obtain discovery against foreign sovereigns for the purpose of establishing whether an exception to the FSIA applies.  *See, e.g., Af-Cap*, 475 F.3d at 1095 (discussing district court's permission of "more than fifteen months of discovery from . . . the Congo").  In particular, if discovery against a foreign sovereign or its instrumentality could show subject matter jurisdiction under the FSIA, "[i]t is an abuse of discretion to dismiss for lack of subject matter jurisdiction without giving [a] plaintiff reasonable opportunity . . . to conduct discovery for this purpose."  *Greenpeace, Inc.*, 946

MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S  MOTION TO STAY DISCOVERY

F. Supp. at 789; *see also Crist v. Republic of Turkey*, 995 F. Supp. 5, 12 (D.D.C. 1998) ("[T]he parties should be permitted a fair opportunity to engage in jurisdictional discovery so as to adequately define and submit to the court facts necessary for a thorough and complete consideration of the issue."). Discovery may proceed against a sovereign otherwise entitled to FSIA immunity if it is "ordered 'circumspectly and only to verify allegations of specific facts crucial to the immunity determination.'" *Id.* (quoting *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 260 n.10 (5th Cir. 2002)).

If such discovery directly against a sovereign is permissible to resolve questions of subject matter jurisdiction, jurisdictional discovery of third parties and non-sovereign defendants must be at least equally (and likely significantly more) available to Plaintiffs here.[13]

## CONCLUSION

For the reasons set forth above and in Plaintiffs' Opposition to Muzin's Motion to Stay, this Court should deny Qatar's Motion to Stay Discovery.

Respectfully submitted,

Dated:  June 11, 2018

**BOIES SCHILLER FLEXNER LLP**

By:   */s/ Lee S. Wolosky*

LEE S. WOLOSKY
*Counsel for Plaintiffs*

---

[13] Notably, Plaintiffs are unaware of any court denying jurisdictional discovery directed to an outside contractor claiming to be the agent of a foreign sovereign.

Case No. 18-cv-02421-JFW

MEMO OF P'S AND A'S ISO PLAINTIFFS' OPPOSITION TO STATE OF QATAR'S  MOTION TO STAY DISCOVERY