COVINGTON & BURLING LLP
Mitchell A. Kamin (Bar No. 202788)
  mkamin@cov.com
Neema T. Sahni (Bar No. 274240)
  nsahni@cov.com
Mark Y. Chen (Bar No. 310450)
  mychen@cov.com
Rebecca G. Van Tassell (Bar No. 310909)
  rvantassell@cov.com
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: + 1 424-332-4800
Facsimile: + 1 424-332-4749

*Attorneys for Defendant State of Qatar*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY | Civil Case No.: |
| | 2:18-CV-02421-JFW-(Ex) |
|      Plaintiffs, | |
|      v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT STATE OF QATAR'S MOTION TO DISMISS PURSUANT TO RULES 12(b)(1) AND 12(b)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE** |
| STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, GLOBAL RISK ADVISORS LLC, KEVIN CHALKER, DAVID MARK POWELL, MOHAMMED BIN HAMAD BIN KHALIFA AL THANI, AHMED AL-RUMAIHI, and DOES 1-10, | |
|      Defendants. | [*Filed Concurrently with Notice of Motion and Motion to Dismiss; Request for Judicial Notice; Proposed Order*] |
| | **Hearing Date:** July 30, 2018 |
| | **Time:** 1:30 p.m. |
| | **Courtroom:** 7A |
| | **Judge:** Hon. John F. Walter |
| | **Complaint Filed:** March 26, 2018 |
| | **Amended Complaint:** May 24, 2018 |

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 3

I.       Qatar Is a Key Strategic Partner of the United States in the Middle East ................ 3

II.      Plaintiff Elliott Broidy and the Alleged Hack. ................................................. 5

III.     Plaintiffs' Causes of Action Depend on Extraterritorial Conduct ............................ 7

LEGAL STANDARD ................................................................................................ 8

ARGUMENT ............................................................................................................ 10

I.       This Court Lacks Subject-Matter Jurisdiction over Qatar ....................................... 10

         A.       The Noncommercial Tort Exception Does Not Apply. ................................ 10

                  1.       Plaintiffs Have Failed to Allege an Entire Tort by the State of
                           Qatar Occurring in the United States. .................................................. 11

                  2.       Even Assuming *Arguendo* the Noncommercial Tort Exception
                           Applied, the Alleged Conduct Falls Within the FSIA's
                           Discretionary Function Rule. ............................................................... 14

                  3.       The FSIA's Rule Barring Claims Based on Misrepresentation
                           or Deceit Applies. ............................................................................... 16

         B.       The Commercial Activity Exception Does Not Apply. ................................ 17

II.      Plaintiffs Cannot Establish Personal Jurisdiction over the State of Qatar. ............. 20

III.     Qatar Is a Necessary Party and Therefore the Entire Case Must Be
         Dismissed .......................................................................................................... 21

CONCLUSION ......................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adler v. Nigeria*,
   107 F.3d 720 (9th Cir. 1997) ................................................................19-20

*Alperin v. Vatican Bank*,
   No. C-99-04941 MMC, 2007 WL 4570674 (N.D. Cal. Dec. 27, 2007) ..................... 11

*Am. W. Airlines, Inc. v. GPA Grp., Ltd.*,
   877 F.2d 793 (9th Cir. 1989) ................................................................ 19

*Andrews v. Metro N. Commuter R.R. Co.*,
   882 F.2d 705 (2d Cir. 1989) .................................................................. 5

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
   869 P.2d 454 (Cal. 1994) .................................................................... 14

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989).................................................................9, 10, 11

*Asociacion de Reclamantes v. United Mexican States*,
   735 F.2d 1517 (D.C. Cir. 1984) ............................................................. 10

*Bauer v. Tacey Goss, P.S.*,
   No. C 12-00876 JSW, 2012 WL 2838834 (N.D. Cal. July 10, 2012)........................... 5

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................................9, 13

*Berkovitz by Berkovitz v. United States*,
   486 U.S. 531 (1988)......................................................................... 15

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
   137 S. Ct. 1312 (2017).....................................................................9, 20

*Cabiri v. Gov't of Republic of Ghana*,
   165 F.3d 193 (2d Cir. 1999) ............................................................16, 17

*Cassirer v. Kingdom of Spain*,
   461 F. Supp. 2d 1157 (C.D. Cal. 2006) ..................................................... 20

*Cholla Ready Mix, Inc. v. Civish*,
  382 F.3d 969 (9th Cir. 2004) ...................................................................... 9

*Dalehite v. United States*,
  346 U.S. 15 (1953).................................................................................... 15

*Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*,
  276 F.3d 1150 (9th Cir. 2002) .........................................................21, 22, 23

*De Letelier v. Republic of Chile*,
  748 F.2d 790 (2d Cir. 1984) ...................................................................... 17

*Delano Farms Co. v. Cal. Table Grape Comm'n*,
  623 F. Supp. 2d 1144 (E.D. Cal. 2009) ..................................................... 23

*Doe v. Fed. Democratic Republic of Ethiopia*,
  851 F.3d 7 (D.C. Cir. 2017)........................................................................ 11

*Doe v. Holy See*,
  557 F.3d 1066 (9th Cir. 2009) ............................................................... 8, 15

*Doe v. Holy See*,
  434 F. Supp. 2d 925 (D. Or. 2006) ............................................................ 20

*Egypt v. Lasheen*,
  603 F.3d 1166 (9th Cir. 2010) ................................................................... 19

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
  122 F.3d 1211 (9th Cir. 1997) ................................................................... 14

*Fed. Ins. Co. v. Richard I. Rubin & Co.*,
  12 F.3d 1270 (3d Cir. 1993) ...................................................................... 20

*Friends of Amador Cty. v. Salazar*,
  No. 11-17996, 2011 WL 4709883 (E.D. Cal. Oct. 4, 2011) ....................... 22

*Frolova v. Union of Soviet Socialist Republics*,
  761 F.2d 370 (7th Cir. 1985) ..................................................................... 11

*Garb v. Republic of Poland*,
  440 F.3d 579 (2d Cir. 2006) ...................................................................... 19

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ..................................................................... 3

*Greenpeace, Inc. v. State of France*,
    946 F. Supp. 773 (C.D. Cal. 1996) ............................................................................. 13

*Jerez v. Republic of Cuba*,
    775 F.3d 419 (D.C. Cir. 2014) ................................................................................. 11

*Kescoli v. Babbitt*,
    101 F.3d 1304 (9th Cir. 1996) ................................................................................. 23

*Kozorowski v. Russian Fed'n*,
    124 F.3d 211 (9th Cir. 1997) ................................................................................... 17

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) ................................................................................... 8

*MacArthur Area Citizens Ass'n v. Republic of Peru*,
    809 F.2d 918 (D.C. Cir. 1987) ................................................................................. 10

*Meadows v. Dominican Republic*,
    817 F.2d 517 (9th Cir. 1987) ..................................................................................... 9

*MGIC Indem. Corp. v. Weisman*,
    803 F.2d 500 (9th Cir. 1986) ..................................................................................... 5

*MOL, Inc. v. Peoples Republic of Bangladesh*,
    736 F.2d 1326 (9th Cir. 1984) ................................................................................. 18

*O'Bryan v. Holy See*,
    556 F.3d 361 (6th Cir. 2009) ........................................................................ 15, 16, 20

*OBB Personenverkehr AG v. Sachs*,
    136 S. Ct. 390 (2015) ........................................................................................ 9, 19

*Odhiambo v. Kenya*,
    764 F.3d 31 (D.C. Cir. 2014) ................................................................................... 19

*Olsen by Sheldon v. Government of Mexico*,
    729 F.2d 641 (9th Cir. 1984) ............................................................................ 11, 13

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992) ............................................................................................... 18

*Republic of Philippines v. Pimentel*,
    553 U.S. 851 (2008) ............................................................................ 21, 22, 23, 24

iv

*Rong v. Liaoning Province Gov't*,
   452 F.3d 883 (D.C. Cir. 2006)......................................................................8

*Samantar v. Yousuf*,
   560 U.S. 305 .............................................................................................21

*Sampson v. Fed. Republic of Germany*,
   250 F.3d 1145 (7th Cir. 2001) .....................................................................9

*Santa Fe Pac. Realty Corp. v. United States*,
   780 F. Supp. 687 (E.D. Cal. 1991) ............................................................14

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993)..........................................................................9, 18, 19

*Schermerhorn v. Israel*,
   876 F.3d 351 (D.C. Cir. 2017)......................................................................9

*Southway v. Cent. Bank of Nigeria*,
   198 F.3d 1210 (10th Cir. 1999) ..................................................................19

*Tarantino v. Gawker Media, LLC*,
   No. CV-14-603-JFW (FFMx), 2014 WL 2434647 (C.D. Cal. Apr. 22,
   2014)  ............................................................................................................5

*United States v. Varig Airlines*,
   467 U.S. 797 (1984).....................................................................................15

*Verlinden B.V. v .Cent. Bank of Nigeria*,
   461 U.S. 480 (1983).......................................................................................9

*Vickers v. United States*,
   228 F.3d 944 (9th Cir. 2000) ......................................................................15

**Statutes**

17 U.S.C. § 1201 .............................................................................................12

18 U.S.C. § 1030 .............................................................................................12

18 U.S.C. § 1839 .............................................................................................12

18 U.S.C. § 2701 .............................................................................................12

28 U.S.C. § 1330 ...............................................................................................9

28 U.S.C. § 1603 ........................................................................................17

28 U.S.C. § 1604 ..........................................................................................9

28 U.S.C. § 1605 ....................................................................................*passim*

Cal. Civ. Code § 3426.1 ...........................................................................12

Cal. Penal Code § 496 ...............................................................................12

Cal. Penal Code § 502 ...............................................................................12

**Other Authorities**

CACI No. 1800 ..........................................................................................12

CACI No. 2100 ..........................................................................................12

Fed. R. Civ. P. 12 .....................................................................................3, 8

Fed. R. Civ. P. 19 ...........................................................................21, 22, 23

H.R. Rep. No. 94-1487 (1976) ..................................................................10

S. Rep. No. 94-1310 (1976) ......................................................................10

Vienna Convention on Diplomatic Relations, art. 24, Apr. 18, 1961, 23
     U.S.T. 3227, 500 U.N.T.S. 95 ..........................................................22

Vienna Convention on Consular Relations, art 33, Apr. 24, 1963, 21 U.S.T.
     77, 596 U.N.T.S. 261 ........................................................................22

## INTRODUCTION

The State of Qatar ("Qatar") is immune from this lawsuit.  Plaintiffs seek to interfere with Qatar's legitimate pursuit of diplomatic, foreign policy, and national security interests.  This is precisely the kind of intrusion into the affairs of sovereign nations that the Foreign Sovereign Immunities Act of 1976 ("FSIA" or the "Act") was designed to prevent.

The FSIA reflects Congress's sound judgment that, in order to protect the immunity necessary for the United States and its officials to operate effectively abroad, foreign nations must be given reciprocal immunity here.  Based on that judgment, the Act deprives United States courts of their jurisdiction over foreign sovereigns.  This is particularly vital in cases such as this one, in which private plaintiffs attempt to use the courts to pursue unsubstantiated allegations against sovereign states.  The protections of the FSIA are even more important in the case of a close ally such as Qatar, which hosts strategically important military installations where United States service men and women work and live.

Allowing private plaintiffs to hale foreign sovereigns into court also undermines the exclusive authority of the Executive Branch to conduct diplomacy.  That interest is heightened here, where Plaintiffs' previous attempts to exert improper influence over U.S. foreign policy are a matter of public record—and the same agenda that they now seek to advance through impermissible litigation.

In recognition of these fundamental principles, the FSIA establishes that the immunity of a foreign sovereign is the rule and litigation is the exception.  The exceptions to immunity set forth in the FSIA are triggered by only a handful of narrow factual circumstances, and it is Plaintiffs' burden to establish that those circumstances exist.  Despite two attempts to meet that burden, Plaintiffs' complaint fails to establish any exception to sovereign immunity.

*First*, Plaintiffs have invoked the FSIA's non-commercial tort exception notwithstanding their own factual allegations and expert testimony that, if credited,

establish that each cause of action is a *transnational* tort.  Courts, including the Ninth Circuit, have repeatedly held that the non-commercial tort exception does not apply to torts where either the precipitating act or the alleged injury occurred outside the United States.  Rather, under the "entire tort rule," a foreign sovereign is entitled to immunity unless the *entire* tort alleged by the plaintiffs occurred in the United States.  Plaintiffs have pled themselves out of the non-commercial tort exception by telling this Court repeatedly, including through expert testimony, that the alleged hacking at the heart of this case was executed in Qatar.  All ten causes of action depend upon the acts that Plaintiffs steadfastly assert occurred in Qatar, and that is the end of this case.

**Second**, Plaintiffs have invoked the FSIA's commercial activity exception.  Setting aside the absurdity of attempting to paint Qatar's alleged acts as simultaneously non-commercial and commercial, this theory fails.  The commercial activity exception is triggered in cases based on the commercial activity of a foreign state or on acts in connection with such activity.  By contrast, Plaintiffs' case is based on alleged actions that are decidedly noncommercial: an information and government relations campaign to improve Qatar's standing in the United States and a purported hacking operation to discredit a known critic of Qatar's state policies.  Alleged contracts between Qatar and other defendants do not trigger this exception because the rights Plaintiffs assert here have nothing whatsoever to do with those agreements.

**Finally**, the FSIA's jurisdictional bar requires dismissal of the First Amended Complaint ("FAC") in its entirety.  Under directly applicable Supreme Court precedent, a foreign sovereign's immunity demands dismissal of the litigation as a whole when the immune party is necessary under Federal Rule of Civil Procedure 19 and where its sovereign interests would be undermined by allowing the case to continue.  That is true here.  Given Plaintiffs' demand for an injunction binding Qatar, Qatar's absence from the suit leaves the Court unable to provide the relief requested.  And, as Qatar has demonstrated, its interests remain at risk if the case is allowed to proceed against any of

the other defendants insofar as Qatar would have to repeatedly object and intervene to protect its state secrets and the inviolable records of its diplomatic mission.

Plaintiffs Elliott Broidy and Broidy Capital Management brought this suit in an apparent attempt to deflect attention from Broidy's well-documented misconduct, including his efforts to trade access to his political contacts for lucrative foreign security contracts. Plaintiffs' case is built entirely on speculation and is replete with unsupported allegations that reflect their self-interested, anti-Qatar agenda.

Because Plaintiffs fail to establish any statutory exception to Qatar's presumptive immunity, the FSIA absolutely bars this lawsuit and deprives this Court of jurisdiction over Qatar. The case should be dismissed in its entirety with prejudice.[1]

## FACTUAL BACKGROUND[2]

## I.   Qatar Is a Key Strategic Partner of the United States in the Middle East.

Qatar and the United States have a longstanding relationship as allies. From its strategically critical location in the Arabian Gulf, Qatar has assisted U.S. military efforts in the region for decades, including in the campaign to eject Iraqi occupation forces from Kuwait in 1991. Cong. Research Serv., R44533, *Qatar: Governance, Security, and U.S.*

---

[1] In order to bring these threshold jurisdictional issues to the Court expeditiously, Qatar submits the instant Motion solely pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(2). However, the FAC also fails to state a claim under Rule 12(b)(6), because its factual allegations do not suffice to establish that Qatar bears any responsibility for the alleged hacking and because several of its causes of action fail to adequately plead the required elements.

As explained in the Joint Statement Regarding Local Rule 7-3 Pre-Filing Conference on this Motion, *see* **Dkt. 109**, Qatar sought Plaintiffs' agreement to hold any Rule 12(b)(6) briefing in abeyance until the Court decides the threshold FSIA issues raised herein to avoid the need to reach any issues unnecessarily. Plaintiffs did not agree to a bifurcated briefing schedule absent additional conditions which Qatar could not accept. Qatar thus moves solely under Rules 12(b)(1) and 12(b)(2), but respectfully reserves the right to seek permission from the Court to file a separate motion under Rule 12(b)(6) in the event this Motion is denied.

[2] This factual background is based on the *factual* allegations contained in the FAC and properly excludes "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). It also includes readily available public record information.

*Policy* (2018) (Request for Judicial Notice in Support of State of Qatar's Motion to Dismiss ("RJN"), Ex. A at Summary & p.15); S. Prt. 112-35, *The Gulf Security Architecture: Partnership with the Gulf Cooperation Council* (2012) (RJN, Ex. B at 15). In 1992, Qatar and the United States signed a Defense Cooperation Agreement, which was renewed for 10 years in December 2013.  RJN, Ex. A at 15.  In the period since the September 11 attacks, Qatar has been the sole regional home to a critical United States Air Force base housing thousands of American troops.  *Id.*; *see also* RJN, Ex. B at 15.[3]

The governments of the United States and Qatar recently confirmed that the relationship between the two nations is "key to successfully combating terrorism, countering violent extremism, and deterring external aggression."  *Joint Statement of the Inaugural United States–Qatar Strategic Dialogue*, U.S. Dep't of State (Jan. 30, 2018) (RJN, Ex. C).[4]  President Trump continues to highlight the importance of Qatari-U.S. relations.  On January 15, 2018, he "thanked the Emir for Qatari action to counter terrorism and extremism in all forms" and discussed with the Emir ways the United States and Qatar could "partner to bring more stability to the region, counter malign Iranian influence, and defeat terrorism."  *Readout of President Donald J. Trump's Call with Emir Tamim bin Hamad Al Thani of Qatar* (Jan. 15, 2018) (RJN, Ex. E).

This litigation—and this Court's potential exercise of jurisdiction over Qatar—directly implicates this critical diplomatic and national security relationship.  In turn, it impacts Qatar's other strategic foreign policy and national security objectives in the

---

[3] Since 2003, Qatar has also been the host of the forward headquarters of military forces at U.S. Central Command.  Overall, 10,000 U.S. troops are currently deployed in Qatar. Most are U.S. Air Force personnel at Al Udeid air base, participating in U.S. operations such as Operation Inherent Resolve to combat the Islamic State organization in Iraq and Syria.  RJN, Ex. A at 15.

[4] The Qatari-U.S. relationship also extends to broader economic cooperation.  *See, e.g.*, *U.S.-Qatar Trade Facts*, U.S. Trade Rep., ustr.gov/countries-regions/europe-middle-east/middle-east/north-africa/qatar (last visited June 27, 2018) (trade between the United States and Qatar has increased approximately three-fold from 2006 to 2016) (RJN, Ex. D).

region—including the goal of ending a regional blockade imposed by Saudi Arabia, the United Arab Emirates ("UAE") and other Middle Eastern countries—all of which are matters of the utmost sensitivity and at the core of Qatar's sovereignty.  In sum, this litigation, and related discovery, will implicate and jeopardize matters vital to the national and international security and diplomatic interests of Qatar, the United States, and other nations.

## II.      Plaintiff Elliott Broidy and the Alleged Hack.

Among other well-publicized activities, Plaintiff Elliott Broidy is a businessman who has publicly opined on various geopolitical topics.  As acknowledged in the articles Broidy submitted in this litigation, Broidy also sought to obtain lucrative procurement contracts in Saudi Arabia and the UAE by lobbying his U.S. government contacts on behalf of those countries.  Original Complaint, **Dkt. 1** ("OC"), ¶ 6 (curiously, the amended complaint omits any reference to these countries); *see also, e.g.*, FAC ¶¶ 121, 138; **Dkt. 31-9** (Declaration of Lee Wolosky ISO Plaintiffs' TRO Application), Ex. 2.[5]

As coverage of Broidy's far-reaching agenda in the Middle East grew, Broidy filed this lawsuit, claiming that an unlawful and unauthorized intrusion into his personal and company email servers led to the unfavorable publicity he has received.[6]  The FAC alleges that the "hack" began with simple "phishing" emails, disguised as Gmail security alerts, sent to Mr. Broidy's wife and his executive assistant on January 14, 2018.  FAC

---

[5] The allegations in Plaintiffs' prior representations and submissions to this Court remain binding on Plaintiffs.  *See Bauer v. Tacey Goss, P.S.*, No. C 12-00876 JSW, 2012 WL 2838834, at *3 (N.D. Cal. July 10, 2012) (allegations in original complaint are deemed judicial admissions unless explained in the amended complaint); *see also MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (in ruling on a motion to dismiss, a court may judicially notice documents previously filed by the Plaintiff); *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989).  Additionally, the Court may judicially notice the news articles referenced in the FAC and previously submitted by Plaintiffs to this Court.  *Tarantino v. Gawker Media, LLC*, No. CV-14-603-JFW (FFMx), 2014 WL 2434647, at *1 n.1 (C.D. Cal. Apr. 22, 2014) (Walter, J.).

[6] Plaintiffs do not contend that any of the news coverage regarding Broidy's misconduct is false.

¶¶ 97-100, 109-111.  In response, Mr. Broidy's wife and the executive assistant provided their usernames and passwords, which an unidentified third party allegedly then used to access the email accounts and remotely control those accounts via a Russian mail service called "mail.ru."[7]  *See id.*  Plaintiffs contend that the third party logged into Plaintiffs' email accounts on "thousands" of occasions, using different IP addresses.  FAC ¶ 113.  Plaintiffs argue that Qatar is the responsible party, because, among those thousands of logins, two allegedly came from an IP address registered to a computer located somewhere in Doha, Qatar.  FAC ¶ 115.  Plaintiffs' forensic expert also has declared under oath that two connections to Plaintiffs' systems occurred from the Doha, Qatar address.  **Dkt. 31-5** (Declaration of J. Luke Tenery ISO Plaintiffs' TRO Application), ¶ 17.

Since filing the original complaint, Broidy has subpoenaed more than thirty internet service providers and other internet companies, including the purported "Virtual Private Networks" that Plaintiffs contend were used to mask the hacker's true identity.  While the FAC lists these entities, it does not identify any relationship between them and any of the Defendants.  *See, e.g.*, FAC ¶ 114.

Finally, in their FAC, Plaintiffs now also try to blame newly-named defendants Sheikh Mohammed Bin Hamad Bin Khalifa Al Thani and Ahmed Al-Rumaihi for the hack.  But once again, they plead no specific facts that even remotely suggest that either of these defendants were engaged in any unlawful hacking activity.  Rather, Plaintiffs' allegations about these individuals include only irrelevant material designed to inflame the Court and smear their names in a public lawsuit.  *See, e.g.*, FAC ¶¶ 26-27, 56-61.

Plaintiffs' effort to extrapolate some grand conspiracy from normal and legitimate diplomatic and sovereign activity is wholly unsupported.  Indeed, as this Court held in

---

[7] Plaintiffs allege a similar hacking attempt on Broidy's friend Joel Mowbray, which was ultimately unsuccessful.  FAC ¶¶ 101-108.  Mr. Mowbray is not a party to this action.

denying a temporary restraining order, Plaintiffs have "failed to demonstrate a likelihood of success on the merits," as they have not provided any "admissible evidence demonstrating that any of the defendants . . . are responsible for the unauthorized access of Plaintiffs' email accounts or that any of the Defendants are in possession of or are responsible for disseminating the allegedly illegally-obtained emails and documents to various media outlets." **Dkt. 37**, at 2-3.

Plaintiffs amended the Complaint, but failed to cure any of these problems or include allegations that would bring this case within the narrow exceptions to the FSIA, despite receiving substantive document productions by internet service providers. The paucity of Plaintiffs' allegations reveal this action for what it is: a misguided attempt to salvage a personal reputation and pursue Plaintiffs' own geopolitical goals, in conflict with core foreign sovereignty concerns and the attendant risks to both American foreign policy and the bedrock principle of international comity.

## III.  Plaintiffs' Causes of Action Depend on Extraterritorial Conduct.

The locus of the actions giving rise to Plaintiffs' tort claims is key to the jurisdictional analysis under the FSIA. All ten of Plaintiffs' causes of action arise out of extraterritorial activity—in Qatar and other foreign countries—including allegations that:

- "Defendant Powell . . . ***established GRA's office [in Qatar]*** through a Gibraltar subsidiary in October 2017 – just weeks prior to the commencement of the attack on Plaintiffs."  FAC ¶ 5.

- "[T]he GRA Defendants introduced Defendant State of Qatar to cyber mercenaries ***in various countries*** to coordinate technical aspects of the illegal intrusion into Plaintiffs' email server . . . ."  *Id.* ¶ 7.

- "On February 14, 2018 and February 19, 2018, unlawful and unauthorized connections originated ***from an IP address in Qatar***. . . .  These connections revealed the ***actual location*** of a computer or computers accessing Plaintiff BCM's network ***from an IP address in Qatar***."  *Id.* ¶ 115.

- Qatar "converted or disposed of Plaintiff's property . . . by unlawfully accessing, or at a minimum receiving that property . . . and disseminating [it] to the media in the United States **and abroad**."  *Id.* ¶ 180.

Plaintiffs submitted sworn expert witness testimony in support of their request for a temporary restraining order, confirming their theory that all alleged hacking activity originated from Qatar:

> Two mistakes or brief failures in the attacker's IP address obfuscation techniques on February 14, 2018 and February 19, 2018 revealed another foreign IP address, identified by Ankura after a detailed review of the unauthorized activity associated with the Netherlands and United Kingdom IP addresses. That IP address is a Qatar source IP registered to a physical location in Doha, Qatar. The nature of the Qatar IP discovery is consistent with the attacker's system configuration losing its obfuscation ability and exposing the true origin of the attacker by mistake. This event is the foundation of Ankura's conclusion that individuals located in Qatar are responsible for the unauthorized activity identified in logs.

**Dkt.  31-5** ¶ 11; *see also id.* ¶ 17 (describing event that "exposed the Qatari origin on February 14, 2018 and February 19, 2018").

Thus, each of Plaintiffs' causes of action indisputably is based on a precipitating act that, under Plaintiffs' own theory, occurred outside of the United States.

## LEGAL STANDARD

Where a defendant challenges the legal sufficiency of the plaintiff's jurisdictional allegations pursuant to Federal Rules of Civil Procedure 12(b)(1) and (2) under the FSIA, "the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff."  *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009) (citing *Rong v. Liaoning Province Gov't*, 452 F.3d 883, 888 (D.C. Cir. 2006)); *see also Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  However, the Court need not assume the truth of legal conclusions merely because they are cast in the form of factual allegations, nor should it accept as true allegations that are merely conclusory, unwarranted deductions of fact, or

unreasonable inferences.  *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (conclusory allegations based on nothing more than "information and belief" must be rejected at pleading stage).

The FSIA provides "the sole basis" for obtaining jurisdiction over foreign countries in federal or state courts.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  The FSIA establishes a fundamental rule that foreign sovereigns are not subject to the jurisdiction of United States courts unless a specific statutory exception to immunity applies.  *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 394 (2015) (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)); *see also* 28 U.S.C. § 1604.  This important rule is rooted in diplomatic and international sensitivities of the highest order.  *See, e.g.*, *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017) (foreign sovereign immunity "recognizes the absolute independence of every sovereign authority and helps to induce each nation state, as a matter of international comity, to respect the independence and dignity of every other, including our own." (quotations and citations omitted)).

Plaintiffs bear the threshold burden of showing that one of the FSIA's limited exceptions applies.  *Meadows v. Dominican Republic*, 817 F.2d 517, 522-23 (9th Cir. 1987).  The exceptions are construed narrowly, consistent with the overall statutory objective of preserving the sovereign immunity of foreign states.  *See, e.g.*, *Schermerhorn v. Israel*, 876 F.3d 351, 358 (D.C. Cir. 2017) ("The FSIA is premised on 'a presumption of foreign sovereign immunity' qualified only by a small number of 'discrete and limited exceptions.'" (citation omitted)); *Sampson v. Fed. Republic of Germany*, 250 F.3d 1145, 1155-56 (7th Cir. 2001) (any expansion of the FSIA exceptions bears "significantly on sensitive foreign policy matters," which "might have serious foreign policy implications").  If Plaintiffs fail to meet their burden of proving one of these narrow exceptions applies, the Court lacks both subject matter and personal jurisdiction over Qatar.  *See* 28 U.S.C. § 1330(a)-(b); *Verlinden B.V. v .Cent. Bank of Nigeria*, 461 U.S.

480, 489 & n.5 (1983) (FSIA provides personal jurisdiction only if subject matter jurisdiction exists and service of process has been made in accordance with the Act).

## ARGUMENT

### I.      This Court Lacks Subject Matter Jurisdiction over Qatar.

Qatar is entitled to sovereign immunity under the FSIA, precluding subject matter jurisdiction in this action.  Plaintiffs' assertions that the noncommercial tort exception (28 U.S.C. § 1605(a)(5)) and the commercial activity exception (28 U.S.C. § 1605(a)(2)) apply are unsubstantiated and do not permit them to circumvent the fundamental sovereign immunity that the law provides to Qatar, like other foreign states.

### A.      The Noncommercial Tort Exception Does Not Apply.

Plaintiffs rely primarily on the FSIA's noncommercial tort exception, which abrogates immunity only in actions:

> for personal injury or death, or damage to or loss of property, *occurring in the United States* and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment . . . .

28 U.S.C. § 1605(a)(5) (emphasis added).

Courts read this exception narrowly, consistent with the general presumption that foreign states are entitled to sovereign immunity, and mindful that Congress's immediate objective in enacting the non-commercial exception was to "eliminate a foreign state's immunity for traffic accidents and other torts *committed in the United States*, for which liability is imposed under domestic tort law."  *Amerada Hess Shipping Corp.*, 488 U.S. at 439-40 (citing H.R. Rep. No. 94-1487, at 14, 20-21 (1976); S. Rep. No. 94-1310, at 14, 20-21 (1976) (emphasis added); U.S. Code Cong. & Admin. News 1976, pp. 6613, 6619)); *see also MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir. 1987) (noting that the legislative history of the noncommercial tort exception "counsels that the exception should be narrowly construed so as not to encompass the farthest reaches of common law"); *Asociacion de Reclamantes v. United Mexican States*,

735 F.2d 1517, 1525 (D.C. Cir. 1984) ("We decline to convert [the noncommercial tort exception] into a broad exception for all alleged torts that bear some relationship to the United States.").

### 1. Plaintiffs Have Failed to Allege an Entire Tort by the State of Qatar Occurring in the United States.

The noncommercial tort exception "makes no mention of 'territory outside the United States' or of 'direct effects' in the United States," and thus Congress' deliberate word choice indicates that the noncommercial tort exception "covers only torts occurring within the territorial jurisdiction of the United States." *Amerada Hess*, 488 U.S. at 441; *accord Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 379 (7th Cir. 1985). The Ninth Circuit therefore instructs district courts to follow the "entire tort" rule, under which plaintiffs must allege at least "one entire tort" occurring in the United States in order to escape the immunity demanded by the FSIA. *Olsen by Sheldon v. Government of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984), *abrogated on other grounds as stated in Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987); *Alperin v. Vatican Bank*, No. C-99-04941 MMC, 2007 WL 4570674, at *9 (N.D. Cal. Dec. 27, 2007) (dismissing action where "plaintiffs have failed to show that 'one entire tort' has occurred in the United States"), *aff'd*, 360 F. App'x 847 (9th Cir. 2009), *amended in part*, 365 F. App'x 74 (9th Cir. 2010).

*Doe v. Federal Democratic Republic of Ethiopia*, 851 F.3d 7 (D.C. Cir. 2017), is particularly instructive and confirms that under this narrow exception, "[t]he entire tort—including not only the injury but also the act precipitating that injury—must occur in the United States." *Id.* at 10 (quoting *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014)). In *Doe*, the D.C. Circuit held that electronic espionage launched from a foreign country "is a transnational tort" that does not fall within the FSIA's noncommercial tort exception. *Doe*, 851 F.3d at 11. Critically, "the software's initial dispatch [and] an intent to spy" were "integral aspects of the final tort which lay solely abroad." *Id.* "Ethiopia's placement of the FinSpy virus on [the plaintiff's] computer,

although completed in the United States when [the plaintiff] opened the infected e-mail attachment, began outside the United States."  *Id.* at 9.  "The tort [the plaintiff] allege[d] thus did not occur '*entirely*' in the United States."  *Id.* at 11.

Here, too, Plaintiffs have failed to allege a tort occurring entirely in the United States.  Each of the substantive torts alleged by Plaintiffs is premised on conduct that the Complaint alleges occurred *outside* the United States:

Plaintiffs' first, second, and sixth causes of action for violations of the Computer Fraud and Abuse Act, California Penal Code section 502, and the Stored Communications Act all require proof of "access."  *See* 18 U.S.C. §§ 1030(a)(2)(C), (a)(5); Cal. Penal Code § 502; 18 U.S.C. § 2701(a); FAC ¶¶ 140-161, 188-193.  Plaintiffs' third cause of action for a violation of California Penal Code section 496 requires establishing receipt of stolen property.  Cal. Penal Code § 496.  Plaintiffs' fourth cause of action for invasion of privacy by intrusion upon seclusion depends on a showing of "intentional intrusion."  CACI No. 1800.  Plaintiffs' fifth cause of action for conversion requires proof that the defendant "substantially interfered with the plaintiff's property by knowingly or intentionally taking possession" of the property.  CACI No. 2100.  Plaintiffs' seventh cause of action for a violation of the Digital Millennium Copyright Act depends on showing that the defendant "circumvent[ed] a technological measure that effectively controls access" to a protected work.  17 U.S.C. § 1201(A); FAC ¶¶ 194-201 (alleging that defendants "illegally accessed" networks and files).  Plaintiffs' eighth and ninth causes of action for a violation of the California Uniform Trade Secrets Act and violation of the Defend Trade Secrets Act both require proof of "misappropriation," meaning "acquisition" or "disclosure."  Cal. Civ. Code § 3426.1; 18 U.S.C. § 1839(b)(5).

Plaintiffs' allegations and expert testimony confirm that, under their theory of liability, such alleged access, receipt, intrusion, interference, taking, circumventing, and

misappropriation all occurred from Qatar.[8]  *See supra* at p.8 (citing **Dkt. 31-5** ¶ 11 ("*individuals located in Qatar are responsible for the unauthorized activity identified in logs*")).  The Complaint is crystal clear: every key alleged act—from GRA's alleged establishment of a presence in Doha, to the IP address responsible for the hack, to the alleged dissemination of Broidy's emails "abroad"—occurred outside the United States, making each alleged tort indisputably transnational.  Indeed, as Plaintiffs themselves alleged in their Original Complaint, "[a]ccess to Plaintiffs' personal accounts was achieved by unlawful hacking and stealing of personal data"—the same conduct allegedly traceable to a server in Qatar—and "[w]ithout these unlawful actions, Plaintiffs' personal information would not have been made public."  OC ¶ 108.  Simply put, the essential factual predicate for *all* of Plaintiffs' substantive causes of action is the alleged hacking that originated outside the United States.

Plaintiffs' tenth cause of action for Civil Conspiracy cannot save their claims.  In their TRO pleadings, Plaintiffs suggested that their civil conspiracy claim provided a way around the "entire tort rule."  **Dkt. 34** (Response ISO Plaintiffs' TRO Application), at 2-3.  However, "[u]nder California law, there is no separate and distinct cause of action for

---

[8] Plaintiffs concede their failure to plead an "entire tort" within the United States, alleging merely for some causes of action that "*at least some* instances of the unlawful [conduct] occurred in the United States."  FAC ¶¶ 165, 171, 182.  This is insufficient to establish a jurisdictional exception under the FSIA for several reasons.  *First*, the Court is entitled to reject "conclusory allegations based on nothing more than 'information and belief' at the pleading stage."  *Twombly*, 550 U.S. at 557.  *Second*, even if the Court credits these unsupported allegations, it is clear on the face of the FAC that those instances were merely the continuation of purported conduct allegedly originating in Qatar and "do not demonstrate an independent tort occurring entirely within the United States."  *Greenpeace, Inc. v. State of France*, 946 F. Supp. 773, 786 (C.D. Cal. 1996) (alleged unlawful detention of plaintiffs on French military and civil aircraft in Los Angeles did not constitute entire tort in the United States, where detention was continuation of conduct begun outside of United States jurisdiction).  The *Greenpeace* court also rejected as erroneous Plaintiffs' interpretation of *Olsen by Sheldon v. Government of Mexico*, 729 F.2d 641 (9th Cir. 1984), as permitting a court to exercise jurisdiction over all tort causes of action alleged in a complaint "if *any* 'entire tort' took place in the United States" because "*Olsen* does not extend FSIA jurisdiction to tortious conduct occurring overseas."  946 F. Supp. at 785 (emphasis added).

civil conspiracy." *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1228 (9th Cir. 1997).

Because civil conspiracy is not an independent tort, it cannot provide a basis for the application of the FSIA's noncommercial tort exception in the absence of any other cause of action to which that exception is otherwise applicable.[9]  *Cf. Santa Fe Pac. Realty Corp. v. United States*, 780 F. Supp. 687, 693 (E.D. Cal. 1991) (stating that because there is no separate tort of civil conspiracy under California law, if the underlying tort is subject to immunity under the Federal Tort Claims Act, "the conspiracy claim is likewise barred").  Since Plaintiffs' substantive causes of action fail under the "entire tort rule," the sovereign State of Qatar "cannot be bootstrapped into tort liability by the pejorative plea of conspiracy."  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 459 (Cal. 1994).  Nor can it be subjected to suit and deprived of its sovereign immunity based solely on that claim.  Plaintiffs' attempted bootstrapping is unavailing.

2.    **Even Assuming *Arguendo* the Noncommercial Tort Exception Applied, the Alleged Conduct Falls Within the FSIA's Discretionary Function Rule.**

In any event, the noncommercial tort exception only applies where, unlike here, the torts alleged do not involve the exercise of discretionary functions.  The FSIA's discretionary function rule is an independent, adequate ground for finding Qatar immune.  It provides immunity for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  28 U.S.C. § 1605(a)(5)(A).

---

[9]  Plaintiffs' conspiracy claim also derives from the same set of alleged conduct originating in Qatar that gives rise to Plaintiffs' substantive torts and thus is not "entirely" within the United States either.

Courts undertake a two-part test to determine whether the discretionary function exception under the FSIA applies.  The first inquiry asks whether the challenged action involved an element of choice or judgment, for it is clear that the discretionary function exception "will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Vickers v. United States*, 228 F.3d 944, 949 (9th Cir. 2000) (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  If choice or judgment is exercised, the second inquiry asks whether that choice or judgment is of the type Congress intended to exclude from liability—that is, whether the choice or judgment was one involving social, economic, or political policy.  *See Vickers*, 228 F.3d at 949.

Here, Plaintiffs have not alleged any "specific or mandatory" statute, regulation, or policy that required any of the actions alleged in this case, all of which are purported to be part of an information campaign—a clearly discretionary function.  *Compare Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) (claims barred as "discretionary judgments" where there was no "specific and mandatory" policy governing retention of an allegedly abusive priest and failure to warn others about his activities), *with O'Bryan v. Holy See*, 556 F.3d 361 (6th Cir. 2009) (discretionary function exception did not preclude claims where an official 1962 legislative text imposing the highest level of secrecy on the handling of clergy sexual abuse matters constituted a "policy").

Plaintiffs' allegations confirm that the type of discretionary acts at issue involved policy considerations subject to the exception, including Qatar's diplomatic relations with the United States and its neighboring countries, as well as policy judgments involving public relations.  FAC ¶¶ 2-4, 14; *see United States v. Varig Airlines*, 467 U.S. 797, 811 (1984) (quoting *Dalehite v. United States*, 346 U.S. 15, 35-36 (1953)) ("[The discretionary function exception] includes determinations made . . . in establishing plans, specifications or schedules of operations.  Where there is room for policy judgment and decision there is discretion.").

### 3. The FSIA's Rule Barring Claims Based on Misrepresentation or Deceit Applies.

The noncommercial tort exception is inapplicable to Plaintiffs' allegations for still another reason: section 1605(a)(5)(B) of the FSIA explicitly excludes from the scope of the noncommercial tort exception "any claim arising out of malicious prosecution, abuse of process, libel, slander, *misrepresentation, deceit,* or interference with contractual rights." 28 U.S.C. § 1605(a)(5)(B) (emphasis added).  In determining whether a claim "arises out of" misrepresentation or deceit, courts look to whether the "wrongful acts alleged to have caused the injury are misrepresentations," *Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 199 (2d Cir. 1999), or whether the claims "stem[] directly from misinformation."  *O'Bryan v. Holy See*, 556 F.3d 361, 388 (6th Cir. 2009).  Plaintiffs' hacking allegations are the essential factual predicate for all of Plaintiffs' substantive causes of action, *see supra* Section I.A.1, and Plaintiffs specifically allege that "the hack, and the resulting" effects, were achieved through misrepresentation and deceit.  FAC ¶ 15 (alleging that Defendants' "spearphishing campaign" included "***spoofing or otherwise obfuscating*** U.S.-assigned phone numbers ***to deceive***," "***misappropriating*** trademarks," and "***fraudulently***" registering websites).  As a result, the misrepresentation or deceit rule applies to all of Plaintiffs' causes of action.

Moreover, to the extent Plaintiffs are alleging that Qatar "altered" or "doctored" Plaintiffs' personal information,[10] such conduct also falls squarely within this rule.  "[B]oth the Second and Ninth Circuits have dismissed claims against foreign sovereigns where the foreign sovereign allegedly provided false or misleading information" constituting misrepresentation or deceit.  *O'Bryan*, 556 F.3d at 385 (citing *Cabiri*, 165

---

[10] It is unclear whether Plaintiffs are maintaining this claim in the FAC because a comparison of the FAC to the Original Complaint reveals that Plaintiffs have deleted all allegations related to alteration and doctoring of data from the Statement of Facts. However, Plaintiffs have retained certain references to alteration and doctoring in their causes of action.  FAC ¶ 152, 171, 229.

F.3d 193 and *Kozorowski v. Russian Fed'n*, 124 F.3d 211 (9th Cir. 1997)).  In *Cabiri*, for instance, the court concluded "with confidence" that Ghana enjoyed immunity for its failure to provide "full or truthful information"—"in essence" a misrepresentation claim—because "[t]he FSIA is not an enforcement mechanism for global freedom of information."  *Cabiri*, 165 F.3d at 199-200.  Similarly here, to the extent Plaintiffs' claims rely on allegations of alteration or doctoring of Plaintiffs' information, they fall outside the scope of the noncommercial tort exception pursuant to 28 U.S.C. § 1605(a)(5)(B).

## B. The Commercial Activity Exception Does Not Apply.

Plaintiffs' alternative theory, that the FSIA's commercial activity exception set forth in 28 U.S.C. § 1605(a)(2) applies, also fails.[11]  *First*, the alleged conduct by Qatar on which Plaintiffs rely for the applicability of this exception does not constitute commercial activity within the meaning of Section 1605(a)(2).  *Second*, even if the alleged conduct is deemed to be commercial activity (which it is not), Plaintiffs' claims are not based on, or in connection with, that activity as required by the statutory language.[12]

For the purposes of the FSIA, "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).  "[T]he issue is

---

[11] Plaintiffs' assertion in the FAC that the Court has jurisdiction under *both* the noncommercial tort exception and the commercial activity exception is incorrect and fatal to their argument.  By its plain language, the noncommercial tort exception only provides jurisdiction in "case[s]… not otherwise encompassed" by the commercial activity exception.  28 U.S.C. § 1605(a)(5); *De Letelier v. Republic of Chile*, 748 F.2d 790, 795 (2d Cir. 1984) (noting that the language of the FSIA suggests that the commercial activity exception and the noncommercial tort exception are "mutually exclusive").

[12] Plaintiffs have not specified which of the three grounds they are relying upon to claim an exception to immunity under Section 1605(a)(2).  *See* FAC ¶ 31.  All three bases for the exception require a showing that Plaintiffs' claims are "based upon a commercial activity" or are "based upon . . . an act . . . in connection with a commercial activity," which Plaintiffs have not established here.  *See* 28 U.S.C. § 1605(a)(2).

whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (quotation omitted).  Plaintiffs allege that, as part of an aggressive information and government relations campaign, Qatar and its alleged agents engaged in hacking and dissemination of the private information of a known critic of the State's policies.  FAC ¶¶ 88-92.  These allegations postulate conduct that is fundamentally noncommercial in nature.  Neither the broader information and government relations campaign nor the specific "black operation" that Plaintiffs recklessly impute to Qatar is the type of action by which private, commercial enterprises typically engage in trade or commerce.  As such, it is not commercial activity that can justify the lifting of foreign sovereign immunity.

That Qatar allegedly entered into contracts with its agents does not transform this fundamentally noncommercial conduct into commercial activity within the meaning of the FSIA.  *See, e.g.*, *Weltover*, 504 U.S. at 614 (looking beyond existence of a contract to examine whether the conduct governed by the contract was commercial in nature); *MOL, Inc. v. Peoples Republic of Bangladesh*, 736 F.2d 1326, 1327 (9th Cir. 1984) (finding an agreement by Bangladesh to constitute a sovereign, not commercial, activity because the agreement was one "that only a sovereign could have made").  And the allegation that Qatar's conduct was influenced by considerations of Qatar's economic and international trade policy, FAC ¶ 31, does not make the alleged conduct commercial, but instead simply confirms the sovereign nature of the activities alleged.

Even if, contrary to the test set out by the Supreme Court in *Weltover*, the Court were to deem the contracts alleged by Plaintiffs to be commercial activity, Plaintiff's alternative theory still fails.  That is because Plaintiffs' action is neither "based upon" nor "in connection with" the contracts, as those terms have been interpreted in the case law.

An action is "based upon" a commercial activity for the purpose of Section 1605(a)(2) where the action relies on the activity for "those elements of a claim that, if

proven, would entitle plaintiffs to relief under their theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993).  As the Ninth Circuit has explained, "[t]he commercial activity relied upon . . . to establish jurisdiction must be the activity upon which the lawsuit is based.  The focus must be solely upon those specific acts that form the basis of the suit." *Am. W. Airlines, Inc. v. GPA Grp., Ltd.*, 877 F.2d 793, 796-97 (9th Cir. 1989) (quotation, emphasis, and citation omitted); *see also OBB Personenverkehr AG v. Sachs*, 136 S. Ct. at 396 (suit not "based upon" the purchase of the rail pass because "[a]ll of [plaintiff's] claims turn[ed] on the same tragic episode in Austria," which was the "foundation" of her suit); *cf. Egypt v. Lasheen*, 603 F.3d 1166, 1171 (9th Cir. 2010) (holding that plaintiff's claim was "based upon" the alleged breach of an agreement because the breach determined whether the plaintiff was entitled to relief).

Plaintiffs' action is not "based upon" commercial activity, because Qatar's purported contractual arrangements with third parties do not give rise to any right to relief by Plaintiffs and are merely incidental to Plaintiffs' claims.  Plaintiffs are not parties to the alleged contracts and do not seek to enforce them.  Nor do they claim any injury resulting from the contractual arrangements alone.

Courts have held that the phrase "in connection with" has a narrow meaning within the FSIA.  *See Garb v. Republic of Poland*, 440 F.3d 579, 587 (2d Cir. 2006).  To establish that an action is "in connection with" commercial activity, the acts complained of must have "some 'substantive connection' or a 'causal link' to the commercial activity." *Adler v. Nigeria*, 107 F.3d 720, 726 (9th Cir. 1997) (citing *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1289-91 (3d Cir. 1993)).  Courts have generally found a substantive connection or causal link to commercial activity for the purpose of Section 1605(a)(2) where the plaintiffs were a party to or received rights under a contract or agreement at issue in the case.  *See, e.g.*, *Odhiambo v. Kenya*, 764 F.3d 31, 38 (D.C. Cir. 2014) (finding plaintiff's claim based upon Kenya's breach of contract to be "in connection with" the underlying commercial activity, a monetary rewards program under which plaintiff claimed rights, but dismissing case on other grounds); *Southway v. Cent.*

19

*Bank of Nigeria*, 198 F.3d 1210, 1217-18 (10th Cir. 1999) (plaintiffs' contracts with defendant alleged to be part of a RICO conspiracy); *Adler*, 107 F.3d 720 at 726.

In contrast, tortious conduct rarely satisfies the requirements of the commercial activity exception. *See e.g.*, *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1291 (3d Cir. 1993) (causes of action are not substantively in connection with, or based on, commercial activity where the claims are "primarily tort-based and do not include a breach of contract allegation"); *Doe v. Holy See*, 434 F. Supp. 2d 925, 942 (D. Or. 2006) (rejecting application of the commercial activity exception where "plaintiff's complaint does not allege . . . any . . . theory whose true essence is commercial" but rather "sound[s] in tort"); *O'Bryan*, 556 F.3d at 380 (noting that "the gravamen of plaintiffs' claims is the tortious conduct of priests" and thus allowing jurisdiction under the commercial activity exception would be an inappropriate "semantic ploy").  Here, Plaintiffs are not claiming breach of contract or "any theory whose true essence is commercial," nor do Plaintiffs' causes of action "stem from" the alleged commercial activity.  Because any connection between Plaintiffs' claims and Qatar's commercial contracts is so attenuated, Plaintiffs' claims are not "substantively connected" to the alleged underlying commercial activity, and the commercial activity exception does not apply.

## II.   Plaintiffs Cannot Establish Personal Jurisdiction over the State of Qatar.

The FSIA conditions personal jurisdiction over foreign states on the existence of subject matter jurisdiction plus effective service.  *Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157, 1166 (C.D. Cal. 2006), *aff'd in part and rev'd in part*, 616 F.3d 1019, 1037 (9th Cir. 2010) (affirming district court's analysis of personal jurisdiction).  As explained above, subject matter jurisdiction is lacking because no exception to the FSIA applies.  *See Helmerich & Payne*, 137 S. Ct. at 1317 ("[A] court lacks 'subject-matter' and 'personal' jurisdiction over a foreign sovereign unless an FSIA exception applies.").  Absent a valid basis for exercising subject matter jurisdiction, personal jurisdiction is likewise lacking.

**III.    Qatar Is a Necessary Party and Therefore the Entire Case Must Be Dismissed.**

Qatar's sovereign immunity requires dismissal of the FAC in its entirety because Qatar is a necessary party under Rule 19 but the State's joinder is statutorily forbidden under the FSIA.  The Supreme Court has held that "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign."  *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008); *see also Samantar v. Yousuf*, 560 U.S. 305, 324-25 (2010) (quoting *Pimentel* and observing that if "the entity is immune from suit under the FSIA, the district court may have to dismiss the suit, regardless of whether [an individual] official is immune or not under the common law").

In applying *Pimentel*, courts look to Rule 19 of the Federal Rules of Civil Procedure.  Under Rule 19(a), a party is necessary (1) if the court cannot accord complete relief in its absence, or (2) if, without its presence, its interests in the subject matter are not protected.  Fed. R. Civ. P. 19(a).  Under Rule 19(b), "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).  Here, Qatar is a necessary party under Rule 19(a), but equitable considerations, which prominently include Qatar's sovereign immunity, weigh strongly against allowing the case to proceed as against the other parties.

First, a plain review of the FAC's allegations reveals that the Court cannot afford complete relief—if indeed any relief were warranted—in Qatar's absence.  *See* Fed. R. Civ. P. 19(a)(1)(A).  The primary relief Plaintiffs seek is an injunction to prohibit Qatar from, *inter alia*, accessing Plaintiffs' protected computers without authorization, accessing and altering data on Plaintiffs' computers and networks, and receiving unlawfully obtained communications from Plaintiffs.  *See, e.g.*, FAC ¶¶ 140-148, 150-160, 162-167.  However, an absent party cannot be bound by any such injunction, making it impossible for the court to afford complete relief.  *Dawavendewa v. Salt River Project*

*Agric. Improvement & Power Dist.,* 276 F.3d 1150, 1155-56 (9th Cir. 2002) (upholding dismissal of complaint when complete relief could not be afforded because the absent necessary party would not be bound by the requested injunctive relief); *see also Friends of Amador Cty. v. Salazar*, No. 11-17996, 2011 WL 4709883, at *2-3 (E.D. Cal. Oct. 4, 2011), *aff'd*, 554 F. App'x 562 (9th Cir. 2014) (dismissing action against all parties when the court could not provide complete relief when the requested injunction "if granted, would fail to bind all absent parties who are in a position to act in direct contravention of that remedy").

Second, Qatar's interests, immunities, and rights would be undermined in its absence. *Dawavendewa*, 276 F.3d at 1155. Plaintiffs' discovery against other parties seeks materials exchanged between Qatar and its agents regarding sensitive matters of foreign policy. Further, discovery against other defendants would necessarily implicate Qatar's immunity protections under the Vienna Conventions.[13]  If discovery continues against other defendants, Qatar will be required to object to and litigate requests for information that elicit its protected information or risk having its interests adjudicated completely in its absence.

Because both Rule 19(a) considerations are fulfilled, Qatar is a required party. Thus, Rule 19(b) directs the Court to further consider whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Pimentel*, 533 U.S. at 862. This analysis balances four factors: "(1) the prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without

---

[13] The Vienna Convention on Consular Relations provides that "[t]he archives and documents of the mission shall be inviolable at any time and wherever they may be." Vienna Convention on Diplomatic Relations, art. 24, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95. The Vienna Convention on Consular Relations likewise states that "consular archives and documents shall be inviolable at all times and wherever they may be." Vienna Convention on Consular Relations, art 33, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STATE OF QATAR'S MOTION TO DISMISS

the absent party; and (4) whether there exists an alternative forum." *Dawavendewa*, 276 F.3d at 1161-62.

In cases involving sovereign immunity, the Supreme Court has recognized that when addressing the first factor, it must give full effect to sovereign immunity and promote the "[c]omity and dignity interests" of the absent sovereign. *Pimentel*, 533 U.S. at 866. Indeed, under the first factor, the Court should take into account the potential prejudice against any party, but it must "accord proper weight to the compelling claim of sovereign immunity." *Id.* at 869; *see also Delano Farms Co. v. Cal. Table Grape Comm'n*, 623 F. Supp. 2d 1144, 1168 (E.D. Cal. 2009) ("[W]here the absent party cannot be joined in light of sovereign immunity, 'there may be very little need for balancing. . . because immunity itself may be viewed as the compelling factor.") (citing *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996)). Thus, Qatar's immunity weighs in favor of dismissal under Rule 19(b).

The other 19(b) factors also weigh in favor of dismissal. As to the second factor, there is no judgment that could be tailored to eliminate prejudice to the absent sovereign, so this factor weighs in favor of dismissal. *Delano Farms*, 623 F. Supp. 2d at 1169. Indeed, any relief granted for Plaintiffs against Qatar's alleged agents working on its behalf would necessarily prejudice Qatar. The third factor, whether adequate relief can be awarded without the absent party, also weighs in favor of dismissal. Any judgment rendered without Qatar would not be adequate, as explained above, and going forward with an action that does not bind the non-parties does not further the public interest in settling the dispute as a whole. *Pimentel*, 533 U.S. at 870-71. The fourth factor takes into account whether an alternative forum exists. Even if Plaintiffs argue that the dismissal of the entire action would leave them without an alternative forum and therefore without an adequate remedy, this result is "contemplated under the doctrine of foreign sovereign immunity," and the potential prejudice to Plaintiffs is "outweighed by prejudice to absent entities invoking sovereign immunity." *Id.* at 872. Thus, under

*Pimentel* and Rule 19, the operation of the FSIA to deprive the Court of jurisdiction over Qatar requires dismissing not just Qatar, but the FAC as a whole.

\* \* \*

Qatar's sovereign interests in this case lie at the heart of the FSIA's fundamental purpose: protecting sovereign functions from harassment by private litigants.  These interests are especially important here given Qatar's close alliance with the United States. Even setting aside Qatari-U.S. relations, upholding sovereign immunity in this case— where a foreign government is haled into court based only on its pursuit of a legitimate diplomatic campaign—is crucial to fostering respect and reciprocal treatment of the United States government in courts abroad.

In this case, Plaintiffs seek to utilize a thinly-pled complaint, regarding an alleged theft of emails, as a vehicle for broad, wide-ranging discovery into Qatar's diplomatic, political, and highly-sensitive national security-related affairs—all of which is more relevant to advancing Broidy's own lobbying efforts than to any of his hacking claims. The FSIA squarely prohibits such unwarranted intrusion into intergovernmental relations.

## CONCLUSION

For the foregoing reasons, Defendant State of Qatar respectfully requests that the Court uphold the fundamental purposes of the FSIA by dismissing with prejudice Plaintiffs' First Amended Complaint in its entirety.

Dated:  June 27, 2018                      Respectfully submitted,

COVINGTON & BURLING LLP

By:  */s/ Mitchell A. Kamin*
     MITCHELL A. KAMIN
     *Attorneys for Defendant State of Qatar*