**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

| | |
|---|---|
| Case No.   **CV 18-2421-JFW(Ex)** | Date: August 8, 2018 |

Title:   Broidy Capital Management, LLC, et al. -v- State of Qatar, et al.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| Shannon Reilly | None Present |
|---|---|
| Courtroom Deputy | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFFS: | ATTORNEYS PRESENT FOR DEFENDANTS: |
|---|---|
| None | None |

| | |
|---|---|
| PROCEEDINGS (IN CHAMBERS): | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT STATE OF QATAR'S MOTION TO DISMISS PURSUANT TO RULES 12(b)(1) AND 12(b)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE [filed 6/27/18; Docket No. 112]; and**<br><br>**ORDER DENYING AS MOOT DEFENDANT STATE OF QATAR'S MOTION TO STAY DISCOVERY PENDING RESOLUTION OF DEFENDANT STATE OF QATAR'S MOTION TO DISMISS [filed 6/6/18; Docket No. 80]** |

On June 6, 2018, Defendant State of Qatar ("Qatar") filed a Motion to Stay Discovery Pending Resolution of Defendant State of Qatar's Motion to Dismiss ("Motion to Stay"). On June 11, 2018, Plaintiffs Broidy Capital Management LLC ("Broidy Capital") and Elliott Broidy ("Broidy") (collectively, "Plaintiffs") filed their Opposition. On June 15, 2018, Qatar filed a Reply. On June 27, 2018, Qatar filed a Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(2) of the Federal Rules of Civil Procedure ("Motion to Dismiss"). On July 9, 2018, Plaintiffs filed their Opposition. On July 16, 2018, Qatar filed a Reply. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument. The matter was, therefore, removed from the Court's July 30, 2018 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.   Factual and Procedural Background**

Broidy is a California businessman who owns and operates California-based Broidy Capital and is a prominent critic of Qatar's policies. In late 2017, hackers began using sophisticated

techniques to infiltrate the computer systems and accounts belonging to Plaintiffs and certain of their associates and family members. First Amended Complaint ("FAC"), ¶ 97-116. As a result, the hackers stole Plaintiffs' personal and professional files, correspondence, trade secrets, business plans, and other confidential and private documents. The confidential information was packaged into documents that were disseminated to journalists affiliated with various media organizations in the United States. The journalists then wrote stories that largely exploited the private and confidential information contained in the stolen documents. Forensic investigators retained by Plaintiffs, Ankura Consulting Group, LLC ("Ankura"), initially determined that the unauthorized access originated from Internet Protocol ("IP") addresses in the United Kingdom and the Netherlands. However, a more thorough review of server data revealed that on February 14 and 19, 2018, the attackers accessed Broidy Capital's server from an IP address in Doha, Qatar. Broidy claims that he became aware of Qatar's involvement in these unlawful actions through Joel Mowbray, a longstanding acquaintance of both Defendant Nicolas D. Muzin ("Muzin") and Broidy. FAC, ¶¶ 10-13 and 133-37. In a conversation with Mowbray – the contents of which Mowbray later relayed to Broidy – Muzin told Mowbray that Qatar was "after" Mowbray and Broidy. Based on Mowbray's conversations with Muzin (and the discovery of the IP address in Doha, Qatar), Broidy concluded that Qatar was responsible for the attack on his and Broidy Capital's servers and filed this action on March 26, 2018.

Plaintiffs' original Complaint alleged seven tort causes of action against Defendants Qatar, Muzin, and Muzin's company, Stonington Strategies LLC ("Stonington") and alleged that Plaintiffs' computer systems were accessed without authorization from an IP address in Qatar and that their contents were subsequently disseminated to media outlets. On April 2, 2018, Plaintiffs filed an Ex Parte Application for Temporary Restraining Order ("Application") and a request for expedited discovery. On April 4, 2018, the Court entered an Order denying Plaintiffs' Application and request for expedited discovery.

On May 24, 2018, Plaintiffs filed a First Amended Complaint, alleging causes of action for: (1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(2)(C) and (a)(5); (2) violation of the California Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502; (3) receipt and possession of stolen property in violation of California Penal Code § 496; (4) invasion of privacy by intrusion upon seclusion; (5) conversion; (6) violation of Stored Communications Act, 18 U.S.C. § 27012; (7) violation of Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.*; (8) violation of the California Uniform Trade Secrets Act, California Civil Code § 3426 *et seq.*; (9) misappropriation of trade secrets in violation of the Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*; and (10) civil conspiracy. The First Amended Complaint added a number of factual allegations, many on information and belief, concerning the method by which the hack purportedly occurred, including that the hackers used virtual private networks to disguise their identities. FAC, ¶¶ 97-116. Plaintiffs also alleged that the "hack" began with "phishing" emails, disguised as Gmail security alerts, sent to Broidy's wife and his executive assistant on January 14, 2018. *Id.*, ¶¶ 97-100, 109-111. Plaintiffs alleged that Broidy's wife and his executive assistant provided their usernames and passwords in response to these disguised Gmail security alerts, which an unidentified third party then used to access the email accounts and remotely control those accounts via a Russian mail service called "mail.ru." *Id.* Plaintiffs contend that the third party logged into Plaintiffs' email accounts on "thousands" of occasions, using different IP addresses. *Id.*, ¶ 113. Although Plaintiffs also named additional defendants, including Sheikh Mohammed Bin Hamad Bin Khalifa Al Thani ("Al Thani"), Ahmed Al-Rumaihi ("Al-Rumaihi"), and

Global Risk Advisors LLC ("Global Risk"), in their First Amended Complaint Plaintiffs did not plead any specific facts suggesting that these defendants were engaged in any unlawful hacking activity. Plaintiffs allege that Qatar is responsible for the hack based on the two logins determined to have originated from an IP address registered to a computer located somewhere in Doha, Qatar. *Id.*, ¶ 115.

## II.   Legal Standard

### A.   Rule 12(b)(1)

The party mounting a Rule 12(b)(1) challenge to the Court's jurisdiction may do so either on the face of the pleadings or by presenting extrinsic evidence for the Court's consideration. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Rule 12(b)(1) jurisdictional attacks can be either facial or factual"). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In ruling on a Rule 12(b)(1) motion attacking the complaint on its face, the Court accepts the allegations of the complaint as true. *See, e.g., Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air*, 373 F.3d at 1039. "With a factual Rule 12(b)(1) attack . . . a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment. It also need not presume the truthfulness of the plaintiff['s] allegations." *White*, 227 F.3d at 1242 (internal citation omitted); *see also Thornhill Pub. Co., Inc. v. General Tel & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir. 1979) ("Where the jurisdictional issue is separable from the merits of the case, the judge may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary. . . '[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'") (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (9th Cir. 1977)). "However, where the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial." *Augustine v. U.S.*, 704 F.2d 1074, 1077 (9th Cir. 1983). It is the plaintiff who bears the burden of demonstrating that the Court has subject matter jurisdiction to hear the action. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989).

### B.   Rule 12(b)(2)

#### 1.   Procedural Considerations

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the Court may decide a question of personal jurisdiction on the basis of affidavits and documentary evidence submitted by the parties, or may hold an evidentiary hearing on the matter. *See* 5A Wright & Miller, Federal Practice and Procedure, § 1351, at pp. 253-59 and n. 31-35 (2d ed. 1990); *Rose v. Granite City Police Dept.*, 813 F. Supp. 319, 321 (E.D. Pa. 1993). Whichever procedure is used, plaintiff bears the burden of establishing that jurisdiction is proper. *See Ziegler v. Indian River County*, 64 F.3d

470, 473 (9th Cir. 1995); *Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1392 (9th Cir. 1984). In this case, the pleadings, declarations and documentary evidence submitted by the parties provide an adequate basis for evaluating jurisdiction. Accordingly, no evidentiary hearing is necessary.

Because this matter is being decided on the basis of affidavits and documentary evidence, Plaintiffs need only make a prima facie showing of personal jurisdiction. *See Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986). All allegations in Plaintiffs' complaint must be taken as true, to the extent not controverted by Defendant's affidavits, and all conflicts in the evidence must be resolved in their favor. *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) (citing *WNS, Inc. v. Farrow*, 884 F.2d 200, 203 (5th Cir. 1989)). If Plaintiffs' evidence constitutes a prima facie showing, this is adequate to support a finding of jurisdiction, "notwithstanding [a] contrary presentation by the moving party." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

### 2.   Substantive Standard

Whether a federal court can exercise personal jurisdiction over a non-resident defendant turns on two independent considerations: whether an applicable state rule or statute permits service of process on the defendant, and whether the assertion of personal jurisdiction comports with constitutional due process principles. *See Pacific Atlantic Trading Co. v. M/V Main Express*, 758 F.2d 1325, 1327 (9th Cir. 1985).

California's long-arm statute extends jurisdiction to the limits of constitutional due process. *See Gordy v. Daily News, L.P.*, 95 F.3d 829, 831 (9th Cir. 1996); Cal. Code. Civ. Proc. § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States"). Consequently, when service of process has been effected under California law, the two prongs of the jurisdictional analysis collapse into one – whether the exercise of jurisdiction over the defendant comports with due process. *See Fireman's Fund Ins. Co. v. National Bank of Cooperative*, 103 F.3d 888, 893 (9th Cir. 1996); *Aanestad v. Beech Aircraft Corp.*, 521 F.2d 1298, 1300 (9th Cir. 1974).

The Fourteenth Amendment's Due Process Clause permits courts to exercise personal jurisdiction over a defendant who has sufficient "minimum contacts" with the forum state that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). There are two recognized bases for personal jurisdiction over nonresident defendants: (1) "general jurisdiction," which arises where the defendant's activities in the forum state are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over him in all matters; and (2) "specific jurisdiction," which arises when a defendant's specific contacts with the forum have given rise to the claim in question. *See Helicopteros Nacionales de Columbia S.A. v. Hall*, 466 U.S. 408, 414-16 (1984). *See Doe v. American Nat'l Red Cross*, 112 F.3d 1048, 1050-51 (9th Cir. 1997); *Fields*, *supra*, 796 F.2d at 301-02.

### III.   Discussion

### A.     The Foreign Sovereign Immunities Act of 1976

The Foreign Sovereign Immunities Act of 1976 ("FSIA") provides "the sole basis" for obtaining jurisdiction over foreign countries in federal or state courts:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 and 1607 of this chapter.

28 U.S.C. § 1604; *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  The FSIA establishes a fundamental rule that foreign sovereigns are not subject to the jurisdiction of United States courts unless a specific statutory exception to immunity applies.  *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 394 (2015) (*citing Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)); *see also* 28 U.S.C. § 1604.  This important rule is rooted in diplomatic and international sensitivities of the highest order. *See, e.g., Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017) (foreign sovereign immunity "recognizes the absolute independence of every sovereign authority and helps to induce each nation state, as a matter of international comity, to respect the independence and dignity of every other, including our own") (quotations and citations omitted).  It is the plaintiff that has the burden of offering proof that one of the FSIA's limited exemptions applies.  *Meadows v. Dominican Republic*, 817 F.2d 517, 522-23 (9th Cir. 1987).  Once the plaintiff "offers evidence that an FSIA exception to immunity applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply." *Joseph v. Office of the Consulate Gen. of Nig.*, 830 F.2d 1018, 1021 (9th Cir.1987).

The exceptions to the FSIA are construed narrowly, consistent with the overall statutory objective of preserving the sovereign immunity of foreign states.  *See, e.g., Schermerhorn v. Israel*, 876 F.3d 351, 358 (D.C. Cir. 2017) ("The FSIA is premised on 'a presumption of foreign sovereign immunity' qualified only by a small number of 'discrete and limited exceptions'") (citation omitted); *Sampson v. Fed. Republic of Germany,* 250 F.3d 1145, 1155-56 (7th Cir. 2001) (holding that any expansion of the FSIA exceptions bears "significantly on sensitive foreign policy matters," which "might have serious foreign policy implications").  If one of these narrow exceptions does not apply, the Court lacks both subject matter and personal jurisdiction over the foreign state.  *See* 28 U.S.C. § 1330(a)-(b); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 489 & n.5 (1983) (holding that the FSIA provides personal jurisdiction only if subject matter jurisdiction exists and service of process has been made in accordance with the Act).

### B.     The Court Lacks Subject Matter Jurisdiction Over Qatar.

The Court concludes that Plaintiffs' claims against Qatar fall outside any applicable exception to the FSIA and, therefore, the Court lacks subject matter jurisdiction over Qatar. Foreign sovereign immunity under the FSIA "recognizes the absolute independence of every sovereign authority and helps to induce each nation state, as a matter of international comity, to respect the independence and dignity of every other, including our own." *Helmerich & Payne Int'l Drilling*, 137 S. Ct. at 1319.  In recognition of these fundamental principles, immunity of a foreign sovereign is the rule and litigation is the exception.  The exceptions to immunity set forth in the

FSIA are triggered by only a handful of narrow factual circumstances, and the Court concludes that none of those exceptions are applicable in this case.

### 1. The Noncommercial Tort Exception Does Not Apply.

In this case, Plaintiffs allege in the First Amended Complaint that the noncommercial tort exception applies.  FAC, ¶ 30.  Under the FSIA's noncommercial tort exception set forth at 28 U.S.C. § 1605(a)(5), immunity is only abrogated in actions:

> for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

Courts read this exception narrowly, which is consistent with the general presumption that foreign states are entitled to sovereign immunity and Congress's objective in enacting the non-commercial exception, which was to "eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law." *Amerada Hess*, 488 U.S. at 439-40 (*citing* H.R. Rep. No. 94-1487, at 14 and 20-21 (1976); S. Rep. No. 94-1310, at 14 and 20-21 (1976); U.S. Code Cong. & Admin. News 1976, pp. 6613 and 6619)); *see also MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir. 1987) (noting that the legislative history of the noncommercial tort exception "counsels that the exception should be narrowly construed so as not to encompass the farthest reaches of common law"); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir. 1984) ("We decline to convert [the noncommercial tort exception] into a broad exception for all alleged torts that bear some relationship to the United States").

The noncommercial tort exception "makes no mention of 'territory outside the United States' or of 'direct effects' in the United States," and, thus, Congress' deliberate word choice indicates that the noncommercial tort exception "covers only torts occurring within the territorial jurisdiction of the United States." *Amerada Hess*, 488 U.S. at 441; *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 379 (7th Cir. 1985).  The Ninth Circuit follows the "entire tort" rule, and plaintiffs must allege at least "one entire tort" occurring in the United States in order to escape the immunity demanded by the FSIA.  *Olsen by Sheldon v. Government of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984), *abrogated on other grounds as stated in Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987); *Alperin v. Vatican Bank,* 2007 WL 4570674, at *9 (N.D. Cal. Dec. 27, 2007) (dismissing action where "plaintiffs have failed to show that 'one entire tort' has occurred in the United States"), *aff'd*, 360 F. App'x 847 (9th Cir. 2009), *amended in part*, 365 F. App'x 74 (9th Cir. 2010).

In *Doe v. Federal Democratic Republic of Ethiopia*, 851 F.3d 7 (D.C. Cir. 2017), the D.C. Circuit held that "[t]he entire tort – including not only the injury but also the act precipitating that injury – must occur in the United States." *Id.* at 10 (*quoting Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014)).  The D.C. Circuit also held that electronic espionage launched from a foreign country "is a transnational tort" that does not fall within the FSIA's noncommercial tort exception.  *Doe*, 851 F.3d at 11. The court found that "Ethiopia's placement of the FinSpy virus on [the plaintiff's] computer although completed in the United States when [the plaintiff] opened the

infected e-mail attachment, began outside the United States." *Id.* at 9. Therefore, the court concluded that "[t]he tort [the plaintiff] allege[d] thus did not occur 'entirely' in the United States." *Id.* at 11.

In this case, Plaintiffs have failed to allege a tort occurring entirely in the United States.[1] The substantive torts alleged by Plaintiffs in their First Amended Complaint are all premised on allegedly wrongful conduct by Qatar, its agents, or co-conspirators in gaining access to Plaintiffs' data servers from outside the United States, making each tort transnational.[2] FAC, ¶ 115 ("On February 14, 2018 and February 19, 2018, unlawful and unauthorized connections originated from an IP address in Qatar. These two unlawful and unauthorized intrusions into BCM's California email server were not masked by VPNs, even though the connections immediately before and immediately after the access were routed through VPNs, possibly because the VPN failed or because the accessing computer automatically connected to Plaintiff BCM's network before the VPN could be activated. These connections revealed the actual location of a computer or computers accessing Plaintiff BCM's network from an IP address in Qatar"). Consistent with the allegations in the First Amended Complaint, Plaintiffs have steadfastly claimed that their servers were accessed from outside the United States since the filing of their original Complaint.[3] *See*

---

[1] Plaintiffs' reliance on their cause of action for civil conspiracy is misplaced because civil conspiracy is not an independent tort under California law and, thus, cannot provide a basis for the application of the FSIA's noncommercial tort exception. *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1228 (9th Cir. 1997); *Santa Fe Pac. Realty Corp. v. United States*, 780 F. Supp. 687, 693 (E.D. Cal. 1991) (holding that because there is no separate tort of civil conspiracy under California law, if the underlying tort is subject to immunity under the Federal Tort Claims Act, "the conspiracy claim is likewise barred"). Because Plaintiffs' substantive causes of action fail under the "entire tort rule," Qatar "cannot be bootstrapped into tort liability by the pejorative plea of conspiracy." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 459 (Cal. 1994).

[2] The Court agrees with Qatar's analysis that liability under Plaintiffs' claims will require proof of access, receipt, intrusion, interference, taking, circumventing, and misappropriation of Plaintiffs' private and confidential information that occurred in Qatar. *See*, Motion 12:7-13:12 and Reply, 4:3-6.

[3] Plaintiffs argue in their Opposition that the alleged hack may have occurred in Vermont. However, Plaintiffs concede that they have failed to allege in their First Amended Complaint that an "entire tort" occurred within the United States, and have alleged merely that for some causes of action, "at least some instances of unlawful [conduct] occurred in the United States." FAC, ¶¶ 165, 171, and 182. In addition, even if the Court considered these unsupported conclusory allegations, it is clear on the face of the First Amended Complaint that those instances were merely the continuation of purported conduct allegedly originating in Qatar and "do not demonstrate an independent tort occurring entirely within the United States." *Greenpeace, Inc. v. State of France*, 946 F.Supp. 773, 786 (C.D. Cal. 1996) (holding that alleged unlawful detention of plaintiffs on French military and civil aircraft in Los Angeles did not constitute entire tort in the United States where detention was continuation of conduct begun outside of United States jurisdiction). The *Greenpeace* court also rejected as erroneous Plaintiffs' interpretation of *Olsen*, 729 F.2d 641, as

Complaint, ¶ 73 ("Although initial forensic analysis of the BCM email server logs suggested that the unauthorized access originated from IP addresses in the United Kingdom and the Netherlands, a more thorough review of server data from February 14, 2018 revealed that the attack had originated from an IP address in Qatar.  On information and belief, the IP addresses in the Netherlands and the United Kingdom originally identified were used to mask the true identity of the source of the intrusion.  Plaintiff Broidy's advanced cyber unit was able to uncover problems with the attacker's obfuscation technique on February 14, 2018, which revealed that the attack originated in Qatar").

Even prior to filing their original Complaint, Plaintiffs were convinced based on their investigation that Qatar was responsible for the attack and that it originated in Qatar.  Specifically, Ankura, the forensic experts hired by Plaintiffs, determined "that individuals located in Qatar [were] responsible for the unauthorized activity" based on two mistakes or brief failures in the attacker's IP address obfuscation techniques on February 14, 2018 and February 19, 2018 which revealed that the IP address "is a Qatar source IP registered to a physical location in Doha, Qatar."  April 2, 2018 Declaration of J. Luke Tenery (Docket No. 31-5), ¶ 11.  Counsel for Plaintiffs, presented the evidence of Qatar's unlawful attacks to the Ambassador of Qatar, Al Thani, in a letter dated March 19, 2018.  In the letter counsel for Plaintiffs advised Al Thani that:

> The individuals located in Qatar tied to this attack evidently believed they could maintain anonymity by trying to disguise their malicious activity targeting Mr. Broidy's servers.  They were wrong.  Mr. Broidy's advanced cyber crime forensics unit has established Qatar's ties to this illegal hacking operation.

March 19, 2018 Letter from Lee S. Wolosky to Sheikh Meshal bin Hamad Al Thani (Docket No. 31-9).  The letter concluded with this warning: "[i]f, as you have suggested, the attack on Mr. Broidy that originated in Qatar was not authorized by your government, then we expect your government to hold accountable the rogue actors in Qatar who have caused Mr. Broidy substantial damages."[4]  *Id.*

Although Plaintiffs argue the Court should apply the noncommercial tort exception, Plaintiffs focus on the injury they sustained and ignore that the conduct precipitating that injury involved unlawful access or "hacking" Plaintiffs' servers, which Plaintiffs' own evidence demonstrates

---

permitting a court to exercise jurisdiction over all tort causes of action alleged in a complaint "if any 'entire tort' took place in the United States" because "*Olsen* does not extend FSIA jurisdiction to tortious conduct occurring overseas."  *Greenpeace*, 946 F.Supp. At 785.  Moreover, to the extent that Plaintiffs seek to amend their First Amended Complaint to allege that the alleged hack occurred solely within the United States, any such allegation would be directly contradictory to the allegations in their Complaint and First Amended Complaint and the declarations and other evidence in support of the temporary restraining order that the hack occurred, in whole or in part, in Qatar.

[4]  The ambassador of Qatar never responded to the March 19, 2018 letter.  Plaintiffs construed Qatar's failure to respond as an admission that Qatar was responsible for the hack and immediately filed this action.

originated in Qatar by actors who were acting on behalf of Qatar or who were conspiring with Qatar. In effect, Plaintiffs argue for an expanded interpretation of Section 1605(a)(5) that would allow the Court to find subject matter jurisdiction if the injury, as in this case, occurred in the United States regardless of whether the tortious conduct causing the injury occurred within the United States. However, this interpretation has been overwhelmingly rejected by the courts that have considered the issue. *See, e.g., Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984), *cert. denied* 469 U.S. 881 (1984); *Asociacion de Reclaimantes v. United Mexican States*, 735 F.2d 1517 (D.C. Cir. 1984), *cert. denied* 470 U.S. 1051 (1985); *Olsen*, 729 F.2d 1984; *In re the Matter of the Complaint of Sedco, Inc.*, 543 F.Supp. 561 (S.D. Tex. 1982); *Australian Government Aircraft Factories v. Lynne*, 743 F.2d 672, 674-75 (9th Cir. 1988) (holding that injuries to pilot's family in the United States were insufficient to support jurisdiction); *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 589 n. 10 (9th Cir. 1983) ("We need not decide whether § 1605(a)(5) may ever provide jurisdiction for tort actions in which the tortious act or omission occurs outside the United States. The language of § 1605(a)(5) suggests that only the injury need occur in the United States, but the legislative history declares that, 'the tortious act or omission must occur within the jurisdiction of the United States'") (citation omitted).

Despite Plaintiffs argument to the contrary, the entire tort rule applied by the Ninth Circuit in *Olsen*, 729 F.2d 641, is consistent with the application of the entire tort rule in other circuits. In *Olsen*, the plaintiffs asserted a single cause of action for the wrongful death of their parents in a plane crash in California. *Id.* at 643. In weighing whether the noncommercial tort exception applied, the court considered a number of "potentially tortious acts and omissions occurring both in Mexico and the United States." *Id.* at 645-46. The court found that the plaintiffs had alleged conduct occurring entirely in the United States constituting "a single tort – the negligent piloting of the aircraft" to bring the plaintiffs' wrongful death claim within the exception. *Id.* at 646. Thus, the negligent piloting that occurred in the United States was an independent and sufficient cause of the plaintiffs' injuries – an entire tort. By holding that the plaintiffs must allege "at least one entire tort occurring in the United States" to bring a claim under the noncommercial tort exception, the *Olsen* court did not change the entire tort rule. Instead, the Ninth Circuit held subject matter jurisdiction could only be exercised to the extent that the plaintiffs sought relief for a tort taking place entirely within United States. *Id.* at 646; *see also Greenpeace*, 946 F. Supp. at 785 holding that "*Olsen* does not extend FSIA jurisdiction to tortious conduct occurring overseas" and that "only those torts which occurred entirely within the United States support jurisdiction under section 1605(a)(5)").

The primary reason most courts have rejected a broad interpretation of Section 1605(a)(5) as argued for by Plaintiffs is the specific legislative history indicating Congress's clear intention that the tortious act or omission as well and the injury must occur in the United States. Specifically, the legislative history reveals that:

> Section 1605(a)(5) is directed primarily at the problem of traffic accidents but is cast in general terms as applying to all tort actions for money damages, not otherwise encompassed by section 1605(a)(2) relating to commercial activities. It denies immunity as to claims for personal injury or death, or for damage to or loss of property, caused by the tortious act or omission of a foreign state or its officials or employees, acting within the scope of their authority; **the tortious act or omission must occur within the jurisdiction of the United States**, and must not come within one of the exceptions enumerated in the second paragraph of the subsection.

H.R. Rep. No. 94-1487, at 20-21 (1976); S. Rep. No. 94-1310, at 20-21 (1976); U.S. Code Cong. & Admin. News 1976, p. 6619 (emphasis added). Although it is possible to construe Section 1605(a)(5) as Plaintiffs urge to mean that the tortious act or omission can occur anywhere in the world provided that the injury occurs in the United States, the Court cannot do so in light of the applicable case law and the clear legislative history to the contrary.

Moreover, Section 1605(a)(2) demonstrates that when Congress intended to provide jurisdiction for acts outside the United States which have an effect inside the United States, it said so explicitly. Section 1605(a)(2) provides that there is no immunity for a foreign state's commercial activities outside the United States that cause "direct effect in the United States." The legislative history reveals that this provision was adopted in accordance with the principles in the Restatement (Second) of The Foreign Relations Law of the United States, § 18 (1965), which provides that a nation has jurisdiction to attach legal consequences to conduct outside its borders that causes an effect within its borders. Significantly, there is no reference to Section 18 of the Restatement in the committee reports discussing Section 1605(a)(5).

Accordingly, the Court concludes that the claims alleged by Plaintiffs do not fall within the scope of the FSIA's noncommercial tort exception and, therefore, this Court lacks subject matter jurisdiction.[5][6]

### 2.     The Commercial Activity Exception Does Not Apply.

Plaintiffs also allege in the First Amended Complaint that the commercial activity exception applies. FAC, ¶ 31. Under the FSIA's commercial activity exception set forth at 28 U.S.C. § 1605(a)(2), a foreign state is not immune when "the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

"Commercial activity" is defined in the FSIA as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). "Commercial activity

---

[5]  Because the Court concludes that the noncommercial tort exception does not apply, the Court need not and does not address the discretionary function rule.

[6]  Even Scott A. Gilmore, who argues for a broad interpretation of the noncommercial tort exception of the FSIA in his very interesting article "Suing the Surveillance States: The (Cyber) Tort Exception to the Foreign Sovereign Immunities Act," 46 Columbia Human Rights Law Review 227 (Spring 2015), acknowledges that "[s]o far, the policy debate on cybersecurity has taken it for granted that foreign states enjoy immunity for cyber attacks on U.S. targets." Given the reluctance of the other courts that have considered the issue to abandon a narrow interpretation of Section 1605(a)(5) and the growing prevalence of attacks in cyberspace, it may be an appropriate time for Congress to consider a cyber attack exception to the FSIA which, at the moment, effectively precludes civil suits in United States courts against foreign governments or entities acting on their behalf in the cyberworld.

carried on in the United States by a foreign state" refers to commercial activity carried on by the foreign state that has substantial contact with the United States. 28 U.S.C. § 1603(e). "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

In *Nelson*, 507 U.S. at 360, the Supreme Court held that commercial activity under the FSIA refers to "only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." "[A] foreign state engages in commercial activity . . . where it acts in the manner of a private player within the market." *Id.* (quotation omitted); *see also* Restatement (Third) of The Foreign Relations Law of the United States, § 451 (1987) ("Under international law, a state or state instrumentality is immune from the jurisdiction of the courts of another state, except with respect to claims arising out of activities of the kind that may be carried on by private persons"). Therefore, with respect to the commercial activity exception to the FSIA, the relevant question "is whether the particular actions that the foreign state performs . . . are the type of actions by which a private party engages in trade and traffic or commerce." *Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (quotation omitted). Thus, a court does not consider whether the specific act was one that only a sovereign would actually perform. *Sun v. Taiwan*, 201 F.3d 1105, 1109 (9th Cir.2000). Instead, the court should consider whether the "category of conduct" is commercial in nature. *Id.*

"Application of the commercial activities exception is predicated on the existence of a sufficient nexus between the plaintiff's asserted cause of action and the foreign state's commercial activity." *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1170 (2010). "The commercial activity relied upon . . . to establish jurisdiction must be the activity upon which the lawsuit is based. The focus must be solely upon those specific acts that form the basis of the suit." *Am. W. Airlines, Inc. v. GPA Group, Ltd.*, 877 F.2d 793, 796–97 (9th Cir.1989) (quotation, emphasis, and citation omitted). In other words, the phrase "based upon" in § 1605(a)(2) "is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under [its] theory of the case." *Nelson*, 507 U.S. at 357.

In this case, Plaintiffs allege that, as part of an aggressive information and government relations campaign, Qatar and its alleged agents engaged in hacking and dissemination of the private information of a known critic of Qatar's policies. FAC, ¶¶ 88-92. The Court concludes that the alleged conduct is not commercial in nature. Neither the broader information and government relations campaign nor Qatar's specific "black operation" is the type of action by which private, commercial enterprises typically engage in trade or commerce. Accordingly, the alleged conduct is not commercial activity that would justify the lifting of foreign sovereign immunity.

Although Plaintiffs argue that Qatar's alleged contracts with its agents are commercial because "sophisticated cyber-attack[s] and information campaign[s]" are activities in which private citizens can engage (Opposition, p. 16), "the issue is whether the particular actions that the foreign state performs . . . are the type of actions by which a private party engages in trade and traffic or commerce." *Republic of Argentina v. Weltover,* Inc., 504 U.S. 607, 614 (1992). Cyber-attacks are not the "typical acts of market participants." *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168 (D.C. Cir. 1994); *see also Eringer v. Principality of Monaco*, 2011 WL 13134271, at *6 (C.D. Cal. Aug. 23, 2011), *aff'd,* 533 F. App'x 703 (9th Cir. 2013); *Jin v. Ministry of State Sec.*, 557 F. Supp.

2d 131 (D.D.C. 2008).

Accordingly, the Court concludes that the claims alleged by Plaintiffs do not fall within the scope of the FSIA's commercial activity exception and, therefore, this Court lacks subject matter jurisdiction.[7]

### C. Qatar is a Necessary, But Not Indispensable Party.

#### 1. Qatar is a Necessary Party.

Whether a party is indispensable is determined pursuant to Rule 19. "The inquiry is a practical, fact-specific one, designed to avoid the harsh results of rigid application." *Dawavendewa v. Salt River Project Agr. Imp. And Power Dist.*, 276 F.3d 1150, 1154 (9th Cir. 2002); *see also Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir.1990). Under the Rule 19 inquiry, the court must determine: (1) whether a party is necessary to the action; and then, (2) if the party is necessary, but cannot be joined, whether the party is indispensable such that in "equity and good conscience" the suit should be dismissed. *Confederated Tribes v. Lujan*, 928 F.2d 1496, 1498 (9th Cir.1991) (*quoting Makah Indian Tribe*, 910 F.2d at 558).

In determining whether a party is necessary under Rule 19, the court considers whether, in the absence of that party, complete relief can be accorded to the plaintiff. *See, e.g., Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir.1992). In the alternative, the court considers whether a party claims a legally protected interest in the subject of the suit such that a decision in its absence will: (1) impair or impede its ability to protect that interest; or (2) expose an existing party to the risk of multiple or inconsistent obligations by reason of that interest. See Fed. R. Civ. P. 19(a); *Makah Indian Tribe*, 910 F.2d at 558. If a party satisfies either of these alternative tests, it is a necessary party to the litigation. *See Clinton v. Babbitt*, 180 F.3d 1081, 1088 (1999).

In this case, if Plaintiffs prevail, they cannot be accorded complete relief in the absence of Qatar. Plaintiffs seek injunctive relief prohibiting all defendants, including Qatar, from accessing Plaintiffs' protected computers without authorization, accessing and altering data on Plaintiffs' computers and networks, and otherwise unlawfully obtaining Plaintiffs confidential information. However, because the Court lacks subject matter jurisdiction over Qatar under the FSIA, only the remaining defendants – and not Qatar – would be bound by such an injunction. Thus, under Rule 19(a)(1), Qatar is a necessary party.

#### 2. Qatar is Not an Indispensable Party.

After concluding that Qatar is a necessary party and immune from this action under the

---

[7] The Court is always concerned when its decision may effectively deprive parties of a forum to pursue legitimate claims of wrongdoing. However, this is a natural result of recognizing foreign sovereign immunity as provided for in both the general rule and the explicit mandate of the FSIA. *See Sachs v. Republic of Austria*, 695 F.3d 1021, 1026 (9th Cir. 2012) ("Any injustice that results is not greater than the mine-run of cases – jurisdiction over a foreign state is, after all, ordinarily not available").

FSIA, the Court must next consider whether it is an indispensable party. Under Rule 19(b), if Qatar is an indispensable party, Plaintiffs' entire action must be dismissed. A party is indispensable if in "equity and good conscience," the court should not allow the action to proceed in its absence. Fed. R. Civ. P. 19(b); *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir. 1996). To make this determination, the Court must balance four factors: (1) the prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum. *See Kescoli*, 101 F.3d at 1310. The Ninth Circuit cautions that if no alternative forum exists, courts should be "extra cautious" before dismissing the suit. *Makah Indian Tribe*, 910 F.2d at 560.

If the necessary party enjoys sovereign immunity from suit, some courts have noted that there may be very little need for balancing Rule 19(b) factors because immunity itself may be viewed as "one of those interests 'compelling by themselves,'" which requires dismissing the suit. *Wichita & Affiliated Tribes v. Hodel*, 788 F.2d 765, 777 (D.C. Cir.1986) (*quoting* 3A James W. Moore et al., *Moore's Federal Practice* ¶ 19.15 (1984)); *see also Enterprise Mgmt. Consultants, Inc. v. United States*, 883 F.2d 890, 894 (10th Cir.1989). However, despite these out-of-circuit decisions, the Ninth Circuit has continued to apply the four part balancing test to determine whether a necessary party is also an indispensable party. *See Confederated Tribes*, 928 F.2d at 1499; *see also SourceOne Glob. Partners, LLC v. KGK Synergize, Inc.*, 2009 WL 1346250, at *4 (N.D. Ill. May 13, 2009) ("If the inability to join a sovereign as a party had the automatic effect of nullifying the suit against other private defendants, Rule 19 would be rendered superfluous in these cases. That is not the law") (*citing Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008)).

In this case, despite Qatar's argument to the contrary, it is difficult to see how Qatar or any of the remaining defendants would be prejudiced if this action proceeded without Qatar. The Court concludes that the types of "comity and dignity interests" that the Supreme Court held would make dismissal of an action under Rule 19(b) necessary – claims arising "from events of historical and political significance," the sovereign having " a unique interest in resolving the" claims, or a "comity interest in allowing a foreign state to use its own courts for a dispute if it has a right" – are not present in this action. *See Pimentel*, 553 U.S. at 866. In addition, any potential prejudice by Qatar's absence from this action can be lessened or avoided entirely by crafting injunctive relief that would affect only the remaining defendants, and not Qatar. *Jota v. Texaco, Inc.*, 157 F.3d 153, 160 (2d Cir. 1998) (reversing a district court's dismissal of Ecuadoran residents' suit against an American oil company on the basis that the participation of the Republic of Ecuador, the current owner and operator of oil drilling equipment, was necessary to afford plaintiffs the full scope of equitable relief they sought, because plaintiffs' claims against the American oil company could proceed even if equitable claims involving the Republic of Ecuador had been dismissed). Moreover, the Court is concerned that Plaintiffs would not have an adequate remedy if this action was dismissed because it is unlikely that an alternative forum would be available. *See, e.g. Jota*, 157 F.3d at 160 ("Though extreme cases might be imagined where a foreign sovereign's interests were so legitimately affronted by the conduct of litigation in a U.S. forum that dismissal is warranted without regard to the defendant's amenability to suit in an adequate foreign forum, this case presents no such circumstances").

### D.     Plaintiffs' Request to Amend Their First Amended Complaint and for Jurisdictional Discovery is Denied.

Where a motion to dismiss is granted, a district court must decide whether to grant leave to amend. Generally, the Ninth Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted. *See, e.g., DeSoto v. Yellow Freight System, Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). However, a Court does not need to grant leave to amend in cases where the Court determines that permitting a plaintiff to amend would be an exercise in futility. *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile"). "Leave to amend may be denied if a court determines that allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Abagninin v. AMVAC Chemical Corp.*, 545 F.3d 733, 742 (9th Cir. 2008) (quotations and citations omitted).

In this case, Plaintiffs have already had two opportunities to allege claims that would fall within an exception to the sovereign immunity provided by the FSIA and have failed to present "non-conclusory allegations that, if supplemented with additional information, will materially affect the court's analysis with regard to the applicability of the FSIA." *Crist v. Republic of Turkey*, 995 F. Supp. 5, 12 (D.D.C. 1998) (citation omitted). Although Plaintiffs have had any opportunity to conduct discovery, that discovery had failed to provide any evidence that might cure or change the Court's analysis that it lacks subject matter jurisdiction over Qatar. In addition, Plaintiffs have failed to identify with particularity how the additional discovery they would seek could cure the jurisdictional defects in the First Amended Complaint. *See Greenpeace,* 946 F. Supp. at 789.

Accordingly, Plaintiffs' request to amend their First Amended Complaint and to take jurisdictional discovery is denied.

## IV.    Conclusion

For all the foregoing reasons, Qatar's Motion is **GRANTED in part and DENIED in part**. Qatar's motion to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(2) is **GRANTED**, and Qatar is **DISMISSED** from this action without leave to amend.[8] Qatar's motion to dismiss the First Amended Complaint pursuant to Rule 19 is **DENIED**. Plaintiffs' request to amend their First Amended Complaint and to take jurisdictional discover is **DENIED**. In light of the Court's dismissal of Qatar from this action, Qatar's Motion to Stay Discovery Pending Resolution of Defendant State of Qatar's Motion to Dismiss is **DENIED as moot**.

IT IS SO ORDERED.

---

[8] Because the Court lacks subject matter jurisdiction, the Court also necessarily lacks of personal jurisdiction over Qatar. *See, e.g., Verlinden*, 461 U.S. at 489 & n. 5 (holding that the FSIA provides personal jurisdiction only if subject matter jurisdiction exists and service of process has been made in accordance with the Act).