**EXHIBIT A**

**REDACTED**

**BOIES SCHILLER FLEXNER LLP**
David K. Willingham (State Bar No. 198874)
  dwillingham@bsfllp.com
725 South Figueroa Street, Floor 31
Los Angeles, California 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

Lee S. Wolosky (*pro hac vice*)              Amy L. Neuhardt (*pro hac vice*)
  lwolosky@bsfllp.com                          aneuhardt@bsfllp.com
Robert J. Dwyer (*pro hac vice*)             1401 New York Avenue, NW
  rdwyer@bsfllp.com                          Washington, DC 20005-2102
575 Lexington Ave., Floor 7                  Phone:  (202) 237-2727
New York, NY 10022-6138                      Fax:  (202) 237-6131
Phone:  (212) 446-2300
Fax:  (212) 446-2350

*Counsel for Plaintiffs*
*[Additional counsel listed on signature page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY,<br><br>            Plaintiffs,<br><br>      v.<br><br>STATE OF QATAR, STONINGTON STRATEGIES LLC, NICOLAS D. MUZIN, GLOBAL RISK ADVISORS LLC, KEVIN CHALKER, DAVID MARK POWELL, MOHAMMED BIN HAMAD BIN KHALIFA AL THANI, AHMED AL-RUMAIHI, and DOES 1-10,<br><br>            Defendants. | Case No.  18-cv-02421-JFW<br><br>**JOINT STIPULATION PURSUANT TO LOCAL RULE 37-2 RE MOTION CHALLENGING DEFENDANT QATAR'S DESIGNATIONS OF MATERIAL UNDER THE PROTECTIVE ORDER**<br><br>**Magistrate Judge Charles Eick**<br><br>Discovery Cut-Off: March 1, 2019<br>Pretrial Conference Date: June 7, 2019<br>Trial Date: June 25, 2019 |

# Table of Contents

LOCAL RULE 37-1 MEET AND CONFER ................................................- 1 -

PLAINTIFFS' POSITION ...................................................................- 2 -

  A.  Statement of Facts.........................................................................- 2 -

  B.  Statement of Law ..........................................................................- 6 -

  C.  Plaintiffs' Challenges to Qatar's Designations...................................- 9 -

    1.  Emails to or from Mr. Muzin Containing Proposed Lobbying
        Strategy (Exs. 10-13 (PROD000000001-PROD000000019)).........- 9 -

    2.  WhatsApp Messages Amongst Nick Muzin, Joseph Allaham,
        Jamal Benomar, and Ahmed Al-Rumaihi (Ex. 14 (Prod00000024-
        25); Ex. 15 (PROD00000027); Ex. 16 (PROD00000051)) ...........- 13 -

    3.  Bank Records ███████████████
        ███████████ (Ex. 17 (PROD000000067 to PROD000000074))- 16 -

    4.  The Transcript Of The Deposition Of Joseph Allaham (Ex. 18) ...- 17 -

QATAR'S POSITION ........................................................................- 17 -

  A.  Any Action on Plaintiffs' Challenge Should be Held in Abeyance
      Given the Current Procedural Posture of the Case. ......................- 18 -

  B.  Plaintiffs' Purposes in Pursuing This Discovery Motion are
      Improper and Outside of the Scope of Rule 26.............................- 19 -

  C.  Qatar's Designations Are Proper Under the Protective Order. .......- 21 -

JOINT STATEMENT RE MOTION CHALLENGING QATAR'S DESIGNATIONS UNDER
THE PROTECTIVE ORDER

In accordance with Local Rule 37-2, the following is the Joint Stipulation of Plaintiffs Elliott Broidy and Broidy Capital Management LLC (together, "Plaintiffs") and Defendant State of Qatar ("Qatar") concerning Plaintiffs' challenge to designations made by the Qatar pursuant to the Court's Protective Order.

## LOCAL RULE 37-1 MEET AND CONFER

On September 6, 2018, Qatar, Kevin Chalker and Global Risk Advisors LLC (together, the "GRA Defendants"), and Stonington Strategies LLC and Nicolas D. Muzin (together, the "Stonington Defendants") separately designated certain materials produced by third-parties as Highly Confidential or Confidential pursuant to the Protective Order entered in this matter.  The designations made by Qatar on that date are attached as Ex. 1.  The Protective Order is attached as Ex. 2.  Plaintiffs objected to those designations on September 8, 2018.  (Ex. 3.)  Plaintiffs informed Defendants of their intention to challenge many of these designations, and the parties held a telephonic meet and confer on Wednesday, September 12, 2018 at 4:30 p.m. Eastern Daylight Time to discuss Plaintiffs' intention to challenge the designations made by Defendants pursuant to the Protective Order.  The day before that meet and confer, Qatar sent a letter clarifying its designations.  (Ex. 4.)

Lee Wolosky, Amy Neuhardt and Sam Kleiner of Boies Schiller Flexner LLP participated on behalf of Plaintiffs.  Jonathan Gimblett, William Phillips, Neema Sahni, and Rebecca Van Tassell of Covington & Burling LLP participated on behalf of Qatar.  Steve Obermeier and Matt Gardner of Wiley Rein LLP participated on behalf of the Stonington Defendants.  David Gringer of Wilmer Cutler Pickering Hale and Dorr LLP participated on behalf of the GRA Defendants.

During the meet and confer, Plaintiffs objected to all of Qatar's designations of materials as Confidential or Highly Confidential for the reasons set forth in Plaintiffs'

- 1 -

1  Position below.[1]

2       On September 13, 2018, Plaintiffs sent an additional written objection to Qatar

3  concerning the designations it made on September 11, 2018.  (Ex. 5.)  In response, on

4  September 14, 2018, Qatar withdrew the designation of one page as Confidential but

5  otherwise maintained all of its designations.  (Ex. 6.)

6  **PLAINTIFFS' POSITION**

7     **A.**    **Statement of Facts**

8       Sometime in late 2017, hackers began using sophisticated techniques to

9  infiltrate computer systems and accounts belonging to Plaintiffs, and certain of their

10  associates and family members.  (First Amended Complaint, "FAC" ¶¶ 97-116, ECF

11  No. 47.)  After breaching Plaintiffs' computer systems and accounts, the hackers

12  stole large volumes of confidential and proprietary information without Plaintiffs'

13  consent or knowledge.  (*Id.*)  The confidential information was then given to a

14  number of journalists from U.S. media organizations who wrote news stories based

15  on the information stolen from Plaintiffs' computers and accounts.  (*Id.* ¶¶ 117-26.)

16  Plaintiffs alleged that Qatar was responsible for the attack and that the Stonington

17  Defendants had acted in concert with Qatar.  (*Id.* ¶ 9.)  On August 8, 2018, this Court

18  dismissed Qatar as a defendant, holding that the Court did not have subject matter

19  jurisdiction under the Foreign Sovereign Immunities Act.  (ECF No. 198.)

20       On August 17, 2018, the Court entered a Protective Order in this matter.  (ECF

21

22  [1] Plaintiffs also objected during this meet and confer to designations made by the

23  GRA and Stonington Defendants.  The Stonington Defendants since have withdrawn

23  many of their designations and Plaintiffs have agreed not to challenge the remaining

24  designations at this time.  Plaintiffs also have decided not to challenge the

25  designations made by the GRA Defendants at this time.

26

27  - 2 -

28

*BOIES SCHILLER FLEXNER LLP*

No. 210, adopting ECF No. 185-1, which is attached as Ex. 7.)  The Protective Order states that "Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order."  (Ex. 2, G.1.) Plaintiffs challenge the designations purportedly made by Qatar on September 6, 2018, as modified on September 11, 2018.   (*See* Exs. 1 and 4.)

In the September 11, 2018 letter, Qatar designated thirty pages of documents of third-party discovery materials as Highly Confidential –Attorneys Eyes Only.  The documents designated involve communications among four individuals: Defendant Nicolas Muzin, Joseph Allaham, Jamal Benomar, and Ahmed Al-Rumaihi.  Dr. Muzin was the President of Defendant Stonington Strategies and a registered agent of Qatar.  Significantly, none of the other individuals with whom Mr. Muzin was communicating was a registered agent of Qatar, fatally undermining Qatar's core claim to a legitimate interest in the protection of these materials from disclosure.  Mr. Allaham is an associate of Dr. Muzin who, only after being compelled to produce documents and testify in this litigation, later registered as an agent of Qatar, in June 2018.  (*See* Ex. 8 (Joseph Allaham, Short Form FARA Registration, June 15, 2018).) Mr. Benomar is an associate of Mr. Allaham and Dr. Muzin, who left his position as a high-ranking United Nations official sometime in late 2017.  Plaintiffs understand that Mr. Benomar was employed by the United Nations for much of the period relevant to Qatar's purported designations.  Dr. Muzin and Messrs. Allaham and Benomar never have been members of the Qatari diplomatic mission.  Mr. Al-Rumaihi is a former Qatari diplomat, but, as Qatar has made clear in an official pronouncement, "Since March 2017, Mr. Al-Rumaihi has not represented the State of Qatar in official matters.  Nor is Qatar involved in any of his private business matters."  *See* "Statement from Qatar's Media Attache in Washington DC on Meeting

- 3 -

BOIES SCHILLER FLEXNER LLP

with President Trump's Transition Team," May 16, 2018, *available at* https://www.gco.gov.qa/en/2018/05/16/statement-from-qatars-media-attache-in-washington-dc-on-meeting-with-president-trumps-transition-team/, and attached as Ex. 9.

Qatar – which produced no documents in this case – purported to designate third-party discovery materials after it was dismissed from this litigation, notwithstanding the fact that the Protective Order makes clear that only "any **Party** to the action may designate [materials] as protected under" the Protective Order.  (Ex. 2, F.2) (emphasis added).  The documents Qatar purported to designate as Highly Confidential include:

- Emails from Dr. Muzin to Messrs. Allaham and Benomar ███████ ████████████████████████ ████████████████████████ ████ (Ex.10 (PROD00000001-3); Ex. 11 (PROD00000004-6); Ex. 12 (PROD0000007-9); Ex. 13 (PROD00000010-19));

- WhatsApp messages amongst Dr. Muzin and Messrs. Allaham, Benomar, and Al-Rumaihi discussing ████████ ████████████████████████ ████████████████████████ ████████ (Ex. 14 (Prod00000024-25); Ex. 15 (PROD00000027); Ex. 16 (PROD00000051);[2]  and

---

[2] Plaintiffs also objected to Qatar's designation of one page of WhatsApp messages as Confidential.  In its September 14, 2018 response, Qatar withdrew that designation.

1   • Bank records █████████████████████████████████
2   ███████████████████████████████████ (Ex.
3   17 (PROD00000067-74)).

4   Additionally, Qatar designated as Highly Confidential and Confidential portions of

5   the transcript of the deposition of Joseph Allaham.  (Ex. 18 (Transcript of the

6   Deposition of Joseph Allaham, "Highly Confidential" portions highlighted in red and

7   "Confidential" portions highlighted in yellow).)

8       This issue is not mooted by this Court's rulings on Defendants' motions to

9   dismiss.  To the contrary, Plaintiffs raise this issue precisely because the Court's

10  rulings that it lacks personal jurisdiction over the GRA and Stonington Defendants in

11  this case effectively requires Plaintiffs to consider filing new lawsuits against them in

12  other jurisdictions.  Qatar's improper designations serve no legitimate purpose, but

13  they do substantially interfere with Plaintiffs' counsel's ability to fully advise and

14  consult with their clients regarding the evidence in this case and the decision they

15  must make regarding continued litigation.  Furthermore, they potentially require

16  Plaintiffs to conduct duplicative discovery in parallel proceedings and to jump

17  through the cumbersome and expensive hoops required to file new complaints under

18  seal so that there can be no allegations that Plaintiffs' new complaints have somehow

19  violated this Court's Protective Order.  In addition, there currently is a case pending

20  in the Southern District of New York against Jamal Benomar alleging participation

21  by Mr. Benomar in the same conspiracy at issue here.  Plaintiffs need to be able to

22  use the materials they have obtained from discovery in this matter in prosecuting the

23  related action against Mr. Benomar and the anticipated actions against defendants in

24  other districts.  (*See* Ex. 2, D.1 (defining "Action" as "This pending federal lawsuit

25  and related actions").)

26

27

28

BOIES SCHILLER FLEXNER LLP

BOIES SCHILLER FLEXNER LLP

### B.     Statement of Law

The Protective Order entered by this Court provides the mechanism for designating materials as Highly Confidential.  Under the Protective Order, a Highly Confidential designation is proper only for information that is "(i) sensitive, non-public, financial, marketing, customer, regulatory, research, development, personal, or commercial information; (ii) information protected by the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular relations, to the extent such material is produced; or (iii) any other information relating to the conduct by Qatar of its foreign policy."  (Ex. 2, D.4.)   Although any party may designate materials as Confidential or Highly Confidential, the Protective Order prohibits designating an entire document as Confidential or Highly Confidential when only a portion of a document merits such a designation.  (*See id.* ("Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.  The Designating Party must designate for protection only those parts of material, documents, items or oral or written communications that qualify so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.").)

Additionally, the Highly Confidential designation renders materials "attorneys' eyes only," ("AEO"), whereby a party to this litigation may not have access to said materials unless he or she produced them.  (*Compare* Ex. 2, H.3 *with* H.4.)  Although the Protective Order includes potential categories of documents that may deserve AEO status, including those containing information protected by the Vienna Conventions or that relate to the conduct of Qatar's foreign policy, (*id.*, D.4), a

BOIES SCHILLER FLEXNER LLP

designating party must nonetheless meet the high burden of establishing the necessity of AEO status, even for documents falling within those categories.  Courts view the AEO designation as "a drastic remedy given its impact on the party entitled to the information, in that it prevents a party from reviewing documents with counsel, and can hamper the ability of the party to present his or her case." *Gillespie v. Charter Commc'ns*, 133 F. Supp. 3d 1195, 1201-02 (E.D. Mo. 2015) (internal citation omitted).  As a consequence, the AEO designation "should be reserved for only those rare instances in which it is truly justified . . . and there is no other effective alternative." *Ragland v. Blue Cross Blue Shield of N.D.*, No. 1:12–CV–080, 2013 WL 3776495, at *2 (D.N.D. June 25, 2013); *see also Global Material Techs., Inc. v. Dazheng Metal Fibre Co., Ltd.*, 133 F. Supp. 3d 1079, 1084 (N.D. Ill. 2015) ("The AEO designation must be used selectively because discovery and trial preparation are made significantly more difficult and expensive when an attorney cannot make a complete disclosure of relevant facts to a client and because it leaves the litigant in a difficult position to assess whether the arguments put forward on its behalf are meritorious.").  In order to justify an AEO designation, the designating party must show that "unrestricted disclosure to others would create a substantial risk of serious injury." *Scentsy, Inc. v. B.R. Chase, L.L.C.*, No. 1:11–cv–00249–BLW, 2012 WL 4523112, at *5 (D. Idaho Oct. 2, 2012); *see also id.* ("This standard is high.  It does not apply when there is *any* risk or *any* injury—the risk must be *substantial* and the injury must be *serious*.").  Moreover, there is no "basis to designate [communications] which contain . . . publicly available [information] … as highly confidential AEO." *Ubiquiti Networks, Inc. v. Kozumi USA Corp.,* No. 12-CV-2582 CW (JSC), 2012 WL 12964820, at *2 (N.D. Cal. Dec. 13, 2012); *Humphreys v. Regents of Univ. of Cal.*, No. C-04-03808 SI (EDL), 2006 WL 3020902, at *3 (N.D.

1  Cal. Oct. 23, 2006); *In re ULLICO Inc. Litig.*, 237 F.R.D. 314, 317 (D.D.C. 2006).

2      The Protective Order's definition of "Highly Confidential" includes

3  "information protected by the Vienna Convention on Diplomatic Relations or the

4  Vienna Convention on Consular Relations."  (Ex. 2, D.4.)  But that portion of the

5  definition is irrelevant to the documents at issue here.  The Vienna Conventions do

6  not extend diplomatic privileges to communications from or among individuals who

7  are not part of the diplomatic mission.  *See* Eileen Denza, *Diplomatic Law:*

8  *Commentary on the Vienna Convention on Diplomatic Relations* 189 (4th ed. 2016)

9  (quoting *Summary of Records of the 10th Session*, [1958] 1. Y.B. Int'l L. Comm'n

10  143, U/N. Doc. A/CN.4/SER.A/1958) ("The phrase 'official correspondence of the

11  mission' meant correspondence from the mission, that sent to the mission from its

12  chancellery or other authorities of the sending state, and the correspondence between

13  the mission and consulates situated in the receiving state."); *Shearson Lehman Bros*

14  *Inc. v. Maclaine, Watson and Co Ltd; Int'l Tin Council* (*Intervener*) (*No 2*) [1988] 1

15  All ER 116, 124-25 (Eng.) (records provided to third parties are not protected by the

16  Vienna Convention).  The inviolability of "official correspondence" within the

17  meaning of the Vienna Convention on Diplomatic Relations ("VCDR") "is not really

18  dealing with the correspondence between the mission and the outside world; it is

19  really dealing with internal correspondence [within a government]."  *Investigation*

20  *into Abductions of American Children to Saudi Arabia: Hearing Before the H.*

21  *Comm. on Govt. Reform*, 107th Cong. 1326 (2002) (statement of Professor Eileen

22  Denza).  The VCDR contains a circumscribed definition of those considered

23  members of a diplomatic mission.  *See* VCDR, Apr. 18, 1961, 23 U.S.T. 3227, art.

24  10(a) (notice of "the appointment of members of the mission [and] their arrival" must

25  be provided to the receiving State); art. 8(2) ("Members of the diplomatic staff of the

26

27                                      - 8 -                        Case No. 18-cv-02421-JFW

28

B O I E S   S C H I L L E R   F L E X N E R   L L P

mission may not be appointed from among persons having the nationality of the receiving State, except with the consent of that State which may be withdrawn at any time.").  Here, the documents that Qatar seeks to hide were created by, or exchanged among, persons not part of its diplomatic mission; the Vienna Conventions therefore do not apply.

In any challenge to a designation under the Protective Order, the "burden of persuasion" is on the "designating party" to support each designation.  (Ex. 2, G.4.)  "As a general rule, the public is permitted 'access to litigation documents and information produced during discovery.'"  *In re Roman Catholic Archbishop of Portland in Oregon,* 661 F.3d 417, 424 (9th Cir. 2011) (quoting *Phillips v. Gen. Motors Corp.,* 307 F.3d 1206, 1210 (9th Cir. 2002) and citing *San Jose Mercury News, Inc. v. U.S. Dist. Court,* 187 F.3d 1096, 1103 (9th Cir.1999) ("It is well-established that the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public.")).  And "conclusory representations" from a designating party "fall short of the showing required" to meet the assigned burden.  *Ubiquiti Networks, Inc.*, No. 12-CV-2582 CW (JSC), at *1.

### C.   Plaintiffs' Challenges to Qatar's Designations

Plaintiffs challenge the following designations made by Qatar:

### 1.   Emails to or from Mr. Muzin Containing Proposed Lobbying Strategy (Exs. 10-13 (PROD000000001-PROD000000019))

Qatar designated four emails written by Dr. Muzin as Highly Confidential. (Exs. 10-13.)  Dr. Muzin addressed these emails , dated September 10 and 18, 2017, to either Mr. Allaham or both Messrs. Allaham and Benomar.   Each email attached materials ███████████████████████████████████████

███████████████████████████████████████████

Designating these emails as Highly Confidential is inappropriate.  <u>First, Qatar fails to explain what legitimate interest would be harmed if these emails became fully public, much less what, if any, "substantial risk of serious injury" it faces from not affording them AEO protection.</u>  *See Scentsy, Inc.*, 2012 WL 4523112, at *5.  To justify an AEO designation, a designating party must show that there is "no effective alternative" other than precluding another party from viewing the designated documents.  *See Ragland*, 2013 WL 3776495, at *2.  Because Qatar fails to explain why disclosure of these emails presents any "substantial risk of serious injury," its designations should be rejected.

<u>Second, the emails do not warrant a Highly Confidential designation because they discuss publicly available information.</u>  Documents that are based on publicly available information cannot enjoy a Highly Confidential designation.  *See Ubiquiti Networks, Inc.,* 2012 WL 12964820, at *2; *Humphreys*, 2006 WL 3020902, at *3; *In re ULLICO Inc. Litig.*, 237 F.R.D. at 317.  On August 29, 2018, the *Wall Street Journal* reported that Qatar, via Dr. Muzin and Mr. Allaham, targeted 250 "influencers" who were close to President Trump in an effort to have President Trump side with Qatar against a blockade placed upon it by its neighbors.  Julie Bykowicz, "The New Lobbying: Qatar Targeted 250 Trump 'Influencers' to Change U.S. Policy," *Wall Street Journal*, August 29, 2018, *available at* https://www.wsj.com/articles/the-new-lobbying-qatar-targeted-250-trump-influencers-to-change-u-s-policy-1535554647, and attached as Ex. 19.  Based on interviews with Dr. Muzin and Mr. Allaham, the article stated that in late 2017 "[t]he

- 10 -

JOINT STATEMENT RE MOTION CHALLENGING QATAR'S DESIGNATIONS UNDER THE PROTECTIVE ORDER

Qataris agreed to their influencer-list proposal[.]" *Id.*  Similarly, Dr. Muzin and Mr. Allaham have provided extensive documentation of their lobbying campaign to the Department of Justice as required under the Foreign Agents Registration Act ("FARA").  (*See* Ex. 20 (Stonington Strategies, FARA Supplemental Statement, May 22, 2018); Ex. 21 (Lexington Strategies, FARA Registration Statement, June 15, 2018).)  Yet these publicly disclosed ██████████████████████████ ████████████████████████████████████  (*See* Ex. 10 at ███████████████████████████████████████ PROD000000002 ███████████████████████████████████████ ██████████████████████████████████Ex. 11 at PROD000000005 (same); Ex.12 at PROD000000008 (same); Ex.13 at PROD000000013 ██████████████████████████████████ ██████████████████████████████████ ████████    Because the information contained in the emails Qatar wishes to designate as Highly Confidential is now public and appears to have been in fact thrust into the public domain by Qatar itself, Qatar has no grounds for such a designation.

Third, because the emails are not protected by the Vienna Conventions, those conventions provide no basis for designating the emails as Highly Confidential.  As explained *supra*, Sec. B, the privileges offered by the Vienna Conventions do not extend to communications from or among individuals who are not part of a nation's diplomatic mission, much less to individuals pitching business to such a mission.  Dr. Muzin and Messrs. Allaham and Benomar are not now nor have they ever been members of the Qatari diplomatic mission and at the time they wrote the proposals they were not even Qatari agents.  Indeed, despite the requirement that Qatar provide notice to the United States of the appointment and arrival of the members of their diplomatic mission, *see* VCDR, art. 10(a), Qatar has never provided such notice for

- 11 -

Case No. 18-cv-02421-JFW

BOIES   SCHILLER   FLEXNER   LLP

the three men in question.

Dr. Muzin's authorship of the emails Qatar wishes to designate as Highly Confidential confirms that the Vienna Conventions do not protect those documents. Although the Vienna Conventions require that Qatar receive the approval of the United States before naming an American citizen to be a member of its diplomatic staff in the United States, VCDR, art. 8(2), Qatar has never requested, and the United States has never given, approval for Dr. Muzin, a U.S. citizen, to serve as a member of Qatar's diplomatic staff.  Stated simply, Qatar cannot assert that emails from an American lobbyist to his business associates implicate protections provided to Qatar under the Vienna Conventions.[3]

_____

[3] The law is clear that documents in the possession of a FARA agent will have to be disclosed and will not be protected from disclosure under the Vienna Conventions. Section 615 requires FARA agents to keep all "records with respect to all [their] activities" while they are "agent[s] of a foreign principal," and requires them to "open" them for inspection by "any official charged with the enforcement" of FARA. 22 U.S.C. § 615.  FARA is a "disclosure statute." *Attorney Gen. of U.S. v. Covington & Burling*, 411 F. Supp. 371, 373 (D.D.C. 1976). When lobbyists for a foreign state tried to argue that their documents were protected under the Vienna Conventions, the House of Representatives strongly refuted this position:

> Simply put, the Vienna Convention extends broad protections to diplomatic agents of a foreign government, as well as some more limited protections to foreign nationals who are employed by a diplomatic mission in other capacities, but it has no application to American citizens who choose to sell their services as public relations/lobbying mouthpieces for foreign interests. To the contrary, [FARA] makes clear that the activities of such "propagandists," including the documents they generate, send and receive in the course of those activities, are to be subject to the "spotlight of pitiless publicity" so that the American people may be fully informed of both the identity of the propagandists and the nature of the activities they undertake on behalf of their foreign masters.

JOINT STATEMENT RE MOTION CHALLENGING QATAR'S DESIGNATIONS UNDER
THE PROTECTIVE ORDER

BOIES  SCHILLER  FLEXNER  LLP

Finally, even if the Court finds that portions of the emails should enjoy a Highly Confidential designation, it should not allow Qatar to apply that designation to the entirety of those documents.  The Protective Order explicitly requires a designating party to "take care to limit any such designation to specific material that qualifies under the appropriate standards" and "designate for protection only those parts of material, documents, items or oral or written communications that qualify." (Ex. 2, F.1.)  Qatar has not even attempted to justify applying the Highly Confidential designation to the entirety of the emails rather than specific portions of them.  For example, there is no basis for designating as Highly Confidential the cover emails to which Dr. Muzin's lobbying proposals are attached.  Dr. Muzin sent those proposals as attachments to cursory emails that contain no confidential information.  (*See* Ex. 10 at PROD000000001; Ex. 11 at PROD000000004; Ex. 12 at PROD000000007; Ex. 13 at PROD000000010.)  Qatar's designation of those cover emails as Highly Confidential is the very sort of "mass" and "indiscriminate" designation the Protective Order prohibits.

### 2. WhatsApp Messages Amongst Nick Muzin, Joseph Allaham, Jamal Benomar, and Ahmed Al-Rumaihi (Ex. 14 (Prod00000024-25); Ex. 15 (PROD00000027); Ex. 16 (PROD00000051))

Qatar designated as Highly Confidential portions of WhatsApp messages amongst Dr. Muzin and Messrs. Allaham, Benomar, and Al-Rumaihi.  (Ex. 14 (Prod00000024-25); Ex. 15 (PROD00000027); Ex. 16 (PROD00000051).)  For the

Congressman Dan Burton to His Royal Highness Prince Bandar bin Sultan bin Abdulaziz, November 21, 2002, attached as Ex. 22.

Case No. 18-cv-02421-JFW

reasons explained below, the Court should reject Qatar's proposed designations.

First, as shown above, because Qatar fails to explain why disclosure of these WhatsApp messages presents any "substantial risk of serious injury," it cannot justify an AEO designation for the messages. *See Scentsy, Inc.*, 2012 WL 4523112, at *5. These WhatsApp messages do not involve any sensitive matters.  Mr. Allaham in fact states in a February message that ████████████████████████████████ ████  (Ex.14 at PROD000000024).  In another message, Mr. Allaham ████████ ████████████████████████████████████████████████████████ ████  (Ex. 14 at PROD000000024).  ████████████████████████████ ████████████████ cannot possibly implicate the protections Qatar seeks.

Second, the subject matter of the WhatsApp messages is already publicly available.  Documents that are based on publicly available information, such as the WhatsApp messages, cannot enjoy a Highly Confidential designation. *See Ubiquiti Networks, Inc.,* 2012 WL 12964820, at *2; *Humphreys*, 2006 WL 3020902, at *3; *In re ULLICO Inc. Litig.*, 237 F.R.D. at 317.  One WhatsApp message includes Mr. Allaham sending ████████████████████████████ to Mr. Benomar.  (Ex. 14 at PROD00000024-25.)  Another WhatsApp message includes Dr. Muzin sending ████████████████████ to Messrs. Allaham and Benomar.  (Ex. 16 at PROD00000051.)  Additionally, as explained *supra* Sec. C(1), both reports in the press and Dr. Muzin's and Mr. Allaham's own FARA disclosures revealed Dr. Muzin and Mr. Allaham's strategy of targeting "influencers" to help sway American foreign policy.  There is consequently no basis for designating as Highly Confidential WhatsApp messages in which Dr. Muzin and Messrs. Allaham and Benomar discuss ████████████.  (*See* Ex. 15 at PROD00000027; Ex. 16 at

Case No. 18-cv-02421-JFW

JOINT STATEMENT RE MOTION CHALLENGING QATAR'S DESIGNATIONS UNDER THE PROTECTIVE ORDER

BOIES SCHILLER FLEXNER LLP

1  PROD00000051.)

2       Third, the Vienna Conventions do not provide a basis for designating the

3  WhatsApp messages as Highly Confidential.  As explained *supra*, Sec. B, the

4  privileges offered by the Vienna Conventions do not extend to communications from

5  or among individuals who are not part of a nation's diplomatic mission.  Dr. Muzin

6  and Messrs. Allaham, Benomar, and Al-Rumaihi were not members of the Qatari

7  diplomatic mission at the time they sent the WhatsApp messages.  Dr. Muzin and

8  Messrs. Allaham and Benomar have never been members of the Qatari diplomatic

9  mission, *see* Sec. A, and Qatar confirmed publicly that Mr. Al-Rumaihi ceased being

10  a Qatari diplomat in March 2017.  *See* "Statement from Qatar's Media Attache in

11  Washington DC on Meeting with President Trump's Transition Team," May 16,

12  2018, *available at* https://www.gco.gov.qa/en/2018/05/16/statement-from-qatars-

13  media-attache-in-washington-dc-on-meeting-with-president-trumps-transition-team/,

14  and attached as Ex. 9.  Because all of the WhatsApp messages occurred well after

15  March 2017, the communications occurred at a time when *none* of the participants

16  was a member of the Qatari diplomatic mission.  (*See* Ex. 14 at PROD00000024-25;

17  Ex. 15 at PROD00000027; Ex. 16 at PROD00000051.)

18       Finally, Qatar again fails to explain why the Highly Confidential designation

19  should apply to the entirety of the WhatsApp messages.[4]  As the Protective Order

20  explicitly prohibits "mass" and "indiscriminate" designations, Qatar has an obligation

21  to limit its designations to only the necessary portions of a document.  (Ex. 2, F.1.)

22  Yet Qatar indiscriminately designated portions of the WhatsApp messages that

23

24  [4] Unlike the WhatsApp messages found at Exs. 14 and 16, Qatar has designated as

25  Highly Confidential only a portion of the WhatsApp messages found at Ex. 15.

26

27                                    - 15 -                     Case No. 18-cv-02421-JFW

clearly do not warrant Highly Confidential treatment.  For example, as mentioned above, several WhatsApp messages contain ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*See* Ex. 14 at PROD00000024-25; Ex.16 at PROD00000051.) Even if some portions of the WhatsApp messages deserve a Highly Confidential designation—and they do not for the reasons already stated—Qatar cannot justify such a designation for all portions of the messages.

### 3.  Bank Records Showing ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ **(Ex. 17 (PROD000000067 to PROD000000074))**

Qatar has designated as Highly Confidential bank records ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*See* Ex. 17 (PROD00000067-74).) The Court should reject that designation.

First, as explained *supra* Sec. C(1), because Qatar fails to explain why providing these bank records to both counsel for Plaintiffs and Plaintiffs themselves presents any "substantial risk of serious injury," it cannot justify an AEO designation for the messages.  *See Scentsy, Inc.*, 2012 WL 4523112, at *5.

Second, Mr. Allaham already publicly disclosed the payment and the amount thereof in his FARA disclosures.  (*See* Ex. 21 (Lexington Strategies, FARA Registration Statement, June 15, 2018).)  Because the information contained in the bank records is already publicly available, Qatar cannot designate those records as Highly Confidential.  *See Ubiquiti Networks, Inc.,* 2012 WL 12964820, at *2; *Humphreys*, 2006 WL 3020902, at *3; *In re ULLICO Inc. Litig.*, 237 F.R.D. at 317.

Third, the Vienna Conventions do not provide a basis for designating the bank records as Highly Confidential.  As explained *supra* Sec. B, the privileges offered by the Vienna Conventions do not extend to communications from or among individuals

BOIES SCHILLER FLEXNER LLP

who are not part of a nation's diplomatic mission.  Because the bank records only

deal with ███████████████████████████████████████████████████████████████

████████████████████████████████████████, *see* Sec. C(2), those payments did not

come from a member of the Qatari diplomatic mission.

### 4.  The Transcript Of The Deposition Of Joseph Allaham (Ex. 18)

Qatar has designated as Highly Confidential or Confidential significant

portions of the transcript of the deposition of Mr. Allaham.  (Ex. 18)  Qatar offers no

independent basis for these designations except that the deposition included

discussion of documents that Qatar has designated as Highly Confidential or

Confidential.  For the same reasons that the designations of those documents are

inappropriate, the corresponding designations of these portions of the transcript of the

deposition of Mr. Allaham are also inappropriate.

\* \* \* \* \*

This is a classic case of abuse of a Protective Order to hamper the other side

and to hide from public scrutiny documents that are embarrassing and inconvenient

for Qatar and the other Defendants but that do not contain trade secrets, personal

information, or other material of the sort appropriately kept confidential.  This Court

should, therefore, rule that the documents at issue are not even appropriately

designated Confidential, much less Highly Confidential.[5]

### QATAR'S POSITION

Having soundly lost this case in the Central District of California, Elliot

---

[5] As required by Local Rule 37-2, attached as Ex. 23 is a true and correct copy of the current case management order in this matter.

BOIES SCHILLER FLEXNER LLP

Broidy—a self-professed political enemy of Qatar—now proposes to waste the Court's time on a discovery dispute that serves no legitimate purpose and that is in fact a vehicle for continuing his ongoing campaign to denigrate Qatar in the public arena.

The Court should deny Plaintiffs' challenges to Qatar's confidentiality designations. *First*, countenancing Plaintiffs' motion at this juncture would be an unjustifiable waste of judicial resources, because the procedural posture of this case means there is no possibility of active litigation until after the appeal is decided. *Second*, Plaintiffs themselves admit that the information subject to Qatar's designations can have no bearing in this case, and therefore can only possibly be relevant in either the "court of public opinion" or in potential cases in other districts—an inappropriate use of the Court's discovery functions. *Third*, if the Court proceeds to consider this motion, it should affirm Qatar's confidentiality designations because they squarely comport with the definitions of "Confidential" and "Highly Confidential" in the Protective Order entered by this Court.

**A.     Any Action on Plaintiffs' Challenge Should be Held in Abeyance Given the Current Procedural Posture of the Case.**

This case is over.  All of the Defendants that have been served were dismissed by the Court for lack of jurisdiction.  **Dkts. 198, 209, 212**.  Thereafter, the Court strongly suggested that Plaintiffs should agree to voluntarily dismiss the Unserved Defendants, which they then did.  **Dkt. 223.**  The Court then entered an Order of Final Judgment.  **Dkt. 227.**  There is clearly no pending case in the Central District of California, and the *only* legitimate way for Plaintiffs to proceed is to appeal to the Ninth Circuit, which they have already done.  **Dkt. 221.**

As there is no active litigation in the district court, Plaintiffs' insistence on

Case No. 18-cv-02421-JFW

JOINT STATEMENT RE MOTION CHALLENGING QATAR'S DESIGNATIONS UNDER THE PROTECTIVE ORDER

B O I E S   S C H I L L E R   F L E X N E R   L L P

motions practice with regard to confidentiality designations is wholly inappropriate and a waste of judicial and party resources.  It is clear to all parties—including Plaintiffs—that the *only* situation in which disputes about confidentiality designations could *possibly* be relevant to this action is in the unlikely event that the Ninth Circuit reverses the Court's order dismissing Qatar, and remands the case for further proceedings.  Unless and until that time, Qatar respectfully submits that the Court should hold this and any other discovery-related motion in abeyance, as it can serve no purpose in furthering this case.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy and time and effort for itself, for counsel, and for litigants.").[6]

> ### B.   Plaintiffs' Purposes in Pursuing This Discovery Motion are Improper and Outside of the Scope of Rule 26.

The purpose of discovery—and by extension discovery-related motions—is to "facilitate orderly preparation for trial, not to educate or titillate the public."  *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982).  Plaintiffs have not even attempted to hide that their true agenda in filing this case and in aggressively serving over *eighty* subpoenas is to "titillate the public" by advancing a press campaign against Qatar, their admitted political adversary.  Recent articles in the national news could not make this more evident.  On the same day that the Court ordered Plaintiffs to dismiss the remaining unserved Defendants, **Dkt. 216**, effectively ending this case, the *New York Times* published an article detailing the purported results of an electronic data

---

[6] Importantly, the Court's inherent power to manage its docket toward the goal of judicial efficiency exists even if the Court retains jurisdiction over Protective Order matters throughout the course of the appeal.

1  subpoena return—information which the *Times* could only have received from a

2  party.  *See* David D. Kirkpatrick, *Hackers Went After a Now-Disgraced G.O.P.*

3  *Fundraiser.  Now He Is After Them*, Sept. 20, 2018, available at

4  https://www.nytimes.com/2018/09/20/world/middleeast/broidy-trump-hackers-

5  qatar.html, and attached as Ex. 24.  In that article, Plaintiffs' lead attorney, Lee

6  Wolosky, was quoted as stating that although Plaintiffs have lost the case before

7  Judge Walter, the subpoena response purportedly "establishes *in the court of public*

8  *opinion* what really happened."  *Id.* (emphasis added).

9      After saying one thing to the *Times*, Plaintiffs make an about face and here

10  complain to the Court that they need unfettered access to confidential discovery

11  materials in order to "consider filing new lawsuits" against other parties in other

12  jurisdictions.  *Supra* p. 5-6.  But the purpose of discovery is to prepare for trial in *this*

13  case, *not* hypothetical separate cases that Plaintiffs may or may not choose to file

14  against other parties in other districts.  "[D]iscovery, like all matters of procedure, has

15  ultimate and necessary boundaries."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S.

16  340, 351-52 & n.5 (1978).  And the Supreme Court has made clear that discovery is

17  outside of the necessary boundaries of Rule 26 when it is sought for the purpose of

18  "gather[ing] information for use in proceedings *other than the pending suit*."  *Id.*

19  (emphasis added).  The Court cannot "blind itself to the purpose" for which Plaintiffs

20  bring this discovery motion, which is clearly *not* "aimed at illuminating issues in the

21  case" before this Court.  *Id.* at 354.  "[I]t is not appropriate, and there is not good

22  cause," to pursue discovery in a case "solely to obtain information that will be used in

23  another lawsuit in a different venue."  *Nu Image, Inc. v. Does 1-23,322*, 799 F. Supp.

24  2d 34, 41-42 (D.D.C. 2011).

25      Plaintiffs parenthetically suggest that the suits they are considering filing

26

27                                          - 20 -                    Case No. 18-cv-02421-JFW

28  JOINT STATEMENT RE MOTION CHALLENGING QATAR'S DESIGNATIONS UNDER
    THE PROTECTIVE ORDER

BOIES  SCHILLER  FLEXNER  LLP

justify intruding on the time and resources of this Court because they are "related" cases and thus within the scope of the terms of the Protective Order. *See supra* p. 6. They are wrong. The phrase "related actions" in the Protective Order was clearly never intended to capture *all* cases Plaintiffs subjectively believe may be relevant, including those that have yet to be filed in other districts. In contrast to Plaintiffs' invented definition, the term "related case" is *actually* defined in the local rules: it applies where two or more civil cases "filed *in this District*" arise from closely-related factual circumstances. Local Rule 83-1.3.1 (emphasis added).[7] This excludes from the scope of the Protective Order Plaintiffs' pending suit in the Southern District of New York against Jamal Benomar, as well as any forthcoming suits they may file against the Stonington and GRA Defendants in other jurisdictions.

## C.   Qatar's Designations Are Proper Under the Protective Order.

If the Court *does* decide to wade into premature challenges raised by Plaintiffs notwithstanding these prudential considerations, it should find that Qatar's designations are entirely appropriate and consistent with the Protective Order entered

---

[7] Plaintiffs are already well-apprised of this local rule, as the docket sheet in this case prominently shows that there are two *actually* "Related Cases" associated with this matter. They are miscellaneous cases involving subpoena disputes. *See Broidy Capital Management LLC v. Allaham*, No. 2:18-mc-00095-JFW-E (C.D. Cal. 2018); *Sport Trinity LLC v. Broidy Capital Management LLC*, 2:18-mc-00105-JFW-E (C.D. Cal. 2018). In the miscellaneous case against Mr. Allaham, Plaintiffs themselves filed a "Notice of Related Case" pursuant to Local Rule 83-1.3, demonstrating their familiarity with this rule and the proper definition of "Related Case." Notice of Related Civil Cases, *Allaham*, No. 2:18-mc-00095-JFW-E (C.D. Cal. July 17, 2018), Dkt. 28. They have not filed any such notice with respect to the *Benomar* litigation in the SDNY, because it is outside of this district and therefore does not meet the definition of "Related Case."

Case No. 18-cv-02421-JFW

BOIES SCHILLER FLEXNER LLP

in this case.

    1.   <u>The Entered Protective Order Defines *All* Information Relating to Qatar's Foreign Policy as "Highly Confidential."</u>

Plaintiffs spend the bulk of their "Statement of Law" section haggling over the scope of the Vienna Convention, and the definition of "Highly Confidential" or "Attorneys Eyes Only," as such terms are used in other cases under different entered protective orders. *See supra* p. 7-9.  Much, if not all, of this line of argument is completely beside the point.[8]  The Protective Order that was entered by *this* Court, which adopted in full all of the terms of Qatar's proposed order after adversarial briefing, defines "Highly Confidential" as including any information that is "(i) sensitive, non-public, financial, marketing, customer, regulatory, research, development, personal, or commercial information; (ii) information protected by the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, to the extent such material is produced; *or (iii) any other information relating to the conduct by Qatar of its foreign policy.*"  (Ex. 2, D.4) (emphasis added).  In their stated position, Plaintiffs virtually ignore this third definition of "Highly Confidential," which is disjunctive from the other two definitions.  All of the material designated as Highly Confidential by Qatar is properly designated, because

---

[8] For instance, Plaintiffs spill much ink about the high bar for AEO designations, but their position makes clear that they *really* want the material to be wholly public so they can (1) use it in other lawsuits without needing to file under seal, and (2) disclose it to the press in aid of their smear campaign against Qatar.  Moreover, Plaintiffs' concern that filing under seal would require "cumbersome and expensive hoops" is overblown.  Filing under seal is commonplace in lawsuits involving sensitive matters, and it is the *least* Plaintiffs should have to do if they want to use discovery from this case to mount new lawsuits against dismissed defendants.

1   it is information "relating to the conduct by Qatar of its foreign policy," regardless of

2   whether it *also* meets the standards of the Vienna Convention or whether it is

3   equivalent to a corporate trade secret.  Plaintiffs cannot now relitigate whether that

4   definition should be included the Protective Order, having already had an

5   (unsuccessful) opportunity to do so.

6        Furthermore, Plaintiffs suggest that Qatar's designations under the Protective

7   Order were inappropriate as a *general* matter because Qatar was not a "party" at the

8   time the designations were due on September 6, 2018.  *Supra* p. 5.  That is nothing

9   more than an accident of timing.  At the time designations were due, there were *no*

10  served defendants remaining in this case because they all had been dismissed by the

11  Court.  Plaintiffs' suggestion that designations are therefore inappropriate would

12  mean that they get an evidentiary windfall whereby *no* defendant is able to designate

13  documents as confidential due to the fact that Plaintiffs *lost* their case before the

14  Court.  Such a perverse result is completely at odds with the intended effect of the

15  entered Protective Order, whereby the Court recognized that Qatar's important

16  foreign policy interests were at stake, and that documents relating to that information

17  should receive Highly Confidential treatment.  It is perfectly appropriate and wholly

18  consistent with the Protective Order that Qatar should be able to designate documents

19  implicating its diplomatic or foreign policy work.

20           2.   The Vienna Convention Protects Communications Relating to

21                Qatar's Diplomatic Mission, Regardless of Source.

22        In addition to the fact that the information designated by Qatar is Highly

23  Confidential because it relates to Qatar's conduct of its foreign policy, at least some

24  of that information is *also* protected by the Vienna Convention and is thus properly

25  designated.  Plaintiffs continue to incorrectly conflate registration under the FARA

26

27                        - 23 -                    Case No. 18-cv-02421-JFW

28

BOIES  SCHILLER  FLEXNER  LLP

1    statute with the bounds of the Vienna Convention, *supra* p. 4, when the Vienna

2    Convention explicitly states that information is inviolable "at all times and *wherever*

3    *they may be*," *regardless* of whether the custodian of information is a formal member

4    of the diplomatic mission or not.  Vienna Convention on Diplomatic Relations, art.

5    24, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95 (emphasis added).  There are no

6    exceptions to this inviolability.  *767 Third Ave. Assocs. v. Permanent Mission of*

7    *Republic of Zaire to United Nations*, 988 F.2d 295, 300 (2d Cir. 1993); *Ewald v.*

8    *Royal Norwegian Embassy*, No. 11:-CV-2116 SRN/SER, 2011 WL 6094600, at *5

9    (D. Minn. Nov. 20, 2013).

10       Plaintiffs rely on *Shearson Lehman Bros Inc. v. Maclain, Watson & Co. Ltd;*

11   *International Tin Council (Intervener) (No 2)* [1988] 1 All ER 116, 124-25 (Eng.) to

12   broadly state that no diplomatic material can be protected if it was sent to "third

13   parties."  This foreign court citation is overstated, non-binding, and inapplicable.

14   The subject matter of the discussion and material designated by Qatar explicitly relate

15   to the work of Qatar's diplomatic mission, and involve FARA-registered Qatari

16   agents, their subagents and contractors, and others that were working for or with

17   Qatar to advance Qatar's diplomatic objectives.  Nothing in the Vienna Convention

18   provides any limitations based on whether a particular individual was formally

19   registered as a "diplomat" under the Vienna Convention or as an agent under the

20   FARA statute.[9]

21   ─────────────────

22   [9] Plaintiffs inappropriately assert that FARA itself strips the Vienna Convention's document protections of all meaning.  *Supra* p. 11 & n.3.  Although FARA allows the

23   *Attorney General*, in very limited circumstances, to inspect the books and records of a FARA agent, this inspection right does not extend to private plaintiffs in civil

24   litigation.  *Attorney General v. Covington & Burling*, 442 F. Supp. 371, 373 (D.D.C.

25   1976).  And FARA *certainly* does not support the claim that if such documents *are*

26

28

1    In fact, the State Department has submitted this exact position to Congress.  It

2  specifically stated that the *Shearson* case from the United Kingdom does not apply

3  where a foreign government hires or works with local individuals to pursue its

4  diplomatic work.[10]  The State Department explicitly said that if the courts of another

5  country tried to seek similar information from *its* local contractors abroad, the United

6  States would "object strongly" and would "argue that the information is protected

7  under the Vienna Convention."  *Id.*

8

9

10 _____

11 produced, they cannot be properly designated as Highly Confidential under the terms
   of a duly-entered Protective Order.  In discussing the limited access available to the

12 Attorney General, the district court in *Covington & Burling* noted that it was "very

13 unlikely" such an inspection would ever result in "public disclosure of confidential
   conversations" of a FARA registrant, suggesting that even under the special auspices

14 of the Attorney General, such material should never in the normal course enter the
   public record.  *Id.*  Much of the information designated as Highly Confidential by

15 Qatar is just such material—communications and files of Qatar's registered agent,

16 Defendant Muzin, directly related to his work for Qatar.  *See* Ex.10 PROD00000001-
   3); Ex. 11 (PROD00000004-6); Ex. 12 (PROD0000007-9); Ex. 13 (PROD00000010-

17 19); (Ex. 14 (Prod00000024-25); Ex. 15 (PROD00000027); Ex. 16

18 (PROD00000051).

19 [10] *Investigation into Abductions of American Children to Saudi Arabia Before the
   House Comm. on Gov't Reform*, Serial No. 107-83 at 1467, 107th Cong. (2002),

20 attached as Ex. 25.  Plaintiffs cite to a statement by a professor and an individual

21 congressman in this same hearing to support their alternate contention.  *Supra* p. 12
   & n.3.  But the State Department's interpretation of the Vienna Convention, unlike

22 the interpretations of an academic and a single lawmaker, is actually entitled to legal

23 deference.  *United States v. Jimenez-Nava*, 243 F.3d 192, 197 (5th Cir. 2001) (the
   State Department's interpretation of the Vienna Convention "is entitled to substantial

24 deference").  *See also United States v. De la Pava*, 268 F.3d 157, 164 n. 6 (2d Cir.

25 2001); *United States v. Al-Hamdi*, 356 F.3d 564, 570 (4th Cir. 2004).

26

27                                    - 25 -                     Case No. 18-cv-02421-JFW

28

BOIES  SCHILLER  FLEXNER  LLP

3. <u>Qatar's Confidentiality Designations are Proper and Should Be Upheld.</u>

        (1)    Emails from Defendant Muzin Containing Qatari Diplomatic Strategy Plan (Exs. 1-4 (PROD000000001-PROD000000019))

The emails to and from Defendant Muzin, ███████████████ ██████ a proposed strategy plan for his diplomatic work on behalf of Qatar, are properly designated as Highly Confidential.

*First*, they clearly fall within the third definition of "Highly Confidential" in the entered Protective Order, which Plaintiffs essentially ignore. These documents, which Plaintiffs themselves describe as ████████████████████████ ████████████, by definition contain "information relating to the conduct by Qatar of its foreign policy." Ex. 2, D.4(iii). Thus, the Court has *already ruled* that without Highly Confidential protection, Qatar would suffer specific, irreparable harm from their public disclosure. Plaintiffs' ongoing press campaign in the *New York Times* and other publications, which specifically utilizes discovery material from this case, itself demonstrates that if the Court releases these documents for public disclosure, they will be featured in in the national press within days by the Plaintiffs, for the express purpose of attempting to damage Qatar's reputation in the United States. Where Plaintiffs' stated objective is to bring irreparable damage to Qatar's reputation via these documents, it cannot reasonably be *Qatar's* burden to explain exactly how Plaintiffs' intend to twist these documents in the public record to achieve their goal.

*Second*, Plaintiffs incorrectly state that the documents are already public information. Although the general concept of coordinating meetings with leaders in

Case No. 18-cv-02421-JFW

BOIES SCHILLER FLEXNER LLP

the Jewish community has been reported in public sources, the underlying communications ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ are *not* in the public record, and should be protected under the plain terms of the entered Protective Order.  The fact that a general *topic* is public knowledge sheds no light on whether otherwise-confidential documents about that topic may be properly designated.[11]

Moreover, assuming for the sake of argument that these materials *were* coextensive with material in the public record, Plaintiffs' argument would be even less coherent.  Indeed, Plaintiffs' position on this score is completely inconsistent with their counsel's simultaneous argument that Qatar's Highly Confidential designations "substantially interfere" with their ability to "advise and consult with their clients regarding . . . the decision they must make regarding continued litigation."  *Supra* p. 5.  According to Plaintiffs, they *already* have this information at their disposal via public sources.[12]

*Third*, these documents are covered by the Vienna Convention because they constitute drafts of inviolable correspondence with the diplomatic mission of Qatar

---

[11] This basic logical concept is fundamental to all privilege or confidentiality law. For example, the fact of Plaintiffs' filing of the Complaint in this case is public information, but Plaintiffs would certainly never argue that the underlying communications between client and counsel about the Complaint were not subject to the attorney-client privilege.

[12] Even if the Court were to conclude that Plaintiffs need the information to not be "Highly Confidential" so that they can consult with their client, that is no reason to fully downgrade them to being public documents.  At the *very* least, they should retain a Confidential designation if not Highly Confidential.

Case No. 18-cv-02421-JFW

BOIES SCHILLER FLEXNER LLP

and relating to Qatar's diplomatic mission with the United States.  As discussed above, *supra* p. 27, nothing in the Vienna Convention requires that the author of the correspondence himself be a member of a diplomatic mission, or that those working for or with Qatar on its foreign policy be formally recognized as diplomats.  This provides an independent basis for Highly Confidential designation, separate and apart from the fact that the documents, in their entirety,[13] clearly relate to Qatar's foreign policy.

> (2)   WhatsApp Messages Amongst Nick Muzin, Joseph Allaham, Jamal Benomar, and Ahmed Al-Rumaihi (Ex. 14 (PROD00000024-25); Ex. 15 (PROD00000027); Ex. 16 (PROD00000051))

The WhatsApp messages among Defendant Muzin, Joseph Allaham, Jamal Benomar, and Ahmed Al-Rumaihi are properly designated as Highly Confidential because they are private messages between individuals working for, on behalf of, or with Qatar on matters related to foreign policy, and the messages relate to the conduct by Qatar of its foreign policy.  (Ex. 2, D.4(iii)).  Again, Plaintiffs seek this information *solely* for the improper purpose of doing as much damage to Qatar's

---

[13] Plaintiffs' final objection that Qatar should have only designated some portion of these documents is facially absurd.  *Supra* p. 12.  The whole of each iteration of the document constitutes diplomatic correspondence under the Vienna Convention, and its focal topic is Qatar's foreign policy efforts in the United States.  The fact that Qatar did not designate only portions of these documents, standing alone, does not and cannot mean that Qatar's designation was improper; it simply means that the documents in question do not lend themselves to partial designation.  As is evident in Qatar's other designations, it reviewed the discovery material at issue carefully and made line-by-line designations, rendering spurious Plaintiffs' contention that Qatar's designations are "indiscriminate."

BOIES   SCHILLER   FLEXNER   LLP

1   reputation as possible.  Thus, any public disclosure, or disclosure to Elliott Broidy,

2   who himself admits he is a political enemy of Qatar, would lead to irreparable harm.

3   Again, the Court has already acknowledged these tangible harms in ruling that any

4   information relating to Qatar's foreign policy work is protectable as Highly

5   Confidential.

6         The fact that the individuals communicating in these messages are not

7   "members of the Qatari diplomatic mission" is of no consequence, either for

8   designation under the Vienna Convention or the third definition in the Protective

9   Order.  As explained above, the Vienna Convention applies regardless of whether the

10  custodian or recipient of documents is an official member of the Qatari diplomatic

11  mission; all that is required is that the correspondence be related to the purposes of

12  the diplomatic mission.  And the inclusion within the Protective Order's definition of

13  Highly Confidential information of all documents "relating to the conduct by Qatar

14  of its foreign policy" also contains no such limiting requirement.

15        In addition, Plaintiffs' current position that these individuals were wholly

16  unrelated to Qatar's diplomatic or foreign policy work is flatly inconsistent with their

17  own allegations in this lawsuit.  All parties agree that Defendant Muzin was a duly-

18  registered agent of Qatar, and Joseph Allaham worked with him as a subcontractor

19  for and on behalf of Qatar, later filing his own FARA statement for that work.  In

20  their First Amended Complaint, Plaintiffs allege that Ahmed Al-Rumaihi worked "on

21  behalf of and with the knowledge of and agreement to by Defendant State of Qatar"

22  with regard to its foreign policy objectives in the United States.  FAC, ¶ 4.  And in

23  their lawsuit against Jamal Benomar, they explicitly allege that he has worked to

24  "serve the interests of Qatar." *Broidy Capital Management LLC v. Benomar*, No. 18-

25  CV-6615 (S.D.N.Y. July 23, 2018), Dkt. 1.

26

27                              - 29 -                    Case No. 18-cv-02421-JFW

28

BOIES SCHILLER FLEXNER LLP

The WhatsApp communications among these individuals that Qatar has designated are *only* those in which the individuals discuss their foreign policy work on behalf of Qatar, ███████████████████████████████████ ████████████████ (Ex. 14 at PROD00000024-25.)  As explained, *supra* p. 28, all underlying communications about ██████████████████ ██████████████████████████████████████ is properly designated as Highly Confidential, as it is correspondence relating to Defendant Muzin and Mr. Allaham's diplomatic and foreign policy work on behalf of Qatar, *notwithstanding* the fact that the general concept of that strategy is available in the public domain.

> (3)    Bank Records Showing Payment from Ahmed Al-Rumaihi to Joseph Allaham (Ex. 17 (PROD000000067 to PROD000000074))

Qatar has also properly designated as Highly Confidential bank records ████████████████████████████████████ ██████████████████████████ (*See* Ex. 17 (PROD00000067-74)).  Although the fact of the payment has been publicly disclosed by Mr. Allaham in his FARA registration statement, all other details about the payment that are included in this document, ███████████████████ █████████████████████████████████████ ████████ are *not* in the public record.  All of these details relate to payment to Mr. Allaham related to his work on behalf of Qatar, and thus "relat[e] to the conduct by Qatar of its foreign policy."  (Ex. 2, D.4(iii)).

> (4)    Portions of the Transcript of Joseph Allaham (Ex. 18).

The portions of the deposition of Joseph Allaham that Qatar has designated as

- 30 -

JOINT STATEMENT RE MOTION CHALLENGING QATAR'S DESIGNATIONS UNDER THE PROTECTIVE ORDER

1  either Confidential or Highly Confidential are properly designated as such because

2  each instance of redaction is testimony that relates to, discusses, or transmits

3  information relating to Allaham's work on behalf of Qatar, or communications with

4  Qatari officials, agents, or associates.  These portions of the deposition transcript are

5  therefore properly designated because they "relat[e] to the conduct by Qatar of its

6  foreign policy."  (Ex. 2, D.4(iii)).

7                                     *         *         *

8          Contrary to Plaintiffs' bold statement, this is not a classic case of abuse of a

9  Protective Order.  It is a classic case of abuse of the legal discovery process.

10  Plaintiffs' *only* agenda is to press a political vendetta that Plaintiffs wish to play out

11  in the "court of public opinion," *not* to pursue any legitimate pending case—of which

12  there are none in this district.  The Court should continue to protect Qatar's interests

13  as an improperly-sued foreign sovereign, and confirm that the designated information

14  relates to Qatar's diplomatic mission and foreign policy, and is thus properly

15  protected from disclosure.

16

17                                          Respectfully Submitted,

18  Dated:  October 1, 2018            **BOIES SCHILLER FLEXNER LLP**

19                                          By:   *Lee S. Wolosky*

20                                          Lee S. Wolosky (*pro hac vice*)
                                            Email:  lwolosky@bsfllp.com

21                                          575 Lexington Ave., 7th Floor

22                                          New York, NY 10022
                                            Telephone: +1 212-446-2300

23                                          Facsimile: + 1 212-446-2350

24

25                                          *Attorneys for Plaintiffs*

26

27                              - 31 -                    Case No. 18-cv-02421-JFW

28

BOIES SCHILLER FLEXNER LLP

Dated:  October 1, 2018

COVINGTON AND BURLING LLP

By:   *Mitchell A. Kamin*

Mitchell A. Kamin
Email:  mkamin@cov.com
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: + 1 424-332-4800
Facsimile: + 1 424-332-4749

*Attorneys for Defendant State of Qatar*

Case No. 18-cv-02421-JFW
JOINT STATEMENT RE MOTION CHALLENGING QATAR'S DESIGNATIONS UNDER THE PROTECTIVE ORDER

# SIGNATURE CERTIFICATION

Pursuant to L.R. 5-4.3.4(a)(2)(i), I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized this filing.

Dated:  October 1, 2018      **BOIES SCHILLER FLEXNER LLP**

By:    */s/ Lee S. Wolosky*

Lee S. Wolosky

*Counsel for Plaintiffs*

JOINT STATEMENT RE MOTION CHALLENGING QATAR'S DESIGNATIONS UNDER THE PROTECTIVE ORDER