# Exhibit R

181010broidyC                    Conference


1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ----------------------------x

3    BROIDY CAPITAL MANAGEMENT,
     LLC, et al.,
4
                    Plaintiffs,
5
            v.                              18 CV 6615 CS
6
     JAMAL BENOMAR,
7
                    Defendant.
8
     ----------------------------x
9                                     United States Courthouse
                                      White Plains, N.Y.
10                                    October 10, 2018
                                      4:05 p.m.
11
     Before:
12
                    THE HONORABLE CATHY SEIBEL,
13
                                             District Judge
14
                            APPEARANCES
15
     BOIES SCHILLER & FLEXNER, LLP
16        Attorneys for Plaintiffs Broidy Capital Mgmt., LLC, et al.
     SAM KLEINER
17   JOSHUA LIBLING
     ROBERT DWYER
18   LEE WOLOSKY

19   WINSTON & STRAWN, LLP
          Attorneys for Defendant Jamal Benomar
20   ABBE LOWELL
     ERIC BLOOM
21

22

23

24

25

181010broidyC                    Conference

1              (In open court; case called)

2              THE COURT:  I have Mr. Kleiner.

3              MR. KLEINER:  Present.

4              THE COURT:  Mr. Libling in the back.

5              MR. LIBLING:  Good afternoon, your Honor.

6              THE COURT:  Mr. Dwyer.

7              MR. DWYER:  Good afternoon.

8              THE COURT:  That leaves Mr. Wolosky on the plaintiffs'

9  side.  Good afternoon.

10             MR. WOLOSKY:  Good afternoon, your Honor.

11             THE COURT:  And Mr. Lowell.

12             MR. LOWELL:  Good afternoon, your Honor.

13             THE COURT:  Good afternoon.

14             And Mr. Bloom.

15             MR. BLOOM:  Good afternoon, your Honor.

16             THE COURT:  I have lots of letters.  I have

17  Mr. Lowell's September 28th letter about the motion to

18  dismiss he would like to make, and Mr. Wolosky's October 4th

19  response.  And I have Mr. Lowell's September 28th letter

20  about the motion to stay discovery he would like to make, and I

21  have Mr. Wolosky's October 4 response to that.

22             As far as the 12(b)(6) motion goes -- well, it would

23  be 12(b)(1) and 12(b)(6).  What I do in every case when there's

24  a 12(b)(6) motion that somebody wants to make, I always let the

25  plaintiff amend if the plaintiff wants to.

181010broidyC                    Conference

1        Now that the pre-motion letter has flagged what the

2   defendant sees as the issues, so, I don't see any reason why I

3   wouldn't do that here.

4        To the extent the motion is going to be made on

5   immunity issues, that I can go outside the complaint, you don't

6   need to amend, but you can put anything you want in the

7   complaint on that.  Let me just ask some questions on that

8   point.  And I have not delved very deeply into this issue

9   because you're going to brief it for me, but it seems like,

10  from your letters, and you'll correct me if I'm wrong, that

11  there's a difference between being a diplomat and being on the

12  mission staff of -- on the staff of a mission.

13       Which is it, Mr. Lowell, that your client is?

14       MR. LOWELL:  Your Honor, our client fits into the

15  category of being a full-blown diplomat for purposes of full

16  status immunity, as opposed to being at a category for which

17  the only immunity would depend on whether his actions were as

18  part of his duties.

19       THE COURT:  That's what I was wondering about.  So

20  your position is that he's a full-blown diplomat, and if he

21  wasn't, either at the time of the acts alleged or at the time

22  the lawsuit was filed, does he still get to take advantage of

23  diplomatic immunity if he's a diplomat at the time you make the

24  motion?

25       MR. LOWELL:  Your Honor, because of the purpose of the

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

181010broidyC                    Conference

1    Vienna Convention and the United States statute that codifies

2    it, when a person is a diplomat for purposes of status

3    immunity, as the case law in the Second Circuit indicates and I

4    think we provided it and certainly it would be part of the

5    briefing, it doesn't matter whether or not the individual had

6    acknowledged diplomatic status at the point at which a

7    complaint was filed or at the point at which the conduct

8    alleged in the complaint occurred.

9            THE COURT:  Really?

10           MR. LOWELL:  Yes, ma'am.

11           THE COURT:  That just doesn't seem right, because if,

12   let's say I go out and shoot someone, and then when the police

13   are closing in, my country could protect me by declaring I'm a

14   diplomat?

15           MR. LOWELL:  Indeed.  Not only can it, it does it all

16   of the time.  Remember, Judge, the reason for that is not

17   because it provides protection to the human being or the

18   individual.  It has to do with comity between states and the

19   sanctity of not having that individual's country be involved in

20   litigation.

21           And all you need to do is look at even a more

22   egregious example of what you said, which is, I can never say

23   it right, and I think we may raise it in our paper, it's the

24   *Kobrajati* (ph.) case, which is a criminal case in which, if you

25   think about the order, the order of events were on December of

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

181010broidyC          Conference

1   2013, the individual was arrested; in January, that individual

2   ended up being indicted; and thereafter, the person asserted

3   and was shown to have gotten status diplomatic immunity.  And

4   even on that point, the case ended up having to be dismissed

5   because of the status action.  It doesn't matter because it's

6   not immunity based on an individual.  It's status.  You cannot

7   bring a suit against a diplomat with immunity for acts that

8   occurred, even at an earlier point.

9        Now I should point out to you that when a comes to

10  Mr. Benomar's status, from the moment he left the United

11  Nations and beforehand, he was serving as a diplomat from the

12  country that has his diplomatic status and had his diplomatic

13  passport, for example, since back to 2016, and got his

14  diplomatic visa from the United States before.

15       But however, to answer squarely the question the Court

16  has posed, there's not a case anywhere that stands for the

17  proposition that if a diplomat has status immunity, that

18  immunity had to have both been asserted and recognized and

19  acknowledged and notarized at the time of the events or at a

20  time the case is brought.  Quite the opposite, all the case law

21  is, when you get it, you get it, and the case is over.

22       THE COURT:  Anything you want to say?

23       MR. WOLOSKY:  Sure.  Thank you, your Honor.  Just a

24  few points.

25       First is, that it's not sufficient to be a diplomat in

181010broidyC                    Conference

1   Morocco, which I take it is the claim here, even if you were in

2   early 2018, which is when the acts complained of in this

3   complaint took place.  You also need to be accepted by the

4   United States and accredited by the United States, and that

5   simply hasn't happened here.

6           When you do that -- and that's required by statute,

7   that's required by the international organization's immunity

8   act.  You have to be notified and accepted by the United

9   States.  When you do that, the State Department gives you an

10  identity card, which is used for precisely the purposes

11  relevant here: law enforcement and judicial purposes.

12          THE COURT:  So he doesn't have that card yet?  We

13  could go on with this case and a year from now, be ready for

14  trial, and then if they give him the card then, we have to go

15  home?

16          MR. WOLOSKY:  Certainly, we would not take that

17  position, and we can't predict the future.  My point goes to

18  what does he have now, if anything?  He's not been accepted and

19  recognized by the United States to the best of our knowledge

20  based on our inquiries.  There's been nothing that's been

21  produced in this case that affirms his diplomatic status as

22  recognized by the United States; therefore, he doesn't have

23  immunity.

24          His position, as articulated by counsel, is contrary

25  to the public record.  I have in my hand a listing.  This is

181010broidyC          Conference

1  the official U.N. listing, the blue book referred to in our

2  letter, of diplomats that are posted to the Moroccan Mission to

3  the United Nations.  It was printed out this morning.  It has a

4  lot of diplomats on it.  Mr. Benomar is not there.  He's not

5  there.

6         Where I'm heading in terms of -- and what we're

7  seeking out of this conference, your Honor, is, first, we would

8  like to get this case on track.  We'd like a date for filing

9  the amended complaint.  We'd like a date for a Rule 16

10 scheduling conference, which, under Rule 16, should occur

11 October 31st.  We'd like to move --

12        THE COURT:  Unless I decide to stay discovery.

13        MR. WOLOSKY:  I'm sorry?

14        THE COURT:  Unless I decide to stay discovery pending

15 resolution of the motions.

16        MR. WOLOSKY:  Yes, correct, your Honor.  Of course.

17 Our view on that would be that that issue needs to be

18 appropriately briefed, and there's nothing in the federal rules

19 that abrogates the federal rules in the event that your Honor

20 invites a motion to stay discovery.  Obviously, we don't think

21 they meet the legal standard, but what we're talking about is

22 the normal operation of the federal rules for a case that was

23 filed in July.

24        Additionally, we think because of these statements or

25 assertions of diplomatic status immunity, or any type of

1    diplomatic immunity, it's a little bit unclear from the letter

2    – now it's clarified what immunity status is sought – we think

3    jurisdictional discovery of this status right away is

4    necessary.  That is routinely done, including in the cases

5    cited by counsel, the *Moriah* case where someone comes to court

6    and says I'm a diplomat.  In that case, it was an advisor to

7    the Prime Minister of Israel.  I'm immune.  In that case, there

8    was actually a sworn declaration that supported the witness'

9    assertions.  Judge Scheindlin nonetheless ordered discovery.

10   And after that discovery, jurisdictional discovery took place,

11   she issued the ruling that the individual was, in fact, immune.

12   So that's what we're looking for.

13          We're looking for jurisdictional discovery about these

14   assertions that are contrary to the public record.  And we're

15   looking to have this case move forward in the routine manner

16   that's contemplated by the federal rules, subject, of course,

17   to a future motion to stay if your Honor permits that.

18          MR. LOWELL:  May I address those points, just very

19   briefly.

20          THE COURT:  Yes.

21          MR. LOWELL:  The reason why the Court should invite –

22   and I think you already have, I hope – the kind of briefing

23   that would elucidate what you're asking me and what counsel for

24   Mr. Broidy just said, is because he didn't tell you what you

25   need to know to know that what he just told you is wrong.

181010broidyC                Conference

1          As an example, he just said to the Court that some

2     status that the United States hasn't yet given Mr. Benomar or

3     acknowledged is dispositive.  That's just simply not the case.

4          Article 39 of the Vienna Conference, which we will

5     show you or you can find out yourself, could not be clearer

6     that it says, Every person entitled to privileges and

7     immunities shall enjoy them, quote, "from the moment he enters

8     the territory, if already in the territory, from the moment

9     when his appointment is notified to the Ministry of Foreign

10    Affairs of the country involved."  Our brief, our memo, and our

11    exhibits will show you that that notification to the United

12    States has occurred for him to have full diplomatic immunity at

13    the moment the notification occurred.  That's what the Vienna

14    Conference indicates as the triggering moment.

15         Second, Mr. Wolosky is good at citing a case but has

16    just jumbled two important different pieces of legal precedent.

17    The *Moriah* case, which he should know very well since he was

18    questioned in that case, is not a case in which the individual

19    was asserting status diplomatic immunity.  Instead, that person

20    was indicating he got derivative agent -- foreign sovereign

21    immunity, agency immunity.  And because that person was seeking

22    foreign sovereign immunity agency derivative, there were five

23    questions the Court allowed in an interrogatory to determine

24    whether the person acted in the function of an agent.  And what

25    he just did is jumbled.

181010broidyC                    Conference

1        There is status immunity as a diplomat; there is

2   diplomatic functional immunity; and there is something else

3   called derivative agency.  Those are not the same.

4        He cites the *Moriah* case for something that I have not

5   indicated is the one that dictates what happens.  Now because

6   of that, two things.  Thing one:  He can amend his complaint

7   today, next week, and 60 times in the remainder of this year,

8   and the 12(b)(1) issue of his having status immunity needs to

9   come first, because it's a meaningless effort to have him do

10  better at alleging anything under 12(b)(6) if it doesn't matter

11  because no amendment will occur that will fix it.  That being

12  the case, the Court should entertain the 12(b)(1) motion before

13  we get to 12(b)(6).

14        Second, the discovery issue, of course he's chomping

15  at the bit.  Mr. Broidy has found any place and every place he

16  possibly can to seek discovery.  As we indicate in our letter,

17  even though the case was not going anywhere in California

18  before it was dismissed, I think there were some 80-some-odd

19  subpoenas and I don't know how many other discoveries.  That's

20  what he wants.  I get that's what he wants.  But this case is

21  not the vehicle to get it because the immunity that Mr. Benomar

22  enjoys, as he has given the United States notice, or the

23  Moroccan government has, is also immunity from discovery.  It

24  would defeat the purpose of not putting a diplomat to the cause

25  of discovery if, what you did, was allowed discovery to

181010broidyC                    Conference

1   determine something that the immunity prevents him from having

2   to give.

3              THE COURT:  What if the discovery the plaintiffs were

4   seeking was just from third parties?

5              MR. LOWELL:  Then I ask you, what is the purpose of

6   third-party discovery in a single-defendant case?  The point

7   being --

8              THE COURT:  I guess their answer would be whatever

9   they think your client did, he did it through these third-party

10  Internet service providers and other tech kind of people, and

11  they need to preserve that evidence.

12             MR. LOWELL:  Well, let's talk about --

13             THE COURT:  I think that's what Mr. Wolosky would say.

14             MR. LOWELL:  I think that is partially what he said in

15  response to our discovery state letter.  Let's go backwards.

16             This is a single-defendant case.  We're not asking

17  that there's been anybody else.  Discovery shouldn't be used to

18  identify other potential people that Mr. Broidy can sue.  It

19  should be that discovery, when and if it ever occurred in a

20  case that could survive a 12(b)(1) motion, would be germane to

21  the issues that were in the case.

22             As to third parties, there's no third-party discovery

23  that can elucidate the issue that's squarely before the Court

24  when we make our motion, which is whether or not our client

25  enjoys status diplomatic immunity, and why would the Court

1   allow --

2            THE COURT:  I'm not quarreling with that.

3            MR. LOWELL:  So what's the -- I don't --

4            THE COURT:  Until I decide that, I have an open mind.

5   I don't know who is right as I'm sitting here.  You both tell

6   me you have the law on your side.  One of you is right.  But

7   the plaintiffs' position, and I'm sure Mr. Wolosky will correct

8   me if I'm wrong, is that, as we speak, very important evidence

9   is being written over or lost.

10           MR. LOWELL:  I don't think he's saying it's happening.

11  I'm saying, I think he's saying it could be happening, but on

12  that, I guess two points.  One, --

13           THE COURT:  Well, I have some questions for him about

14  what it is he's after and why his 84 subpoenas haven't gotten

15  it, and what the emergency is now.

16           But I think, to the extent you're arguing we should do

17  the immunity motion first and then the 12(b)(6) and then have

18  discovery, he's going to say, All the more reason why I need to

19  serve these subpoenas now because the motions are going to drag

20  out for so long.

21           MR. LOWELL:  Well, let me just respond to the last

22  piece forward.

23           The events that he indicates happened to his client

24  happened at the point so long ago after the controversies have

25  taken place, after the lawsuit that was brought in California

181010broidyC                    Conference

1    and dismissed, that I can imagine that if there's a world of

2    people out there that are no longer in possession of material

3    that would have been discoverable, it's long gone from the time

4    at which the allegations occurred to January, February, March.

5    However, there's not been --

6          THE COURT:  If anybody was going to flush evidence

7    down the toilet, they've done it.

8          MR. LOWELL:  Maybe, but my saying that is on no more

9    solid ground than him conjecturing that he needs discovery

10   because there's a risk that people will be destroying it.

11         I think the 84 subpoenas that he had two Internet

12   service providers, cellphone providers, and gosh knows how many

13   other people within seven dozen subpoenas, will have gotten

14   him, if frozen, whatever he needs, but it also raises the

15   question, again, of it's a little bit of the cart before the

16   horse.  In a single defendant case in which there is status

17   diplomatic immunity, what is the purpose of having discovery to

18   a world of third parties at which, when the case is dismissed,

19   it had no basis for occurring?  What's the point?

20         THE COURT:  Well, if you're right about immunity, then

21   that's one thing.  But what if I decide you're wrong, and the

22   case is going to go forward and the discovery is to get

23   information from third parties that will help build the case

24   against your client, I mean, I can't make a decision about

25   whether to stay discovery on the assumption that you're right

181010broidyC          Conference

1    about immunity.

2          MR. LOWELL:  The immunity thing doesn't take long to

3    be briefed.  A couple of weeks to respond.  We can expedite

4    that, number one.  Number two is, for time in memorial, lawyers

5    send potential witnesses, and no doubt they've done it here,

6    hold letters, telling them, by the way, there's a case.  It's

7    not as if this is secret litigation, your Honor.  The whole

8    world knows that Mr. Broidy is on a tear.  The whole world

9    knows that he is finding every vehicle he can to complain about

10   what happened to him, for whatever reason.

11         THE COURT:  Yes, but that doesn't mean that some

12   obscure or not-so-obscure ISP or bank knows that it holds

13   records that might be relevant.

14         MR. LOWELL:  But I think it takes somebody coming to

15   court with some credible evidence after the events that are so

16   long ago, in which the discovery has already existed for so

17   long, to say that there's a reason for the extraordinary relief

18   of allowing third parties to have to take the burden of

19   discovery when there is a meritorious motion to be decided that

20   ends the case.  It just seems to me, it's cart before the

21   horse.

22         THE COURT:  Let me ask Mr. Wolosky.

23         What specifically are you after from third parties?

24         MR. WOLOSKY:  Your Honor, with respect to electronic

25   discovery, which, by the way, even the State of Qatar in the

181010broidyC          Conference

1  case of California did not oppose when it moved to stay

2  discovery, and that stay was never entered, but it didn't

3  oppose electronic discovery that presented no burden to the

4  party in that case; this is the Internet service companies,

5  companies that, you know, store images that are downloaded into

6  phishing e-mails, things of that sort. That is the type of

7  discovery in part that we're seeking. And some of it, your

8  Honor, has been lost.

9          THE COURT: Let me just interrupt you because I don't

10  really understand what you've just said.

11          MR. WOLOSKY: Sure.

12          THE COURT: Maybe you can dumb it down for a low tech

13  sort of person. If I said, Go wild, serve subpoenas, to whom

14  would you serve them?

15          MR. WOLOSKY: Let me explain a little bit about this

16  attack, because it's necessary to understand the discovery.

17          Basically, as a result of the discovery that was

18  conducted in California, our team discovered a very large

19  hacking operation that, in one year, which was the period

20  governing one of the subpoenas that uncovered the specific

21  evidence, attacked at least 1200 targets who were political

22  opponents of Qatar. We have their names, their e-mail

23  addresses, and we received this information from a company

24  called tinyurl, which compresses URLs. So if you're clicking

25  on a link --

1          THE COURT:  I know what URL is, thank God.

2          MR. WOLOSKY:  Okay, but a tinyurl is one that doesn't

3     look suspicious to you, so it tricks you into clicking onto it,

4     okay?

5          As a result of that one subpoena, we were able to

6     discovery 1200 targets of the same group.  This group, when it

7     attacked Elliott Broidy's servers, accessed his computers from

8     scores of countries around the world, called virtual private

9     networks in order to disguise their identity; they created

10    numerous fake e-mail accounts and other proxies to enable them

11    to gain access to the systems; they accessed his computer

12    systems alone over 200,000 times in the first quarter of this

13    year.

14         So what I'm saying, your Honor, is that this was a

15    massive operation that targeted many, many people, our client

16    included among them.  They took great pains to obfuscate their

17    identity, moving through different countries of the world,

18    creating fake e-mail accounts and things of that sort.

19         Uncovering and proving attribution at trial of who did

20    that and who is involved with it involves peeling back multiple

21    layers of an onion that is intended to disguise the identity of

22    the attackers.  That is what we have started to do and we

23    significantly completed in the California action.  We're not

24    done with it.  We're not done with it specifically as it

25    relates to the defendant's conduct in this case, which we have

181010broidyC                 Conference

1   alleged was involved with sorting through, analyzing the stolen

2   e-mails, and disseminating them to the worldwide media.

3          THE COURT:  You're not alleging that he did the hack

4   himself, but once somebody else did it, he reviewed the

5   materials and decided, Ooh, this will be good to leak or that

6   would be good to leak?

7          MR. WOLOSKY:  That's correct.  That's what we say in

8   our complaint that's been filed.  And we will be expanding on

9   those allegations in our amended complaint.

10         THE COURT:  So by peeling back the onion as to who did

11  the hack, you're shopping for additional defendants or just

12  evidence that you're trying to link that person to the

13  defendant?

14         MR. WOLOSKY:  I would say that we are able to prove

15  attribution of the attack at trial through a forensic

16  evidentiary chain, an electronic evidentiary chain, which

17  people in my firm and our experts, who are a lot more talented

18  than I am in these areas will do a better job of explaining to

19  you.

20         But the point is, a computer attack actually can be

21  proven, okay?  That's why you see indictments by the U.S.

22  government.  There are forensic fingerprints that are left, and

23  when the group is sophisticated, that is conducting the attack,

24  the investigation has to be similarly sophisticated and

25  comprehensive.

181010broidyC                    Conference

1          Just while we're on the issue of our amended

2     complaint, first, we will be adding at least one additional

3     defendant who was involved in the prior proceedings, so this

4     will not be a one-defendant case once we file our amended

5     complaint.

6          Additionally, in that, we will also be expanding our

7     allegations with a higher degree of specificity as to the

8     current defendant, Mr. Benomar.  We obtained discovery in the

9     California case, actually in this district, a witness located

10    here who was a co-conspirator of Mr. Benomar, and there's a lot

11    of evidence that we'll be adding to the complaint.  Some of it

12    is still designated confidential under a productive order in

13    the California case.  We were unable to use this when we filed

14    the initial complaint in this action.  So I can only describe

15    some of it in open court, but what I can say in open court is

16    that the additional allegations will include an allegation from

17    Mr. Benomar co-conspirator that he personally was reviewing the

18    e-mails and trying to claim credit for the attack.

19         We will also include the allegation that that same

20    co-conspirator of Mr. Benomar threatened to sue Mr. Benomar

21    because he was owed between $5- and $10 million after the

22    completion of the attack.

23         Now on the issue of immunity and status immunity, we

24    will strongly argue at the appropriate time that this conduct,

25    which may be criminal, does not qualify for any type of

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

181010broidyC               Conference

 1   immunity, certainly before it's notified to the United States

 2   government.  But what we need now is jurisdictional discovery

 3   that will support completely unsupported statements that

 4   Mr. Benomar has any diplomatic status at all.

 5          THE COURT:  Well, I think the discovery on his

 6   diplomatic status is an easier question for me to resolve.

 7          They're going to make the motion.  They're going to

 8   attach whatever documents and certificates and things that have

 9   pretty red and gold seals on them, and they're going to say,

10   This shows that our guy's a diplomat.  And if you can't respond

11   to that without discovery, you'll say that in your opposition.

12   But I don't think this is the same situation that was before --

13   was it Judge Scheindlin? -- where the argument wasn't this guy,

14   you know, has a gold seal and he's a diplomat.  It was a much

15   more fact-intensive question of whether he was acting as an

16   agent for somebody who had that status.

17          So I'm not going to order jurisdictional discovery

18   now.  You can put in your opposition if it's the case that we

19   need this, this and this before you, Judge, can decide that.

20   And if I agree with you, then we'll have jurisdictional

21   discovery.

22          With respect to third-party discovery that you want to

23   take, what reason do we have to believe that this hack which

24   occurred now, I guess, 10, 11 months ago, either that the

25   information you're looking for hasn't already been deleted or

 1    that it will shortly be deleted?

 2          It seems to me, if you're looking for money transfer

 3    records or records from ISPs and the like, that they're not

 4    going anywhere.  So, why should I put the potentially immune

 5    defendant to the burden of dealing with your subpoenas?  And I

 6    understand they're not going to be directed to him, but he's

 7    entitled to see them and raise hell about them if he wants.

 8    Why should I do that now?

 9          What reason do we really have to believe that this

10    information isn't going to be here in a few months when the

11    immunity issue will have been decided?

12          MR. WOLOSKY:  Your Honor, these companies that provide

13    electronic services typically have automatic override

14    provisions.  So in the course of our 84 subpoenas, or whatever

15    the number was, we encountered some instances where a company

16    said, We don't have the data anymore.  Far more often, we got

17    results.

18          But we are concerned that as the one-year anniversary

19    of this attack approaches, that these auto override matters

20    that are implemented as a matter of corporate policy in many of

21    these companies will take hold.

22          I can represent to you that, first, it is the case

23    that a lot of these companies do have these automatic override

24    policies; they just happen by default.  And I can also

25    represent to you that we have encountered them in the course of

181010broidyC                    Conference

1   our discovery in the California case, and that has frustrated

2   some of our discovery.

3            THE COURT:  Is the California case completely over

4   now?

5            MR. WOLOSKY:  It is, your Honor.  And as I said, next

6   week, we will be adding at least one defendant who has no claim

7   to diplomatic immunity.

8            MR. LOWELL:  Your Honor, may I respond to a couple of

9   points.

10           THE COURT:  Yes.

11           MR. LOWELL:  Thank you.

12           The Court is right that the cases that exist in our

13   letter on the discovery issue talks about the burden on the

14   person who is enjoying the immunity that allows that person not

15   to have to participate in discovery.  If there was a good

16   reason for which that could occur outside of this complete bar

17   to the suit, it could be heard, I suppose.

18           If there's going to be somebody else that gets sued

19   sometime who doesn't have immunity, that will be an issue for

20   that person and Mr. Broidy, but you can't bootstrap against the

21   person who has status immunity discovery that might be allowed

22   when you allow an amended complaint to occur that would bring

23   in another party.

24           And for Mr. Wolosky to be in open court and say the

25   phrase co-conspirator, that's an interesting phrase, it's an

181010broidyC                    Conference

1   interesting word, but that's just him saying it.  And that

2   doesn't give him anymore rights to discovery by saying it in

3   the midst of what we're putting forward to the Court than if he

4   said as, without proof, that Mr. Benomar doesn't have

5   diplomatic immunity because somebody hasn't stamped it yet.

6   You need to see the evidence of this so that you can decide.

7          The next thing to say, again, just because he puts

8   forward it as a reason that his so called co-conspirator said,

9   for example, that Mr. Benomar, quote, "reviewed material."

10  This is what we need to tell the Court when we file.  Yes,

11  Mr. Benomar is alleged by this person to have maybe reviewed,

12  but he did it in March when the entire world was reviewing it

13  because it was already on the Internet.

14         You can't say, Well, because he looked at it when I

15  could look at it and, indeed, did look at it, I'm as much a

16  co-conspirator because I clicked on a link that showed his

17  e-mails from, I don't know, "The New York Times" or whatever it

18  was, as anybody else did.  See, that's what I'm saying about

19  the difference between making a statement and getting precise

20  about it when we file the papers.

21         And example number 2, Mr. Wolosky says that somebody

22  threatened to sue Mr. Benomar for $5 million and seemed to

23  suggest that that was having something to do with either the

24  hacking or the review.  Remember, Mr. Benomar is not alleged by

25  Mr. Broidy to be involved in the hacking.  It had nothing to do

181010broidyC                  Conference

 1   with that.

 2          The two individuals that Mr. Wolosky is referring to,

 3   one of whom he may end up suing, was involved in lobbying and

 4   bringing members of the American Jewish community to Qatar and

 5   all kinds of things.  They allege that they were owed money for

 6   their lobbying efforts; not for their hacking.

 7          Indeed, when the person that Mr. Wolosky deposed was

 8   asked by Mr. Wolosky, Did you have any conversations with

 9   Mr. Benomar about hacking, the person said one word:  Never.

10          That was an entirely different event having nothing to

11   do with the allegations.  That's why it's just easy to throw

12   sentences into the well of the court, but precision in

13   pleadings will indicate two things:  Thing one, status

14   immunity.  Thing 2, in the present configuration of the case,

15   there's no need for discovery, either because there's no

16   jurisdictional discovery that will elucidate the issue, and

17   third parties are third parties.  That should all wait.  We can

18   do this in a timely manner, but it is putting the cart before

19   the horse.

20          THE COURT:  Well, there's no obvious right answer to

21   all of this, but what I think we should do is the following:

22   Let me deal with the immunity question on as expedited a basis

23   as we can all reasonable do it.

24          How soon can you make your motion?

25          MR. LOWELL:  We can do that within three weeks, your

181010broidyC          Conference

 1  Honor.

 2          THE COURT:  All right.  October 31st.

 3          MR. DWYER:  Three weeks?  You're not ready now?

 4          MR. LOWELL:  Hold on.

 5          No, it's not on my desk.  No.  Not ready now.

 6          MR. DWYER:  It seems -- we're trying to expedite this,

 7  your Honor, and he just gave himself another three-week

 8  extension, which, it seems to me, with all of the bluster that

 9  he's brought forth to this Court about how we have no position

10  and he has a rock-solid position, he should be able to do it in

11  a week.

12          THE COURT:  Three weeks is fine.

13          How long would you like for your opposition on

14  plaintiffs' side?

15          MR. WOLOSKY:  Two weeks, your Honor.

16          THE COURT:  That would take us to November 14th.

17          MR. LOWELL:  And we would then ask for a week for the

18  reply, Judge.

19          THE COURT:  November 21.

20          MR. WOLOSKY:  Your Honor, normally in a case when

21  there's a disputed issue of immunity, the State Department will

22  file a suggestion of immunity or be invited to file a

23  suggestion of immunity with the Court.  That can happen on

24  motion of the party.  It can happen *sua sponte*.  But my

25  question, really, is that contemplated in this case?  It might

181010broidyC                    Conference

1    affect the briefing.

2              MR. LOWELL:  Judge, again, I want to disagree with my

3    learned counsel here as to whether that elucidates anything

4    because the case law is very clear that it doesn't matter what

5    the State Department says if the person has been notified to

6    be, and in addition to which, courts have found the existence

7    of immunity without regard to what the State Department says.

8              I think that's just a diversion.

9              THE COURT:  Well, I don't think it would be binding,

10   but it might be helpful.

11             What's the procedure?  Does the party who thinks the

12   State Department will be helpful to it make that request?  Do I

13   make that request?  To whom do I make it?

14        MR. WOLOSKY:  Well, you may.  You may do it *sua*

15   *sponte*.  It can happen on motion of a party.  I'm not prepared

16   to say that we are going to do it in this case.  The question

17   was really more directed to counsel as to whether or not he

18   contemplates it.

19             It does affect briefing schedules.

20        MR. LOWELL:  I will confer and find out, confer with

21   Mr. Wolosky on it.  If I decide that, again, because of the

22   case law that I'm bringing to the Court's attention, it doesn't

23   elucidate or it's helpful or, as you said, it might be not

24   dispositive or conclusive, then I don't have any objection to

25   it, but then I should confer to see whether or not, if

181010broidyC                    Conference

 1  Mr. Wolosky believes it's important, that he be the one to move

 2  for it.  So we should talk, because I can't answer that right

 3  this second without understanding what he's asking for, from

 4  whom, and how long it would take for them to do it.  It may be

 5  that we are under a schedule, but I have an idea that the U.S.

 6  government has its own schedule.

 7          THE COURT:  That's fair enough, but if you decide --

 8  have that conversation before the end of the week, because if

 9  one or the other of you is going to request that, I would

10  suggest doing it even before the motion is formally filed

11  because if they are going to take six weeks, then it won't hold

12  us up.

13          Assuming that the motion is going to be fully briefed

14  November 21, let me ask Mr. Clark to find a time, maybe right

15  before the Christmas week, and I will try to give you my

16  ruling.  And if I can't get my act together to do it, we'll

17  push it off and let you know, but this will be a goal for me,

18  maybe, like, right before Christmas.

19          THE DEPUTY CLERK:  December 21, 2018, at 10:00 a.m.

20          THE COURT:  Does that work for everyone?

21          MR. DWYER:  Is that a conference, your Honor?

22          THE COURT:  That's for me to give you my ruling on the

23  immunity motion.

24          MR. DWYER:  But for us to show up?

25          THE COURT:  Oh, yes.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

181010broidyC                    Conference

 1           MR. LOWELL:  I think so, Judge.  It's far enough in

 2     advance.  I wasn't one of those people smart enough to have the

 3     card to bring my phone in, so I'll have to get back to you, but

 4     I'm sure it's fine.

 5           THE COURT:  You have to get that little card.  Okay.

 6     If it turns out it's no good, we'll work around it.

 7           Now the amended complaint...

 8           MR. DWYER:  Can I raise an issue on the amended

 9     complaint, which I think the parties could use your guidance.

10           Mr. Lowell has minimized his client's role in this.

11     And in the amended complaint, we would plan to amplify on

12     things that we've said in the original complaint, a lot of

13     which is based on discovery in the California action, a bunch

14     of which was designated under the confidentiality protective

15     order out there.  Mr. Lowell is not a signatory to that.

16           So our thought would be, your Honor would enter a

17     confidentiality protective order that the parties could agree

18     on and that we provide him with the documents in that case that

19     would relate to the amended complaint.  And then we would file

20     the amended complaint under seal until such time as the

21     designated parties in that case had the opportunity to come in,

22     if they wanted to, and try to persuade your Honor, which we

23     would oppose, that the complaint should be filed under seal.

24           The order out there only related to the documents.  It

25     did not -- the discovery, it did not -- it specifically said

                   SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

181010broidyC                    Conference

1  that you have to come back to that Court for filing under seal,

2  which we don't think it would be merited, to file under seal.

3  The public has a right to know about these issues, about any

4  issues generally, but particularly about these issues because

5  of what they entail.  So that's our suggestion as to how to

6  proceed.

7            THE COURT:  Well, if you think you're not restricted

8  by the confidentiality order in California from putting

9  whatever you want in the complaint, as long as the document

10 from which you got the information remains confidential, then

11 why do you need to file the amended complaint under seal at

12 all?

13           MR. DWYER:  There are very specific facts that would

14 be in the amended complaint that are only found in either the

15 documents or in a part of -- Mr. Alaham (ph.) is the witness

16 that was referred to by Mr. Lowell who gave

17 deposition testimony, and some of his testimony was designated

18 under this order.

19           So for us to, in terms of specific pleadings, to make

20 it as specific as possible, anticipating that Mr. Lowell would,

21 if we didn't do that, would make a motion that said it's not

22 specific, my problem is, right now, I couldn't even give the

23 draft amended complaint to Mr. Lowell because it's got facts

24 and figures and events in there that are specific and under

25 that order.

181010broidyC                    Conference

1          It's a very unusual situation.

2          THE COURT:  Right.  And it also sounds like it's not

3    really my problem.  I mean, I didn't sign that protective

4    order.  It seems to me, if you want to use this information,

5    you need to go back to --

6          MR. DWYER:  No, your Honor, because the case -- as

7    Mr. Wolosky -- although we have an appeal in the Ninth Circuit

8    against the State of Qatar on the subject matter jurisdiction

9    dismissal.  The other case -- the rest of the case is

10   dismissed.  All of the parties are dismissed.

11         THE COURT:  But it's not my order.

12         MR. DWYER:  But we're not asking your Honor to --

13         THE COURT:  You're asking me to adjudicate disputes if

14   the other parties in California come in and object.  I don't

15   see why this is my problem.

16         MR. DWYER:  I'm not asking your Honor to change the

17   order.  I'm asking you, as the only Court that has a case

18   before it right now, to allow us to file this -- first, if we

19   could file it under seal, but I can't yet give it to

20   Mr. Lowell's firm because he's not a signatory to the order.

21   So I have information that's relevant to this case that I want

22   to use in this case to amend the complaint to deal with

23   Mr. Lowell's objection.

24         THE COURT:  But you can't use it because you signed an

25   agreement in California saying you wouldn't use it.

                    SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

181010broidyC                    Conference

 1          MR. DWYER:  No.  I signed an agreement in California

 2    saying that, for discovery purposes, it would be deemed to be

 3    protected under the confidentiality protective order.  I didn't

 4    say that I -- what that order says is that you go back, that it

 5    doesn't allow --

 6          MR. WOLOSKY:  It allows the use of discovery materials

 7    and related proceedings.

 8          THE COURT:  Let's keep it simple.  Let's keep it

 9    simple.

10          Let's say you got all this information in California

11    and you wanted to amend the complaint there, what, if anything,

12    would you have had to do to use information gathered in

13    discovery to amend your complaint in California?

14          MR. WOLOSKY:  We would have filed it under seal.

15          MR. DWYER:  And made a motion to the Court.

16          MR. WOLOSKY:  Which is what we're proposing to do

17    here.

18          MR. DWYER:  The protective order --

19          THE COURT:  Yes, but I don't want to have to deal with

20    all of the defendants in the other case coming in and raising

21    objections about an order that I didn't sign, in an agreement

22    in a case that wasn't my case.

23          MR. DWYER:  The protective order there acknowledges,

24    quote, "a strong presumption that the public has a right of

25    access to judicial proceedings and records."

181010broidyC                    Conference

1              THE COURT:  I believe in that.

2              MR. DWYER:  Yes.  And that "the parties' designation,

3    without more, doesn't" -- I'm sorry.  I have allergies, your

4    Honor.  I'm sorry.

5              THE COURT:  Take your time.

6              MR. DWYER:  It doesn't prevent the filing.  You have

7    to go back to the Court.

8              THE COURT:  I love that idea.  Go back to the Court

9    whose order it is.

10             MR. WOLOSKY:  Your Honor, we have discovery material.

11   We have material that is pertinent to this case.  We want to

12   put it in a complaint.  We want to be able to have Mr. Lowell

13   have access to that material, which, as a technical matter, he

14   can't currently.

15             We're proposing a stipulation and order that would

16   enable him to have access to the material.  He already has

17   access apparently to a deposition that was taken in that case.

18   Part of it is probably blacked-out.  The blacked-out portion is

19   relevant to this case and to additional defendants or the

20   defendants we're going to add, and we just want to show him the

21   material, and that has to happen in this court.

22             THE COURT:  It seems to me, Mr. Lowell can sign onto

23   the protective order in the other case.

24             MR. WOLOSKY:  That case is done.  It's on appeal.

25             THE COURT:  I understand, but there are other parties

               SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                         (914)390-4053

181010broidyC                    Conference

1   to that agreement.  It's an order and an agreement, I take it.

2          I understand the other case is done, but just because

3   you happen to be in front of me, doesn't mean that that order

4   has been dissolved.  If you wanted to give the material to "The

5   New York Times," you couldn't because it's covered by the

6   protective order.  And you'd have to go back to the judge in

7   the closed case and say, I want to give it to "The New York

8   Times."  Do I have your permission?

9          MR. DWYER:  We're asking --

10         THE COURT:  It seems to me, you have to go back to the

11  judge in the closed case and say, I want to use in this in a

12  complaint in New York.  Do I have your permission?

13         MR. DWYER:  He no longer has jurisdiction.  The case

14  is closed.

15         THE COURT:  What if you wanted to give the material to

16  "The New York Times"?  You'd be unable to, because there's no

17  entity in the world that could get out from under that

18  protective order.

19         Is that what you're telling me?  I don't think so.

20         MR. DWYER:  We're not asking for permission to expose

21  the documents.  We're asking for permission to file a complaint

22  under seal that, by definition in the protective order, is not

23  covered by the current designations.

24         THE COURT:  That's where you just lost me.  If it's

25  not covered --

181010broidyC                    Conference

1          MR. DWYER:  The documents that we would be citing to,

2   relying on, quoting from, are confidential, but the public

3   filing is specifically excluded from that order; the public

4   filing that says you have to come back to the Court.  If you

5   want to file something under seal, you have to come back to the

6   Court, but there's no longer a Court there.

7          You're it.  You're the only Court that we're before,

8   and we're trying to file something in this case.

9          THE COURT:  I'm just trying to understand something,

10  and maybe I'm being dense, so bear with me.

11         Let's assume this lawsuit doesn't exist.  Let's assume

12  somebody in the California case wants to use something covered

13  by the protective order for some purpose – suing a lawyer for

14  malpractice, using it in a law school class as a model of

15  wonderful drafting, anything – you have to go back to the judge

16  in the closed case, or you would be stuck, permanently,

17  forever, not being able to use it.  That seems to me like those

18  would be the option in that case.

19         My second confusion is, you're saying, on the one

20  hand, that it's only the discovery materials themselves that

21  are covered, the records that you got from the subpoenaed

22  parties that are covered, but it's also the complaint that's

23  covered, and that's where I'm also getting lost.

24         MR. DWYER:  Because the stipulation and order says

25  that if you're going to file something under seal, you have to

181010broidyC                    Conference

 1   come back.
 2           THE COURT:  Why don't you just --
 3           MR. DWYER:  Because the protective order --
 4           THE COURT:  What forces you to file it under seal?
 5           MR. DWYER:  The protective order allows parties to
 6   designate documents that are produced in discovery, or
 7   depositions that are taken in the case, that allows them to be
 8   designated confidential.
 9           THE COURT:  And can they designate anything they want
10   as confidential, or does it has to meet some standard?
11           MR. DWYER:  Well, actually, our view is that -- it
12   doesn't provide a standard.  Our view is that they were overly
13   generous in what they designated as confidential.  But it says
14   you have to go back.  If you're going to file something in
15   court, you can't just do it by saying it's confidential.  You
16   have to go back to the Court, and you have to make a showing.
17           THE COURT:  You just lost me again.  Let me interrupt
18   you.
19           The parties are allowed to designate anything as
20   confidential.
21           MR. DWYER:  Right.
22           THE COURT:  Okay.  Then you said, and I don't remember
23   exactly how you worded it, but you said if you want to do it,
24   you have to go back to the Court.
25           What's the "it"?

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                            (914)390-4053

1              MR. DWYER:  If you want to file something under seal,

2    you have to go back to the Court.

3              THE COURT:  Let me stop you right there.  Why do you

4    want to file something under seal?  Why don't you want to file

5    it publicly?

6              MR. DWYER:  I do want to file it publicly.

7              THE COURT:  What's stopping you from filing it

8    publicly?

9              MR. DWYER:  I don't want the people who produced these

10   and designated them as saying -- if I were filing it in

11   California, they would have had, and the case was still going

12   on --

13             THE COURT:  The stuff you've got, the stuff that's

14   gone designated confidential, does it say that those pieces of

15   paper are confidential or does it also say you cannot use the

16   information in them in a public filing?  Because that's two

17   different things.

18             MR. WOLOSKY:  I'm pretty sure it says the latter.

19             THE COURT:  Well, that was the missing piece.

20             MR. WOLOSKY:  I'm sorry for that confusion.

21             MR. DWYER:  But it says if you want to file the public

22   filing under seal, you can't just do it by saying it's under

23   seal; you have to go to a Court.

24             Now we're not going to file something in California

25   under seal; we're coming to White Plains, to federal court in

181010broidyC                    Conference

1    White Plains, and we want to file something here.  We do not

2    want to file under seal, but we feel obligated to file it under

3    seal and provide notice because that's what we would have been

4    doing in California.

5              THE COURT:  That's what you ought to be doing in

6    California.

7              MR. WOLOSKY:  We were dismissed for a lack of personal

8    jurisdiction, and so in many ways, your Honor --

9              THE COURT:  Is it your position that when you sign a

10   protective order in the course of litigation, and then, for

11   whatever reason, the case goes away, and ten years go by and

12   you want to use it for something, and there's no pending

13   lawsuit, then you're forever stuck?  There's nowhere you can

14   go?  You can go back to the same court.

15             MR. WOLOSKY:  It's a little different.  The Court in

16   California said we're dismissing some of these defendants for

17   lack of personal jurisdiction.  They're in New York; you have

18   sue them there.  We're going to sue one or more of them here.

19   We took discovery in that case.

20             MR. DWYER:  And you're allowed to use that discovery

21   in related actions, and that's what we're trying to do.

22             MR. WOLOSKY:  That's what the order says.

23             MR. DWYER:  We have two problems: one, I don't want to

24   file it under seal, I want to file it publicly, but I'm

25   concerned that having this order out there, I will be in

181010broidyC          Conference

 1    contempt of the order.  I don't want to do that.

 2              THE COURT:  I understand why you're concerned.

 3              I'm concerned that I'm going to go down a rabbit hole

 4    with parties who aren't even in front of me, an order I didn't

 5    sign, in litigation that you went into with a million third

 6    parties.

 7              MR. DWYER:  My second problem is, I can't give the

 8    complaint to Mr. Lowell.

 9              THE COURT:  Well, you have a problem, but that's why,

10    if I were you, I'd go back to the court in California.

11              MR. DWYER:  It doesn't exist anywhere.

12              THE COURT:  Mr. Lowell is dying to say something.

13              What are you dying to say, Mr. Lowell?

14              MR. LOWELL:  Given the adjective is dying, it'd better

15    be good.

16              What I'm trying to say is, the point is, that's why

17    there's no purpose or timeliness to an amended complaint right

18    now because it doesn't matter what it is they want to put into

19    a complaint that is or is not public or sealed.  I don't want

20    them to provide me any material.  I'm not part of the

21    California proceedings.  I don't want to endure the work

22    necessary with my client having immunity to deal with what has

23    now taken more time to talk about the California litigation

24    than we're talking about the New York litigation.

25              We should do the 12(b)(1) motion.  If it is right,

181010broidyC                    Conference

1    then, and only then, does it make sense, as you said, to deal

2    with the 12(b)(6), which would allow them to do an amended

3    complaint.

4           If their point is they have some third party they want

5    to sue, they can sue a third party.  I don't think they have a

6    statute of limitations problem.  Certainly this individual is

7    on notice that he's in their crosshairs.  That's why we should

8    do what you said before: let's resolve the issue that will, in

9    our opinion, end the case.

10          Everything that just got said only supports the point

11   that I don't want to be involved in having to deal with an

12   amended complaint that will make no moment to what is before

13   the Court.  I don't know what they want to say, but I do know

14   this:  I do know that complaints like this in this very public

15   battle get done for purposes of creating more public opinion,

16   more public notice.  We should avoid all of that.

17          One of the things I need to do before we leave is to

18   ask you how to address things that are happening to my client

19   that, for example, counsel for Mr. Broidy said something about

20   or your hypothetical was if they don't want to -- if they

21   wanted to give this to "The New York Times," they'd have to go

22   back to the Court.  I need to say two things about that.

23          The first is, today, I got a call from a journalist,

24   and the journalist was quoting material from the California

25   case.  Now I can't tell whether the journalist who was asking

181010broidyC                    Conference

1    me questions about it, because he knew we were coming to court

2    today, got it from that which somehow has been released.  It

3    didn't seem that way to me from what he asked.  And he did say

4    that he got this from Mr. Broidy's counsel.

5           Now, I don't want to duplicate this in New York as

6    what happened in California.  This case should not be litigated

7    in the media.  We should make our motion and play it out on a

8    legal issue that will dispose of it.  And I need to understand

9    why it is that we have to undergo this whole amended complaint

10   issue when it won't matter.

11          There's not one thing that they can allege at any

12   point that will do anything to obviate the 12(b)(1) grounds

13   that we're going to seek to dismiss on.

14          MR. DWYER:  Two things:  One is, there are things in

15   the California action that are not under seal, that are not

16   subject to the designations under the confidentiality order;

17   and therefore --

18          MR. LOWELL:  And therefore, you can give it to the

19   media to bring attention to this case?

20          MR. WOLOSKY:  This case has a lot of attention

21   attracted to it.  Our client was hacked by a sovereign nation

22   and his e-mails were distributed to media all over the world.

23          THE COURT:  Time out.  Time out.

24          Let me just tell you something.  I'm not interested

25   in -- I'm old fashioned.  I make my decisions on the facts and

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

181010broidyC                    Conference

1   the law.  I'm not interested in the PR battles that are going

2   on between lawyers or between clients.  I'm not interested in

3   who is trying to get over on who in the public mind or any of

4   that stuff.  I'm here to manage a lawsuit, which, if

5   Mr. Benomar is immune, doesn't even belong in this courthouse,

6   because I think the only reason we're in this building is

7   because he lives in Westchester.

8           So unless the other people you plan to sue live in

9   Westchester, depending on how the motion goes, I could be

10  washing my hands of all of you.  And I don't mean to sound

11  gleeful when I'm saying that.

12          MR. DWYER:  You don't.  I know you love us and you'd

13  like to see us more.

14          Your Honor, one thing is, there's several types of

15  immunity.  It's not clear to us, if he's simply taking the

16  position -- if Mr. Lowell is simply taking the position that

17  he's got some absolute immunity, but if there's other types of

18  immunity for which --

19          THE COURT:  Well, it sounds like he's saying I have

20  status immunity, but as a fallback, I have these other things.

21          MR. DWYER:  For the other immunities, the things that

22  are in the amended complaint would be highly relevant.

23          THE COURT:  You don't need to put them in your amended

24  complaint.  You can put them in your opposition papers.

25          Look, I have, as you can tell, no desire to administer

181010broidyC                    Conference

1    an order that was issued in another case.  If I'm wrong, and I

2    have to, show me some authority.  But I don't know why, just

3    because that case is closed, you -- I mean, people come back

4    all the time on stuff in closed cases.  I don't know why you

5    can't use the procedures, whatever they were in that order, for

6    getting the okay to use the material.

7            If you were going to write a book, and you wanted to

8    get permission to use the material, you'd have to go back to

9    the judge in California.

10           MR. DWYER:  We will endeavor to do that, but I note

11   that if the judge in California says, Go away, go back to the

12   judge in White Plains, --

13           THE COURT:  I'm sure the judge in California will do

14   what he or she thinks is best.

15           MR. DWYER:  Your Honor, it happen happens to be a man.

16           THE COURT:  Okay.  I'm sure he'll do what he thinks

17   makes sense, but I've got to tell you, it seems to me a

18   dangerous precedent if, every time I sign a protected order and

19   then there's some related litigation somewhere in the country,

20   I'm dumping on random judges around the country the burden of

21   making decisions based under my order.

22           MR. DWYER:  On your solution of put it in opposition

23   to the motion, we still have the same problem, so we'll have to

24   solve that before then.

25           THE COURT:  You'll have the same problem.  You can

181010broidyC                    Conference

1   file it under --

2         MR. DWYER:  I can't give it to him.  I can't give it

3   to Mr. Lowell.  That's my problem.  I can't give the

4   information --

5         MR. LOWELL:  Your Honor, again, I'm sorry.  I'm going

6   to be only slightly repetitive, but I'll say it in a different

7   way.  I don't need anything that they have from California to

8   address the status immunity of our client.

9         THE COURT:  If your motion is going to be based solely

10  on status immunity, then this isn't going to come up, I don't

11  think.  But if it's going to be based on the other types of

12  immunity mentioned in your letter --

13        MR. LOWELL:  Correct, then I agree that it could be

14  elucidating to that.  If that's the case, I could, again, talk

15  to opposing counsel, because I'm not sure that I understand the

16  contours of what the California Court has said.  And, like your

17  Honor, I'm mystified that one can't go to the judge there and

18  if it's lost jurisdiction to go to the Ninth Circuit and ask

19  for a return of some small part of the jurisdiction to address

20  the issue of a protective order, as opposed to having you

21  adjudicate on this side of the United States that which should

22  be adjudicated on that side of the United States.

23        THE COURT:  Well, look, I mean, the other way to do it

24  is, I don't know how many defendants there were in the

25  California case, but maybe what the plaintiff should do is give

181010broidyC              Conference

1   them notice: I intend to put this in an opposition to a motion

2   or I intend to put this in an amended complaint.  Do you

3   object?

4           If they don't, then you don't have to bother any

5   judge.

6           MR. WOLOSKY:  Yes.  I think, though, the issue would

7   still be that there may be a sealing issue in this court that

8   would probably need to be addressed by this Court.

9           THE COURT:  If you come to me with an application that

10  says, We have to file this under seal because we want your

11  permission to file this publicly, we've given notice to all of

12  the defendants in the California case and none of them object

13  to it being publicly filed, fine, I will rubber stamp that.

14          I don't have the agreement, the order.  I don't

15  understand what the procedure is, but there's only a problem,

16  it seems to me, if somebody objects to that information coming

17  out.  And I have no idea on what basis I would adjudicate such

18  a dispute because you don't have any standards in your

19  agreement, apparently.

20          But maybe the bottom line is, hey, you agreed to keep

21  things confidential, and if that means we can't use them, we

22  can't use them.  This is how the cookie crumbles sometimes.

23          MR. LOWELL:  Right.

24          THE COURT:  If there's somebody who objects, and their

25  objection is, We had a deal that this was going to be

181010broadyC                    Conference

1   confidential, I don't know what your argument would be as to

2   why you should get out from under the deal. But there must

3   have been something in the order about what you were going to

4   do to use this material in the California case if it survived.

5   I don't think you were agreeing that you were going to take

6   discovery and then not be able to use it in that case.

7            MR. WOLOSKY: No, no. The remedy, and we did this

8   many times in the California case, is we filed material under

9   seal, and that's basically what we would seek to do in this

10  Court, as well.

11           THE COURT: Right. But then when somebody objects,

12  then I have this --

13           MR. WOLOSKY: But object to what?

14           THE COURT: -- problem.

15           MR. WOLOSKY: Object to filing something confidential

16  under seal?

17           THE COURT: No.

18           You told me the reason why you have to file it under

19  seal is to give the other parties the opportunity to object to

20  it being filed publicly.

21           MR. WOLOSKY: That was just one proposal that we had

22  for dealing with the problem.

23           The other thing that we can do, and I think we will do

24  based on your Honor's direction, is we will go to the other

25  parties, we will advise them -- I'm sorry, the California

181010broidyC                    Conference

1    designating parties.  We will say, We intend to use some of

2    this material in an amended complaint in New York.  And then we

3    will come to your Honor and tell you what they said.  And if

4    they say, We object to the public disclosure of this material,

5    we will come to your Honor and say we would like to file this

6    complaint under seal – or portions.

7              THE COURT:  According to Mr. Dwyer, you wouldn't even

8    be able to give the amended complaint to anybody on the other

9    side of the case or, presumably, the new defendant.

10             It sounds like from what you're saying, you could file

11   it under seal, but nobody could see it, including Mr. Lowell.

12             MR. WOLOSKY:  We're trying to keep this simple, I know

13   you won't believe us, but there are two levels of designation.

14   There's an "attorneys' eyes only" designation in that case, and

15   just regular confidential designation.  So a portion of the

16   material, yes, we would have a hard time.  It's "attorneys'

17   eyes only" in that case, counsel of record in that case.  We

18   would need some form of relief to show to share it with

19   Mr. Lowell, but let us think about how to do that.  And it

20   would only be a portion of the designated material.  Not all of

21   it.

22             THE COURT:  Let's say your case hadn't been dismissed,

23   and fast forward to summary judgment in the California case,

24   what did the order say about how you were allowed to use the

25   material?

181010broidyC                    Conference

1          It must have said something.

2          MR. WOLOSKY:  We can tell you in a moment.  I don't

3    remember what it said.

4          THE COURT:  In any event, what I want to hear, what I

5    want now is the 12(b)(1) motion.  The amended complaint, it

6    seems to me, should await the decision there.  If Mr. Benomar

7    is out of the case, then it can be a whole new complaint.  It

8    won't be an amended complaint.

9          The issue of jurisdictional discovery, I'm not going

10   to allow that now.  It seems to me that once the plaintiffs see

11   the motion, if they think they need it, they can put that in

12   their opposition, and if I agree, then I will allow that to go

13   forward.  But if there's a way of ruling on it without getting

14   into factual disputes, I'll do that.

15         As far as whether discovery from third parties will go

16   forward in the meantime, my inclination is no.  It seems to me

17   that there's already been a ton of discovery taken in a case

18   that eventually went away.  I haven't gotten anything specific

19   as to subpoenas that the plaintiffs want to issue to entities

20   that have a one-year retention policy, but that doesn't mean

21   you couldn't make a more concrete showing.

22         MR. WOLOSKY:  Your Honor --

23         THE COURT:  So I think the procedural way this should

24   happen is, the motion the defendant's going to file should, as

25   he has proposed, be a motion to dismiss under 12(b)(1) and to

181010broidyC                    Conference

1  stay discovery pending resolution.  And then I'm going to be

2  dealing with these in reasonably rapid fashion.

3          And if there's something that you can point to me that

4  is going to turn into a pumpkin before I can rule, flag it for

5  me and I'll deal with it.  But I don't think that you should go

6  back to the races until I've decided, at least the immunity

7  issue.

8          MR. WOLOSKY:  We will not go back to the races.

9          What I would like permission to do is to submit, by

10  the end of this week, a list of no more than ten subpoenas that

11  we would like to serve, given the issues of perishability that

12  we have identified today.

13          THE COURT:  Yes, but give me something concrete.  If

14  you say I want to subpoena Verizon, tell me specifically why

15  you think Verizon's information is not going to be there after

16  December 21st.

17          MR. WOLOSKY:  Absolutely.

18          THE COURT:  You can give me a letter by the end of the

19  week, and I'm sure if Mr. Lowell wants to respond -- the end of

20  the week is a couple of days from now.  The end of the week is

21  the 12th.

22          Mr. Lowell, if you want to respond, why don't you

23  respond by the 17th.

24          MR. LOWELL:  Fine, your Honor.

25          THE COURT:  I'll get you an answer as soon as I can,

181010broidyC                    Conference

1    but there's a lot of different ways this could go.  There's no

2    one right way to manage this, but I think for now, if there's

3    going to be discovery, it should be only for things that we

4    really have reason to believe might not be there later on if

5    the case survives.

6           But typically, you don't file a case, get gobs of

7    discovery, get your case dismissed, then use that information

8    to file a new case which itself might get dismissed, and then

9    use that information to file a new case, you know?  Usually, if

10   there's a dispositive motion that might be meritorious, I don't

11   put the parties to the expense of discovery until I've decided

12   it.  And I have no idea who is right, but it passes the laugh

13   test, both sides' argument pass the laugh test.

14          So I'll just wait and see what you put in your briefs

15   and I'll see you on December 21st.

16          MR. LOWELL:  Thank you.

17          MR. WOLOSKY:  Thank you, your Honor.

18          MR. LOWELL:  One last question.

19          THE COURT:  Yes.

20          MR. LOWELL:  How did you know it was red and gold?  It

21   is red and gold, but how did you know that?

22          THE COURT:  I've gotten stuff from the State

23   Department in the past.  I don't know.  I think I was actually

24   thinking of the thing you get – and it's not the State

25   Department, it's Homeland Security – to show there's no record

181010broidyC                    Conference

1   of some illegal alien having gotten permission to reenter the

2   U.S. or something.  Everything that comes from the government

3   has fancy gold and red.

4          MR. LOWELL:  Thank you, Judge.  See you.

5              - - -

6   Certified to be a true and correct

7   transcript of the stenographic record

8   to the best of my ability.

9   _____

    U.S. District Court
10  Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25